*Exhibit A*

# In The Matter Of:

*CELLULAR COMMUNICATIONS EQUIPMENT LLC VS APPLE, INC., ET AL*

---

*September 9, 2016*

---

Original File 9916 Cce V Apple.txt
Min-U-Script® with Word Index

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF TEXAS
 2                   TYLER DIVISION

 3
    CELLULAR COMMUNICATIONS    )
 4  EQUIPMENT, LLC             )
                              )  DOCKET NO. 6:14cv251
 5      -vs-                   )
                              )      Tyler, Texas
 6                            )      8:33 a.m.
 7  APPLE INC., ET AL         )   September 9, 2016

 8              TRANSCRIPT OF TRIAL
 9  BEFORE THE HONORABLE K. NICOLE MITCHELL,
          UNITED STATES MAGISTRATE JUDGE
10
11              A P P E A R A N C E S
12  FOR THE PLAINTIFF:
13  MR. BRADLEY W. CALDWELL
    MR. JOHN AUSTIN CURRY
    CALDWELL CASSADY & CURRY
14  2101 Cedar Springs Rd., Suite 1000
    Dallas, Texas 75201
15
    MR. EDWARD R. NELSON III
16  NELSON BUMGARDNER PC
    3131 West 7th Street, Suite 300
17  Fort Worth, Texas 76107
18  MR. J. WESLEY HILL
    WARD, SMITH & HILL PLLC
19  1507 Bill Owens Parkway
    Longview, Texas 75604
20
21  COURT REPORTER:   MS. CHRISTINA L. BICKHAM, CRR, RMR
                      FEDERAL OFFICIAL COURT REPORTER
22                    300 Willow, Ste. 221
                      Beaumont, Texas 77701
23
24  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
25
```

Page 2

```
 1  FOR THE DEFENDANTS:
 2
    MR. DOUGLAS E. LUMISH
 3  MR. JEFFREY G. HOMRIG
    MS. LISA K. NGUYEN
 4  MR. BRETT M. SANDFORD
    LATHAM & WATKINS LLP
 5  140 Scott Dr.
    Menlo Park, California 94025-1008
 6
 7  MR. JOSEPH H. LEE
    LATHAM & WATKINS LLP
 8  650 Town Center Drive, 20th Floor
    Costa Mesa, California 92626-1925
 9
10  MR. ERIC H. FINDLAY
    FINDLAY CRAFT PC
11  102 N. College Avenue, Suite 900
    Tyler, Texas 75702
12
13
14       *******************************
15           P R O C E E D I N G S
16         (Jury out.)
17       THE COURT:  I know we've got a few issues to take
18  up this morning before we bring in the jury.  I also want to
19  give you your trial times as of the end of the day yesterday.
20       Plaintiff has used 6 hours and 51 minutes.
21  Defendant has used 5 hours and 1 minute.  And that's just on
22  the jury issues.
23       So what's the first thing we need to take up?
24       MR. LUMISH:  The first issue for me, Your Honor --
25  and this is Doug Lumish for Apple -- is Mr. Stattin's lawyer
```

Page 3

```
 1  told me yesterday that he needs to fly home to Sweden
 2  tomorrow.  I have discussed it with Mr. Hill.
 3       I think we have a solution that works for both of
 4  us, which we hope will work for the Court, which is they will
 5  start with Ms. Mewes today.  I understand their examination
 6  sounds like it will be about a half an hour.
 7       We'll do some redirect with Ms. Mewes, but if it
 8  looks like it's going to go longer than would allow
 9  Mr. Stattin to go up and down today, we'd like to state to
10  the Court that we're going to reserve the rest of our
11  questions, we have more questions for her, but that we're
12  going to reserve them in order to let Mr. Stattin go and get
13  home to Sweden, give them a chance to rest, call Mr. Stattin
14  and then go back to our witnesses and our case-in-chief.
15       THE COURT:  Any objection?
16       MR. HILL:  No, Your Honor.
17       THE COURT:  Okay.  That's great.
18       MR. LUMISH:  There's -- we were waiting for a
19  ruling from you on the key deposition designations which
20  we'll need to play the video at some point, but I don't think
21  you need to do that at this moment, Your Honor.
22       THE COURT:  Let me hear argument on that again.
23  I've reviewed the deposition.  I've the gotten notice from
24  you-all in light of the testimony yesterday.
25       MR. LUMISH:  It's fairly straightforward.  He's the
```

Page 4

```
 1  CEO of CCE.  He's the only CCE witness that would be
 2  appearing in this case.  We think the jury should hear from
 3  him.
 4       There's been an effort -- and I think we'll see
 5  more of an effort when our witnesses appear -- to paint them
 6  as having been cavalier or negligent about the way they went
 7  about this case; that they didn't review source code
 8  sufficiently; that they didn't do the things that CCE thinks
 9  they should have done in response to this case.  And I think
10  it's only fair to have some balance in that.
11       Mr. Key is the person who was sending letters back
12  and forth to Apple.  He's the one who's at the top of the
13  letterhead, as it were, on this case and this company.  And
14  this testimony goes to some of that.
15       In addition, it just is relevant to damages issues
16  as much as anything else.  They have presented the '820
17  patent as if it were the crown jewel and the most important
18  thing in the CCE portfolio.  And we think it's very clear
19  from Mr. Key's testimony that he didn't, at least, observe
20  that or -- or believe that.
21       THE COURT:  Okay.  Response.
22       MR. HILL:  Thank you, Your Honor.  Wesley Hill for
23  the Plaintiff.
24       Your Honor, we oppose the playing of Mr. Key's
25  deposition, for a couple reasons.
```

Page 29

1  Q.  And is this an e-mail you actually sent on or around
2  October 22nd, 2007, sir?
3  A.  I believe that's correct.
4  Q.  The attachments referenced something called:  MAC LTE
5  workshop v3.
6        What is the MAC LTE workshop?
7  A.  The MAC LTE workshop was an ad hoc that Ericsson
8  arranged in Helsinki in October 2007 to try to progress some
9  matters related to the 36.321 specification.
10  Q.  And why were you forwarding slides -- well, let me ask
11  you this:  There's a number of people listed in the "to" line
12  of the e-mail in the address.  So were those the people
13  involved in the workshop?
14  A.  Those were some of the people involved in the workshop,
15  those that I had the e-mail addresses of readily available.
16  Q.  Are there other people that participated in the workshop
17  that you know of or can remember now, that aren't listed
18  there in the e-mail addresses?  Mr. Sebire listed out who all
19  these people are.
20  A.  Yes.  There are more people that were present at that
21  workshop.  There were a number of more delegates or
22  representatives from Nokia and NSN.
23  Q.  Do you remember any particular names that aren't listed
24  here?
25  A.  From the top of my head, I recognize -- or I can't --

Page 30

1  yes -- Malkamaki and Lars Dalsgaard.
2  Q.  Just like it sounds?
3  A.  I believe so.
4  Q.  Would you mind spelling it, please, sir?
5  A.  Sorry.  I cannot spell it.
6  Q.  Okay.
7  A.  Lars is spelled L-A-R-S.  The last name, I regret I
8  don't recall how to spell it.
9  Q.  Okay.  We're in the same boat.
10        MR. LUMISH:  So let's turn to the slides, if we
11  could.  If we can go to Page 2 of this exhibit, 754, Page 2.
12  Q.  (By Mr. Lumish) You see again a reference to the MAC LTE
13  workshop, and there's dates there, 22nd through 23rd, October
14  2007.  What do those dates mean to you?
15  A.  Those dates are the dates where we had our discussions
16  on our LTE workshop.
17  Q.  And there's an Ericsson logo on these slides in the
18  bottom right corner.  Do you know why that's there?
19  A.  It's there because I produced this summary of our
20  discussions.
21  Q.  So are these slides that you yourself created then, sir?
22  A.  I created these slides, and possibly there's maybe input
23  from both Ericsson and other companies on them.  But I
24  created the slides.
25        MR. LUMISH:  Can we turn to DTX-754, Page 3?

Page 31

1  Q.  (By Mr. Lumish) So it will be the next page of your
2  exhibit if you're looking on the paper, sir.
3        And Mr. Schmoller is highlighting exactly what I wanted
4  to show you here, which is down towards the bottom, a
5  reference to when -- it says:  BSR is triggered when UL-SCH
6  resources are allocated and number of padding bits is larger
7  than the BSR size.
8        Do you see that statement, sir?
9  A.  I see that.
10  Q.  Can you tell me, first of all, what padding bits means
11  to you?
12  A.  Padding bits is -- they are bits, which are not filled
13  with data.  So they are leftovers, and they aren't used for
14  any particular purpose.  They just -- we need to fill the
15  protocol data unit up to the size that is expected by lower
16  layers in the mobile device.
17        And to do that, we add some bits, put them 0's or 1's or
18  a mix of 0's or 1's.  It depends on how it is specified.
19  Q.  You mentioned a protocol data unit.  What is that?
20  A.  That is the -- the units are blocks that are produced by
21  the protocol layer and sent further down in the protocol
22  stack to the lower layers to transmit them over the air.
23  Q.  Is a protocol unit a type of packet, data packet?
24  A.  Yes.  We actually -- we have these service data units
25  and protocol data units.

Page 32

1        Service data units is where data from higher layers,
2  from above, potentially user data, is coming in.
3        And protocol data units are where, after you have
4  processed them and put them together in a certain format or
5  arranged many different SDUs and some internal control
6  information, and then you output them as PDUs, protocol data
7  units.  That's on the sending side.
8        On the receiving side, it's the opposite.  Then you're
9  receiving the protocol data units, and then you demultiplex
10  and disassemble them and out comes service data units that
11  you are sending further up.
12  Q.  Does the number of padding -- let me ask you a different
13  question.  I'll withdraw that.
14        Are you familiar with something called the uplink grant
15  that would be provided to a phone or a tablet?
16  A.  Yes.
17  Q.  And can you tell us just briefly what your understanding
18  of an uplink grant is?
19  A.  An uplink grant is an indication that the mobile device,
20  the mobile phone or the tablet, has a right or permission to
21  send something from the mobile device to the network.  It
22  describes how much data and in which -- how it should be
23  encoded.
24  Q.  So, if the uplink grant says how much data can be sent,
25  does that relate in any way to the number of padding bits

Page 33

1 that may be found in a PDU or those protocol data unit
2 packets?
3 A.  Yes.  If, for instance, the grant says that the UE, or
4 the mobile device, should send 800 bits worth of data, and
5 there's only data maybe in some 700 bits in the terminal that
6 needs to be sent, then you'll have to add a hundred bits of
7 padding.
8 Q.  So the jury has heard a fair bit about something called
9 a padding BSR or a padding buffer status report.  Are you
10 familiar with that concept?
11 A.  I -- strictly speaking, there is no padding buffer
12 status report.
13 Q.  Are you familiar with the concept in the standard of
14 putting a buffer status report in a protocol data unit packet
15 to replace padding bits?
16 A.  Yes, I am.
17 Q.  Do you call that by any particular name?
18 A.  We call it buffer status report triggered by padding or
19 for padding --
20 Q.  Okay.
21 A.  -- for padding purposes.
22 Q.  In the case we've been referring to that as a padding
23 buffer status report.  So if I do that again, you'll know at
24 least what I'm talking about.
25     The sentence that we have up on the screen:  BSR is

Page 34

1 triggered when the UL-SCH resources are allocated and number
2 of padding bits is larger than the BSR size.
3     Is there a check here to determine the space available
4 in the protocol data unit or the uplink grant to determine
5 whether the buffer status report should be triggered and
6 sent?
7 A.  Sorry.  Could you repeat the first part of the question?
8 Q.  Sure.  It was long.  I apologize.
9     Does the sentence I read relate to checking the space
10 that's available in the uplink grant as it's reflected in the
11 PDU?
12 A.  Yes.
13 Q.  In what way?
14 A.  To know whether a buffer status report would fit in the
15 PDU, but in the place of padding you would need to check how
16 many bits are not used yet.
17 Q.  If you tried to fit a buffer status report into the
18 protocol data unit packet, that PDU packet, and there were
19 not enough padding bits, what would happen?
20 A.  You couldn't fit the entire report.
21 Q.  Can you say that again?  I'm sorry?
22 A.  You couldn't fit the entire report.
23 Q.  What would the logical thing -- well, let me ask you a
24 different question.
25     If you tried to first send -- let me start over.

Page 35

1     You're familiar with long and short form buffer status
2 reports, I assume?
3 A.  Yes, I am.
4 Q.  If you tried to send a long form buffer status report to
5 replace padding bits and it didn't fit, what would be the
6 logical thing to do, in your mind?
7 A.  I would think that --
8     MR. CALDWELL: Objection, Your Honor.
9 A.  -- the short --
10     MR. CALDWELL: Objection, Your Honor.
11     THE COURT: Mr. Stattin, hold on just a second --
12 Dr. Stattin.
13     MR. CALDWELL: He's offering expert testimony that
14 hasn't been disclosed.  We can approach if you would like.
15     THE COURT: Yeah, do.
16     (Bench conference.)
17     THE COURT: Okay.
18     MR. CALDWELL: Mr. Lumish asked him a question that
19 was -- this isn't disclosed here, so what would be the
20 logical next step in your mind?
21     So he's asking him to make sort of an obviousness
22 type extension of what's in the document, and that hasn't
23 been disclosed.
24     Just so you know, this man is literally not on
25 their Rule 26 disclosures at all.  The only reason he's even

Page 36

1 here period is because we're not going to raise tick-tack
2 stuff.  They incorporated by reference -- they incorporated
3 by reference AT&T's -- or T-Mobile's, and I think one of them
4 just says, you know, he was around for the 3GPP.  That's
5 fine.
6     But, I mean, the extension to try to draw
7 inferences that should have been disclosed.  And we,
8 obviously, have a motion in limine on the expert testimony
9 extensions.
10     MR. LUMISH: I'm not offering it as expert
11 testimony.  I'm not asking him to give an opinion.  I'm
12 asking as a percipient fact witness of ordinary skill in the
13 art how he reads the document.
14     THE COURT: I'm not going to let him go into what's
15 the logical next step --
16     MR. LUMISH: Okay.  Thank you.
17     (Bench conference concluded.)
18     MR. CALDWELL: Your Honor, I know that he began
19 answering that, and I don't know if we were talking over what
20 the transcript looks like; but obviously, we -- I would like
21 to clarify that the question and answer are stricken from the
22 record.  Because I was paying attention to you.  I wasn't
23 aware of how much he was starting to answer to the --
24     THE COURT: Okay.  The jury will disregard the last
25 question and answer.

CELLULAR COMMUNICATIONS EQUIPMENT LLC VS
APPLE, INC., ET AL

September 9, 2016

---

Page 37

1        Let's continue, Mr. Lumish.
2        MR. LUMISH: Thank you, your Honor.
3    Q.   (By Mr. Lumish) Can we turn to Defendants' Exhibit
4    DTX-756 in your binder, sir?  We'll bring up the cover of
5    that on the screen for you as well.
6        We have the same e-mail address issue here, but do you
7    recognize this e-mail, sir?
8    A.   Yes, I do.
9    Q.   It says in the subject -- or in the body there it says:
10   Dear all, please find the raw slides from today.
11       How do you pronounce that name that I see there?
12   A.   Janne.
13   Q.   Janne?
14   A.   Janne.
15   Q.   Janne, okay.  I'll do my best.  I apologize.
16       And who is that person?
17   A.   Janne was the head of our RAN2 delegation.
18   Q.   And was Janne part of -- what's the last name?  Let me
19   ask that first.
20   A.   Peisa.
21   Q.   Peisa.  And it's Mr. Peisa?
22   A.   It's Dr. Peisa.
23   Q.   Dr. Peisa.
24       Was Dr. Peisa involved in the MAC LTE workshop?
25   A.   He was.

---

Page 38

1    Q.   And what was his role?
2    A.   He was arranging it.
3    Q.   What do you mean by that?
4    A.   On behalf of Ericsson he contacted the participants and
5    invited them to the workshop.  And he arranged the meeting
6    venue so that we could be where we were.  And he also -- I
7    believe he chaired the meeting and provided notes and minutes
8    from the meeting.
9    Q.   So was -- who had the original idea, then, for the MAC
10   LTE workshop?
11   A.   It was an Ericsson idea.
12   Q.   Now, there are attachments to this document as well.  It
13   says:  MAC LTE workshop v3.zip.
14       Are these the same slides that we saw before, or are
15   they different somewhat?
16   A.   These, I believe, are different.  These are the output
17   from the entire workshop.
18   Q.   And what do you mean by that?  What's the -- what do you
19   mean by the output from the entire workshop?
20   A.   They -- they captured the agreements made during the
21   workshop.  On some topics we were able to draw some
22   conclusions and companies could -- could agree on a common
23   solution.
24       On certain other topics or details, there was no
25   consensus.

---

Page 39

1        But these slides, I believe, capture those things which
2    were agreed.
3    Q.   What was the process you went through in trying to reach
4    consensus among the workshop members?  Can you describe for
5    us, and maybe put us in the moment, of what you guys were
6    doing and how -- how you were doing it, please?
7    A.   It was a long time ago; but as usual, at these kind of
8    meetings, we presented the views.  I presented part of the
9    views from Ericsson.
10       I -- if I recall correctly, Janne presented some other
11   views from Ericsson on another topic.
12       Other companies presented their views and their
13   preferred solutions.  And then we had long discussions on the
14   pros and cons of different solutions and whether we could
15   sort of align on particular solutions so that we could show
16   that we had a common understanding of where to go with the
17   standard.
18   Q.   Did -- did everybody in the workshop contribute to the
19   ideas that were being provided or was it a smaller subset?
20   A.   I believe all companies at the workshop contributed to
21   the discussions.
22   Q.   And did you personally contribute to the discussions?
23   A.   I did.
24   Q.   And did you observe Dr. Peisa contributing to the
25   discussions and -- and trying to reach consensus?

---

Page 40

1    A.   I did.
2    Q.   Can I ask you to look at DTX-756, Page 9, please?  And
3    we'll bring it up on the screen.
4        There is a reference down towards the bottom.  It says:
5        Would prefer two formats:  Single byte format when only
6    one radio bearer has data to transmit; multi-byte format when
7    only several radio bearers have data.
8        Now, the jury has heard, I think, quite a bit about long
9    and short form buffer status reports.  Does this -- these
10   statements here about formats relate to the notion of long
11   and short form buffer status reports?
12   A.   In my opinion, yes, they do.
13   Q.   In what way?
14   A.   A single byte format is a shorter format than the
15   multi-byte format.
16   Q.   And can you tell from the description here when one
17   would use a single byte format versus a multiple byte format
18   in the context of the workshop discussions?
19   A.   Yes.  This would indicate that in case there is data on
20   only radio bearer or radio bearer group, then you would use
21   the single byte format to avoid the overhead of reporting
22   that there is no data on the other bearers.
23       And in case -- the second sub-bullet.  In case you would
24   have data on multiple radio bearers or radio bearer groups,
25   then the multi-byte format would be used to convey

---

**Page 41**

1  information about the data available on more than one group.
2  Q.  At the very top of the slide, it says:  Buffer Status
3  Reporting.  The buffers aren't mentioned in the sentences
4  we've highlighted on the center of the screen there.
5      When you talk about radio bearers and radio bearer
6  groups, does that relate to buffers and the status reports
7  for those buffers?
8  A.  Yes, it does.
9      And, generally, it was understood that there could be
10  radio bearers and logical channels and queues and buffers.
11      And each queue or radio bearer or logical channel would
12  have a buffer.  And consequently, also, if you group the
13  radio bearers and logical channels, there would be a buffer
14  for the group of bytes.
15  Q.  Let me ask you, please, to turn to Page 11.  So DTX-756,
16  Page 11.  We'll bring that up on the screen for you.
17      This slide starts with High-Level Format Summary.  And
18  in the middle of the slide, it says:  2 formats.  Can you
19  tell from the slide, sir, what is -- what things or formats
20  are being referred to here?  Is it buffer status reports or
21  something else?
22  A.  It's buffer status report formats.
23  Q.  So in the first part, it says:  2 formats, 1 byte format
24  with Group-ID + Absolute size.  And then it's -- the thing in
25  parentheses is what I want to ask you about.

**Page 42**

1      Is that the same short form buffer status report that we
2  looked at a couple of slides earlier?
3  A.  That would be my understanding.
4  Q.  And what do you read "(if only one group to report)" to
5  mean?
6  A.  That you would use this format if there's data in only
7  one group, a radio bearer group or logical channel group.
8  Q.  And then it says:  3 byte fixed size format.
9      Is that the same long form buffer status report we
10  talked about earlier?
11  A.  I believe so.
12  Q.  And if we jump down just a little bit on the page --
13      MR. LUMISH:  Mr. Schmoller, could you bring up the
14  last two bullets for me, please?
15      I want the -- yeah, that one as well.  Thank you.
16  Q.  (By Mr. Lumish) So one says:  Only one set of triggers
17  for both formats.
18      Do you see that?
19  A.  Yes, I see that.
20  Q.  What does the word "triggers" mean to you here?
21  A.  The trigger here, to me, means the events that triggers
22  the need or the transmission of a buffer status report.  And
23  it's not -- this trigger does not describe whether it's going
24  to be a long or short.  That's described based on the buffer
25  status.

**Page 43**

1  Q.  That was my question.  I wasn't sure if it related to
2  the format selection or not.
3      Now, the next sentence says -- or the next bullet says:
4  How to choose the format.
5      Is this then describing the selection criteria for
6  choosing long versus short?
7  A.  Yes.
8  Q.  And it says:  How to choose the format.  Based on how
9  many groups need to report, based on amount of data in the
10  buffer.
11      When it says:  Based on how many groups need to report,
12  how do you read this slide in the selection criteria for long
13  versus short buffer status reports?
14  A.  I would read this as -- it would depend on how many
15  groups were expected to be reported.  And then the criteria
16  for what is needed to be reported that -- it's a little bit
17  vague here, and it -- my understanding is that may be so that
18  companies didn't fully agree on the exact criteria at the
19  meeting.
20      However, there was input to the meeting, as we saw on
21  the previous page, on Page 9, I believe it was, where one
22  solution was described.  And I believe that was the Ericsson
23  idea provided to the workshop.
24  Q.  Tell us again, then, what you believe the Ericsson idea
25  provided to the workshop was, as far as the selection

**Page 44**

1  criteria for choosing short versus long buffer status
2  reports.
3  A.  My understanding is that the Ericsson idea was to report
4  data for non-empty radio bearers.  And that would be that you
5  use a short report if there is data on one group or radio
6  bearer, and you use a long format if there is data available
7  for transmission on multiple radio bearers or radio bearer
8  groups.
9  Q.  And who put that idea, both on Page 9 and Page 11 of the
10  slides, into this PowerPoint that we're looking at as
11  Exhibit 756?
12  A.  I believe Janne Peisa provided these slides, and he may
13  have put them there.
14  Q.  Do you believe it came from Ericsson or from companies
15  other than Ericsson?
16  A.  I believe that the first part on Slide 9, what we
17  referred was coming from Ericsson, and the other part on
18  Slide 11, that was the output or the contribution at the
19  workshop.  So that would be the joint.
20  Q.  And I showed you the dates on the cover before.  It was
21  October 22nd through 23rd of 2007.  Was it the first time --
22  was the LTE -- MAC LTE workshop the first time that Ericsson
23  had the idea of choosing a long or short buffer status report
24  based on the number of radio bearer group buffers that needed
25  to report data?

Page 45

1  A.   No, it was not.
2  Q.   Do you know when the first time was?
3  A.   To my understanding, we filed a patent application in
4  the summer of 2006 suggesting the use of multiple different
5  formats to improve efficiency and precision of buffer status
6  reporting.
7        THE COURT: Mr. Lumish, in the next few minutes,
8  whenever you get to a good stopping point, we need to take
9  our morning break.
10       MR. LUMISH: Perfect time right now, Your Honor.  I
11 was about to switch documents.
12       Thank you.
13       THE COURT: Very good.
14       All right.  Ladies and Gentlemen of the Jury, we'll
15 be in recess until 10:45.
16       COURT SECURITY OFFICER: All rise.
17       (Jury out.)
18       THE COURT: I have to take care of a quick criminal
19 matter on our break, so I just need you to make room for our
20 incoming attorneys.
21       Thank you.
22       (Recess.)
23       (Jury in.)
24       THE COURT: Please be seated.
25       Mr. Lumish.

Page 46

1        MR. LUMISH: Thank you, your Honor.
2  Q.   (By Mr. Lumish) Dr. Stattin, I'd like to turn you now to
3  DTX-569.  And it's a document we've seen several times in
4  this case, and it's been referred to, at least by me, as a
5  joint proposal with Ericsson and others.
6        Do you recognize Exhibit 569?
7  A.   I do.
8  Q.   Did you have a role in the creation of Exhibit 569 --
9  well, let me ask this, I can tell you're puzzled.  Let me
10 start with, is there a relationship between this document --
11 let me start again.
12       Tell me what you understand this document to be.
13 A.   My understanding is that this document is the output
14 from -- or it's capturing the output from the -- this
15 workshop and we made a joint contribution to the RAN2 Working
16 Group.
17 Q.   When you say "capturing the output from the workshop,"
18 do you mean the MAC LTE workshop we talked about before?
19 A.   Yes, I do.
20 Q.   And when you said "we," do you include the people who
21 are listed -- or the companies that are listed as sources on
22 the top of Exhibit 569?
23 A.   Yes, I do.
24 Q.   Did the -- did you at least, and any other people at
25 Ericsson by your observation, read and participate in the --

Page 47

1  the -- the ideas that are provided in Exhibit 569?
2  A.   Yes.  We -- at Ericsson, we reviewed this document that
3  was drafted by Mr. Sebire and checked that it was in line
4  with the contributions at the workshop.
5  Q.   And do you feel that you and Ericsson contributed ideas
6  to this proposal, this joint proposal to the RAN2 Working
7  Group?
8  A.   Yes, I do.
9  Q.   What ideas do you believe you helped contribute?
10 A.   For instance, I believe we contributed the idea to use
11 multiple different buffer status reporting formats.
12 Q.   The --
13       MR. LUMISH: If we could turn to Page 2 of the
14 exhibit, if you'll look at DTX-569, Page 2, and I'd like the
15 text above and below.
16       Thank you.
17 Q.   (By Mr. Lumish) So we've spent a fair amount of time in
18 this case on these -- this part of the joint proposal as
19 well.  And I'll just look at some of the text at the top
20 there.  It says:  Since it is not necessary to report the
21 four RBGs always...
22       What does that mean to you?
23 A.   It means that when there is no information about --
24 nothing to report on all of these radio bearer groups, it
25 could be that they're not -- some of them are not configured

Page 48

1  or some of -- of that some of them have no data.
2  Q.   So you have a statement in parentheses there, and I want
3  to jump ahead to the end of that line.  It says:  It is
4  proposed to introduce two formats of BSR:  One where only one
5  RBG is reported and one where all four RBGs are.
6        And then it describes the number of bits and refers to
7  the figures below it.  Do you see that?
8  A.   I see that.
9  Q.   And did Ericsson have any role in the text I just read
10 and the figures that we see below of the short and long form
11 buffer status report?
12 A.   It looks consistent with ideas we've had at Ericsson.
13 Q.   And then you have Proposal 6 at the bottom.  It says:
14 There are two types of BSR, a short BSR reporting the status
15 of one RBG only, 1 byte long; and a long BSR reporting the
16 status of the four RBGs, 3 bytes long.
17       Do you see that?
18 A.   I see that.
19 Q.   And does this text and looking at the figures tell you
20 when you would choose a long and when you would choose a
21 short as a reader of the joint proposal?
22 A.   If you only read the Proposal 6 and the figures -- and
23 the figures, then it doesn't necessarily tell you-all about
24 when to use which.
25 Q.   Would you know at least, though, you would use the short

Page 49

1  form buffer status report if there was only one radio bearer
2  group that had data in the buffers to report?
3  A.  Could you repeat that question, please?
4  Q.  Sure.
5     The -- we start with the figure.  It says:  Buffer size,
6  6 bits.
7     Do you see that?
8  A.  I see that.
9  Q.  And is that a size that's intended to hold data from one
10  buffer or more than one buffer?
11  A.  It's there to show our -- disclose the amount of data
12  available on one radio bearer group.
13  Q.  One radio bearer group.  Is that different from buffer,
14  though?  I want to make sure we're on the same page with
15  that.
16  A.  Depends on how you read it.  It's a buffer size of --
17  pertaining to an aggregate of a number of radio bearers.
18  Q.  And then -- but these are buffer status reports, so
19  they're reporting on buffer data for radio bearer groups; or
20  do I have that wrong?
21  A.  It's -- what is meant here is that it's the sum of the
22  buffers of the individual radio bearers in the one group.  So
23  it's the amount of data available for transmission on all
24  other radio bearers within a group collectively.
25  Q.  And then it's -- the text that's highlighted in green

Page 50

1  below says that:  The short BSR reporting the status of one
2  RBG only.
3     Does that tell you when you would use the short buffer
4  status report as far as how many radio bearer groups were
5  reporting data?
6  A.  In the view of some it would.  And I think different
7  readers may have different understandings of that.
8  Q.  Okay.  What does it tell you?
9  A.  To me, it was in line with the Ericsson proposal to have
10  a short buffer status report if you would have data only on
11  one radio bearer group.
12  Q.  And is it in line with your view of when you would
13  have -- when you would use the long buffer status report?
14  A.  It's in line with that.
15  Q.  And when would you use the long buffer status report
16  again?
17  A.  When you have data on more than one radio bearer group.
18     MR. LUMISH: If we could go to DTX-757, please.
19  Q.  (By Mr. Lumish) I don't know if you've seen this one
20  before.  It's an e-mail from Mr. Sebire, and it's to a number
21  of people.
22     By the way, I don't think this e-mail does it, but I
23  wanted to ask you one question, which is there's some e-mails
24  where your name is referenced as magnus.lindstrom instead of
25  magnus.stattin; is that right?

Page 51

1  A.  Yes.
2  Q.  And can you tell us why that is?
3  A.  Yes.  When I married, my wife had a name, which was not
4  very common.  Her maiden name was not very common.  And my
5  name was -- last name was Lindstrom.  It was a very common
6  name, and she didn't really feel like changing to a more
7  common name than she already had.
8     So we looked into our families' history, and we found
9  out the maiden name of my grandmother on my father's side, it
10  was a rather uncommon name, which was disappearing from our
11  branch of the family, so we decided to change names, both of
12  us, to Stattin instead of taking either Lindstrom or my
13  wife's maiden name.
14     MR. LUMISH: So, if I now can go back to
15  Defendants' Exhibit 757, please.
16  Q.  (By Mr. Lumish) It's an e-mail from Mr. Sebire to the
17  working group.  We've seen this before here in the trial.
18     But I wanted to direct your attention to a sentence at
19  the top that CCE's counsel has focused on.
20     The e-mail says:  Attached please find a contribution on
21  the BSR I quickly drafted based on Samsung & Nokia-NSN
22  previous contributions.
23     Do you see that?
24  A.  I see that.
25  Q.  So, Dr. Stattin, you'll see that there is, I think, an

Page 52

1  early draft of the joint Ericsson contribution that begins on
2  the next page, DTX-757, Page 2.
3     Did you read what Mr. Sebire was saying here to mean
4  that all the ideas in the joint contribution came only from
5  Samsung and NSN?
6  A.  No, I did not.
7  Q.  How did you read it, if you recall, when he said:  Based
8  on Samsung and Nokia-NSN proposal?
9  A.  I understood it to mean that he had used parts or pieces
10  of text coming from those previous contributions to describe
11  certain aspects.
12     And then in addition to that, the proposals, they were
13  describing the conclusions from our MAC workshop.
14  Q.  And then counsel -- we've both actually looked at with
15  the jury the third bullet down in the e-mail body.
16     It says:  The selection of which BSR (long/short) is not
17  discussed (running out of steam now.)
18     Do you see that?
19  A.  Yes.
20  Q.  Do you recall reading that when you got it from
21  Mr. Sebire?
22  A.  Yes.
23  Q.  And what did you take "(running out of steam now)" to
24  mean?
25  A.  He was on a flight back from Helsinki.  I believe it was

Case 6:14-cv-00251-KNM   Document 283-1   Filed 09/13/16   Page 10 of 21 PageID #:  11064
CELLULAR COMMUNICATIONS EQUIPMENT LLC VS
APPLE, INC., ET AL

September 9, 2016

Page 53

1  a long-haul flight, so I took it to mean that he was tired
2  and didn't have the energy to complete all aspects of what we
3  had contributed at the meeting.
4  Q.  Did you take it to mean that Mr. Sebire hadn't yet
5  conceived of all of the ideas for selecting long versus short
6  buffer status reports on his own and separate from the
7  workshop?
8  A.  Now, that, I don't know.  I know that we discussed this,
9  how to select long and short at the workshop, but he did not
10  include that in the contribution for some reason.
11     My take on it was, from reading this, that he was too
12  tired to do it and that he didn't feel it was urgent to
13  propose that in 3GPP at that moment.  We had made substantial
14  progress or consensus in this group of companies to drive
15  progress in 3GPP, and then we could add this aspect later.
16  Q.  So you mentioned that you had the ideas before the
17  workshop and during the workshop of selecting a short buffer
18  status report when there's only one buffer to report data and
19  a long when there was more than one.  Did you share those
20  ideas with the workshop members?
21  A.  We did.
22  Q.  Now -- and did that include Mr. Sebire?
23  A.  Yes.
24  Q.  I want to turn your attention, please, to Plaintiff's
25  Exhibit 296.

Page 54

1     And this is an e-mail.  It says it's from, as I read it,
2  Dr. Peisa to Mr. Sebire, and I believe it cc's the Workshop
3  Group.  And it's really the first sentence there that I want
4  to focus your attention on.
5     It says:  Thanks a lot for the contribution, excellent
6  work.
7     Do you see that?
8  A.  I do.
9  Q.  Did you take that to mean that Ericsson or Dr. Peisa was
10  acknowledging in some way that Mr. Sebire had conceived of
11  all of the ideas in the Ericsson joint proposal all on his
12  own?
13  A.  No.
14  Q.  What did you take it to mean?
15  A.  I understood it to mean that we were very grateful that
16  someone -- in this case, Mr. Sebire -- had taken the time to
17  put down in a joint contribution form the conclusions and
18  suggestions from the -- our joint workshop.
19  Q.  Can you turn to Defendants' Exhibit 570 for me, please?
20     And I would like you to look at it on the binder so you
21  may want to compare them.
22     We've done this for the jury before.  I won't do it
23  again in any detail, but what you see on the screen now and
24  in your binder is the cover of the Ericsson proposal -- the
25  joint Ericsson proposal, I should say, Defendants'

Page 55

1  Exhibit 570.  That's color-coded.
2     Do you see that?
3  A.  Yes.
4  Q.  And I won't ask you to do this, in the interest of time,
5  because I want to make sure CCE's lawyers have a chance to
6  ask you their questions so we can get you home to Sweden
7  tomorrow.
8     But if you look at 572 [sic] and you flip through it,
9  you'll see color-coding in what is the original application
10  filed for the patent application in Mr. Sebire's name.
11  Have you seen Exhibit 572 [sic] before?
12  A.  Not in this moment.
13  Q.  And you'll see the color-coding there.  I'll just
14  represent to you, sir, so you don't have to do the work, that
15  the colors match up -- and we've shown this to the jury
16  already -- they match up to the joint Ericsson proposal.
17     Before you got pulled into this lawsuit, did you know
18  that the text from the joint Ericsson proposal had been
19  copied into a patent application for Nokia?
20  A.  No, I did not.
21  Q.  What was your reaction when you found out?
22  A.  Surprised.
23  Q.  I've got a lot more questions for you, but I'm very much
24  interested in making sure you get home, so I'm going to just
25  jump to the end here.

Page 56

1     When CCE's lawyer comes up in a couple of moments, I
2  think he's going to ask you eight ways to Sunday and maybe in
3  a dozen different ways whether the people in the Working
4  Group and the 3GPP sit around and talk with each other about
5  all of their patents.
6     You don't do that, do you?
7  A.  We don't do that.
8  Q.  But that's not really what I want to know.  What I'd
9  really like to understand is:  Would you put your name, and
10  only your name, on a patent application that covered the
11  combined efforts and contributions of a team of people?
12  A.  No, I would not do that.
13  Q.  Why not?
14  A.  Because it's not my -- only my work.  It's not only my
15  ideas.
16  Q.  If you had worked with a team of people to come up with
17  ideas and you thought you should be able to patent some of
18  those just to yourself, do you think you would talk to them
19  about it before you did that?
20  A.  I would.  I would check whether they felt that they had
21  contributed.
22  Q.  And did Mr. Sebire or anybody from Nokia ever ask you
23  whether you thought you should be named as an inventor on the
24  '820 patent?
25  A.  No.

Case 6:14-cv-00251-KNM  Document 283-1  Filed 09/13/16  Page 11 of 21 PageID #:  11065
CELLULAR COMMUNICATIONS EQUIPMENT LLC VS
APPLE, INC., ET AL

September 9, 2016

---

Page 57

1 Q.  Sir, I want to -- on behalf of my client, Apple, I want
2 to extend our sincere thank you to you.  I know this has been
3 a terrible imposition for you.  I hope you enjoyed your time
4 here in Texas.  Thank you very much for your testimony.
5        MR. LUMISH: Pass the witness, your Honor.
6        THE COURT: All right.
7              CROSS-EXAMINATION
8 BY MR. CALDWELL:
9 Q.  Good morning, Mr. Stattin.
10 A.  Good morning.
11 Q.  How are you?
12 A.  Fine.  Thank you.  How are you?
13 Q.  Fine.
14      Were you suggesting to the jury that you had never
15 talked with Apple's lawyers?
16 A.  No.
17 Q.  You have talked with Apple's lawyers prior to your
18 testimony, correct?
19 A.  I talked to Apple's lawyer on a video call.
20 Q.  On a video call, what, was it about a week ago, ten days
21 ago, something of that nature?
22 A.  Probably two weeks ago.
23 Q.  You didn't mean to suggest that you had not talked with
24 Apple's lawyers to prepare at all for this trial, correct?
25 A.  No.

---

Page 58

1 Q.  And we've actually not met, correct?
2 A.  Excuse me?
3 Q.  You and I have actually not met.
4 A.  We have not met.  I met Mr. Cecil.
5 Q.  Right.  Well, my name is Brad Caldwell, and I represent
6 CCE.  It's nice to meet you.
7      Do you feel it's important for you to be here on behalf
8 of Ericsson today?
9 A.  I was asked to but not to be here today by Ericsson
10 Legal.
11 Q.  Just -- do you feel it's important for you to be here
12 today?
13 A.  It was -- my employer asked me to, so I feel that it is
14 important that I do what I'm asked to do.
15 Q.  Now, just to get one thing real clear, in your testimony
16 you did not tell the jury that you or Ericsson or anyone else
17 at any of those meetings contributed to something that
18 Mr. Sebire claimed in his patent claims, correct?
19 A.  I don't know because I haven't read his patent
20 application.  And I haven't studied it in detail.
21 Q.  So is it correct that you did not tell the jury that you
22 or Janne or anyone else at the meeting contributed anything
23 to Mr. Sebire's patent claims?
24 A.  I don't know.
25 Q.  You don't know if you told the jury?

---

Page 59

1 A.  I didn't tell the jury that we did not, and I didn't
2 tell the jury that we did, because I haven't studied the
3 application.
4 Q.  Are Apple and Ericsson adversaries?
5 A.  Not that I know of.
6 Q.  I mean, you're familiar with Apple, correct?
7 A.  I am.
8 Q.  Are they competitors?  Do they compete, for example, in
9 the base station market?
10 A.  No.
11 Q.  Are you aware of any markets where Apple and Ericsson
12 compete?
13 A.  Not immediately.
14 Q.  Are Ericsson and Nokia-NSN competitors?
15 A.  They are two vendors in the same market.
16 Q.  Is that yes?  They are competitors?
17 A.  In some sense -- in some sense we are competitors, yes.
18 Q.  Before LTE was released, did Mr. Sebire's company notify
19 the other participants in the standard setting community that
20 a patent application had been filed on his idea?
21 A.  I don't know.
22 Q.  So am I correct that you are not here contending that
23 Mr. Sebire has patent claims on something that is not his
24 idea?  Am I correct about that?
25 A.  I don't think that's my responsibility.

---

Page 60

1 Q.  Am I correct that you are not here making that claim,
2 sir?
3 A.  I'm not making any claims.  I am here to provide the
4 facts I know.
5 Q.  You've seen a joint proposal that counsel for Apple
6 usually refers to as the Ericsson proposal and sometimes
7 refers to as a joint Ericsson proposal.  Do you remember
8 that?
9 A.  I do.
10 Q.  Do you think it's fair to call that proposal an Ericsson
11 proposal?
12 A.  I think it is a joint proposal.  It's a joint
13 contribution by the companies listed on the source.
14 Q.  So for purposes of presenting the facts to the jury, is
15 it more accurate to call it a joint proposal or an Ericsson
16 proposal?
17 A.  I'm not a lawyer, so I wouldn't know.
18 Q.  Would you call it an Ericsson proposal, sir?
19 A.  I would call it a joint proposal or an Ericsson proposal
20 or something proposal.
21 Q.  So you would call it an Ericsson proposal?
22 A.  That's a possibility.
23 Q.  Did Ericsson draft it?
24 A.  Ericsson did not draft the document.
25 Q.  Now, when a proposal is joint -- and let's say

---

Page 61

1  Ericsson's name is on it -- does that mean that Ericsson
2  conceived of the ideas in the proposal, or does it mean that
3  Ericsson is willing to co-sponsor or co-sign the proposal?
4  A.  That varies.
5  Q.  You can't tell from Ericsson's name being listed on the
6  cover as one of the sponsors whether or not that means
7  Ericsson contributed to the ideas, correct?
8  A.  No, you cannot.
9  Q.  I think this may have been dealt with just -- aptly at
10  the end of your direct.  But just to be clear, when you go to
11  these meetings, do you tell Mr. Sebire and other folks at the
12  meeting that you filed a patent application?
13  A.  No, I don't.
14  Q.  And is that because the goal of the meetings is to work
15  towards the best technical standard?
16  A.  It's because the meetings are focused on the technical
17  aspects.
18  Q.  Would you agree that the companies in the working group
19  make decisions based on the contributions, not patent
20  applications?
21  A.  The group doesn't see patent applications so decisions
22  and product specifications are made based on contributions.
23  Q.  And, Mr. Stattin, some ideas are rejected, right?
24  A.  Yes.
25  Q.  As the rapporteur, did you get to just force ideas in to

Page 62

1  the standard without discussion and approval?
2  A.  No.  No, I did not.
3  Q.  And so sometimes someone proposes an idea, and they
4  explain why they like it, and does the group say, no, we
5  don't agree?  Does that happen?
6  A.  It happens.
7  Q.  Do sometimes companies present competing proposals of
8  how to solve the problem?
9  A.  Yes, they do.
10  Q.  And do you just put the two competing results in the
11  standard, or do you figure out which one is best?
12  A.  That is what I devised this long -- at times very long
13  discussions would go on for many meeting cycles.  Some
14  disagree, but one tries to find a common way for trying to
15  form a consensus for which to deduce.
16  Q.  Now, are -- in that situation when people are having
17  that debate, are the participants in the working group
18  prevented from speaking their mind about what they think is
19  the best proposal?
20  Do you ever tell someone they have to stay quiet?
21  A.  No, never.
22  Q.  Do they get a chance to say, I like this proposal or I
23  like that proposal?
24  A.  Yes.
25  Q.  Do they get to say, you're proposing something that

Page 63

1  we've already rejected before?
2  A.  They can say that, but it depends on -- on the group
3  whether that is still considered again or not.
4  Q.  Do you file patent applications on ideas that you
5  contribute to a working group?
6  A.  Yes.
7  Q.  And I won't ask you any specifics.  This is just a
8  yes/no question.  Do you get compensated by your company when
9  you file patent applications?
10  A.  Yes.
11  Q.  When you file the patent application, as a delegate, is
12  it part of your duty that you need to stand up and interrupt
13  the meeting -- or sit and interrupt the meeting -- and tell
14  the other members that you've got relevant intellectual
15  property rights you're pursuing?
16  A.  No.
17  MR. CALDWELL: Can I see Plaintiff's Exhibit 149 at
18  Page 25?
19  Actually, if we could just go to the first page.
20  I'm sorry there, Mr. Evans.
21  Q.  (By Mr. Caldwell) Do you recognize the document that's
22  shown on the screen, sir?
23  A.  I do.
24  Q.  36.321, that was the portion of the standard where you
25  were rapporteur, correct?

Page 64

1  A.  That's correct.
2  Q.  When was that portion of the standard finalized?
3  A.  It's still being developed and -- and evolved.  But the
4  first version was, to my recollection, completed -- I believe
5  it was in December, 2008.
6  Q.  Now, are you familiar with the contents of this
7  document?
8  A.  Yes, I am.
9  MR. CALDWELL: Could I see Page 25.
10  Q.  (By Mr. Caldwell) Are you familiar with the Section
11  5.4.5, buffer status reporting?
12  A.  Yes.
13  Q.  And then starting partway down, do you see that there's
14  a description of buffer status report shall be triggered?  Do
15  you see that?
16  A.  I see that, yes.
17  Q.  Is there a difference between triggering a buffer status
18  report and having criteria to determine whether it is long or
19  short?
20  A.  Yes.
21  Q.  What is that difference, sir?
22  A.  The triggering is related to whether the buffer status
23  report shall be transmitted at all, whereas the selection
24  about which format to use is based on other criteria.
25  Q.  Has Mr. Sebire ever said, I claim to have invented

CELLULAR COMMUNICATIONS EQUIPMENT LLC VS
APPLE, INC., ET AL
September 9, 2016

---

Page 65

1  triggering buffer status reports?
2  A.  I don't know.  Not to me.
3  Q.  Are you aware -- do you have any reason to think that in
4  this court case he has taken the position that he invented
5  triggering of buffer status reports?
6  A.  I don't know.  I haven't -- haven't been here in
7  listening to Mr. Sebire.
8          MR. CALDWELL: Can we flip to the next page, sir?
9          Just kind of grab maybe the top 40 percent of the
10  page, something like that.
11  Q.  (By Mr. Caldwell) Now, do you see these portions of
12  5.4.5?
13  A.  Yes.
14  Q.  And it's -- I don't want to read it all, but:  For
15  regular -- I'll read a portion of it.  Is that okay?
16      For regular and periodic buffer status reports:  If more
17  than one LCG has data available for transmission in the TTI
18  where the BSR is transmitted, report long BSR; else report
19  short.
20      Correct?
21  A.  Yes.
22  Q.  And then the next one is:  The number of padding bits is
23  equal to or larger than the size -- and it goes on.
24      Were you the rapporteur who put this in the standard?
25  A.  I don't recall when this was put into the standard and

---

Page 66

1  whether I drafted the document doing that.  Up to the point
2  where the document -- the specification was put under change
3  control, I was providing the text and the input.
4      And after it was put under change control, then also
5  other companies could propose change requests to the
6  specification.
7  Q.  Just to be real clear, when you say you drafted the
8  document putting this into the standard, are you saying,
9  after someone proposed it, you typed it into 36.321, or are
10  you saying you're the person who proposed that text for
11  inclusion in 36.321?
12  A.  I didn't quite follow.  Did I say that I drafted the
13  text?
14  Q.  I thought you did.
15  A.  I believe I said that up to the point that the
16  specification was put under the change control, I drafted
17  document, the text which went into the specification.
18      After that point, it was also possible for other
19  companies to propose changes and change requests.
20  Q.  And I'm not talking about, like, the possibility of
21  change requests at the end.  I just want to be real clear.
22      When this text that's in the area -- when this text
23  that's in that area (indicating) was added in 5.4.5, are
24  you the person who came up with the text that would be
25  included in 5.4.5 or not?

---

Page 67

1  A.  I don't recall.
2  Q.  Is that a contribution from Benoist Sebire?
3  A.  Which part?
4  Q.  The same portion, sir.  (Indicating.)  Is that a
5  contribution from Benoist Sebire?
6  A.  I believe this is a contribution that is containing the
7  parts that was agreed in this workshop, plus some parts which
8  may have been added later.
9  Q.  By whom?
10  A.  I don't recall.
11      May I ask for clarification of the question?
12  Q.  Certainly.
13  A.  Do you mean by whom -- who wrote the text that went into
14  this specification or the --
15  Q.  Yes, sir.
16  A.  -- who contributed the proposal to 3GPP or who disclosed
17  the idea the first time?
18  Q.  Who wrote the text that's in the specification?
19  A.  If this was prior to releasing and the closure of the
20  release, then it might have been myself.
21  Q.  It might have been you?
22  A.  (Nods head affirmatively.)
23  Q.  You're not telling the jury that it was you; you're just
24  saying that's a possibility?
25  A.  Depends on when it was done.  I didn't go back and

---

Page 68

1  check.
2  Q.  All right.  Now, the next option -- who put that in a
3  proposal -- that information, that criteria in a proposal to
4  3GPP?
5  A.  The -- some of the text was put in a proposal to 3GPP by
6  these joint companies, these companies in the joint
7  contribution.
8  Q.  Anyone else separate from that joint contribution?
9  A.  As I said, I don't recall all of the details on what
10  happened as to that.
11  Q.  Do you recall showing us these -- do you recall showing
12  us these PowerPoint-type presentations that had some Ericsson
13  logos on them?  They were, I think, Defendants' Exhibits 754
14  and 756.
15      And the question is just whether you recall showing
16  these to us.
17  A.  Sorry.  What was the question?
18  Q.  Do you recall showing the jury Defendants' Exhibits 754
19  and 756 that had the Ericsson PowerPoints?
20  A.  I recall they were shown to the jury, yes.
21  Q.  What is the significance of text that is in bold versus
22  text that is not in bold in those presentations?
23  A.  My understanding is that the text in bold is the
24  conclusion -- is the conclusion from the workshop; whereas,
25  the text not in bold are parts which were discussed but may

---

Page 69

1 not have been accepted by all companies.
2 Q. Or maybe it's unanswered questions that need to be
3  addressed, correct?
4 A. Oh, I understand that a lot of the text was input to
5  the workshop.
6 Q. My question is this, though: If there are things that
7  are not in bold, it may represent unanswered questions that
8  still need to be resolved, correct?
9 A. If there is a question mark, yes.
10 Q. And we've seen a question mark in an unbolded sentence
11  in this case, haven't we?
12 A. Where?
13      MR. CALDWELL: Can you flip to 756-011, sir?
14 Q. (By Mr. Caldwell) Do you remember this page,
15  Mr. Stattin?
16 A. I do.
17 Q. The group specifically left unresolved "what to do when
18  short format fits but long one does not," correct?
19 A. That was -- there was no conclusion on that.
20 Q. And there's no place we can flip to in this document to
21  find an answer to that question, is there?
22 A. I don't believe that there is in this document, no.
23 Q. Are you aware of any other documents that answer that
24  question before Mr. Sebire did?
25 A. I don't -- I'm not aware of a document presenting that,

Page 70

1 and I'm not aware whether Mr. Sebire did or not.
2 Q. Do you have any reason to believe --
3      MR. CALDWELL: I'm sorry. Thank you.
4 Q. (By Mr. Caldwell) Do you have any reason to believe that
5  Mr. Sebire has ever taken credit for inventing the concept of
6  having short buffer status reports and long buffer status
7  reports?
8 A. No.
9      MR. CALDWELL: Could we see Defendants' Exhibit
10  569, please?
11      All right. Let's just kind of zoom in the top
12  third, if you don't mind, Mr. Evans.
13 Q. (By Mr. Caldwell) Are you familiar with this document,
14  sir?
15 A. I am.
16 Q. This is the document that Apple's lawyers sometimes call
17  the Ericsson proposal, correct?
18 A. Yes.
19 Q. Who prepared this document?
20 A. It was drafted by Mr. Sebire and capturing the
21  conclusions and the proposals that the -- the conclusions of
22  the group at this MAC workshop.
23 Q. And are you here on behalf of Ericsson taking credit for
24  the conclusions that are repeated in this document?
25 A. That's not why I'm here.

Page 71

1 Q. After the meeting that we discussed that was around
2  October 22nd and 23rd, was Ericsson tasked with focusing on
3  the triggering aspects of buffer status reporting?
4 A. If I recall correctly, yes.
5 Q. And that's different from the determination criteria,
6  correct?
7 A. Yes.
8      MR. CALDWELL: Can we flip to the second page and
9  grab the middle of the page?
10      Perfect.
11 Q. (By Mr. Caldwell) Now, I'm sorry that the imagery is a
12  little spotty. Can you -- can you make it out okay? It's
13  got -- the lines are a little faint, but can you make it out?
14 A. Yes.
15 Q. I apologize for that. I think it was used maybe in a
16  deposition and copied and scanned. So sorry about that.
17  Who drew the figures, Figure 1 and Figure 2, that are in
18  this document?
19 A. I don't know.
20 Q. Now, if Mr. Sebire drew those figures, would you
21  challenge that? Would you dispute it?
22 A. No. I -- I would only note that these figures do
23  describe what we saw on some other slides captured in text.
24  And this is a figure capturing the same thing.
25 Q. I'm asking about the figures. I'm not arguing with you

Page 72

1 about that point. I'm asking who drew the figures.
2 A. I don't know.
3 Q. If Mr. Sebire drew these figures, would you reuse them
4  in an Ericsson-only document and pass them off as Ericsson
5  figures?
6 A. If a figure in a joint contributions, yes, I would use
7  them because these figures are -- these are joint
8  contributions, so it's the -- the work and the output from
9  our joint efforts.
10 Q. But would you be sure to say, hey, a guy from NSN drew
11  these pictures?
12 A. In 3GPP, we typically reuse figures because that's part
13  of our normal work.
14 Q. What about if you reused them in a patent application?
15  Would you be sure to say, you know, some guy from NSN drew
16  these figures?
17 A. If I would reuse something then -- if I'm reusing
18  something from prior art, then it is described as prior art.
19  And if I have used some figure -- it depends on the context.
20 Q. So you don't know?
21 A. I don't know.
22 Q. Would it surprise you if this figure were almost
23  identically reused in an application that names you as an
24  inventor and --
25 A. No.

Page 73

1 Q.   -- does not mention Mr. Sebire?
2 A.   Not -- no, I wouldn't be too surprised.
3 Q.   You can see at the top of the screen -- if I can work
4    this thing -- there's a reference to Proposal 5.  Do you see
5    that?
6 A.   Yes.
7 Q.   Okay.  And I think -- I'll admit that I have trouble
8    reading these documents when they first come out.  But am I
9    correct, just for context, that Proposal 5, where it says
10   Proposal 5, is actually referring to what's above the bold
11   word "Proposal 5"?
12 A.   Could you say that again?
13 Q.   Sure.  I'm -- it was probably a dense question.  Let me
14   ask you slightly differently.
15       This says "Proposal 6" down here (indicating), do you
16   see that?
17 A.   Yes.
18 Q.   And you'll agree with me that this (indicating) is what
19   it's talking about is Proposal 6, not what's further down on
20   the page below?
21 A.   I have to look at the contribution --
22 Q.   No problem.
23 A.   -- completely.
24 Q.   Yes, sir.  It's No. 569.
25       MR. CALDWELL: In fact, would you zoom out?  That

Page 74

1    might help out, actually.
2 A.   It's a new section of Proposal 6, so I think it's fair
3    to say what is below Proposal 6 is a part of something else,
4    but it could be related.
5 Q.   (By Mr. Caldwell) Fair enough.  I'm not disputing that
6    point.
7       MR. CALDWELL: Can you just slide it up just a tiny
8    bit?
9       That's fine.  Thank you.
10 Q.   (By Mr. Caldwell) So all I'm getting at is the simple
11   point that where Proposal 6 is presented in this paper is in
12   the area I've just marked in red.
13 A.   Yes.  The text leading up -- the text after Proposal 5
14   seems to be leading up to Proposal 6.
15 Q.   Would you agree with me that this merely had proposed
16   that there are two types and two formats, and it does not say
17   under which conditions we use them?
18 A.   This text does not include the aspects of which to use
19   that was discussed in this joint workshop, no.
20 Q.   This text merely had proposed that there are two types
21   and two formats and does not say under which conditions we
22   use them, correct?
23 A.   Yes.  This text does not disclose that.
24 Q.   You mentioned that you've got a lot of patents, sir.
25 A.   Yes.

Page 75

1 Q.   You said something earlier about providing background
2    information in a patent.  Or context information.  Do you
3    recall describing that generally?
4 A.   No.
5 Q.   Let me ask you a different question, then.
6       Are you familiar with what a claim of a patent is?
7 A.   I'm familiar that there are claims, but I'm not a patent
8    lawyer.
9 Q.   Do you know what the significance of the claims of a
10   patent is?
11 A.   I'm not a patent lawyer.
12 Q.   Was a separate contribution to 3GPP made to present
13   criteria for choosing between short and long buffer status
14   reports?
15 A.   I don't recall.
16 Q.   Have you looked for that in preparing to testify to the
17   jury today?
18 A.   No, I have not.
19 Q.   Now, if a separate proposal was made to show criteria
20   for choosing between long and short buffer status reports, is
21   that something that we could find publicly available on the
22   Internet?
23 A.   If there were documents contributed to 3GPP, you should
24   be able to find that.
25 Q.   When you had your video conference with Apple's lawyers,

Page 76

1    were you shown any subsequent contribution where criteria for
2    choosing short or long buffer status reports was contributed?
3 A.   No.
4       MR. CALDWELL: Could we see Defendants' Exhibit
5    DTX-567.
6       Just kind of grab the top third of it, sir.
7 Q.   (By Mr. Caldwell) Have you ever seen this contribution,
8    R2-080015, sir?
9 A.   I may have, long time ago.
10 Q.   You don't remember it as you sit here today, correct?
11 A.   Correct.
12 Q.   Do you have any doubt that the contributions of this
13   document came from Nokia or Nokia Siemens Networks?
14 A.   I believe this document was produced and that --
15   submitted to 3GPP by Nokia Siemens Networks.
16 Q.   But you're not here taking the position that the
17   contents did not come from Mr. Sebire, are you?
18 A.   I haven't read the contribution now, so I don't know
19   what is the content.  I would only speculate based on the
20   title.  And I'm not here to speculate.
21 Q.   Fair enough.
22       But you're also not here under oath telling the jury
23   that you or your colleagues at Ericsson came up with the
24   ideas in this contribution, are you?
25 A.   I don't know.  I haven't studied this contribution in a

CELLULAR COMMUNICATIONS EQUIPMENT LLC VS
APPLE, INC., ET AL

September 9, 2016

---

Page 77

1  very long time.
2  Q.  Did it cross your mind before you testified to go look
3  at the 3GPP website and see if there were other related
4  contributions to the issues that we're talking about in this
5  trial?
6  A.  I was looking at contributions prior to those -- that we
7  had been discussed before, not after.
8  Q.  Would you agree that this proposal introduces criteria
9  for short and long BSR, DTX-567?
10 A.  I don't know.  I haven't studied it.  And I have
11 difficulty reading it on the screen.  And it's not in my
12 binder.
13 Q.  And will you --
14     MR. CALDWELL: Do we have 567?
15 A.  And it would probably take me some time to study it.
16 Q.  (By Mr. Caldwell) Well, about how long do you think it
17 would take you to study it?
18 A.  I don't know.
19 Q.  Okay.  I mean, I'm happy to give you a copy of it.  I
20 don't have a problem with that, so...
21     MR. CALDWELL: Mr. Lumish, do you have 567
22 somewhere?
23     May I approach the witness and hand him this
24 binder, Your Honor?
25     THE COURT: Yes.

---

Page 78

1  Q.  (By Mr. Caldwell) Now, I know we have a limited amount
2  of time because I know we're ending at noon today, and you're
3  taking off in the morning, correct?
4  A.  Correct.
5  Q.  Just suffice it to say, you haven't studied Defendants'
6  Exhibit 567, correct?
7  A.  Correct.
8  Q.  And you're not here taking a position claiming any
9  portion of Defendants' Exhibit 567, correct?
10 A.  What does that mean?
11 Q.  You're not here claiming to have invented or conceived
12 of the content of Defendants' Exhibit 567, correct?
13 A.  I'm not -- I was not asked to come here to do that.  But
14 if I look at this, the first paragraph in Section 2, it looks
15 very much like what Ericsson suggested in the joint MAC
16 workshop.
17 Q.  Was this proposal ever discussed in the Working Group?
18 A.  I don't recall if it was discussed prior to this
19 document was submitted in the Working Group.  I know it was
20 discussed at this joint workshop among those companies.
21 Q.  And that's not reflected in the presentation, is it?
22 A.  In which presentation?
23 Q.  That this proposal was discussed.  That is not reflected
24 in the Ericsson PowerPoints we've seen, is it?
25 A.  It is -- I believe there were a couple of bullets

---

Page 79

1  listing the criteria for selecting long or short, and it
2  was -- I believe it was mentioned that there was a preference
3  to do it in a certain way, and I believe that was the
4  Ericsson input.
5  Q.  And we also discussed, didn't we, that the decision of
6  what to do when certain things don't fit was left as an
7  unresolved, unanswered question, correct?
8  A.  There was no consensus from that workshop.
9  Q.  It was left as an unanswered question, correct?
10 A.  From the collective -- from the group point of view, it
11 was left as an unanswered question.  There may have been
12 suggestions and ideas on how to handle it from different,
13 individual companies.
14 Q.  So, Mr. Stattin, who presented this proposal, the
15 DTX-567, to the Working Group?
16 A.  I don't recall.  It was a very long time ago.  It was in
17 2008, it appears here; and now it is 2016, eight years ago.
18     And we present typically up to a thousand contributions
19 per meeting.
20 Q.  Now, is there any way to check and see if it was
21 presented at a meeting?
22 A.  Possibly.
23 Q.  And how might we do that?
24 A.  You could look in meeting minutes, if that is captured,
25 but it has not always been.

---

Page 80

1  Q.  What would you expect the meeting minutes to reflect if
2  this proposal were discussed at a meeting?
3  A.  I don't know.  The style of meeting has varied and
4  changed over the years.  So this was something eight years
5  ago.  I don't recall.
6     MR. CALDWELL: Your Honor, may I approach the
7  witness and Mr. Lumish as well?
8     THE COURT: Yes.
9  Q.  (By Mr. Lumish) I've handed you a document that has not
10 been pre-admitted in this case.  But are you familiar with
11 Working Group meeting minutes that are reflected and recorded
12 and stored online?
13 A.  Yes, I am.
14 Q.  Can you take a look at what you were just handed that is
15 marked at the top R2-080549?
16     MR. LUMISH: Can we approach, Your Honor?
17     THE COURT: You may.
18     (Bench conference.)
19     MR. LUMISH: This looks like a 20-page document.
20 There's no trial exhibit number.  It wasn't disclosed.  I'm
21 not aware of what it is.  This is unfair.
22     MR. CALDWELL: It's the meeting minutes off the
23 public 3GPP website.
24     THE COURT: Okay.  And what is the relevance to
25 them?

---

Page 81

1     MR. CALDWELL: They're the meeting minutes where
2 Mr. Sebire's proposal was discussed by the Working Group
3 where he was at the meeting.
4     MR. LUMISH: The issue is it's not on the list.
5     THE COURT: Why wasn't it disclosed?
6     MR. CALDWELL: Well, it's an impeachment exhibit.
7     THE COURT: Okay.
8     MR. CALDWELL: It's certainly at least --
9     THE COURT: I'm just asking you to assert your
10 objection and your response.
11     MR. CALDWELL: Absolutely. Absolutely.
12 I'm also thinking about -- the reason I smile is
13 I'm thinking about the cross-examination on an order from a
14 Georgia court yesterday. It's a public record.
15     And this document had -- this witness has personal
16 knowledge of these meetings and the minutes that come out of
17 them, so I think he has more than adequate foundation for it.
18     THE COURT: If he lays the foundation, what's your
19 objection to the document?
20     MR. LUMISH: Just that it wasn't disclosed. That's
21 all.
22     THE COURT: Okay. That objection is overruled.
23 Lay the foundation and then offer it.
24     MR. CALDWELL: Yes, Your Honor. Yes, Your Honor.
25 I was just going to also remind the Court, remember that we

Page 82

1 got a huge production from him and Ericsson the night before
2 trial, so...
3     THE COURT: I've got it.
4     MR. LUMISH: Can I make one more point, if I may,
5 please, while we're here?
6     THE COURT: Yes.
7     MR. LUMISH: I'm going to need three or five
8 minutes of redirect, so I just wanted to check in on timing.
9     MR. CALDWELL: I think you'll be fine.
10     MR. LUMISH: Okay. Thank you.
11     THE COURT: All right. Thank you.
12     MR. LUMISH: Thank you very much.
13     (Bench conference concluded.)
14 Q. (By Mr. Caldwell) So, Mr. Stattin, what is the document
15   that I've handed you?
16 A. It appears to be a 3GPP RAN2 Working Group document.
17 Q. Are you familiar with documents like this?
18 A. Yes.
19 Q. Have you flipped through it a little bit to see that it
20   reflects minutes from a meeting known as No. 60b?
21 A. No, I have not.
22 Q. Can you tell that, by looking at the header and flipping
23   through it for a second?
24 A. Based on the header and the object, it appears to be
25   minutes from an LTE user session.

Page 83

1 Q. Do you have any reason to believe that these are not the
2   authentic meeting minutes from those meetings that are
3   reflected on the public 3GPP website?
4 A. No immediate reason to say that.
5     MR. CALDWELL: Your Honor, we'd move for the
6 admission of this exhibit, which I will get a new sticker
7 for.
8     MR. LUMISH: No objection, Your Honor.
9     THE COURT: Okay. It will be admitted.
10 Let me know what the number will be.
11     MR. CALDWELL: Your Honor, it is Plaintiff's
12 Exhibit 299.
13     THE COURT: Thank you.
14 Q. (By Mr. Caldwell) Mr. Stattin, will you do me a favor
15   and flip to the eighth page, which we'll also pull up on the
16   screen?
17     MR. CALDWELL: Would you pull up that section,
18 Mr. Evans?
19 Q. (By Mr Caldwell) Mr. Stattin, do you see that Nokia's
20   contribution of criteria for short and long BSR was discussed
21   at this meeting?
22 A. Excuse me. Could you repeat that question?
23 Q. Yes, sir.
24     Do you see that the Nokia contribution, R2-080015, was
25   specifically discussed at the 60b meeting?

Page 84

1 A. From this document, it appears that this Nokia
2   contribution was discussed at that meeting, yes.
3 Q. Now, is there any indication whatsoever that anybody at
4   that meeting disputed that this contribution came from
5   Mr. Sebire?
6 A. Whether the content of the ideas are coming from a
7 certain company or not is not reflected by the company or who
8 is creating the contribution to the meeting.
9     It may be based on early ideas and early discussion, and
10 then it has been put in a contribution at some point by a
11 company because maybe they're being formed more -- more of a
12 consensus in that direction or it's -- the standard has
13 more -- matured a bit, and it's a better moment, better time
14 to discuss and decide certain aspects.
15     So from just seeing this document and the title and its
16 minutes, I cannot tell from whom the ideas are coming.
17 Q. Have you seen any document from which you can say
18   someone other than Mr. Sebire conceived of the ideas in his
19   patent claims?
20 A. I'm not aware of the patent claims.
21 Q. And just so we're clear, that question was about --
22   about documents. Are you contending, or is it your belief
23   that someone other than Mr. Sebire contributed and conceived
24   of the ideas that are inventive in his patent claims?
25 A. I've not seen the claims. What I have seen is that I've

Page 85

1  told already that in the beginning of this contribution
2  080015, there were some bullets and criteria which were
3  contributed by Ericsson in the joint workshop.
4  Q.  How well do you know Mr. Sebire?
5  A.  I've been meeting him at RAN2 Working Group meetings for
6  a number of years.
7  Q.  Do you trust him?
8  A.  I believe I do.
9  Q.  You guys actually knew each other fairly well.  It's not
10  just that you happen to see each other at meetings; is that
11  fair?
12  A.  Can you define "know someone well"?
13  Q.  Let me ask a different question.
14      Did you and Mr. Sebire actually get pitted against each
15  other in an election at one point?
16  A.  We were -- Mr. Sebire, myself, and a delegate of -- was
17  it LG Electronics -- were at one point all candidates for a
18  vice chairman position in RAN2.
19  Q.  What happened in the election?
20  A.  In the election there was a round of elimination and
21  then there was a final round.  In the first round the
22  candidate from LG Electronics was eliminated, and in the next
23  round it was concluded that Mr. Sebire won the election.
24  Q.  Did that election take place before or after Mr. Sebire
25  made contribution 080015 to the standard?

Page 86

1  A.  My recollection is that the election was in 2009, so
2  that would have been after 2008.
3  Q.  The election was after the contribution?
4  A.  The election was after the meeting that we are looking
5  at in this exhibit.
6  Q.  Was the election before or after Nokia-NSN told the
7  other 3GPP participants that it had a patent application on
8  Mr. Sebire's idea?
9  A.  I don't know.
10  Q.  Does Ericsson sometimes have ideas that it keeps secret
11  until it can file a patent application before they propose it
12  to the standards group?
13  A.  What do you mean by "keep secret"?
14  Q.  Does Ericsson sometimes have ideas that it keeps
15  confidential internally at Ericsson to make sure they file a
16  patent application before they disclose it to the working
17  group?
18  A.  If we're going to file a patent application, that, to my
19  understanding, needs to be done before disclosing the
20  invention or publishing the invention.
21  Q.  So does that mean that, yes, Ericsson will keep it
22  confidential from the working group until they get the
23  application on file?
24  A.  Ericsson would keep it confidential from the public.
25  I mean, if we would share it with other companies, then I

Page 87

1  think it would be very difficult for us to file it
2  afterwards.
3  Q.  Will you find DTX-576?
4      MR. CALDWELL:  No.  I think I gave you the wrong --
5  I was looking for 080015 -- I'm sorry.
6  Q.  (By Mr. Caldwell) I'm sorry -- I'm sorry, 567.  Do you
7  have Defendants' Exhibit 567 handy, sir?  It's the
8  contribution from Mr. Sebire.
9  A.  Yes.
10  Q.  Would you have preferred to show this contribution to
11  the jury during your direct testimony?
12  A.  I don't think I understand the question.
13  Q.  Would your testimony have been more complete if you had
14  showed Defendants' Exhibit 567 to the jury, sir?
15  A.  I don't know.
16  Q.  I understand that you have -- we have a limited amount
17  of time, and you have to leave tomorrow.
18      MR. CALDWELL:  So I will pass the witness now so
19  that Mr. Lumish can have some follow-ups.  Thank you.
20      THE WITNESS:  Thank you.
21          REDIRECT EXAMINATION
22  BY MR. LUMISH:
23  Q.  Let's look at 567.
24      The suggestion you were hearing, sir, if you were
25  confused by it, was that we somehow were hiding this document

Page 88

1  either from you or from somebody else.  Let's start at the
2  top of it.
3      First of all, look at the date.  It says January -- why
4  don't --
5      MR. LUMISH:  Actually, Mr. Schmoller will you bring
6  up through Proposal 1 for me, please?
7      Right there.  So I want to have the date at the top
8  and -- thank you.
9  Q.  (By Mr. Lumish) Do you see the date at the top, sir?
10  A.  I do.
11  Q.  It says 14-18 January 2008.
12  A.  Yes.
13  Q.  Is that before or after the workshop?
14  A.  That's after the workshop.
15  Q.  Is that before or after the joint Ericsson contribution
16  that we talked about before?
17  A.  It's after.
18  Q.  And there is a source listed there.  Do you see the
19  source?
20  A.  Yes.
21  Q.  Does it include Ericsson on it?
22  A.  No.
23  Q.  Now, he didn't show you the actual criteria and call
24  those up.  Let's take a look at those in Section 2 here.  Do
25  you see it says --

Page 89

1    **MR. LUMISH:** Can you maybe blow that up for me
2 please, Mr. Schmoller?
3 **Q.   (By Mr. Lumish) It says:   In its simplest form the
4 criteria can simply depend on the amount of data that is
5 buffered in the different logical channel groups.**
6    **Do you see that?**
7 A.   I see that.
8 **Q.   And you've talked about radio bearer groups.   Is there a**
9 difference, in your mind, between logical channel groups and
10 **radio bearer groups?**
11 A.   They are commonly used -- they use these terminologies
12 interchangeably in the RAN2 Working Group.
13 **Q.   And the criteria that Mr. Sebire lists here only in**
14 Nokia's name are, first:   If only one LCG has buffered data,
15 report the short BSR format.   And as soon as more than one
16 LCG has buffered data, report the long BSR format.
17    **Do you see that?**
18 A.   I see that.
19 **Q.   Do you believe that Mr. Sebire conceived of those**
20 selection criteria for choosing between short and long buffer
21 status reports all by himself, separate from the workshop?
22 A.   No.
23    **MR. LUMISH:** Let's look at the proposal, please,
24 Mr. Schmoller.
25    That was right underneath there, Proposal 1.

Page 90

1    Thank you.
2 **Q.   (By Mr. Lumish) It says Proposal 1:   If only one LCG has**
3 buffered data, report short BSR.   As soon as more than one
4 **LCG has buffered data, report long BSR.**
5    Is that an idea that Ericsson had before January 2008?
6 A.   Yes.
7 **Q.   And is that an idea that Ericsson presented to the**
8 **workshop?**
9 A.   Yes.
10 **Q.   Is that an idea that Ericsson presented to the workshop**
11 **when Mr. Sebire was there?**
12 A.   Yes.
13    **MR. LUMISH:** Can you -- Mr. Schmoller, will you
14 bring up the criteria again, please?   I'm going to ask you to
15 split screen.
16    And if you could split it with Page 11 of
17 Defendants' Exhibit 756.   So DT-756, Page 11.
18 **Q.   (By Mr. Lumish) So we have on the left the January 2008,**
19 Nokia submission; and on the right, we have the PowerPoint
20 **slide from Ericsson from the workshop.**
21    **MR. LUMISH:** Can you make them bigger or maybe put
22 one on top of the other?
23    Thank you.
24    So I -- yeah, I need the -- exactly.   Actually,
25 above that.   So the four or five bullets above it, too.   From

Page 91

1 "2 formats" down, please.
2    Thank you.
3 **Q.   (By Mr. Lumish) We're going to try to make this a little
4 easier to read.**
5    So on the top now we have the proposal that Mr. Sebire
6 submitted in Nokia's name only.   It says:   If only one LCG
7 has buffered data, report the short; and if more than one,
8 **report the long.**
9    Now, on the bottom we have the PowerPoint from Ericsson.
10 **It's in bold text, isn't it?**
11 A.   Yes.
12 **Q.   So that's the same bold texting that Mr. Caldwell asked**
13 you about and with the same significance he asked you about
14 **in the -- in the PowerPoint?**
15 A.   Yes.
16 **Q.   And do you see any similarities here, sir, between what**
17 Ericsson wrote in the PowerPoint and what's in Mr. Sebire's
18 **name in the first document at the top there?**
19 A.   Yes, I do.
20 **Q.   And what's the similarity?**
21 A.   The similarity is that if you have data to report on one
22 group, then you use the short format.   If you have data on
23 more radio bearer groups, then you use the long format.
24 **Q.   Forgive me.   I wrote on this.   I got excited when I saw**
25 **it.**

Page 92

1    Mr. Caldwell didn't show you this part of Plaintiff's
2 Exhibit 299.   These are the meeting minutes.
3    Let me make sure I've got the number correct.   Sorry.
4 Plaintiff's Exhibit 299.
5    He showed you these meeting minutes from the RAN2
6 Working Group.   He didn't ask you about that bullet, I don't
7 think, unless I misheard, where it says:   Ericsson is quite
8 happy with the Proposals 1 and 2.
9    Do you see that?
10 A.   I do.
11 **Q.   Do you remember what Proposals 1 and 2 are?**
12 A.   Not from the top of my head.   Proposal 1, I have read
13 now during my testimony.   And you showed it to me so that I
14 recall.   And that is in line with what Ericsson has been
15 proposing before.
16 **Q.   So Proposal 1 is the one that we looked at here in the**
17 **Nokia submission of using one -- of using a short form buffer**
18 **status reports when there's only one buffer to report.   And a**
19 **long form buffer status report, when there's more than one**
20 **buffer to report.   Are you surprised that Ericsson was happy**
21 **with that proposal?**
22 A.   Not at all.
23 **Q.   Why would you think Ericsson would be happy with it?**
24 A.   Because it was consistent with our ideas and what we
25 were thinking.

Page 93

1 Q. Now, a couple of times Mr. Caldwell referred to a video
2 conference you and I had. Do you remember this?
3 A. Yes.
4 Q. And I think he also was suggesting to the jury there
5 that I -- I hid that from him. Do you remember me asking you
6 about that in your first minute or two of your testimony
7 today?
8 A. Yes, you did.
9 Q. Okay. And tell the jury more about that call, please,
10 the video conference you and I had.
11 A. In that video call we discussed -- I was asked about my
12 educational background, my work at Ericsson, my work in 3GPP.
13     We discussed a little bit about buffer status reporting.
14 We discussed the joint contribution and a patent by Johan
15 Torsner.
16     THE REPORTER: By who? I'm sorry, repeat that.
17     THE WITNESS: The name?
18     THE REPORTER: Yes.
19     THE WITNESS: Johan Torsner.
20     THE REPORTER: Thank you.
21 Q. (By Mr. Lumish) Now, earlier in your testimony on direct
22 you mentioned something about a patent application that you
23 thought showed to you that Ericsson had conceived of the
24 ideas of using a short form with a single buffer that needs
25 to report data and a long form when there's more than one.

Page 94

1     What -- what was the application or patent you had in
2 mind when you testified?
3 A. That was the same patent by Johan Torsner.
4 Q. And do you know if that patent ends -- excuse me -- do
5 you know if that patent ends in the number '666?
6 A. I think it does.
7 Q. Okay. Now, he also asked you about whether you knew --
8 whether you thought of Apple as an adversary. You're not in
9 the legal department of Ericsson, are you?
10 A. I'm not.
11 Q. And are you aware of any lawsuits between Apple and
12 Ericsson?
13 A. No.
14 Q. So you -- you don't know if Apple and Ericsson have been
15 embroiled in lawsuits in any time in the past?
16 A. In the past I am aware, yeah, we have been in lawsuits.
17 But not any -- I'm not aware of any present.
18 Q. Okay. He -- Mr. Caldwell asked you if it crossed your
19 mind to look at any later dated proposals to the working
20 group or to the 3GPP, later dated than the joint Ericsson
21 proposal.
22     By the way, the reason I call it that, is Ericsson is
23 the first name. I've been calling it that for two years. I
24 don't think I'm going to be able to change now.
25     So he said: Did it cross your mind to look later -- at

Page 95

1 later proposals after the joint Ericsson proposal?
2     You said you looked for prior. Why did you look for
3 prior instead of later?
4 A. I was looking trying to understand what led up to the
5 joint proposal. And I had no reason to believe I would look
6 at things after that.
7 Q. All right. I think my last question for you, sir, is,
8 Mr. Caldwell referred to an election. Do you remember that?
9 A. Yes.
10 Q. And in the election you were running to become vice
11 chair of some part of the standards body; is that right?
12 A. That's right.
13 Q. You lost that election to Mr. Sebire; is that fair?
14 A. I did.
15 Q. And how did you feel about that?
16 A. At the time it was my not preferred outcome, of course,
17 because if you're running, then you prefer to come out
18 winning.
19     But it's also -- it would be an honor to be chairman,
20 but it would also be a lot of work. And, frankly speaking, I
21 think I made a better job for Ericsson being a delegate.
22 Q. Do you hold a grudge against Mr. Sebire because he won
23 the election and you didn't?
24 A. No, I don't.
25 Q. Did you shade any of your testimony to our jury today

Page 96

1 because you lost that election?
2 A. No.
3 Q. Did you say anything today that you think is untruthful
4 because you lost some election at the working group level?
5 A. No.
6 Q. That's all I have for you, sir. Thank you very much.
7     MR. CALDWELL: Can I try and fit it in, in a minute
8 here?
9     THE COURT: All right.
10     RECROSS-EXAMINATION
11 BY MR. CALDWELL:
12 Q. Mr. Stattin, I'll try to be real quick, given the time.
13     You said that Apple and Ericsson used to be adversaries
14 in lawsuits, right?
15 A. I said that I am aware that Ericsson and Apple was in a
16 lawsuit.
17 Q. And they resolved those difference in December of 2015,
18 correct?
19 A. I don't have a clear picture of the entire timeline on
20 that.
21 Q. Prior to the resolution of that lawsuit, had you ever
22 contended that Mr. Sebire claimed inventions that weren't
23 his?
24 A. No.
25 Q. Did you ever offer to have a video conference with us?

CELLULAR COMMUNICATIONS EQUIPMENT LLC VS
APPLE, INC., ET AL

September 9, 2016

Page 97

1  A.  I didn't have a video call with CCE.  I met a CCE
2    representative at the -- at my deposition, though.
3  Q.  And then when you had a discussion with Apple and talked
4    about this Torsner patent, just to be clear, you didn't
5    present any indication to the jury that that Torsner patent
6    has any relationship to what we're talking about today, did
7    you?
8  A.  I don't recall if I -- if I did or not.
9  Q.  Sir, you've not identified a single person who conceived
10    of inventive concepts in Mr. Sebire's claims, correct?
11  A.  I still haven't seen the claims, so sorry, I cannot
12    answer that question.
13  Q.  So -- I may -- I may already know the answer to this,
14    then.  Do his claims address the unanswered question of what
15    to do if a short format fits and a long one does not?
16  A.  I don't know.
17  Q.  And when his proposal was presented to the working
18    group, Ericsson said it was happy, right?
19      It was quite happy with this proposal, correct?
20  A.  Ericsson seemed so.
21  Q.  Do you remember the suggestion that I hid that -- that
22    bullet point from the jury?  Do you remember that suggestion
23    just now?
24  A.  Can you repeat that question?
25  Q.  Yes, sir.

Page 98

1      Do you remember Mr. Lumish's suggestion that I did not
2    show the jury that bullet point?
3  A.  No.  I must have missed his saying that.
4  Q.  You don't remember him saying:  Now, Mr. Caldwell didn't
5    direct you to this part right here where it says Ericsson is
6    quite happy with Proposals 1 and 2?
7      You don't remember that?
8  A.  Now that you say it, yes, I remember it.
9  Q.  Who brought that document to court?
10  A.  You did.
11  Q.  Who directed the jury to that page?
12  A.  You did.
13  Q.  And in those minutes does it say that Ericsson stood up
14    and said:  Hey, this is our proposal.  We talked about it a
15    long time ago?
16  A.  That's not usually the way things are done in 3GPP.
17  Q.  It does not say that, does it?
18  A.  Doesn't say that, and that's not how we work in 3GPP.
19      MR. CALDWELL: No further questions, Your Honor.
20    Thank you.
21    THE COURT: All right.  Anything further?
22    MR. LUMISH: No, Your Honor.
23    THE COURT: Okay.
24    MR. LUMISH: Nothing further.  Thank you.
25    THE COURT: All right.  Dr. Stattin, you may step

Page 99

1    down.
2      All right.  Ladies and Gentlemen of the Jury,
3    you've put in a long half day, and we're going to recess
4    until Monday morning at 9:00 a.m.
5      Again, if you'll be here a few minutes early so we
6    can start on time.  I will, again, caution you not to talk
7    about this case over the weekend with family or friends or
8    anyone.  Just put it out of your mind.  Enjoy your weekend,
9    and we'll pick it back up an Monday.  We'll be in recess.
10      COURT SECURITY OFFICER: All rise.
11      (Jury out.)
12      THE COURT: Please be seated.
13      I just wanted to give you all your trial times
14    before we adjourn.
15      So the Plaintiff has used 8 hours and 18 minutes.
16    Defendant has used 6 hours and 5 minutes.
17      Is there anything that you need from the Court
18    before I let you go for the weekend?
19      MR. CALDWELL: No, Your Honor.
20      MR. LUMISH: Nothing at all.
21      THE COURT: All right.  Thank you very much.  We'll
22    be in recess until Monday at 9:00 a.m.
23      COURT SECURITY OFFICER: All rise.
24      (Court adjourned until 9:00 a.m.,
25      September 12, 2016.)

Page 100

1
2      CERTIFICATION
3      IT IS HEREBY CERTIFIED that the foregoing is a
4  true and correct transcript from the stenographic notes of
5  the proceedings in the above-entitled matter to the best of
6  our abilities.
7
8  /s/
   CHRISTINA BICKHAM, CRR, RMR      September 9, 2016
   Official Court Reporter
9
10
11  /s/
   SHEA SLOAN, CSR, RPR
12  Official Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25