```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                       TYLER DIVISION

 3
    CELLULAR COMMUNICATIONS      )
 4  EQUIPMENT, LLC
                                 )   DOCKET NO. 6:14cv251
 5
        -vs-                     )
 6                                   Tyler, Texas
                                 )   8:31 a.m.
 7  APPLE INC., ET AL                September 6, 2016

 8
              TRANSCRIPT OF PRETRIAL, VOIR DIRE, TRIAL
 9                        MORNING SESSION
             BEFORE THE HONORABLE K. NICOLE MITCHELL,
10               UNITED STATES MAGISTRATE JUDGE

11                    A P P E A R A N C E S

12  FOR THE PLAINTIFF:

13  MR. BRADLEY W. CALDWELL
    MR. JOHN AUSTIN CURRY
14  CALDWELL CASSADY & CURRY
    2101 Cedar Springs Rd., Suite 1000
15  Dallas, Texas 75201

16  MR. EDWARD R. NELSON III
    NELSON BUMGARDNER PC
17  3131 West 7th Street, Suite 300
    Fort Worth, Texas 76107
18
    MR. J. WESLEY HILL
19  WARD, SMITH & HILL PLLC
    1507 Bill Owens Parkway
20  Longview, Texas 75604

21
    COURT REPORTER:     MS. CHRISTINA L. BICKHAM, CRR, RMR
22                      FEDERAL OFFICIAL COURT REPORTER
                        300 Willow, Ste. 221
23                      Beaumont, Texas 77701

24
    Proceedings taken by Machine Stenotype; transcript was
25  produced by a Computer.
```

```
 1    FOR THE DEFENDANTS:

 2
      MR. DOUGLAS E. LUMISH
 3    MR. JEFFREY G. HOMRIG
      MS. LISA K. NGUYEN
 4    MR. BRETT M. SANDFORD
      LATHAM & WATKINS LLP
 5    140 Scott Dr.
      Menlo Park, California 94025-1008
 6

 7    MR. JOSEPH H. LEE
      LATHAM & WATKINS LLP
 8    650 Town Center Drive, 20th Floor
      Costa Mesa, California 92626-1925
 9

10    MR. ERIC H. FINDLAY
      FINDLAY CRAFT PC
11    102 N. College Avenue, Suite 900
      Tyler, Texas 75702
12


13

14                  *****************************

15                     P R O C E E D I N G S

16          THE COURT:  Good morning, everyone.

17          Ms. Hardwick, if you'll call the case, please.

18    Please be seated.

19          COURTROOM DEPUTY:  Yes, your Honor.  Court calls

20    Civil Action 6:14cv251, Cellular Communications Equipment,

21    LLC, versus Apple, Inc.

22          MR. HILL:  Good morning, Your Honor.  Wesley Hill,

23    Brad Caldwell, Ed Nelson, Austin Curry on behalf of the

24    Plaintiff.

25          THE COURT:  Good morning.
```

1          MR. FINDLAY:  Good morning, Your Honor.  Eric

2   Findlay, Doug Lumish, Jeff Homrig, Gabrielle Lahatte.

3          Ready to proceed.

4          THE COURT:  Good morning.  All right.  I understand

5   we've got a matter we need to take up before we begin the

6   jury selection this morning.  What's first?

7          MR. LUMISH:  If we can address the issue we raised

8   last night, Your Honor, yesterday afternoon.

9          THE COURT:  Sure.

10          MR. LUMISH:  Doug Lumish, Your Honor, for Apple.

11   I'll try to be brief here.

12          The -- this issue goes back to the pretrial

13   conference and the motions that proceeded that.  There was

14   the motion related to NSN that we raised, Apple raised, with

15   concerns that the discovery we were getting from NSN was, as

16   we put it in the briefing, being curated; that we were

17   getting the documents that were good for them and not getting

18   the documents that were not good for them.

19          We asked for documents that were related to

20   Mr. Sebire, and in particular related to his interactions and

21   work and collaboration with people on certain documents in

22   the 3GPP RAN2 Working Group, and we got very little.

23          There -- Mr. Homrig can walk you through, there was

24   a statement yesterday that we didn't ask for them, we didn't

25   pursue them.  And we've gone back to look and that's

1    incorrect.

2         We pursued them.  We asked for them.  We got some

3    documents.  Mr. Sebire testified that he searched for

4    documents by looking in his hard drive.  Nobody -- he didn't,

5    anyway, search anywhere else inside of Nokia.  He said his

6    hard drive wasn't backed up to their systems, and he didn't

7    have any correspondence that went back to the time period we

8    were interested in.

9         Yesterday after the call with Your Honor, we got a

10   production from Ericsson that included something on the order

11   of 27 e-mails to and from Mr. Sebire, and there were some

12   additional documents that were internal communications at

13   Ericsson.

14        The e-mails included some attachments.  And at

15   least four of those attachments that we've identified so far

16   bear directly on the question of invention and derivation,

17   which as you know, is a very important defense to Apple.

18        Here, we had a hearing about it last time at the

19   pretrial conference in response to a MIL trying to knock it

20   out.

21        The documents -- I could hand them up if Your Honor

22   would like.

23        THE COURT:  Yes.

24        MR. LUMISH:  I could show you the four that

25   we've -- these four, as they go up, are ones that we have put

1    onto our new trial exhibit list we supplemented last night,

2    and I can show them to you now.

3              May I approach, Your Honor?

4              THE COURT:  Yes.

5              MR. LUMISH:  I can go through each of them if you

6    would like, Your Honor.  I wasn't planning to.

7              What you'll see in there are e-mails back and forth

8    and then two proposals -- or I should say two PowerPoint

9    presentations from Ericsson.  These presentations predate the

10   filing of the patent-in-suit.  They predate the provisional

11   application.  They predate the Ericsson proposal that Your

12   Honor has heard about in other motions.  And they refer to

13   the exact same things that are being claimed as inventions in

14   this case by CCE and Mr. Sebire.

15             As you know, the claims and the accusations in this

16   case relate to what Mr. Sebire has called triggers for

17   choosing between long and short form buffer status reports.

18             So how -- what criteria do you use to pick long or

19   pick short.  And he has claimed to be the sole and only

20   inventor of those concepts.

21             It's been our position from the beginning of this

22   case that he derived those from the working group at 3GPP or

23   that they contributed -- people contributed to at least one

24   requirement, at least one claim.  And, so, under both

25   theories the claims are invalid under 102(f) for derivation

1    or failure of inventorship.

2           The documents that I just handed up, if you'd like

3    I could show you a couple of instances, they go right to this

4    question.

5           If you look at Exhibit 756, for example, so this is

6    now marked as DTX-756.  This is a document we only got

7    yesterday.  You can see on the second page -- so DTX-75602

8    the date -- this was a group effort called the MAC LTE

9    workshop.

10          I think what Mr. Sebire's testimony will be is that

11   this is a group that got together in order to discuss some of

12   these triggers.  And in order to present them in a

13   presentation or a proposal to the RAN2 Working Group in a

14   meeting that was coming up on November 5th.

15          All right.  I'll try not to do all of this, Your

16   Honor.

17          If we jump to -- if we jump to Page 6, please,

18   Mr. Schmoller.

19          You'll see "need to update buffer status" towards

20   the bottom.  And it says:  BSR is triggered when UL-SCH -- I

21   believe that means uplink scheduling -- resources are

22   allocated.  And here's the important part -- and number of

23   padding bits is larger than the BSR status.

24          That's exactly what we're being accused of doing

25   for infringement in this case is what they call the bandwidth

1  trigger or the uplink capacity trigger in the original

2  claims.

3           This is on an Ericsson document.  You'll see in the

4  bottom right-hand corner an Ericsson logo predating the

5  alleged invention in this case.

6           And then if we go to page -- it's the internal

7  Page 10.  So that's DTX-756, Page 11.  You will see the other

8  trigger, the one that relates to looking at how many buffer

9  groups need to report data to determine whether you go long

10  or short.

11           As Your Honor knows, if you have more than one

12  group under their theory of infringement, you use a long form

13  buffer status report.  If you have fewer than -- well, if you

14  have fewer than two or if you have one group -- one buffer,

15  you report the short.

16           You can see that right in the language here, it

17  says how to choose the format based on how many groups need

18  to report.

19           And if you go up a little bit for me, please,

20  Mr. Schmoller, you'll see the reference to the two formats.

21           You've got a large one.  You've got a short one.

22  The short one is used if there's only one group to report.

23           This is -- I'm trying to pick my language

24  carefully.

25           This is very powerful evidence of derivation of

inventorship problems by Mr. Sebire.  We should have gotten

this months and months ago when we asked for it from Nokia

Siemens Networks.  And I have no reason to say that counsel

for CCE had it.  I have no reason to say that they had it and

withheld it.

But if CCE had it or could have gotten it as their

relationship with NSN would have allowed, it's in their

possession, custody, and control, it should have been

produced a long time ago.

So with that, we're still struggling with what it

is we should do here.  We have tried to be narrow.  We're not

going to ask for anything extreme.  We would like to

supplement our trial exhibit list to include at least the

four documents that I've handed up to Your Honor.  There may

be some more as we work through them in the next 24 hours or

so.

Mr. Sebire, we understand, will at least begin his

testimony today.  We would ask that if he finishes his direct

examination on both the jury and bench trial issues, that we

be able to start his examination on cross tomorrow just to

give us a little extra time to work these documents through.

It may very well be that we need additional relief

down the line and don't know what that is.  Maybe it's an

order to show cause; maybe it's an adverse inference

instruction.  We still need to work through that.  But we

1    need a day or two to consider that if Your Honor would permit

2    it.

3              And then the only other thing I've got is if

4    Mr. Sebire does hang over tonight, we would ask for about an

5    hour to take a deposition of him on these newly-produced

6    documents.  We would keep it brief.  We understand everybody

7    is busy.  But we just got these yesterday.  We're still

8    trying to figure out what they all mean.

9              That's what I had to say, Your Honor.  I would ask

10   if Mr. Homrig would come up -- he knows this better than I

11   do -- and just walk you through the requests we made for

12   these documents in the past because I know that was an

13   argument made to you yesterday that we didn't pursue them

14   diligently.

15             THE COURT:  Okay.

16             MR. HOMRIG:  Thank you, Your Honor.  Jeff Homrig.

17   Just -- just to be brief about this, the basic timeline on

18   this is once the Court issued the letters rogatory, in that

19   letters rogatory we called out specifically a number of joint

20   proposals that we wanted to focus on in terms of standard

21   setting proposals.

22             Those were called out, including the specific

23   proposal that we referred to as the Ericsson joint proposal,

24   to which all of these new documents relate.

25             During meet and confer, they asked us to narrow

those requests.  We narrowed them down to ten.  And again, this was one of those on there.

We had a back and forth with NSN's lawyers, and there were two sort of separate issues.  There was the issue of what documents would they search for from Mr. Sebire.  And there was the issue of what documents would they search for more generally with other folks.

What they told us in March was that they had already searched for Mr. Sebire, that they had found nothing that they would produce to us.  It was all public or privileged, but they would go back and check.

They then specifically told us on May 3rd, in a letter that I can hand up to Your Honor, that they would go back and check for these specific types of proposals, they were doing that; that they would produce those to us by June 9th.

They then made a production on June 9th.  It -- it had a few documents in it.  They continued to search.  They made another production on June 29th.  And then Mr. Sebire was produced for deposition on June 30th.  Shortly after that, we moved in the NSN asking for relief.

So that's the basic dialogue.  Your Honor, I would be happy to hand up the letter from their lawyer which confirms that they were still looking; that they had already searched but were searching again; and, in fact, were

1     searching for these specific kinds of documents.

2             THE COURT:  Okay.  Hand it up.

3             MR. HOMRIG:  Thank you, Your Honor.

4             THE COURT:  Response.

5             MR. CALDWELL:  Good morning, Your Honor.

6             Reference to the NSN motion I think is a little

7     gratuitous here.  One thing that you haven't seen is a large

8     number of the documents that were produced last night are

9     internal Ericsson-only documents that wouldn't have even been

10    in the possession of Mr. Sebire.

11            And for what it's worth, I understand from NSN's

12    counsel that Mr. Sebire actually doesn't even have these

13    documents.  I mean, they were seven years ago e-mails.  So I

14    don't think it's a result of not searching.  I think it's a

15    result of not having.

16            But the fact that really what's happening is there

17    are a large number of internal Ericsson documents, actually

18    just shows that this starts at a different point in time.  It

19    starts with prior to the close of discovery AT&T subpoenaing

20    Ericsson, and Apple subpoenaing Ericsson, arranging for a

21    30(b)(6) document -- or a 30(b)(6) deposition, asking for

22    documents, and then us spending the money to fly to Sweden to

23    do that deposition.

24            None of this stuff was -- was produced, which was,

25    of course, the purpose.  And it was due at that time so that

1    the witness could be deposed.

2          And then we -- we went through this thing -- not to

3    rehash, but we went through this thing last Thursday about

4    how we were hours away from starting trial and Apple somehow

5    didn't know any of the witnesses it was going to bring other

6    than its hired experts.

7          Well, as a result of this, we have asked what's

8    been going on with Ericsson.  And what you actually see is

9    that like two weeks ago Apple's counsel was setting up video

10   conferences, arranging for video conferences to work with

11   this witness they want to bring from Ericsson.  And this is

12   the result of Apple working with Ericsson to try to get

13   someone to come over here and to testify.

14         They didn't know he was coming, someone that has

15   just popped up from Stockholm now.  And then on the night

16   before, we get these documents, which should have been

17   produced previously.

18         Just even under the notions of Rule 37, these

19   documents are not timely.  They were subpoenaed timely in

20   discovery and just simply not produced.  And getting them on

21   the eve of trial is -- is not okay.

22         Also, I don't know that you really want a technical

23   debate on the invention.  We disagree with the

24   characterization because there were differences just as a

25   10,000-foot level between triggering a buffer status report,

1    something like there's more data and now we have to notify

2    the base station, versus doing the steps that are in the

3    claim to where you run through a particular routine to

4    determine what type you send.

5         So they are very distinct concepts.  And that's

6    actually particularly important in the context of these

7    documents because beyond the few that you've seen, even when

8    you start getting to the internal Ericsson documents -- and I

9    don't know if someone wants to seal the Court or whatever,

10   but I'll stay at a very high level -- when you start getting

11   to the ones that we just get last night, internal Ericsson

12   documents, you actually see that distinction being

13   significant between the actual technical differences in these

14   two issues and who was taking the lead on different issues in

15   their working group.

16        So what you're seeing is an incomplete picture of

17   what was produced last night, all documents that should have

18   been produced many months ago when we paid to go to Sweden to

19   take this gentleman's deposition.

20        So, you know, I don't understand the concept of

21   these threats of an order to show cause or an adverse

22   instruction, but I think that the characterization is wrong.

23   They are just not timely and should be excluded on that

24   basis.

25             THE COURT:   Thank you.

1           Any final word, Mr. Lumish?

2           MR. CALDWELL:  And, Your Honor, I guess, let me

3  just say, so I don't have to hop back up --

4           I'm sorry, Mr. Lumish.  I'll just be a second.

5           I -- we -- I do think they should be excluded.  And

6  if for some reason they are not exclude as just simply

7  untimely, the notion of now we -- they wouldn't even start

8  their cross-examination, that seems crazy to me.  We should

9  be moving forward.  They can start their cross-examination.

10          But more to the point, if anybody needs a short

11 deposition, we do, of the gentleman that they have arranged

12 to bring in from Sweden, who has suddenly produced all these

13 things that he should have produced before we were there

14 taking his deposition, and now there is a variety of internal

15 Ericsson documents and things that under no world could we

16 have had them.

17          MR. LUMISH:  Thank you, Your Honor.  Very briefly.

18          I just want to point out, again, that these are

19 e-mails to and from Mr. Sebire.  We're not talking about the

20 internal documents at Ericsson.  We understand that those

21 were just produced yesterday, but these are documents that

22 went to Mr. Sebire at his NSN address and came from

23 Mr. Sebire at his NSN address.

24          And what you haven't seen is a declaration or

25 anything else that suggests that those were searched for in

response to the materials Mr. Homrig walked you through in

response to the discussions that we've had or that they were

provided.  These are documents -- I agree with

Mr. Caldwell -- that should have been provided a long time

ago but from NSN, who has a vested interest in this.

Now, a third party from another country didn't

produce these documents, who has no relationship to the

issues, has nothing to win here, I think is a -- is a

diversion from the real issue.

As for the witness prep issue, I think Mr. Caldwell

will probably bring this up every time he comes, and I'll

have to tell Your Honor every time.  We hadn't selected our

witnesses.  Mr. Stattin is somebody that I talked to on the

telephone.  I did it, I think -- I'd have to go look --

within the context with the pretrial conference.  As soon as

we decided we were calling him, we let them know.  They know.

That's just another distraction from the issue.

We would ask that these documents be permitted to

be added to the trial exhibit list; that they be permitted to

be used in this trial; and that we have just a little bit of

time.  I'm talking about 18 hours, 24 hours, to process them

a little further before we have to use them in

cross-examination.

Thank you, Your Honor.

THE COURT:  Okay.  I am going to allow Defendants

1    to supplement with these four documents.  However, when it's

2    time to get into Mr. Sebire's cross, you'll start that if we

3    get to it today.  If it carries over to tomorrow, then that's

4    fine.  And I have a feeling that's likely, given everything

5    we've got to get to before we get to our first witness today.

6    No depositions either way.

7           And in light of the ruling, Plaintiffs, if there

8    are documents you feel like you need in to complete the

9    picture, I will entertain those as well, as they come up.  So

10   y'all continue to go through those, and let me know if you

11   have any additions that you need.

12          Let me hand these back to you-all before it ends up

13   in the bottomless pit that is my bench.  Here you go.

14          MR. CALDWELL:  Thank you.

15          THE COURT:  What's next?

16          MR. FINDLAY:  Your Honor, Eric Findlay on behalf of

17   Apple.  If we could briefly be heard on the financial issue

18   that was raised with --

19          THE COURT:  Let me let --

20          MR. FINDLAY:  I'm sorry.

21          THE COURT:  That's okay.  He's sneaking back there.

22   Let me let Plaintiffs take up one point, and then we'll kind

23   of go back and forth here.

24          MR. LUMISH:  Sorry, I think you handed me one of

25   your documents.

```
 1              THE COURT:  I think it belongs to the Plaintiff.
 2   Each of you have handed me up something.  Yes?
 3              All right.
 4              MR. STEWART:  Your Honor, Chris Stewart for the
 5   Plaintiff CCE.  Sorry to sneak in here.
 6              We had four outstanding disputes on the motions in
 7   limine, the additional motions in limine filed by the
 8   Plaintiff.
 9              Pursuant to your instructions, we immediately, soon
10   after the hearing on Thursday, reached out to Defendants to
11   confer further on these and try to reach agreements.  And as
12   is has sort of been the pattern in the past, we got our very
13   first response of any kind to that original e-mail after
14   multiple follow-ups last night at 7:00 o'clock where the
15   response was, we can't agree to certain parts of these
16   additional motions in limine, and we have no explanation as
17   to why.
18              So the outstanding disputes are with respect to
19   Plaintiff's additional motions in limine, 11, relating to the
20   presumption of validity not applying.  And excluding any
21   reference to that.
22              No. 12, which deals with trying equitable or legal
23   issues in front of the jury.
24              No. 14, which deals with Apple introducing that the
25   status quo has changed with respect to non-infringing
```

1    alternatives since the close of fact discovery.

2             And No. 17, which deals with source code access and

3    not being able to imply that there was something improper or

4    deficient in an expert's review of the source code, given the

5    fact that there were stringent protective order measures that

6    had to be taken.

7             And, Your Honor, I'm happy to discuss any of those

8    further if you'd like more clarification.  But as we have

9    said in previous hearings, these are orders that have either

10   been agreed to by Apple in the past or granted by Your Honor.

11            And I can show you those agreements or orders, if

12   you'd like.  And we feel like they are routinely granted and

13   should be granted in this case.

14            THE COURT:  Mr. Stewart, do you have a copy of the

15   additional request on the limine points?  I just don't have

16   that right in front of me.

17            MR. STEWART:  Sure.  I have a copy with the four

18   relevant ones highlighted up here.

19            THE COURT:  Hand that up.

20            All right.  Let me get a response.

21            MR. LEE:  Good morning, Your Honor.

22            THE COURT:  Good morning.

23            MR. LEE:  Joseph Lee for Apple.

24            Now, with respect to addressing the individual

25   MILs, I'm -- there are others that may speak to some -- on

1    the team that may speak to some of them individually.  But to

2    address the major point, which is, you know, the

3    characterization of Apple's conduct with respect to the

4    additional MILs, I just want to point a few things out for

5    Your Honor.

6            So, first of all, it is simply not true that the

7    first that they heard from us regarding the substance of

8    these MILs that they are seeking was late last night.

9            These are MILs that have been discussed, as Your

10   Honor is aware, they filed these requests for additional MILs

11   along with the ten MILs that they're allowed to seek way back

12   on -- I forget the exact date, but it's been several weeks

13   now.

14           And we've been in dialogue with CCE regarding these

15   MILs to attempt to reach agreement on them.  And, in fact, we

16   have reached agreement on some of them.  We have reached

17   partial agreement on others.  But the point is that we have

18   been engaging in a good-faith process with them.  For them to

19   characterize us as just staying silent and responding at the

20   last minute, is just simply incorrect.

21           Now, with respect to the specifics regarding these

22   MILs, as I think I explained to Your Honor, or at least

23   someone explained to Your Honor at the pretrial conference

24   last week, you know, we have concerns with regards to how

25   these MILs have been written.

1          You know, we don't necessarily disagree with the

2    substance of at least part of the MILs.  In fact, we have

3    reached agreement on a number.  But there are others where we

4    just simply feel that the way that the MILs are characterized

5    are -- are unfair and don't -- are not tailored to the

6    circumstances of the case.

7          And, you know, just to give you one example, the --

8    they're seeking to have us not discuss that the presumption

9    of validity doesn't apply.

10         Now, we certainly have no intention of arguing that

11   the presumption of validity doesn't apply.  I mean, that's

12   the law.  But what's also the law is that the burden in

13   showing that the presumption of validity is -- can be

14   overcome is lessened when you have art that's not previously

15   been before the Patent Office.  I mean, that's just the law.

16         And yet, they refuse to acknowledge that that's

17   something that we can include.  And so they just simply say,

18   you're just not allowed to talk about presumption of

19   validity.  And we can't accept that because that's -- that's

20   going to be a one-sided MIL.  That's just one example, Your

21   Honor.

22         THE COURT:  Okay.  Let me get a response on that

23   one.  We've got a jury coming in, in the next 20 minutes.

24   We're going to rule on these.  So y'all tell me what the

25   dispute is, and let's see if we can figure out where we need

1    to be on each one.

2            MR. STEWART:  Sure, Your Honor.

3            On that one, the presumption of validity doesn't

4    apply.  Saying otherwise is contrary to the law, and that's

5    clear.

6            This other caveat that they want to add to it about

7    the burden of proof being lessened if there wasn't art in

8    front of the examiner, they've never shown us authority that

9    expressly states that.

10           We have some disagreements as to whether that is,

11   in fact, an accurate representation of the law.  And we think

12   since they agreed to the first part -- you just heard they do

13   agree, that they cannot say the presumption of validity

14   doesn't apply -- that MIL should be granted.  And they can

15   approach if they think they are getting into inappropriate

16   insinuation that might violate that MIL.

17           THE COURT:  All right.  So, I mean, where is the

18   dispute?  Are you saying that they cannot say, hey, the PTO

19   did not consider this piece of prior art, and that's relevant

20   in your analysis on invalidity?

21           MR. STEWART:  Your Honor, I think that part we

22   wouldn't dispute, that they can talk about the fact that the

23   PTO may not have considered a piece of art.  They want an

24   express exclusion from this MIL that says the burden of proof

25   is less than -- is less than clear and convincing evidence

1   when the PTO has not reviewed the prior art.  And we just

2   dispute that that is, in fact, a clear statement of the law.

3          THE COURT:  Okay.  Response.

4          MR. LEE:  Your Honor, that's just wrong.  I -- I

5   believe that we have given them authority.

6          For example, the i4i case -- and I don't have the

7   exact cite in front of me, but Your Honor may very well be

8   aware of that case -- is one example where the Court

9   explicitly said that the burden is lessened -- or -- or what

10  you need to show, the burden is lessened because of the fact

11  that the art was not previously before the Patent Office.

12         THE COURT:  Right.  I am familiar with that case.

13  I don't have it right in front of me so I don't have the

14  exact language.  I'll hold you to that language and no more,

15  okay?

16         So I'm going to grant the motion in limine.  You're

17  not going to be able to argue the presumption of validity

18  does not apply.  You can talk about prior art not in front of

19  the PTO in context and in line with the law set out in i4i

20  and its progeny, okay?

21         MR. LEE:   Thank you, Your Honor.

22         THE COURT:  What's next?

23         MR. STEWART:  Your Honor, the next one that was

24  specifically addressed was equitable and legal issues.  There

25  was agreement as to certain of the equitable legal issues

listed in MIL 12, that they did say they would not present to

the jury.

But, for example, they deleted from this MIL in

their counter-proposal, Section 101, ownership,

indefiniteness, untimely disclosure, things that are clearly

purely legal or purely equitable issues that they have at

least implied they're intending to present to the jury with

no explanation as to how they're allowed to do that or why

they would do that.

I think Your Honor referenced for practice that

equitable issues are tried to the bench.  Purely legal

issues, obviously, are not for the jury.  And so we just

think that there's nothing controversial about saying these

legal and equitable issues should not be in front of the

jury.

THE COURT:  Response.

MR. SIMS:  Good morning, Your Honor.  Cassius Sims

for Apple.

The issue that we have with this is not in

substance as with the other MILs.  This is more an issue of

overlapping issues that could be tried to the bench and to

the jury.  And how the MIL is phrased, we believe, that -- I

think it would be misinterpreted or misused to preclude us

from presenting issues such as to inventorship and

derivation, which Mr. Lumish recently discussed, among other

1    issues that may cross over.

2           The factual underpinnings of those issues which are

3    tried to the jury would have common ground with those that

4    would be tried to the bench.  And we want to ensure that

5    we're not precluded from discussing those things that should

6    be heard by the jury.

7           THE COURT:  Okay.  You are not precluded from

8    discussing those things; however, anything that is purely an

9    equitable or legal issue, leave it for the bench, all right?

10          What's next?

11          MR. SIMS:  Your Honor, the next one is with respect

12   to MIL 14.  The undisclosed non-infringing alternatives, part

13   of it is agreed.

14          But the second part, that since the close of fact

15   discovery there has been a change in the status quo regarding

16   Defendants' use of a non-infringing alternative.  They

17   wouldn't agree to that.

18          Presumably, they're going to get up here and say,

19   hey, we didn't get any fact discovery on it.  But we have now

20   implemented one of those non-infringing alternatives we set

21   out, and we didn't have a chance to get discovery on how that

22   implementation occurred, how expensive it was, and what it

23   took, whether it's actually, in fact, been implemented.

24          And so, you know, we think that the status quo as

25   of the close of fact discovery is what should be at issue

1   here in trial.

2          MR. SANDFORD:   Good morning, Your Honor.   Brett

3   Sandford for Apple.

4          With respect to the first part, as Mr. Stewart

5   mentioned, we -- we agree and we do not intend to introduce

6   any expert opinions that there is any non-infringing

7   alternatives that were not disclosed in our expert reports.

8          We're going to stay within the bounds of that.

9   We've told them that repeatedly since day one, and we finally

10  reached agreement last night with that.

11         Our concern, and I believe Your Honor has been made

12  aware of this through the -- through the different

13  conversations we've had about these MILs, is a concern with

14  the second language.   CCE wants a little more here.

15         And our concern here, as we've expressed, is that

16  if we agree to this second part that they would use that in a

17  manner that would preclude our witnesses from testifying as

18  to just the facts and that they would be able to, for

19  example, if we agree that there had been no change in the

20  status quo, then say, well, you haven't done anything since

21  then.

22         And if they elicit that testimony, our witness

23  should just be allowed to testify based on their personal

24  knowledge.

25         And that's our concern there, Your Honor.   We don't

1    seek to affirmatively introduce any of that evidence, but

2    our -- our concern is, is the way -- is the potential for

3    abuse there.  And that's -- that's specifically why we

4    haven't agreed to that second part, Your Honor.

5            THE COURT:  Mr. Stewart, are you-all going to ask

6    such questions?

7            MR. STEWART:  Your Honor, I don't know for certain;

8    but, obviously, that would be a reason they could approach

9    and say the door has been opened and the -- when the MIL is

10   granted.

11           THE COURT:  I would caution you to be careful about

12   that.

13           MR. STEWART:  Yes, ma'am.

14           THE COURT:  All right.  Then I will -- I will grant

15   the motion with the caveat that if you open the door, I'm

16   going to let them answer truthfully.

17           MR. STEWART:  Yes, your Honor.

18           THE COURT:  All right.

19           MR. STEWART:  Last one is with respect to source

20   code access.  Again, because of stringent protective order

21   provisions in place with respect to review of source code, we

22   think that in a reciprocal MIL, no party should be

23   criticizing an expert because they didn't go and review

24   source code frequently enough, because it was just costly and

25   inefficient to send an expert out repeatedly, repeatedly, and

 1   repeatedly.

 2         They have agreed to only the part of this MIL that

 3   says we can't criticize source code -- or criticize for not

 4   reviewing source code that was not produced, but they still

 5   intend to criticize someone because of the number of times it

 6   was accessed, or the identity of the person reviewing, or the

 7   inability to access certain source code.  And that's just

 8   simply unfair due to the protective orders.

 9         THE COURT:  Response.

10         MR. LEE:  Your Honor, I think the best way to

11   address this MIL is just tackle it head-on and explain

12   exactly what our concern is.

13         We -- we don't intend to, and we don't want to --

14   or we don't expect to question the witnesses regarding the

15   fact that, you know, they didn't have a copy of the source

16   code that they could keep on their sight 24/7 and, therefore,

17   somehow their opinion is deficient.

18         But the thing that we're worried about, and the

19   reason why we haven't been able to reach agreement -- and to

20   be clear, we haven't reached agreement with part of the

21   source code MIL, but the part that we can't reach agreement

22   on, our concern is that they're going to use it against us to

23   prevent us from testing the representations made and the

24   things that the experts will say regarding what they did, in

25   fact, do.

 1          And it's not -- it's not a question of, hey, you

 2   didn't go look at this code every week during the case.

 3   That's -- that's not what we would be checking.  What we

 4   would -- but what we should be allowed to do is given the

 5   level of access they had, what did they do with regard to

 6   that.  And as well, if they made representations regarding

 7   the thoroughness of their source code review, then we

 8   shouldn't be precluded from testing that representation.

 9          THE COURT:  The part of the motion in limine that

10   is not agreed to is denied.

11          What is next?  Mr. Findlay?

12          MR. FINDLAY:  Thank you, Your Honor.  I'll try to

13   be quick.

14          Your Honor will recall the motion to compel certain

15   financial information from Mr. Bakewell which granted

16   production of his salary percentage, equity in his firm and

17   whatnot.  And the order from Your Honor said that if this was

18   not about admissibility, it was about discovery, we could

19   talk about it further.

20          Mr. Hill and I spoke yesterday about this issue,

21   and he did agree that they would approach before they got

22   into anyone's salary or percentage of income in the firm.

23          Respectfully, what I wanted to raise with you is I

24   think we -- we would prefer to have a more clear

25   understanding as we go into trial because we think it

 1    potentially affects more than just the experts.  And we want

 2    to make sure we understand the Court's feelings on this.

 3            And if I could very briefly put it into three

 4    categories from our standpoint, Your Honor.

 5            A number of the witnesses in this case, including

 6    Ms. Wagner, I believe, CCE's corporate representative, are

 7    residents of California, which has a very strict, as I

 8    understand it, state constitution providing protections of

 9    privacy.

10            We think for those individuals, that would include

11    the Apple folks, I believe, and like I said, Ms. Wagner, any

12    reference into that, salaries, amount of money paid,

13    percentage of equity, just shouldn't be permitted.  If

14    they -- if they have a financial interest in the case, in the

15    outcome of the case, that's obviously fair game.  And I think

16    we would both agree with that.

17            The second category we would put it in is the

18    third-party witnesses that Your Honor has heard about.  This

19    would be Mr. Stattin and Mr. Sebire.  Questions to them

20    regarding bias, interest, money they've made in connection

21    with coming here or being here or in connection with their

22    motivation, we think, is all appropriate.

23            The third category, the experts, is the one that

24    was raised by the -- Mr. Bakewell's motion.  And again, I

25    think we're close in agreement, at least if I understand

1   Mr. Hill's position.  We don't -- experts are all paid.  We

2   know they're all paid well.  Both sides have them, Your

3   Honor.

4           They can be inquired as to their billing rate, how

5   much have they been paid by the client, both Mr. Green in

6   terms of CCE or Acacia, Mr. Bakewell in terms of Apple, how

7   much their firms have gotten.

8           But we just think there's a -- there's a bright

9   line there in terms of when you're asking about someone's

10  take-home pay or salary, how much money did you make last

11  year to support your family, that, to us, just seems to cross

12  a line.  I think that could be seen as unseemly in some

13  respects.

14          As to a percentage of your home income that came

15  from Apple, might be a hypothetical question to Mr. Bakewell,

16  I think that's fair.  Similarly, with respect to Mr. Green, a

17  percentage of your income that came from testifying for

18  Acacia, I think that's fair.

19          But to get into the actual numbers of what somebody

20  takes home to provide for their families, we would ask just

21  simply be precluded.

22          Thank you.

23          THE COURT:  Response.

24          MR. HILL:  Thank you, Your Honor.  May I use this

25  podium?

```
 1              THE COURT:  Yes.  Thank you.

 2              MR. HILL:  Your Honor, where this issue came up, as

 3    the Court knows, is in the context of the expert witnesses

 4    where we had this additional disclosure of information

 5    regarding their compensation.

 6              And Mr. Findlay is correct.  We have agreed that

 7    we're not going to go into the experts' take-home salary or

 8    their equity stake in their respective firms without first

 9    approaching the bench.

10              And I'll be candid with you, Your Honor.  We're --

11    we're leaving that door open about approaching the bench.  I

12    don't expect that's going to happen.  I just don't see that

13    as becoming relevant in the case.  And if it does, we'll come

14    talk to you about it before we go into it.  So that shouldn't

15    be an issue.

16              With regard to other witnesses, Your Honor, if a --

17    again, our point is not to go into other witnesses' salaries

18    except to the extent it becomes relevant in the course of the

19    case.

20              There may be discussions or accusations made

21    against certain witnesses that they have some financial stake

22    or financial incentives for things they've done.  And if that

23    becomes a line of questioning from one side, it could make

24    other persons' financial interest and maybe bonus structures

25    or other things relevant as well.
```

1        We'll address those issues with the Court if we

2   need to before we launch into them.  But to have them

3   excluded categorically at this point, when frankly that's not

4   been an issue that's been discussed between the parties, it

5   wasn't part of the expert compensation issues, it's very

6   abstract.  I don't know what they're shooting for, to be

7   honest with you.

8        So we would certainly let the Court know that

9   before we launch into somebody's take-home pay, we're going

10  to come talk to you about it first.

11       THE COURT:  Okay.

12       MR. FINDLAY:  I can assure the Court the only thing

13  we're looking for, Your Honor, is clarification of what is --

14  what is acceptable, what is not acceptable.  And we think we

15  should have that before we begin evidence.  That's the only

16  reason I raise this.

17       THE COURT:  It -- it sounds like y'all are close.

18  It sounds like we are not going to get into anyone's

19  take-home pay.  We're likely -- we're not going to get into

20  that at all.  And if for some reason it becomes relevant,

21  you-all will approach before you get anywhere close to it.

22       So what else concerns you, Mr. Findlay?

23       MR. FINDLAY:  I get with -- that admonition to the

24  parties.  I think we can work with that, Your Honor.

25       THE COURT:  Okay.

1          MR. FINDLAY:  Thank you very much.

2          THE COURT:  Very good.

3          MR. HILL:  Thank you, Your Honor.

4          MR. MCMANIS:  Your Honor, Jason McManis for CCE.  I

5    have two sets of objections to some of Apple's opening

6    slides.  And rather than mess with the document camera, if I

7    might approach?

8          THE COURT:  Certainly.

9          MR. MCMANIS:  Your Honor, with respect to Apple's

10   Slides 1.7 and 1.11, our objection here is to the image of

11   the royalty stacking.  And I know that Your Honor denied our

12   motion in limine on that -- on that point, but we think this

13   particular image is overly prejudicial and creates the

14   perception that Apple has this stack of patents or other

15   documents that they have a license to, sitting somewhere.

16          And -- and this is going to cause problems for them

17   to be able to pay money to CCE.

18          And I think the corollary, Your Honor, would be

19   if -- for damages slides, instead of putting a number of

20   units up there, we had trucks -- semi-trucks full of iPhones

21   to show that we have all these iPhones.  We have -- we have

22   no way of quantifying how many iPhones are in that truck.  We

23   have no way of quantifying how many stacks of paper there are

24   there.  And we just think it's prejudicial and confusing to

25   the jury.

```
 1              THE COURT:  So your -- your objection to this
 2   particular slide is just the stack of papers?
 3              MR. MCMANIS:  Yes, Your Honor.
 4              THE COURT:  Okay.  Response.
 5              MR. HOMRIG:  Thank you, Your Honor.  Jeff Homrig.
 6              I wish they had said this straightforward in the
 7   meet-and-confer because that's not what we're doing at all.
 8              This is just intended to show how large the
 9   standard is.  It's huge.  And the point is, is that a part of
10   this case that -- that -- or the part of the standard that is
11   at issue in this case is just a small piece of that.  So
12   that's it.  It's not a stack of patents.  It's not a stack of
13   Apple patents.  So I can't imagine that there's an issue with
14   demonstrating that this particular part of the standard is
15   just a small part.
16              THE COURT:  All right.  I'm going to overrule the
17   objection to this slide.
18              Mr. McManis, what's your objection to the other
19   one?
20              MR. MCMANIS:  Your Honor, with respect to 1.12 and
21   1.13, they kind of go hand-in-hand.  And I think the first
22   slide, in and of itself, which appears to be how the patents
23   ended up in CCE's possession, we don't really have a problem
24   with that slide in isolation.
25              But what it looks like they're trying to do is
```

1    create this imagery that suggests that CCE bought a ticket to

2    the courthouse.  And we believe that that's properly excluded

3    under the parties' agreed MIL 4.

4              And we did raise this specific issue last night.

5              And for that reason, we think that the slides

6    together should be excluded.  Or at least the second slide

7    should be excluded because what we didn't hear from Apple was

8    any reason why a picture of the courthouse is relevant if

9    it's not used for that improper issue.

10             THE COURT:  Okay.  Response.

11             MR. HOMRIG:  Thank you, Your Honor.

12             On Slide 1.12, the point here is simply that the

13   patent transferred through Acacia, and Acacia transferred it

14   to its subsidiary.  That's it.

15             On the next slide, they filed in this courthouse.

16   We're trying to the case in this courthouse.  And my point is

17   just they filed here.  It's -- it's not an issue -- I think

18   they were concerned during meet-and-confer that we were going

19   to somehow disparage this district or do something like that.

20             We're not doing anything like that.  The point is,

21   is that they filed this lawsuit, and it's just a vehicle to

22   talk about, frankly, what Apple did in response.

23             MR. HILL:  Your Honor, can I just say one thing

24   about that?

25             THE COURT:  Sure.

1              MR. HILL:  What I hear when I hear Mr. Homrig's

2     explanation makes me worry about basically a covert venue

3     attack.  And I just want to make sure that's not what we're

4     going to hear once we see that picture of the courthouse.

5              MR. HOMRIG:  Not at all, Your Honor.

6              THE COURT:  Okay.  Well, with that representation,

7     I'll let you keep this in your slide deck.

8              MR. HOMRIG:  Thank you.

9              THE COURT:  All right.  What's next?

10             I understood from someone that -- I think the Court

11    got one of the motion in limine points a little bit wrong.

12    Is that -- Motion in Limine No. 5, the last part of No. 5, I

13    think I am just incorrect about that; is that right?

14             MR. FINDLAY:  I would never say the Court is wrong

15    on anything, Your Honor.

16             THE COURT:  I will.  I'll do it for you,

17    Mr. Findlay.

18             MR. FINDLAY:  But we think maybe words got jumbled.

19             On that point, I think the parties were in

20    agreement that we could talk about the other licenses, we

21    could talk about the fact that they resulted from litigation.

22             And I am quoting from Mr. Stewart, who I agree

23    with, there are inferences and arguments that you could make

24    from that.  His concern was that we were going to go back to

25    the litigation itself and talk about the details of the

 1    litigation, which we have no intention of doing.  So I think

 2    we are all on the same page.

 3              THE COURT:  Good.  Far be it from me to bust out an

 4    agreement with poor wording.  So I am going to -- I'm

 5    striking the part of that MIL that's in parentheses, which I

 6    think is the problematic language.

 7              MR. HILL:  Thank you, Your Honor.

 8              THE COURT:  Okay.  What else can I help you with

 9    before we bring in this jury panel?

10              Is there -- I got a note from my law clerk about

11    somebody maybe wanting to do a little mini opening or an

12    issue?

13              MR. FINDLAY:  Thank you, Your Honor.

14              And I just was -- Mr. Hill indicated that they

15    didn't want to do it.  I didn't know what Your Honor's

16    preference was.  This was my first trial in front of Your

17    Honor.  Sometimes we're allowed to do a three- to five-minute

18    mini opening just to explain the case.  If that's your

19    Court's preference, we would prefer that, but I understand

20    Mr. Hill would rather not.

21              MR. HILL:  That's correct, Your Honor.  We believe

22    that the time for opening statements is opening statements.

23    We open with the jury this morning.

24              THE COURT:  All right.  I agree.  Let's not do

25    that.

1          MR. FINDLAY:  That's fine.  Thank you, Your Honor.

2          THE COURT:  Sure.

3          MR. HILL:  Can I ask one last question, Your Honor?

4    Does the Court have a preference about where we -- which

5    podium we use for jury selection?

6          THE COURT:  My preference is to use that -- that

7    podium.

8          MR. HILL:  The mic podium?

9          THE COURT:  And it's sort of a -- sometimes we --

10   sometimes we move this podium here because it's not a fixed

11   podium.  And, in fact, that will -- I usually sort of pull it

12   up here where you all can see the panel and you can move it

13   in such a way so it's sort of -- not the base podium, but

14   this one that's sitting right here.  And we'll -- we'll

15   reposition that so that you can address the panel.

16         MR. HILL:  Thank you, Your Honor.

17         THE COURT:  All right.

18         MR. FINDLAY:  Thank you, Your Honor.

19         THE COURT:  And I know we've got a lot of folks in

20   the audience today.  I'm happy to see you all.  We're going

21   to bring the panel in, though, and they're going to need this

22   whole side of the courtroom.  So when we break, I just need

23   y'all to get cozy over here for jury selection.

24         Anything else?

25         MR. SANDFORD:  Yes, Your Honor.  Brett Sandford for

1    Apple again.

2            We have a -- an objection to a bucket of slides, I

3    guess you could say, for Mr. Sebire's direct examination.  If

4    the Court would like to hear those now or before he goes up.

5            THE COURT:  Ms. Hardwick, is our -- is our panel

6    ready downstairs?

7            COURTROOM DEPUTY:  They're ready.

8            THE COURT:  They're ready, okay.

9            Well, we're going to go ahead and get started this

10   morning, and we'll take it up over the lunch break.

11           MR. SANDFORD:  Of course, Your Honor.

12           THE COURT:  All right?

13           MR. SANDFORD:  Be happy to.  Thank you.

14           THE COURT:  We will be in recess awaiting the jury.

15           COURT SECURITY OFFICER:  All rise.

16           (Recess.)

17           (Jury Panel in the Courtroom.)

18           THE COURT:  Good morning, Ladies and Gentlemen.

19           Welcome to jury service in the United States

20   District Court for the Eastern District of Texas.  I am Judge

21   Nicole Mitchell, and I'm very honored to have you all here

22   today for jury selection.

23           You've already met some of our Court personnel

24   downstairs, but I want to introduce you to a few folks in the

25   courtroom before we begin.

1              So I've got with me today my courtroom deputy,

2      Ms. Lisa Hardwick, down in front here; my court reporter

3      Ms. Chris Bickham; my law clerk, Ms. Prachi Mahta; and our

4      court security officer, Ms. Gail Mayes.

5              And so we're going to do jury selection this

6      morning.  We're about to begin the trial of a civil case.

7              Let me first thank you again for your service here

8      today.  I hope that you will feel like it is an honor to

9      serve your country today rather than a burden.

10             This is a patent lawsuit in which the Plaintiff,

11     who is Cellular Communications Equipment LLC, or CCE, claims

12     that the Defendant, who is Apple, Incorporated, infringes its

13     patent.

14             I and the parties will have more to say about that

15     throughout the case, but I wanted you to just have a general

16     idea of what the case is about.

17             I anticipate that the presentation of the evidence

18     and the whole case is going to take five to six days, and I'm

19     going to adjourn the case at lunchtime on Friday so that I

20     can attend to another commitment that I have.

21             So I expect that this case will run until Tuesday

22     or possibly Wednesday of next week.

23             Let me give you an overview of what will be

24     happening over the next several days if you are selected as a

25     juror in this case.  Right now we're doing the beginning

1    phase of the trial, what we call voir dire examination of the

2    jury panel.

3            And what we're doing is allowing the Court and the

4    attorneys to ask some questions of you-all and make some

5    decisions about you as a potential juror.  This will probably

6    take about two hours, maybe a little less.

7            And then each side is allowed to strike a certain

8    number of jurors, and the first remaining eight jurors will

9    be sworn in as the jury who will decide the case.

10           After jury selection, we will have opening

11   statements by the attorneys for each side, followed by the

12   presentation of the evidence.

13           You will receive the charge of the Court, some

14   instructions on the law on the case.  You will hear closing

15   argument from the attorneys.  And then the jury will retire

16   to the jury room to deliberate and to reach a verdict.

17           The purpose of voir dire, as I mentioned, is to

18   enable the Court to determine whether or not any prospective

19   juror should be excused from jury service, either by the

20   Court for cause or by counsel for the parties by way of a

21   peremptory challenge, which is a challenge for which no

22   reason need to be given.

23           "Voir dire" is a Latin phrase, which means "to

24   speak the truth," which I know you will all do today in

25   answering the questions.

1      Please listen carefully to the questions that I'm

2  going to ask you and that the parties are going to ask you,

3  and do not be timid about standing up and talking and

4  answering the questions.  It's very important that you fully

5  answer any of the questions if they apply to you.

6      With that, we're going to get started.  I'm going

7  to get you talking and get you used to answering questions,

8  and so we're going to have a little bit of an icebreaker.

9      I'm going to ask each of you, whenever you speak

10  today, to stand up, to tell me your name, and then to answer

11  the question each time.

12      So we're going to practice that right now.  What

13  I'm going to do is have each of you stand one by one, and

14  you're going to tell me your name; the city where you live;

15  your job; if you're retired, what your job used to be; if

16  you're married, your spouse and his or her occupation; and my

17  favorite part, your favorite thing to do in your spare time.

18  All right?

19      So we're going to practice with Juror No. 1,

20  Mr. Kinsman.

21      JUROR KINSMAN:  My name is Adam Kinsman.  I live in

22  Henderson.  I'm a teacher.  I'm married.  My spouse's job is

23  being a teacher as well.

24      And I've never served on a jury, and my favorite

25  hobby or after-school-type activities is listening to music

1    and collecting records.

2              THE COURT:  Very good.  Perfect.

3              JUROR FAULKNER:  I'm Bruce Faulkner.  I live in

4    Tyler.  Oil and gas production company.  Married.  I'd rather

5    be playing golf.

6              THE COURT:  Wait, Mr. Faulkner.  What does your

7    spouse do?

8              JUROR FAULKNER:  She is an interior decorator.

9              THE COURT:  Thank you.

10             JUROR JENNINGS:  My name is Chris Jennings.  I live

11   in Mineola, Texas.  I'm a mechanic with General Motors.

12   Married.  My wife is in retail.  I've never served on a jury.

13   Hobbies, drag race, electronics.

14             THE COURT:  Thank you.

15             JUROR STODDARD:  My name is Loreba Stoddard.  I

16   live in Longview.  I am a guardian with -- well, it used to

17   be DADS.  Now we're with HHS.  I'm married.  George is a

18   dentist.

19             And once I got picked for jury; but it went to

20   settlement, so I didn't really have to do anything.

21             THE COURT:  Do you remember if it was a civil case

22   or a criminal case?

23             JUROR STODDARD:  It was a criminal case in

24   Longview.

25             THE COURT:  Okay.  What do you like to do in your

1    spare time?

2                JUROR STODDARD:  Oh.  Who has spare time?

3                THE COURT:  I know.

4                JUROR STODDARD:  Read.

5                THE COURT:  Very good.

6                JUROR RISINGER:  My name is Sandra Risinger.  I

7    live in Tyler.  I am retired, a retired schoolteacher.  I

8    work part-time now at my church office.  I am divorced.

9    I have served on three juries, and they were so long ago, I

10   can't remember whether they -- I think one was -- I think two

11   were civil and one was criminal.

12               THE COURT:  Did you reach a verdict in each of

13   those juries?

14               JUROR RISINGER:  Yes.

15               THE COURT:  Were you ever the foreperson?

16               JUROR RISINGER:  No.

17               THE COURT:  Thank you.

18               Did you tell me what you like to do in your spare

19   time?

20               JUROR RISINGER:  Read.

21               THE COURT:  Read.  Okay.

22               JUROR BURNEY:  My name is Larry Burney.  I'm from

23   Jacksonville.  I am the pretreatment coordinator for the City

24   of Jacksonville, which means I look at sewers all the time.

25               I am married.  My wife is a retired schoolteacher

```
 1    and now a professional quilter.  I have served on a jury.

 2    I served when I lived in San Antonio.  I was on a district --

 3    I guess it was -- it was a federal -- American -- ADA,

 4    Americans with Disabilities, I think.  And that was settled

 5    out of court after about four days in the jury room, so...

 6               THE COURT:  What do you like to do in your spare

 7    time?

 8               JUROR BURNEY:  Work on my tractor.

 9               JUROR GARLAND:  My name is Donald Garland.  I live

10    in Kemp.  I'm a maintenance inspector for TxDOT.  I am

11    married.  My wife works at the lumberyard doing receiving.

12               And I've never served on a jury, and I really don't

13    have much spare time for anything except for raising

14    grandkids.

15               JUROR SCALLIONS:  I'm Kathy Scallions, and I live

16    in Canton.  And I'm a pharmacy technician.  I'm married, and

17    my husband is retired.

18               And I have served on a jury in Canton.  It was a

19    criminal case; but while we were deliberating, they settled.

20    And I spend a lot of time with my grandkids when I'm off.

21               THE COURT:  Ms. Scallions, what did your husband do

22    before he retired?

23               JUROR SCALLIONS:  He was an equipment mechanic.

24               THE COURT:  Thank you.

25               JUROR DREW:  My name is Steve Drew.  I live in
```

```
 1    Lindale, Texas.  I am an officer at a rigging and lifting
 2    company.  My wife is a teacher in Lindale School District.
 3             And I have never served on a jury.
 4             THE COURT:  What do you like to do in your spare
 5    time?
 6             JUROR DREW:  Spare time.  Chase grandkids, mountain
 7    biking.
 8             THE COURT:  Thank you.
 9             JUROR THOMAS:   I'm Kevin Thomas.  I live in Emory,
10    Texas.  My occupation is construction worker, installer.  I
11    am married.  My wife is a student, office assistant at Texas
12    A&M Commerce.
13             I've never served on a jury.  And my spare time is
14    just spending time with my family -- or my kids before they
15    grow up too fast.
16             THE COURT:  Thank you.
17             JUROR STATEN:  Larry Staten.  I live in Bullard.
18    I'm a retired mechanic working full time at a parts
19    department.  Married.  My wife is a legal assistant.
20             And I have served on a couple of municipal juries,
21    and I guess they were traffic tickets.  I don't know what
22    that makes a difference on.  And in my spare time, I build
23    things.
24             THE COURT:  When you were on those juries, did you
25    reach a verdict each time?
```

1              JUROR STATEN:  Yes, we did.

2              THE COURT:  And were you ever the foreman, the

3    foreperson on the jury?

4              JUROR STATEN:  Yes, on one of them.

5              THE COURT:  Okay.  Thank you.

6              JUROR WASHINGTON, JR.:  Hartest L. Washington, Jr.

7    I live in Tyler.  My occupation is toolmaker at Trane.

8    Single.  I never have served on a jury.  And I work on my old

9    truck in my spare time.

10             THE COURT:  Thank you.

11             JUROR STROUD:  My name is Susan Stroud.  I live in

12   Longview.  I'm retired.  I am married, and my husband is a

13   supervisor at Luminant.

14             And I have served on a jury before, and I had to be

15   excused due to my mother getting sick and passing away, so...

16             THE COURT:  So you didn't stay through the end of

17   the verdict?

18             JUROR STROUD:  No, ma'am.

19             THE COURT:  Okay.  What do you like to do in your

20   spare time?

21             JUROR STROUD:  I have grandkids, and I take care of

22   family, elderly.

23             THE COURT:  Thank you.

24             JUROR DAVIS, JR.:  Bob Davis.  I'm a regional sales

25   manager for a Tyler Union, Division of McWane Company.  I do

extensive travel.  I live in Flint, Texas.  And I am married
to a juvenile probation officer here in Smith County and have
been for quite awhile.

I have served on a civil jury, settled out of
court.  And I was on a criminal case.  I never have been a
jury captain, whatever you call them.  And I too would rather
be hitting a golf ball, and I do that very much.

THE COURT:  In that criminal case, did you all
reach a verdict?

JUROR DAVIS, JR.:  Yes, we did.

THE COURT:  Thank you.

JUROR PALMER:  My name is Toni Palmer.  I live in
Gladewater.  I am a stenographer.  I am married.  My husband
is a locomotive mechanic.  Never been on a jury.  And my free
time is pretty much being a taxi for my kids.

JUROR WADE:  Hello.  My name is Lauren Wade.  I
live in Troup.  My occupation is I work at Suddenlink
Communications.  I am single.  And I have served on a jury.
And in my spare time, I just enjoy my kids.

THE COURT:  On that jury, do you remember if it was
a civil case or a criminal case?

JUROR WADE:  It was a criminal.

THE COURT:  And did you-all reach a verdict?

JUROR WADE:  Yes, ma'am.

THE COURT:  Were you the foreperson on the jury?

 1              JUROR WADE:  No.

 2              THE COURT:  Thank you.

 3              JUROR STOCKMAN:  My name is Valarie Nicole

 4   Stockman.  I live in Seven Points.  My husband is a State

 5   Park police officer.

 6              And I have served on a jury before.  It was a civil

 7   case.  I was not the foreperson.  And I -- in my free time, I

 8   like to kayak and fish.

 9              THE COURT:  Ms. Stockman, tell me what you do for a

10   living.

11              JUROR STOCKMAN:  I apologize.

12              THE COURT:  No problem.

13              JUROR STOCKMAN:  I work in the engineering

14   department at Baylor Scott & White in downtown Dallas.

15              THE COURT:  And that jury you were on, you-all

16   reached a -- did you-all reach a verdict?

17              JUROR STOCKMAN:  Yes, ma'am, we did.

18              THE COURT:  Thank you.

19              JUROR SEALE:  Yes.  My name is Edward T. Seale.  I

20   live here in Tyler.  I'm semi-retired.  My wife, she's

21   semi-retired as well.  And, yes, I've served as an alternate

22   on a jury.

23              THE COURT:  Did you participate in the

24   deliberations, or did you just watch the testimony, and then

25   you were done when they went to deliberate?

1          JUROR SEALE:  Right.  I was done when --

2          THE COURT:  The second one?  Okay.

3          JUROR SEALE:  Yes.

4          THE COURT:  Do you remember if it was a civil or a

5  criminal case?

6          JUROR SEALE:  Yes.  It was an armed robbery.

7          THE COURT:  Okay.  And you said you're

8  semi-retired.  So what do you do when you're not retired,

9  when you're actually working?

10         JUROR SEALE:  Oh, I'm sorry.

11         THE COURT:  That's okay.

12         JUROR SEALE:  I work for U.S. Silica.

13         THE COURT:  And what about your wife?

14         JUROR SEALE:  She works for Tyler Independent

15  School District.

16         THE COURT:  Thank you very much.

17         JUROR MENEFEE:  My name is Karen Menefee.  I live

18  in Flint, Texas.  I am a nurse here in Tyler.  I am not

19  married.  I have not served on a jury.  And in my free time,

20  I have grandchildren that I love dearly, and I play games and

21  listen to music.

22         THE COURT:  Thank you.

23         JUROR WEDGEWORTH:  My name is Keith Wedgeworth.  I

24  live near Carthage, Texas.  I'm an environmental health and

25  safety coordinator for -- in the oil and gas field.  I am

 1    married.   My wife is an at-home mom.   I've never been picked

 2    to actually serve on a jury.

 3              THE COURT:   What do you like to do in your spare

 4    time?

 5              JUROR WEDGEWORTH:   I like to be involved with my

 6    kids' activities.

 7              THE COURT:   Thank you.

 8              JUROR YOUNGBLOOD:   I'm Dorcie Youngblood.   I live

 9    in Grand Saline.   I work at the Beto Unit as a teacher.   I am

10    married.   My husband works as a maintenance boss at the

11    Michael Unit.   I've never served on a jury.   I like to watch

12    athletic events in my spare time.

13              THE COURT:   Thank you.

14              JUROR PRICE:   My name is Erika Price.   I live in

15    Bullard.   I work at Dairy Queen on Broadway.   I'm single.

16    I've never served in a jury, and I like to hang out with

17    friends.

18              THE COURT:   Thank you.

19              JUROR GILL:   Good morning.   I'm Timothy Gill.   I

20    live in Smith County between Whitehouse and Chapel Hill.   I'm

21    a faculty member at Tyler Junior College.   My wife is a

22    retired public schoolteacher.

23              I've served both on a military court martial and

24    briefly -- which I was the equivalent of a foreperson.   I was

25    the senior officer.   And briefly on a criminal case here in

1    the county.

2          And in my spare time, I like to perform and record

3    music.

4          THE COURT:  In that criminal case, did you-all

5    reach a verdict?

6          JUROR GILL:  The defendant pled out.

7          THE COURT:  Thank you.

8          JUROR MILLER:  My name is Emmit Miller.  I'm from

9    Fruitvale.  I am sales manager for a heavy equipment auction

10   company.  I'm married.  My wife is a schoolteacher.

11         And I have served on a jury.  It was a county jury,

12   and we did reach a verdict.  I was not a foreperson.  And in

13   my spare time, I like to fish.

14         THE COURT:  Very good.

15         All right.  Great job.  I knew y'all would make a

16   good panel.  You did a great job.  So more of the same when

17   we're asking you these question.  Stand up, state your name,

18   and Ms. Mayes will bring you the microphone, and we'll let

19   you answer your question.

20         Let me say before we get started -- or go any

21   further, if we -- if I or the attorneys ask you a question

22   that maybe would elicit a response you're not comfortable

23   sharing in front of the whole panel, I'd like you to just

24   stand up, anyway, raise your hand, tell me your name, and

25   tell me that you'd like to discuss the matter up at the

1    bench.

2           And what we'll do is, at the end, I'll call you up,

3    and we can talk about that in more detail, not in front of

4    everyone.  The last thing I want to do is make you

5    uncomfortable.  If you don't want to talk about it, we'll

6    take it up up here.

7           So what I'm going to do now is ask Counsel for the

8    Plaintiff to introduce the client, counsel associated with

9    the trial of the case, and any witnesses who are here or who

10   you think may testify in the case?

11          Mr. Hill?

12          MR. HILL:  Thank you, Your Honor.

13          Good morning, Ladies and Gentlemen.  My name is

14   Wesley Hill.  I'm one of the lawyers representing the

15   Plaintiff in this case, Cellular Communications Equipment

16   LLC.

17          I want to introduce you this morning to our client

18   representative, Ms. Cristin Wagner.  The folks that are on

19   the jury will see Ms. Wagner throughout the trial.

20          Ms. Wagner is the senior vice-president with Acacia

21   Research Group, which we'll learn about -- a little more

22   about here in a minute about Acacia.

23          Also here for the trial, Ladies and Gentlemen, is

24   Mr. Brad Caldwell.  Mr. Caldwell is a lawyer from Dallas,

25   who's with a firm called Caldwell Cassady & Curry.  His law

1   partner, Austin Curry, also here with us, also from Dallas.

2          And then Mr. Ed Nelson, which is with the Nelson

3   Bumgardner law firm in Fort Worth.

4          I told you my name is Wesley Hill.  I live here in

5   Tyler.  I practice with a law firm called Ward, Smith & Hill.

6   We're based over in Longview, but we work -- have offices

7   here in Tyler as well.

8          I grew up over in Murchison, so I'm familiar with a

9   lot of areas you folks have listed here that you're from.  We

10  look forward to putting our case on to you and look forward

11  to letting you hear the issue we have for you folks to

12  decide.

13         THE COURT:  Mr. Hill, any witnesses you want to

14  highlight, anyone you think we might have that anyone would

15  know or --

16         MR. HILL:  Your Honor, I don't believe we have them

17  in the courtroom here presently to introduce them to the

18  jury.

19         THE COURT:  All right.  Well, let me ask you-all,

20  on the people that Mr. Hill introduced, do you know any of

21  these people, have any business dealings with them?  Are any

22  of them friends of yours?  Anybody recognize a familiar face?

23  I see one hand.

24         If you'll stand, Ms. Mayes will get the microphone

25  to you.

 1          Is this Mr. Drew?

 2          JUROR DREW:  Yes.  Steve Drew.

 3          My firm is currently involved in a legal action

 4  with the Plaintiff attorney's firm.

 5          THE COURT:  All right.  Thank you, Mr. Drew.

 6          Anyone else?

 7          All right.  Okay.  I'm going to -- what I'm going

 8  to do now is ask the Defendants' counsel to do the same

 9  thing.

10          Mr. Findlay --

11          MR. FINDLAY:  Yes.

12          THE COURT:  -- if you'll just introduce yourself

13  and everybody -- everybody at your table.

14          MR. FINDLAY:  Thank you, Your Honor.

15          May I go to the podium there?

16          THE COURT:  Yes.  Thank you.

17          MR. FINDLAY:  Thank you.

18          Good morning, Ladies and Gentlemen.  My name is

19  Eric Findlay, and I represent Apple in this case, and it is

20  my privilege to do so.

21          Let me first start by introducing you to some of

22  the people that you'll hear from and you'll see from Apple.

23          We have Ms. Heather Mewes, who's sitting here just

24  next to you.  Mr. Andy Song, Mr. Ash Upreti, and Mr. David

25  Melaugh.  These folks all work at Apple.  I think you'll hear

1  from Ms. Mewes during the trial.  They've come here from

2  California to talk to y'all because this is an important

3  case.

4           With me at counsel table is Mr. Doug Lumish and

5  Mr. Jeff Homrig and Ms. Gabrielle LaHatte.  They're from the

6  firm of Latham & Watkins.  Mr. Homrig and Mr. Lumish are from

7  California.  Ms. LaHatte is from Washington, D.C.  And also

8  we have Mary Noffsinger, and she is helping us out with jury

9  selection.

10          I think there may be one of our witnesses in the

11  courtroom.

12          Mr. Frappier, would you stand?

13          Mr. Mark Frappier is one of our -- what we call a

14  technical witness.  You'll hear from him later on.  And we're

15  happy to be here and look forward to presenting the case to

16  the eight of you lucky folks that get selected.

17          Thank you.

18          THE COURT:  All right.  So --

19          MR. FINDLAY:  Thank you, Your Honor.

20          THE COURT:  Thank you, Mr. Findlay.

21          So I have the same question for you-all.  Anybody

22  recognize anyone, ever had any dealings with anyone?  See any

23  familiar faces?

24          All right.  I see no hands.

25          So I am about to turn this over to the lawyers.

1    I've got a couple more questions to ask you, and my first one

2    is this:  If you're selected to sit on the case, will you all

3    be able to render a verdict solely on the evidence presented

4    at trial in the context of the law as I give it to you,

5    disregarding any other ideas or notions or beliefs about the

6    law that you may have in reaching your verdict?

7            Can you all do that?  Can you all make a decision

8    based on the evidence in light of the law that I give you?

9            Anyone feel like they cannot do that at this point?

10   Raise your hand now.

11           All right.  I've got one more question for you.  Is

12   there any other reason that suggests itself as to why you

13   might not be the right person for this jury or you're just

14   unable to sit on the jury for this length of time?  Is there

15   some urgent reason why you might not be able to serve?

16           One hand -- okay.  Two hands.

17           All right.  Let's see.  We've got Mr. -- that's

18   Juror No. 20.

19           JUROR WEDGEWORTH:  Keith Wedgeworth.

20           THE COURT:  Mr. Wedgeworth.

21           JUROR WEDGEWORTH:  I'm still under a doctor's care,

22   and I attend physical therapy, occupational therapy three to

23   four times a week.

24           THE COURT:  Okay.  Thank you, Mr. Wedgeworth.

25           I saw Mr. Drew's hand come up as well; is that

```
 1   right, Ms. Mayes?
 2             JUROR DREW:  I've been called to testify in a civil
 3   hearing next Tuesday with the Plaintiff's firm.
 4             THE COURT:  Thank you.
 5             All right.  And I saw one more hand.
 6             If you will please stand.  Ms. Mayes, I think, is
 7   bringing you the mic.
 8             JUROR STROUD:  My name is Susan, and I was told to
 9   go see an eye doctor, and I need to go get an eye
10   appointment.
11             THE COURT:  Okay.  You're Ms. Stroud?
12             JUROR STROUD:  Yes, ma'am.
13             THE COURT:  All right.
14             All right.  Thank you, everyone.
15             At this time, I'm going to recognize Plaintiff's
16   counsel for the purposes of voir dire.
17             Mr. Hill?
18             MR. HILL:  Thank you, Your Honor.
19             Good morning, Ladies and Gentlemen.  How are y'all?
20   I appreciate you being here this morning.  I know that jury
21   service is always an imposition on your time.  We recognize
22   that, and we don't take it lightly.
23             I want to tell you thank you right off the bat for
24   taking the time out of your life to come help us resolve the
25   legal issues that we can't resolve without your help.
```

 1          And I want you to sincerely know, on behalf of the

 2   lawyers for CCE and on behalf of CCE, that we genuinely value

 3   your time and appreciate you being here, because without

 4   folks like you, you can't get legal disputes resolved in this

 5   country with some companies.  So thank you and I appreciate

 6   you being here.

 7          Let me start off by saying you've met the folks

 8   here.  I want to give a little more of an introduction.

 9          You met Ms. Wagner.

10          Ms. Wagner, please stand up.

11          This is Cristin Wagner.  As I mentioned to you,

12   Ms. Wagner is a senior vice-president with Acacia Research

13   Group, and she as the corporate representative for CCE, will

14   be here in the courtroom with us throughout the trial.  Those

15   of you who are on the jury will also hear her testimony in

16   the case.

17          Thank you, Ms. Wagner.

18          Folks, I mentioned to you the name of our company,

19   Cellular Communications Equipment Company, CCE for short.

20   That's what we call it.  CCE is the owner of approximately 57

21   families of patents originally developed by Nokia Siemens

22   Networks that are related to advanced cellular communications

23   technologies.

24          We are here in this courtroom today with you folks

25   over one of these patents in particular.  This is a patent

 1   that you'll hear people refer to by its last three numbers,

 2   the '820 patent.  That's what this is.  And that's what

 3   brings us to court here today is the '820 patent.

 4           Now, as I mentioned, this name of our company,

 5   Cellular Communications Equipment, well, it indicates what

 6   the technology is about.  This is a case that -- and a patent

 7   that relates specifically to what's known as LTE cellular

 8   technology.

 9           Some of you folks may have noticed on your cell

10   phones sometimes the letters LTE.  That's the type of

11   cellular network that is on at a particular time.

12           Acacia Research Group is the parent company of CCE.

13   That's who Ms. Wagner works for.  Acacia Research Group is

14   owned by another company known as Acacia Research

15   Corporation, which is a publicly traded corporation, it's

16   traded on NASDAQ, that was founded in 1993.

17           Now, as you know by now, as the Judge told you and

18   as I've told you, we're here today because we allege, CCE,

19   that Apple is using the '820 patent without our permission

20   and without paying for that use.

21           And so, essentially, this is akin to a trespass

22   case.  We're here today because CCE believes that Apple is

23   trespassing on its rights, trespassing on its patent; and CCE

24   needs your help to fix that.  That's what brings us all to

25   court today.

1           Now, Ladies and Gentlemen, the facts of our case

2    will come out during opening statements, and now is not the

3    time for me to tell you what I believe the evidence will

4    show.  The lucky eight of you that get to spend some time

5    with us will get to hear all of that, probably more than you

6    want.

7           For now, just know that CCE believes that Apple is

8    using the invention covered by the '820 patent and that CCE

9    seeks to recover royalties that Apple should have paid for

10   that use.

11          As you might expect, we're here because Apple

12   refuses to be accountable for its actions in this case.  So

13   that's what the case is about.  That's what we're here for.

14          Now, as Judge Mitchell told you a little earlier,

15   this is the voir dire section of the case.  This is our

16   opportunity to talk to you folks and for you to talk back to

17   us.  It's the only chance we get to talk to you or for you to

18   speak back to us.  Once the trial gets started, you have to

19   sit there and listen to us, but we don't have a chance to

20   interact with you.

21          I would ask and tell you that there's only one rule

22   in jury selection, and that's speak up.  And that would be my

23   request to all of you today as we go through some of these

24   materials.

25          You all did a great job responding to Judge

 1   Mitchell's questions, but it's hard not to answer a Judge's

 2   question.  You know, when they tell you to answer a question,

 3   you answer it.

 4           I'm hoping you'll show me the same courtesy.  And

 5   if I ask a question that bears on something pertaining to

 6   you, please just speak up.

 7           As you folks learned downstairs, this is a patent

 8   case.  You learned a little bit about the patent system.

 9           One of the other things you did, though, is you

10   took an oath.  You took an oath to be a juror.  Part of that

11   oath is that you give truthful answers to questions.  And so

12   all I can ask for you here today is that you tell me -- if

13   something pertains to you, that you tell me the truth.

14           Now, let me know by a show of hands, who owns more

15   than one Apple device?  More than one Apple device.

16           All right.  Keep those hands up for me just a

17   second.

18           We've got No. 1 here.  That's Mr. Kinsman.

19   Mr. Faulkner, Ms. Stoddard.  Let's see who else we've got.

20   There on the back, Mr. Drew.  That's Ms. Stroud, Mr. Davis.

21   Also there, No. 10, Mr. Thomas.

22           And then on the back corner there, we've got

23   Ms. Palmer.  Let's see, Mr. Wedgeworth and on the back row,

24   Ms. Price, Mr. Gill, and Mr. Miller.

25           Did I get everybody?  Did I miss anybody?

1               All right.  Thank y'all.  Y'all can put your hands

2    down.

3               Also saw No. 5 there, Ms. Risinger.

4               Now, so you folks own more than one Apple device.

5    Let me ask you this question:  How many of you consider

6    yourself an Apple fan, you really like Apple?

7               All right.  We've got No. 2, Mr. Faulkner.

8               Anybody else?

9               Listen, there's nothing wrong with it.  I'm not

10   going to -- nobody is going to criticize you.  You just like

11   Apple products.  You're a big Apple fan.

12              No. 14 here, Mr. Davis.  Also, Mr. Wedgeworth,

13   No. 20.  And then on the back row there, Ms. Price.

14              Now, you folks who consider yourself an Apple fan,

15   I want to talk to some of you about it.

16              Let me start with you, Mr. Faulkner.  What do you

17   mean by that?  Why do you consider yourself an Apple fan?

18              JUROR FAULKNER:  Gosh, I guess it goes back to when

19   my -- my son was always an Apple fan, and I refused to get, I

20   guess, any kind of a smartphone until about eight or nine

21   years ago, and I got my first Apple phone, and I really liked

22   it.  Then I got an iPad, so I have both of those at home.

23              MR. HILL:  Uh-huh.

24              JUROR FAULKNER:  I just like the product.

25              MR. HILL:  Okay.  Anything about that that you

think would start you out leaning one way or another in a

lawsuit involving Apple?

JUROR FAULKNER:  No.

MR. HILL:  Okay.  Let me ask you this question:  Do you happen to own Apple stock?

JUROR FAULKNER:  No.

MR. HILL:  Does anybody on the jury happen to own Apple stock?

Okay.  Mr. Drew, you own Apple stock?

Okay.  That's okay, Ms. Mayes.  I don't need to ask him about it.

Let me ask some of you this, and we'll start here with -- well, let's see.  Let's start with Mr. Davis.

Mr. Davis, you indicated you're an Apple fan.  You like the products?

JUROR DAVIS, JR.:  I wouldn't say I'm -- excuse me -- I wouldn't say I'm an Apple fan.  I just -- I happen to own four devices.

MR. HILL:  Okay.

JUROR DAVIS, JR.:  And I don't know any competitor, in my opinion, that can compete with the quality of the items that I've purchased.

My daughter has a MAC computer for college and a couple of iPads and several iPhones.  But I don't trust the competitors, you know.

1          MR. HILL:  Okay.

2          JUROR DAVIS, JR.:  That's why I'm a fan, I guess.

3          MR. HILL:  All right.  Let me ask you this:  Do you

4   think that your affinity for Apple products would start you

5   out leaning toward Apple in a lawsuit over patent

6   infringement?

7          JUROR DAVIS, JR.:  Absolutely not.

8          MR. HILL:  All right.  Let me ask you one other

9   question.  As a person who likes Apple products, how

10  comfortable would you be, if the evidence supports it, of

11  returning a verdict against Apple for possibly millions of

12  dollars?

13         JUROR DAVIS, JR.:  I wouldn't have a problem with

14  it.  I'd look at the facts of the case and make my decision

15  on that.

16         MR. HILL:  Okay.  All right.  I appreciate it, sir.

17  Let me talk to a couple of other folks.  Let's talk to

18  Ms. Price back there on the back row, if we could.

19         Ms. Price, you're a fan of Apple products?

20         JUROR PRICE:  Yes.

21         MR. HILL:  Would you say you're just really, really

22  rabid about Apple, or you just kind of like their stuff?

23         JUROR PRICE:  I just kind of like their stuff.  I

24  own two Apple products.

25         MR. HILL:  All right.  Let me ask you the same

```
 1   question I asked Mr. Davis.  If the evidence supports it,

 2   would you be comfortable returning a verdict against Apple

 3   for potentially millions of dollars for patent infringement?

 4            JUROR PRICE:  No.  No, sir.

 5            MR. HILL:  You wouldn't be comfortable doing that?

 6            JUROR PRICE:  No.

 7            MR. HILL:  Okay.  So, even if the evidence in the

 8   case supported an award of that type, you would have some

 9   issue with that?

10            JUROR PRICE:  (Nods head affirmatively.)

11            MR. HILL:  Okay.  Wouldn't be able to set that

12   aside, you don't think?

13            JUROR PRICE:  No.

14            MR. HILL:  Okay.  I appreciate it.

15            Is there anybody that agrees with Ms. Price?

16            And that's a good example of what voir dire is

17   about.  There's nothing wrong with anybody's answers.  We all

18   have points of view based on life experience.

19            Is there anybody that agrees with Ms. Price, who is

20   a fan of Apple products, who would not be comfortable, even

21   if the evidence supports it, returning a verdict against

22   Apple for potentially millions of dollars for patent

23   infringement?  Anybody else feel that way?

24            Let me ask this question:  Who thinks Apple is an

25   innovator?  Thinks Apple is an innovator.
```

```
 1              Okay.  We've got a number of hands here.  Let me
 2    ask a couple questions.  Let's start here on the front row.
 3              Mr. Jennings?  Mr. Jennings, you work for Dow
 4    Autoplex; is that right, Eddie Dow?
 5              JUROR JENNINGS:  Yes, sir.
 6              MR. HILL:  Do you think Apple is an innovator?
 7              JUROR JENNINGS:  I believe so.  I bought an iPod
 8    years ago.  It's still working --
 9              MR. HILL:  Okay.
10              JUROR JENNINGS:  -- original battery.  I know some
11    day it's going to die, but --
12              MR. HILL:  Yeah.
13              JUROR JENNINGS:  -- it's still going.
14              MR. HILL:  Yeah.
15              Let me ask you this:  What do you think they're an
16    innovator of, an innovator of what?
17              JUROR JENNINGS:  I like the way that they've got
18    everything compact.  Seems like they were the first ones that
19    had the smallest MP3 player, and that's what I was looking
20    for.
21              MR. HILL:  Okay.  All right.  Is there -- let me
22    ask, who else --
23              I appreciate that, Mr. Jennings.
24              Who else thinks Apple is an innovator?
25              Let's see some hands.  We'll go right next to you
```

```
 1    there to Ms. Stoddard.
 2              Ms. Stoddard, what do you believe Apple is an
 3    innovator of?   Innovator of what?
 4              JUROR STODDARD:   Technology, I guess.
 5              MR. HILL:   Any specific kind of technology?
 6              JUROR STODDARD:   I know my kids love their MACs.
 7    They like that operating system.
 8              MR. HILL:   Uh-huh.
 9              JUROR STODDARD:   I don't know if I'm using the
10    right words there --
11              MR. HILL:   Right.
12              JUROR STODDARD:   -- but they -- I can't use them.
13    I have to use my old laptops.
14              MR. HILL:   Right.
15              JUROR STODDARD:   But they -- they really seem to
16    like them.
17              MR. HILL:   Okay.   So innovator of computer
18    technology; would that be fair?
19              JUROR STODDARD:   I think so.
20              MR. HILL:   Who else agrees with Ms. Stoddard, that
21    Apple is an innovator of computer technology?
22              Okay.   We've got several hands here.
23              Let me ask No. 21, Ms. Youngblood, Ms. Youngblood,
24    do you think of Apple as being an innovator with respect to
25    anything other than computer technology?
```

```
 1              JUROR YOUNGBLOOD:  Probably not.  I -- I just know

 2    that Apple is an innovator.  They're not the only ones.  I

 3    wouldn't say they're the best ones.  But I do believe that

 4    they have made a lot of innovations.

 5              MR. HILL:  Okay.  All right.  Let me ask this

 6    question:  Is there anyone who thinks that Apple is an

 7    innovator when it comes to how cell phones communicate on

 8    cellular networks?

 9              Is there anyone who thinks Apple is an innovator

10    when it comes to how cell phones actually communicate on

11    cellular networks?  Anybody?

12              Now, Apple made its first cell phone in 2007, the

13    iPhone.  Who had a cell phone before 2007?

14    Several of you?

15              All right.  No. 24 there, Ms. Mayes, if I may.

16    That's Mr. Miller?

17              JUROR MILLER:  Yes, sir.

18              MR. HILL:  Mr. Miller, you had a cell phone before

19    2007?

20              JUROR MILLER:  Yes, sir.

21              MR. HILL:  Do you remember what kind it was?

22              JUROR MILLER:  Not really.  It was an old bag

23    phone.

24              MR. HILL:  All right.  But it worked?  You had a

25    cellular network?  The phone worked?
```

1          JUROR MILLER:  Yes.

2          MR. HILL:  All right.  Okay.  I appreciate it.

3   Let me see hands again.  Who else had a cell phone before

4   2007?

5          Let me ask it the other way.  Who didn't have a

6   cell phone before 2007?

7          We've got one here.  That's No. 12.

8          Mr. Washington, you didn't have a cell phone before

9   2007?

10         And then also on the end, Ms. Scallions; is that

11  right?

12         JUROR WASHINGTON, JR.:  No, I didn't.

13         MR. HILL:  All right.  Those were more peaceful

14  times, weren't they?

15         JUROR WASHINGTON, JR.:  Right.

16         MR. HILL:  Now, folks, you heard earlier some of

17  the lawyers in the case.  I want to ask you again more

18  specifically, does anybody know any of the lawyers?

19         Let's go through them again.  First off, we have

20  Latham & Watkins.  That's the law firm that's representing

21  Apple.  The lawyers in this case, Mr. Doug Lumish right here,

22  and Mr. Jeff Homrig, who are from the Latham & Watkins office

23  just outside San Francisco.

24         Does anyone here have any connections or knowledge

25  about Latham & Watkins or these lawyers?

1          No?

2          Thank you, Gentlemen.

3          Apple has hired a local lawyer in this case.  His

4    name is Eric Findlay.  You met Mr. Findlay earlier.  His law

5    firm is called Findlay Craft.  Findlay Craft.  His other

6    partners are Brian Craft, Debby Gunter, Walter Lackey, and

7    Joey Seeber.

8          Does anyone here have any connection to or know any

9    of those lawyers?

10         Does anyone here -- and let me say, I mean this in

11   the broadest sense.  And we had a good example of what we

12   mean by connections to things.

13         Earlier -- Mr. Drew, if I can speak to you just a

14   second.

15         Mr. Drew, you mentioned that you're familiar with

16   my law firm, correct?

17         JUROR DREW:  Yes, I am.

18         MR. HILL:  And as I understand -- you and I have

19   never met before, have we?

20         JUROR DREW:  I've never met you.

21         MR. HILL:  All right.  As I understand it, your

22   company has retained my law firm to help y'all with a legal

23   matter; is that right?

24         JUROR DREW:  Yes, sir.  Your partner, Bruce Smith

25   and Brett Miller.

1          MR. HILL:  Bruce Smith and Brett Miller.

2          Okay.  Is the fact that my law firm is representing

3    your company in another unrelated case, do you think that

4    would impact whether you think you could sit on this case?

5          JUROR DREW:  No, sir.

6          MR. HILL:  No?  You think you could still be fair

7    to both sides?

8          JUROR DREW:  Yes, I could.

9          MR. HILL:  All right.  The other case -- and I

10   don't want to get into your business.  But the other case you

11   have, what is it about?

12         JUROR DREW:  It's a civil case involving former

13   employees.

14         MR. HILL:  Okay.  Is it a -- does it have anything

15   to do with what's known as intellectual property, similar to

16   patents?

17         JUROR DREW:  Yes, it does.

18         MR. HILL:  What's it about?

19         JUROR DREW:  It's a violation of a non-compete

20   contract.

21         MR. HILL:  Okay.  So someone maybe has taken your

22   IP, stolen your property in violation of a non-compete?

23         JUROR DREW:  Yes.

24         MR. HILL:  All right.  I appreciate that, sir.

25         And just to make it clear, my firm is representing

```
 1   your company against the person that stole that property; is
 2   that right?
 3             JUROR DREW:  Yes, sir, that's correct.
 4             MR. HILL:  Okay.  Thank you, sir.
 5   That's an example.  Mr. Drew and I didn't know each other,
 6   but we had a connection through our law firm.  And so we want
 7   to know if there's any connection between Mr. Findlay's firm,
 8   any of the lawyers in his firm, or anyone here.
 9             Another connection where people know each other and
10   don't sometimes know it, Mr. Faulkner -- let me talk to you
11   just a second again, Mr. Faulkner.
12             Do you know Claire Henry?
13             JUROR FAULKNER:  I do.
14             MR. HILL:  Claire Henry is one of my other law
15   partners.
16             JUROR FAULKNER:  Okay.
17             MR. HILL:  I tell you that just in fair disclosure.
18   I don't want you to learn it later and feel uncomfortable.
19             Is there anything about the fact that you know
20   Ms. Henry that you think would make you uncomfortable sitting
21   on this jury, hearing a case where one of her law partners is
22   involved?
23             JUROR FAULKNER:  No.
24             MR. HILL:  Do you think you would still be able to
25   be fair to both sides?
```

```
 1              JUROR FAULKNER:  Yes.

 2              MR. HILL:  All right.  I appreciate that.

 3              Now, I heard during the introduction earlier --

 4    Mr. Staten.  Let me talk to you, Mr. Staten, if I may.

 5    You're No. 11.

 6              Mr. Staten, you mentioned your wife is a legal

 7    assistant; is that right?

 8              JUROR STATEN:  Yes, she is.

 9              MR. HILL:  Who is she a legal assistant for?

10              JUROR STATEN:  With the White-Shaver law firm just

11    down the street.

12              MR. HILL:  Clay White's law firm?

13              JUROR STATEN:  Uh-huh.

14              MR. HILL:  Okay.  Has she been there a long time?

15              JUROR STATEN:  About 15 years.

16              MR. HILL:  All right.  Is there anything about

17    that -- do you think she would have connections to the

18    lawyers in the case that would make you uncomfortable sitting

19    on this jury?

20              JUROR STATEN:  No, not at all.

21              MR. HILL:  All right.  I appreciate that.

22              Now, let me ask this:  There's a lot of people

23    here.  You met the Apple folks earlier.  If I can get anyone

24    that's associated with Apple as an employee, a witness, or a

25    representative to stand up for us.
```

1            Folks, take a good look at these folks.  I know we

2    were moving fast a little bit earlier.  Does anybody see a

3    face they recognize?

4            No?

5            Okay.  Thank you.

6            Thank you, folks.

7            Do any of you know Judge Mitchell?  She lives over

8    in Van.  I think she's got nine small boys.

9            [Laughter]

10            THE COURT:  Just four, Mr. Hill.  Just four.

11            MR. HILL:  I say that in jest.  She only has four,

12    which is plenty.

13            Nobody knows Judge Mitchell?

14            Okay.  Do any of you know each other?  Anybody see

15    a fellow juror that you know from somewhere?  Some of you are

16    from similar towns.

17            Okay.  We've got a couple of folks.

18            Right here, Mr. Washington, do you know somebody

19    else on the panel?

20            JUROR WASHINGTON, JR.:  Yes.

21            MR. HILL:  Who is that?

22            JUROR WASHINGTON, JR.:  Yes.  I think I know him,

23    Ms. Menefee.

24            MR. HILL:  Ms. Menefee, you believe you know?

25            Okay.  Ms. Menefee, do you think you know -- are

1    you going to claim him?

2           No?

3           All right.  Well, I'll let y'all work that out.

4           Who else?  Who else thinks they know somebody?

5           Right here?  Okay.  That's Ms. Youngblood, and you

6    believe you know Mr. Miller?

7           JUROR YOUNGBLOOD:  I do.

8           MR. HILL:  Okay.  Where do you know Mr. Miller

9    from?

10          JUROR YOUNGBLOOD:  Well, his wife goes to my

11   church.

12          MR. HILL:  Okay.  So I see he's from Fruitvale.

13   You're from Grand Saline.  That's not very far.

14          JUROR YOUNGBLOOD:  Yeah.

15          MR. HILL:  All right.  Very good.

16          Is there -- is there anything about that -- you

17   guys just know each other from a church connection?  Is that

18   it?

19          Okay.  All right.  Anybody else?

20          No?

21          Okay.  Now, Ladies and Gentlemen, as I've told you,

22   this is about -- this is a lawsuit.  A lot of people have

23   strong feelings about lawsuits.  So I want to talk about that

24   a little bit.

25          I want to know how many of you will agree with this

```
 1    statement:  There are too many lawsuits.  Too many lawsuits.

 2              I'm a lawyer, and I'll raise my hand to that.

 3              Okay.  Let's see here.  We've got -- on the end,

 4    that's Mr. Garland here, Ms. Scallions, Mr. Drew.

 5              Who else?

 6              Ms. Youngblood, Mr. Ray (sic), Mr. Staten,

 7    Mr. Miller, and Mr. Wedgeworth.

 8              Okay.  There are a lot of lawsuits, folks.  There's

 9    even frivolous lawsuits.  There's, you know, people who claim

10    they're hurt when they're not.  There's abuses that go on in

11    our legal system.

12              Luckily, we have a lot of good judges, like Judge

13    Mitchell, who take care of those before they get anywhere.

14    I want to know if anyone feels this way:  That you don't

15    believe in lawsuits, for whatever reason.  Some people have

16    personal feelings about it, have political reasons, have

17    religious reasons even, where they don't feel comfortable

18    sitting in judgment of others.

19              Is there anybody on the panel that for some

20    personal or moral or religious belief just doesn't believe in

21    the concept of lawsuits?

22              No?

23              Is there anyone who thinks there's too many patent

24    infringement lawsuits?

25              Who agrees with this statement:  There are too many
```

1    lawsuits, and either the Texas legislature or Congress should

2    do something about it?

3            Anybody feel that way?  Do you feel strongly enough

4    about the fact that there's too many lawsuits that you think

5    there ought to be legislative action on it?

6            Now, let me get a show of hands about something

7    else that's kind of related to lawsuits.  I want to ask you

8    about the Government in general.

9            Who would agree with this statement:  Our

10   Government does more harm than good?  Government does more

11   hand than good.

12           Keep those hands up for me.  No. 2, Mr. Faulkner.

13   No. 6 here is Mr. Burney.  Mr. Drew.  And then No. 12 -- or

14   11 -- excuse me -- Mr. Staten.

15           Anybody else, more harm than good?

16           I see Mr. Wedgeworth also.

17           I want to talk to you folks about that a little

18   bit.  Let's start here with Mr. Faulkner.

19           Mr. Faulkner, what motivates you to believe that

20   the Government does more harm than good?

21           JUROR FAULKNER:  Well, I mean, the question is a

22   statement.  Everything you see, you know, with the

23   legislature, state, national, just too much intervention.

24           MR. HILL:  Okay.  All right.  Have you had a bad

25   experience personally with a Government agency?

1              JUROR FAULKNER:  Not yet.

2              MR. HILL:  Not yet?  Okay.  Well, let's hope your

3    luck keeps up.

4              All right.  I appreciate that.

5              Let me ask one last question.  Is there anything

6    about your feelings about Government in general that you

7    think would make it hard for you to participate in one of the

8    arms of our Government, which is being on a jury, part of the

9    judicial service?

10             JUROR FAULKNER:  No.

11             MR. HILL:  No?  Okay.  Thank you, sir.

12             Mr. Burney, can I talk to you just a second?

13             How are you today?

14             JUROR BURNEY:  I'm good.

15             MR. HILL:  Good.

16             Let me ask you the same question.  Has there been

17   any bad experience in your life with a Government agency that

18   causes you to hold that feeling?

19             JUROR BURNEY:  Well, it depends on what you mean by

20   "bad experience."

21             MR. HILL:  Yes, sir.

22             JUROR BURNEY:  I'm retired Navy, so I've had some

23   not so good experiences with the VA and down like that.

24             MR. HILL:  Right.

25             JUROR BURNEY:  But I just think that there's too

 1   much -- I'm Libertarian by nature.  So the smaller the

 2   government, the better as far as I'm concerned.

 3            MR. HILL:  All right.  All right.  I appreciate it.

 4   Let me ask you one last thing.  I'm sorry.  I'm too quick.

 5   Don't let the microphone go.

 6            Anything about those feelings that you think would

 7   cause you to lean one way or another in a lawsuit --

 8            JUROR BURNEY:  No.

 9            MR. HILL:  -- in a case like this?

10            JUROR BURNEY:  No.

11            MR. HILL:  Everybody would start even?

12            JUROR BURNEY:  That's correct.

13            MR. HILL:  You'd give them a fair shake?

14            JUROR BURNEY:  That's correct.

15            MR. HILL:  All right.  I appreciate it.

16            All right.  Let's see.  Who else?

17            Mr. Staten there on the back -- on the middle row.

18   Mr. Staten, same question.  You've mentioned -- is there

19   anything -- any bad experience you've had with a Government

20   agency?

21            JUROR STATEN:  No, not --

22            MR. HILL:  Just a general feeling?

23            JUROR STATEN:  Just general feeling, too many

24   regulations.  It hurts small business, getting in people's

25   lives too much.

1          MR. HILL:  Right.  All right.

2          Who else who raised their hand earlier agrees with

3    Mr. Staten, and that generally describes the way they feel

4    that way?

5          Mr. Wedgeworth, that captures you, too?

6          JUROR WEDGEWORTH:  (Nods head affirmatively.)

7          MR. HILL:  Is there anybody else that's had a bad

8    experience with a Government agency specifically?

9          Okay.  Let me ask you this question:  Big companies

10   are treated unfairly by the media.  Big companies are treated

11   unfairly by the media.

12         Anybody believe that?

13         Got a few hands here on the front row.

14         All right.  Mr. Faulkner, you feel like big

15   companies get a bad rap sometimes?

16         JUROR FAULKNER:  I think so.

17         MR. HILL:  Okay.  Do you believe that feeling would

18   cause you to be more sympathetic to a big company's cause in

19   a case like this?

20         JUROR FAULKNER:  Not particularly.

21         MR. HILL:  All right.  I appreciate that.

22   Next to him, Mr. Jennings.  Do you kind of feel that way,

23   too, Mr. Jennings?

24         JUROR JENNINGS:  Yes, sir.  I've worked with

25   General Motors for 22 years, and I've seen a lot of re-calls

 1    on cars that didn't quite make sense.

 2         MR. HILL:  Right.

 3         JUROR JENNINGS:  And people are scared to drive

 4    their cars.  Yet they've been driving it for the last eight

 5    years and...

 6         MR. HILL:  So you think that gives the big company

 7    a black eye undeservedly?

 8         JUROR JENNINGS:  Right.  And I understand they need

 9    to re-call certain items, but people overreact.

10         MR. HILL:  Okay.  All right.  I appreciate it.

11    Anybody else agree, share the feelings with Mr. Jennings and

12    Mr. Faulkner?

13         Okay.  Mr. Burney here, you think big companies get

14    a bad rap in the media sometimes?

15         JUROR BURNEY:  I think in a lot of cases, they do

16    get a bad rap.  If it wasn't for big companies, there

17    wouldn't be big paychecks.

18         MR. HILL:  Okay.

19         JUROR BURNEY:  And that supports the economy as

20    well as the small businesses.  But somebody said before, due

21    to all of the regulations and stuff for business, we've

22    become an anti-business country, I believe, so...

23         MR. HILL:  All right.  Who agrees with Mr. Burney?

24    Who else hears that and thinks, yeah, that makes a lot of

25    sense to me?

1          Right back here.  Ms. Youngblood, do you agree with

2     that sentiment that --

3          JUROR YOUNGBLOOD:  I do.

4          MR. HILL:  Okay.  All right.  Anything specific

5     about it you would add to what Mr. Burney had to say?

6          JUROR YOUNGBLOOD:  It just seems like -- and I'm

7     for all business, small or large.  But I believe a lot of

8     times the large business, people with money have a reputation

9     of being the bad guys when they're not necessarily the bad

10    guys.

11         MR. HILL:  Okay.  I appreciate that.

12         Who else shares that sentiment with Mr. Burney and

13    Ms. Youngblood?  Anybody else?

14         I think Mr. Wedgeworth, did I see your hand as

15    well?

16         JUROR WEDGEWORTH:  Yes.

17         MR. HILL:  Anybody I'm missing?

18         Okay.  All right.  Let me ask this question:

19    Juries asked to award money damages do more harm than good.

20    Juries asked to award money damages do more harm than good.

21         Same kind of question as with our Government.  Who

22    thinks juries also generally do more harm than good?  Anybody

23    feel that way?

24         Let me ask, is there anybody here who's active with

25    a member of a social justice organization like the ACLU, East

 1    Texans Against Lawsuit Abuse, Texas Watch?  Any of those

 2    organizations familiar to anybody?

 3              No?

 4              Anybody heard of those, are familiar with them?

 5              Now, I want to talk to the few of you folks who may

 6    have been -- either you, yourself, or maybe an employer has

 7    had the experience of being a defendant in a lawsuit.  Other

 8    than a divorce, if you've been a defendant in a lawsuit, let

 9    me see your hands, please.

10              Anybody?  Anybody been -- either yourself or a

11    company, you know, your employer or you were involved or the

12    company you own been a defendant in a lawsuit?

13              No?  All right.

14              I told you earlier that this is a case about money

15    damages, could be millions of dollars.  Is there anyone that

16    feels like they may begin leaning towards the Defendants in

17    this case, leaning toward Apple, simply based on the fact

18    that CCE brought this lawsuit and will be asking for a lot of

19    money?

20              And I can tell you right now, we'll be asking up to

21    $28 million in this lawsuit.  Is there anybody that they hear

22    that number, and you think, man, something must be up, and

23    you lean toward Apple because of it?  Anybody feel that way?

24              No?

25              Everybody agree that if the evidence supports it,

```
 1    that they would be able to return a verdict for up to $28

 2    million against Apple?

 3            Let me ask you -- now, I know earlier, Ms. Price,

 4    you indicated that might make you uncomfortable; is that

 5    right?

 6            JUROR PRICE:  (Nods head affirmatively.)

 7            MR. HILL:  Okay.  Do you still feel that way about

 8    it?

 9            JUROR PRICE:  Uh-huh.

10            MR. HILL:  All right.  Anybody else share

11    Ms. Price's feelings?  You just -- yes, ma'am,

12    Ms. Youngblood.  Tell me about what's on your mind.

13            JUROR YOUNGBLOOD:  That's a lot of money.

14            MR. HILL:  Yes, ma'am, it is.

15            JUROR YOUNGBLOOD:  I just -- I don't know.  I'm

16    very conservative.

17            MR. HILL:  Uh-huh.

18            JUROR PRICE:  And I don't see that I would feel bad

19    about a fair decision either way, except that being a lot of

20    money.

21            MR. HILL:  And do you believe that that just

22    general conservatism and view that you have, might cause you

23    to be reluctant to award that kind of damages even if the

24    evidence supported it?

25            JUROR PRICE:  It would need a lot of evidence to
```

1    support $28 million.

2            MR. HILL:  Do you think you would have a problem

3    getting there?

4            JUROR PRICE:  Prob- -- well, I hate to say it, but

5    probably so, yes, sir.

6            MR. HILL:  Okay.  Listen, that's just being honest.

7    I'm trying to seat a fair jury for my client, just like Apple

8    is trying for theirs.

9            JUROR PRICE:  I understand that.

10           MR. HILL:  And all I can ask is honesty from folks.

11   And I appreciate your honesty.

12           And, listen, I encourage people, if you feel that

13   way, let me know.  Is there anybody that shares

14   Ms. Youngblood's feelings?  Because there's certainly nothing

15   wrong with her feeling.

16           Anybody else?

17           Let me ask it this way, and I'm going to run

18   through everybody on this just to get a point of view:  If

19   the facts justify a large damages award, how uncomfortable or

20   comfortable would you feel awarding millions of dollars in

21   damages?

22           How uncomfortable or comfortable?  Zero is very

23   uncomfortable, very uncomfortable awarding millions of

24   dollars in damages.  Ten is very comfortable.

25           So think about your number.  Zero, you would be

```
 1    very uncomfortable.  That sounds like that might be where

 2    Ms. Youngblood is coming from.  Ten would be you would be

 3    comfortable with that.

 4            Let's start here on the front, and I'm going to run

 5    through everybody, Ms. Mayes, so we may not need a

 6    microphone.  We'll start here on the front.

 7            Mr. Kinsman, what's your number?

 8            JUROR KINSMAN:  An eight.

 9            MR. HILL:  Eight?  Okay.

10            Mr. Faulkner?

11            JUROR FAULKNER:  Ten is fine with me.

12            MR. HILL:  Okay.  Mr. Jennings?

13            JUROR JENNINGS:  It would be a ten.

14            MR. HILL:  Ms. Stoddard?

15            JUROR STODDARD:  I'm nine or ten.

16            MR. HILL:  Ms. Risinger?

17            JUROR RISINGER:  Eight.

18            MR. HILL:  Mr. Burney?

19            JUROR BURNEY:  Ten.

20            MR. HILL:  Mr. Garland?

21            JUROR GARLAND:  About six.

22            MR. HILL:  All right.  Back row here -- or second

23    row.  Ms. Scallions?

24            JUROR SCALLIONS:  Probably a nine.

25            MR. HILL:  Okay.  Mr. Drew?
```

1        JUROR DREW:  Ten.

2        MR. HILL:  Mr. Thomas?

3        JUROR THOMAS:  About a five.

4        MR. HILL:  Mr. Staten?

5        JUROR STATEN:  Probably about a six.

6        MR. HILL:  Mr. Washington?

7        JUROR WASHINGTON, JR.:  Ten.

8        MR. HILL:  Ms. Stroud?

9        JUROR STROUD:  Ten.

10        MR. HILL:  Mr. Davis?

11        JUROR DAVIS, JR.:  Ten.

12        MR. HILL:  Ms. Palmer?

13        JUROR PALMER:  Five.

14        MR. HILL:  Mr. Wade -- or excuse me -- Ms. Wade?

15        JUROR WADE:  About a seven.

16        MR. HILL:  Okay.  Ms. Stockman?

17        JUROR STOCKMAN:  About a 10.

18        MR. HILL:  Mr. Seale?

19        JUROR SEALE:  Ten.

20        MR. HILL:  Ms. Menefee?

21        JUROR MENEFEE:  Seven.

22        MR. HILL:  Mr. Wedgeworth?

23        JUROR WEDGEWORTH:  Ten.

24        MR. HILL:  Ms. Youngblood?

25        JUROR YOUNGBLOOD:  Zero.

1          MR. HILL:  All right.  And then on the back here,

2  we've got Ms. Price?

3          JUROR PRICE:  About a five.

4          MR. HILL:  Mr. Gill?

5          JUROR GILL:  I'm going with 9.5.

6          MR. HILL:  All right.  And Mr. Miller?

7          JUROR MILLER:  Ten.

8          MR. HILL:  And, Your Honor, I get up here and get

9  lost in time sometimes.  Will you let me know when I have

10  five minutes left?

11          THE COURT:  I will.

12          MR. HILL:  Thank you, Your Honor.

13          Now, folks, I want to talk to you about patent

14  licensing a little bit.  Patents are a lot like private

15  property, a lot like mineral rights, in fact.  They can be

16  bought and sold.

17          You'll learn that the patents in this case were the

18  result of inventions by a company called Nokia Siemens

19  Networks.  Nokia Siemens Networks.  That's who invented the

20  '820 patent.  Those of you who serve on the jury will get to

21  hear from the inventor from Nokia Siemens.

22          Eventually, CCE acquired the '820 patent from NSN.

23  That's what people call Nokia Siemens Networks for short.

24  You'll hear from NSN.

25          Is there anyone that's heard of Nokia or Nokia

```
 1    Siemens?

 2              Most folks?

 3              All right.  Anybody who hasn't?  Let me ask it that

 4    way.

 5              No?  All right.

 6              Is there anyone that has positive or negative views

 7    about Nokia Siemens?  Have a view one way or the other?

 8              All right.  We've got a hand or two back here.

 9              No. 17.  That's Ms. Stockman?  Yes, ma'am.

10              JUROR STOCKMAN:  I know when you mentioned earlier

11    about the cell phones before 2007, that was my first cell

12    phone, and it's still working.

13              MR. HILL:  Was it a Nokia?  It still works today?

14              JUROR STOCKMAN:  Yeah.  It was a little square one.

15    My mom uses it.

16              MR. HILL:  Let me ask you a question while you're

17    up, Ms. Stockman.  You mentioned earlier that you work in the

18    engineering department at Baylor; is that right?

19              JUROR STOCKMAN:  Yes, sir.  I work at the service

20    desk.  We take all of the calls.

21              MR. HILL:  Is the engineering department like their

22    physical plant, or what is that?

23              JUROR STOCKMAN:  Well, what it is, is we take all

24    of the calls for all of the Baylor hospitals --

25              MR. HILL:  Uh-huh.
```

1          JUROR STOCKMAN:   -- meaning that -- all of the

2    lights out and all of the physical engineering parts.

3          MR. HILL:   Okay.

4          JUROR STOCKMAN:   So AC, electrical, flooding, fire,

5    all of that stuff.

6          First, we give it to our service desk, and then we

7    dispatch it out to the technicians or whoever needs to come.

8          MR. HILL:   All right.   Anything about that early

9    Nokia cell phone that will make you lean one way or another

10   in this case?

11         JUROR STOCKMAN:   No, sir.

12         MR. HILL:   All right.   Anybody else have a strong

13   view, positive, negative, you just have some kind of opinion

14   about Nokia Siemens Networks or Nokia?

15         No?

16         Now, folks, CCE is a licensing company.   Let me

17   tell you what that means.   That means we do not make products

18   like Apple does.   We don't make and sell cell phones or make

19   and sell products.

20         What we do is we're in the business of licensing

21   the rights to the patents that we own to people who want to

22   use the inventions or the technologies that are owned by CCE.

23   That's what we do.

24         Is there anyone who feels funny about that?   You

25   think:   You know, that doesn't sound right to me.   You've got

1   a patent on something, but you don't actually make the

2   product yourself that practice the patent.

3              That notion give anybody concern?

4              Is there anybody that feels like, you know, kind

5   of -- in other words, if you don't use it, you ought to lose

6   it?  If you don't use it, you lose it?

7              THE COURT:  Five minutes, Mr. Hill.

8              MR. HILL:  Thank you, Your Honor.

9              Now, I want to talk to you a little bit about

10  burdens of proof in this case.  The burdens of proof, you'll

11  hear about two of them.  You'll hear about one called the

12  preponderance of the evidence standard.  That's the standard

13  of proof that means more likely true than not true.

14             If you have the Scales of Justice, it means you

15  just tip them a little bit one way or the other.  If you can

16  imagine a football field, it would mean getting past the 50

17  yard line.  That's preponderance of the evidence.

18             Ladies and Gentlemen, that's the burden of proof

19  that CCE has to carry to prove its claims of infringement and

20  damages in this case, preponderance of the evidence.

21             There is a second burden of proof you'll hear about

22  in this case.  We heard it in the patent video this morning.

23  It's called clear and convincing evidence.  That's the burden

24  of proof that means something has got to be highly likely,

25  really got to tip those scales.

1          If you imagine the football field analogy again, it

2     might mean getting down to the other team's red zone, okay?

3     That's the burden of proof that Apple must carry to try to

4     invalidate the '820 patent, which is something they're going

5     to try to do.

6          They've got a number of defenses in this case.

7     They're going to say:  We don't do it.  Yeah, but it's not

8     worth a lot of money.  Yeah, but you didn't claim it right.

9     Yeah, but it's no good, okay?

10          They've got to prove invalidity by a higher burden

11     of proof than we have to prove infringement and damages.  And

12     there's a reason for that.  The reason for that is because

13     the Patent Office has examined that patent, and that creates

14     a presumption that it's valid.

15          Now, the clear and convincing evidence standard is

16     a higher burden.  That's the same burden of proof the courts

17     use, for instance, if they were going to civil commit

18     somebody against their will.

19          If somebody needed to be committed to a mental

20     institution, you would have to prove that by clear and

21     convincing evidence to take their rights away and put them in

22     that institution.  It's a higher burden.

23          Is there anybody that's served on a jury before

24     that's applied the clear and convincing evidence standard?

25          Yes, sir.  Right here, Mr. Burney.  You have?  Tell

1  me about that, Mr. Burney.

2          JUROR BURNEY:  It was a disabilities claim.  A

3  group of handicapped people were suing a physicians group

4  because they had claimed that they were being discriminated

5  against because they were handicapped.

6          MR. HILL:  Okay.  And did you have to apply that

7  burden in that case?

8          JUROR BURNEY:  Yes.

9          MR. HILL:  Did that pose any issue for you?

10          JUROR BURNEY:  No.

11          MR. HILL:  All right.  Is there anybody that thinks

12  it's unfair; it's unfair that CCE has a lower burden to prove

13  infringement and damages than Apple has to prove to try to

14  invalidate this patent?  Does that notion sound wrong to

15  anybody?

16          All right.  I've got limited time left, and I want

17  to learn some more information about -- as much -- as much as

18  I can about you folks.

19          THE COURT:  Mr. Hill, you do have limited time, but

20  I've told you wrong.  You're at 38 minutes, so you've got a

21  few more minutes than --

22          MR. HILL:  About seven minutes, Your Honor?

23          THE COURT:  Yes, sir.

24          MR. HILL:  Okay.  I got a little nervous when you

25  told me that.

     1              THE COURT:  Sorry about that, yeah.

     2              MR. HILL:  So you folks probably got excited I only

     3   had five.

     4              JUROR:  You just used up one.

     5              MR. HILL:  So let's talk a little bit -- I want to

     6   know if you have a bachelor's degree.  Please raise your

     7   hand.  I'm going to run through each of your numbers here.

     8   Just keep your hands up.

     9              No. 1, 2, 4, 5, 6.  That would be -- going back

    10   here, No. 9, 14.

    11              And the next row here, Mr. Wedgeworth, you're 20,

    12   21.

    13              And then on the back row, 23 and 24.

    14              Okay.  Thank you.

    15              Who has an advanced degree?

    16              Got a few advanced degrees.  5, 6, 20, 21, and 23.

    17              All right.  Regardless of whether you received a

    18   degree, who has studied or taken classes in cellular,

    19   computer, or other types of technology?  Regardless of

    20   whether you have a degree, taken classes.

    21              Mr. Gill, that's you on the back row.  I see your

    22   hand.

    23              Who else?

    24              No. 3.  That's Mr. Jennings.

    25              Anybody else studied cellular, computer, or other

```
 1   type of technology?

 2           Let me ask for the teachers.  Let me see the hands

 3   of the teachers I saw earlier.

 4           What do you teach?

 5           JUROR KINSMAN:  Third grade elementary.

 6           MR. HILL:  Mr. Kinsman, third grade elementary?

 7           JUROR KINSMAN:  Yes, sir.

 8           MR. HILL:  Okay.  Who else do we have?

 9           No. 5.  That's Ms. Risinger.  What did you teach?

10           JUROR RISINGER:  I'm a retired teacher.  I taught

11   eighth grade American History.

12           MR. HILL:  All right.  Who else do we have?

13           Yes, sir.  Mr. Burney?

14           JUROR BURNEY:  I was a business instructor at

15   Jacksonville College for about eight years.

16           MR. HILL:  Okay.  Who else?

17           Yes, ma'am.  Ms. Youngblood?

18           JUROR YOUNGBLOOD:  I'm a retired Texas public

19   schoolteacher for 33 years, and then -- but now I'm teaching

20   in the Texas Department of Criminal Justice, in the prison

21   system.

22           MR. HILL:  Okay.  Thank you very much.

23           And we had one other.  Mr. Gill, yes, sir.

24           JUROR GILL:  I currently teach information

25   technology support for entry level IT technicians at Tyler
```

1    Junior College.

2              MR. HILL:  All right.  Thank you, sir.

3              Let me ask this:  I want to know about your commute

4    today.  How many of you, it took you approximately 60 minutes

5    to get to the courthouse or more?  60 minutes or more.  Let's

6    see those hands.

7              No. 7, No. 8, No. 10, No. 13, 17, Mr. Wedgeworth

8    there, 20, 21, and 24.

9              Folks, if it took you that long to get here today

10   and you had to do that every day, morning and night, for the

11   next five to seven days, for whom would that cause a hardship

12   that you think it would be such a hardship it would distract

13   from your ability to be on this jury?  Does anybody feel that

14   way?

15             Yes, sir.  No. 7.  Mr. Garland, you came from Kemp.

16   That's the other side of Cedar Creek Lake, right?

17             JUROR GARLAND:  Yes, sir.  It could possibly be a

18   hardship.  My wife and I are raising the two grandchildren.

19   One of them is kind of borderline special needs.  We never

20   know when we might need to go to the school to get him or his

21   sister.  So I don't know from day to day --

22             MR. HILL:  Yes, sir.

23             JUROR GARLAND:  -- where I'm going to be or what

24   I'm doing.  That's the reason I have no spare time.

25             MR. HILL:  Do you think that uncertainty and being

1    that far away from home for this period of time would cause

2    you to have trouble concentrating on the case because you

3    would be concerned about what you might be missing?

4              JUROR GARLAND:  Well, I'm every day wondering if

5    I'm going to need to go get the boy.  I mean, I could

6    probably do it; but we never know when we're going to get a

7    call to come to the school to handle it.

8              MR. HILL:  Okay.  I appreciate it.

9              Anybody else have a similar circumstance where this

10   drive is going to be a hardship to the extent it would make

11   it hard for you to serve on this jury?

12             All right.  Well, I believe I have about three

13   minutes left, so I want to cover just one or two other

14   topics.

15             Is there anybody who's sitting out there who's

16   listened to the questions we've asked so far and just feels

17   like:  You know, this isn't the type of case for me, or this

18   isn't something I want to do; I want out of here in the worst

19   way?  Is anybody feeling that way right now?

20             Mr. Washington, are you ready to go?

21             JUROR WASHINGTON, JR.:  Yes, sir.

22             MR. HILL:  All right.

23             JUROR WASHINGTON, JR.:  Yep.

24             MR. HILL:  Have you got better things to do than

25   this?

1              JUROR WASHINGTON, JR.:  Right.

2              MR. HILL:  I understand.  I understand.

3              Anybody feel the opposite, thinks:  You know, what;

4    this sounds kind of fun; I might be interested to sit on a

5    patent case and hear about these things?

6              A couple of hands.

7              Yeah.  No. 17.  That's Ms. Stockman.  Sound kind of

8    interesting?

9              JUROR STOCKMAN:  Yep.

10              MR. HILL:  All right.  Mr. Gill, are you the same

11    way?

12              JUROR GILL:  (Nods head affirmatively.)

13              MR. HILL:  Great.

14              Folks, let me ask you one other question.

15              And, Your Honor, may I touch base on the clock

16    again?

17              THE COURT:  Two minutes.

18              MR. HILL:  Let me ask a couple of follow-ups with a

19    couple of you specifically.

20              Mr. Davis, I made a note earlier, you mentioned

21    that you work for Tyler Union McWane.  Is that the old Tyler

22    Pipe?  Is that McWane at Tyler Pipe?

23              JUROR DAVIS, JR.:  McWane is the parent company of

24    Tyler Pipe, Tyler Union, and 20 other different companies.

25              MR. HILL:  Yes, sir.

1          JUROR DAVIS, JR.:  McWane is the parent company in

2   Birmingham, Alabama, and I work for Tyler Union, which is

3   clean water utility fittings, ductile iron --

4          MR. HILL:  Okay.

5          JUROR DAVIS, JR.:  -- is what I do.  I sell that.

6          MR. HILL:  Okay.  So you're a salesman for --

7          JUROR DAVIS, JR.:  I'm a sales manager for the

8   Southeast Texas section, be Eastern Texas, Louisiana,

9   Arkansas, Mississippi, and parts of Alabama.

10          MR. HILL:  All right.  Are you actually employed --

11   I guess you're employed by McWane; is that right?

12          JUROR DAVIS, JR.:  McWane is who I -- yes.

13          MR. HILL:  Yes.  Okay.

14          So you work out here --

15          JUROR DAVIS, JR.:  My paycheck has got McWane on

16   it, but Tyler Union signs it.

17          MR. HILL:  I gotcha.

18          Does your work out here have anything to do with

19   this facility, the one on 69 going out --

20          JUROR DAVIS, JR.:  Yes, sir.  Yes and no.  Our

21   corporate office, our corporate execs are there --

22          MR. HILL:  Uh-huh.

23          JUROR DAVIS, JR.:  -- three of them and the two

24   biggest ones are in Birmingham, Alabama.  I office out of my

25   house and travel.  So I do not have an office here in Tyler

1    except for my residence.

2           MR. HILL:  Now, I know the Steel Workers Union out

3    here, the McWane folks were always union, the employees at

4    least.  Management weren't.

5           Do you fall on one side or the other of that?

6           JUROR DAVIS, JR.:  I'm non-union.

7           MR. HILL:  All right.

8           JUROR DAVIS, JR.:  I'm the executive side of it.

9           All the production guys are union --

10          MR. HILL:  All right.

11          JUROR DAVIS, JR.:  -- yeah.

12          MR. HILL:  All right.

13          JUROR DAVIS, JR.:  The guys that make our products.

14          MR. HILL:  Folks -- I appreciate that, Mr. Davis.

15          Folks, I'll ask you one last question.  You're

16   sitting out there.  Lawyers are asking you questions.  He's

17   trying to find out if you're the right people to hear this

18   case and give these people a fair shake.

19          Is anything on your mind that I didn't ask about;

20   but you, if you were in my shoes, would want to know to seat

21   a fair jury?  Would you tell me about that?  Anybody?

22          All right.  I appreciate y'all's time.  We look

23   forward to the chance to present our case to the eight of you

24   that are selected.  And, again, we recognize the hardship

25   we've imposed by asking you to be here, and we're very

1    grateful and appreciative of the fact that you answered the

2    call, answered your civic duty, and showed up for jury

3    selection today.

4            Thank you.

5            MR. HILL:  Thank you, Your Honor.

6            THE COURT:  Thank you, Mr. Hill.

7            Mr. Findlay, would you like a time warning?  I'll

8    try to get it right.

9            MR. FINDLAY:  Yes, please, Your Honor.

10           THE COURT:  Five minutes?

11           MR. FINDLAY:  Yes, ma'am.

12           THE COURT:  Okay.

13           MR. FINDLAY:  Thank you very much.

14           Good morning again, Ladies and Gentlemen.  And I

15   thank you a lot for your patience and your responsiveness to

16   Mr. Hill.  I know it's been a long morning already.

17           The Court has given me another 45 minutes.  I'll

18   try not to use all of it, but I can't promise that I won't.

19           Let me start out by introducing myself to you and

20   telling you a little bit about myself, like y'all did with

21   us.

22           I work and live here in Tyler.  As Mr. Hill said,

23   I've got a small law firm called Findlay & Craft.  We office

24   right in the People's Petroleum Building that the

25   Brookshire's Family has been renovating.

1          My wife has put up with me for 25 years now, and

2    we've got two boys.  One is a sophomore at Baylor, and one is

3    a sophomore here in high school in Tyler.

4          So we thank you again very much for being here.

5          That's a little bit about me.  Let me tell you a

6    little bit about what I was thinking about when Mr. Hill was

7    making a few of his introductory comments, and then I'll get

8    into my questioning.

9          Mr. Hill is a friend of mine, actually.  He and I

10   live in the same neighborhood.  A week or so ago, I was

11   running through the rain on Sunday and a car pulled up to me,

12   and it was Mr. Hill offering to give me a ride back home.

13         So on a personal front, he's a great guy.

14         Professionally, in this case, I couldn't disagree

15   with Mr. Hill more if I tried.

16         He said something to you, and so -- and it probably

17   won't surprise you that he said something to you, and I wrote

18   it down.  Apple is using the '820 patent.  And I thought that

19   Mr. Hill almost got it right, but he forgot the word "not."

20   Apple is not using the '820 patent.

21         You'll hear the evidence in this case.  You'll see

22   the witnesses presented to you.  And while, as Mr. Hill

23   admitted, they have that burden, I think you'll see us prove

24   that to you convincingly, that we are not using that patent.

25         And because of that, when Mr. Hill spoke about

1    damages and lots of money, that doesn't come into play,

2    Ladies and Gentlemen.  Because if there's no infringement,

3    there's what?  Anybody finish that statement for me?

4              JURORS:  No money.

5              MR. FINDLAY:  No money.  Thank you very much.

6    Exactly right.

7              Now, let me go down and make sure there's no one

8    else that knows anybody else in Mr. Hill's law firm.  It's in

9    Longview, as I think Mr. Drew, you probably know.  He has an

10   office here in Tyler as well.

11             One of his partners, I think Mr. Drew mentioned, is

12   Mr. Bruce Smith.  Anybody recognize that name from Longview?

13             Mr. Drew, obviously.

14             And Juror No. 4, Ms. Stoddard, how do you know

15   Mr. Smith?

16             JUROR STODDARD:  He is the ex-husband of a lady I

17   used to be friends with years ago.  I haven't seen her in

18   probably 10, 15 years.

19             MR. FINDLAY:  Okay.  So that --

20             JUROR STODDARD:  But I do know the name.

21             MR. FINDLAY:  Sounds like it would have no

22   influence either way on your --

23             JUROR STODDARD:  Absolutely not.

24             MR. FINDLAY:  Okay.  Thank you, ma'am.

25             Did anybody else, other than Mr. Drew, know

1    Mr. Smith?

2              There's a gentleman, Johnny Ward; and his father is

3    also in the firm, Mr. T. John Ward.

4              Nobody?

5              And Claire Henry.  And I think, Mr. Faulkner, you

6    mentioned Claire Henry.  How do you know Ms. Henry?

7              JUROR FAULKNER:  Just a family friend.

8              MR. FINDLAY:  Okay.  Been to their house, they've

9    been to your house, that sort of thing or --

10             JUROR FAULKNER:  Had dinner with her two weeks ago

11   and was at her grandmother's funeral a month ago, so...

12             MR. FINDLAY:  And I think Mr. Hill asked you these

13   questions, but does that give you any pause in being able to

14   render a complete, fair, down-the-middle verdict?

15             JUROR FAULKNER:  No.

16             MR. FINDLAY:  Okay.  Thank you, sir, very much.

17             Mr. Hill also introduced on his team Caldwell

18   Cassady & Curry.  They've got offices, I think, in Dallas and

19   Austin.  Let me list some of the names.  I don't think it

20   would be likely that y'all know them, but we want to just

21   make sure there's no connection there.

22             Bradley Caldwell, Jason Cassady, Austin Curry,

23   Chris Stewart -- I'm not sure where Chris is -- but Jason

24   McManis.  Ring a bell?

25             There's also a firm representing CCE called the

1   Bumgardner firm, a gentleman named Ed Bumgardner and Don

2   Puckett.

3           I didn't think so, but thank you, Ladies and

4   Gentlemen, for bearing with me on that.

5           There are a number of teachers in the audience or

6   former teachers, and they might know the answer to this

7   question, but the Seventh Amendment to the Constitution is

8   what gives us the right to be here in jury selection.   I

9   suspect some of the teachers did know that.

10          The Seventh Amendment gives American citizens the

11  right to have these decisions decided by a jury.  We're the

12  only country in the world that has that right.

13          Apple believes in that, and we're glad that you're

14  here.  We think that right and the -- we think that

15  participation in the jury system is second really only to

16  military service.

17          And I know there are some veterans here.  I think

18  Mr. Burney, retired Navy.  We thank you all for your service.

19          And doing this is, I would suggest, just one step

20  below that.  The justice system breaks down without you

21  folks.  So we really do appreciate it.

22          This case is about Apple.  And Mr. Hill talked to

23  you about Apple.  I would like to just have a volunteer, if I

24  could.

25          When you first heard the case was about Apple, that

1    that was the Defendant, what did you think?  Anybody have any

2    initial thoughts you would be willing to share with us?  Did

3    you think, oh, that sounds exciting; that sounds boring?

4             Anything you're willing to share?

5             Yes.  Okay.  Well, Juror No. 1, Mr. Kinsman.  Thank

6    you.

7             JUROR KINSMAN:  I just heard Apple, and you just

8    think, okay, it's a big company.  It's got a lot of different

9    products.  I know within my classroom this year, you know,

10   schools are going technology, and you can see around the

11   courtroom and up there on the juror stands that technology is

12   a big implementation of our world.

13            And so I just thought, you know, it's a big

14   company, that they have got a lot of varying products.

15            MR. FINDLAY:  Are you using technology even in the

16   third grade level?

17            JUROR KINSMAN:  Yes, sir, we are.  We have Apple

18   one-to-one iPads to each student this year.  So --

19            MR. FINDLAY:  Wow.

20            JUROR KINSMAN:  -- that's really something that's

21   interesting, and I look forward to using.  It's the future.

22   Technology is what we use to drive a lot of different

23   mechanics and different things.

24            MR. FINDLAY:  Can you give us just a real quick

25   idea of what you use those -- with them being in third grade,

1    how do you use those?

2            JUROR KINSMAN:   Third grade -- it's only the third

3    week of school, so having them I've used them for different

4    things.  You can do online assessments.  It gives back data

5    feedback, instant things that, you know, you can use about

6    your students.

7            So it's just a quick way of assessing.  You can use

8    it for informal assessments and different things like that.

9    So we use them a lot.  We don't use them -- they're not our

10   main mechanic, you know, but it is an implementation of our

11   day, and we use it here and there, so...

12           MR. FINDLAY:   Thank you very much --

13           JUROR KINSMAN:   Yes, sir.

14           MR. FINDLAY:   -- for sharing that with us.

15           Mr. Gill, I think you raised your hand.

16           JUROR GILL:   Just very briefly.  I've been involved

17   in computer technology since 1973 when I enlisted in the Air

18   Force, and I've been interested in technology.  And it's

19   been -- well, that's kind of like, you know, what I teach

20   now.

21           And so, intellectually, I thought, oh, this would,

22   you know, be very interesting to be involved in this aspect

23   of the technology industry.

24           MR. FINDLAY:   If you're selected to the jury, I do

25   think you will find it interesting.  I don't think it will be

1   a boring case for you.

2              Thank you very much, Mr. Gill.

3              Is anybody else willing to share with us what

4   initial thought you may have had when you heard about Apple?

5              We've got two folks.  Let me take No. 17,

6   Ms. Stockman.

7              JUROR STOCKMAN:  My name is Valarie Nicole

8   Stockman, and I think it would be very interesting to do, to

9   sit on the jury.  I sat on one jury before, and it was just

10  as interesting but not as big of a case nearly.  It was

11  through Seven Points, but I found it very interesting.

12             MR. FINDLAY:  Thank you very much.

13             And in the front, Ms. Stoddard?

14             JUROR STODDARD:  I just wondered why it was being

15  heard here in Tyler.

16             MR. FINDLAY:  Okay.

17             JUROR STODDARD:  Two big companies --

18             MR. FINDLAY:  Okay.

19             JUROR STODDARD:  -- little town.

20

21             MR. FINDLAY:  Okay.  Well, because you've got one

22  of the best Judges around.  That's why it's being heard here

23  in Tyler.  That would be my answer to you.

24             Thank you all very much.

25             Now, let me ask an uncomfortable question, for

1    someone representing Apple.  A lot of you have Apple

2    products.  Have any of you ever gotten to the point where you

3    just were saying a whole bunch of words you shouldn't say

4    about the product, wanted to throw it down, throw it out the

5    window, grab a hammer, and smash it?  Anybody ever had those

6    sorts of really frustrating experiences with any of their

7    Apple products?

8              Okay.  Let's start -- remember your hand.  Let me

9    start with Mr. Faulkner real quickly.

10             What can you share with us?

11             JUROR FAULKNER:  Well, I usually just find somebody

12   that's 20 or 30 years younger, and they can solve the

13   problem.  It's just, you know, when you're in your 60s, that

14   technology and things change.  It's just hard to stay up with

15   it.  I always find someone younger, and they seem to correct

16   it without a problem.

17             MR. FINDLAY:  I have the same thing with my

18   14-year-old, so -- but it doesn't -- it didn't somehow taint

19   your view of the company Apple?

20             JUROR FAULKNER:  No.

21             MR. FINDLAY:  All right.  Thank you.

22             JUROR FAULKNER:  It's usually my fault.

23             MR. FINDLAY:  Thank you, sir.

24             Ms. Stoddard?

25             JUROR STODDARD:  Just very similar to what he said,

```
 1   just using the devices.  But half the time it turns out it

 2   was AT&T.

 3             MR. FINDLAY:  Okay.

 4             JUROR STODDARD:  So -- and then like he said, I

 5   just find a kid to walk me through it.

 6             MR. FINDLAY:  Thank you.

 7             Anybody else have some Apple products and at times

 8   you've just been madder than heck or all frustrated with it?

 9             Let me ask you this:  Has anyone ever had the

10   opportunity to -- to call an Apple -- AppleCare or to call

11   the Apple folks or go to one of the stores and try to get

12   help or assistance with a problem?

13             We'll start with the front row and work back.

14             Again, Mr. Faulkner, can you tell us about that?

15             JUROR FAULKNER:  I was in Austin, I guess, about

16   three months ago, and I had an issue with my phone and took

17   it in.  And again, it was something that I'd messed up so --

18             MR. FINDLAY:  Did you take it in to like --

19             JUROR FAULKNER:  It was an Apple store in Austin.

20             MR. FINDLAY:  An Apple store.  All right.  And how

21   did they treat you?

22             JUROR FAULKNER:  Fine.

23             MR. FINDLAY:  Fix the problem?  Did they fix the

24   problem?

25             JUROR FAULKNER:  They fixed the problem.
```

 1          MR. FINDLAY:  Great.  Thank you.

 2          I think there was someone in the second row?

 3          Yes, Mr. Drew?

 4          JUROR DREW:  Steve Drew.  I've been to multiple

 5    Apple stores with my MAC, just various issues.  They've

 6    always treated me real well.

 7          MR. FINDLAY:  Good.  Thank you very much.

 8          Is there anybody else on the second row?

 9          Third row?

10          And at the back, Mr. Gill, is that -- did you just

11    raise your hand?

12          JUROR GILL:  Yes.

13          MR. FINDLAY:  Yes, sir?

14          JUROR GILL:  I can remember a couple of times when

15    I called the customer assistance with, you know, a couple of

16    different issues, and they were always resolved to my

17    satisfaction.

18          MR. FINDLAY:  Worked out well?

19          JUROR GILL:  Yeah.

20          MR. FINDLAY:  All right.  Thank you, sir.

21          Mr. Drew, let me jump out of line a little bit.

22    Could we go back to you?

23          As you might -- would it -- would it surprise you

24    to know that it causes me a little bit of concern if

25    you're -- you've got a legal case that's -- that you're being

1   represented by Mr. Hill's firm with?

2           JUROR DREW:  Yes, I can understand that.

3           MR. FINDLAY:  Okay.  Thank you.  So I don't want

4   you to take these questions the wrong way.

5           Now, could you hand back the microphone to

6   Ms. Mayes.  Thank you.

7           And I know you said that Mr. Hill isn't the lawyer

8   working on it.  Did you say it was Mr. Smith?

9           JUROR DREW:  Mr. Smith and Mr. Miller.

10          MR. FINDLAY:  Okay.  Do you think in any way,

11  though, that that somehow is going to make you, perhaps, more

12  likely to -- to believe something that you hear, perhaps,

13  from Mr. Hill or their side than -- than our side, just

14  because of that relationship, because you've -- you've

15  entrusted them with something pretty -- pretty important?

16          JUROR DREW:  No, sir, I don't believe it would.

17  But it's an inconvenience because I am scheduled to appear at

18  a hearing next Tuesday.  That's the reason I would like to be

19  excused.

20          MR. FINDLAY:  Okay.  So, your concern is that?

21          JUROR DREW:  Not as far as my ability to make an

22  unbiased decision.

23          MR. FINDLAY:  Okay.  Thank you, Mr. Drew.  I

24  appreciate that.

25          I believe -- I think it was Ms. Stockman who

1   indicated that she was somewhat excited that this case was

2   about Apple or something.  And you mentioned, I think,

3   Ms. Stockman, it's not -- the other case you were on wasn't

4   as big of a case.

5        But let me talk -- bring that back to something

6   else that Mr. Hill asked about, big corporations.  I think we

7   can all agree, as some of you said, that Apple is a big

8   company.

9        Do you have any strong feelings,

10  Ms. Stoddard [sic], about big companies in general?

11       JUROR STOCKMAN:  Not in general.  My mother used to

12  work for IBM so I have no feelings one way or another.

13       MR. FINDLAY:  Okay.  Thank you.

14       Let me ask for a show of hands, anybody else have

15  strong feelings -- and let's just start off first one way or

16  the other -- about large corporations, passionate about them

17  for whatever the reason is?

18       Let me ask you this, it may be a little bit

19  different way:  Does anybody believe that a corporation in a

20  lawsuit like this should be held to a higher standard than

21  the individual should?  That somehow there should be more

22  burden on us to show that we didn't do anything wrong, that

23  we didn't infringe?  Anybody have that sense just because a

24  corporation is big it should have that more -- that higher

25  responsibility?

 1              I see no show of hands.  Thank you.

 2              Let me ask another one.  And -- because there are

 3    some people that have very strong feelings about big

 4    corporations.  Sometimes there's anti-corporate views.  And,

 5    although I know some of you expressed just the opposite, does

 6    anybody here think that a big corporation will steal or cheat

 7    if they can get away with it?  Anybody ever had that

 8    sentiment, that a big corporation is going to cheat and steal

 9    if they can get away with it?

10              JUROR BURNEY:  May I ask for clarification?

11              MR. FINDLAY:  Of course.

12              JUROR BURNEY:  Do you mean just because they're a

13    big company versus a small company?

14              MR. FINDLAY:  Yes, Mr. Burney, just because it's a

15    big -- that big companies are likely to cheat and steal if

16    they can get away with it.

17              JUROR BURNEY:  No.  I don't believe that any more

18    than for a small company.

19              MR. FINDLAY:  I agree.

20              JUROR BURNEY:  If they're going to cheat and steal,

21    they're going to cheat and steal.

22              MR. FINDLAY:  Thank you very much.

23              Somebody else on the first row raised their hand?

24              Okay.  Thank you.

25              Anybody think that the responsibility or -- or

accountability, if you will -- that responsibility or

accountability increases with the size of the company?  That

somehow if you're a larger company you should be more

accountable than a smaller company should?

Okay.  Thank you.

We are -- we're here in Federal Court.  This is a

pretty formal place.  Some of you have indicated, you know,

you felt excited when you first heard it was Apple, that it

was going to be an interesting and big case.

Who thinks that the fact that this case has gotten

all of the way here to Federal Court, it's been pending for

about two years, means that Apple must have done something,

there must be something to the story that Mr. Hill was

suggesting was going to be their story?  Anybody feel that

way at all?

Juror No. 3, Mr. Jennings.  Could you share that?

JUROR JENNINGS:  I just feel like CCE, they

wouldn't pursue it if they didn't feel they had a case also,

you know.  So I want to see both sides.

MR. FINDLAY:  So let me ask you this, though:  Does

that -- since we made it -- and I appreciate you sharing

those feelings with us.  Since we've made it all this way to

the courthouse, we're sitting here picking a jury, does that

mean that in your mind CCE starts a little bit ahead?  And

you figure, well, there's got to be something to the story

```
 1   if -- if we're even here?
 2           JUROR JENNINGS:  I believe they believe there is a
 3   case, and they are pursuing it the way they should, and
 4   that's what we're here for.
 5           MR. FINDLAY:  Okay.
 6           JUROR JENNINGS:  I don't know if that answers your
 7   question or --
 8           MR. FINDLAY:  Well, do you think you would -- do
 9   you think that means they start a little bit ahead?  That
10   if -- if you put us on like the starting blocks --
11           JUROR JENNINGS:  No.
12           MR. FINDLAY:  -- of a race at the Olympics they get
13   a headstart over our side?
14           JUROR JENNINGS:  No.
15           MR. FINDLAY:  All right.  Thank you, Mr. Jennings.
16           Anybody else feel that way?
17           Yes, Ms. Youngblood.  Do you feel that -- share
18   that with us.  You feel that somehow the fact that we're all
19   the way here in Federal Court, we've gotten this far in this
20   case, we're picking a jury, means that Apple just must have
21   done something wrong?
22           JUROR YOUNGBLOOD:  Yes, I do.
23           MR. FINDLAY:  Okay.
24           JUROR YOUNGBLOOD:  I believe -- I mean, why would
25   they be here if they did not believe that Apple did
```

```
 1    something?  That doesn't mean Apple did.  It just means that

 2    they believe that they did.

 3              MR. FINDLAY:  Right.  And I guess then that's a

 4    good point.  My question is a little bit different, though.

 5              Does that put in your mind, as you sit here and

 6    listen to Mr. Hill talk to you and you listen to me ask you

 7    questions, does that put in your mind that CCE starts a

 8    little bit ahead of Apple in this case because you think,

 9    well, gosh darn, we've made it all the way here, there's got

10    to be something to CCE's case?

11              Do you understand what I'm trying to ask?

12              JUROR YOUNGBLOOD:  Yeah, I understand.  I'm trying

13    to think.

14              MR. FINDLAY:  Certainly.

15              JUROR YOUNGBLOOD:  And, you know, it's hard.

16              MR. FINDLAY:  I'm sorry.

17              JUROR YOUNGBLOOD:  This case has been going on for

18    three years?

19              MR. FINDLAY:  About two.

20              JUROR YOUNGBLOOD:  Well, it -- have we ever been

21    here before on this case?

22              MR. FINDLAY:  No, ma'am.

23              JUROR YOUNGBLOOD:  Okay.  Because it seems like I'm

24    having deja vu here.  I don't know.  I don't know whether it

25    makes me think that they are a little bit -- no, I'm not
```

```
 1   senile.  Don't write that down, please.
 2              MR. FINDLAY:  I was just putting a checkmark.  I
 3   promise.
 4              JUROR YOUNGBLOOD:  I saw you over there.
 5              MR. FINDLAY:  I'm sorry.  I'll keep my hands back
 6   here.
 7              JUROR YOUNGBLOOD:  It seems like -- I believe that
 8   they must have a case or they wouldn't be here.  But I
 9   believe that if Apple really believed that they were wrong,
10   they would have paid them off.
11              MR. FINDLAY:  Okay.  That's fair.  That's fair.
12   Thank you very much.
13              Let me ask you this, change the subject a little
14   bit:  Who likes to watch some of those shows, CSI, Law &
15   Order, those type of shows?  Let me see a big -- let me get a
16   big hand so I can -- we can write this down.
17              No. 7, No. 5, No. 4, No. 9, No. 10, No. 11, 13, 14,
18   Ms. Youngblood, which is No. --
19              JUROR YOUNGBLOOD:  21.
20              MR. FINDLAY:  21.  No. 20.
21              Looks like we've got a bunch.  No. 19, Nos. 17 and
22   16.
23              And I think -- did I get everybody?
24              Okay.  Who wants to give me a -- volunteer, raise
25   your hand, tell me why you like watching those shows.
```

1          Okay.  Ms. Stoddard, why do you enjoy watching

2   those kind of shows?

3          JUROR STODDARD:  I just finished a marathon of

4   Suits.  It's just fun.  I mean, what else is there to watch

5   on TV?  They're smart people.  They're, you know, figuring

6   things out.  It's just -- I think it satisfies a lot of

7   curiosity to watch people figure it out.

8          MR. FINDLAY:  Okay.  Thank you.

9          Somebody else who was brave enough to raise their

10  hand, tell me why you like to watch those shows.

11         No. 16, Ms. Wade, you haven't said too much.  We're

12  going to pick on you a little bit.  Thank you.  Why do you

13  enjoy those shows?

14         JUROR WADE:  Evidence.

15         MR. FINDLAY:  Evidence.

16         JUROR WADE:  Yes.

17         MR. FINDLAY:  We love evidence.  We're lawyers.

18  Tell us what you mean.

19         JUROR WADE:  Evidence makes the case.  I mean, you

20  have to have all the right evidence.

21         MR. FINDLAY:  Okay.  Ms. Youngblood, I'm going

22  to -- I'm going to write that one down.  That's a good one.

23  Thank you.  Evidence makes the case.  Ms. Wade, I couldn't

24  agree with you more.

25         Let me ask you this:  Is one reason why some of you

enjoy those shows is because when it starts and you're first

watching it, the first ten minutes you think, ah, I think I

know what happened?  And then by the time the show ends it's

entirely different; that what you thought was the case, isn't

the case?  Can we all get a show of hands?  That's -- that's

kind of what is enjoyable about those shows, right?

Well, you probably see where I'm going with this.

In this format in this trial, Mr. Hill and his folks are

always going to get to go first before Apple.  And then Apple

gets to stand up and give its response.  That's why I'm using

that as an example to suggest to you why it's so important

that you keep an open mind all the way through the process in

this case.

Because until the end, until you've heard

everything, you don't know exactly what the facts are.

And as Ms. Wade said, the evidence will make the case.  So

thank you very much for that.

Let me ask you this:  Has anybody ever been wrongly

accused of taking something or doing something that they

didn't do?  Somebody's been wrongly -- you've been wrongly

accused of taking somebody's idea, you've been wrongly

accused of taking somebody's property?  Anybody willing to

share any event that's happened like that?

No?  Thank you.

Let me put a hypothetical in there.  If -- if you

were accused of taking something that you didn't take or

using something that you didn't use, you could do two things.

Somebody might just try to say, okay, admit it, and go away

because that was the easier part.  Or you could stand on

principle, and you could fight and fight hard to try to

vindicate yourself.

We would submit to you that's what the evidence is

going to show that Apple is doing in this case.

Will everybody agree with me that anybody who is

accused of doing something in a court of law has got an

absolute right to fight hard to vindicate themselves if they

believe they did nothing wrong?  Can I get a show of hands

that everybody agrees with that?

Thank you.

We think that's what this case is about, Ladies and

Gentlemen.  And you'll -- you'll see that as we -- as we move

through.

Let me ask you another question.  Can everybody

agree with the statement that it's wrong to not give credit

where credit is due?  That it's wrong to not give somebody

credit if they have worked on something, and they should be

entitled to credit?

Anybody ever been involved in a team effort at

work?  A work project that you worked with a bunch of

colleagues on?

```
 1              Let's take -- take a couple folks.  Let's start
 2   with Mr. Burney.  Can you tell us about that?
 3              JUROR BURNEY:  Well, all through my military
 4   career, everything is a team effort.  I mean, you don't run a
 5   ship without a team, you know.  Working various jobs through
 6   the years and businesses, everything has to be a team.
 7              MR. FINDLAY:  Can you think of a particular project
 8   in the military that stands out where you had a team of -- of
 9   men that were trying to accomplish something?
10              JUROR BURNEY:  Sure.
11              MR. FINDLAY:  Share that with us, if you would,
12   please.
13              JUROR BURNEY:  I was in the -- I was in the medical
14   side and we used to have to do accreditation for the
15   hospitals.  And so you put a team together to work towards
16   that accreditation.
17              You know, you check all the paperwork and this one
18   would do that and on and on and on.
19              Same thing when I was at the college.  We have
20   accreditation that you've got to go through.  One guy does IT
21   stuff.  One -- the dean of students does other things.  And I
22   did the business, the finance and business side.  You know,
23   so long hours and it's a team.
24              MR. FINDLAY:  And at some point with those team
25   efforts, would -- would at some point during the process you
```

```
 1    would have to report to somebody or a supervisor --
 2               JUROR BURNEY:  Sure.
 3               MR. FINDLAY:  -- would have to come to look and see
 4    what you did?
 5               JUROR BURNEY:  Sure.
 6               MR. FINDLAY:  And how -- how y'all performed?
 7               JUROR BURNEY:  Sure.  You have inspecting teams
 8    that come in and do that.
 9               MR. FINDLAY:  Would it -- would it make you mad if
10    somebody in the team took credit for all the teamwork?
11               JUROR BURNEY:  Sure.  You've always got somebody
12    who's not carrying a full load, and somebody else has got to
13    pick up the slack or the whole team dies.  I mean, the whole
14    organization doesn't do well so...
15               MR. FINDLAY:  And would you agree with me that it's
16    wrong for one member of the team to try to claim that all of
17    the success was because of him?
18               JUROR BURNEY:  Yes.
19               MR. FINDLAY:  As opposed to the team effort?
20               JUROR BURNEY:  Yes.
21               MR. FINDLAY:  You've heard that statement, there's
22    no "I" in team?
23               JUROR BURNEY:  That's right.
24               MR. FINDLAY:  All right.  Thank you very much.
25    Somebody else had their hand raised.
```

1              Yes, Mr. Kinsman?

2              JUROR KINSMAN:  Being a teacher we have a third

3    grade team that I'm very proud of that I work with all of the

4    time that, you know, our goal is the betterment of children

5    and what they are learning socially and emotionally.  So --

6    and we work on lesson plans and things like that.

7              So our ideas are, to me, to be shared and to be

8    given without, I guess, full credit in a sense.  It's -- it's

9    for the betterment of the students, so therefore, if someone

10   else uses it within their classroom, I'm not looking for, you

11   know, that teacher to stand there and say that, oh, this idea

12   came from so-and-so.

13             So it's a little bit different from this

14   gentleman's example, I guess, in the sense that we work

15   together; but it's for the -- you know, it's for students.

16             So it's not necessarily, this is mine.  You know,

17   you want to kind of get some of that credit occasionally

18   like, you know, that was a good idea, I guess, but...

19             MR. FINDLAY:  Is it -- is it more a sense of the

20   credit should go to the group, not the individual?

21             JUROR KINSMAN:  I'm under the impression that, yes,

22   if that's what it calls for.  It's just for that -- you know,

23   it's -- you occasionally get those teachers that, you know,

24   that don't pull their workload or they -- they don't want to

25   share their ideas.  But it's -- to me, you know, it's to

1   share.  It's to give out those ideas.  So if it calls for

2   that, yes.

3          But, I mean, this case is different.  It's two

4   companies.  It's, you know, it's a different kind of ball

5   game.

6          MR. FINDLAY:  Thank you, Mr. Kinsman.

7          JUROR KINSMAN:  Yes, sir.

8          MR. FINDLAY:  I asked the question simply because

9   if you're sitting on the -- on the jury, the eight of you

10  that get there, there is relevance of the question and you'll

11  understand it at that time.  We can't go into it at this

12  point, but thank you very much.

13         Does anybody else want to volunteer of a team

14  effort they have been involved in that they're particularly

15  proud of?

16         No one?  Thank you.

17         Now, Mr. Hill talked about damages a little bit in

18  the case.  And when I first started out I mentioned to you

19  that we think we don't infringe.  We believe we will prove we

20  don't infringe.  And, therefore, the damages is zero.

21         But under the way these cases work, and under the

22  law, we will present a witness who will talk about damages.

23  And the purpose of that will be he will look at what the

24  Plaintiff is claiming, what CCE is claiming in terms of

25  damages.  And we'll explain why we think that's just too

high.   It shouldn't be anything close to that.   And if a jury

were going to award a number, it should be something much

lower.

Now, when I -- I've been fortunate enough and

blessed to do this kind of work for a while now.   I've tried

a lot of these cases.   And sometimes they don't come out the

way you want and sometimes you lose.   And sometimes you're

able to talk to the jurors after it happens, which is always

a great opportunity for the lawyer.

And I've heard from a number of jurors in those

situations where it didn't go as I wanted it to, and they

will say something along the lines of:   Mr. Findlay, you

know, I heard you and I kind of believed you when you said

y'all didn't infringe, and you had some good evidence on it;

but then when you started talking about damages, I thought,

well, that's kind of hypocritical, that why would you be

talking about damages if you don't infringe?   That seem to be

contradictory.

Anybody have that kind of a sense that it might

puzzle you as to why we might talk about damages on our side

when we're forcefully telling you we don't infringe?

Mr. Jennings, I saw you nodding your head a little

bit.   What do you think about that?

JUROR JENNINGS:   Well, you have to plan ahead, I'm

assuming, you know, you want to know if you are found

1   accountable, you don't want it to be the full amount.

2            MR. FINDLAY:  Correct.

3            JUROR JENNINGS:  I could see that being

4   hypocritical, though, and that's kind of...

5            MR. FINDLAY:  Let me -- let me give you an example.

6   Have you ever been involved in a -- in a car wreck?

7            JUROR JENNINGS:  No.

8            MR. FINDLAY:  Okay.  Let's -- let's pretend.  Play

9   hypothetical.  Let's say you're involved in a car wreck and

10  you're convinced in your heart of hearts that you were not at

11  fault for that accident.  Your light was green.

12           But the other guy sues you.  He says just the

13  opposite, that, you know, Mr. Jennings, you were at fault in

14  this accident.

15           And this is just a hypothetical, so we're playing.

16           And it goes to court.  And you -- so you're

17  going -- there's going to be a jury decide whether you're at

18  fault or he's at fault.

19           But you also notice that the damages that he's

20  claiming for his car are $20,000; $10,000 more than it should

21  be.  Even if you're not at fault and you believe that, do you

22  think you might contest the damages number and say, look,

23  that's crazy.  He was driving an old ten-year-old pickup

24  truck, not a Cadillac.  The damages ought to be a lot less?

25           JUROR JENNINGS:  Yes.  And you would want it to be

 1   fair even if you lost.  You wouldn't want it to be

 2   unreasonable.

 3          MR. FINDLAY:  Okay.  And would you hope in that

 4   situation that the jury didn't hold it against you that you

 5   were talking about damages?  Do you follow what I mean,

 6   because you weren't at fault for the accident?

 7          JUROR JENNINGS:  Right.

 8          MR. FINDLAY:  Okay.  Does everybody -- anybody have

 9   any thoughts on that, with what I was discussing with

10   Mr. Jennings?

11          Does everyone agree with that, that just because we

12   talk about damages in this case doesn't mean that we think we

13   owe any damages?

14          I'm getting some nods or -- and shaking of the head

15   so...

16          Let me pick on somebody, though.

17          Mr. Garland you've been kind of quiet today.  What

18   do you think about that?  Do you agree that -- that just

19   because we talk about damages shouldn't suggest that we're

20   being inconsistent or -- or not -- or we're hypocritical?

21          JUROR GARLAND:  No, sir.  I think you're realizing

22   that it could go either way.  And should you lose, just

23   because Apple is a company that everybody in the world has

24   heard of --

25          MR. FINDLAY:  Uh-huh.

1          JUROR GARLAND:  -- they've got plenty of money, why

2    this 28 million-dollar number -- I thought that is -- this a

3    number we reached in the air or is that what is really owed.

4          MR. FINDLAY:  Understood.

5          JUROR GARLAND:  I have a problem going overboard,

6    paying a lot of money for steal -- copying a laptop.

7          MR. FINDLAY:  And that -- and that you -- you put

8    it a good way because I think what -- the eight of you that

9    sit here, when you hear our damages side of the case it will

10   be kind of like what Mr. Garland said, it's overboard for

11   what they are asking for.  I just wanted to make sure that no

12   one holds it against us just because we're talking about

13   damages.  Because as -- as I started this out -- I lost my

14   page -- we are not using the '820 patent.

15          Thank you very much, Ladies and Gentlemen.

16          When you first -- let me ask you this:  Did

17   everyone see the patent video?

18          Did you enjoy that video?  Find it was --

19   learned -- learned -- I'm going to bet you learned a lot that

20   you didn't know before seeing the video.

21          All right.  Let me -- we'll do it this way.  I'm

22   going to pick on somebody.

23          Ms. Palmer, what was the first thing you thought of

24   when you realized this was a patent case?

25          Let me ask, did you think about any particular

```
 1    invention or any particular person?
 2              JUROR PALMER:  No.
 3              MR. FINDLAY:  Okay.  Did you think it might be
 4    something interesting?
 5              JUROR PALMER:  I'm sorry?
 6              MR. FINDLAY:  Did you think it might be something
 7    interesting?
 8              JUROR PALMER:  No.
 9              MR. FINDLAY:  Okay.  Fair enough.  Thank you very
10    much.
11              Did anybody have any thought when they heard of a
12    patent -- Mr. Kinsman, go ahead.
13              JUROR KINSMAN:  I thought of a Keurig.  They came
14    out with that patent, I think it was, for the K-Cups.
15              MR. FINDLAY:  Yes, sir.
16              JUROR KINSMAN:  And I think that patent must have
17    expired, which I've learned I didn't know patents could
18    expire for other companies to make things, so that, you know,
19    that's why we see like the Hamilton Beach having the pods and
20    things like that now.
21              So I think Keurig must have had a patent for that
22    that expired.  So I thought that was kind of an
23    interesting -- the video itself was, you know, a presenter
24    presenting, but it was -- it was interesting.
25              MR. FINDLAY:  Good.  Let me ask you:  Did it --
```

1    did -- did you, or if anybody else did raise your hand, when

2    you first heard of the -- heard this was a patent case, did

3    you think of, well, it's got to be something incredible,

4    like -- like Edison and his light bulb or like -- like Henry

5    Ford and the Model T car?

6              JUROR KINSMAN:  I seemed to think it was -- yeah.

7    I thought it was maybe something tangible.  This seems

8    intangible.  Or it's something that's technology based.  I'm

9    not sure if like the patent itself is tangible or not.  Is it

10   something that we use, yes.  But I thought of, you know, I

11   thought something tangible, something you would hold,

12   something you -- you can put in your hand.

13             MR. FINDLAY:  All right.  Thank you.

14             How about -- let me pick on somebody else.

15             Mr. Thomas, what did you first think when you heard

16   this was a patent case?  Did you think about anything --

17             JUROR THOMAS:  Big headaches.

18             MR. FINDLAY:  A big headache?

19             JUROR THOMAS:  Yeah.  I've had family members try

20   to do patents, and they -- they draw out for years.  And so

21   to me it's a headache.  And that's my -- that's my thoughts

22   on it.

23             MR. FINDLAY:  Who -- tell us about that.  Who in

24   your family has tried to get a patent?

25             JUROR THOMAS:  I've had -- well, I guess it was

 1   family.  He tried to invent something and somebody already

 2   prior to that had the same idea but it wasn't made the same

 3   way.

 4            MR. FINDLAY:  Uh-huh.

 5            JUROR THOMAS:  But in the long-run it had the same

 6   function.  So in the long-run it was the same, so he just

 7   draw -- it was drawn-out and drawn-out and drawn-out.

 8            MR. FINDLAY:  So did he -- did your family member

 9   get the patent or --

10            JUROR THOMAS:  No, he did not.  He didn't.  They --

11   they said it was too close engineering.

12            MR. FINDLAY:  To what had come before?

13            JUROR THOMAS:  Uh-huh, yes.

14            MR. FINDLAY:  So, he wasn't -- and I'm sorry for

15   him.  But he wasn't given the patent because the Patent

16   Office decided that somebody had kind of --

17            JUROR THOMAS:  Somebody already had the same -- the

18   same idea, pretty much.

19            MR. FINDLAY:  Same idea before him?

20            JUROR THOMAS:  Right.

21            MR. FINDLAY:  But you understand that that's kind

22   of a principle in patent law, that --

23            JUROR THOMAS:  Yeah.  I mean, I just -- I just

24   believe that, you know, if someone has done it, you need to

25   present the full patent, like the full engineer, not hold

1  anything back.  You know what I'm saying?

2           MR. FINDLAY:  Yes, sir.

3           JUROR THOMAS:  So I guess with my family member,

4  he -- he tried to do the full engineering, and then the other

5  guy just only did half.  So, I mean, that's what I know.

6           MR. FINDLAY:  Does that experience at all make you

7  lean one way or the other if you're selected on this case?

8           JUROR THOMAS:  Not really.  I just believe in

9  presenting everything in front, you know, in full and not

10  hold anything back.

11           MR. FINDLAY:  Making a full disclosure?

12           JUROR THOMAS:  A full disclosure, yeah.  If you

13  have anything to hide, you know, there's something wrong.

14           MR. FINDLAY:  Understood.  Thank you, sir.

15           Anybody else had a particular thought of a

16  particular invention or inventor when you heard about that

17  this was a patent case?

18           Does -- did you see the part in the -- in the

19  patent video -- and I think I wrote it down -- where the

20  gentleman talked about the fact that sometimes the Patent and

21  Trademark Office can make mistakes?  Does everybody agree

22  with that from -- that the video did a good job of explaining

23  that?  He said no -- I think he said no process is perfect;

24  that sometimes mistakes can happen.

25           Is there anybody that thinks, despite what I heard

```
 1    in the video, if the Patent Office granted a patent and did

 2    this with the '820 patent, that despite -- since they --

 3    since the Government did that, since the PTO did that, I

 4    would never have the ability to find the patent invalid,

 5    despite the evidence?  Does anybody feel that way, that they

 6    just couldn't find it invalid since the Patent Office has

 7    already blessed it?

 8              Good.  Thank you.

 9              Has anybody before today heard of LTE in the

10    context of cell phones?

11              I see a show of hands.  Okay.  No. 4, No. 3,

12    Mr. Drew.  I know there are some others on the back row.

13    Let me pick on somebody.

14              Ms. Wade, I think you had your hand raised.

15              JUROR WADE:  Uh-huh.

16              MR. FINDLAY:  What have you heard about LTE?  Or

17    just seeing it on your phone?

18              JUROR WADE:  I've just seen it on my phone.

19              MR. FINDLAY:  Okay.  Thank you, Ms. Wade.

20              Anybody else know anything more about LTE than just

21    seeing it on their phone?

22              Mr. Gill?

23              JUROR GILL:  As I -- as I understand it, it's

24    essentially the current technology, the current cell phone

25    systems used as far as the communications, establishing the
```

```
 1   communication and the high-speed cellular networks that we

 2   currently experience.  That's my understanding of it.

 3           MR. FINDLAY:  And do you have any work experience

 4   with that or just general understanding?

 5           JUROR GILL:  Just general understanding.

 6           MR. FINDLAY:  Okay.  Thank you.

 7           Anybody else have any particular -- yes,

 8   Mr. Jennings.

 9           JUROR JENNINGS:  I've installed some of the early

10   OnStar modules and I think they were LGE.  I can't remember

11   exactly what technology was with them.  It was back in the

12   late '90s.

13           MR. FINDLAY:  Yes, sir, installed them with your

14   work at General Motors?

15           JUROR JENNINGS:  Yeah, automobiles.  Now we have

16   WiFi in the cars.

17           MR. FINDLAY:  Okay.

18           JUROR JENNINGS:  That's my experience with it.

19           MR. FINDLAY:  What -- do you -- there's a

20   difference between LTE and WiFi, isn't there?

21           JUROR JENNINGS:  Right.

22           MR. FINDLAY:  Okay.  What do you understand that

23   difference to be?

24           JUROR JENNINGS:  I'm not sure which one is in the

25   car right now, honestly.
```

```
 1                MR. FINDLAY:  Okay.

 2                JUROR JENNINGS:  I can fix it when it's inop, but I

 3   can't tell you exactly what it's -- how it's getting into the

 4   car, who's streaming it.

 5                MR. FINDLAY:  All right.  Thank you, sir.

 6                Anybody else?  Any understanding of LTE more than

 7   just seeing it on your phone or something?

 8                Okay.  Let me ask some general questions.  Has

 9   anybody ever been a member of a union?  If you would raise

10   your hand.

11                There's a few folks.  Keep your -- keep your --

12   can I see your hands again?  Thank you.  I'm sorry.

13   That's Mr. Garland, No. 6; Ms. Stoddard, No. 4;

14   Mr. Washington.

15                JUROR WASHINGTON:  7.

16                MR. FINDLAY:  No. 7.  I'm sorry.

17                Mr. Thomas.

18                In the back row, is that Mr. Seale?

19                JUROR SEALE:  Yes.

20                MR. FINDLAY:  Thank you, sir.

21                I believe we've got everybody.  Thank you.

22                Anybody ever been a supervisor in a union or a

23   leadership role in the union?

24                Mr. Garland, can you tell us what that was?

25                JUROR GARLAND:  Back when I was in the carpenter's
```

 1    union, I was a carpenter's foreman, led a construction crew.

 2    That's pretty low tech.

 3            MR. FINDLAY:  And when was that?

 4            JUROR GARLAND:  Probably 30 years ago.

 5            MR. FINDLAY:  Okay.

 6            JUROR GARLAND:  No high-tech back then, so it was

 7    just a hammer and nails.

 8            MR. FINDLAY:  Okay.  Thank you, sir.

 9            I think Mr. Hill asked you-all had anybody been a

10    defendant in a lawsuit.  Let me ask the other side of that.

11            Has anyone, other than Mr. Drew -- I think we'll

12    exclude you because I think you've told us about that,

13    Mr. Drew -- anybody else ever had to been -- be a plaintiff

14    in a lawsuit, to bring a lawsuit against somebody?

15            Mr. -- No. 4, Ms. Stoddard; Mr. Washington, No. 10,

16    Mr. Staten, No. 6; Mr. Gill, No. 23.

17            Ms. Stoddard, can you tell us about that?  If --

18    and I don't -- and if this is something that which is

19    uncomfortable, I don't mean to delve into it, we can talk

20    about it in front of the Court.

21            JUROR STODDARD:  It's a -- it's actually ongoing

22    with a medical device.

23            MR. FINDLAY:  Okay.

24            JUROR STODDARD:  A company that manufactured.

25            MR. FINDLAY:  Anything about that that makes you

```
 1    lean one way or the other?
 2                JUROR STODDARD:  Not at all.
 3                MR. FINDLAY:  Okay.  Thank you.
 4                Mr. Staten, I think you had your hand raised.
 5                JUROR STATEN:  Yeah.  We had a car wreck, my
 6    daughter and I.  And we had to sue the company to get them to
 7    pay for what their driver did.
 8                MR. FINDLAY:  Okay.  And did that get resolved to
 9    your satisfaction?
10                JUROR STATEN:  Yes, it did.  Yes.
11                MR. FINDLAY:  Anything about that that makes you
12    lean toward one side or the other?
13                JUROR STATEN:  No.
14                MR. FINDLAY:  All right.  Thank you, sir.
15                Mr. Washington.
16                JUROR WASHINGTON:  It was a car wreck.
17                MR. FINDLAY:  Okay.  Did it get resolved to your
18    satisfaction?
19                JUROR WASHINGTON:  Yes, yes.
20                MR. FINDLAY:  And the same question.  Anything
21    about that makes you lean one way or the other in this case?
22                JUROR WASHINGTON:  No.
23                MR. FINDLAY:  Okay.  Thank you, sir.
24                THE COURT:  Five minutes, Mr. Findlay.
25                MR. FINDLAY:  Thank you, Your Honor.
```

1           Mr. Gill, did you have your hand raised?

2           JUROR GILL:  Actually twice.

3           MR. FINDLAY:  Okay.

4           JUROR GILL:  One was local here.  We had our home

5  built by a contractor here, and he did -- he left before the

6  home was finished.

7           MR. FINDLAY:  That's not good.

8           JUROR GILL:  No, it wasn't good.

9           And -- no, it wasn't resolved to our satisfaction.

10  Yes, we got a judgment but weren't able to really do anything

11  as far as collecting.

12          MR. FINDLAY:  And what was the other one you said?

13          JUROR GILL:  The other was product liability or --

14  a hip -- hip implant device that went bad.  That one was

15  resolved.

16          MR. FINDLAY:  Okay.  And those make you lean either

17  way?

18          JUROR GILL:  No.  No.

19          MR. FINDLAY:  Okay.  Thank you, Mr. Gill.

20          A few more questions, then I'm going to give you

21  guys back the time.  And I do really appreciate it.

22          Anybody -- this is a funny question.  But anybody

23  have a bumper sticker or emblem on their car?  And I'll come

24  forward.  I've got a -- I've got a Baylor sticker on my car.

25  That's where my oldest is, and my wife and I met at Baylor.

```
 1              Has anybody got a bumper sticker?

 2              Some hands slowly going up.

 3              Let's start with Mr. Kinsman, No. 1.  Would you

 4    share with us what that bumper sticker is?

 5              JUROR KINSMAN:  I just have a Pearl Jam sticker

 6    from ACL music so...

 7              MR. FINDLAY:  Eddie Vedder, all right.

 8              JUROR KINSMAN:  That's it.  There you go.

 9              MR. FINDLAY:  That's a good bumper sticker.

10              JUROR:  Logo baseball.

11              MR. FINDLAY:  Yeah.

12              JUROR:  And middle school twirler.

13              MR. FINDLAY:  Okay.  Thank you.

14              Anybody on the second row?

15              Mr. Drew?

16              JUROR DREW:  Cruz 2016.

17              MR. FINDLAY:  Mr. Washington?

18              JUROR WASHINGTON:  Mine's in the window.  It's

19    United States Navy.

20              MR. FINDLAY:  Thank you.  And thank you for your

21    service, sir.

22              Anybody on the third row?

23              Mr. Wedgeworth?

24              JUROR WEDGEWORTH:  Texas A&M.

25              MR. FINDLAY:  Texas A&M.  Go Aggies.  Thank you,
```

```
 1   sir.

 2              And anybody on that last row?

 3              No?  Thank you, Ladies and Gentlemen.

 4              Let me ask you another one which is kind of --

 5   might sound silly, but -- but it's a fun one.  CNN people or

 6   Fox people?

 7              Let me have a show of hands for CNN people.

 8              Nobody?

 9              Or Fox people?

10              Majority are Fox people.  Fair enough.

11              Is there anything as I've been asking you

12   questions -- sometimes inartfully -- anything that I have not

13   asked that you think, if he had only asked that, or anything

14   you've been dying to say, now is the time because I've got

15   about 30 seconds left.

16              No?

17              Okay.  Ladies and Gentlemen, I want to thank you

18   again very much.  And on behalf of the folks that I've

19   introduced you to from Apple, we thank you.  On behalf of the

20   lawyers that are on this team, we thank you.  And we look

21   forward to presenting the case to the eight of you that are

22   selected.

23              Thank you very much.

24              Thank you, your Honor.

25              THE COURT:  Thank you, Mr. Findlay.
```

```
 1              All right.  Counsel, approach, please.
 2              (Bench conference.)
 3              THE COURT:  Let's talk about strikes.
 4              MR. FINDLAY:  Mr. Drew, No. 9.
 5              MR. HILL:  Let me write this down.
 6              MR. FINDLAY:  That's our only for cause.
 7              MR. HILL:  I have several, your Honor.
 8              THE COURT:  Okay.  What about No. 9?  Do you have
 9   any objection to him?
10              MR. HILL:  To challenge for cause?  I do have an
11   objection to a cause challenge for him.
12              THE COURT:  Okay.
13              MR. FINDLAY:  I understood what he said --
14              THE REPORTER:  I'm sorry, could you back up?
15              MR. FINDLAY:  Sorry.
16              I would agree he answered the questions
17   appropriately, but Mr. Hill's firm is representing them.  I
18   don't think he can be fully non-biased, even if he tries.
19   And he has this other commitment involving that case.
20              THE COURT:  And --
21              MR. HILL:  And just for the record, your Honor, my
22   firm is not representing Mr. Drew.  We represent a company he
23   works for.
24              THE COURT:  I had a note that he also owns stock in
25   Apple.  Does that give you any pause?
```

```
 1            MR. HILL:  It did not give us pause.

 2            THE COURT:  Okay.

 3            MR. HILL:  I didn't have that same note.  I missed

 4   it.

 5            THE COURT:  Okay.  I'm going to strike him for

 6   cause.

 7            So that's your only one, Mr. Findlay?

 8            MR. FINDLAY:  I believe so.  Yes.  We have no

 9   other.

10            THE COURT:  Mr. Hill, let's hear yours, please.

11            MR. HILL:  Just one moment, your Honor.

12            THE COURT:  Sure.

13            MR. HILL:  Let me make a note.

14            Okay.  Your Honor, I have challenges for cause to

15   No. 21, Ms. Youngblood.

16            THE COURT:  Any objection to that one?

17            MR. FINDLAY:  No.  We don't, no objection.

18            MR. HILL:  No. 22, Ms. Price.

19            MR. FINDLAY:  We can let her go.

20            MR. HILL:  No. 7, Mr. Garland.

21            MR. FINDLAY:  We would -- I don't see a -- I don't

22   see a basis for No. 7.

23            MR. HILL:  Your Honor, in particular, Mr. Garland

24   discussed the length of travel he has and the fact that he's

25   got a special needs grandson that he cares for.  And he
```

 1  indicated that it would be a hardship for him to consider and

 2  pay attention to the evidence.

 3          It could be a distraction because of that.  We

 4  think his inability to clearly hear and consider the evidence

 5  because of that potential life distraction, driving an hour

 6  each way to court with a special needs child, establishes a

 7  basis for cause.  He couldn't fairly hear and consider the

 8  evidence.

 9          MR. FINDLAY:  He said it might be a problem.  He

10  didn't know.  It sounded like it's a joint situation with he

11  and his wife.  I would assume his wife could pick him up.

12  I think Your Honor asked anybody that just can't be here, and

13  he didn't raise his hand, I don't recall.  I don't think it's

14  appropriate for cause, not at this point.

15          THE COURT:  All right.  I'm going to strike him.

16          Mr. Hill, do you have any others?

17          MR. HILL:  I have one other, Your Honor, and this

18  is -- I may need individual voir dire on this, Your Honor.

19          Ms. Stoddard, in response to one of Mr. Findlay's

20  questions, raised the issue of venue.  I want to know what's

21  on her mind about that because it could be a basis for a

22  cause challenge.

23          THE COURT:  I'll let her stay back.

24          I had a note -- I also have a note that

25  Mr. Wedgeworth who has three -- three to four times a week he

```
 1  has occupational therapy.  Anybody have an objection to him

 2  being stricken?

 3          MR. FINDLAY:  I'd like to talk -- can we talk to

 4  him about that?

 5          THE COURT:  I'll hold him back.  No. 4 and No. 20.

 6          MR. HILL:  So, Your Honor, if we can just recap who

 7  has been struck so far?

 8          THE COURT:  All right.  No. --

 9          MR. HILL:  7.

10          THE COURT:  -- 7, 9, 21, and 22.

11          MR. HILL:  Thank you.

12          THE COURT:  Okay.  And I have No. 4 and 20 to be

13  held back.

14          (Bench concluded.)

15          THE COURT:  All right.  Ladies and Gentlemen, thank

16  you all for your participation.  We're going to take a brief

17  recess.

18          I'm going to ask that Panel Members No. 4 and

19  No. 20 stay in the courtroom so we can follow up with you a

20  little bit.

21          Everyone else, we're going to take a recess until

22  11:45.  I'm going to let you adjourn.  I would caution you,

23  do not talk with the lawyers or the parties.  You've got

24  these juror badges on, and they all know that you're in the

25  jury panel.  They should not approach you.  And they won't
```

```
 1   think you're rude if you do not approach them.  So don't talk
 2   about the case with each other or with any lawyers or with
 3   anyone out in the hallway.
 4          If you'll just take a nice break and a little
 5   before 11:45, if you'll come back here.  And you can just --
 6   when Ms. Mayes lets you in, you can just be seated in any
 7   order on this side of the courtroom.
 8          We'll be in recess until 11:45.
 9          COURT SECURITY OFFICER:  All rise for the jury
10   panel.
11          (Jury Panel leaves the courtroom.)
12          THE COURT:  Please be seated.
13          All right.  Ms. Stoddard and Mr. Wedgeworth, thank
14   you-all for hanging back.  The lawyers just have a couple of
15   more questions for you.
16          So, Ms. Stoddard, if you will -- if you'll approach
17   the bench.
18          And, Counsel, if you'll come up here with me.
19          (Bench conference with Juror Stoddard.)
20          THE COURT:  Okay.  What questions do you have for
21   Ms. Stoddard?
22          MR. HILL:  Hi, Ms. Stoddard, how are you?  I'm
23   Wesley Hill.  I represent CCE.
24          You raised one issued there at the end where
25   Mr. Findlay asked you a question about you had a question in
```

```
 1    your mind about why this lawsuit was here in Tyler.

 2                JUROR STODDARD:  Oh, yeah.

 3                MR. HILL:  And I wanted to ask you about that.  I

 4    believe you're going to see that the facts in the case are

 5    going to show that Acacia, CCE's parent company, is a

 6    California company.  Of course, Apple is a California

 7    company.  This case is filed here in East Texas.  Is that

 8    issue going to give you concern, or is that something you

 9    think --

10                JUROR STODDARD:  No, sir.  It was odd for -- you

11    know, unusual.

12                MR. HILL:  Just a -- just a thought you had?

13                JUROR STODDARD:  Yeah.

14                MR. HILL:  Not anything that you think --

15                JUROR STODDARD:  No.

16                MR. HILL:  -- would cause you to lean one way or

17    another?

18                JUROR STODDARD:  No.

19                MR. HILL:  Okay.  All right.  That's all I needed

20    to know.  Thank you, ma'am.

21                THE COURT:  Thank you, Ms. Stoddard.

22                (Juror Stoddard leaves the courtroom.)

23                (Open court.)

24                THE COURT:  Mr. Wedgeworth, would you come on up?

25                Thank you.
```

```
 1                    (Bench conference with Juror Wedgeworth.)

 2               THE COURT:  Hi, Mr. Wedgeworth.  The lawyers just

 3    had a couple more questions -- follow-up questions for you.

 4               JUROR WEDGEWORTH:  Okay.

 5               MR. FINDLAY:  You mentioned that you had a medical

 6    issue.

 7               JUROR WEDGEWORTH:  Yeah.

 8               MR. FINDLAY:  Could you explain that a little bit?

 9               JUROR WEDGEWORTH:  I was in an accident in the end

10    of February.  I actually blew my elbow up and fractured my

11    hand and my thumb.  And I just returned to work three weeks

12    ago.

13               MR. FINDLAY:  Okay.

14               JUROR WEDGEWORTH:  I've been out since the first

15    of -- I mean, about March 7th.  And I've got physical therapy

16    and occupational therapy that I've been going to.

17               MR. FINDLAY:  May I ask how often?

18               JUROR WEDGEWORTH:  I'm going -- this week I go

19    tomorrow and Friday for occupational therapy here in

20    Carthage.  Friday morning at 10:00 o'clock I do physical

21    therapy in Carthage.  And occupational therapy is in Tyler

22    over here at ETMC.

23               MR. FINDLAY:  All right.  And would it -- to your

24    knowledge, would it be detrimental to your recovery if you

25    had to postpone that or move it or -- just be honest with us,
```

1   sir.  We're just trying to find that out.

2           JUROR WEDGEWORTH:  I really -- I get -- I have

3   episodes where I get stiff.  And I -- since I've returned to

4   work, I move around a good with.  But when I sit, it -- it

5   hurts.  So I've kind of tried to keep going so...

6           MR. HILL:  Do you think sitting in the jury box all

7   day would be a problem for you because of that?

8           JUROR WEDGEWORTH:  Yeah, just as long as I sit.

9           Now, if I was excused to do some exercises and

10  things like that, but it does have lingering effects when I

11  just sit for, you know, three or four or five hours.

12          MR. HILL:  Has your doctor ordered you that that's

13  important to you, that you need to do this therapy?

14          JUROR WEDGEWORTH:  Yes.  I have no motion.  This is

15  the motion I have with my elbow.

16          MR. HILL:  Okay.

17          THE COURT:  Thank you very much, Mr. Wedgeworth.  I

18  appreciate it.

19          MR. HILL:  Appreciate it.

20          JUROR WEDGEWORTH:  Thank you.

21          MR. FINDLAY:  I hope you're feeling better.

22          JUROR WEDGEWORTH:  Thank you.

23          (Juror Wedgeworth leaves the courtroom.)

24          THE COURT:  Okay.  So we're going to -- we're going

25  to strike Mr. Wedgeworth.  And I'm not going to strike

1    Ms. Stoddard for cause.

2             So I show for cause Juror Nos. 7, 9, 20, 21, and

3    22.  That's five.  We've got 24 on our panel.  We just lost

4    five.  I need eight, which leaves us with 11.  You all get

5    five strikes a piece.

6             MR. FINDLAY:  Okay.

7             THE COURT:  Okay?

8             MR. HILL:  Thank you, your Honor.

9             THE COURT:  You have until 11:45.

10            MR. FINDLAY:  Thank you, your Honor.

11            THE COURT:  We'll be in recess until 11:45.

12            COURT SECURITY OFFICER:  All rise.

13            (Recess.)

14            (Jury out.)

15            COURT SECURITY OFFICER:  All rise.

16            THE COURT:  Please be seated.

17            MR. HILL:  Your Honor, may we approach briefly?

18            THE COURT:  Yes.

19            (Bench conference.)

20            MR. HILL:  Your Honor, I have a -- we had one

21   double strike.  And there are two jurors still in play who

22   didn't get reached because of the double strike.  And I was

23   going to propose to Mr. Findlay -- I didn't have a chance to

24   do it before we got back in here for this point -- that since

25   that is available, that the Court allow the parties each one

```
 1    additional strike that we can then exercise.  It would take

 2    us through the full list.  And we would go from there.

 3               THE COURT:  Any response?

 4               MR. FINDLAY:  No, we're happy with the list now,

 5    Judge.

 6               THE COURT:  Okay.

 7               MR. HILL:  Okay.

 8               THE COURT:  That is denied.  Thank you.

 9               MR. HILL:  Thank you.

10               (Bench conference concluded.)

11               THE COURT:  All right.  If your name is called,

12    please come forward promptly and take your seat over here as

13    directed to you by the court security officer.

14               Ms. Hardwick, if you will now call the names of the

15    selected jurors, please.

16               COURTROOM DEPUTY:  Yes, your Honor.

17               Bruce Faulkner, Christopher Jennings, Larry Burney,

18    Hartest Washington, Toni Palmer, Lauren Wade, Valarie

19    Stockman, and Edward Seale.

20               THE COURT:  All right.  Ladies and Gentlemen of the

21    Jury, if you will please stand and raise your right hand to

22    be sworn.

23               (The oath is administered to the jury.)

24               THE COURT:  Thank you.  You may be seated.

25               Ladies and Gentlemen of the Jury Panel, I want to
```

thank you, again, for your service today.  This process would

not have been possible without you.  Thank you for coming and

giving me half of your day, giving the parties your time.  It

matters.  It's important.  And I thank you for doing it.

You were not one of the lucky number 8, and so with that, you

are excused.  Thank you again.

COURT SECURITY OFFICER:  All rise for the jury

panel.

(Unselected Jury Panel members leave the

courtroom.)

THE COURT:  Thank you.  Please be seated.

All right.  Ladies and Gentlemen of the Jury, we

are going to take a lunch break in just a minute.  But before

we do, I'm going to tell you a little bit about what's going

the happen the rest of the afternoon.

I expect that we will finish each day at or around

5:00 o'clock, and we will start each morning at or around

9:00 a.m.

The parties, both sides together, are providing

lunch for you.  So there is going to be lunch here in the

jury room.

If you need to leave the jury room -- there are

restrooms.  There are drinks.  There are -- everything you

need in the jury room.  But if you need to leave, if you need

a break, if you'll just alert our court security officers,

1    and they'll tell you the procedures for all of that.

2           So we're going to take a break, a lunch break until

3    1:30.  Again, I just remind you do not discuss the facts of

4    the case with each other or with anyone.  And should you

5    interact with any -- or see anyone in the hallway, you should

6    not interact with them, okay?

7           We'll be in recess until 1:30.

8           COURT SECURITY OFFICER:  All rise.

9           (Jury leaves the courtroom.)

10          THE COURT:  Please be seated.

11          I am going to give you all a lunch break.  But I

12   know that we have a few things we need to take up that we

13   didn't quite get to this morning.  And what I would like to

14   do is return at 1:00 o'clock to take up any slide or exhibit

15   objections, with the caveat that I intend to get us rolling

16   back on schedule at 1:30.  So let's discuss what we need to

17   resolve to get through this afternoon's testimony and then

18   we'll get going.

19          Is there anything that the Court can help you with

20   before we recess for lunch?

21          MR. CALDWELL:  I don't think so, with the one

22   observation, Your Honor, that it seems like they want to take

23   the back half of the inventor's presentation and say it can't

24   be presented.  And I understand you want to take that up at

25   1:00.  My concern is rolling from 1:00 to 1:30 discussing it

1   and then hitting preliminary instructions and opening and we

2   don't have time to adapt.  I don't think we're going to need

3   to adapt because in my experience the inventor can teach his

4   invention.  So I'm worried about that due to the time.

5           THE COURT:  Fair point.  Let's take it up now.

6           MR. CALDWELL:  It's Apple's objections to.

7           THE COURT:  Okay.  I see Mr. Sims over there.

8           MR. SIMS:  May I approach, Your Honor?

9           THE COURT:  Yes.

10          MR. SIMS:  Good afternoon, again, Your Honor.

11          So, as Mr. Caldwell foreshadowed, I will be

12  discussing 14 -- the last 14 slides of the -- Mr. Sebire's

13  direct examination that were disclosed to us last night.

14  And they are not numbered.  So I apologize for -- some are

15  numbered and some are not, so I'm just going to address them

16  as a group, and then call out specifically what I believe to

17  be the -- the most objectionable slides.

18          To frame the issue for the Court, I believe CCE's

19  Motion in Limine No. 9, which Your Honor addressed at the

20  pretrial conference, frames the issue best.  CCE said we

21  filed this motion in limine simply for the Court to establish

22  that boundary between what the technical experts can testify

23  to versus what would be an extrapolation or opinion that

24  would fall under Rule 702.

25          The Court granted -- as the Court is aware, the

1   Court granted CCE's Motion in Limine No. 9 and set that

2   boundary for the parties to abide by at trial.  We now ask

3   that CCE live by that boundary.

4          When we received Mr. Sebire's slides last night,

5   which the Court has a copy of, it's our position that with

6   respect to at least two of those slides -- and the entire

7   group crossed the line in the 702.  Because Mr. Sebire was

8   not disclosed as an expert witness, did not file an expert

9   report in this case, these slides are objectionable and

10  should be excluded.

11         So I'd -- I'd like to just talk about for a second

12  the general group of slides and then -- and then point out to

13  you in specific.

14         And what strikes me about the group of slides that

15  CCE disclosed that -- that we objected to is it speaks more

16  as like a technology tutorial -- excuse me -- technology

17  tutorial that you would see during a claim construction or

18  something like that.  And then culminates at the end -- if I

19  could direct the Court's attention to the last slide in the

20  deck.  It's entitled "The invention."  This slide is numbered

21  Slide 40.

22         What we basically have here is -- is shorthand

23  descriptions of the claim elements of Claim 1, asserted

24  Claim 1.  And it appears that Mr. Sebire will be defining the

25  invention in his own words.

1        As I said, he is not -- he has not been disclosed

2    as an expert in this case.  The Court has construed claim

3    terms.  The experts will apply those constructions to reach

4    their opinions in this case.

5        Mr. Sebire should not be allowed as a fact witness

6    to just summarize and leave, frankly, important parts of the

7    claim language out of each of these elements.

8        With respect to Slide -- the next slide --

9        Chris, can I have Slide 3 up there, please?

10       I apologize, Your Honor.

11       Your Honor, on Slide -- it's -- it's the fourth to

12   the last slide in the deck.  I apologize for the delay.

13   It's titled "BSR formats" in the top right-hand corner.  And

14   lists three different types of formats:  Long, short and

15   truncated.

16       And -- and the second and third one frame the

17   issue -- one of the issues as the dispute between the parties

18   that CCE's infringement theory relies upon the short and

19   truncated BSR formats as they described it as being two

20   different types of BSR formats.

21       And if you will -- if I can direct the Court's

22   attention to the other document I handed you, which is an

23   excerpt from Dr. Caloyannides' infringement report, on the

24   bottom of Page 26 starting at Paragraph 72.

25       This section entitled "Overview of LTE buffer

1  status reporting" is basically the same -- what these slides

2  indicate would be the same testimony that Mr. Sebire intends

3  to give this afternoon or tomorrow morning, just a general

4  background on buffer status reporting which is contained and

5  disclosed by Dr. Caloyannides in his report.

6         And at the beginning of Paragraph 72

7  Dr. Caloyannides says there's two BSR formats described by

8  Section 321, the short format, short BSR type, or truncated

9  BSR type.

10         And here if you look back at the slide Mr. Sebire

11  intends to present this afternoon, he has presented three

12  different types of formats.  This, Your Honor, is squarely

13  expert testimony within Rule 702.  Mr. Sebire was not

14  disclosed as an expert.  Dr. Caloyannides has, at the

15  minimum, cumulative testimony.  He should be the one to talk

16  about that and give those opinions that were disclosed.  He

17  was deposed on these.

18         Mr. Sebire should not be allowed to come up here

19  and summarize the claims in his own language; and, B, present

20  format slides, like Slide 28, that Dr. Caloyannides should be

21  allowed to talk to in his expert report.

22         And the last issue I'd just like to briefly raise

23  with the Court is, although there is not a direct comparison

24  of the claims to the accused products, which would be --

25  which Mr. Sebire clearly cannot do, there are throughout the

1    slides -- there's four instances I'd be happy to identify for

2    the Court of applications of -- from like the face of the

3    iPhone that have the phone and the e-mail, Facebook, that

4    clearly suggest at a minimum that here is our infringement

5    analysis, and here's something with the accused product.  And

6    that suggests to the jury that -- an infringement analysis to

7    the accused products that Mr. Sebire should not be allowed to

8    present.

9              Thank you.

10             THE COURT:  Response.

11             MR. CALDWELL:  Your Honor, I think it is no

12   surprise that there's overlap between what the inventor

13   invented and put in his patent and what the technical experts

14   are going to come back and talk about when analyzing

15   infringement of the patent.  So observing overlap with

16   Dr. Caloyannides' report I think is uninteresting.

17             It is true that Mr. Sebire is not going to opine on

18   infringement.  And I'm actually a little bit curious about

19   the argument about he's showing BSR types and things like

20   that.  I mean, just to where we were talking about this

21   unproduced document in the debate that we heard earlier about

22   how the other side wants to cross him on working group

23   documents, talking about the triggering of different types of

24   buffer status reports, and things like that, in light of

25   that, I think the argument makes no sense.

1          But in any event, his working group was working on

2    buffer status reports and ways to improve reporting.  So he's

3    describing the fact of his invention.  He doesn't have access

4    to the code that is used to prove infringement.  And he's not

5    going to render any opinions on infringement.  He's just

6    describing his invention and how they worked to result in an

7    improvement that improved over what was existed before.

8          THE COURT:  On this last slide, is he, in fact,

9    putting the claims into his own words or taking any liberties

10   with the Court's claim construction?

11         MR. CALDWELL:  No, it's definitely not that.

12         THE COURT:  Okay.

13         MR. CALDWELL:  What I think we're doing there is

14   that there is a figure that was just submitted with his

15   application.  And like monitor buffers is what's written

16   there.  It's -- so it's him describing what his invention is.

17   And, again, he's definitely not going to do any mapping it to

18   infringement or opining, that sort of thing.

19         THE COURT:  Okay.  I'm going to let him in.

20         What other objections do you have?

21         MR. SIMS:  Those are the objections, Your Honor.

22         If I could just have a quick response to that?

23         THE COURT:  No.  Thank you.

24         Anything else I can take up with you all before

25   lunch?

1          MR. FINDLAY:  Very -- very quickly, Your Honor.

2          I don't think this is likely intentional.  I don't

3     know.  Yesterday I called Mr. Hill.  Mr. Hill and I spoke

4     about my concern that they were going to try to equate the

5     clear and convincing evidence standard used in a patent case

6     to invalidate a patent with the family issues.  The one we

7     hear the most about is taking a child away from the home.

8          During voir dire Mr. Hill said something about

9     clear and convincing evidence, that burden in terms of

10    invalidity is like a civil commitment like sending someone to

11    an insane asylum.

12         I think that's a clear violation of the good-faith

13    understanding that I had with Mr. Hill.  Maybe he's going to

14    say I'm wrong.  We had this specific discussion yesterday

15    morning.

16         It bothers me tremendously that this was brought

17    up.  Because if I had thought he was going to do this, I

18    would have raised it with Your Honor beforehand.  I think a

19    curative instruction, which just simply tells the jury, maybe

20    with the final instructions, that it is not similar or it's

21    not akin to this sort of, you know, frightening situation

22    where someone is involuntarily put in an insane asylum, is

23    appropriate to be made.

24         MR. HILL:  Your Honor, I am -- I am going to tell

25    you he's wrong.  Mr. Findlay did call me.  And what he called

1    to ask me about is whether we were going to use the reference

2    in the Family Code to a suit to terminate parental rights.

3    That's the family law analogy that has been used often in

4    this Court without objection.  And I will note here there was

5    no objection made at the time.

6             That's the analogy that's been used, and I assured

7    him I would not use that analogy.  I understand that some

8    Judges in our district don't favor that and that other Courts

9    have commented on it.

10            And so in lieu of that, I found another perfectly

11   correct legal analogy of the application of clear and

12   convincing evidence standard.  And it's not any kind of

13   scandalous context.  It's in the context that has been set by

14   the U.S. Supreme Court as a fundamental constitutional right

15   in Addington -- Addington versus Texas, 441 U.S. 418, 1979

16   U.S. Supreme Court case, which imposes the clear and

17   convincing evidence standard any time there is an issue of a

18   civil commitment.

19            People serve in commitment proceedings.  It's a

20   fair question to ask whether someone has applied the clear

21   and convincing evidence standard.  It is the same legal

22   standard, and it infects no bias or any issue with our jury.

23   It tests their knowledge about that standard and whether they

24   have applied a heightened burden of proof.  In fact, one of

25   our jurors had.

 1          So the suggestion that that is, one, welching on

 2   our deal doesn't sit too well with me.  I don't think there

 3   is any question.

 4          I told Mr. Findlay when we talked on the phone I

 5   won't use the family law analogy.  I will use other analogies

 6   to analogize the burden of proof.

 7          I -- so I left off limits what was raised to me,

 8   and I used a perfectly permissible and constitutionally

 9   correct application of the clear and convincing burden as an

10   example.

11          MR. FINDLAY:  I submit he did not.  I submit he

12   intentionally used one that was prejudicial, and the

13   suggestion that this sort of thing wasn't encompassed in our

14   discussion is -- I'm -- I'm personally offended by that

15   considering the relationship that one East Texas counsel

16   normally has with another.  It's an improper analogy.  It's

17   prejudicial.  And I would, respectfully, resubmit the request

18   that the jury be told something along those lines.

19          Thank you, Your Honor.

20          THE COURT:  Thank you.

21          All right.  That request is denied.  I will

22   instruct the jury on the burdens under the law but no more.

23          We're going to be in recess until 1:30.  I

24   understand I've resolved all of your issues, and we're ready

25   to go into preliminaries and opening statements at 1:30.

```
 1              Is there otherwise -- I don't intend to come back
 2   early is my point, unless you need me to.
 3              MR. CALDWELL:  I think that's it for us.
 4              MR. FINDLAY:  I think we have competing preliminary
 5   instructions, but I'm sure the Court will decide what it
 6   wants to tell the jury.
 7              THE COURT:  Yes.  Thank you.
 8              MR. FINDLAY:  Just wanted to alert the Court.
 9              THE COURT:  Thank you.  We'll be in recess.
10              COURT SECURITY OFFICER:  All rise.
11              (Lunch recess.)
12
13                         CERTIFICATION
14              IT IS HEREBY CERTIFIED that the foregoing is a
15   true and correct transcript from the stenographic notes of
16   the proceedings in the above-entitled matter to the best of
17   our abilities.
18
19
     /s/_____
20   CHRISTINE BICKHAM, CRR, RMR          September 6, 2016
     Official Court Reporter
21
22
23   /s/_____
     SHEA SLOAN, CSR, RPR
24   Official Court Reporter
25
```