```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
2                        TYLER DIVISION

3

   CELLULAR COMMUNICATIONS       )
4  EQUIPMENT, LLC
                                 )   DOCKET NO. 6:14cv251
5
       -vs-                      )
6                                    Tyler, Texas
                                 )   1:28 p.m.
7  APPLE INC., ET AL                 September 6, 2016

8

9                     TRANSCRIPT OF TRIAL
                       AFTERNOON SESSION
              BEFORE THE HONORABLE K. NICOLE MITCHELL,
10                UNITED STATES MAGISTRATE JUDGE

11               A P P E A R A N C E S

12  FOR THE PLAINTIFF:

13  MR. BRADLEY W. CALDWELL
    MR. JOHN AUSTIN CURRY
14  CALDWELL CASSADY & CURRY
    2101 Cedar Springs Rd., Suite 1000
15  Dallas, Texas 75201

16  MR. EDWARD R. NELSON III
    NELSON BUMGARDNER PC
17  3131 West 7th Street, Suite 300
    Fort Worth, Texas 76107
18
    MR. J. WESLEY HILL
19  WARD, SMITH & HILL PLLC
    1507 Bill Owens Parkway
20  Longview, Texas 75604

21
    COURT REPORTER:      MS. CHRISTINA L. BICKHAM, CRR, RMR
22                       FEDERAL OFFICIAL COURT REPORTER
                         300 Willow, Ste. 221
23                       Beaumont, Texas 77701

24
    Proceedings taken by Machine Stenotype; transcript was
25  produced by a Computer.
```

```
 1   FOR THE DEFENDANTS:

 2
     MR. DOUGLAS E. LUMISH
 3   MR. JEFFREY G. HOMRIG
     MS. LISA K. NGUYEN
 4   MR. BRETT M. SANDFORD
     LATHAM & WATKINS LLP
 5   140 Scott Dr.
     Menlo Park, California 94025-1008
 6

 7   MR. JOSEPH H. LEE
     LATHAM & WATKINS LLP
 8   650 Town Center Drive, 20th Floor
     Costa Mesa, California 92626-1925
 9

10   MR. ERIC H. FINDLAY
     FINDLAY CRAFT PC
11   102 N. College Avenue, Suite 900
     Tyler, Texas 75702
12

13

14              ******************************

15                   P R O C E E D I N G S

16          (Jury out.)

17          COURT SECURITY OFFICER:  All rise.

18          THE COURT:  Please be seated.

19          Before we bring in the jury, let me talk to you all

20   about exhibits.  I understand the parties have exhibit lists

21   that are in agreed form that we can preadmit at this time?

22          MR. MCMANIS:  Yes, Your Honor.  Jason McManis for

23   CCE.

24          CCE offers its trial exhibit list offered on

25   September 6th, 2016.
```

1          THE COURT:  Any objection?

2          MR. SIMS:  No objection, Your Honor.

3          THE COURT:  And that --

4          MR. MCMANIS:  We can hand them up.

5          THE COURT:  If you'll, yes, hand it up to

6   Ms. Hardwick, please.

7          Those exhibits will be preadmitted.

8          MR. SIMS:  Defendants offer their list of

9   unobjected-to exhibits.

10          THE COURT:  Very good.  Those exhibits will also be

11   preadmitted.

12          And then if you all will just each morning prepare

13   an updated version of that list, of anything that you

14   continue to agree upon or anything that the Court has

15   admitted, so that we can keep current, updated, running

16   exhibit lists with Ms. Hardwick.  We'll take that up with you

17   each morning.

18          Any questions about that?

19          MR. MCMANIS:  No, Your Honor.

20          THE COURT:  Okay.  All right.  Anything before we

21   bring in the jury?

22          MR. GLEASON:  Yes, Your Honor.  Your Honor, my name

23   is Joseph Gleason.  I'm an attorney here for NSN.  And I

24   wanted to enter an appearance on behalf of NSN.

25          I don't anticipate having to speak, hopefully, at

1    all during the trial; but there is the possibility that I may

2    have to object to preserve a privilege or confidentiality or

3    something like that on behalf of NSN, so I wanted the Court

4    to know who I was.

5                    THE COURT:   Thank you very much.

6                    MR. LUMISH:   Your Honor, I'm actually very glad

7    Mr. Gleason is here because we may use some NSN documents and

8    examinations, and I wasn't quite sure how you would want to

9    handle that if they weren't here to represent themselves, as

10   far as sealing the courtroom.

11                   THE COURT:   Very good.

12                   MR. LUMISH:   So that might come up.

13                   THE COURT:   Thank you for that, Mr. Lumish.

14                   And, Mr. Gleason, as I've told the parties, if we

15   get into any documents that for which we need to seal the

16   courtroom, before we get into that, I just put the burden on

17   you-all to let me know.   I'm happy to do that.   Our court

18   security officers will take care of it, but I want it done

19   before we get into the documents to the extent that that is

20   possible so...

21                   MR. GLEASON:   Sure.

22                   THE COURT:   Thank you.

23                   Anything else?

24                   MR. GLEASON:   I want to make a note I'm available

25   for any discussions about that before witnesses take the

1    stand.

2         THE COURT:  Thank you, Mr. Gleason.

3         MR. GLEASON:  Thank you.

4         THE COURT:  All right.  Let's bring in the jury.

5         COURT SECURITY OFFICER:  All rise for the jury.

6         (Jury in.)

7         THE COURT:  Please be seated.

8         Ladies and Gentlemen of the Jury, I'm going to read

9    some preliminary instructions before we get into opening

10   statements.  These are just what they are called, preliminary

11   instructions.  You will have much more detailed final

12   instructions from the Court after the close of the evidence,

13   but we're going to get started with that, and then we'll hear

14   opening statements from the parties.

15        You have now been sworn as the jury in the case.

16   As the jury you will decide the disputed questions of fact.

17        As the Judge, I will decide all of the questions of

18   law and procedure.

19        From time to time during the trial and at the end

20   of the trial, I will instruct you on the rules of law that

21   you must follow in making your decision.

22        The party who brings the lawsuit, as we have

23   discussed, is called the Plaintiff.  In this action that is

24   CCE, Cellular Communications Equipment LLC.

25        The party against whom this lawsuit is brought is

1       called the Defendant.  As you heard in jury selection, the

2       Defendant in this case is Apple.

3               The case is a case of patent infringement.  The

4       Plaintiff alleges that the Defendant infringes the

5       Plaintiff's patent; and that it is entitled to damages.

6               The Defendant denies the Plaintiff's claim of

7       infringement and that the Plaintiff is entitled to damages.

8               The Defendant, additionally, alleges that the

9       Plaintiff's patent is invalid.  Invalidity is a defense to

10      infringement.

11              Generally, there are four questions you are going

12      to be called upon to answer in the case:  Is there

13      infringement?  If there is, is it willful?  Is the patent

14      invalid?  And if it is not invalid, what are the damages?

15              This case involves one patent.  As you've heard

16      about, it is Patent No. 8,055,820.  Patents are usually

17      referred to by their last three digits, and so we will refer

18      to this patent as the '820 patent.

19              You'll hear more about the patent and the

20      technology during opening statements.

21              Keep an open mind during the trial.  Do not decide

22      any fact until you've heard all of the evidence the closing

23      arguments, and my instructions.  Pay close attention to the

24      testimony and to the evidence.  If you would like to take

25      notes during the trial, you may do so.

1          You each have your juror notebooks, and so I want

2   to look at that with you real quick.  What I would first like

3   you to do is open your notebook to the first page and write

4   your name on that cover page.

5          Everything you write in this notebook is

6   confidential.  They will be turned in each day at the end of

7   the day to our court security officer.  She will keep them,

8   and she will give them back to you the next morning.  When

9   the trial is over, the notebooks will be shredded.

10          The notebooks contain several things.  There's a --

11   the first tab is the Court's claim construction chart.  And

12   we'll talk more about that in a minute.

13          The second tab contains a copy of the patent.

14   We're going to talk about that, too.

15          And the remaining tabs are each a witness page for

16   each of the witnesses who may be called in the case, with a

17   picture of them and a place for you to take notes.

18          All right.  If you do take notes, do not get so

19   involved in your note-taking that you become distracted and

20   miss part of the testimony.  Your notes are to be used only

21   as aids to your memory.  And if your memory should be

22   different from your notes, you should rely on your memory and

23   not your notes.

24          Do not be unduly influenced by the notes of other

25   jurors.  A juror's notes are not entitled to any greater

1    weight than the recollection of each juror concerning the

2    testimony.

3         Even though the court reporter is taking down notes

4    of everything that's said, a typewritten copy of the

5    testimony will not be available for you during deliberations.

6         On the other hand, any exhibits that are admitted

7    will be available to use during your deliberations.

8         Until the trial is over, do not discuss the case

9    with anyone and do not permit anyone to discuss the case in

10   your presence.  Do not discuss the case even with other

11   jurors until all of the jurors are in the jury room actually

12   deliberating at the end of the case.

13        If anyone should attempt to discuss this case or to

14   approach you concerning the case, you should inform the Court

15   immediately.

16        Hold yourself completely apart from the people

17   involved in the case:  The parties, the witnesses, the

18   attorneys, and persons associated with them.

19        It also means if you have a social networking site

20   like Facebook or Twitter, you should not discuss anything

21   about this case on that site.  You should not mention that

22   you are on a jury.  And you should definitely not talk about

23   this case on any social networking site.

24        Do not post updates about what's going on.  It's

25   important that you not only be fair and impartial but that

1   you appear to be fair and impartial.

2           You've got a juror badge on, as we discussed in

3   voir dire.  And all of the lawyers here and the spectators

4   know what that means, and they know to respect that.  Don't

5   feel like they're not being friendly if they don't come up

6   and chat with you, and they won't feel like you're being rude

7   if you don't chat with them.

8           Do not make any independent investigation of any

9   fact or matter in this case.  Do not learn anything about

10  this case from any outside source.  Do not watch TV or read

11  the newspaper about the case.  Do not use the Internet.  Do

12  not Google to find more information out about the case, the

13  parties, the attorneys in the case.  You are to be guided

14  solely by what you see and hear in this trial.

15          Do not leave without asking the court security

16  officer for a break.

17          During the trial it may be necessary for me to

18  confer with the parties and the counsel up here at the bench

19  outside of your presence.  I will handle these matters as

20  briefly and as conveniently for you as I can, but you should

21  remember that they are a necessary part of every trial.

22          You will first hear the opening statement from the

23  attorney for the Plaintiff.  He will tell you what he expects

24  to prove.  And when he concludes, the attorney for the

25  Defendant will give his opening statement.  If the attorney

1    for the Defendant so desires, he may make his opening

2    statement at the conclusion of the Plaintiff's presentation

3    of the evidence.

4           Remember that these statements are not evidence in

5    the case.  The only evidence which will be before you will be

6    given to you from the witness stand; stipulations,

7    depositions, and any exhibits admitted into evidence.

8           Following opening statements you will begin to hear

9    the evidence in the case.  After the Plaintiff concludes the

10   presentation of its evidence, the Defendant will do the same.

11          At the close of Defendants' testimony, the

12   Plaintiff has the right to bring in rebuttal testimony, and

13   the Defendant may desire to offer rebuttal testimony to the

14   Plaintiff's rebuttal testimony.

15          After all of the evidence has been presented, the

16   Court will recess for the purpose of preparing its

17   instructions.  The Court will return, instruct you on the

18   law, and the attorneys will present to you their closing

19   arguments.

20          The Plaintiff will argue first, then the Defendant,

21   and then the Plaintiff will present its closing rebuttal

22   argument.

23          I'll give you further instructions on the law after

24   which you'll retire for the purpose of deliberating your

25   verdict.

1          Now, as jurors you are the triers of the facts.

2   And to that extent you are the exclusive judges of the facts.

3   The law you will receive from the Court, and you will be

4   bound by that law.  It isn't your province to decide whether

5   it's a bad law or a good law, nor will be deliberate upon the

6   correctness of the law.  You will accept the law as given to

7   you by the Court and be bound thereby.

8          However, you are the exclusive judges of the facts,

9   the credibility of the evidence, the weight to be given to

10  the testimony of each of the witnesses.

11         By credible testimony we simply mean the testimony

12  as may be deemed worthy of your belief.  You have the

13  exclusive right to decide the facts under the credible

14  testimony, and you may believe all of the testimony, you may

15  believe none of the testimony, or you may believe any portion

16  of it which you believe to be credible and worthy of belief.

17         In other words, you are the searchers for the true

18  facts.  And after you have found the true facts, then you

19  will, of course, be governed by your discovery in reaching

20  your verdict.

21         There are, generally speaking, two types of

22  evidence from which a jury may properly find the truth as to

23  the facts of a case.

24         One is direct evidence, such as the testimony of an

25  eyewitness.

1           The other is indirect or circumstantial evidence,

2    the proof of a chain of circumstances pointing to the

3    existence or nonexistence of certain facts.

4           As a general rule, the law makes no distinction

5    between direct and circumstantial evidence but simply

6    requires that the jury find the facts in accordance with the

7    preponderance of all the evidence in the case, both direct

8    and circumstantial.

9           Before jury selection you saw a video that provided

10   a good overview of the U.S. patent system and how it works.

11   The United States Constitution empowers the United States

12   Government to enact patent laws and issue patents to protect

13   inventions.

14          The purpose of the patent system is to help advance

15   science and technology.  The patent system achieves this

16   purpose by granting to the owner of a patent the right, for

17   the life of a patent, to exclude any other person from

18   making, using, offering for sale, or selling anywhere in the

19   United States the invention covered by a patent.

20          A patent has a life for a limited amount of time

21   which, for the patent involved in this case, has not yet

22   ended.  Once a patent expires, the invention becomes part of

23   the public domain, which means anyone is free to use it, and

24   the patent owner may no longer exclude anyone from making use

25   of the invention claimed in the patent.

1          During the term of the patent, however, if another

2     person, without the patent owner's permission, makes, uses,

3     sells, or offers to sell something that is covered by the

4     claims of the patent, then that person is said to infringe

5     the patent.

6          The patent owner may enforce a patent against

7     persons or companies believed to be infringers in a lawsuit

8     in Federal Court, as in this case.  Everyone, however, has

9     the right to use existing knowledge and principles.  A patent

10    cannot remove from the public the ability to use what was

11    known or obvious before the invention was made or patent

12    protection sought.

13         Thus, to be entitled to patent protection, an

14    invention must be new, useful, and nonobvious.

15         To obtain a patent, the applicant must file a

16    patent application with the United States Patent Office.

17         After the applicant files a patent application, the

18    Patent Examiner examines the application to determine whether

19    the invention described in the patent application meets the

20    requirements of the patent laws for patentable inventions.

21         If the examiner concludes that the legal

22    requirements for a patent have been satisfied, he or she

23    allows the claims and the application issues as a patent.

24         The process from the filing of the patent

25    application to the issuance of a patent is called patent

1    prosecution.  The record of papers relating to the patent

2    prosecution is referred to as the prosecution history, or

3    file history.

4         The granting of a patent by the Patent Office

5    carries with it the presumption that the patent is valid.

6    From the issuance of a patent, it is presumed that its

7    subject matter is new, useful, and constitutes an advance

8    that was not, at the time the invention was made, obvious to

9    one of ordinary skill in the art.  However, that presumption

10   may be rebutted at trial and you, the finder of fact, may

11   find that the patent is invalid.

12        You've been provided with copies of the

13   patent-in-suit in your notebooks.  Let's turn there to Tab 2

14   in your notebook and have a look at the '820 patent.

15        First, I want you to look at the cover page of the

16   '820 patent.  It provides identifying information, including

17   the date the patent issued, and the patent number along the

18   top, as well as the inventor's name, the filing date, the

19   assignee, and a list of prior art publications considered by

20   the Patent Office when deciding to issue the patent.

21        Next on that same page on the right-hand side you

22   will see the abstract.  It starts with the first sentence:

23   An apparatus, system, and method for increasing buffer status

24   reporting according to uplink capacity.

25        On the next few pages are drawings which appear as

Figures 1 through 6.   The drawings depict various aspects and features of the invention.   They are described in words later in the patent specification.

The written description appears next.   If you get just past the drawings you'll start seeing two columns.   Each page is divided into two columns which are numbered at the top.   The lines on each page are also numbered going down the middle of the column.

The written description in the '820 patent begins at Column 1, Line 1, and continues to Column 11, Line 5.   It includes a background section, a summary of the invention, a detailed description of the invention including some specific examples.

So when you see a reference to the patent during trial, you can -- you can look at the column and line number referenced, and you can go to that part of the patent and locate it in your notebook.

The patent ends with paragraphs that are numbered called claims.   The claims may be divided into a number of parts referred to as claim limitations.   In the '820 patent, the claims begin at Column 11, Line 6, and continue to the end of the patent at Column 14, Line 8.

The claims are a main focus of the patent because the claims are what define the patent owner's rights under the law; that is, the claims define what the patent owner may

exclude others from doing during the term of the patent.

The claims in the patent serve two purposes.
First, they set out the boundaries of the invention covered
by the patent.  Second, they provide notice to the public of
those boundaries.

The claims of the patent are what are infringed
when a patent infringement occurs because the claims define
what the patent is.  Thus, when a product or a method is
accused of infringing a patent, the patent claims are
compared to the accused product or method to determine
whether there is infringement.

The claims are also at issue when the validity of a
patent is challenged.  In reaching your determination with
respect to infringement and validity, you must consider each
claim separately.

Patent claims exist in two forms referred to as
independent claims and dependent claims.

An independent claim does not refer to any other
claim of the patent.  It's not necessary to look at any other
claim to determine what an independent claim covers.  For
example, in the '820 patent, Claim 1, which is located in
Column 11, Line 7, that is an independent claim.

A dependent claim refers to at least one other
claim in the patent.  A dependent claim includes each of the
limitations of the other claim or claims to which it refers,

1   as well as the additional limitations recited in the

2   dependent claim itself.

3          Therefore, to determine what a dependent claim

4   covers, it is necessary to look at both the dependent claim

5   and the independent claim or claims to which it refers.

6          An example of that in this patent is Claim No. 4.

7   It's located in Column 11, Line 27.  And you'll see at the

8   start of that it says:  A method of Claim 1.  So it refers to

9   Claim 1.  To determine what dependent Claim 4 covers, you

10  have to read the words of Claim 4 and the words of Claim 1

11  together.

12         While claims define the invention, sometimes there

13  is a disagreement between the parties as to what certain

14  words or terms in the claims mean.  When that happens, they

15  ask the Court to interpret these terms in light of the patent

16  as a whole.  This is to help resolve their disagreement and

17  to give you, the jury, guidance in applying the claims to the

18  facts of the case.

19         That happened in this case.  And at some time prior

20  to trial we had some hearings, the Court heard arguments, and

21  then rendered a claim interpretation of the disputed claims.

22  The Court's claim construction of these terms is what is set

23  forth in Tab 1 of your jury notebook.

24         So if you turn to Tab 1 you'll see claim

25  construction chart, and then a list of terms and the Court's

1   construction of what those terms mean.  You must use these

2   meanings when you decide the issues of infringement and

3   invalidity.

4          As I mentioned earlier, there are really four

5   questions that you will be asked to resolve by the verdict

6   you return in the case.  The issues are:  Infringement,

7   willfulness, invalidity, and damages.

8          Plaintiff has the burden of proof on the issues of

9   infringement, willfulness, and damages.

10          Defendant has the burden of proof on the issue of

11   invalidity.

12          However, there are different burdens that you must

13   apply in answering each of the questions.

14          In any legal action facts must be proved by a

15   required standard of the evidence known as the burden of

16   proof.  You've probably heard of beyond a reasonable doubt,

17   which is the burden of proof required in criminal cases.

18   It's the very highest burden of proof, and it is not involved

19   in this case.

20          There are two different burdens of proof.  You

21   heard a little bit about them in voir dire.  But the first

22   one is called the preponderance of the evidence standard.

23          The second is called clear and convincing evidence.

24          The preponderance of the evidence burden means that

25   you must be persuaded that what the party seeks to prove is

more probably true than not.  Put another way, if you were to put the evidence for and against the party who must prove the fact on opposite sides of the scale, the preponderance of the evidence standard requires that the scale tip at least somewhat toward the party who has the burden of proof.

The clear and convincing evidence burden means that the evidence must produce in your minds a firm belief or conviction as to the matter sought to be established.  In other words, if you were to put the evidence for and against the party who must prove the fact on opposite sides of the scale, clear and convincing evidence requires that the scale tip more heavily toward the party who has the burden of proof.

In this case Plaintiff has the burden of proving infringement and damages by the preponderance of the evidence standard.  Plaintiff also has the burden of proving willfulness by the same preponderance of the evidence standard.

Defendant has the burden of proving invalidity by the higher clear and convincing evidence standard.

Statements and arguments of counsel are not evidence in the case unless they are made as an admission or stipulation of fact.

When the attorneys on both sides stipulate or agree as to the existence of a fact, the jury must, unless

otherwise instructed, accept the stipulation as evidence and regard that fact as conclusively proved.

Any evidence to which an objection was sustained by the Court and any evidence ordered stricken by the Court must be entirely disregarded.

Anything you may have heard or seen outside the courtroom touching on the merits of this case is not evidence and must be entirely disregarded.

You, as the jurors, are the sole judges of the credibility of the witnesses and the weight their testimony deserves.

You should carefully scrutinize all of the testimony given, the circumstances under which each witness has testified, and any matter in evidence which tends to indicate whether a witness is worthy of belief.

Consider each witness's intelligence, motive, and state of mind, demeanor, and manner while on the stand.

Consider also any relation each witness may bear to either side of the case, the manner in which each witness might be affected by the verdict, and the extent of which, if at all, each witness is either supported or contradicted by other evidence in the case.

After making your own judgment, you will give the testimony of each witness such credibility, if any, as you think it deserves.

1          The Rules of Evidence ordinarily do not permit

2   witnesses to testify to opinions or conclusions.   An

3   exception to this rule exists as to those whom we call expert

4   witnesses.  Witnesses who, by education and experience, have

5   become expert in some art, science, profession or calling may

6   state their reasons for their opinion.

7          You should consider each expert opinion received in

8   evidence in this case and give it such weight as you think it

9   deserves.  If you should decide that the opinion of an expert

10  witness is not based upon sufficient education and

11  experience, or if you should conclude that the reasons given

12  in support of the opinion are not sound, you may reject the

13  opinion entirely.

14          During the trial of this case, certain testimony

15  may be read or shown to you by way of a deposition.  The

16  testimony of a witness, who, for some reason, cannot be

17  present to testify from the witness stand is usually

18  presented in writing or on video under oath in the form of a

19  deposition.

20          Such testimony is entitled to the same

21  consideration and, insofar as possible, is to be judged as to

22  the credibility and weighed and otherwise considered by the

23  jury in the same way as if the witness had been present and

24  had given from the witness stand the testimony read to you

25  from the deposition.

1          It is the duty of the attorneys on each side of the

2    case to object when the other side offers testimony or other

3    evidence which the attorney believes is not properly

4    admissible.

5          Upon allowing testimony or other evidence to be

6    introduced over the objection of any attorney, the Court does

7    not, unless expressly stated, indicate any opinion as to the

8    weight or effect of such evidence.

9          As stated before, the jurors are the sole judges of

10   the credibility of all witnesses and the weight and effect of

11   all the evidence.

12         When the Court has sustained an objection to a

13   question addressed to a witness, the jury must disregard the

14   question entirely and may draw no inference from the wording

15   of it or speculate as to what the witness would have said if

16   permitted to answer the question.

17         You have two duties as jurors.  Your first duty is

18   to decide the facts from the evidence in the case.  That's

19   your job and your job alone.  Your second duty is to apply

20   the law that I give you to the facts.

21         You must follow these instructions even if you

22   disagree with them.  Each of the instructions is important

23   and you must follow all of them.

24         Perform the duties fairly and impartially.  Do not

25   allow sympathy, prejudice, fear, or public opinion influence

1    you.   Nothing I say now and nothing I say during the trial is

2    meant to indicate any opinion on my part about what the facts

3    are or about what your verdict should be.

4          Do not be concerned if you feel a little lost at

5    this point.   I'll be giving much more detailed, final,

6    written instructions at the close of the evidence; and you

7    will have all of the instructions to carry back with you when

8    you deliberate.

9          By the time you get to those questions, you will

10   have a much greater understanding and confidence in answering

11   them.

12         Also, let me reassure you, you do not need to be

13   experts in patent law to decide this case.   We have very good

14   attorneys on both sides, good witnesses who are going to

15   bring you the testimony.

16         And by the end of this case, you will feel

17   confident and able to make a decision.   So if you're feeling

18   a little bit lost now, that's normal.   But I promise by the

19   end you will have all of the tools you need to make your

20   decision.

21         All right.   This concludes my preliminary remarks

22   and instructions.

23         Is the Rule to be invoked?

24         MR. CALDWELL:   Your Honor, I believe we'll invoke

25   the Rule after opening.

1            THE COURT:  Okay.  Then the Court recognizes

2    Plaintiff's counsel for the purposes of opening statement.

3            MR. CALDWELL:  May I have this moment to organize a

4    few things?

5            THE COURT:  Yes.

6            MR. CALDWELL:  Thank you.

7            May it please the Court.

8            Good afternoon.  My name is Brad Caldwell, and I'll

9    just take a moment to introduce myself.  We haven't formally

10   gotten to introduce ourselves yet.

11           I was born here in Tyler.  I've really lived here.

12   I grew up in Athens.  That's where my parents went to school.

13   I've basically been in Texas my whole life.  I studied

14   engineering and then went to law school, and that's how I got

15   into patent law.

16           I'm proud to represent Cellular Communications

17   Equipment LLC in this case.  You know, the more time you

18   spend on cases, you begin to realize that there is sort of a

19   story that develops in every case.  And sometimes those

20   stories reflect common themes that we see in our everyday

21   lives.

22           And, although you know this is about an inventor

23   and his patent, I think you're going to see a little theme

24   that develops in this case.  A lot of the facts sort of fit

25   into that, at least one that I -- I recognize.

1          I'll admit that I had a very good childhood.  I

2     lived close to my grandparents and everything.  It was a

3     wonderful place to live in Athens.  But there was a friend of

4     mine, this kid that I knew when I was growing up that really

5     kind of stands out.

6          He got literally any toy that he wanted, any one.

7     I mean, he was fun to be around on his terms, and he had a

8     lot of cool toys.  But there's sort of a completely different

9     dimension when you get to the playground environment.  You

10    know, sharing is completely out of the question.  He felt

11    entitled to grab whatever toy somebody else had.  Denied that

12    he did anything wrong.  And he wouldn't give it back until

13    someone made him.

14         And the facts that you're going to see in this case

15    probably reflect something like that.  And most of us have

16    met someone like that along the way.

17         You'll see that while Apple certainly has an awful

18    lot of cool toys, they have used something that is not

19    theirs.  They have been asked to stop and won't.  They will

20    deny some of the most basic facts, and then now we're here in

21    court to make it right.

22         I'm going to introduce to you some of the folks

23    that you're going to hear from in this case.  And on the

24    other side of the story is a brilliant engineer, Mr. Benoist

25    Sebire.

1          Mr. Sebire, will you please stand up?

2          Thank you.

3          Now, after Mr. Sebire's military service, he spent

4   his entire career developing cellular technology.  But after

5   he invents something, he does something really strange.  He

6   goes and teaches his idea to his competitors.  He doesn't get

7   fired for it because that's what his company wants him to do.

8   It's all part of this process by which cellular technologies

9   develop, and we all benefit, whether it's you or me or Nokia

10  or even Apple, Samsung.

11         And you'll hear why.  And I'm going to introduce

12  this concept called a standard.  I was thinking about

13  standard, and in most contexts when I hear about it, really

14  it either means ordinary or it means the regular size of

15  staples.  But that's not what we're talking about here.

16         I mean, everybody is familiar with a VHS.  And I

17  sort of took an informal poll at our firm, and as long as

18  you're older than about 33, you also remember Betamax.  The

19  thing about Betamax that's pretty interesting, it looks real

20  similar, but had better quality, better picture quality than

21  it initially came out.  Some people said it had better sound,

22  the devices were built a little better, and it cost more.

23         Now, VHS the tapes typically ran a little longer.

24  You could record a football game and maybe not just Law &

25  Order.  But the thing is, is that neither one was perfect,

and neither one of them was the best.  And there was a competition for a long time and that affected companies.  It affected consumers.

And, you know, eventually I -- I noticed the movie rental store in Athens, they only had VHS, the Betamax disappeared and hasn't been sold in forever.  Still, it was a great product at the time.

You see a lot of common themes in early days of cell phones.  They are incompatible technologies, PDMA and CDMA and things.  Something works here in Tyler, it doesn't work in Dallas.  And whatever you have there won't work when you're in Europe for sure.

So what happened is the industry actually decided to get together, and they wanted to put the best and the brightest in one room to kind of solve these problems and make sure that the products that came out were really the best.

And you're going to hear that Mr. Sebire is one of the brightest of the best and brightest.  You're going to hear that Mr. Sebire worked on a technology called LTE.

You might recognize a logo, and this is showing an iPhone.  It's up there on the top corner.  But you might see it on other phones as well.

It stands for long-term evolution.  And it's a collection of ideas that dramatically improved mobile

communications.  And we're going to talk about one of those

ideas.

Now, the standard setting process is not without

some concern because, like I said, the companies spend money.

They hire someone like Mr. Sebire.  And they say, come up

with things, and then let's go tell our competitors, which

seems like a bad way to stay in business; but that's part of

why we have patents, as you may have seen in the video.

You tell the industry things.  You advance

technology.  And the Government protects you with a property

right for a limited amount of time.

But as a result, the standard will embody the very

best from a variety of sources.

Throughout his career, Mr. Sebire has worked for

Nokia and a related entity, Nokia Siemens Networks.  Nokia is

a name that's very familiar to many.  I think we had an

indication earlier lots of folks have seen the phones.

These things are often called the candy bar phone.

Were super popular for a long time.  And I think someone

noted it still works.  Great products.

But they do a lot more than just make phones.

They, for years, have been a leading innovator of networks

and infrastructure.  And this goes back long before

smartphones, like the iPhone or Samsung's phones.  NSN is

related.  It's a critical think tank for these ideas.

1                So who is Benoist Sebire?  As I said, he's one of

2      NSN's top engineers and has been for almost 20 years.  He's

3      flown in today from Japan to teach us about his invention.

4      And you're going to hear from him later today.

5                After the Army he spent his time just working on

6      communications problems and cellular standards.  But he's

7      going to tell you about his story, where he grew up.  He grew

8      up in a tiny town actually in France, a town of about 300

9      people.

10               And as I'm sitting with Mr. Sebire and Mr. Hill at

11     lunch, I realize one of us has a pretty funny accent; and

12     we'll forgive Mr. Hill for that because he's from Murchison.

13               But we're going to hear from Mr. Sebire, and he's

14     going to explain to us how he's moved around the world

15     working on these projects for the last 20 years.  He's always

16     been fascinated with solving problems and inventing things.

17     He excelled at school.  And now it's his invention that

18     brings such an unlikely group of folks here to this courtroom

19     today.

20               In 2007 while these companies were working on LTE,

21     they were working on just improvements to make the cellular

22     system much faster and much more capable.  And I have to

23     level with you, I'm not going to go into a lot of detail now,

24     but you're going to probably learn more about mobile

25     communications than you ever wanted to.

1          The thing is, you're going to have a lot of really

2     good teachers to get you there.

3          At a very basic level most of us understand that

4     cellular networks use radio waves, maybe like the local radio

5     station or TV broadcast, things of that nature, remote

6     control cars.

7          Now, they use the radio waves in a different way,

8     but they still use radio waves.  And there's only so much of

9     the radio waves that can be used for cellular information.

10    And it can only carry so much information.

11         So all the phones are actually engaged in a very

12    precisely coordinated dance with the tower about who can talk

13    when and what can they send.  And it's quite complicated, but

14    at a very high level your phone has to notify the tower:

15    I've got stuff to send.

16         And it also has to give the tower a clue of what

17    you have to send because it matters.  Like a voice call, you

18    can't just sort of wait for a couple seconds for some of the

19    data to go through.  The call might break up.

20         On the other hand, if an e-mail gets somewhere two

21    seconds later, nobody notices.  This is an

22    oversimplification, but these are the kind of coordinations

23    that have to happen constantly in cellular communications.

24         To do that, there is some data that's sent to a

25    tower called a buffer status report.  And I'm sort of getting

1    into the weeds.  We'll get into that later.

2           They're not new in and of themselves, but there are

3    ways for them to be improved.  And that's one of the things

4    that Mr. Sebire has worked a lot on.

5           Now, they would go to these meetings, like I said,

6    and talk about ideas that they have to improve cellular

7    standards.  And when they have ideas they thought would

8    improve their new LTE that they were working on, the groups

9    would make formal proposals.

10          And this is one of the proposals that you'll see in

11   this case.  Typically, when there was an idea, a formal

12   proposal was made to the group.  And sometimes they were

13   jointly proposed.  Like this one says it came from Ericsson,

14   Nokia, Nokia Siemens Networks, NTT, Qualcomm, and Samsung.

15          What happens is they had a meeting, talked about

16   some ideas, and someone is in charge of documenting it.  Then

17   they go off, and they're back at their house or their office,

18   and they're trying to think of:  How do I fix the next thing

19   that we didn't solve in that meeting?

20          So what kinds of things might you see in here?

21   Particular information on how data should be formatted and

22   other things that Mr. Sebire and the experts in this case

23   will explain to you.

24          This is a document that Mr. Sebire prepared

25   following group discussions, but it's not his invention.  It

defined a problem that needed to be solved because you need

to make improvements in every possible way to make the system

better.  That is simply because there are more and more

cellular customers that have more and more data to send, and

they all want it to happen faster and faster.

That's why we've had such dramatic evolution in

cell phone technology since those bag phones, that someone

referred to earlier, that literally was like carrying around

a small briefcase.

Mr. Sebire came up with a very clever invention to

help determine what kind of data should be communicated back

to the tower.  And he'll walk you through a flowchart and

explain how it works.

But this is a drawing he submitted in his patent

application in 2007.  He's going to take you through it

step-by-step.  And there's also a written explanation of

this.  And it's pretty technical.

But, ultimately, this was a way to solve problems

that were in the baseline document I showed you earlier, and

he submitted it to the group.  It was unanimously accepted,

his criteria for short and long buffer status reports.

So what is the impact, again, at a high level?  You

will hear that his invention helps make the LTE communication

faster, more reliable.  It makes good use of the radio

frequency that's available so you can have more phones

1    performing more features and do it faster.

2          And now you guys know this is a patent case and

3    there's a patent that's going to relate to that, so let me

4    talk a little bit about the concept of a patent.

5          You're going to hear, generally, about where a

6    patent comes from.  But at the most basic level the idea of a

7    patent in the United States of America comes from the

8    Constitution, which states that:

9          The Congress shall have Power...To promote the

10   progress of Science and useful Arts by securing for limited

11   Times to Authors and Inventors the exclusive Rights to their

12   Respective Writings and Discoveries.

13         What does that mean?  Promote research by

14   protecting the folks who invested in research and then teach

15   it to the world to advance the state of the art.  So it's a

16   trade-off.  You teach people your idea, and we'll protect it

17   for a while.

18         Now, after four years, the United States Patent and

19   Trademark Office granted a patent to Mr. Sebire for this

20   invention.  And it's this patent that we're going to be

21   talking about as the property right at issue in this case.

22         Like royalties from someone who drills on your

23   land, you will hear that Apple owes fair compensation.

24         Now, I don't think Apple will disagree that if they

25   infringe, they owe fair compensation.  But this concept is

1    also recognized in documents, the official documents for LTE,

2    for companies that want to practice LTE.

3          The documents recognize that intellectual-property-

4    right holders should be adequately and fairly rewarded for

5    the use of their intellectual property rights in the

6    implementation of the standards and technical specifications.

7          So what is it that infringes?  Hundreds of millions

8    of phones, tablets, and other devices that use LTE.

9          And a number of large companies have taken a

10   license to the '820 patent, meaning they have gotten

11   permission to use it.

12         You'll see that companies like NEC, LG, Amazon,

13   Samsung, Kyocera, Sony, Sharp have taken a license.  These

14   are familiar companies to all of us.  And a lot of these are

15   some of the biggest, oldest technology companies around.  If

16   I remember correctly, even the monitors in the jury box are

17   from NEC.  Nobody here is unfamiliar with Samsung, LG, or

18   their phones.

19         But Apple hasn't taken a license.  They're not on

20   that list, but they infringe.

21         Apple infringes with millions upon millions of

22   devices that communicate on LTE.  And the products you're

23   going to hear about now in this case are the iPhone 5, 5c,

24   5s, 6, 6 Plus, iPad, 3, 4, iPad mini, and mini with Retina

25   Display.

1          There have been some subsequent products that came

2     out later.  But given the way that a lawsuit goes, your

3     accusations take place at a certain time and we go to trial.

4          So the ones that have come out later are not at

5     issue in this particular list because they came out too late

6     in the process of the case.

7          Now, Apple can infringe even if they did not know

8     about the patent.  It's a property right.  Someone could be

9     trespassing if they don't know.  If you have mineral rights

10    and someone drills on it and they didn't know, they're still

11    trespassing.

12         That said, Apple has known about the '820 patent

13    for a long time, and they have not taken a license.  Yet,

14    they use the same LTE standard as all those other companies;

15    but they say, we don't infringe and we won't pay.

16         Now, not only did they know about the '820 patent a

17    long time ago, Apple specifically knew about Mr. Benoist

18    Sebire.  They were very interested in him, and they were very

19    interested in his inventions prior to this lawsuit.

20         But now I suspect we're going to see them attack

21    him on the stand, say he didn't invent anything, he copied

22    someone else's idea.  I think that's what we're going to see.

23         Now, we're not disputing that iPads and iPhones are

24    fantastic products.  Not at all.  They are.  But understand

25    they also have displays that came from great display

companies, memories that came from great memory companies or

batteries from great battery companies.

They also include key networking technology that

makes them better, makes them great products.

So who is Cellular Communications Equipment,

cellular Communications Equipment, or CCE for short?

CCE, I've explained to you how companies can recoup their

investment through licensing the technologies that they get.

But companies like Nokia have a question as to whether they

divert their resources from research to bring a lawsuit, is

it in their expertise, is there someone better suited to

help?

And in 2012, NSN decided to take that latter route

and involve somebody that could help.  They worked with

Acacia Research Corporation.  They sold the patent to Acacia

Research Corporation, along with some other patents that they

own, as Mr. Hill mentioned.

Now, Acacia Research Corporation, as you were told,

started around 20 years ago to help develop new technology.

But in that process they became experts in helping others

stand up for their intellectual property rights.  They helped

lots of people, whether you're a solo inventor or whether

you're a large company.

In some respects they might be a kid that comes to

the playground and brokers some resolution to a problem,

helps work things out.  They have companies -- I'm sorry, they have employees in California and Texas.  And they started CCE here in Texas to own and protect the rights of this collection of patents.

And as you were told by Apple's counsel -- and we agree completely -- this Court is an expert in intellectual property rights.  Judge Mitchell knows patents, and this is a good Court for resolution of these disputes.

Now, here to explain Acacia Research Corporation and CCE to you is Ms. Cristin Wagner.

Ms. Wagner, will you stand?

She's a senior vice-president --

Thank you.

She's a senior vice-president at Acacia Research Corporation.  She will explain the company and how she has worked to license the '820 and other patents.

So where do you fit in?  Well, you're going to be asked to answer how does Apple infringe -- I'm sorry, excuse me.  You're going to be asked to answer:  Does Apple infringe?  And are they infringing willfully?

But you're also going to be asked to award reasonable compensation for the value of Apple's infringement.  To do that we're going to have to look at what's inside the property lines that is protected by this United States patent.  And that is defined by the claims of

the patent, which are those numbered paragraphs that Judge

Mitchell showed you at the end.  All it takes is for Apple to

be infringing any one claim of the patent, and they infringe

the patent.

You're going to hear about Claims 4, 10, 12, 20,

and 24.  We will go step-by-step to show you how Apple has

been trespassing on those rights by going through each of the

parts of the claims.  And you're not going to have to take my

word for it or just trust the lawyers on this issue because

we're going to present technical experts that can help with

these issues.

So, in addition to Mr. Sebire and Ms. Wagner,

you're going to hear from some folks that I would like to

introduce now.  And, first, I would like to introduce

Mr. Nigel Jones.

Please stand up.

Thank you.

And also, Dr. Michael Caloyannides.

Thank you.

Now, Mr. Jones is an engineer and software expert

who has been able to see the top secret code that is how the

cellular -- dictates how the cellular communications in Apple

devices are programmed to work.  He's studied it.  He wrote a

report.  And he's going to present his findings and teach you

how those products work.

1          Now, Dr. Caloyannides is an engineer who spent his

2     life in telecommunications and in computer science.  He's

3     been a professor at Johns Hopkins University, been a senior

4     scientist for the United States Government.  And he will go

5     step-by-step and show you that Apple is practicing claims of

6     the '820 patent.

7          And I'm not going to misrepresent this to you.

8     It's probably going to be fairly tedious, but that's because

9     we want to show you that the evidence supports the findings

10    we will be asking you to make.

11         Now, Apple began infringing with the iPhone 5 and

12    an iPad in 2012, but they're going to argue there's no

13    infringement.  But you're going to see there's evidence that

14    there is.

15         If you find that there is infringement, we're going

16    to ask you to award a reasonable royalty.  And that comes

17    from the United States Code, that upon finding for the

18    claimant, the Court shall award the claimant damages adequate

19    to compensate for the infringement; but, in no event, less

20    than a reasonable royalty for the use made of the invention

21    by the infringer.

22         This could be thought of as in no event less than

23    the amount that Apple would have agreed to pay if they had

24    come to the table at the beginning, acknowledged their

25    infringement, and paid the royalty.  You're going to be asked

1    to determine that.

2            And there's going to be one other person you're

3    going to hear from that will help you determine that.  I'd

4    like to introduce Mr. Philip Green.

5            Thank you.

6            Now, Mr. Green is a financial analyst, and he's

7    going to show you how to calculate a reasonable royalty.

8    He's been given access to the documents he needs and will

9    present that to you.

10           Remember how I said when we were talking about NEC

11   and Amazon and all those folks, remember that they took

12   licenses.  Mr. Green will take you through them and show you

13   the fair rate Apple should pay for its infringement.

14           For example, some folks paid between 9 cents or 24

15   cents per device.  And even though it's been a long struggle

16   in the dispute with Apple, we will explain why despite the

17   fighting that's gone on to get here, we believe Apple should

18   pay around the middle of that range, 15 cents per device.

19           Apple will try to convince you to let them get a

20   special rate, that they wouldn't pay a dime and a penny for

21   each time someone goes to Best Buy and buys an iPad with LTE

22   functionality.

23           But the truth is that's going to be just one of

24   many things that Apple argues in this case, and that one

25   probably comes after several others.

1          You know, Apple is likely to say, hey, we use LTE,

2     but we don't practice the patent.  And if you don't buy, one

3     reason why they don't practice the patent, they're going to

4     give you a second reason why they don't practice the patent.

5          But then if you don't agree with that, I think

6     Apple is likely to come in here and say, look, the whole

7     patent should be taken away anyway.  Someone else did it

8     first.  Or, if not, if you take what this person did and that

9     person did and then one of the guys that we've hired looks at

10    it, he thinks that that makes it obvious and you should take

11    it away.

12         Then if that doesn't work, Mr. Sebire is really a

13    liar, and he just copied it from someone else.

14         And they will not be close to that clear and

15    convincing burden that you heard they have to meet to show

16    that this patent should be taken away.

17         It's going to be quite the opposite.  And we'll

18    show you that.  We'll show you that through cross-examining

19    their witnesses.  And I think you'll see it from the way

20    Apple puts on their evidence.

21         But it's quite the opposite, the notion that he

22    took it from someone else, because the funny thing you'll see

23    is that after Mr. Sebire had his invention and actually put

24    it in that second document I showed you and sent it to the

25    group, other people started adopting his determination

```
 1    criteria in their -- in their papers.  But he had already put
 2    his patent on file a couple of months earlier.
 3              Now, Ladies and Gentlemen, at the end of the day,
 4    we are going to ask you to award damages.  And as Mr. Hill
 5    said, it's going to be in the millions of dollars.  It sounds
 6    like a lot, and it is a lot to each of us.  But that's where
 7    context is important.  Apple infringes a lot.
 8              Just as an example, I'm holding up a box of an
 9    iPhone.  If you look across the accused products, 184 million
10    of these boxes went out the door or came on a truck from
11    Amazon or went out the Apple Store door or Best Buy door.
12    That's not $184 million worth of boxes.  It's 184 million
13    units that were sold.  That's why it's a lot of money.
14              And the fair reasonable royalty is just 15 cents a
15    device.  So, when you look at the number of units that were
16    sold, and you look at 15 cents per device, that turns out to
17    be a large number.  That's $27,647,000.
18              And Mr. Green will explain how he's taken all the
19    inputs to come up with that royalty rate.  And that rate
20    actually could certainly be higher.  But this is a reasonable
21    royalty that we're going to ask you to award.
22              Mr. Sebire's invention, as I mentioned, was
23    unanimously accepted into the LTE standard because it was
24    brilliant, and it was valuable.  Apple did not have the idea,
25    and they weren't even at the meetings.  But they have
```

1    infringed to a dizzying extent.  And the law says they need

2    to pay a reasonable royalty for that infringement.  That's

3    what we're asking for.

4          And you'll also see -- although infringement stands

5    alone, if Apple meets the claims, you will also see that

6    Apple's infringement has also been willful.  That's a

7    separate question that will be presented to you.

8          Ladies and Gentlemen, thank you for your time.

9    Thank you for your service.  On behalf of CCE, we look

10   forward to presenting you the evidence.

11         THE COURT:  The Court recognizes defense counsel

12   for opening statement.

13         MR. HOMRIG:  Thank you, your Honor.  May I have

14   just a moment to get organized?

15         THE COURT:  Sure.

16         Mr. Homrig, would you like any time warnings or no?

17         MR. HOMRIG:  Five minutes, please, Your Honor.

18         THE COURT:  Okay.

19         MR. HOMRIG:  Thank you, Your Honor.

20         Good afternoon, Ladies and Gentlemen.  My name is

21   Jeff Homrig, and I am privileged to represent Apple in this

22   case.

23         This is my chance to walk through some of the

24   evidence in the case with y'all, just like Mr. Caldwell did,

25   and help you start to make sense of it and see what

1   conclusions you might draw from it.

2           As I was listening to his opening statement, I was

3   struck by the fact that he was telling a great story.  But

4   the thing about what we're doing here is that this is a

5   trial, not a storytelling contest.  And because of that, what

6   matters isn't the story but the evidence from the facts that

7   y'all are going to see in this case.

8           And I think when you see all of the evidence that

9   comes in, I think you're going to agree that Apple does not

10  infringe this patent; and that this patent is invalid, not

11  just for one reason but for two.  And I've got to tell you,

12  the second one, it's pretty surprising, at least it was to

13  me, not one we expected.

14          Now, before I go through all that, I'm going to

15  answer the same questions y'all did from Judge Mitchell so

16  you know just as much about me as I know about you.

17          As I said, my name is Jeff Homrig.  I live in

18  California now, although my dad, he was in the Air Force, so

19  I mostly grew up in West Texas and Mississippi.

20          I'm married.  My wife Staci and I have two

21  daughters.  She raises them.  They are Katie, who is ten, and

22  Emma, who is eight.

23          I have never had the privilege of being on a jury.

24          And what I like to do in my free time is pretty

25  much whatever my girls are doing that week.  They like to

1    jump from thing to thing to thing, and so I get into -- into

2    that.

3            Now that you've seen a little bit about me, let's

4    talk about this case and about Apple.

5            So this is an early picture of Apple, back when the

6    founders, Steve Jobs up on the left, and Steve Wozniak down

7    on the right, were still working on early versions of the

8    Apple computer, what built the company from a garage into

9    what it is today, a company that has an amazing line of

10   products.  And we'll see some of those, some like the iPhone

11   and some like the iPad.  Amazing products.

12           Now, I've got to tell you.  I would love to stand

13   here and visit with y'all about the amazing technologies that

14   Apple built, the things that they invented and put in these

15   devices to make them what they are, and distinctive and so

16   successful.

17           But that, Ladies and Gentlemen, is not what this

18   case is about.  This case is about choosing between short and

19   long buffer status reports.  That's what this case is about.

20   Now, buffer status reports, that's a technology that Apple

21   does not make.  It's a technology that Apple buys from

22   Qualcomm on this chip right here that you see on the screen,

23   circled in blue.

24           Now, this chip has a lot of technology on it.  See,

25   what it does is it's put into the iPhone and into the iPad.

1    And it helps those devices communicate with a network.   It

2    does LTE, which you heard about a little bit, and you'll hear

3    a lot more about in this case.   But it also does other types

4    of other generations of cellular communications, so things --

5    you might have heard the words "3G" or "GSM."   Those are

6    different versions of cellular communications.   This chip

7    does all of that.

8             To do that, it's got a lot of technology on it.

9    And even when we talk about LTE, it does a whole lot of

10   things, not just buffer status reporting.

11            I brought myself a list so I wouldn't forget.

12            So this chip, it does things like power control and

13   resource allocation.   It does things like emergency services,

14   multiple radio co-existence, temporary block flow

15   connections, location services, and a host of other things,

16   including buffer status reporting.   And that's important for

17   context, I think.

18            Just to put it in some more context, the way this

19   chip from Qualcomm works, is it has code on it.   So the

20   microchip that runs on code, the coder, like the instructions

21   that tell it what to do.

22            And when that code is written up, it's written up

23   in lines.   And so people talk about coding in terms of how

24   many lines is it to get a sense of how big it is.

25            Well, I'll tell you, you're going to hear in this

case that there's something like 9 million lines of code on that one chip.  9 million lines.  And this case, it deals with about a hundred of those 9 million lines.  Buffer status reporting or choosing between long and short buffer status reports, that's about a hundred lines on that chip.

So that gives you some perspective when you hear from CCE, as you heard today and you're going to hear again and again throughout this case, that, well, LTE, we've got to focus on LTE.  No.  The patent in this case, it deals with choosing between short and long buffer status reports.  And you've got to focus on that.

Now, I've got to tell you.  When -- before this case came up, before the dispute started, Apple, it didn't know a lot about buffer status reporting.  I think you're going to hear that before this came up, Apple engineers, they didn't know a single thing about how buffer status reporting was actually implemented in that Qualcomm chip.  That's because they didn't work with it.

With all the things on that chip, buffer status reporting and choosing between short and long, it's not something that stood out, so they didn't have to work with it.

But as you'll see, once this case came about, they learned a whole lot about it.  And I think you'll be real interested to see what they learned.

1              Now, one of the folks that you're going to meet --

2    you already met her this morning, Ms. Heather Mewes.  She's a

3    licensing attorney at Apple.  And she's going to describe to

4    you how licensing works at Apple.  And I think she'll have

5    some thoughts to share with you about how Apple learned about

6    this '820 patent.

7              Now, here's the thing.  Mr. Caldwell, he suggested,

8    I think, that the '820 patent and the LTE standards somehow

9    go together.  And he also said pretty clearly today, well,

10   Apple has known about this infringement for a long time.

11             Let's break that down a little bit.  You're going

12   to hear a lot of evidence in this case about infringement and

13   what it means and how you show it.  So I just want to lay the

14   groundwork for you.

15             So the idea that the '820 patent covers the LTE

16   standard, you've got to first focus on the claims themselves.

17             So when you look, as Apple first did when it first

18   heard about this patent to gather folks together to see

19   whether or not this patent and this standard went together,

20   first of all, the standard is -- just like in the microchip,

21   it's a small part of the LTE standard, which is the set of

22   rules that govern LTE.

23             So what you have to do is you have to figure out do

24   the claims match up with the requirement in the standard.

25   That's the test.  And if there's a single thing missing,

1   there's no infringement.  A single thing.

2          See, it's like bingo.  If you're playing bingo,

3   what you've got to do is you've got to get all the numbers in

4   a line to make bingo.  If they're calling out numbers and you

5   get most of "I" but you are missing I-24, you don't have

6   bingo.  Now, they can call out I-23, they can call out I-25,

7   but there's no bingo.

8          If they call out B-8 or N-31, that's pretty close,

9   but it's not bingo.  For this bingo board as it is, you've

10  got to get exactly I-24 or there's no bingo.

11         Well, it's just the same with infringement.  See,

12  what Apple learned when it started looking into this '820

13  patent, when it first heard about it is that there is

14  differences between the '820 patent and the LTE standard for

15  buffer status reporting.  They're not the same.

16         And what you'll see in this case -- in the interest

17  of time we're not going to go through it in detail right now,

18  but I just want to show you a document that you're going to

19  see.

20         See, this right here is an analysis that was given

21  over at the time to show that there's differences.  And, in

22  fact, you'll hear terms like "pre-selected conditions" and a

23  "plurality of pre-selected conditions."  And whether or not

24  you find one of those conditions and then make a decision

25  about short or long, based in part on that.

1              And what Apple found at the time is that's not in

2    the standard.  And as you will see in the case, that's not

3    the Qualcomm chip either, the way they read it.

4              So here's the thing.  You're going to hear from

5    experts.  You're going to hear from a lot of folks about

6    this.  But there are clear differences.  Apple has seen the

7    differences from the beginning.  That's -- that's what the

8    evidence is going to show.

9              Here's the other interesting thing, is right after

10   NSN heard about this -- this issue, it decided to get rid of

11   a bunch of patents.  And one of the patents that it got rid

12   of back in 2012 was the '820 patent, right after it learned

13   of this.

14             So what the evidence is going to show is that NSN

15   had transferred the patent to Acacia.  And Acacia, as you

16   heard, is a company.  It doesn't sell products, doesn't make

17   products.  What it does is it buys up patents, and it tries

18   to license them.  And sometimes it files lawsuits like this

19   one.

20             Now, Acacia, once it had the '820 patent, it

21   transferred it to its subsidiary, CCE.  And that's how CCE

22   got its hands on the patent.  And that's why CCE is the

23   Plaintiff in the case here.

24             Now, CCE wasn't satisfied with the idea that the

25   '820 patent does not cover the standard, wasn't satisfied

with the idea that companies like Apple might not infringe.

So what it did is it filed this lawsuit here in this courthouse in Tyler.  And it accused Apple of infringement.  And as you heard from Mr. Caldwell, it accused Apple of willful infringement, even though Apple already knew and already communicated that the '820 patent did not cover the standard, and it did not cover its product.

Now, I'd be willing to bet that most folks have had someone come to them at some point in their lives and point the finger at them and accuse them of doing something they didn't do, that they knew they didn't do.  Maybe it's big; maybe it's small.  But I'd be willing to bet it's happened.  It's certainly happened to me.

And if you think about that, when that happens to you, you've got a hard choice.  And you really have two options.  You can lay down and you can accept blame for something you knew you didn't do.  And when that allegation is a lawsuit, there's powerful reasons to do that.  It's called settling.  Sometimes parties agree not to go forward with a case, for whatever reason.  And there's powerful reasons to do that.  Because lawsuits are difficult.  They're expensive.  Folks have to take times out of their jobs to be able to sit for depositions and gather documents, do things like that, work for the case instead of their normal day-to-day lives.  So there's lots of reasons to do that.

1          Now, one thing you heard from Mr. Caldwell is that

2     lots of folks have licensed the '820 patent.  And I think he

3     identified names like Samsung and Amazon, LG, and some

4     others.  What he didn't tell you was that those folks

5     settled.  Those are licenses that came out of litigation.

6     And that's fine.

7          But your other choice when someone points the

8     finger at you and accuses you of doing something you knew you

9     didn't do, is to stand up and defend yourself.  You have that

10    right.  You have that choice.  It's hard, but it's your right

11    to do it.

12         And that's what Apple did.  See, once this lawsuit

13    was filed, the folks at Apple learned a whole lot about

14    buffer status reporting.

15         You'll hear from folks at Apple like Madhu

16    Chaudhary.  He's a senior software manager at Apple.  He

17    manages a team of about 20 engineers.  And what they do is,

18    their job is to take that Qualcomm chip and integrate it into

19    the iPhone and the iPad.  That's what they do.

20         Now, when this case came about, his team had

21    studied the evidence.  It studied the Qualcomm code that

22    comes on the chip.  They studied the standard.  And they

23    pulled together all kinds of evidence.  And that evidence is

24    in the case.  You'll, I think, hear some testimony from

25    Mr. Chaudhary.  And you'll get to see it.

1          Apple also retained a gentleman named Dr. Tony

2     Acampora.

3          Dr. Acampora, would you please stand?

4          Thank you, sir.

5          So not to embarrass him, but Dr. Acampora, he is

6     renowned in this field.  He was back at Bell Labs when they

7     were developing communications technology and all kinds of

8     networking technology.  Then he moved on to Columbia

9     University.  And then on to UC San Diego where now he's a

10    professor emeritus.

11         Let me just say this man, he knows his stuff.  He's

12    studied all of the evidence in this case.  He's studied

13    source code analysis.  He's studied the documents.  He saw

14    the testimony.  And what he found is that the evidence in

15    this case shows that Apple is right.  The '820 patent, it

16    does not cover the standard, and it does not cover Apple's

17    products.  There is no infringement.  That's what he found.

18    And you'll hear it directly from him.

19         That's not all he found, and it's not all Apple

20    learned when it got into this case.

21         See, if you look at when the patent was filed,

22    November 5th of 2007, what you'll see is that there's a whole

23    lot of things that came before it.  Folks were doing a lot of

24    work before that.

25         And Dr. Acampora, he looked at some of the

1    evidence.  I'm just going to show you an example of it.  And

2    you'll hear directly from him about the testimony.  But this

3    idea of choosing between short and long buffer status

4    reports, in light of what other people were doing at the

5    time, that idea was obvious.

6            See, what the patent basically said is you have

7    these pre-selected conditions.  And if you find one, then you

8    choose long unless it won't fit, and then you choose short.

9            In light of the evidence, Dr. Acampora will explain

10   to you, that's obvious.  That was obvious at the time.  Plain

11   and simple.

12           Now, as I said at the outset, this patent, it's

13   invalid for two reasons, one of which is a surprise, and

14   we're going to get to that now.  See, when Apple first saw

15   this patent, it saw what y'all are seeing right now, which is

16   that it listed Mr. Benoist Sebire as the sole inventor.  And

17   that's important because when you list yourself as an

18   inventor or where you're listed as an inventor on the patent,

19   it's got to be right.  If it's wrong, the patent is invalid

20   unless it can be corrected somehow.

21           Now, what we'll see from the evidence in this case

22   is that that's not right.  He's not the sole inventor of this

23   patent.

24           To understand why, you have to go back to where

25   this patent came from.  And that is this organization called

1    3GPP and its parent organization called ETSI, which you may

2    hear about.  And what those basically are is a bunch of folks

3    who get together, and they set the rules for LTE.

4           See, back in 2007 folks were trying to figure out

5    what was LTE going to look like, what were the rules going to

6    be.  And the way this works is that different companies send

7    representatives in to meet with each other to talk about what

8    the rules could be, to talk about what the standard could be

9    so that everybody is kind of playing by the same rules on the

10   things that they decide on.  That's the goal.  It's very

11   collaborative.

12          This is a long process.  And they have meetings

13   around the world where they meet two, three, four times a

14   year, depending.  And they get to know each other pretty well

15   because they're working together to try to develop a

16   technology that everybody can use.

17          Now, they are far away from home, oftentimes,

18   because they start out around the world, and then they go to

19   places like South Korea and other places in Asia, places in

20   Europe to meet.  So they spend a lot of time together, get to

21   know each other real well, socialize together, have dinner

22   together, that sort of thing.  They know each other.  And

23   their goal is to work together to create this technology.

24          Now, Mr. Sebire, he was at NSN, which was

25   participating in this standard setting organization.  And he

1   was there working alongside those folks in what's called

2   Working Group 2.  Now, Working Group 2, it worked on a whole

3   lot of technologies.  One of them was buffer status

4   reporting.  That's one of the things that they were working

5   on.

6           Another witness you're going to hear a lot about is

7   Ericsson because Ericsson was there in that same working

8   group working on the same technology.

9           And you're going to hear from a gentleman named

10  Dr. Magnus Stattin.  This gentleman was Ericsson's

11  representative, or one of them, in Working Group 2.  And he's

12  going to provide some context and some understanding about

13  how these groups work, what the basic process was, and how

14  information was shared and what the goals were and how it was

15  used.  That, I think, will be helpful to y'all in -- in

16  looking at the evidence.

17          Now, I want to focus on a set of meetings that

18  happened in October and November of 2007.  These are going to

19  be real important.  See, what happened is that back in that

20  time frame, folks were meeting to get together to talk about

21  buffer status reporting.  They were thinking about, well, do

22  you have short and long, and, if so, how do you choose

23  between them?  That's what was in front of them.

24          Mr. Sebire was part of that discussion.  So was

25  Mr. Magnus Stattin.  So were a lot of folks.

1          So they met in late October, some subset, not the

2     entire working group, but some subset of folks got together

3     and talked about what should they do about short and long

4     buffer status reporting.  And what they agreed upon was some

5     technology to try to suggest to the other folks in their

6     working group to put into the standard.

7          Now, after that first set of meetings for those

8     companies, Mr. Sebire wrote up a proposal based on their

9     discussion.  And what we're looking at right here is an

10    e-mail that he sent out to the full working group where he

11    forwarded that proposal, those ideas from the group out to

12    the bigger group for consideration because they were getting

13    together in South Korea for a meeting, the whole working

14    group was in a few weeks, so he sent this out.

15         Now, one of the things he attached to it is a

16    proposal, I think y'all are going to see a lot of during this

17    trial.  And that's this right here.  This is a joint

18    proposal.  I think you saw it during Mr. Caldwell's

19    presentation.  This was a joint proposal that included

20    Ericsson, and that's Mr. Stattin -- Dr. Stattin's company.

21         Nokia, NSN, that's Mr. Sebire's company.  And

22    several others.

23         Now, this proposal, it reflected those discussions

24    that they had already had.  See, sometimes in this

25    environment what happens is someone comes up with their own

1    idea or their own company, and they put it down, and they

2    send it out in their own company's name.

3         But here, this was different, because here these

4    companies had already talked, already figured out what they

5    wanted to put together.  And he was writing it up for the

6    whole group.

7         And you can see that right there in that

8    highlighted piece where all those companies are listed.

9    He was sending this out because they were going to meet with

10   the bigger group, and he wanted them to see it all.  The

11   folks who weren't in that first discussion, he wanted them to

12   see it before the meeting so they could think about it and

13   vote, that sort of thing.  That's how the process usually

14   worked.  So he sent this out.

15        Now, why are we spending all this time on this

16   document?  Well, we're doing that because there's another

17   thing that happened around this time.  See, Mr. Sebire, he

18   filed a provisional patent application, or NSN did.  That

19   application isn't just any application.  As you might

20   imagine, it's the application that was the very beginning,

21   the very first application that led to the '820 patent.  So

22   this application is real important.  That was filed in

23   November, 2007.

24        Now, you can see we've highlighted in green,

25   there's a little check box down there.  You can see a line

there where if there's additional folks who should be listed, you can check that box.  And you can see it's not checked in this case.

And here's why that's important.  See, if you match up on the one hand the joint proposal from Ericsson with the provisional patent application from Mr. Sebire; and if you take a hard look at them, what you see is that they are very much the same.  And I don't mean a little the same; I mean a lot the same.

And showing here on the screen, see all those parts in yellow?  All those parts are the same subject matter, the same substance, the same ideas from the provisional patent application on the bottom, they're the same as the joint proposal on the top.

Now, it's worse than that.  It's not just the same ideas.  These documents, they are in so many places that you will see during this trial word-for-word the same.  I'm not going to walk through all of them.  But let's take a look.

See, here is an example where they're talking about buffer status reporting and short and long.  You can see it says:  Necessary to report the 4 RBGs always; e.g., when only a limited number of bearers are configured.

Now, what you'll see is it doesn't matter when you were looking at the top one or the bottom one, it was word-for-word what I read.  Because they're the same.

1  If you go on to the very next sentence, what you see is

2  there's more word-for-word the same.

3          THE COURT:  Five minutes, Mr. Homrig.

4          MR. HOMRIG:  Thank you, Your Honor.

5          This one is too long for me to read out, but you

6  can see as you go through, word-for-word the same.

7          And if you go further, what you see, it's not just

8  the text, it's the figures, too.

9          Here they have figures for short BSRs.  Those are

10  the buffer status reports.  And they've got long BSRs.  And

11  you can see from the Ericsson joint proposal, if you match it

12  up with the provisional patent application with Mr. Sebire's

13  name on it, they are the same.  They're not just the same

14  general idea.  They're not just the same general shape.  They

15  are the same right down to the little words in the bottom

16  saying "6 bits."  These documents, they are the same.

17          So this idea you heard from CCE that, well, this

18  was generally the same or not the invention, it's right there

19  in the patent application, Ladies and Gentlemen.  How much

20  more evidence do you need to see than that?  And you'll see

21  it.  You'll have the opportunity to consider it.

22          But that, that's not even the most surprising part.

23  It's pretty surprising, but it's not the most surprising

24  part.  See, if you look at dates, what you see is that

25  Mr. Sebire, he sat around that joint proposal on the 30th of

1    October of 2007 and filed his application on November 5th,

2    2007, just six days later.

3         But as it turns out, that set of meetings they were

4    going to have, they started on November 5th.  So as

5    Mr. Sebire's application was being filed, that application

6    that is word-for-word the same with that joint proposal, he

7    was just starting a five-day meeting with those folks.  On

8    that very day they were starting their meeting in South

9    Korea.  All those folks he worked with, he met with them for

10   five days.

11        And you know what you're going to see in this

12   evidence?  He didn't tell a single one of them that he was

13   filing a patent application.  Not a one.  He didn't tell a

14   single one of those folks that he met with throughout all

15   those meetings, that he went to dinner with, that he

16   socialized with, that he knew so well that he was filing an

17   application that was word-for-word the same with the joint

18   proposal.

19        To quote from CCE's opening, Ladies and Gentlemen,

20   I think you'll see from the evidence who it was that thought

21   that they were entitled to grab what everyone else had.

22        Now, this -- this was a provisional application.

23   There's another application a year later.  And there,

24   Mr. Sebire, what he said was, I believe I am the original,

25   first, and sole inventor of this technology he was trying to

1    patent.  That's what he said.

2         Now, as I said before, we went through these

3    documents, when there's an inventorship problem, the patent

4    is invalid.  When it's obvious, it's invalid.

5         And when -- and you heard the evidence is going to

6    show that it's not infringed.  And when there is no

7    infringement, and when the patent is invalid, there are zero

8    damages.  That's it.

9         You'll hear evidence that will show why their

10    numbers are wrong.  You'll hear that.  But this, Ladies and

11    Gentlemen, this is the right damages number for this case

12    because this patent is not Mr. Sebire's, certainly not his

13    own.  And this patent, well, Apple doesn't use it.  The

14    evidence is going to show that.

15         THE COURT:  Time, Mr. Homrig.

16         MR. HOMRIG:  Thank you, Ladies and Gentlemen.  We

17    very much appreciate your time.

18         THE COURT:  All right.  Is the Rule going to be

19    invoked?

20         MR. CALDWELL:  Yes, your Honor.

21         THE COURT:  Okay.  Would all of the witnesses in

22    this case please stand?

23         And do you-all have exemptions under the Rule that

24    you would like --

25         MR. CALDWELL:  Experts, Your Honor.

1          THE COURT:  Okay.  If you were -- go ahead.

2          MR. LUMISH:  We agree, Your Honor.

3          MR. CALDWELL:  And corporate representatives.

4  Sorry.

5          THE COURT:  Experts and corporate reps.

6          MR. CALDWELL:  Yes, Your Honor.

7          THE COURT:  Okay.  If you are an expert in the case

8  and -- you are not an expert and not a corporate

9  representative, then I'm going to ask you to leave the

10  courtroom at this time.  The Rule has been invoked.  And what

11  that means is that you must retire from the courtroom and

12  remain outside the presence and hearing of these proceedings

13  here in court.

14          During the trial do not discuss this case among

15  yourselves.  Do not discuss it with anyone else.  Do not

16  permit it to be discussed in your presence.  The only

17  exception is that you may discuss the case with the

18  attorneys.  The Rule has been invoked.  Unless you are

19  exempted from the Rule, you need to leave at this time.

20          Thank you.

21          Everyone else may be seated.

22          Ladies and Gentlemen of the Jury, we're going to

23  take our afternoon break.  We've been going about an hour and

24  a half, so we're going to take a break until 3:15.

25          We'll be in recess.

```
 1              COURT SECURITY OFFICER:  All rise for the jury.

 2              (Jury out.)

 3              (Recess.)

 4              (Jury out.)

 5              COURT SECURITY OFFICER:  All rise.

 6              THE COURT:  Please be seated.

 7              I understand there are a couple of matters we need

 8    to discuss before we bring the jury back in, quickly.

 9              MR. CURRY:  Your Honor, Austin Curry for the

10    Plaintiff.

11              The first issue is a matter in limine on equitable

12    issues tried to the jury.

13              Mr. Homrig referenced in his opening statement that

14    the most surprising thing about everything you're going to

15    hear today -- addressing the jury -- is that Mr. Sebire did

16    not tell the other people at the SSO about his provisional

17    patent application.

18              It's not relevant to derivation on joinder.  The

19    only thing it's possibly relevant to is their SSO estoppel

20    defense.

21              And so what we've proposed to Your Honor is a

22    curative instruction -- excuse me -- and it's one of those

23    things -- Mr. Caldwell actually wanted to argue this, Your

24    Honor.

25              THE COURT:  Quickly.  We are past breaktime.  Let's
```

1    go.

2             MR. CALDWELL:  So there were two issues.  And I'm

3    sorry.  I just don't know what I missed.  On the derivation

4    issue, we took it up as a motion in limine last week.  It was

5    denied as a motion in limine.

6             But they are raising a derivation issue.  But the

7    Local Rule requires you have to tell us the person that you

8    contend he derived this from.  To this day, they have not

9    done that.  And so we object on that basis.  And that should

10   not be coming in.  We request an instruction on it.

11            And there is a second issue.  I can either tell you

12   now or later.

13            THE COURT:  Let me get a response on the first

14   issue.

15            MR. HOMRIG:  Thank you, Your Honor.

16            We disclosed that it was a group issue.  It's

17   everybody in that group who was participating.  That's the

18   argument, and this is just sort of revisiting what the

19   argument was last week that Your Honor denied.  So I don't

20   think there's any new issue.

21            May I also respond to the other issue Mr. Curry

22   raised?  Would Your Honor like to hear that, or do you want

23   me to sit down and bring in the jury?  We can do, obviously,

24   whatever you want.

25            THE COURT:  That's fine, yeah.

1              MR. HOMRIG:  So on that issue, this is directly

2       relevant to inventorship, whether he told the folks who

3       helped him write that proposal or who came up with those

4       ideas.

5              The standard setting issue is a different one.

6       That's whether there was a declaration filed with a standard

7       setting organization.  I didn't reference that at all.  I was

8       speaking directly to the people he was working with.

9              That goes rightly to whether or not those folks

10      knew he was filing this, whether he felt comfortable telling

11      him, which he clearly didn't.  That's directly to

12      inventorship.

13             MR. CALDWELL:  Your Honor, this is an absolutely

14      ridiculous explanation.  When you go to these meetings -- and

15      this is why this is all meant for a bench issue.  When you go

16      to these meetings, you don't talk to people about the patents

17      you filed.  It doesn't come up.  None of them do.

18             And what's happened is he has just injected a

19      complete misrepresentation of how these meetings go in front

20      of this jury.  They have an expert who's never been to a

21      standards meeting, the best I can tell, who is going to

22      present this to Your Honor.  They're not even going to call

23      him, and he was going to give a characterization of it that's

24      not true, which could be addressed by Mr. Sebire, and it

25      should have been, I guess, in a bench trial if they were

1    going to pursue that.

2           But what's happened is, he's now suggested that

3    what happened was he comes and he sneaks this into the

4    standard and didn't tell them about a patent, but they don't

5    talk about their patents.

6           The Siemens -- or I'm sorry -- the Samsung guy

7    doesn't tell them.  The Ericsson guy doesn't tell them.  They

8    just don't.  They get the technically best solution.

9           And I'm not trying to plead the case and that you

10   should rule or grant summary judgment or that sort of thing.

11   What I'm saying is that's an argument we were set to have at

12   the bench, and that's why I filed a motion in limine on it.

13          And he's just injected a complete misrepresentation

14   of the facts into the jury, which makes us have to try a

15   purely equitable issue as a sideshow.  And that's the purpose

16   of motions in limine.  They should have approached.

17          MR. HOMRIG:  Your Honor, this -- I did not touch

18   the standard setting issue.  That goes to whether or not

19   there's -- it's declared to ETSI or it's declared to 3GPP.

20   This was all about the folks he was working with, whether he

21   consulted them, told them what he was doing.  That goes

22   straight to inventorship.

23          THE COURT:  Why is it relevant to inventorship?

24          MR. HOMRIG:  It's relevant to inventorship because,

25   you know, he worked on this proposal with them; and, you

1    know, as a basic sort of connection that one can make is, if

2    he kept that secret, he didn't tell them that he was taking

3    material straight out of that joint filing and then filing

4    with the Patent Office, that, you know, he was hiding that

5    from him or he was uncomfortable sharing that with him, they

6    didn't have the opportunity to say that they were

7    co-inventors, too.

8            That goes directly to just basic human interaction

9    of when you work in a group, do you then go off by yourself

10   and do something else?

11           And he -- it's just a direct, you know,

12   interrelationship kind of thing.  It doesn't deal with the

13   formal standard setting process, which is a separate issue.

14   And I didn't touch that.

15           MR. CALDWELL:  And this is -- this gets back, I

16   think, to the point that I've made about derivation.  I mean,

17   think about what's happened.  They've refused to comply with

18   the Local Rule and tell you who it is.  Now we can't call any

19   of those people there.

20           And they're trying this sort of theory that in this

21   one instance, he should have done something that hasn't

22   happened in the 200 other meetings he's gone to with 3GPP,

23   and they've injected that idea in front of this jury.

24   It does have nothing to do with derivation, exactly as

25   Your Honor said.  It just doesn't.

1          And by them not complying with the Local Rule and

2    instead just saying, well, what you should do, if we're going

3    to tell you the estoppel-related facts so you can infer

4    something, that's just insanely prejudicial.

5          And we had no chance to pursue it through

6    discovery.  It's just irrelevant to the derivation defense.

7    I mean, it --

8          THE COURT:  What about this notion that it's

9    relevant to inventorship?

10         MR. CURRY:  Your Honor knows the elements of

11   inventorship are conception and communication.  And that's

12   true for both the non-joinder and the derivation defense.

13         So are these unnamed people -- did they conceive of

14   something in the SSO, a part of the claim, or the entirety of

15   the claim in the case of derivation, and communicate that to

16   Sebire?  Those are the issues.

17         We cannot draw that inference by having the

18   inventor go and not tell something -- his invention to the

19   rest of the people who they claim to be alleged inventors of

20   this.  That inference cannot be drawn.

21         Again, it's the communication from the other people

22   to Mr. Sebire.  That's what matters.  Not what Mr. Sebire was

23   allegedly too ashamed to do in front of his alleged imputed

24   inventors.

25         MR. HOMRIG:  The communication back and forth is

what matters.  So here we've got, you know, the group
situation, what he communicated to them, what they
communicated to him.  That goes to show whether or not, you
know, there's inventorship.

As to whether we identified the specific people,
two issues there.  We disclosed this defense.  We identified
the documents, you know, as a basis for it.  They knew what
documents they are.

The specific individuals who are attached to those
companies, now, some of that is laid out in the documents we
just got last night and will be in the trial, and they can
cross-examine folks like, you know, Mr. Stattin -- or
Dr. Stattin on issues like that.  They can have Mr. Sebire
testify about who he talked to and what that dialogue was.
But it's a two-way street, right?

And the reference, you know, is another example.
The reference, you know, in opening to how, you know, after
he came up with this idea, then all of a sudden, other folks
at those groups started using the idea and implementing it.
That is also relevant and ties right into this whole issue of
what that dialogue -- not between him and the standard
setting organization but him and the specific people he was
working with.

That's the inventorship question, and it's
different from him versus ETSI or NSN versus ETSI, which is

1    all the standard setting issue.

2            MR. CALDWELL:  Your Honor, that also doesn't make

3    sense.  It shows that they have not pursued this defense, and

4    it's an ambush.  Because he's showing you something off the

5    3GPP website where you could see, oh, look, here's where he

6    submitted this e-mail to the list server, and it reflects

7    he's going to this meeting with these people.

8            They have not pursued any of that.  They've not

9    identified a soul that they say contributed or was a

10   co-inventor, much less another person who actually conceived

11   of the entire invention from which it was derived.  They

12   haven't.

13           As to his comments, I mean, if you want me to

14   address what he says about my part, I can.  I don't know that

15   that's at all relevant.  But later, after the documents that

16   Mr. Homrig showed, Mr. Sebire's invention of how to actually

17   make the decision was submitted as a subsequent contribution

18   with him as the sole inventor, and it was discussed in the

19   minutes and unanimously approved.

20           That one was.  There's not someone standing up

21   saying:  Wait a minute.  That's joint.  We did that together.

22   I mean -- but we don't need to have that argument in front of

23   the jury because they've never pled this to put us on notice

24   of what he just did.

25           He hasn't complied with the Local Rule and

absolutely went into the equitable issue that's for the bench
trial, specifically enumerated in the motion in limine.  And
lest we forget, we are supposed to approach.  He did not
approach.

MR. HOMRIG:  Your Honor, I would have approached if
I were addressing the standard setting issues, which I was
not.  This human interaction of the folks that he was talking
to and working with, that is different.  I didn't touch the
SSO issues or I would have approached first.

MR. CURRY:  It's important to remember where we
are.  There's been an allegation of wrongdoing that we
believe is covered by the motion in limine, and it relates to
the SSO estoppel issue.  That's, in fact, the only thing that
accusation relates to.

We either need a chance to defend ourselves, in
which case we're going to be trying this SSO estoppel case to
the jury.  The fact that he didn't give it that label is
irrelevant.  We need to defend ourselves or we need a
curative instruction from the Court to take this issue off
the table.

MR. HOMRIG:  Your Honor, that's not appropriate for
the reasons that I mentioned.  I think -- you had said final
word, so I didn't start speaking, but I think I've made my
argument.  Trying to conflate the two, they're just not the
same issue.

 1          THE COURT:  Well, I'm going to let you go into it,

 2     and I'm going to let you-all deal with it in direct or

 3     redirect as you see fit, so...

 4          I do not want this to be a pattern, though, that we

 5     think we're sort of walking into motions in limine.  I mean,

 6     if there's something even close, I would prefer to take it up

 7     on the front end rather than on the back end.

 8          I'm not commenting -- I don't think you violated

 9     the motion in limine in this case, but I don't want to have

10     these discussions after the fact.  Either deal with them on

11     the front end; or when doing something objectionable, stand

12     up and let's stop it, and let's have a discussion about it.

13          Yes, Mr. Lumish.

14          MR. LUMISH:  In that spirit, Your Honor, before I

15     do his cross, maybe I can ask you, if going into the same

16     subjects and Mr. Sebire's failure to tell people at the

17     cooperative group, the collaborative group on the Ericsson

18     proposal, about the patent filing and the applications and

19     all of that would still be appropriate, instead of stopping

20     at a sidebar to do that later.

21          THE COURT:  And tell me for what purpose you're

22     going into that line of questioning.  Let's just tee it up.

23          MR. LUMISH:  Exactly what Mr. Homrig articulated,

24     which is it's at least circumstantial evidence that he was

25     unwilling to tell them about the invention such that they

couldn't say:  Wait a minute.  That's mine.  That's ours.

The idea that other people jump in and start using his proposal later, there's one that comes several months later, that's supposed to somehow cure the issue, if he had told me he had a patent, there might have been a very different reaction.

The fact that he didn't tell them that there was a patent filing, I think is circumstantial evidence.  And we think the jury should hear it; that he knew that this was something or his lawyers told him or something; but that there was a reason not to tell his colleagues that the same collaborative thing they worked on was now being submitted in his name only.  I think it's circumstantial evidence of the inventorship issue and maybe derivation.

On the point that Mr. Caldwell made, which is they don't usually talk about patents, they don't usually file patents on things that they did as a group.  That's the difference here.

MR. CALDWELL:  I think then ask him if it came up as a group or show him the evidence that said these ideas came from the group.  That was the point of this whole debate we had earlier.

They think these documents from earlier meetings show that it came from a group.  They can try that. Your Honor already said so.  This is -- could not possibly be

1   more transparent, I don't think, given what Mr. Homrig

2   argued.  And now Mr. Lumish stands up and says:  Great.

3   Thank you for that entree.  Let's go ahead and try this

4   estoppel.

5          They had an expert, Mr. Ben Levitan who they say

6   they're not going to call, who put on an expert report

7   talking about how it was bad faith for this guy to file an

8   application and then go contribute things to the standard.

9          But the truth is that is the way it is done in all

10  of these groups so that they get the best technical solution

11  so that they're not sitting there basically committing

12  antitrust violations or think that that will -- where two of

13  them are saying, well, no, let's go with this because you've

14  got the patent on it.  That's the whole bench trial issue

15  that should be coming up.

16         And what he's doing is he's saying:  Okay.  Give me

17  an inch, I'll take a mile.  He wants to now try that case.

18  It can't happen.  I mean, if they've got these documents --

19  and most of this 3GPP stuff is public.  You'll see it with

20  the experts.  It's on the web.

21         If they think this was contributed previously,

22  cross Mr. Sebire on it.  That's the issue of whether he

23  invented or not, he got it from someone else, whether it was

24  obvious in view of what someone else had submitted.  That's

25  fine.

1          The post talk, oh, yeah, you got it into the

2     standard; you didn't tell us about your patent under the

3     guise of -- under the guise of one of them might have claimed

4     inventorship, that is just completely a red herring, and the

5     entire reason the motion in limine is granted, and you've set

6     aside -- two hours aside for a bench trial.

7          THE COURT:  Any final word, Mr. Lumish?

8          MR. LUMISH:  I have maybe 15 or 20 questions at the

9     most for Mr. Sebire on this.  Everything you heard from

10    Mr. Caldwell is testimony.  He's not a witness.  He can

11    certainly elicit that testimony from Mr. Sebire if he thinks

12    it's true.

13         And the jury can weigh the facts and weigh the

14    credibility and make a decision.  We're not going to go into

15    standard setting estoppel.

16         I want to ask him to admit in front of the jury

17    that after he copied and pasted -- or his lawyers did -- I

18    don't know who did it -- the text from one document into the

19    other, that he didn't tell anybody.  Nobody had word of it.

20    There was nobody who had a chance to come up and say:  Wait a

21    minute.  That's mine, too, which is exactly the argument you

22    heard from Mr. Caldwell in his opening.

23         He's going to stand in front of the jury and say:

24    Look, nobody stood up and said:  Wait a minute.  That's my

25    invention, too.  They didn't do it for a reason, because they

1    didn't know there was a patent pending.

2        MR. CALDWELL:  That's why we're having a bench

3    trial on the estoppel issue before Your Honor, if you think

4    what they did is something wrong, but there's a dividing line

5    between the portion that's equitable for Your Honor and the

6    part that's not and should be in front of the jury.

7        You know, the trial is about to be completely

8    derailed if they put an equitable expert up.  We responded

9    with the guy, you've got findings of fact and conclusions of

10   law on this submitted to you for this issue.  This is not a

11   jury triable issue.

12       And what they're doing is they're trying to kick

13   open their own door by taking the inch and now saying, well,

14   thank you for allowing us to do that.  Obviously, we get the

15   next mile.  That cannot derail this trial.

16       THE COURT:  All right.  I'm going to let you get

17   into the general nature that you've put forth before the

18   Court.  I am cautiously letting you do that.  I don't want

19   this to turn into a trial on the equitable issue about

20   estoppel.  And so don't take the mile.

21       MR. LUMISH:  Understood, Your Honor.

22       MR. CALDWELL:  Your Honor, we had no notice to

23   depose the other folks to come in here in a parade of

24   contributors to say that literally none of them come into the

25   group and say:  Hey, by the way, we filed a patent

1    application on it.

2         I mean, it's just -- this is a complete ambush that

3    follows the lack of any notice about derivation and pitching

4    this as an estoppel issue.  It is a complete ambush on this

5    trial.

6         MR. LUMISH:  That's ironic, to say the least, Your

7    Honor.  The names of the people who participated are in the

8    e-mails we got two days ago.

9         MR. CALDWELL:  They're on the --

10        MR. LUMISH:  NSN is the company that his client

11   bought the patents from and retains an interest in this

12   lawsuit, likely had or has in their possession.

13        So to complain that he didn't get discovery when

14   it's us who needed it, is, I think, a good tactic but not

15   helpful here.

16        THE COURT:  All right.  I've made my ruling.

17        Let's bring in the jury.

18        COURT SECURITY OFFICER:  All rise for the jury.

19        (Jury in.)

20        THE COURT:  Plaintiff, who will be your first

21   witness?

22        MR. CALDWELL:  Your Honor, the Plaintiff calls

23   Mr. Benoist Sebire.

24        THE COURT:  Mr. Sebire, if you'll raise your right

25   hand and be sworn.

```
 1              (Witness sworn.)
 2              MR. CALDWELL:  Your Honor, the parties are going to
 3    exchange witness binders in the trial.  May I pass one up?
 4              THE COURT:  You may.
 5              MR. CALDWELL:  May it please the Court.
 6              BENOIT SEBIRE, PLAINTIFF'S WITNESS, SWORN
 7                      DIRECT EXAMINATION
 8    BY MR. CALDWELL:
 9    Q.   Would you please introduce yourself to the jury?
10    A.   Good afternoon.  My name is Benoist Sebire.
11    Q.   Mr. Sebire, will you just make sure the microphone is
12    lifted up a tiny bit there for you?  Thank you.
13         Why are you here today, Mr. Sebire?
14    A.   I'm here today as the inventor of the '820 patent.
15    Q.   Mr. Sebire, what is the invention of yours that's at
16    issue in this case?
17    A.   It's a BSR selection criteria to make LTE more
18    efficient.
19    Q.   Who benefits from your invention?
20    A.   Any equipment that integrates LTE, so it could be mobile
21    phone.  It could be networks.  It could be tablets.  It also
22    benefits the operators, like AT&T, Verizon, any companies
23    that LTE services.
24    Q.   Do you have some slides prepared to help us just keep
25    track of some terms that we'll talk about today?
```

```
 1   A.    Yes, I do.

 2   Q.    You've used the term "LTE."  What is LTE?

 3   A.    So LTE stands for long-term evolution.

 4   Q.    Mr. Sebire, before we get into the details of your

 5   invention, can we learn a little bit about you?

 6   A.    Sure.

 7   Q.    How old a man are you?

 8   A.    I am now 43 years old.

 9   Q.    Do you have a family?

10   A.    I do.  I have a wife and two children, two daughters,

11   age 10 and 3.

12   Q.    Mr. Sebire, where did you grow up?

13   A.    So I grew up in France; hence, the accent.  Sorry about

14   that.  I grew up near a little town in Normandy called by

15   Bayeux.  Bayeux is what -- if you've seen Saving Private

16   Ryan, that is basically the area where I grew up.  So my home

17   is like 8 kilometers away from Omaha Beach where, as you can

18   see, the American troops landed in 1944.

19   Q.    Is Bayeux a large city?

20   A.    No.  It is quite small.  So actually the villa where I

21   was, was like 300 in that village.  I was living among crops

22   and cattle.  But Bayeux, the main town, the residents is

23   currently between 20,000 inhabitants.

24   Q.    Is that Bayeux?

25   A.    Yes, that's Bayeux.
```

```
 1    Q.    Mr. Sebire, did you come from a family of engineers?
 2    A.    Not at all.  So my dad was in construction, and my mom
 3    was a nurse in the hospital taking care of kids.
 4    Q.    Do you still live in the Normandy part of France today?
 5    A.    No.  I moved quite around in the world; and nowadays, I
 6    live in Tokyo.
 7    Q.    What brought you to Japan?
 8    A.    My wife.  So she is Japanese.
 9    Q.    Do you speak Japanese in addition to French?
10    A.    Little bit, yes.
11    Q.    Let's talk about your educational background.  Do you
12    have a high school or college education?
13    A.    Yes.  I have a high school diploma.  We call that the
14    baccalaureate in France, in science.  Then I went to
15    university to study for two years.  I think it is the
16    equivalent of a college degree in U.S.  And then I moved on
17    to engineering school to get an engineering degree, and then
18    that took me three years.
19    Q.    Is that about equivalent to having a master's degree in
20    engineering in the United States?
21    A.    Yes, I believe it is.
22    Q.    Why did you decide to become an engineer, Mr. Sebire?
23    A.    So that goes back to my childhood.  So when I was a kid,
24    I used to read a comedy called Leonardo, and it was about
25    Leonardo da Vinci.
```

```
 1        Picture it in a funny way.  He always invented crazy
 2   machines.  And so I remember reading these in my bedroom as a
 3   kid, and I decided I wanted to invent things.  So that's why,
 4   very young, I wanted to be an engineer.
 5   Q.   Did you do well in school?
 6   A.   Quite okay, yes.
 7   Q.   Did you graduate at the top of your class?
 8   A.   Most of the time, yes.
 9   Q.   Now, what was the name of the school where you went to
10   study engineering?
11   A.   So that was the ENSSAT.  That stands for École Nationale
12   Supérieure des Sciences Appliquées et de Technologie, which
13   means National School of Applied Science and Technology.
14   Q.   And sometime tonight we're going to have to spell that
15   one for the court reporter.
16        Why did you -- can we call it ENSSAT?
17   A.   You can call it.
18   Q.   Why did you select ENSSAT to study engineering?
19   A.   So there were, I think, three main reasons.  So the
20   first one was what they were teaching there, mostly
21   telecommunications, and that's something I was interested in.
22        Then I quite liked the campus.  So as you can see from
23   the picture, it was an old monastery converted into a school.
24   Almost looked like Harry Potter.  The library was very fancy.
25        And then the last reason was that I used to have an
```

1    uncle there -- or he still lives there.  He is a pharmacist.

2         So it was nice to have some family near the school

3    because that was away from where my parents lived.

4    Q.   Were you required to complete any work studies or

5    internships while in engineering school?

6    A.   Yes, that is correct.  So, at the end of a three-year

7    program, we had to spend some time in enterprise to work to

8    see if what we actually learned could be applied in real

9    life.

10   Q.   Where did you complete your engineering internship?

11   A.   So I went to Switzerland to work for Swatch, the company

12   that makes watches.

13   Q.   After you received your degree, did you just enter

14   straight into the corporate world?

15   A.   No, I did not.

16        So, at that time, France still had the mandatory

17   military service, so I had to spend one year in the Army.

18   Q.   What did you do in the Army?

19   A.   I -- so I was based in the south of France at the

20   beginning; and I spent one month studying basics, like

21   handling guns and fighting.

22        But after that, I was based near Paris in the military

23   police headquarters.

24   Q.   What was your rank in the French Army?

25   A.   I was a -- in English, that would be scientist of the

1  Army.

2  Q.   Did you have to apply for that role within the French

3  Army?

4  A.   Yes, I did, because there were only a few spots

5  available every year.

6  Q.   What kind of projects did you work on as a scientist in

7  the Army?

8  A.   So I was charged to develop communication software for

9  the French on the Pacific Ocean.

10  Q.   Did you receive awards for your military service, sir?

11  A.   Yes, I did.  I got a medal of the national defense.

12  Q.   After serving in the Army, did you go back and work for

13  that watch company, Swatch?

14  A.   I did get an offer from that company, but I decided that

15  I wanted to do something else.  So I applied to Nokia in

16  Finland.

17  Q.   And why did you apply to Nokia?

18  A.   I had to go back to my family.  So I had a brother, who

19  was one year and five days younger than me, and when he was 6

20  or 7, he jumped one weight, which means we have always been

21  together and looked like twins.

22      And so we went to the same school, same high school,

23  same university, that same engineering school.  And while I

24  was spending my time in Switzerland, he was working at Nokia.

25  And so he convinced me that I should have a go and have a

```
 1   try.

 2   Q.   What was your impression after meeting with Nokia?

 3   A.   I was quite impressed.  So I did like the city, so

 4   Helsinki.  I did like the people and the tasks they were

 5   suggesting me to do.

 6   Q.   Did you accept an offer from them?

 7   A.   Yeah.  I got an offer, and I accepted.

 8   Q.   What was your title when you first started?

 9   A.   I really don't remember.

10   Q.   Have you continued to work for Nokia throughout your

11   entire career?

12   A.   Yes, till this day.  So now it has been -- so I started

13   in July 1998, so almost 18 years.

14   Q.   And you've worked up through the years?

15   A.   Yes.

16   Q.   Let's talk a little bit about Nokia.  What does Nokia

17   do?

18   A.   So Nokia is quite old company.  I think it recently

19   celebrated its 150-year birthday.  It started with, I think,

20   toilet paper, rubber boots.  I think it is quite known for

21   the small phones to the public.  But it's also a company that

22   provides network equipment, and thus currently what I'm

23   working on.

24   Q.   So the network equipment, is that the behind-the-scenes

25   equipment that makes the telecommunications networks work?
```

1   A.   Yes.  So it's everything that you cannot see that makes

2   mobile communications possible.

3   Q.   Did you work on the cell phone side or on the networking

4   equipment side at Nokia?

5   A.   I was actually working in between, in the Nokia Research

6   Center.  So that was the corporate unit taking care of

7   research for both mobile phones and networks.

8   Q.   What were your primary responsibilities in your first

9   job at Nokia?

10  A.   In my first job at Nokia, I was actually working on

11  Edge, so worked on some GSM evolution for the American

12  market.

13  Q.   You mentioned GSM.  What is GSM?

14  A.   GSM stands for global system for mobile communications.

15  Q.   Was GSM meant to be a system that was kind of consistent

16  globally?

17  A.   Yes.  So it started in Europe, so there countries

18  gathered together to design a mobile phone system that would

19  allow the user to cross any countries and use their mobile

20  phones.

21  Q.   Was a global standard for cellular communications an

22  important goal?

23  A.   Yes, it was.  So it was important for the users so you

24  could travel around with a mobile phone.  It was also

25  important for the company so that you could benefit from a

1  communicative scale, and you could send your technology

2  anywhere in the world.

3  Q.   All right.  Now, we've heard of things like LTE or 3G.

4  Speaking of GSM, what G is that?  What generation?

5  A.   So GSM is actually 2G.  So the first digital mobile

6  communication system after 1G, which was analog.

7  Q.   Were you in Finland when you were working on the 2G or

8  GSM work?

9  A.   Yes, I was in Finland at the time.

10  Q.   Were you happy with the decision to work with Nokia?

11  A.   Excuse me?

12  Q.   Were you happy with the decision to work at Nokia?

13  A.   Yes, I was.  Still am.

14  Q.   Did your wife work for Nokia?

15  A.   At the beginning, no.  So Nokia had at that time an

16  exchange program to attract young talents from around the

17  world.  And so they went to Japan and asked her to join Nokia

18  for work in Finland.  So she came from Japan, and there we

19  met.

20  Q.   So how long did you work in Finland in your engineering

21  role for 2G?

22  A.   I worked in Finland for five-and-a-half years.

23  Q.   Did you transition to 3G?

24  A.   Yes.

25  Q.   And where did you go?

1   A.   I went to Asia then.

2   Q.   How long did you work on 3G?

3   A.   About three years.

4   Q.   And where did you go after that?

5   A.   After that, I worked on 4G, and I moved to Japan in

6   2006.

7   Q.   How did you get involved in 4G?

8   A.   (No response.)

9   Q.   How did you get involved in 4G?  In other words, what

10  did Nokia ask you to do on 4G?

11  A.   They asked me to take care of the user plane aspect.  So

12  that's the part of the -- what you say?  That's the part that

13  we take care of your user data to make sure that it's

14  transmitted.

15  Q.   Now, did you work with other companies as part of some

16  standards body?

17  A.   Sure, yes, all the time.

18  Q.   And what was that standards body?

19  A.   So the standards body is 3GPP, which stands for Third

20  Generation Partnership Program.

21  Q.   And what is the reference to RAN that we see on the

22  slide or RAN2?

23  A.   So within 3GPP, you have different groups.  You have

24  groups that take care of service aspects.  Groups that takes

25  care of security of -- I don't know -- legal aspects.  And

1    there is a group that takes care of the radio access network.

2    Q.    The radio access network?

3    A.    Yes.

4    Q.    Is that where you worked?

5    A.    Yes, that's where I work.

6    Q.    Now, being a participant in this 3GPP process, was that

7    an important opportunity for you?

8    A.    Yes.  So, of course, I like my -- the colleagues of my

9    own company, but I think it's quite interesting to see other

10   folks from other companies and try to discuss together.

11   Q.    Was there a specific aspect of the LTE standard that you

12   were involved in?

13   A.    Yes.  So, as I said earlier, I was especially involved

14   in the user plane aspects of LTE.

15   Q.    Did you have any special responsibilities with 3GPP in

16   addition to your roles as a delegate?

17   A.    Yes.  I was the Stage 2 rapporteur, so --

18   Q.    And is that -- are you -- is that just your accent

19   coming through, or is it actually a French word?

20   A.    No.  It is a French word.

21   Q.    What does the word "rapporteur" mean?

22   A.    It means to report.  So that's the person who's

23   responsible for a specification.  So 3GPP writes

24   specifications, and to each specification is assigned one

25   person; and in case of the overview of LTE, I was that

1   person.

2   Q.    You were the rapporteur for the overview of LTE?

3   A.    Yes.

4   Q.    Now, does that mean, because you're the rapporteur of

5   that portion of LTE, does that mean you get to just put

6   whatever you want into the standard?

7   A.    No, of course not.  So the role of the rapporteur is

8   strictly to capture the agreements of the meetings.  So,

9   after each meeting, we have a list of agreements, and the

10   rapporteur takes them into account and translates them into

11   specification text.

12       And during that process, what the rapporteur suggests is

13   always reviewed by his and her colleagues.  So anyone is free

14   to bring in changes or make any offerings.

15   Q.    So the things you draft as a rapporteur are peer

16   reviewed by the other members?

17   A.    Always, yes.

18   Q.    Are you still involved to this day?

19   A.    Still am, yes, the rapporteur of the Stage 2.

20   Q.    But are you still working on LTE that we already have or

21   something new?

22   A.    No.  In March of this year, I moved on to 5G.

23   Q.    So when will we get phones that are 5G and even faster?

24   A.    So the target is 2020 for the Tokyo release.

25   Q.    I made reference earlier to being a delegate to 3GPP.

1          What is the role of a delegate?

2   A.   So the role of the delegate is to represent his company

3   in 3GPP.

4   Q.   And is LTE one of the standards for which you were a

5   delegate and helped contribute?

6   A.   Yes.

7   Q.   Who are some of the other big players in developing LTE?

8   A.   So, as you can see on the screen, you also have Samsung,

9   Sharp, LG, NEC, and there's also a few others, like Ericsson.

10  Q.   So in addition to these companies and Ericsson, let me

11  ask you, what was Apple doing to help get LTE ready for its

12  initial release?

13  A.   So Apple was not at any 3GPP run meetings at the time.

14  Q.   Now, the companies that are on this slide, are these

15  some of the companies we saw in opening that had licenses to

16  your patent?

17  A.   I believe, yes.

18  Q.   I want to embarrass you a little bit.  Have you been

19  recognized in the standard setting industry for your work in

20  3GPP?

21  A.   Yes.  In 2009, I was elected vice chairman of RAN2.

22  Q.   Will you do me a favor?  I just got word that maybe we

23  need to pull the microphone just a tiny bit closer or else

24  speak up just a little bit.  Thank you.

25          Now, I didn't mean to cut you off there.  I'm sorry.

1    You said you got elected what?

2    A.   Vice chairman of RAN2, so the group I attend.

3    Q.   Right.  And that was conducted as a vote of whom?  Who

4    voted?

5    A.   Who voted?  All the companies attending 3GPP.  So I

6    don't know, 50, 100 different votes.

7    Q.   Now, besides being recognized by the industry for your

8    work, have you been recognized internally at NSN for your

9    work on the standards?

10   A.   Yes.  So I got a few awards internally.  I was

11   recognized as what they call talent.  I also got a few awards

12   regarding the inventions I contributed to 3GPP, so inventor

13   of the year.

14   Q.   Have you been promoted through NSN over the years?

15   A.   Yes.  I have different titles, different job grades, and

16   nowadays, I manage the RAN2 team, which is a -- consists of

17   13 delegates, as the head of the delegation for Nokia in

18   RAN2.

19   Q.   The head of the company's delegation to the meetings?

20   A.   Yes.

21   Q.   Getting back to RAN2 Working Group, you mentioned that

22   the working group has meetings to work on the standard.

23        Where do those meetings take place?

24   A.   We meet almost everywhere in the northern hemisphere.

25   So it could be U.S., Asia, Japan, Korea, Europe.

1    Q.    How often do those meetings occur?

2    A.    It depends on the years.  Between six and eight regular

3    meetings; and in addition to that, from time to time, we have

4    ad hoc meetings when we want to discuss specific topics.

5    Q.    So it's six to eight regular meetings and then

6    additional ad hoc meetings?

7    A.    Yes.

8    Q.    Altogether, about how many 3GPP meetings have you

9    attended?

10   A.    Since 2000, about 200 meetings.

11   Q.    Is that a lot compared to other delegates?

12   A.    I think I'm the most experienced guy in the room

13   usually.

14   Q.    Now, do the delegates all meet in the same room

15   together?

16   A.    Usually when we start the meeting, yes.  We are all

17   together in the same room, and then we break into different

18   sessions so that we can progress the work faster.

19   Q.    Is there work that is done leading up to each meeting?

20   A.    Yes.  We prepare documents for the meeting, so we have

21   to know that every meeting, we usually handle around between

22   600 and 1,000 different documents.  So to give enough time

23   for people to review, we have a submission deadline, which is

24   usually one week before the meeting.  So before the meeting,

25   there's a lot of preparation work.

1    Q.   Now, are those proposals circulated to the other members

2    before every meeting?

3    A.   Yes.  All of the agreements are available on the public

4    FTP website.  So you have to upload the documents for them to

5    be available to everyone.

6         In addition to that, there can be what we call offline

7    discussions between a subset of companies to try to progress

8    different issues.

9    Q.   Now, I want to get off topic for just a second.  Were

10   you here for opening?

11   A.   I was, yes.

12   Q.   Did you hear Apple's lawyer, as I understand it, accuse

13   you of taking ideas that came from a group in a meeting and

14   claiming that they were your ideas for this patent?

15   A.   Yes, I heard.

16   Q.   How does that make you feel?

17   A.   Not good.

18   Q.   Do you agree with him?

19   A.   No.

20   Q.   Have you ever done that, Mr. Sebire?

21   A.   No, I haven't.

22   Q.   What kind of relationship do you have with the folks

23   that you work with?

24   A.   I think I'm quite well-respected, and people usually

25   like me.

1    Q.    Okay.   Outside of this courtroom, has anyone accused you

2    of that?

3    A.    Never.

4    Q.    Now, when you were first asked to show up and go to a

5    meeting where you would say, hey, Samsung here's a real good

6    idea I had over the weekend, did that seem weird to you, that

7    you would tell your competitors?

8    A.    Well, no, because the goal of every company who goes to

9    these meetings is to get the best possible specification.   So

10   it is in the interest of everyone to share ideas so that we

11   hopefully can select always the best one and end up with the

12   best possible specification.

13   Q.    And if your goal is to submit -- to get the best idea,

14   do you reject an idea from the standard if it's an idea that

15   Ericsson came up with or Samsung came up with?

16   A.    No, of course not.   We only judge ideas based on their

17   technical merits.

18   Q.    Now, what if you found out that Ericsson had filed a

19   patent on an idea?   Would you then reject it so you didn't

20   have to deal with Ericsson's patent?

21   A.    No.   I wouldn't care.

22   Q.    When Ericsson comes to these meetings, do they tell you

23   about their patents?

24   A.    No, of course not.

25   Q.    Why not?

A.   No one does that in 3GPP.  I mean, I've been attending

for almost 20 years, and I've never seen anybody saying they

have a patent.

Q.   And is there a reason why discussions about patents are

kept to the side in 3GPP meetings?

A.   Yes.  It goes back to what I was saying earlier.  So

really the goal is to develop the best technical solution,

and we should only judge ideas based on their technical

merits, not based on who owns what.

Q.   Has the group ever judged ideas based on their technical

merits and then voted your ideas into the LTE standard?

A.   Yes, of course, quite a few times.

Q.   Now, if you go and propose an idea, do you get to just

slide it in the standard, or is there some sort of discussion

about it?

A.   So the way the discussion goes in 3GPP meetings, or at

least the one I attend, is that the chairman would share a

screen and pull out all the proposals from a given

contributional document.

     So you can see the proposal on the screen, and then we

will discuss this proposal one by one.  And the chairman will

ask if the proposals can be agreed; and if no one says they

cannot, then they are agreed.

     And sometimes they are; sometimes we discuss them, and

they are not.  Sometimes they are rejected.  Sometimes it

1    takes 30 seconds to agree.  Sometimes it takes two hours, and

2    we disagree.

3    Q.    Can other companies stand up and say:  Wait a minute;

4    that's not your idea; that's my idea?  Could they say that?

5    A.    They could, yes.

6    Q.    Has that ever happened in meetings?

7    A.    Never.

8    Q.    Do people take credit for other ideas in these meetings,

9    in your experience?

10   A.    Not that I'm aware of.

11   Q.    What would it do to your relationship if you were just

12   making a habit of taking people's ideas back in the 2007-2008

13   time frame like Apple is accusing you of?

14   A.    You would lose all credibility.  And you have to

15   understand that these are a roomful of engineers, so maybe

16   not the best -- easiest people to deal with.

17   Q.    Are you proud of the fact that they have incorporated

18   your ideas into the patent?

19   A.    Yes, I am.

20   Q.    I'm sorry.  I misspoke.  Are you proud of the idea that

21   they have incorporated your ideas into the standard?

22   A.    Yes, I am.

23   Q.    Now, since you go to a meeting and you might teach your

24   idea to a competitor, does your company do something to

25   protect its investment in the ideas that you came up with?

1   A.   Yes, of course.  So when a company like mine spends so

2   much money in R&D, I think it's quite logical for my company

3   to try to protect the idea we come up with and to file

4   patents.

5   Q.   They file patent applications?

6   A.   Yes, patent applications.

7   Q.   And do the other people participating and contributing

8   ideas file patent applications?

9   A.   Yes.  That's a well-known, unspoken rule.

10  Q.   When one of your inventions is important enough for you

11  to apply for a patent and if a patent issues, who then owns

12  the patent?

13  A.   My employer.

14  Q.   Mr. Sebire, we're going to get to the technical side of

15  your invention here shortly.  Can you tell the jury, though,

16  first when you had the idea for the invention that became the

17  '820 patent?

18  A.   Yes.  So it was in the fall of 2007.

19  Q.   Had you and the group been working on any particular set

20  of problems before you had your idea?

21  A.   Yes.  We were working on the scheduling information in

22  general, including buffer status reports.

23  Q.   And what were the companies that were working on this

24  set of problems beforehand?

25  A.   So there was at least Qualcomm, Ericsson, DoCoMo,

1   Samsung, and Nokia and NSN.

2   Q.   All right.   What is the document that we're seeing on

3   the screen, sir?

4   A.   So this is a joint document from Meeting No. 60.   That

5   meeting took place in Korea, November 2007, between the 5th

6   and 9th.

7        Do you want me to walk through the headers to explain?

8   Q.   Not just yet.   I think we may go through it in more

9   detail throughout.

10       Is this an example of what a contribution paper looks

11  like for a contribution to 3GPP?

12  A.   Yes.   It's a typical example.

13  Q.   All right.   Now, let's just take a look at how these

14  things are -- well, let me just ask you, what kinds of

15  information might be in a technical proposal like this one?

16  A.   So the top part of the document is always the same.   So

17  on the top left, you have the meeting number and the location

18  and the date.

19       Top right, you can find the contribution number or

20  document number.   So you have R2.   This means that this is a

21  document that was submitted to 3GPP RAN Working Group No. 2.

22  So this is a group I attend.

23       Then you have 07.   That describes the year.   And then

24  you have the four-digit number that uniquely identifies the

25  contribution.

1   Q.   Did you see in the opening when Apple had a slide with,

2   like, three documents lined up?  Do you remember that,

3   towards the end of their opening?

4   A.   Yes.

5   Q.   And did you see the header that said The Ericsson

6   Document?

7   A.   Yes, I saw that.

8   Q.   Sir, is it an accurate characterization to call this The

9   Ericsson Document?

10   A.   No.  I think it came from the fact that we have the

11   company names in alphabetical order.  But this is a Nokia

12   document.

13   Q.   Who wrote this?

14   A.   I did.

15   Q.   Okay.  Now, are you the one that put the names in

16   alphabetical order?

17   A.   Yes.

18   Q.   If this document were filed today, what company would be

19   in first order -- first in the order?

20   A.   So today it would be a Nokia document.

21   Q.   And why is that, Mr. Sebire?

22   A.   So now we have a new rule that the main editor of the

23   document has to be listed first to avoid these kind of

24   problems.

25   Q.   And in the past, it was done in alphabetical order?

1    A.   In the past, we always had a gentleman's agreement to

2    have alphabetical order.

3    Q.   All right.  And what is this R2-074682 in the corner,

4    the number on the top right corner?

5    A.   I think I just explained that.

6    Q.   Okay.  I'm sorry.  How did -- okay.  Let me ask it a

7    different way.  That was ambiguous.

8         How did that number come about so that it could be

9    included on the document?

10   A.   Yes.  So to get this number, you have to ask the 3GPP

11   secretary to allocate you the number.

12   Q.   And I assume, if we go look at the records, it will show

13   that Ericsson is the one who requested that number; is that

14   right?

15   A.   No, no.  It will show that I requested the number.

16   Q.   On behalf of Nokia Siemens Networks?

17   A.   Yes.

18   Q.   So, in this instance, why is -- why are there more than

19   one company that are listed?

20   A.   So, in this instance, it just reflects the fact that all

21   of these companies, we worked together to write this.

22   Q.   Now, this proposal, 074682, does this reflect your

23   invention that was claimed in the '820 patent?

24   A.   No, it doesn't.

25   Q.   Did your invention come about around the same time of

1    this proposal?

2    A.    Yes, it did.

3    Q.    When you had your invention, did you file for a patent

4    application?

5    A.    Yes.

6    Q.    Now, the official filing date of the application is

7    November 5th, 2007.  Do you recall that?

8    A.    I recall that, yes.

9    Q.    So your idea -- did you have your idea some number of

10   days or so before that?

11   A.    Yes, probably one week or two.

12   Q.    Now, was a patent application filed in the United States

13   for a United States patent?

14   A.    Yes, it was.

15   Q.    If you were traveling all around the world working on

16   the standards, working on the cell phone systems, and your

17   company was in Finland, why is it that your application was

18   filed in the United States?

19   A.    So we usually file in the U.S. because it's an important

20   market for us.

21   Q.    Now, does a patent application -- or I'm sorry.  Did

22   your patent application have information in it describing the

23   new idea?

24   A.    Yes, of course.

25   Q.    Did it also have information as background information

1    or contextual information separately?

2    A.    Yes.

3    Q.    Is that typical in your experience?

4    A.    It's very common, yes.

5    Q.    Can you give us an example of why?

6    A.    So, for instance, if you want to invent some headlights

7    for a car that swivel together with a chainwheel, so first

8    you describe what the car is, what you do with the

9    chainwheel, why you have lights, and then at the end, you

10   describe your invention.  But you always first need to

11   describe the context.

12   Q.    After you had your idea, did you submit it as a Nokia

13   submission to your group that you were working with?

14   A.    Yes.  So, after I had my idea and filed a patent

15   application, I submitted the idea to that next meeting, which

16   you can see on the screen.

17   Q.    And is the idea that you put in your patent application

18   reflected at R2-080015?

19   A.    Yes.  That's the contribution we made.

20   Q.    And that's DTX-567?

21   A.    Yes.

22   Q.    What is the title of this document, and what does it

23   signify?

24   A.    So the title is Criteria for Short and Long BSR, so it

25   describes basically the invention, so how to select long and

1    short.

2    Q.    Mr. Sebire, are you claiming or are you telling this

3    jury that you were the first person to think up BSR or buffer

4    status reports?

5    A.    No, I am not.

6    Q.    Are you claiming in your patent that you invented having

7    long and short BSRs?

8    A.    No, I am not.

9    Q.    We heard something in opening about this concept of

10   triggering.   What is triggering a BSR?

11   A.    So triggering is to know when you need to send it.

12   Q.    Are you here telling this jury that what you claimed in

13   your patent is triggering a BSR?

14   A.    No.

15   Q.    Now, just at a high level, how is the concept of

16   triggering different from what you put in your disclosure as

17   a criteria for short and long BSR?

18   A.    So triggering is to decide when to send.   Selection

19   criteria has to decide what to send.   So these are different

20   things.

21   Q.    Did you end up presenting this -- in addition to filing

22   the papers with your Working Group on it, did you present it

23   to your colleagues in the group?

24   A.    Yes.   So I presented it at this Meeting No. 60b, which

25   took place in Spain, and it was agreed.

1   Q.   So when we see here on the page, it says 60bis, is that

2   Latin for 60b?

3   A.   Yes.  That means No. 2.

4   Q.   Did other folks have contributions that they also

5   presented at the same meeting?

6   A.   Yes, they did.

7   Q.   Had those been circulated in papers beforehand?

8   A.   Yes.

9   Q.   Was each proposal just sort of accepted?

10   A.   No, of course not.

11   Q.   So how did that go, the discussions?

12   A.   Can you repeat that?

13   Q.   Yes.  How did the discussions go about the proposals

14   that were pending for 60b?

15   A.   So, as I mentioned earlier, proposals are always

16   discussed during the meeting and either agreed, rejected, or

17   postponed.  For that particular contribution describing my

18   ideas, they were agreed in 30 seconds.

19   Q.   And are there public records where we could look to see

20   if it was agreed or not?

21   A.   Yes, of course.  So all the meeting minutes of all the

22   meetings are always available.

23   Q.   Were Ericsson folks at this meeting?

24   A.   Yes.

25   Q.   Samsung folks?

1   A.    Yes.

2   Q.    NTT DoCoMo?

3   A.    Yes.

4   Q.    All those folks that we saw on the joint proposal

5   earlier, did they have representatives at the meeting?

6   A.    Yes, of course.

7   Q.    Now, how many of them stood up and said:  Wait a minute;

8   that is not a Nokia contribution; that is our joint idea, or

9   that is my idea?

10  A.    No one.

11  Q.    Did the group reject it?

12  A.    No.  The group agreed.

13  Q.    Was it unanimous?

14  A.    Yes.

15  Q.    Were there other proposals at that meeting that were

16  rejected, sir?

17  A.    Yes.

18  Q.    Let's learn a little bit more about the details of your

19  invention.  You have some slides prepared to kind of help us

20  with some cellular concepts that we need to know?

21  A.    Yes.  We did design some slides.

22  Q.    All right.  What are we looking at here, Mr. Sebire?

23  A.    So we are basically looking at what -- RAN.  So what a

24  radio access network is taking care of, and that consists of,

25  on one side, the user equipment that we call UE and on the

1   other side the base station.

2   Q.    Did you make up the name "user equipment" and "base

3   station" for the slides?

4   A.    No, I did not.  So those are names we use in the

5   specifications.

6   Q.    So -- well, give us some examples of what user equipment

7   might be.

8   A.    So user equipment is anything that can communicate with

9   a network.  So it can be a mobile phone.  It can be a PC, a

10  tablet, or a smart watch.

11  Q.    And what's a base station?

12  A.    So the base station is the entry point to the network.

13  So that's the first thing the data will meet while entering

14  the network.

15  Q.    What does a base station do?

16  A.    Quite many things, but the main role of the base station

17  is to manage the radio resources.

18  Q.    Is there some process that is the name of the name of

19  the process by which the base station manages when phones can

20  send stuff to it?

21  A.    Yes.  So it is called UL scheduler.  So UL, you can see

22  because the phone is down, and the network is up, so, you

23  know...

24  Q.    And then you said it's an uplink scheduler?

25  A.    Yes.

1    Q.    What is scheduling in this context?

2    A.    So scheduler means -- or scheduling means allocating

3    resources to different units.  So you have to share the time

4    between the different user equipment.

5    Q.    Is scheduling important in the cellular system?

6    A.    Yes.  It's essential, because that's the one thing that

7    takes care of radio resources.

8    Q.    Now, why is scheduling important?

9    A.    It's important because the spectrum is very specific,

10   and it is a scarce resource.

11   Q.    Do you mean the radio spectrum?

12   A.    Radio spectrum, yes.

13   Q.    Why is radio spectrum a scarce resource, and how does

14   that impact the scheduling?

15   A.    So the spectrum is limited, and it's basically allocated

16   by chunks to -- for different users.  So we have a chunk for

17   police stations, one chunk for TV, one chunk for the Army,

18   and you have one chunk dedicated to your cellular

19   communications.

20        And that chunk then is divided into small pieces, and

21   each piece is given or sold to the operators, like AT&T or

22   Verizon.

23   Q.    A portion of the spectrum is sold to the operators?

24   A.    Yes.

25   Q.    And I'm guessing it's not a problem if there's just one

1   phone, right?

2   A.   It's not a problem if you only have one phone.

3   Q.   But what starts happening is you increase the number of

4   phones.

5   A.   So you can see the spectrum as a pipe of fixed diameter,

6   and the more phones you put, the more you have to divide the

7   pipe.  And you can see here on the picture that when you have

8   three phones, you have to divide the pipe into three pieces.

9   Q.   Can you just keep expanding the pipe and make it bigger?

10  A.   No.  The pipe is fixed.

11  Q.   So does the concept stay true if you get to a much

12  larger number of phones?

13  A.   Yes, it does.  So the more phones you have, the more you

14  have to divide.

15  Q.   Now, can you give us an example of how knowing this

16  uplink scheduling information helps the base station make

17  efficient decisions about the radio spectrum?

18  A.   Sure.  So different services have different

19  requirements.  So for a phone call, you need to be able to

20  send one speech frame -- you need to be able to send a speech

21  frame 50 times a second, and you cannot change that.

22       Otherwise, the quality of the call will degrade

23  dramatically.

24       On the other hand, for data, like Facebook updates, you

25  can wait half a second or a second.  That will not annoy the

1    user.

2    Q.   So is this decision-making process happening like really

3    quick, many --

4    A.   Yes, very quick.

5    Q.   -- hundreds of thousands of times a second?

6    A.   Yes.

7    Q.   And what are we seeing here, Mr. Sebire?

8    A.   So here we are seeing the voice users sending their

9    voice frame regularly.

10   Q.   And can that stop when somebody has, say, a Facebook

11   update to send?

12   A.   No.  That cannot stop, so the Facebook update has to

13   wait until there is some space.

14   Q.   Now, what might happen if all data was treated with the

15   same level of priority?

16   A.   So, if you did that, you may not be able to make a phone

17   call at all.

18   Q.   Going back to the idea of scheduling, what does

19   scheduling have to do with the radio frequency spectrum?

20   A.   So the scheduler will decide who uses when, so which

21   user, which UE will send data when.

22   Q.   So does a phone need to notify the base station of what

23   kind of information it has?

24   A.   Yes.  So to help the scheduler in doing that, the user

25   equipment has to give some information.

```
 1   Q.   And then how does the uplink scheduler use that

 2   information?

 3   A.   The uplink scheduler uses that information to know the

 4   requirements of each mobile station of each UE and will then

 5   allocate resources to make sure that as many users are happy

 6   as possible.

 7   Q.   I count myself in the minority that does not have a

 8   Facebook account; but if I did and I were going to actually

 9   send an update, is there someplace where that data sits on my

10   phone just before it's sent out to the tower?

11   A.   Yes.  So the UE will have some buffers.  So buffers are

12   used to store the data you need to send before it is actually

13   sent.

14   Q.   And what is a buffer then?  It's just a -- it's a memory

15   in the phone?

16   A.   Yes.  You can see that as a memory.

17   Q.   Does the phone need to prioritize some kinds of

18   information over others for the reasons you've explained?

19   A.   Yes.  So for the reason I explained, you have typically

20   eight different pipes.

21   Q.   And using the terminology from your invention from the

22   standard, what are these pipes called?

23   A.   So we call these pipes radio bearers.

24   Q.   What is -- what is a radio bearer?

25   A.   Say, it's a pipe with a given quality of service or with
```

1  a set of requirements.

2  Q.   And the quality of service concept, help us understand

3  that a little bit.  What do you mean by referring to

4  different data that has different quality of service

5  requirements?

6  A.   So if you go back to the example we had before, the

7  voice has a very different requirement from Facebook update.

8      So you will typically have to distinguish these within

9  the user equipment.  That is the reason why you will use a

10  different radio bearers.

11 Q.   Are there times when a phone might have different radio

12 bearers active at the same time?

13 A.   Yes.  So in the example here you can see there's a data

14 waiting for a voice call.  You have data waiting for e-mail

15 and Facebook.

16 Q.   Now, is this just sort of an illustration of what it

17 looks like for data to be sitting in the buffers waiting to

18 be sent?

19 A.   Yes, it is.

20 Q.   Assuming that this illustration, we're working off of

21 that, is the phone going to send a status report for each one

22 of those buffers?

23 A.   No.  So, that would increase overhead too much.  So

24 overhead is the part of the data that is transmitted that is

25 not user data.  So for the user it's useless.  And there is

1    always an interest to reduce overhead.  And so to do that in

2    3GPP we agreed to have these logical channel groups.

3    Q.   I'd like to talk a little bit about this overhead

4    concept a minute.  You helped out there.  We understand that

5    there is data waiting to be sent for a phone call, and then

6    there's data waiting to be sent for an e-mail, and data

7    waiting to be sent for the -- for the Facebook update.  Are

8    you with me?

9    A.   Yes.

10   Q.   Is that the overhead you're talking about, or are you

11   talking about other administrative data?

12   A.   I'm talking about the other part.

13   Q.   And so why is it important to reduce overhead?

14   A.   Because it's -- the less overhead you have, the more

15   space you can free for user data.  So you can then increase

16   the speed for the user.  The less overhead you have, the less

17   power you need to consume, so that makes the phone last

18   longer.

19   Q.   The battery?

20   A.   The battery, yes.  And the less overhead you have, the

21   more coverage you could get.  So that allows you to go to the

22   baseband and still make phone calls.

23        And, finally, the less overhead you have, the more

24   capacity you have so you can fit more users together.

25   Q.   How many logical channel groups are there?

1    A.    There are four.

2    Q.    And then how does a buffer status report make use of

3    these four logical channel groups?

4    A.    So the buffer status report then will report the content

5    of four logical channel groups.

6    Q.    And at a high level, once the tower base station

7    receives a report of what's waiting, how does the tower use

8    that information?

9    A.    So after receiving the report, the tower is able to tell

10   what the UE has to send.  And so it is available to look at

11   resources.

12   Q.    Let's talk a little bit about different types of buffer

13   status report.  What types are there?

14   A.    So we have three types of BSR defining, typically.  We

15   have regular BSR, we have periodic BSR, then we have padding

16   BSRs.

17   Q.    What is a regular BSR?

18   A.    So a regular BSR will be triggered when new data

19   arrives.  So when you start a phone call you will have a

20   regular BSR.

21   Q.    To get back to this point we made earlier, are you

22   claiming that this triggering is your invention?

23   A.    No, I am not.

24   Q.    Have you ever claimed that is your invention for the

25   '820 patent?

1    A.    I haven't.

2    Q.    Now, what is a periodic BSR?

3    A.    So periodic BSR will tell periodically -- periodically

4    to the scheduler how much data is sitting in the buffer.  So

5    you can tell the user equipment to send this BSR, for

6    instance, every half a second.

7    Q.    Have you ever claimed that that triggering was your

8    invention, sir?

9    A.    No, of course not.

10   Q.    And finally, what is a padding BSR?

11   A.    So this is a special case where you get uplink grant so

12   you get space to transmit your data.  But what you agree to

13   send is smaller so you have space that is remaining that is

14   not used.  So instead of wasting it, we will send a padding

15   BSR that we tell the base station that I have nothing more to

16   send.  You can stop giving me your sources.

17   Q.    So if you have -- if the phone was allocated this much

18   space (indicating) for ones and zeros?

19   A.    For instance.

20   Q.    And the Facebook update took up this many ones and zeros

21   (indicating)?

22   A.    Yes.

23   Q.    What would you normally do with the extra space you

24   were -- you were told you could have?

25   A.    Just fill it with padding.

1    Q.   Padding?

2    A.   Yes.

3    Q.   Throwing zeros in there, something that is meaningless?

4    A.   Yes.

5    Q.   And so what is the concept -- in that view, what would

6    the padding BSR be?

7    A.   It will tell that there's nothing more in the buffer.

8    Q.   Now, BSRs existed before your invention, correct?

9    A.   Correct.

10   Q.   How can buffer status reports be formatted, sir?

11   A.   So in 2007, the fall, we agreed that we should have a

12   long and short BSR.  So, long is BSR format that will report

13   the content of the four logical channel groups that we saw

14   earlier.  So you reindicate four different logical channel

15   groups.  The short one is a BSR that only indicates one of

16   them.

17        And, finally, the truncated one is a special case.  And

18   it's related to the padding we discussed earlier.  So you

19   have padding.  You still have data to transmit, but you don't

20   have enough room to transmit a long one.  So the padding is

21   too small for you to do that.  So you send a short with some

22   indication that's the truncated BSR.

23   Q.   Now, are short and long buffer status reports mentioned

24   in that joint proposal that Apple showed you?

25   A.   Long and short --

1   Q.   Buffer status reports.

2   A.   -- are mentioned, yes.

3   Q.   Now, are you claiming -- did you put in your '820 patent

4   claim that you invented long and short BSRs?

5   A.   No, I have not.

6   Q.   Have you ever claimed to be the inventor of the long and

7   short BSRs?

8   A.   No, I haven't.

9   Q.   So where does your invention fit into all of this?

10   A.   So my invention fits in the actual selection of the --

11   these BSR formats.

12   Q.   After you already know there might be longs and there

13   might be shorts?

14   A.   Yes.  So after I read the trigger you need to be able to

15   tell which format you are going to send.

16   Q.   Did your invention improve over the kind of buffer

17   status reporting that existed in the older standard, the 3G

18   standard?

19   A.   Yes.  So in 3G we only had one format, which was quite

20   big.  So we wanted to improve that.

21   Q.   But you didn't invent just long and short buffer status

22   reports, right?

23   A.   Right.

24   Q.   So how was your invention an improvement?

25   A.   To allow us to send a long when we need it.  So, for

1    instance, when we had these multiple applications running, so

2    voice call, Facebook.  And it will reduce -- it allows us to

3    reduce our overhead whenever we can by sending the short.

4    Q.   Plaintiff's Exhibit 256 is on the screen.  Is that your

5    provisional patent application?

6    A.   Yes, it is.

7    Q.   Did you map out an illustration of how the criteria

8    would operate?

9    A.   Yes.

10   Q.   I'd like to show the jury that figure.

11            MR. CALDWELL:  Your Honor, may I use the foam

12   board?

13            THE COURT:  Yes.

14   Q.   (By Mr. Caldwell) I'd like to just walk through this

15   flowchart that was in your provisional application.  Is that

16   all right?

17   A.   Sure.

18   Q.   Perhaps a silly question, but where should we start?

19   A.   We should start at the top where it says "start."

20   Q.   What is the very first step mapped out?

21   A.   So the first thing you need is to monitor the buffers to

22   see if there is something in it.

23   Q.   And I don't mean to make the jury put their heads on a

24   swivel.  We'll follow it on the -- on the foam board, but it

25   will also be on the screen.

```
 1              So what is --
 2              COURT SECURITY OFFICER:  Judge, would you like me
 3    to give him a microphone?
 4              MR. CALDWELL:  I can try and speak up if that will
 5    help.  I don't know...
 6              THE COURT:  I'm getting you okay.  But,
 7    Mr. Caldwell, if we have trouble, we've got a mic we can hand
 8    you, too.
 9              MR. CALDWELL:  Can everyone hear me okay?
10    Q.   (By Mr. Caldwell) What is -- on a flowchart like this,
11    what is the significance of a rectangular box like monitor
12    buffers?
13    A.   So the rectangle box is an action, something you do.
14    Q.   Now, right after the rectangular box of monitor the
15    buffers, there's this diamond shape.  First of all, what is
16    the diamond shape?
17    A.   The diamond is a test.  So you are checking for
18    something.
19    Q.   And the first test says:  Data in at least one buffer,
20    question mark?
21    A.   Yes.
22    Q.   What does that mean?
23    A.   It means that you have to check if you have data in at
24    least one buffer.
25    Q.   And if the answer is "no," what happens?
```

1  A.    If the answer is "no," you follow the arrow that says

2  "no" on the right, and you go back to monitor the buffers.

3  Q.    Now, if the answer is "yes," what happens?

4  A.    If the answer is "yes," you go down and you proceed to

5  the next test.

6  Q.    So we know from the "yes" that there is data in at least

7  one buffer, correct?

8  A.    Correct.

9  Q.    What are we checking in the second diamond?

10  A.    In the second diamond we are checking if there is data

11  in multiple buffers.

12  Q.    And if the answer is "no" to that question --

13  A.    In that case you will go on the right side following the

14  arrow that says "no," and you will designate the short

15  format, and you will send that short format and reach the

16  end.

17  Q.    So as that -- as the result of there not being data in

18  multiple buffers, you end up sending the short format?

19  A.    Yes.

20  Q.    If at the decision point of is there data in multiple

21  buffers you say "yes," what happens next, at the next

22  diamond?

23  A.    So in the next diamond, No. 440, you will check if you

24  have enough capacity to send this long format.

25  Q.    And, sir, if you do have enough capacity to send the

1    long format, what happens?

2    A.    In that case you will send the long format.  And you can

3    choose the long -- select the long format and send it.

4    Q.    Now, if we go back to that same decision point, we know

5    we have data in at least one buffer, and we know we have data

6    in multiple buffers.  But then there is not capacity for a

7    long format.  What happens?

8    A.    In that case you will first check the buffer priority.

9    Q.    Let me stop you there.  What does that mean?

10   A.    So it means that you will look in the corresponding

11   priority of the data.  So, for instance, if you have Facebook

12   and phone call waiting, you will select the voice call

13   because it's typically more important.

14   Q.    In our example the voice call is of a higher priority

15   than the Facebook update?

16   A.    Yes, correct.

17   Q.    All right.  And once you've determined the priority of

18   the information that's waiting in a buffer, you don't have

19   enough room for a long, what happens?

20   A.    Then you will designate the short format and report the

21   buffer status report at high priority and, finally, send the

22   short format.

23   Q.    Can this also be represented as -- let me just ask a

24   different question.

25        Can the decision process that you just explained to us,

1   the criteria, also be represented in written words as opposed

2   to a flowchart like this?

3   A.    Yes, of course.

4   Q.    Was this decision process, this criteria analysis,

5   depicted in the joint reports that came from before your

6   invention?

7   A.    No.   Nowhere.

8   Q.    Had you ever seen somebody else in your group come up

9   with it?

10  A.    No, I haven't.

11  Q.    Did -- has anyone since said that they came up with it

12  before?

13  A.    No.   No one has said that.

14  Q.    Did you ever see it proposed to 3GPP, whether in a small

15  group meeting or in the big group meeting, before when you

16  proposed it in that second proposal after the joint meeting?

17  A.    No.

18  Q.    And you put this flowchart in your patent application,

19  didn't you, sir?

20  A.    Yes, I did.

21  Q.    Did you also describe it in words in your patent

22  application?

23  A.    Yes, I did.

24  Q.    And did you describe it in words to your colleagues in

25  your proposal 80015?

1    A.    Yes, in that contribution, yes.

2    Q.    If you were to summarize the key steps to your

3    invention, what would they be?

4    A.    So they would be four steps.   The first one consists in

5    monitoring the buffer.   The second one is to check whether

6    there is data in zero, one, or multiple buffers.   Then you

7    will choose the format based on that check, and you will also

8    have to ensure that there is sufficient space in the uplink

9    grant.

10   Q.    And just so that there's no doubt, your -- we -- the

11   jury will still be asked to look at the patent claims of the

12   issued patent, correct?

13   A.    I don't know.   Yes, I guess.

14   Q.    That's not your role here --

15   A.    Yes.

16   Q.    -- is it, sir?

17        Now, Mr. Sebire, was this incorporated into LTE?

18   A.    Yes, it was.

19   Q.    And how do we know that?

20   A.    You have to check the specifications to -- to know that.

21   Q.    And where can we find it in the specifications for 3GPP?

22   A.    So you will have to look into specification No. 36.321.

23   Q.    Now, asking about specification 36.321, were you the

24   rapporteur for that specification?

25   A.    No, I wasn't.

1   Q.   And so is there someone else that documents the

2   contributions in that one?  In that specification?

3   A.   Say that again.

4   Q.   Sure.

5        You had the role of rapporteur in 36.300, right?

6   A.   Yes.

7   Q.   Is there somebody who had that corresponding role for

8   36.321?

9   A.   Yes.  I believe it is Mr. Stattin.

10  Q.   Okay.  A gentleman from Ericsson?

11  A.   Yes.

12  Q.   Now, what are we seeing in this portion that's shown on

13  the screen of PX-149?

14  A.   Yeah, so this is the section of that specification

15  dealing with buffer status report.

16  Q.   There was some reference in Apple's opening, and I

17  sincerely don't mean to misquote it, but there was some

18  suggestion that we were here trying to take credit for all of

19  LTE, or something of that nature.

20       And again, I don't mean to misquote it, but if there is

21  any doubt, are you saying that you invented LTE or that

22  your -- your patent covers all of LTE?

23  A.   No, of course not.

24  Q.   Have you ever said that?

25  A.   No.

1  Q.   If a phone is operating on LTE, is it making use of your

2  invention?

3  A.   Yes.  Anything -- any device or base station that uses

4  LTE technology has to use my invention.

5  Q.   Do you believe the criteria that you came up with for

6  determining BSR formats is a reason why LTE is successful and

7  improved on prior standards?

8  A.   Yeah.  I believe it is one of the reasons, yes.

9  Q.   For the reasons you mentioned earlier?

10 A.   Yes.

11 Q.   Okay.  Battery life?

12 A.   So speed, battery life, coverage, capacity.

13 Q.   Mr. Sebire, did the United States Patent Office

14 eventually grant you a patent on your invention?

15 A.   Yes.  I have it here.

16 Q.   How does it feel to get the patent awarded?

17 A.   It feels nice.  I actually never had one before.

18 Q.   You never had the -- the printed copy of it?

19 A.   No.  I never had the -- this printed copy with the --

20 Q.   Does that normally go -- go back to the home office?

21 A.   Yeah.  It goes back to my company.

22 Q.   How does it make you feel to know that so many phones

23 are using inventions you contribute?

24 A.   Well, it makes me feel quite proud knowing that every

25 phone on planet Earth is using my invention.

```
 1              MR. CALDWELL:  I'll pass the witness.

 2              THE COURT:  Cross-examination.

 3              Mr. Lumish, we're going to go for about a

 4  half-hour, so if we get to a good stopping point around that

 5  time, if you will just let me know?

 6              MR. LUMISH:  Thank you, your Honor.  I will.

 7              THE COURT:  Thank you.

 8                        CROSS-EXAMINATION

 9  BY MR. LUMISH:

10  Q.    Good afternoon, Mr. Sebire.  You and I met before.  You

11  recall, I hope?

12  A.    Yes.  I recall, yes.

13  Q.    Your -- your lawyer -- CCE's lawyer suggested in his

14  opening statement today that I was going to attack you on the

15  stand, sir.  I want to put your mind at ease.  I'm not going

16  to do anything of the sort.  I hope you found I treated you

17  with respect the last time we met, and I intend to do the

18  same thing today.

19  A.    Sure.  I did.  Thank you.

20  Q.    I do want to talk with you about what you did with this

21  board, though, if I may.  I do have quite a few questions for

22  you.

23       Your discussion with your lawyer, or CCE's lawyer, was

24  the basis of your invention.  Is that what you understood,

25  sir?
```

1   A.   Yes.

2   Q.   All right.  Let's look at it piece by piece.

3        The first step in this chart is monitor buffers.  Do you

4   see that?

5   A.   I see that.

6   Q.   You'll agree with me you didn't invent buffers, right?

7   A.   No, I did not.

8   Q.   And you didn't invent monitoring buffers, did you?

9   A.   I did not invent monitor -- monitoring buffers.  That is

10  correct.

11  Q.   The next step says, No. 420:  Data in at least one

12  buffer.

13       Do you see that, sir?

14  A.   I see that, yes.

15  Q.   You'll agree with me, won't you, that you didn't ID --

16  invent the idea of detecting whether one or two or more

17  buffers have data?

18  A.   That, I do not know if there is prior art on that,

19  because this is the first time we had multiple buffers.

20           MR. LUMISH:  Can I have his deposition?

21           Your Honor, may I approach the witness with his

22  deposition?

23           THE COURT:  Yes.

24  Q.   (By Mr. Lumish) I'll ask you to turn, sir, to Page 43 of

25  your deposition.  And particularly Line 16 through 23.

 1          THE COURT:   Your Honor, I would ask to read this as

 2   impeachment?

 3          THE WITNESS:   Page 43?

 4          MR. LUMISH:   43.

 5          So if you would hold on for one moment, sir.

 6          THE COURT:   Proceed.

 7   Q.   (By Mr. Lumish) You remember I took your deposition,

 8   sir?

 9   A.   I do.

10   Q.   And that was a process where I had an opportunity to ask

11   you questions under oath, right?

12   A.   Yes.

13   Q.   It was the same oath you took in this courtroom today?

14   A.   Yes.

15   Q.   And you swore you would tell the truth during that day,

16   right?   And you did, didn't you?

17          Your testimony when I asked you the same question was a

18   little different.   I said:   Will you agree with me that you

19   didn't invent the idea of detecting, separate and apart from

20   monitoring, actually detecting that a buffer has data?

21          And your answer was:   Correct.

22   A.   Yes.

23   Q.   And then I asked you:   And you didn't invent the idea of

24   detecting that two or more buffers have data?

25          And your answer was:   Correct.

1       Wasn't it?

2   A.   Yes.

3   Q.   Actually, I think I left one sign off.  No. 430 there

4   says:  Detecting data in multiple buffers, right?  That's the

5   step here.

6       Step No. 440 says:  Capacity for a long format.

7       Do you see that?

8   A.   I see that, yes.

9   Q.   You'll agree with me you were not the first person to

10  discover that -- well, actually let me step back.

11      You understand that the infringement allegation in this

12  case is that Apple and with the Qualcomm chip that it buys,

13  the software that Qualcomm puts in there, performs that step

14  when it looks into something called the PDU, a packet, to see

15  if there is enough space to put one of these buffer status

16  reports.  Right?

17  A.   Correct.

18  Q.   You'll agree with me you weren't the first person to

19  discover that if you don't have enough capacity for the data

20  in a packet, then you can't just force it in, right?

21  A.   No, because we -- and as we discussed in the deposition,

22  we have segmentation.  Correct.

23  Q.   You're not the first person to discover that if the data

24  is too big to fit in the packet, that you have to do

25  something.  You have to break it into smaller pieces, right?

1    A.    To do something, yes.

2    Q.    That's segmentation, isn't it, making it smaller,

3    breaking it into smaller pieces?

4    A.    Correct.

5    Q.    And you're not the first person to invent the idea of

6    determining whether data will fit in a packet by checking to

7    see whether there is capacity for that data, are you?

8    A.    I believe I am not.   Correct.

9    Q.    There is a designate long format, designate short

10   format.   Do you see that, sir, on your board?

11   A.    Yes, I do.

12   Q.    You didn't invent the idea of long and short buffer

13   status reports, did you?

14   A.    I said earlier, no, I did not.

15   Q.    You said that a few times when your lawyer asked you

16   questions, right?

17   A.    Yes.

18   Q.    You didn't invent the idea of communicating buffer

19   status reports, did you?

20   A.    I did not.

21   Q.    And you didn't invent the idea of determining a buffer

22   priority, did you?

23   A.    That, I think we discussed in deposition, and I think I

24   said I did not know.

25   Q.    You don't know.   Is that your testimony?

```
 1   A.   As of today, yes.

 2   Q.   Well, do you know that the infringement allegation in

 3   this case is that the Qualcomm chip and the software performs

 4   this step when it uses something called a truncated BSR?

 5   A.   Now I know.

 6   Q.   Now you know; is that what you said?

 7   A.   Yes.

 8   Q.   Okay.   In the truncated BSR, that puts priority data

 9   instead of whenever the original data was, right?

10   A.   Yes.

11   Q.   And you didn't invent the truncated BSR, did you, sir?

12   A.   I have to go back to my deposition.   I think I -- part

13   of why it is describing the patent is; part of it is not.

14           THE REPORTER:   I'm sorry, part of why it is

15   describing the patent is?

16   A.   Part of what is in the patent is the truncated BSR.   So

17   this arrow on the top left part of the chart is the truncated

18   BSR.

19           MR. LUMISH:   Your Honor, I would ask to read from

20   the deposition from Page 46, Line 14 through Line 16 --

21   pardon me -- through Line 18.

22           THE COURT:   Proceed.

23   Q.   (By Mr. Lumish) Sir, at your deposition I asked you the

24   question I think I asked a few moments ago:   Did you come up

25   with the idea first of a truncated BSR, you, yourself?
```

1        And your answer was:  Truncated BSR, no.

2        That was your testimony, wasn't it?

3   A.   You have to go to Line 19.

4   Q.   Was -- do I have your testimony correct on the screen so

5   far?

6   A.   It's not complete.

7   Q.   Okay.  We can bring up -- I'm happy to bring it up

8   through -- how about through 24?  Is that sufficient?

9   A.   That's sufficient, yes.

10  Q.   Okay.  So you [sic] say:  Did you come up with the idea

11  first of a truncated BSR, you, yourself?

12       You said:  Truncated BSR, no.

13       Isn't that true?

14  A.   Yes.

15  Q.   Are you saying now you did invent the idea of a

16  truncated BSR?

17  A.   What I'm saying is that is down below.  Now that I have

18  had the time to check, I can say the patent describes the

19  truncated BSR.

20  Q.   I understand it describes it.  Are you, sir, taking

21  credit in court today for inventing it?

22  A.   There are two pieces to the truncated BSR.  There's the

23  truncated BSR itself, and there's the indication of the

24  truncated BSR.

25  Q.   I understand.  And I'm asking if -- are you taking

```
 1    credit today in this court under oath for inventing the idea

 2    of a truncated BSR which takes into account the buffer

 3    priority?

 4    A.    And what I will answer is that I invented part of the

 5    truncated BSR.

 6    Q.    Did you invent the part that takes into account off --

 7    of priority?

 8    A.    Yes.

 9    Q.    Okay.  We'll come back to that one.

10          So this is your invention now, No. 470?

11    A.    With this patent, yes.  But, I mean, part of the

12    invention is putting all of these pieces together.  So, I

13    mean, you cannot just strike them one-by-one.  You can, for

14    instance, throw them in the air and try to put them together.

15          And I think that is part of the invention to have all of

16    these steps aligned logically.

17    Q.    I'm going to put a question mark on that one.  In light

18    of your deposition testimony and your testimony today, I'm

19    not sure where we stand on this one, so I'll go ahead and put

20    a question mark on that one, and we'll come back to it.

21               MR. CALDWELL:  We object to the sidebar.  That

22    wasn't a question.  It was just argumentation.

23               THE COURT:  Sustained.  Let's move on.

24               MR. CALDWELL:  Can we have that stricken from the

25    record, please, Your Honor?
```

```
 1              THE COURT:  The jury will disregard the last
 2   statement.
 3   Q.   (By Mr. Lumish) Let's go back to your role at Nokia, if
 4   we can.
 5              MR. LUMISH:  Can I have CCE's Slide 7, please, from
 6   Mr. Sebire's direct examination?
 7              Thank you.
 8   Q.   (By Mr. Lumish) These are Nokia phones that you put up
 9   for your examination, right?
10   A.   Yes.
11   Q.   Your title is senior specialist of standardization.  Do
12   I have that right?
13   A.   You do.
14   Q.   And you don't actually build products for Nokia, do you?
15   A.   I do not myself, no.
16   Q.   You don't build Nokia phones.  You're not an engineer
17   who designs or develops these phones, are you?
18   A.   Correct.  I'm a researcher.
19   Q.   You are a delegate to the standards body that you talked
20   about with your lawyer there, the 3GPP RAN2 Working Group,
21   right?
22   A.   Correct.
23   Q.   And 3GPP, it doesn't make phones, right?
24   A.   It doesn't, no.
25   Q.   It doesn't make the phones you put up on this slide?
```

1    A.    It doesn't.

2    Q.    And you're not taking credit, sir, are you, for the

3    engineering or design or development of the phones that you

4    put up on Slide 7?

5    A.    I do not.

6    Q.    All of your work at Nokia relates to standards; isn't

7    that true, standards?

8    A.    Yes, correct.

9          MR. LUMISH:   You can take that down, please.

10   Q.    (By Mr. Lumish) Now, one of the objectives of your job

11   is not only to work on the standards -- well, let me step

12   back.

13       When you work on the standards part of what you're

14   trying to do, isn't it, is to get these standards who adopt

15   things that -- that Nokia likes so that they'll be used as

16   broadly as possible; isn't that true, sir?

17   A.    True.

18   Q.    But at the same time in parallel what you do is you try

19   to file as many patent applications as you can; isn't that

20   right?

21   A.    I would not describe it as that many.

22   Q.    Well, you have an objective at your job.  It's one of

23   the objectives you have been given by your employer to submit

24   what are called invention reports, right?

25   A.    And as I said in the deposition, it depends on my

1    manager and it depends on the years.  So I do not always have

2    such an objective.

3                MR. LUMISH:  Your Honor, I think that testimony is

4    inconsistent with the deposition.  I would ask to read from

5    Page 60, Lines 4 through 6?

6                MR. CALDWELL:  We would object to the

7    characterization.  If it's something that he wants to impeach

8    and finds an inconsistent statement, he's allowed to follow

9    the rules, but these sidebars and argumenting and

10   characterizing are improper.

11               THE COURT:  All right.  Give me the page and line

12   again, please.

13               MR. LUMISH:  Column -- Page 60, Lines 4 through 6.

14               THE COURT:  Proceed.

15               MR. LUMISH:  Will you bring that up, please?

16   Q.   (By Mr. Lumish) So your testimony under oath in your

17   deposition when I asked you if you had an objective that you

18   will submit invention reports was just yes, wasn't it?

19   A.   Yes.  And again, I would like to see Line 17.

20   Q.   That's my very next question.  So this was your

21   testimony under oath, right, that you have an objective,

22   there is an objective that you will file invention reports.

23        Is that true or not?

24   A.   Currently, yes.

25   Q.   Okay.  And what I think you're getting at --

```
 1              MR. LUMISH:  You can take it down, please.

 2    Q.   (By Mr. Lumish) -- is that the number of invention

 3    reports you have to file in any given year, that's something

 4    that changes year to year.  Is that what you're getting at,

 5    sir?

 6    A.   No, it is not.  You can read Line 17 for yourself.  It

 7    says that I don't always have this target, meaning I have had

 8    many years without any target of filed invention reports.

 9    Q.   Well, what your testimony was, was that you didn't

10    recall whether there was a number of invention reports that

11    the company wants to see you submit every year.  Wasn't that

12    your testimony, that you didn't know -- you didn't remember?

13    A.   It reads that I didn't always have this target.  I think

14    it's quite clear that it means that there are some years

15    where I didn't have any target at all.

16    Q.   Okay.

17    A.   No numbers.

18    Q.   I'm sorry to interrupt you.

19         Would you please answer my question, though?

20    A.   Can you repeat the question?

21    Q.   Your testimony was that you do -- you did not recall

22    whether there was a number of invention reports that the

23    company, Nokia, wanted to see you submit every year.  Wasn't

24    that your testimony, sir?

25    A.   To the question on Line No. 12, yes.
```

1    Q.   Now, we keep talking about Nokia.   Nokia is not the

2    plaintiff in this case, correct?

3              MR. CALDWELL:  Your Honor, may we approach?

4              THE COURT:  Yes.

5              (Bench conference.)

6              MR. CALDWELL:  Mr. Lumish is trying to imply that

7    the guy is lying, and it's literally exactly what he said:

8    No.  As I said, I didn't always have this target.  It depends

9    on the boss.  Sometimes it comes up.  Sometimes it does not.

10             It's literally exactly how he answered.  And what

11   he's doing is skirting it to try and make it look like these

12   are dishonest or changed answers.  It's the exact same

13   answer.

14             And I just ask because of -- especially with the

15   way he's arguing it as sidebars, the completion of that

16   answer should be shown to the jury to avoid this impression.

17             MR. LUMISH:  He's doing his own redirect on the

18   stand, Your Honor.  He's asking the next question and the

19   next question.  That's what's inappropriate.  And I think

20   he's been trained to do that.  They can ask him those

21   questions when they want on redirect.  I'm entitled to ask

22   him the questions I want to ask without being guided by the

23   witness.

24             MR. CALDWELL:  It's a fair answer to the exact same

25   topic and to the question that he asked.  He's misleading the

```
 1    jury.  The witness has just tried to show that he was being

 2    entirely consistent all the way around.  And Mr. Lumish is

 3    avoiding that, and that is creating a misleading impression.

 4            I agree that I can redirect tomorrow, but that's

 5    not fair when we know we're going to run the day out.  I just

 6    ask that that answer be shown.

 7            THE COURT:  Yeah.  Let's show them the remainder of

 8    the question and answer.

 9            MR. CALDWELL:  Thank you.

10            MR. LUMISH:  Which one am I showing?

11            THE COURT:  So we're going to show -- you were

12    talking about right through here, 10, right?  You don't

13    recall the number?

14            MR. LUMISH:  Right.  We got through 12.

15            THE COURT:  Right.  What do you want?

16            MR. CALDWELL:  Where the witness specifically

17    said -- he -- he specifically repeated this.  So, let's, I

18    think, show 13 through 20 -- 13 through 19.

19            MR. LUMISH:  Can I ask him the question first?

20            THE COURT:  Yes.

21            MR. LUMISH:  At least so there's context for it?

22            THE COURT:  Yes.

23            MR. LUMISH:  Thank you, Your Honor.

24            (Bench concluded.)

25    Q.   (By Mr. Lumish) It's your testimony, sir, that you
```

```
 1   didn't always have a specific target for the number of
 2   invention reports you'd have to submit; is that right?
 3   A.   That's right.
 4   Q.   And it depends on the boss.  Sometimes it comes up more
 5   than some times -- than other times; is that right?
 6   A.   Yes.
 7   Q.   Okay.  Now, I want to get back to Nokia, if I may.  We
 8   keep talking about Nokia, but what I wanted to ask you was,
 9   Nokia is not actually the Plaintiff, right?  You know that?
10   A.   Yes.
11   Q.   Nokia sold the '820 patent to Acacia which then
12   transferred it to CCE, which is the Plaintiff in this case.
13        You understand that, sir?
14   A.   Yes, I do.
15   Q.   And Nokia is not here today as a company saying that
16   Apple infringes any of its intellectual property, is it?
17   A.   Seems not.
18   Q.   And Nokia is not here today saying the '820 patent
19   itself, your patent, is infringed, right?
20   A.   That's right.
21   Q.   And Nokia is not here today saying that the '820 patent
22   is valid; is that true?
23   A.   That's true.
24   Q.   And Nokia is not here today saying it's owed any damages
25   from Apple or that the number that CCE's lawyer has thrown
```

1   out is a reasonable one, is it?

2   A.   Sorry.  Say that again.

3   Q.   Sure.

4       Nokia is not here in court to support CCE's claim for

5   almost $28 million in damages, is it?

6   A.   Nokia is not here, correct.

7            MR. LUMISH:  Your Honor, I'm going to go into a

8   subject matter that I believe NSN would like to have in a

9   sealed courtroom.

10           THE COURT:  All right.  Ladies and Gentlemen in the

11  courtroom, we are going into some -- some testimony that is

12  going to be sealed.  If you are not covered by the protective

13  order in this case or not allowed to see this type of

14  information, I'm going to need you to leave the courtroom

15  now.

16           The court security officer will let you know when

17  the courtroom can be unsealed.

18               (Courtroom sealed.)

19               (This portion of the transcript is sealed and filed

20               under separate cover as Sealed Portion No. 1.)

21               (Courtroom unsealed by order of the Court.)

22           THE COURT:  All right.  Thank you, Mr. Lumish.

23           Ladies and Gentlemen of the Jury, we're going to

24  stop for today.  We will start in the morning at 9:00 a.m.

25               I would ask, if you could, please plan to arrive a

little bit early so that we can get going right at 9:00.  We

will have breakfast in there for you.

And so if you'll just come straight to the jury

room tomorrow.  I'm sure Ms. Mayes has already explained that

to you.  But you'll just come right down this side hallway

and right in.  And you can have breakfast and wait until we

get started.  Okay?

We will be in recess for the day.

COURT SECURITY OFFICER:  All rise.

(Jury out.)

THE COURT:  Please be seated.

All right.  We'll pick up at 9:00 in the morning.

I'll be here by 8:30 if there is anything the Court needs to

take up with you-all before we get started.  I was just going

to give you your times.  We didn't get through too terribly

much testimony today.  But your times -- Plaintiff has used

58 minutes and 13 seconds.  The Defendants have used 27

minutes and 18 seconds.

So is there anything the Court can help you with?

MR. LUMISH:  I just want to make sure this board

remains available to me to complete my cross tomorrow, if I

may, Your Honor.

THE COURT:  That's fine.

Is there any objection to that?

MR. CALDWELL:  No.  I may rip those all off in

1    redirect.  We'll see.  But it's fine if they stay overnight.

2              THE COURT:  All right.  Thank you all.  I'll see

3    you in the morning.  We will be in recess.

4              (Court adjourned.)

5

6                         CERTIFICATION

7              IT IS HEREBY CERTIFIED that the foregoing is a

8    true and correct transcript from the stenographic notes of

9    the proceedings in the above-entitled matter to the best of

10   our abilities.

11

12

13   /s/_____
     CHRISTINE BICKHAM, CRR, RMR          September 6, 2016
     Official Court Reporter
14

15

16   /s/_____
     SHEA SLOAN, CSR, RPR
17   Official Court Reporter

18

19

20

21

22

23

24

25