```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                      TYLER DIVISION

 3
   CELLULAR COMMUNICATIONS        )
 4 EQUIPMENT, LLC
                                  )   DOCKET NO. 6:14cv251
 5
       -vs-                       )
 6                                    Tyler, Texas
                                  )   8:30 a.m.
 7 APPLE INC., ET AL                  September 7, 2016

 8
                        TRANSCRIPT OF TRIAL
 9                        MORNING SESSION
            BEFORE THE HONORABLE K. NICOLE MITCHELL,
10              UNITED STATES MAGISTRATE JUDGE

11                  A P P E A R A N C E S

12 FOR THE PLAINTIFF:

13 MR. BRADLEY W. CALDWELL
   MR. JOHN AUSTIN CURRY
14 CALDWELL CASSADY & CURRY
   2101 Cedar Springs Rd., Suite 1000
15 Dallas, Texas 75201

16 MR. EDWARD R. NELSON III
   NELSON BUMGARDNER PC
17 3131 West 7th Street, Suite 300
   Fort Worth, Texas 76107
18
   MR. J. WESLEY HILL
19 WARD, SMITH & HILL PLLC
   1507 Bill Owens Parkway
20 Longview, Texas 75604

21
   COURT REPORTER:    MS. CHRISTINA L. BICKHAM, CRR, RMR
22                    FEDERAL OFFICIAL COURT REPORTER
                      300 Willow, Ste. 221
23                    Beaumont, Texas 77701

24
   Proceedings taken by Machine Stenotype; transcript was
25 produced by a Computer.
```

```
 1 | FOR THE DEFENDANTS:
   |
 2 |
   | MR. DOUGLAS E. LUMISH
 3 | MR. JEFFREY G. HOMRIG
   | MS. LISA K. NGUYEN
 4 | MR. BRETT M. SANDFORD
   | LATHAM & WATKINS LLP
 5 | 140 Scott Dr.
   | Menlo Park, California 94025-1008
 6 |
   |
 7 | MR. JOSEPH H. LEE
   | LATHAM & WATKINS LLP
 8 | 650 Town Center Drive, 20th Floor
   | Costa Mesa, California 92626-1925
 9 |
   |
10 | MR. ERIC H. FINDLAY
   | FINDLAY CRAFT PC
11 | 102 N. College Avenue, Suite 900
   | Tyler, Texas 75702
12 |
   |
13 |
   |
14 |             ******************************
   |
15 |                 P R O C E E D I N G S
   |
16 |        (Jury out.)
   |
17 |        COURT SECURITY OFFICER:  All rise.
   |
18 |        THE COURT:  All right.  Let's take up the matters
   |
19 | we need to discuss before we bring in the jury this morning.
   |
20 |        Who's first?
   |
21 |        MR. NELSON:  I believe the only issues are the --
   |
22 | are Apple's issues, Your Honor.
   |
23 |        THE COURT:  All right.
   |
24 |        MR. LUMISH:  Very briefly, Your Honor.  We just had
   |
25 | a couple of concerns about the demonstratives for
```

1  Dr. Caloyannides' expected testimony today.  One relates to a

2  slide that includes -- I can hand it up if Your Honor would

3  like to see it -- but a series of Apple applications or

4  applications that could be run on Apple's iPhones.

5          It's got the Messenger, web browser, telephone,

6  Facebook, e-mail.  None of these were in Dr. Caloyannides's

7  reports as being accused or -- or having functionality that

8  related to his opinions.  I don't believe any of them were

9  mentioned in his opinions.  So that's the first concern.

10         And the second is to the extent there's benefit to

11  these, it's from LTE in general, which is we've raised with

12  Your Honor is something that we're very concerned about being

13  conflated in this case.  And so we object on those grounds.

14         THE COURT:  Okay.  Response.

15         MR. NELSON:  Your Honor, it's real easy.  This is

16  just context.  Dr. Caloyannides talks about his report ad

17  nauseam, the need for uplink data transfer.  And so this

18  is -- we're not accusing these applications.  We've already

19  seen demonstratives in this case that talk about Facebook

20  being uploaded and telephone calls.  And this is just an

21  example.  It would be up for maybe 20 seconds, but it's just

22  to show the types of stuff that goes on uplink and the types

23  of stuff you have to allocate space for.

24         THE COURT:  Okay.  That objection is overruled.

25         What's next?

1          MR. LUMISH:   The second one is Slide 11, Your

2    Honor, if we could bring that up, please.

3          So here you see what they call a corrected figure,

4    No. 4.   The original figures on the left, it shows the arrow

5    coming down from No. 430 to 470.

6          They have changed the figure.   Now it comes down

7    from 440 to 470.   Clearly, they're going to say they changed

8    it, and they're going to say it's corrected.   We appreciate

9    that.   We're not suggesting they're trying to hide it.   But

10   at the same time, this wasn't in Dr. Caloyannides' report.

11         We don't know what his statements are going to be

12   about these changes.   We don't think it's appropriate to try

13   to supplement now that this change is somehow relevant to his

14   opinions without having had a chance to depose him on it.

15         MR. NELSON:   So in his report, Your Honor -- or

16   last night on the call what they were saying is this is an

17   opinion that's not in his report.   It's not an opinion.   It's

18   a draftsman's error, okay?   And everybody knows about this.

19         As a matter of fact, there was already the hand

20   drawing from Mr. Sebire on the screens yesterday in evidence

21   that appropriately draws a line from 440 to 470 instead of

22   430 to 470.

23         And what Dr. Caloyannides does in his report is

24   persistently rely on the description in Figure 4 from

25   Column 8 of the patent, which makes it very clear that this

1    is a draftsman's error and that the line is appropriately

2    drawn from 440 to 470.

3            And so what this is, this corrected Figure 4 is

4    simply a diagrammatical representation of what's in Column 8

5    of the patent.  And it's the only way to discuss it, and it's

6    the only way he ever does discuss it.

7            THE COURT:  Okay.  That objection is overruled.

8            What's next?

9            MR. LUMISH:  Thank you, Your Honor.

10           MR. LEE:  Thank you, Your Honor.

11           We just have a couple of objections to exhibits

12   that CCE intends to use with Dr. Caloyannides.

13           So the first one I think is one that you heard

14   about last week, which is PX-95.  That's the declaration from

15   the Qualcomm employee.

16           As we discussed last week, we -- we have some

17   concerns with what's in that document.  As we expressed to

18   Your Honor, we thought we could resolve it via other -- or

19   getting information that CCE claimed we need from that and

20   via other means which we believe have been achieved.

21           First off, we have agreed that we're not going to

22   make our arguments based upon source code that wasn't

23   produced or provided for in this case.

24           Secondly, with respect to an -- an issue they

25   raised for the first time last night that they said they

1   needed a separation to show that this code -- the Qualcomm

2   code, that is -- runs on processors and is stored in memory.

3         They have, in fact, already designated testimony

4   that they intend to play today from Apple's witnesses

5   testifying about that fact.  And certainly to the extent that

6   they didn't feel satisfied about that, you know, they could

7   have questioned the witness about it.

8         In any case, they have that testimony.  And so we

9   just think this Qualcomm declaration is unnecessary,

10  especially in light of the our concerns as we expressed to

11  you last week.

12        MR. NELSON:  So this one I truly don't understand,

13  Your Honor.  As a matter of fact, let me preface this by

14  saying that during -- during Mr. Homrig's opening he put up a

15  slide that shows the inside of an iPhone with a Qualcomm

16  processor.  And he drew a big blue circle around it.  And all

17  we're using this document for -- it is from Qualcomm.  It was

18  disclosed during discovery when there were subpoenas from

19  Apple to Qualcomm and from us to Qualcomm about these

20  devices.  It just provides basics.  It's fundamental about

21  the processor, meaning it has memory, nonvolatile memory that

22  this code is stored on and that the processor executes the

23  code.

24        He -- Mr. Homrig has already said that there is 9

25  million lines of code in -- in the Qualcomm processor on the

1 phone.  And -- and then that contains the buffer status

2 reporting code.

3        We're just using this for fundamentals.  It just

4 helps streamline things and get through it.  It's not

5 something that we're -- that we're harping on or anything

6 like that, but it is necessary to show just the fundamentals

7 of the code.

8        I mean, a lot of these elements -- a lot of these

9 claims that we're going to be talking about have processor,

10 memory, code elements that say these are the components.  And

11 it's real basic stuff.  Nobody disputes this stuff.  But it's

12 easy just to reference what Qualcomm said about its own

13 processors.

14        And -- and so it meets all the -- all the criteria

15 or hallmarks for reliability under -- under any hearsay

16 exception under 807, the catch-all.  I mean, I can run

17 through that with you if you want.  I don't think their

18 objection is hearsay anyway.  I think it's that somehow this

19 is a Qualcomm document, and it has some extra import because

20 it's a Qualcomm document.

21        But it was the subject of discovery.  It was during

22 the course of having them respond to two subpoenas from Apple

23 and from us.  They have had this thing for months.  They --

24 if they had a problem with it, they can take it up with

25 Qualcomm.

1          MR. LEE:  And --

2          THE COURT:  Go ahead.

3          MR. LEE:  Sorry.

4          And I think that highlights the issue, though, is

5     that this -- this declaration -- the code that the Qualcomm

6     employee is talking about is not even code that's actually on

7     any of the accused products, as Your Honor knows.

8          You know, they -- they accused a lot of other

9     companies infringing as well that also have Qualcomm chips.

10     This is separate from the code on Apple's accused devices

11     that Apple made available for inspection, which they had an

12     opportunity to inspect.  This Qualcomm declaration is about

13     code that Qualcomm made available for inspection for devices

14     other than Apple.

15          So that's part of our concern here is that this

16     document is introducing new things in the case when -- when,

17     as he points out, we're not contesting that this stuff is not

18     a processor, that -- that it's loaded on a memory, that it

19     executes on the processor.

20          In fact, they have designated testimony to

21     establish exactly that.  This -- this declaration is not

22     necessary.  It's not needed by them, and there are issues

23     with what exactly is being said in there.

24          MR. NELSON:  Real quick.

25          So that's misleading.  The fact is, is that

1    there's -- that when we talk about code that Qualcomm

2    produced, it overlaps multiple Defendants' devices because

3    there are multiples Defendants at the time, but that includes

4    Apple, okay?  Apple also produced their own code.

5           But what Qualcomm is saying in here is that the

6    code for the buffer status reporting, there are no material

7    differences for any of the Qualcomm chips that they have.

8           And -- and Apple was part of the subpoena that we

9    sent to Qualcomm.  And all they're doing is saying that there

10   are no material differences in the buffer status reporting

11   code on the Qualcomm chips at issue in this case across all

12   Defendants.

13          THE COURT:  Okay.  I'm going to allow the exhibit.

14          What's next?

15          MR. LEE:  The other exhibit is PX-71.  So it's a

16   modified version of the testing summary chart, if Your Honor

17   will recall.

18          And we're objecting to this exhibit based upon

19   Your Honor's motion to strike.  This exhibit relies upon

20   information that has not been disclosed to Defendants.

21          They have provided some information.  They've made

22   available some information for inspection, although, frankly,

23   the inspection was -- the documents were first made available

24   a week before expert reports were due in a location in

25   Philadelphia that at least Apple's expert couldn't get to.

1            And to this day, we still don't have an explanation

2    for how they got from -- CCE, that is, got from the raw data

3    that they claim to have provided to us to the numbers on this

4    figure.

5            And we asked Dr. Caloyannides about this in his

6    deposition.  Not only could he not explain it, he said that

7    he hadn't even created this.  He -- I believe he said he's

8    never looked at the underlying data.  He certainly said he

9    wasn't familiar with what was actually done to transform that

10   underlying data into this figure here and the numbers on

11   here.

12           And so, to have him testify about something that he

13   really doesn't know anything about and that we can't

14   independently verify, I think is just wrong.

15           THE COURT:  Response?

16           MR. NELSON:  Yes, Your Honor.

17           So I can't believe we're kind of arguing about this

18   all over again.  Your Honor ordered that we can use it for

19   what we've produced, and we produced all the underlying data

20   for this.  We gave them a week's long access at the actual

21   facility with the actual software to query this.

22           They tried to tell you at the last hearing that

23   their expert was actually in the facility examining that and

24   could not figure out what was going on.  It was a lawyer.

25   And their expert was in Europe at the time, and he deposed --

1   he was deposed on that topic, and he admitted that he was in

2   Europe at the time.

3          So that was a misrepresentation to the Court about

4   that.  They had a lawyer there.

5          But they have had ample time to do their discovery

6   on this, and we are only using it for the limited purpose to

7   show that these devices do, in fact, send buffer status

8   reports.  That's it.  That's all you're going to hear.

9          And that's consistent with Your Honor's order about

10  this test data.  I mean, that's exactly what we're showing.

11  We struck the other stuff that had Samsung or HTC or ZTE on

12  there.  That is just the Apple stuff.

13         We can absolutely explain that these devices were

14  tested against live networks for AT&T, Sprint, T-Mobile,

15  Verizon; and it showed the buffer status reports both long

16  and short were sent.  That's the only he reason we're using

17  the data.

18         THE COURT:  I'll allow it for that specific

19  purpose.

20         Anything else on this issue?

21         MR. HOMRIG:  No, Your Honor.

22         MR. CALDWELL:  Your Honor, I have a real quick

23  procedural question.  Upon -- I mean, we don't have to argue

24  over the merits of whether they were proper impeachments

25  yesterday, but each time that Mr. Lumish wanted to show the

1   transcript, he kind of goes to the Court and says:  Well, I

2   think this is inconsistent.  Can I show them this?  He says

3   that to you.  Or can I show him these lines?

4          Do we need to ask Your Honor before we impeach with

5   a prior inconsistent statement?

6          And the reason I ask is because I think it's

7   creating sort of the impression that Your Honor is adopting

8   that the witness has been, you know, testifying incorrectly,

9   and I don't -- my guess is that the Court is not one to put

10  its thumb on the scale in that way.

11         THE COURT:  Right.  I understand.

12         If you're going to impeach a witness with a prior

13  inconsistent statement, you can just go up, hand it to him,

14  and impeach him with that statement; and then if it's not

15  inconsistent, you-all can take that up with an objection or

16  however y'all come back and forth about that.  I don't need

17  to weigh in on it --

18         MR. CALDWELL:  Okay.

19         THE COURT:  -- until there's an objection about

20  whether or not that's consistent, and I'll rule.

21         MR. CALDWELL:  Absolutely.  Thank you.

22         THE COURT:  Okay.  What about -- I had someone

23  mention that maybe we've got some testimony from Mr. Sebire

24  that goes to non-jury issues, and we might want to take that

25  up while he's here.  Tell me about that.

1            MR. LUMISH:  So -- yes, Your Honor.

2            I think we have maybe 20 minutes, 30 minutes of

3    bench trial issues for Mr. Sebire.  We're happy to do them.

4    They had said at the pretrial conference they would like to

5    handle those while he's here.

6            I think there was a statement that he was leaving

7    back to Japan.  I don't know where he's going or if he's

8    going to be here or not.  Doesn't really matter to us.  We're

9    happy to just get it done today, if you would like to.

10           THE COURT:  Okay.  Y'all let me know his schedule.

11   I'm happy to table any -- my preference, if someone is going

12   to be here all week, let's table the equitable issues until

13   the jury is out deliberating.  If Mr. Sebire needs to get

14   back, though, let's absolutely take care of him today or

15   before he goes back.

16           MR. CALDWELL:  Okay.  I'll work on that maybe here

17   shortly, and we can talk about it on the morning break.

18           One of the things was we were talking about at the

19   pretrial with regard to that, remember -- I mean, these are

20   issues on which they bear the burden, and then they

21   subsequently -- I think it was maybe Sunday, and Mr. Lumish

22   can correct me if I'm wrong, but this weekend, maybe Labor

23   Day, they said, oh, we're not actually going to call our guy

24   who did a report on these issues.

25           So we're in a little bit of a tough spot that

```
 1   it's -- I guess we're trying to figure out how to rebut

 2   something that they seem not to be going to present, and

 3   that's causing us a little consternation.

 4            So I actually would like it to come later and -- as

 5   well, but let me work on seeing what I can do.

 6            THE COURT:  Okay.  If it appears that what we need

 7   to do is take it up today, I'm inclined to do it either over

 8   the lunch break, or if you need a little more time, to let

 9   the jury go a little early and maybe do it at 4:00 o'clock

10   today, just to give you a heads-up of the Court's preference.

11            MR. CALDWELL:  Okay.  Thank you.

12            THE COURT:  Anything further?

13            All right.  We'll bring in the jury at

14   9:00 o'clock.  We'll be in recess.

15            (Recess.)

16            COURT SECURITY OFFICER:  All rise.

17            THE COURT:  Good morning, everyone.

18            Let's bring in the jury.

19            COURT SECURITY OFFICER:  All rise for the jury.

20            (Jury in.)

21            THE COURT:  Please be seated.

22            Before we begin, Mr. Lumish, I believe that you

23   mentioned yesterday at the end that we were able to unseal

24   the courtroom, so I just want to put on the record that it is

25   unsealed at this time and that that is correct?
```

1          MR. LUMISH:  Yes, Your Honor.  Thank you.

2          THE COURT:  Very good.

3          MR. HILL:  Your Honor, just as a quick piece of

4   housekeeping before we start, now that we're on the record,

5   Plaintiff would like to offer our updated exhibits for the

6   record.

7          THE COURT:  Thank you.

8          MR. HILL:  Mr. McManis will offer those.

9          MR. MCMANIS:  Your Honor, Jason McManis for CCE.

10         We offer Plaintiff's exhibit list through September

11  6th, 2016.

12         THE COURT:  Any objection?

13         MR. SANDFORD:  No objection, Your Honor.

14         THE COURT:  Okay.

15         MR. SANDFORD:  May I approach?

16         THE COURT:  Yes, please.  Thank you.

17         MR. SANDFORD:  Your Honor, Defendant Apple would

18  like to offer their preadmitted exhibits for September 7th.

19         THE COURT:  Any objection?

20         MR. MCMANIS:  No objection.

21         THE COURT:  All right.  Hand that up.  That will be

22  admitted.

23         Thank you, gentlemen.

24         All right.  Good morning, Ladies and Gentlemen of

25  the jury.  We're going to continue with the cross-examination

1    of Mr. Sebire.

2              Mr. Lumish, you may continue.

3              MR. LUMISH:  Thank you, Your Honor.

4              Good morning.

5         BENOIST SEBIRE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

6                   CROSS-EXAMINATION (CONTINUED)

7    BY MR. LUMISH:

8    Q.   Mr. Sebire, I'm going to go back to something you said

9    on direct examination yesterday.  When being questioned by

10   CCE's lawyers you said that you didn't invent triggers.  Do

11   you remember that?

12   A.   I remember it, yes.

13   Q.   But, in fact, you, yourself, when asked to describe how

14   you and when you came up with the ideas that you claim in the

15   '820 patent, you stated you realized you needed the triggers

16   to select which buffer status report formats to send and

17   when; isn't that true, sir?

18   A.   It is true, yes.

19   Q.   Now, can we go to -- and you have a binder.  I hope we

20   make this a little bit easier on you today than yesterday.

21        You've got a binder in front of you.  It's got the

22   exhibits I'm going to use this morning.  I'd like to start

23   with Defendants' Exhibit 509, which is already admitted into

24   evidence.

25              MR. LUMISH:  So if we could bring up the cover of

1    that and the next page, please.

2    Q.   (By Mr. Lumish) You understand, 509 is the file history

3    to your patent, the back-and-forth with the Patent Office,

4    sir, related to the application for the patent?

5    A.   I understand, sir.

6    Q.   And let's go to Page 62, please.  509, 62.  If you want

7    to look at it in hard copy, you can.  Otherwise, we're going

8    to bring up, everything I'm going to ask you about, on the

9    screen, sir.

10        This is a declaration you signed, right, or an oath

11   related to the application that led to the '820 patent?

12   A.   Correct.

13   Q.   And in that oath you said that you, quote:  I believe

14   I'm the original, first, and sole inventor.

15        And it goes on from there.  But it says the subject

16   matter claimed is inventions in the '820 patent, right?

17   A.   Correct.

18   Q.   You understand -- and the reason we've been asking you

19   all these questions, you understand that if you're wrong and

20   you're not the first or the original or even the sole, even

21   if you contributed some things but you didn't contribute

22   everything to the conception of the invention that's claimed

23   in the '820 patent, that that means your patent is invalid,

24   right?  You understand that's what we're doing here today?

25   A.   I do.

1   Q.   And you understand that's true even if it was a mistake

2   your lawyers made or, you know, something that happened where

3   you weren't involved, right?

4   A.   I do.

5   Q.   Okay.  Now, you -- I've got you looking at the

6   application here.  You didn't actually write any of the text

7   that was submitted to the Patent Office as the application

8   for the '820 patent, did you?

9   A.   To which text are you referring to?

10  Q.   The application itself, the patent application.

11  A.   Is it in the binder?

12  Q.   I'm talking about the actual -- there was an application

13  for the '820 patent.  It's sort of the first big chunk of

14  that binder, yes.

15  A.   So just to make sure -- so from Page 80 is the first

16  part.  Yes, I did not write this myself.

17  Q.   Okay.  You said you did not?

18  A.   Yes.

19  Q.   I want to make sure I understood you.  Thank you.

20  You didn't write any of the specification, the written

21  description part of the '820 patent, right?

22  A.   I did not.

23  Q.   And you didn't write any of the claims, the things

24  that -- the numbered paragraphs at the end that tell the

25  public what the invention is.  You didn't write any of those,

1    right?

2    A.    I did not.

3    Q.    The lawyers wrote those --

4    A.    Pardon me?

5    Q.    I'm sorry.  Your lawyers wrote those things; isn't that

6    right?

7    A.    Somebody.  I don't know whether it was lawyer or not but

8    it wasn't me.

9    Q.    Okay.  You didn't write any of the correspondence, the

10   communications that go back and forth from the Patent Office.

11       So they -- they send things called office actions.  Your

12   lawyers send responses, amendments, those kinds of things.

13       You didn't write any of those either, did you?

14   A.    I did not.

15   Q.    And you didn't even read any of that back-and-forth

16   correspondence, did you?

17   A.    I may have read some.

18   Q.    Do you recall specifically reading anything today?

19   A.    Not specifically, no.

20   Q.    Okay.  So I want to ask you about when you -- I asked

21   you a moment ago about the conception of the invention.  You

22   know that's a really important issue in this -- in this case,

23   right?

24   A.    I do.

25   Q.    And one of the great things about my job is I get to

1    hear some amazing stories from inventors about how they came

2    up with their inventions, the shower flash of genius on the

3    subway, years of toil before they had some major breakthrough

4    in a laboratory, being scoffed at by the industry, people

5    telling them their idea was crazy, and then overcoming all of

6    that with some groundbreaking solution.

7              MR. CALDWELL:   Object to the narrative describing

8    Mr. Lumish's vision of what conception should look like.

9              THE COURT:   Overruled.

10             Mr. Lumish, ask your question.

11             MR. LUMISH:   Thank you.

12   Q.   (By Mr. Lumish) You had a very different experience from

13   that, didn't you, sir?

14   A.   I'm not sure what you're asking.

15   Q.   Well, you don't recall the date on which you conceived

16   of the inventions that were claimed in the '820 patent,

17   right?

18   A.   I do not recall exactly the date, no.

19   Q.   You said fall of 2007 on direct, but you don't know

20   specifically when you came up with it, right?

21   A.   No.   It was ten years ago.   No, I don't remember exactly

22   when.

23   Q.   And you don't recall how long it took you to come up

24   with the selection criteria or the triggers for selecting

25   long versus short buffer status reports?

1  A.    Correct.

2  Q.    You don't -- well, in fact, you said before, I believe,

3  that you would have to guess you couldn't even give an

4  estimate of how long it took to come up with those triggers

5  or selection criteria.

6  A.    Correct.

7  Q.    And you thought it could be, but you weren't sure; that

8  it maybe took an hour or two or maybe a little bit more.

9  Right?

10  A.    I don't exactly remember the ballpark, but yeah, could

11  be.

12  Q.    You don't recall finding it particularly difficult to

13  come up with the triggers or the selection criteria to decide

14  long versus short buffer status reports?

15  A.    I do not recall how difficult it was, no.

16  Q.    You don't recall having to struggle to come up with

17  different ways to select long versus short buffer status

18  reports?

19  A.    I do not recall -- I do not recall, excuse me, any

20  details of the process.

21  Q.    It's true, sir, isn't it, that you just don't remember

22  how you came up with the idea or how long it took to come up

23  with?

24  A.    Correct.

25  Q.    You didn't do anything to test the ideas to make sure

1    they would work, right?

2    A.    What do you mean by "testing"?

3    Q.    Well, you didn't build a prototype system, for example?

4    A.    No.   I did not do that, no.

5    Q.    You didn't build any models or what -- what sometimes I

6    think engineers call breadboards?

7    A.    No.

8    Q.    You didn't write any code, any software, to prototype

9    the triggers or the criteria to make sure they would work,

10   right?

11   A.    Correct.

12   Q.    And you didn't feel any need to test the ideas to make

13   sure they worked?

14   A.    I didn't feel a need, no.

15           MR. LUMISH:   Your Honor, may I approach?

16           THE COURT:   Yes.

17           (Bench conference.)

18           MR. LUMISH:   I want to ask him about corroboration

19   of conception.   There's a document called an invention report

20   that was apparently produced and then clawed back.   I've

21   never seen it.   There were a number of questions he was

22   permitted to answer about it by NSN's counsel in the

23   deposition.

24           I'm not going to go beyond those questions.   But I

25   did want to ask him that there have been no documents

1  produced in the -- not produced -- no documents adduced in

2  evidence, you know, presented by him or me in the trial that

3  would corroborate that he conceived of the invention.

4        And I don't -- I don't want to go further than that

5  other than to say that there's no witnesses, there's no

6  documents that have corroborated it.  I think we're entitled

7  to corroboration.  I'm -- I'm trying to be sensitive to the

8  MIL and the statement you heard yesterday, particularly as it

9  relates to the privilege indication concern.

10       MR. CALDWELL:  So as for the privilege thing, I

11 think there's no dispute that that document is privileged.

12       And then when it came up in his deposition, I think

13 Mr. Lumish said, we'll take that up later.  And of course, he

14 never did.  Now we're in trial.

15       MR. LUMISH:  We're not disputing it.

16       MR. CALDWELL:  But also, I think asking him about

17 corroboration while we're on it, is a touch unfair because, I

18 mean, we're dealing with a guy who's French and not a lawyer,

19 so I don't know that he's going to have any idea.

20       Because the law actually says, of course, that your

21 application -- your application suffices also for a

22 constructive reduction to practice.  And asking for like this

23 concept of prior corroboration, I think is, perhaps,

24 misleading.

25       So, I mean, it's also baiting him into -- I mean,

1    it's baiting him into the question of saying, I gave the

2    information to my lawyers so...

3              MR. LUMISH:  That's what I'm trying to avoid.

4    Your Honor, I've had enough of the misleading statements,

5    being accused of being misleading every time I speak.  It's

6    frustrating.  I'll leave it at that.

7              MR. CALDWELL:  No.  Tell me because I'm not trying

8    to misrepresent.  I'm really not.

9              MR. LUMISH:  But there's a difference between

10   reduction to practice and corroboration.  I already talked

11   about reduction to practice, and he just conceded he didn't

12   do anything to reduce to practice.  We had -- they have to

13   prove -- and I think in this instance it's maybe we have to

14   prove.  I'm not certain.  For a lack of inventorship, there's

15   no corroboration to prove he invented it.  That's a separate

16   requirement of inventorship.  It usually is brought in a

17   priority fight.  We don't have a priority fight --

18             THE REPORTER:  I'm sorry, usually is?

19             MR. LUMISH:  Brought in a priority fight.

20             THE REPORTER:  Okay.

21             MR. LUMISH:  We don't have a priority fight here.

22   But the same law, I believe, applies, and I can't swear on a

23   stack of Bibles that's true.

24             So corroboration, to prove you invented it, has --

25   cannot be the witness' testimony alone.  It cannot be the

1    patent alone.  It has to include either corroborating

2    witnesses or documents.  We need to bring out that he has

3    neither one of those here.

4            MR. CALDWELL:  That's just not the law.  The

5    application itself is sufficient.  If we were trying to prove

6    an earlier filing date, you have to corroborate and prove

7    either diligence or constructive reduction to practice.

8            But nobody -- I mean, there's actually a motion in

9    limine at their request that we would not try to prove an

10   earlier -- an earlier filing date.  And we specifically

11   negotiated that we can point out that he wrote this -- what

12   they referred to as the Ericsson document; and that also we

13   would not try to do the -- the conception diligence reduction

14   to practice to prove up an earlier filing date.  So we have

15   not done that.  And now it sounds like he wants to attack

16   that.  But it's not a legal requirement.

17           THE COURT:  Okay.  I'm going to exclude it.  Don't

18   go into it.

19           MR. LUMISH:  Okay.  Thank you.

20           (Bench concluded.)

21   Q.   (By Mr. Lumish) I want to turn, sir, to the joint

22   proposal that you and Nokia entered into with Ericsson and

23   others.  Do you recall that proposal?  You talked about it

24   yesterday with CCE's lawyer.

25   A.   Yes, I do.

1   Q.   It's Exhibit 569 in your binder.  It's already admitted.

2        So this is a joint contribution, is it not, between

3   Ericsson, Nokia, NSN, DoCoMo, Qualcomm, and Samsung?

4   A.   This is correct.

5   Q.   It's a proposal to suggest to the working group how what

6   you called uplink scheduling should work; is that right, in

7   LTE?

8   A.   Yes.

9   Q.   And it includes uplink scheduling for the long and short

10  form buffer status reports, right?

11  A.   It gives us a description of what the long and short

12  are, yes.

13  Q.   Okay.  And you -- you said yesterday on direct

14  examination that the names of the contributors are in

15  alphabetical order.  That's true, right?

16  A.   Yes.

17  Q.   And you did that because it was a joint effort and we

18  weren't trying to put anybody's contribution in front of

19  anybody else's, right?

20  A.   Correct.

21  Q.   You see Ericsson's there, it's listed first.  There's a

22  man named Magnus Stattin who participated in these -- in this

23  contribution; is that true?

24  A.   There were some delegates at that time, but I suspect

25  Magnus was, indeed, one of them.

1   Q.   Okay.  Now, Mr. Stattin, he's a delegate to the RAN2

2   Working Group just like you, right?

3   A.   Yes, or he used to be.

4   Q.   And he's had the -- the role of reporter, or rapporteur,

5   just like you; is that true?

6   A.   Yes, of the 36321.

7   Q.   And you believe he's an honest person in your

8   experience, don't you?

9   A.   I believe he is, yes.

10  Q.   Now, you needed consensus from all of the authors -- all

11  of the contributors, I mean, to stay listed as sources on

12  this exhibit on DTX-569 before it could be submitted to the

13  working group and the standards body for discussion or

14  approval; is that true?

15  A.   Yes.  I need to circulate the document beforehand.  And

16  they have to confirm that they want their company name on the

17  document.

18  Q.   Now, I want to make sure we are clear that this document

19  was, in fact, circulated and made public.  So if you could

20  look at DTX-523 for me, please.  This is also already

21  admitted.

22       You recognize this, sir, don't you as an e-mail that you

23  sent to the list at the top there, the big letters,

24  3GPP_TSG_RAN, et cetera?

25  A.   Yes.  So this is a distribution list corresponding to a

1   working group I attend, so RAN2, yes.

2   Q.   The RAN2 Working Group?

3   A.   Yes.

4   Q.   And you sent this e-mail on October 30th of 2007?

5   A.   Seems so, yes.

6   Q.   If we turn to the second page of the exhibit, please,

7   you will see a reference to a document.  It's No. R2-074682.

8        Do you see that?

9   A.   I do.

10  Q.   And you gave a helpful explanation yesterday about how

11  to read these things.  This is a document that's from 2007.

12  It's Document No. 4682.  Is that the right way to read that,

13  sir?

14  A.   That is the right way.

15  Q.   And that's the joint proposal with Ericsson and others,

16  isn't it?

17  A.   Correct.

18            MR. LUMISH:  Okay.  Can we go back to the e-mail,

19  please -- oh, no.  Actually, stay there.  I'm sorry.  I

20  wanted to look at right above where we were.  I apologize.

21  Q.   (By Mr. Lumish) You say, "Dear colleagues," at the top.

22  Do you see that?

23  A.   I do.

24  Q.   And those colleagues, those are your friends at the RAN2

25  Working Group, right?

1   A.    They are my colleagues, yes.

2   Q.    And you pushed the -- you circulated or put the joint

3   proposal with Ericsson and others up onto the server, the

4   RAN2 Working Group server, right?

5   A.    Yes.

6   Q.    And that's a public server so anybody from the RAN2

7   Working Group could then access this document from October

8   30th?

9   A.    Yes, anybody inside or outside the RAN2 could check it.

10  Q.    Right.  In fact, if any of us had nothing better to do

11  on a Saturday night, I guess we could do that, too, right?

12        We could go into the RAN2 Working Group server and

13  review the documents that have been uploaded?

14  A.    Only after the trial, I believe.

15  Q.    I'm sorry?

16        THE REPORTER:  I'm sorry?

17  A.    Only after the trial, I believe.

18  Q.    (By Mr. Lumish) Ah.  Fair enough.

19        So you will agree with me then, sir, that the joint

20  proposal with Ericsson was public no later than October 30th,

21  2007?

22  A.    Yes.

23  Q.    All right.  Let's go back, if we could, please, to the

24  Ericsson proposal itself.  That's Exhibit 569.

25        So this was published for discussion -- for meetings

1    that were coming up in South Korea on November 5th through

2    the 9th, right?

3    A.    Correct.

4    Q.    And, so, you see at the top there it says 5-2 -- 5-9

5    September [sic] 2007?

6    A.    Yes.

7    Q.    Now, November 5th, 2007, that's also the date on which

8    the first application for the '820 patent was filed, right?

9    A.    I believe it is, yes.

10   Q.    And that is not a coincidence, is it, sir?

11   A.    Probably not.

12   Q.    Probably not or not?

13   A.    Most likely not.

14   Q.    Well, you did it on purpose, didn't you, in order to

15   make sure that whatever was discussed at the meetings in

16   South Korea would be covered by the filing and so potentially

17   owned by your employer Nokia?

18   A.    Yes.  This is a common practice.

19   Q.    It's what you did here, right?

20   A.    I think, yes.

21   Q.    Okay.  Now --

22          MR. LUMISH:  Can we go to Figure 2, please?  It is

23   on Page 569-2.  We'll start with the -- thank you.

24   Q.    (By Mr. Lumish) So these are two figures that are in the

25   Ericsson proposal, correct?

1    A.    The joint proposal, yes.

2    Q.    Fair enough.   The Ericsson joint proposal.

3         And you show a short buffer status report typed in top

4    in Figure 1, and you show what you call a long buffer status

5    report type in the bottom; isn't that true?

6    A.    Yes.   Those figures I drew depict the long and the

7    short, correct.

8    Q.    These exact figures are copied into the '820 patent,

9    aren't they?

10   A.    As a context, yes.

11            MR. LUMISH:   Can you go to the text above Figure 1

12   for me, please?

13   Q.    (By Mr. Lumish) This explains what these figures are

14   for, right, this text right above the figures?

15   A.    Yeah.   They explain why we needed two formats.

16   Q.    And the Ericsson joint proposal here says, quote:   Since

17   it is not necessary to report the four RBGs always.

18        And it continues, I want to ask you about that first.

19   Four RBGs, that's four radio bearer groups, right?

20   A.    Yes, on the logical channel groups.

21            THE REPORTER:   I'm sorry?

22   A.    Logical channel groups.   Sorry.

23   Q.    (By Mr. Lumish) Not at all.   I'm sure your Japanese and

24   French are far better than mine -- than either of mine.   Your

25   English, I meant to say, is far better than my Japanese or

1    French.

2        These -- so going back to the text here, sir, this is

3    saying we don't always want to report on all four buffers,

4    isn't it?

5    A.    Yes.

6    Q.    And the solution it says is:  It's proposed to introduce

7    two formats of buffer status report, one where only one RBG

8    is reported and one where all four are.

9        Did I read that correctly?

10   A.    You do.

11   Q.    And so what the proposal here is, is, well, instead of

12   always sending a big one that has four buffers being reported

13   in it -- reported in it, we might send something small,

14   right?

15   A.    We might as well send something small, yes.  It doesn't

16   say either/or.

17   Q.    You could send a short format when only one buffer is

18   being reported, and you could send a long when more than one

19   is being reported.  Isn't that what this document is

20   explaining?

21   A.    It just says that sometimes it's not necessary to send

22   the long -- to send the long, sir.  At that time there was a

23   proposal that the short should always be sent.

24            MR. LUMISH:  Mr. Schmoller, bring the figures up

25   with the text, please.

1   Q.   (By Mr. Lumish) Let me make sure I understand what your

2   position is, sir.  Are you saying that somebody in the RAN2

3   Working Group reading this wouldn't understand that the whole

4   point here is that you should select a short buffer status

5   report when you only have one buffer to report, and you

6   should select a long buffer status report if you have four to

7   report, or something more than one?

8   A.   Not necessarily, no.

9   Q.   And is that because it doesn't say the words

10  specifically or something --

11  A.   No, because -- sorry.  Because there are a number of

12  alternatives that were still being possible at the time.  So,

13  for instance, the UE, the user equipment, would only be

14  configured to send the short always.  So it will not have a

15  choice to ever send the long.

16      There also were proposals that the UE should send only

17  the long.  There were proposals that the UE should send the

18  short always, and from time to time the long in addition to

19  the short.

20  Q.   Have you ever been to Six Flags?

21  A.   Excuse me?

22  Q.   Have you ever been to Six Flags?

23  A.   I believe I have not.

24  Q.   Have you been to Disneyland in Japan or Paris maybe?

25  A.   Many times.

1   Q.   You know when you go to the amusement park, you can get

2   tickets to enter, right?

3   A.   To the what?

4   Q.   Get entry tickets.

5   A.   Yes.

6   Q.   And if you're all by yourself, you get an individual

7   ticket, just for one, right?

8   A.   Okay.  I'm not sure where you're getting, but yes.

9   Q.   If you're with a group or a family, you might get the

10  group ticket or the family ticket, true?

11  A.   Not in Japan.

12  Q.   You know what I'm talking about, though, right?  You've

13  seen places where you can get group tickets or family

14  tickets, maybe let's send six people, eight people at a time?

15  A.   Not to my knowledge, but okay, I can imagine it could

16  exist.

17  Q.   Okay.  The -- you'd never buy a group ticket that covers

18  eight people if you're all by yourself, right?

19  A.   Well, actually, I think in some cases people do that

20  just to get the Fastpass.

21  Q.   They're going to pay for their whole family to come into

22  the park even though they're all by themselves?

23  A.   I don't know if you've ever been to Disneyland, but you

24  have this Fastpass.

25  Q.   I know what you're talking about.  I'm not sure how that

1   relates to my question, though.

2   A.   You can buy more than one ticket for yourself so you can

3   get more Fastpasses.

4   Q.   Sir, is it your position that if you need some written

5   statement at the entryway to Six Flags or Disneyland that

6   says, hey, don't buy the individual ticket if you're more

7   than one person, buy the group one or, hey, don't try to buy

8   the group one if you're only one, as opposed to just knowing

9   that if you've got an individual, you buy the individual

10  ticket, and if you have a group, you buy the group or family

11  ticket?

12  A.   I don't know.  I've heard people doing that so...

13  Q.   Okay.  Let's go to the original patent application in

14  this case from November, 2007.  It's in your binder as

15  DTX-571.  It's also been admitted into evidence.

16       We talked about this.  This is the application that was

17  filed on November 5th, 2007, right?

18  A.   I'm looking for the date, yes.

19  Q.   And this is after the October 30th publication of the

20  Ericsson joint proposal, right?

21  A.   Of the joint proposal, yes.

22  Q.   Now, this names you as an inventor, doesn't it?

23  A.   It does.

24  Q.   And there's a box there at the bottom of the screen.  It

25  says:  Additional inventors are being named on separately

1    numbered sheets attached hereto.

2         Do you see that?

3    A.    I do.

4    Q.    That box isn't checked, right?

5    A.    It is not.

6    Q.    Your lawyers didn't check it.  You didn't check it.

7    A.    We did not, yes.

8    Q.    Now, you know, sir, don't you, that this original

9    application has all -- all of the content from the Ericsson

10   joint proposal copied into it?

11   A.    To describe the context, yes.

12   Q.    There are some minor word changes, but everything that

13   was stated in that Ericsson joint proposal is copied in,

14   right?

15   A.    I think everything related to buffer formats, not the

16   powers and things.

17              THE REPORTER:  The powers?

18   Q.    (By Mr. Lumish) Not the power headroom?

19   A.    Yes.

20   Q.    We'll take a look at that.

21        You have in your binder what we've color-coded.  You and

22   I did this in your deposition to try to make it a little

23   easier to find the text.  So we have Exhibit 570.  Will you

24   take a look at that for me, please?

25              MR. LUMISH:  I don't think you can publish this

1  yet.

2  A.   Which one?

3  Q.   (By Mr. Lumish) Exhibit 570, DTX-570.  It should be in

4  your binder there.

5  A.   Yes.

6  Q.   Do you recognize this, sir, as a color-coded copy of the

7  Ericsson joint proposal?

8  A.   Yes, I do.

9  Q.   And then if you look at DTX-572, do you recognize that

10  as a color-coded copy of the original application for the

11  '820 patent, the November 5 application?

12  A.   Yes.

13  Q.   And do you recall being asked about these color-coded

14  copies at your deposition?

15  A.   Yes.

16       MR. LUMISH:  Your Honor, we would move Exhibits 570

17  and 572 into evidence.

18       THE COURT:  Any objection?

19       MR. CALDWELL:  No objection.

20       THE COURT:  They will be admitted.

21  Q.   (By Mr. Lumish) You see the yellow text highlighted on

22  the front page there of 570-001, right?

23  A.   I do.

24       MR. LUMISH:  And if we can go to split screen --

25  thank you.

```
 1    Q.   (By Mr. Lumish) So on the left side, we have the joint
 2    proposal with Ericsson.  On the right side, we have your
 3    original application.
 4         Do you understand that, sir?
 5    A.   I do.
 6    Q.   Now, we're going to highlight the -- by colors here --
 7    and maybe we won't do them all.  I'm not sure we'll need to.
 8    But you see that the text from the Ericsson proposal is
 9    essentially word-for-word found in your original application
10    in yellow highlighting, right?
11    A.   Yes.  The text from the joint proposal, yes, can be
12    found in the application.
13    Q.   And then there is red text right below in the
14    introduction.  You'll see it talks about signaling E-UTRAN
15    scheduling information.  We talked about the buffer status
16    reporting being related to scheduling, right?
17    A.   Correct.
18    Q.   Okay.  So we have red text on the left from the Ericsson
19    joint proposal; and on the right, we have the same text in
20    your original application, don't we?
21    A.   We do.
22    Q.   And then you said Power Headroom Reports.  You didn't
23    think that was copied over.
24              MR. LUMISH:  Let's take a look, please, at Section
25    2.
```

1  Q.   (By Mr. Lumish) And you'll see it's all highlighted in

2  purple.  You can compare that to DTX-572, Page 9, and see

3  that, in fact, that same text has been copied over into the

4  original application for the '820 patent, right?

5  A.   Correct.

6  Q.   Buffer status reports, that's Section 3 of the joint

7  proposal with Ericsson, and we've got on the first page there

8  some green, some pink, and some blue -- or maybe dark purple

9  text on the left.

10       Do you see that, sir?

11  A.   I do.

12  Q.   And if we go to Page -- DTX 572-11, I think you'll see

13  some of the green and the pink.  If you can confirm for us

14  that's the same text?

15  A.   I can.

16  Q.   And then if we go to Page 12 of the application, I think

17  you'll see the remainder of that text from the joint proposal

18  with Ericsson was also copied over; isn't that right?

19  A.   Just to clarify, so the parts that are circled on the

20  one, we identified as being slightly different during the

21  deposition.

22  Q.   You said there's some words that are different --

23  A.   Yes.

24  Q.   -- but the content is the same --

25  A.   Yes.

1   Q.    -- is that fair?

2   A.    Yes, that's fair.

3   Q.    Fair enough.

4         Now, I won't go through all of them.  We'll be able to

5   have the jury look at this for themselves.  The figures,

6   though, I want to make sure we see those.  So on Page --

7   DTX-570, Page 2, you'll see the figures from the Ericsson

8   proposal?

9   A.    The joint proposal, yes.

10  Q.    And then on the -- on Page -- DTX-572, Pages 27 and

11  28 -- we'll start with 27 here.  That's the same figure for

12  "short," isn't it?

13  A.    It is.

14  Q.    And if we go to the next page, DTX-572, Page 28, it's

15  the same figure for "long."

16  A.    It is the same figure.

17  Q.    And, again, it's a short buffer status report that you

18  would use if you only had one buffer to report data, right?

19  A.    Yes.

20  Q.    And it's a long buffer status report that you would use

21  if you had more than one buffer to report data.

22  A.    It's the "long" that you use when you want to signal

23  for, yes.

24  Q.    Now, I'm sure that some of the ideas in that Ericsson

25  proposal are yours.  I'm sure that's going to be your

1  position, right?

2  A.    From the joint proposal, I actually don't remember

3  exactly how we built this together.

4  Q.    Well, are some of the ideas in the joint proposal with

5  Ericsson your ideas?

6  A.    From the joint proposal, I cannot tell.  I know it was a

7  joint effort, but I don't know exactly which part came from

8  which -- I think the long BSR format.  So the idea to import

9  four different groups originated from Nokia, but the rest,

10  like power control, I'm not sure.

11  Q.    All of the ideas in the Ericsson proposal were put into

12  the application for the '820 patent without crediting in any

13  way Ericsson, Samsung, Qualcomm, NTT DoCoMo, or anybody

14  else -- if I didn't say Ericsson, I'll go back to Ericsson --

15  on that proposal, right?

16  A.    Correct.  Because that's not what the invention is

17  about.

18  Q.    Now, when -- I'm a little confused now, because I

19  thought when CCE's lawyer asked you questions yesterday about

20  the joint proposal with Ericsson, Exhibit 569, I thought you

21  said you wrote the thing.

22  A.    I wrote the paper, yes.

23  Q.    You did write it?

24  A.    I did write the paper.

25  Q.    All right.  Are you telling us today that all of the

1    ideas in that proposal, though, were contributed by you and

2    only by you?

3    A.    No, it's not.  Because I write the paper, that it means

4    I invented everything in the paper.  It's just to reflect a

5    joint -- a group discussion, just to capture the agreements

6    between a number of companies.

7    Q.    Somebody needs to write it down, right?

8    A.    Yes.

9    Q.    Okay.  And in that case, you took up the job?

10   A.    Exactly.

11   Q.    Now, I want to ask you about Ericsson's role in the

12   contribution and the conception of the ideas that are in that

13   proposal, and then ultimately I think in your patent

14   application.

15        So, in your binder, you'll see DTX-754.

16            MR. LUMISH:  And I don't believe this is admitted

17   yet.

18   Q.    (By Mr. Lumish) Do you recognize, sir, the cover of

19   DTX-754 as an e-mail that you received from an address at

20   Ericsson -- an e-mail address at Ericsson on October 22nd,

21   2007?

22   A.    I do.

23   Q.    And there's an attachment with some PowerPoint slides,

24   right?

25   A.    There is.

```
 1   Q.   That you received as well?

 2   A.   Excuse me?

 3   Q.   That you received the attachment as well, didn't you?

 4   A.   I guess I did.  I don't remember.

 5           MR. LUMISH:  Your Honor, we move DTX-754 into

 6   evidence.

 7           THE COURT:  Any objection?

 8           MR. CALDWELL:  We object on the grounds that the

 9   company they're working with receives the night before trial

10   when subpoenaed many, many months ago.

11           THE COURT:  That's overruled.  It will be admitted.

12   Q.   (By Mr. Lumish) Now, there's -- the e-mail, it actually

13   doesn't go only to you.  It goes to a number of names there

14   at Ericsson, Samsung, DoCoMo, Qualcomm, Nokia, and yourself,

15   right?

16   A.   Correct.

17   Q.   Do you know the specific names of the people who are on

18   this e-mail, and can you tell us who they were, please?

19   A.   Janne Peisa was an Ericsson delegate working in Finland.

20   Kimsh23 goes by the nickname of S.K.  He's a Korean delegate

21   working for Samsung.

22       Also to myself.

23       Anil Umesh is a delegate from NTT DoCoMo in Japan.

24       Ed Charbonneau was a delegate from Qualcomm.

25       Tsuyoshi.Kashima was a delegate from Nokia.
```

1         And I think that's it.

2    Q.    And the e-mail comes -- you see at the bottom, it has a

3    slash Magnus, right?

4    A.    Yes.

5    Q.    That's Magnus Stattin.

6    A.    I believe it is, yes.

7    Q.    And the e-mail address at the top is very long.  I'm not

8    going to read it into the record here, but it ends @hklaw.

9         Do you see that?

10   A.    I do.

11   Q.    Are these the people that are listed here, including

12   Mr. Stattin, that worked together on the joint proposal with

13   Ericsson?

14   A.    I believe they are, yes.

15   Q.    Were there other people who aren't listed in this e-mail

16   address who contributed?

17   A.    I couldn't tell.

18   Q.    And do you recognize the address at the top as being one

19   from Mr. Stattin in particular, or is it more general than

20   that?

21   A.    In the "from" field?

22   Q.    Yes.

23   A.    I don't really know how to read that e-mail address.

24   Q.    Okay.

25              MR. LUMISH:  Let's go to the PowerPoint, please.

It begins on the second page of the exhibit, DTX-754, Page 2.

Q.   (By Mr. Lumish) And it refers to a MAC LTE workshop.

Now, MAC, that's the part of the standard that you were working on as it relates to buffer status reports, right?

A.   Correct.

Q.   And it's referring to a workshop.  The workshop was a meeting among the people that were listed on the e-mail that you just listed out a few moments ago, right?

A.   Yes.

Q.   And where did this meeting take place?

A.   I believe it took place in Helsinki.

Q.   And did all of the people in that e-mail attend that meeting?

A.   To be honest, I have no recollection of the meeting itself.

Q.   You attended in person?

A.   I did.

Q.   Is Helsinki where Ericsson is headquartered?

A.   No, it's not.

Q.   Okay.  It's in Finland, though.  Same country.

A.   Finland.

Q.   Where Nokia is headquartered.  I'm sorry.  I said Ericsson.  Is Helsinki where Nokia is headquartered?  My apologies.

A.   Yes.

1    Q.    And so did you meet in your offices?

2    A.    No.  It was an Ericsson workshop, so I don't remember

3    where we met exactly.

4    Q.    So I was going to ask you about that.  It has Ericsson's

5    logo there on the slide and Nokia on a few other slides.

6          What do you mean by it was an Ericsson workshop?

7    A.    Ericsson organized the workshop.  Janne Peisa organized

8    the workshop.

9              THE REPORTER:  I'm sorry.

10             THE WITNESS:  Janne Peisa.  It's one of the names.

11             THE REPORTER:  Okay.

12             THE WITNESS:  Janne Peisa.  Yeah.

13             THE REPORTER:  Okay.

14   A.    Okay.  But it is based in Helsinki, and that's the

15   reason why it took place in Helsinki.

16   Q.    (By Mr. Lumish) Okay.

17             MR. LUMISH:  And let's go to Page 3 of the exhibit,

18   please.

19   Q.    (By Mr. Lumish) And there's some text about -- I don't

20   know -- a quarter of the way down that says:  BSR is

21   triggered when UL-SCH resources are allocated, and it goes

22   from there.  Let's pull that out so you can see it.

23        So just that top part there says:  BSR is triggered when

24   UL data arrives in the UE transmission buffer, and the data

25   belongs to a radio bearer (logical channel) group with higher

1   priority than those for which data already existed in the UE

2   transmission buffer.

3        Do you see that, sir?

4   A.   I do.

5   Q.   This is referring to determining the buffer priority; is

6   that fair?

7   A.   No.  This is to know when to send the BSR.

8   Q.   Part of when you go in to send it is based on the

9   priority of the data in the buffer, isn't it?

10  A.   The priority that provides in the buffer.

11  Q.   Well, different buffers have different priorities, don't

12  they?

13  A.   Different buffers -- so, if you have one preferred

14  bearer and different bearers configured with different

15  priorities, then you can say different buffers have different

16  priorities, yes.

17  Q.   And so, in this description here, you have to determine

18  the buffer priority, don't you?

19  A.   I don't exactly know how you could implement that.  I

20  need to think of it.

21  Q.   Okay.  Well, let's go down a little bit lower in the

22  document, about a little bit past halfway, and you'll see

23  something that says:  BSR is triggered, and I want to pick

24  that text up on the screen and then ask you about it.

25        MR. LUMISH:  Right there.  Thank you.

1    Q.   (By Mr. Lumish) So here the text says:  BSR is triggered

2    when UL-SCH resources are allocated and number of padding

3    bits is larger than the BSR size.

4         This is a bandwidth check, right?

5    A.   This is an uplink transport block size check.

6    Q.   Better.

7         So you have to -- before you can send the buffer status

8    report, you have to make sure there's enough available space

9    in the uplink grant, don't you?

10   A.   Yes.  That's the padding BSR we discussed yesterday.

11   Q.   If you go to Page 6 of this exhibit, DTX-754, page 6,

12   there's a flowchart there on the left.

13            MR. LUMISH:  Actually, I don't need the flowchart.

14   I need some text on the right, if you would, please,

15            Mr. Schmoller, the one that's three up right in the

16   middle there.

17            Yes, that one.  Thank you.

18   Q.   (By Mr. Lumish) And this is essentially the same text,

19   right?  Describes the same thing we just looked at on Page 3?

20   A.   Oh, yes.

21   Q.   I want to make sure you and I agree on it.  That's all.

22   A.   Sure.

23   Q.   Okay.  So let's go to the next document.  If you could

24   turn, please, to DTX-755.

25        Do you recognize that as an e-mail actually from your

1  computer back to -- in response to DTX-754?

2  A.   I guess it is, yes.

3  Q.   And, again, it's an October 22nd e-mail, right?

4  A.   Yes, it is.

5  Q.   By the way, that October 22nd date, that's eight days

6  before the Ericsson joint proposal was published to the

7  Working Group, right?

8  A.   I need to check the date, but --

9  Q.   It was October 30th, right?

10  A.   In that case, yes.

11  Q.   Okay.  And it's up on your -- two weeks before the joint

12  proposal was -- before the meetings, I mean to say, in South

13  Korea, right?

14  A.   Correct.

15  Q.   And it's before you filed the original application for

16  the '820 patent?

17  A.   Yes.

18          MR. LUMISH:  Your Honor, we would move Defendants'

19  Exhibit 755 into evidence.

20          THE COURT:  Any objection?

21          MR. CALDWELL:  No, Your Honor.

22          THE COURT:  That will be admitted.

23  Q.   (By Mr. Lumish) Very quick on this one.  It's a small

24  e-mail.  It bounces back -- or you get an automatic response

25  from you, an e-mail that says:  On business trip.  Back at

1    office on 24/10, right?

2    A.    Yes.

3    Q.    So you were on a business trip.  You were on your way to

4    Helsinki for the workshop meeting; is that right?

5    A.    Yes.

6    Q.    And you were planning to be there until October 24th,

7    weren't you?

8    A.    Correct.

9    Q.    If you would look at Defendants' Exhibit 756 in your

10   binder for me, please, sir.

11        So we're moving now to the next day, October 23rd.  Do

12   you have that in front of you?

13   A.    I do.

14   Q.    So Defendants' Exhibit 756, this is an e-mail that you

15   received from Janne, J-A-N-N-E, at Ericsson on October 23rd,

16   2007, isn't it?

17   A.    It is.

18   Q.    And it included the PowerPoint that is attached that

19   goes through DTX-26, right?

20   A.    That goes to DTX-26.

21   Q.    Goes to the end of the PowerPoint, which has the number

22   on it.  We put the little exhibit numbers on the bottom

23   there.  DTX-26 is the last page.

24   A.    Sorry.  Yes.

25             MR. LUMISH:  Your Honor, we move DTX-756 into

```
 1    evidence.
 2              THE COURT:  Any objection?
 3              MR. CALDWELL:  No, Your Honor.
 4              THE COURT:  It will be admitted.
 5    Q.   (By Mr. Lumish) Now, the e-mail is sent to the same
 6    group, right?  This is for that same workshop?
 7    A.   You can see another colleague of mine in the list,
 8    though, but -- Esa Malkamaki.  But, otherwise, it's the same.
 9    Q.   Is it a -- pardon me.  I should know this.  But is that
10    a Mr. or Ms. Malkamaki?
11    A.   Mr.
12    Q.   Okay.  Because I've never heard the name before.
13         Now, Mr. Malkamaki, he works at Nokia?
14    A.   Correct.
15    Q.   Okay.  And if you turn to the second page of the
16    exhibit -- well, actually, go back.  I'm sorry.
17         There's a statement or a message from Janne there.  It
18    says:  Dear all, please find the raw slides from today.
19         Do you see that?
20    A.   I do.
21    Q.   And is -- first of all, what is Janne's last name?
22    A.   Peisa, P-E-I-S-A.
23    Q.   All right.  And is that a Mr. or Ms.?
24    A.   It's a Mr.
25    Q.   Mr.
```

1    And is Mr. Peisa here saying that -- providing to the

2    group slides that he created capturing the discussions from

3    the morning -- or from the day?

4    A.  I would assume so.

5    Q.  If you turn to the next page of the exhibit, please,

6    DTX-756, Page 2, again, refers to the same MAC LTE workshop,

7    right?

8    A.  Yes.

9    Q.  If you turn to Page 3, you'll see a page called:

10   Practical information.  And it refers to rooms that are

11   booked for Monday and for Tuesday.  Those are hours.  It says

12   8-21, 8-15.  Those are hours during the day, right?

13   A.  Yes.

14   Q.  And so this is showing that y'all met together, and

15   y'all met together in these rooms at these times; is that

16   right?

17   A.  I believe we did.

18   Q.  And by "the group," I mean, the group -- the workshop

19   group.  Those are the people who met in those rooms.

20   A.  Yes, the one we saw in the e-mail addresses.

21         MR. LUMISH:  If we could turn to Page 6 of the

22   exhibit, please, DTX-756, Page 6.

23   Q.  (By Mr. Lumish) If you go down about a little bit past

24   halfway, you'll see:  Need to update buffer status.  And then

25   in bold, I think the same text we looked at before:  BSR is

1  triggered when UL-SCH resource ARE allocated and number of

2  padding bits is larger than the BSR size.

3       So that carried over to the next day, didn't it?

4       Oh, I'm sorry.  Take your time to find it.

5       Do you have that text in front of you, sir?

6  A.   Yes, I do.

7  Q.   So this is the same text we looked at in Exhibit 754,

8  isn't it?

9  A.   Correct.

10 Q.   Now, I should have asked you this the first time.  Does

11 UL-SCH mean uplink scheduling?

12 A.   No.  It means uplink shared channel.

13 Q.   Uplink shared channel?

14 A.   Channel, yes.

15 Q.   Okay.  Thank you.

16      MR. LUMISH:  Let's go, please, to Page 9, DTX-756,

17 Page 9.

18 Q.   (By Mr. Lumish) And down towards the bottom, maybe a

19 third of the way up from the bottom, it says:  Would prefer

20 two formats.

21      MR. LUMISH:  Will you bring up that and the

22 supplements, please?

23 Q.   (By Mr. Lumish) So the joint discussion was that the

24 group wanted to have two formats, a single-byte format where

25 only one radio bearer has data to transmit in a multi-byte

1    format when several radio bearers have data, right?

2    A.    Yes.

3    Q.    And so this is saying you should have short when there's

4    one, and when we have a long one, there's more than one,

5    right?

6    A.    Correct.

7    Q.    And if we turn to the next page, DTX-756, Page 10, this

8    shows some of the discussion you were having about how to

9    build these formats; isn't that right?

10   A.    I believe, yes.

11   Q.    In the middle you see grouping TBD; do you see that?

12   A.    Yes.

13            MR. LUMISH:  And if you could bring up the box in

14   the middle there for me, please, the buffer status report and

15   everything in the boxes.

16            Thank you -- no, I don't need all that.  Just right

17   there.  Thank you.

18   Q.    (By Mr. Lumish) There's a reference here -- so this --

19   when it says buffer status report SUFI.  What does "SUFI"

20   mean?

21   A.    I actually do not remember.  This comes from 3G.

22   Q.    And it talks about a highest priority logical channels

23   ID, queue size based on high priority.  Do you see that?

24   A.    I do.

25   Q.    This is determining the buffer priority in order to

1   process the buffer status report, isn't it?

2   A.    No, it is not.

3   Q.    I don't think you and I are ever going to agree on this

4   one, sir.  So, I'm going to -- I'm going to put a "no?" on

5   this guy for determining buffer priority, on No. 4.

6         But let me ask you about this for a second.  So this was

7   the flowchart you used yesterday in describing your invention

8   to the jury.  Do you remember that?

9   A.    I do.

10  Q.    And the only place you and I disagreed that you hadn't

11  invented was this No. 470, right here, this step for

12  determining buffer priority.  Do you recall that?

13  A.    I do.

14  Q.    And it's done to designate a short format.  That's what

15  step 480 says, right?

16  A.    Yes.

17  Q.    Do you know that the claims that are asserted in this

18  case, the ones that were accused of infringing, my client is

19  accused of infringing, only go to the designation of long

20  format over here on the other side?

21  A.    I do not know that.

22  Q.    So you didn't know that the short format designation has

23  not actually been presented to the jury in this case?

24  A.    No.

25  Q.    I'm going to go ahead and put an X over that.  It's not

```
 1    really relevant to the lawsuit.
 2         Now, let's look at --
 3              MR. CALDWELL:  Your Honor, I, again, object to the
 4    sidebars.  He's misrepresenting things to the jury, but he's
 5    also just arguing what's relevant.  I mean, that's argument.
 6    Plain and simple.
 7              THE COURT:  Mr. Lumish, stick to your questions,
 8    please.
 9              MR. LUMISH:  Yes, Your Honor.
10              MR. CALDWELL:  Could we have that comment about
11    what is relevant stricken?
12              THE COURT:  Counsel, approach.
13              MR. CALDWELL:  Thank you.
14              (Bench conference.)
15              MR. CALDWELL:  I just wanted the argument on
16    relevance stricken from the record.  That's all.
17              THE COURT:  Okay.  That's denied.
18              Just get to your questions.
19              MR. LUMISH:  Yes, Your Honor.
20              THE COURT:  You can handle it on redirect.
21              (Bench concluded.)
22              MR. LUMISH:  Can we have DTX-756, Page 11, please?
23    Q.   (By Mr. Lumish) And in the middle there you say --
24              MR. LUMISH:  If you could bring up the -- pull
25    up -- it says two formats -- actually, all the way down to
```

1  the bottom, please.

2  Q.   (By Mr. Lumish) So here Ericsson, in its PowerPoint

3  slide, says -- describes two formats for the buffer status

4  reports, doesn't it?

5  A.   Yes.

6  Q.   A short and a long, right?

7  A.   A 1 byte and 3 bytes, yes.

8  Q.   1 byte is shorter than 3 bytes, isn't it?

9  A.   It is.

10  Q.   And the short one there, it's used and chosen if only

11  one group has data to report; isn't that right?

12  A.   Only says if one group to report.  It leaves nothing to

13  having data.

14  Q.   Okay.  And underneath it says:  6 bits per group.

15  Do you see that?

16  A.   I do.

17  Q.   Is that proposing the size of the buffer status report?

18  A.   Yes.  6 times 3, 18 bits, yes.

19  Q.   And then we go down two bullets, there it says:  How to

20  choose format.

21      Do you see that?

22  A.   Yes.

23  Q.   And it says:  Based on how many groups need to report,

24  based on amount of data in the buffer.

25  A.   I do.

1   Q.   Here, it's telling you exactly what the selection

2   criteria are, and it's how many groups -- buffer groups need

3   to report data, isn't it?

4            MR. LUMISH:   Actually, I need you to highlight the

5   other part, not that one, please.

6   Q.   (By Mr. Lumish) I'm focusing on the first part of the

7   phrase there.   It says:   Based on how many groups need to

8   report.

9        That's telling the reader, you choose the format, short

10  or long, based on the number of buffers that need to report

11  data?

12  A.   Yes, but it doesn't explain what the criteria to know

13  that a group needs to report is.

14  Q.   You think they needed to write down in more words

15  actually saying, choose short if one buffer, choose long if

16  more than one buffer.   Is that what I just heard you testify?

17  A.   Yes.

18  Q.   Okay.   Go to DTX-757 in your binder, please.

19       Do you recognize that as an e-mail that you sent back to

20  the workshop group on October 24th, 2007?

21  A.   Yes.

22  Q.   And you attach a rough draft of what later becomes the

23  joint proposal with Ericsson and the other contributors,

24  right?

25  A.   Looks like it, yes.

```
 1            MR. LUMISH:  Your Honor, we move Defendants'
 2   Exhibit 757 into evidence.
 3            THE COURT:  Any objection?
 4            MR. CALDWELL:  No objection.
 5            THE COURT:  It will be admitted.
 6   Q.  (By Mr. Lumish) On the cover of your e-mail there you
 7   say:  The selection of which BSR long/short is not discussed
 8   running out of steam now.
 9        Isn't that true?
10   A.   Yes.   That's what it says.
11   Q.   But you do include -- if you go to Page 3 of the
12   exhibit, DTX-757, Page 3, you do include those same figures
13   and the same text?
14            MR. LUMISH:  If you would bring the text above it,
15   too, please Mr. Schmoller.
16            Thank you.
17   Q.   (By Mr. Lumish) The same text and the same exhibits --
18   I'm sorry, the same text and the same figures that we saw in
19   the Ericsson PowerPoint that says it's not always necessary
20   to report all four.  You can use a short when you only have
21   one to report, right?
22   A.   Yes, it shows the same two figures.
23   Q.   Now, I asked you about the original application for the
24   '820 patent before and how text from this joint proposal with
25   Ericsson was copied into it.  You know that that same text is
```

1   actually in the final '820 patent as issued, don't you?

2   A.    I do not remember.  The figure on this, I believe.

3   Q.    Well, why don't we take a look at the figures.  At least

4   if we could look at that.

5           MR. LUMISH:  So if we could bring up from

6   Plaintiff's Exhibit 1, Figures 5 and 6.

7   A.    That would be PX-1?

8   Q.    (By Mr. Lumish) Yes, sir.

9           MR. LUMISH:  This is in evidence, if you could

10  bring that up, please, Plaintiff's Exhibit 1.

11  Q.    (By Mr. Lumish) Same figures, right?

12  A.    Yes.

13  Q.    I'll show you a couple.  Again, I'll try not to show you

14  all of them.  If you go to Column 122 through Lines --

15  Column 1, Lines 22 through Lines 25.  I think you will see

16  the same text from the introduction of the Ericsson proposal.

17      Do you see that?

18  A.    Yes, so the text I wrote for the joint proposal can be

19  found in that patent, yes.

20  Q.    And if we go -- why don't we look at -- I'll skip

21  Column 8, Line 66, it's one line at the bottom if you want to

22  look at it for context, you can.

23      But let's look at Column 9, all of it, through the first

24  five lines of Column 10 in the '820 patent.

25          MR. LUMISH:  If you would bring those up for me,

```
 1    please, on Plaintiff's Exhibit 1.

 2              THE WITNESS:  Can you zoom in for me?

 3              MR. LUMISH:  We still don't have it.

 4              I need Plaintiff's Exhibit 1, the patent.

 5              There we go.  Thank you.

 6              So Column 9 and through Column 10, Line 5.

 7    Q.   (By Mr. Lumish) You can look at this --

 8              MR. LUMISH:  Take that column out, please, off the

 9    screen.  I need all of 9 and 10.  It's not going to -- I

10    think it's too big.

11    Q.   (By Mr. Lumish) You recognize, sir, the text from

12    Column 9 up until the first five lines of Column 10 as coming

13    from the discussion of buffer status reports in the joint

14    Ericsson proposal?

15    A.   I'm sorry.  Could you show the text on the screen?

16    Q.   Sure.  Which part?  The Column 9 and 10?

17    A.   Is it possible to have --

18    Q.   Why don't we just zoom into one part.  Why don't we look

19    at Column 9, Line 57 through 63.  Instead of trying to make

20    you read the whole thing.

21         Do you see it says there:  It may not be necessary to

22    report the four RBGs always; e.g., when only a limited number

23    of bearers are configured.  It may be beneficial to introduce

24    two formats of BSR:  One where only one RBG is reported and

25    one where all four are -- four RBGs are.
```

1      And then it talks about 2 bits and buffer sizes and

2  refers to Figure 6.

3      This is the same content that was in the joint Ericsson

4  proposal before the filing of the '820 patent.  And it's in

5  the '820 patent now, isn't it?

6  A.   Yeah.  More or less the same content can be found in my

7  contribution, yes.

8           MR. LUMISH:  Can you go to Claim 1 for me, please?

9  Q.   (By Mr. Lumish) You see, sir -- this is Claim 1.  And

10  you know that Claim 4 has been asserted in this case, and it

11  requires everything in Claim 1 to be met plus what's in

12  Claim 4.  Do you understand that's the way this works?

13  A.   I understand that's how it works, yes.  I didn't know

14  Claim 4 was asserted.

15  Q.   In the first two limitations here, the detecting and the

16  designating limitations, there's reference to pre-selected

17  conditions.  Do you see that?

18  A.   I do.

19  Q.   And do you understand that the allegations of

20  infringement in this case --

21           MR. LUMISH:  Will you highlight both of them for

22  me, please?  The one that's designating as well.

23  Q.   (By Mr. Lumish) The allegations of infringement in this

24  case -- say Apple infringes because it chooses short in the

25  Qualcomm code on the Qualcomm chip, and chooses short when

1   there's one buffer, and long when there's more than one

2   buffer.  Those are the pre-selected conditions according to

3   CCE's lawyers.  Do you understand that?

4   A.   I need to look at the flowchart.

5   Q.   Well, I'm asking you not about the flowchart but about

6   what the accusations are in the lawsuit?

7   A.   For the accusation, yes.  I understand that.

8   Q.   Okay.  So let me make sure we're clear.  You understand

9   that the allegation of infringement brought by CCE in this

10  case is that Apple infringes these parts of the claims

11  because it chooses -- I should say the Qualcomm chip and the

12  code on that Qualcomm chip chooses a short report when

13  there's only one buffer and a long report when there's more

14  than one buffer.

15  A.   I understand that -- I mean, your description of what

16  this is about, yes.

17  Q.   And you understand that functionality I just described

18  is the same as we looked at in Column 9, Lines 57 through 63

19  of the specification, that discussion of radio bearer groups

20  and choosing one when they're short and four when there's --

21  long when there's four?

22  A.   I don't think so.

23  Q.   Let's go back to that text.

24       MR. LUMISH:  Line 57 through 63, please.

25  Q.   (By Mr. Lumish) So it says it may not be necessary to

1  report the four radio bearer groups, and it may be beneficial

2  to have two formats, one where only one buffer is reported,

3  one where all four are.  Do we agree on that so far?

4  A.   Yes.  That's the description of long and short, yes.

5  Q.   And is it your testimony today that that is not a

6  pre-selected condition in the '820 patent?

7  A.   No.  It just lists the formats.  Doesn't say we have to

8  select.

9  Q.   All right.  Let's go to another proposal.

10       Now, in the same month, in October, there was another

11  proposal submitted to the RAN2 Working Group, this time from

12  Samsung; isn't that right?

13  A.   There are many contributions from Samsung at every

14  meeting.

15       THE REPORTER:  I'm sorry, what was the last thing

16  after you said Samsung?

17  A.   There are many contributions submitted from Samsung at

18  every meeting.

19  Q.   (By Mr. Lumish) Will you look at Defendants' Exhibit 738

20  in your binder for me, please?

21       THE COURT:  Mr. Lumish, I've gotten word that our

22  jury needs a break whenever you get to a good stopping point.

23       MR. CALDWELL:  Oh, I can stop right now.

24       THE COURT:  Okay.  Ladies and Gentlemen of the

25  Jury, we're going to take our morning break a little early.

| | |
|---|---|
| 1 | We're going to be in recess until 10:15.  And then we're |
| 2 | going to go until lunchtime.  So take a good break now, and |
| 3 | then we'll be in recess until 10:15. |
| 4 | COURT SECURITY OFFICER:  All rise. |
| 5 | (Recess.) |
| 6 | (Jury out.) |
| 7 | COURT SECURITY OFFICER:  All rise. |
| 8 | THE COURT:  Let's bring in the jury. |
| 9 | (Jury in.) |
| 10 | THE COURT:  Please be seated. |
| 11 | Mr. Lumish, you may continue. |
| 12 | MR. LUMISH:  Thank you, Your Honor. |
| 13 | Q.   (By Mr. Lumish) Right before we broke, sir, we were |
| 14 | going to look at the proposal, DTX-567.  Were you able to |
| 15 | look at that at the break? |
| 16 | A.   Sorry? |
| 17 | Q.   Were you able to look at that document at the break? |
| 18 | A.   No. |
| 19 | Q.   I'm sorry, not 567.  738. |
| 20 | A.   738. |
| 21 | Q.   Yes.  Did you look at that document at the break? |
| 22 | A.   No, I did not. |
| 23 | Q.   All right.  Now, you recognize it as a proposal from |
| 24 | Samsung to the RAN2 Working Group, don't you? |
| 25 | A.   I do. |

```
 1              MR. LUMISH:  I don't know if this has been
 2   preadmitted, Your Honor, so I'll move it into evidence.
 3              THE COURT:  Any objection?
 4              MR. CALDWELL:  I'm not actually clear what the
 5   relevance is, so -- if it hasn't been preadmitted, and we
 6   haven't established any sort of basis for it, whatsoever.
 7              THE COURT:  Response?
 8              MR. LUMISH:  We're going to show in just a moment,
 9   Your Honor, text from this is copied into his patent as well.
10              THE COURT:  It will be admitted.
11              MR. CALDWELL:  Okay.  No objection.
12              THE COURT:  Thank you, Mr. Caldwell.
13   Q.   (By Mr. Lumish) Now, Samsung is the only source listed
14   on the cover of DTX-738, isn't it?
15   A.   Yes.
16   Q.   You're not listed?
17   A.   I am not.
18   Q.   Nokia is not listed?
19   A.   No, Nokia is not listed.
20   Q.   On Page 2 you'll see language that refers to the number
21   of radio bearer groups that have data in the buffers.  Let me
22   see if we can bring that up on the screen.
23        It says since there could -- oh, here we go.
24              MR. LUMISH:  It's above the -- above the figure.
25   There you are.
```

1   Q.   (By Mr. Lumish) It says:   The required fields for the

2   buffer status report are RBG id, buffer size and probably the

3   power headroom information.   Since there could be a number of

4   RB groups that have data in the buffer, the number of RBG

5   id/buffer size pair and consequently the size of the buffer

6   status report is dynamic.

7        Do you see that?

8   A.   I do.

9   Q.   So this is Samsung saying different numbers of buffers

10  may have data, and you can have different sizes of buffer

11  status reports under those circumstances, isn't it?

12  A.   Yes.

13  Q.   And let's go back to the date on this document.   It's

14  October, 2007, isn't it?

15  A.   Yes.

16  Q.   And it was published for presentation at meetings in

17  Shanghai, China, right?

18  A.   Shanghai, yes.

19  Q.   And this is before your filing of the patent application

20  for the '820 patent, isn't it?

21  A.   Correct.   I believe I had this listed as prior art.

22         MR. LUMISH:   Can we go to the patent, please, '820

23  patent, Column 6 at Lines 45 through 46 -- actually, I'm

24  sorry, let's go back to Page 1 of DTX-738.   I need to show

25  one more part of that exhibit?

1   Q.   (By Mr. Lumish) You'll see it says -- under Proposal 2

2   it talks about the mapping.  It says:  The mapping between

3   radio bearers and the radio bearer groups could be either

4   dynamic or static.

5        Do you see that?

6   A.   I do.

7   Q.   And this text is in your patent, isn't it, sir?

8   A.   I don't know.

9   Q.   So let's now go back to where we were in the patent if

10  we could.

11            MR. LUMISH:  So '820 at 6:45 through 46?

12  Q.   (By Mr. Lumish) It says in the second sentence, same

13  content:  The mapping of radio bearers on radio bearer groups

14  could be either fixed -- you've got some text there, you

15  say -- in standards or dynamic, dynamically configured.

16       Isn't that right?

17  A.   I don't think it exactly means the same thing.

18  Q.   We've got the words on the top there, the mapping

19  between the radio bearers and the radio bearer groups could

20  be either dynamic or static, right?  That's in the Samsung

21  proposal?

22  A.   Yes.

23  Q.   And here you say in your patent the mapping of radio

24  bearer groups on radio bearer groups could be either fixed or

25  dynamically configured.  Isn't that what you say?

```
 1   A.    Yes.   And I'm saying it's different.

 2   Q.    Now, the Samsung patent also talks about the size -- I'm

 3   sorry -- the Samsung proposal also talks about the size of

 4   the buffer status report.

 5         If you go to Defendants' Exhibit 571 of Page 12 -- Page

 6   2.   Page 2.

 7         Wait a minute.   I'm sorry.   I'm getting myself confused.

 8   It is 738, Page 2.

 9         You'll see under Proposal 4 there it talks about a 6 bit

10   buffer size as one of the proposals; isn't that right?

11   A.    Yes.

12   Q.    It says the number of RBG id buffer size pair and

13   consequently the size of the buffer status report is

14   dynamic -- I'm sorry we did that before -- the total size of

15   the RBG id/buffer size field pair should be byte-aligned,

16   therefore, the candidate sizes for the buffer size are 6 bit

17   or 14 bit.

18         Right?

19   A.    Right.

20   Q.    Now let's go to your patent.   If we go to -- it's 922

21   through -- Column 9, Lines 22 through 29, I believe.

22         You say:   Candidate size for the buffer size may be 16

23   bit and 14 bit.

24         Do you see that?

25   A.    Yes.
```

1   Q.   That's the same thing that was in the Samsung proposal

2   from October, isn't it?

3   A.   To describe the context of the invention, yes.

4   Q.   You didn't name Samsung or anybody from Samsung as an

5   inventor in your '820 patent, did you?

6   A.   I did not, since it is for the context.

7   Q.   It's for the context.

8        Let's look at Claim 8.

9   A.   Not to my reading.

10           THE REPORTER:   I'm sorry, what?

11  A.   Not to my reading.

12  Q.   (By Mr. Lumish) So here's Claim 8 of the patent.   You

13  understand the claims are where you tell the public what

14  you've invented, right?

15  A.   Yes.

16  Q.   And you propose a 6 bit buffer size; isn't that true?

17  A.   That is true.

18  Q.   And if we go to Claim 19.

19       Not for context, but as the claims of what you invented,

20  you claimed a 6 bit buffer size, don't you?

21  A.   Yes.

22  Q.   Yet you admitted yesterday, and I think you'll admit

23  again today, you didn't invent the idea of a 6 bit buffer

24  size.

25  A.   Correct.   In isolation, no.   I agree.

1   Q.   Now let's look at Defendants' Exhibit 567.

2        CCE's lawyers asks you a little bit about this

3   yesterday.   This is the proposal that Nokia submitted in

4   January of 2008.   Do you remember talking about this

5   yesterday?

6   A.   I do.

7   Q.   And this is after, obviously, the Ericsson joint

8   proposal, after the filing of your provisional application,

9   right?

10  A.   Yes.

11  Q.   It's for meetings in Spain in 2008, January.

12  A.   Yes.

13  Q.   Two months after the patent application was filed?

14  A.   Correct.

15  Q.   And more like three months after the workshop where

16  y'all met together in Helsinki?

17  A.   It was.

18  Q.   If you turn to -- actually, it's on this page actually.

19  Go gown to the criteria section.   And you'll see --

20            MR. LUMISH:   If you can bring that up for me,

21  please, Mr. Schmoller.

22  Q.   (By Mr. Lumish) You say:   In its simplest form the

23  criteria can simply depend on the amount of data that is

24  buffered in the different logical channel groups.

25       Now, logical channel groups and radio bearer groups are

1   the same thing, aren't they?

2   A.   Yes, they are.

3   Q.   And you say in the bullets below it:  If only one

4   logical channel group has buffer data; report the short.  And

5   as soon as more than one logical channel group has buffer

6   data; report the long.

7        Isn't that what you said?

8   A.   Correct.

9   Q.   Now, this is in your proposal once after we saw that

10  same language from Ericsson in its PowerPoints?

11  A.   I disagree.

12  Q.   I'm sorry?

13  A.   I disagree.  This is different.

14  Q.   You say:  In its simplest form the criteria -- that's

15  your selection criteria, right?

16  A.   Yes.

17  Q.   Can simply depend on the amount of data that's buffered.

18  And these are the two examples you give.  One for short.

19  More than one buffer, go long.  Is that what you say here?

20  A.   The first sentence introduces on a high level what the

21  proposal is.  And then you have the two bullets describing in

22  detail what it means.  And I don't think this was captured in

23  the Ericsson slide-set in any way.

24  Q.   Okay.

25             THE REPORTER:  Did you say Ericsson slide-set?

```
 1                    THE WITNESS:  I did.

 2                    THE REPORTER:  Okay.

 3                    MR. LUMISH:  Can you leave that up, please, and

 4    then go to DTX 756, Page 9.

 5                    And if you could make a split screen at the top and

 6    bottom so we could have the -- would prefer two formats --

 7    no, page -- let's do Page 11, the two formats and how to

 8    choose the format.

 9                    So we can put that on the bottom and the text we

10    were just looking at on the top, please, Mr. Schmoller.

11    Q.   (By Mr. Lumish) So this is the Ericsson proposal we have

12    on the screen, right?

13    A.   I wouldn't describe it as Ericsson.  This is the result

14    of the meeting we had.

15    Q.   Fair enough.  And I shouldn't have said "proposal."

16    This is the PowerPoints that came from Ericsson and have the

17    Ericsson logo on them that come from those workshops, right?

18    A.   Correct.

19    Q.   And so it says two formats.  You've got the short, the

20    long, 1 byte, and 3 byte.  It says choose based on how many

21    groups need to report, right?

22    A.   Yes.

23                    MR. LUMISH:  Can we put that up, together with the

24    Nokia proposal, DTX-567?

25    Q.   (By Mr. Lumish) And you're telling this jury that these
```

1    are fundamentally different, aren't you?

2    A.   I think you are highlighting the wrong part here.

3    Q.   We'll fix that.

4         1 byte is the short, if there's only one group to

5    report.  3 bytes is the long.

6    A.   You're linking different things.  I'm sorry.

7    Q.   Okay.  So your position before the jury is these are not

8    the same, right?

9    A.   You selectively highlight things to lead them.

10   Q.   Can you answer my question, please?

11   A.   I'm telling the jury that this is different, yes.

12   Q.   Okay.

13   A.   And I can explain if you want me to.

14   Q.   There's a page -- you -- you described the Nokia

15   document, this Exhibit 7 -- 567, as being the solution to the

16   problem.  Do you remember that?

17   A.   Sorry, which number?

18   Q.   The Nokia proposal from January 2008.  I think your

19   testimony was it solved the problem.

20   A.   Yes, I do.

21             MR. LUMISH:  Can you go to the references at the

22   back of the document for me, please?

23   Q.   (By Mr. Lumish) Now, when you said it solved the

24   problem, you meant it solved the problem in the joint

25   Ericsson proposal, right?

1   A.   Yes.

2   Q.   And you don't even mention the joint Ericsson proposal

3   in the references, do you?

4   A.   Apparently not.  Because I believe it is implicit in the

5   report of the user --

6            THE REPORTER:  Of the?

7   A.   Sorry.  The second references is pointing to the meeting

8   minutes where the joint proposal was discussed.

9   Q.   (By Mr. Lumish) Now, we talked before --

10           MR. LUMISH:  You can take that down, please.  Thank

11  you.

12  Q.   (By Mr. Lumish) We talked before about how you filed the

13  application in November of 2007 for the '820 patent, right?

14  A.   Yes.

15  Q.   And we talked about how that was the first day of the

16  South Korea meetings?

17  A.   Yes.

18  Q.   And that was three or four weeks before a further set of

19  meetings in Spain, the January 2008 meetings?

20  A.   Yeah, a bit more than a month.  Yes.

21  Q.   And you'd gotten to know the people in those meetings

22  pretty well, haven't you?

23  A.   Most of them, yes.

24  Q.   You have dinners with them, you have drinks with them.

25  You don't just go to meetings, you socialize with them as

1    well?

2    A.    Unfortunately, most of the time, no, because we start at

3    8:00, and we end at 10:00, and we go to bed.

4    Q.    Do you have your deposition in front of you, sir?

5    A.    Yes.

6    Q.    Can you turn to Page 181?

7    A.    Yes.

8    Q.    Under oath at your deposition I asked you:

9          Question:  And you had have dinner with them, you have

10   drinks with them, that kind of a thing at these meetings?

11         And you answered:  Yes.

12         Wasn't that your testimony under oath, sir?

13   A.    Yes.

14   Q.    And the "them" in that question was the people from your

15   working group, wasn't it?

16   A.    Correct.

17   Q.    You consider some of the delegates to be friends, right?

18   A.    Yes, of course.

19   Q.    You've had plenty of opportunity to tell the joint

20   contributors, the people that you collaborated with in the

21   workshop to create the Ericsson joint proposal, that you

22   filed a patent application that included text from that

23   workshop, didn't you?

24   A.    Yes.

25   Q.    But you didn't, you didn't talk to any of them, not one

1  of them, to find out whether they ought to be named as an

2  inventor on the '820 patent, did you?

3  A.   I did not.

4  Q.   In particular, you didn't talk to Ericsson?

5  A.   No.

6  Q.   And you didn't talk to Samsung about the 6 bit or the

7  dynamic --

8  A.   No.

9  Q.   -- status report, right?

10  A.   No.

11  Q.   Not over dinner, not over a beer, not at work group

12  meeting, none of that?

13  A.   No.

14  Q.   And you still haven't told them today, have you?

15  A.   I still haven't told.  Yes.

16  Q.   I've had you on the stand a long time.  I'm going to

17  skip some of the other questions I have for you and just wrap

18  this up.

19       Going back to the main issue here --

20          MR. LUMISH:  I won't go back into the numbers.  I

21  don't think we need to seal the courtroom, Your Honor.

22  Q.   (By Mr. Lumish) But you'll agree with me that Nokia

23  wouldn't even file a patent application if the inventors had

24  to include people from other companies?

25  A.   I don't know.  I haven't seen the case.  I don't know if

1    it's regular or not.

2    Q.   You've never seen a case where Nokia would file a patent

3    application if it had to name as inventors people from other

4    companies; is that right?

5    A.   I'd say that I personally never found a case where

6    somebody else outside my company was involved.

7    Q.   You've never seen a case where Nokia would file a patent

8    application where they had to name an inventor from Ericsson,

9    an inventor from Samsung, or an inventor from any other

10   company?

11   A.   I'm not aware of such a case.

12   Q.   And you know, of course, that if Nokia doesn't file that

13   application, you don't get any of the patent bonus awards

14   that we talked about yesterday, right?

15   A.   Excuse me?

16   Q.   If Nokia doesn't file the patent application because it

17   would have to name people from other companies, you know that

18   you wouldn't get any of the filings awards, the money awards

19   we talked about yesterday?

20   A.   I guess it's a logical consequence that I've never

21   thought of before.

22            MR. LUMISH:  Your Honor, I pass the witness.

23            THE COURT:  Redirect.

24                     REDIRECT EXAMINATION

25   BY MR. CALDWELL:

1  Q.   Good morning, Mr. Sebire.

2  A.   Good morning.

3  Q.   Did you have a feeling that Apple was accusing you of

4  taking credit for some idea that someone else came up with?

5  A.   Yes.

6  Q.   Did you do that?

7  A.   No.

8  Q.   Now, you were shown a series of documents from the

9  standard setting process that predated your invention.  Do

10 you recall that?

11 A.   I do.

12 Q.   Do any of those disclose your invention?

13 A.   No.

14 Q.   I think we'll loop back to this in a minute.  But how is

15 it you could have an invention if you're not to -- not the

16 first person to think of looking at what's in a buffer?

17         MR. LUMISH:  Object to the legal conclusion, Your

18 Honor.

19         MR. CALDWELL:  He --

20         THE COURT:  Response.

21         MR. CALDWELL:  I'm sorry.  Oh, he walked right into

22 that.  That was his whole point, that he must not have had an

23 invention because he didn't invent individual parts that

24 existed.

25         THE COURT:  I'll allow it.

1   A.    Can you repeat the question?

2   Q.    (By Mr. Caldwell) Yes, sir.

3        If you didn't invent, in isolation, the step of

4   monitoring buffers, how is it you could have had an

5   invention?

6   A.    I still don't understand the question.

7   Q.    Okay.  If individual pieces of your flowchart existed

8   before, how can you say that you had an invention if those

9   individual pieces existed before?

10  A.    Yeah, of course.  So part of the invention is putting

11  these pieces together.

12  Q.    Had anyone in the group or anyone you've ever seen

13  before put together all of the pieces that you claimed as

14  your invention?

15  A.    No.

16  Q.    Explain to us, just at a high level -- and I think we'll

17  go through some documents.  But explain to us at a high level

18  why you believe your invention is not what was there before.

19  A.    This is because we didn't have the two different BSR

20  formats before.  So it's even visible in the slides from the

21  workshop with Ericsson that that was left for further study.

22       I believe that people in the Ericsson workshop were

23  the -- probably the smartest guys on the topic and, yet, we

24  couldn't find a solution.

25       And you can also see in the e-mail that I sent drafting

1    this joint proposal, that I left that point out, also for the

2    reason that I guess I couldn't find a solution or I was

3    tired.  I remember writing the contribution on the plane.

4         You could see that there's an invitation to other

5    companies to come up with a solution but, yet, nobody

6    suggested anything.

7         And so only at the next meeting I came up with the

8    invention I had.  I presented it to the group and everybody

9    agreed upon it.

10   Q.   And at the second meeting when you presented it as a

11   contribution from you and not a joint contribution, did

12   anybody dispute for a minute that the idea was yours?

13   A.   No one.

14            MR. CALDWELL:  Now, I'd like to pull up Defendants'

15   Exhibit 757.

16   Q.   (By MR. Caldwell) Mr. Sebire, what is Defendants'

17   Exhibit 757?

18   A.   So this is the e-mail I sent after the workshop, after

19   the Ericsson workshop we've gone over.

20   Q.   All right.  So in your cross-exam we saw Defendants'

21   Exhibit 756 and 754 which were the PowerPoint presentation

22   with the big Ericsson logo; is that correct?

23   A.   Yes.

24   Q.   This e-mail falls when, in relation to those

25   discussions?

1    A.    Yeah, you can see on the date it was sent the day after.

2    Q.    And who sent the e-mail that is printed here in green?

3    A.    I did.

4    Q.    Explain to us what you were sending as an attachment in

5    this invention -- or I'm sorry -- excuse me.  Explain to us

6    what you were sending as an attachment in this e-mail.

7    A.    So I was sending the draft of the joint contribution we

8    saw earlier.

9    Q.    And what -- were you sending it to folks from Ericsson?

10   A.    Yes.  And DoCoMo, Samsung, Qualcomm.

11   Q.    What were you telling the other folks that you had just

12   met with about the proposal that you sent?

13   A.    I was saying that I captured the agreement of the

14   meetings, and I left out the part that we could not agree, or

15   that was left in the -- the minutes.

16   Q.    So focusing on the first bullet point, "power headroom

17   aspect" was added.  Are you claiming that as your invention?

18   A.    No.

19   Q.    In the second bullet point, did not know how to address

20   the configuration of the RBG, RRC or fixed.

21         Do you see that?

22   A.    I do.

23   Q.    Is that -- have you claimed any of that as your

24   invention?

25   A.    No.

1    Q.   And what does the third bullet point convey to the

2    people you had just met with?

3    A.   It meant that I didn't have the time to capture a

4    solution for the problem or even to capture the problem we

5    discussed.

6    Q.   At the meeting you had just left, had the group solved

7    the problem of selecting which buffer status report, long or

8    short, would be used?

9    A.   No.  And that's why it is left out here.

10   Q.   Now, other than your interpretation of your e-mail, is

11   there anywhere else we can look to see that resolution of

12   that issue was not reached?

13   A.   Yeah.  We -- we can look at the minutes from the

14   meeting.

15   Q.   In the PowerPoint?

16   A.   Yes, the PowerPoint slides.

17           MR. CALDWELL:  Can we pull up Defendants'

18   Exhibit 756?

19   Q.   (By Mr. Caldwell) Just so that we don't have to loop

20   back to this document later, I'm going to go through a few

21   different things that Mr. Lumish showed to you, okay?

22   A.   Sure.

23           MR. CALDWELL:  Can we go to the page that the

24   exhibit number is -006?

25   Q.   (By Mr. Caldwell) Do you recall being asked about this

```
 1    portion that I've highlighted on the screen where it says
 2    "need to update buffer status?"
 3    A.    Yes.
 4    Q.    Mr. Sebire, does that reflect that the group had settled
 5    on a way to choose between long and short?
 6    A.    No, it does not.
 7    Q.    What does that reflect, Mr. Sebire?
 8    A.    That reflects the triggers.  So when to send the BSR,
 9    not what to send.
10    Q.    And what is the difference, then, between the issue of
11    when you send a buffer status report versus which format of
12    buffer status report you send?
13    A.    So when to send, you -- you know, you need to send a
14    BSR.  You just don't know what type of BSR we -- we're going
15    to send.  So the issue of what is -- after that step, you
16    will look at whether you send -- whether you send a long or
17    short.  So these are really completely different things.  I
18    mean, they are linked but they are really different.
19    Q.    Are they things that happen kind of at different times
20    in the sequence?
21    A.    Yes.  First you have the trigger so you know you need to
22    send something.  And after you need to look at what you need
23    to send.
24             MR. CALDWELL:  And then can we go to the page that
25    ends in 009?
```

1    Q.   (By Mr. Caldwell) I believe you were also asked about

2    the sentence -- or the section of this proposal where it

3    says -- at the presentation where it says:  Would prefer two

4    formats, single byte format when only one radio bearer has

5    data, multiple-byte format when only several radio bearers

6    have data.

7         Do you see that?

8    A.   I do.

9    Q.   Mr. Sebire, have you claimed that that was your

10   invention?

11   A.   No, I do not.

12   Q.   Did you address that on your direct testimony when I was

13   asking you questions yesterday?  Whether you invented --

14   whether you were claiming to invent long versus short?

15   A.   Yes.

16   Q.   Have you ever claimed to invent long versus short

17   formats?

18   A.   Never.

19   Q.   Now, does this portion that Mr. Lumish showed you

20   address your invention that is in the '820 patent?

21   A.   It does not.

22         MR. CALDWELL:  Could we skip to the next page that

23   ends in 010?

24   Q.   (By Mr. Caldwell) I believe you were then asked about

25   this portion of the document?

1    A.    Yes.

2    Q.    What are we seeing there, Mr. Sebire?

3    A.    We are seeing what we used in 3G.

4            THE REPORTER:   I'm sorry, say that again.

5    A.    Sorry.   We are seeing what we had before in 3G.

6    Q.    (By Mr. Caldwell) Does this portion that was shown to

7    you disclose what you claimed as your invention?

8    A.    No, it does not.

9    Q.    Now, finally --

10           MR. CALDWELL:   Could we go to the next page, 011?

11   Q.    (By Mr. Caldwell) Do you recall looking at this page

12   during the cross-exam, Mr. Sebire?

13   A.    I do.

14   Q.    I believe you testified that these notes from the --

15   from the meeting do not explain the criteria.   Do you recall

16   saying that?

17   A.    I do.

18   Q.    All right.   Now, I would like to have you take the

19   opportunity to explain to the jury what is reflected in the

20   notes that were taken here on DTX-756-011 from that meeting

21   with your colleagues.

22   A.    Sure.   So, first of all, what is in bold format is what

23   was agreed.   And the left was left for study.   So, how to

24   choose a format, we knew that we may have to use what's in

25   the buffer, but we did not really know how.   So, I mean, we

1    could have had a special -- if you look one slide up, the

2    format actually considered to have total buffer, so not only

3    four but really everything that is in the UE.

4        And we didn't really know how to address that.  We

5    didn't know whether it should be really dynamic or fixed.  So

6    there were really many different solutions discussed in the

7    workshop, and we could not find a good one.

8        So that is the reason why you can see on the slide that

9    my invention was not -- wasn't captured.  We -- we did not

10   even discuss it.

11   Q.   All right.  Mr. Sebire, now, you were asked about the

12   portion that I've just highlighted here in red.  Do you

13   recall that?

14   A.   I do.

15   Q.   But were you asked about the portion that comes below on

16   how to choose the format?

17   A.   No.

18   Q.   All right.  Explain to us what the notes from the

19   meeting reflect about the actual issue of how to choose the

20   format.

21   A.   So the two formats means that we agree the long and the

22   short.  As I explained many times, this is not what I'm

23   claiming.

24       How to choose the format, so how to choose between long

25   and short, was the problem we're trying to solve and we did

1    not have any agreement.  And that's why you cannot find any

2    agreement on the images.

3    Q.   And so right after this, right after this was

4    completed --

5    A.   Yes.

6    Q.   -- what did you do on the plane?

7    A.   So on the plane I -- so we were tasked to -- I mean,

8    different companies were tasked to write different

9    contributions corresponding to the different parts of the

10   meeting minutes.  And I was tasked to capture the format.

11   Ericsson was tasked to capture the triggers.

12        So I captured the format we discussed.  I captured the

13   long and the short.  And then because we didn't agree

14   anything on the format selection, I just left it out.  This

15   was -- this was also an invitation to other companies to step

16   in.  I mean, it was a joint proposal.

17             MR. CALDWELL:  Can we have 757 again, Defendants'

18   exhibit?

19   Q.   (By Mr. Caldwell) That is the transmittal letter you

20   just showed us?

21   A.   Yes.  I agree.

22   Q.   Now, how did the other participants respond to receiving

23   this transmittal that you had written up?

24   A.   I do not remember exactly.  But looking at the

25   differences between the draft and what was actual

```
 1   contributed -- so what was sent to the Working Group 2

 2   meeting, so the meeting I attend, you can see there are no

 3   differences.  So I assume everybody was very happy.  And

 4   nobody tried to solve this format selection.

 5              MR. CALDWELL:  May I approach the witness with an

 6   e-mail that -- a subsequent e-mail?

 7              THE COURT:  Yes.

 8   Q.   (By Mr. Caldwell) First of all, I'll ask you ignore just

 9   the top line.  That's -- our office administrator had to

10   print these off, so that's what that is.  I'm sorry about the

11   way that it leaves a tag on the top there.

12        Mr. Sebire, do you recognize the e-mail that has just

13   been handed to you?

14   A.   Yes.

15   Q.   Okay.  And it says it was transmitted -- at least the

16   best regards was signed off by J-A-N-N-E.  Do you see that?

17   A.   Yes, Janne.  Yes.

18   Q.   Who is that?

19   A.   It's the Ericsson delegate who was organizing the

20   workshop.

21   Q.   And did you receive this e-mail back from him in

22   response to circulating the draft?

23   A.   Seems so, yes.  I do not remember, but yes.

24              MR. CALDWELL:  Your Honor, Plaintiff moves the

25   admission of Plaintiff's Exhibit 296.
```

```
 1                    THE COURT:  Any objections?

 2                    MR. LUMISH:  No objections.

 3                    THE COURT:  It will be admitted.

 4                    MR. CALDWELL:  And if we could, we'll just get a

 5    stamped copy officially.

 6                    THE COURT:  Thank you.

 7    Q.   (By Mr. Caldwell) Now --

 8                    MR. CALDWELL:  Can I use the document camera, Your

 9    Honor?

10                    THE COURT:  Yes.

11                    MR. CALDWELL:  Is there a particular secret to

12    this, not breaking this?

13                    THE COURT:  Gently.  There you go.

14                    MR. CALDWELL:  Okay.

15    Q.   (By Mr. Caldwell) Mr. Sebire, what did Ericsson's

16    representatives say back to you after you circulated the

17    proposal?

18    A.   So looking at the e-mail, it seems that they were quite

19    happy with the work I did.  They even said it was excellent.

20    They wanted some minor changes, to leave out some

21    explanations.  I don't know exactly why.  But it indicates

22    that we fully support all the proposals and are willing to

23    co-sign.

24                    MR. CALDWELL:  Now may I approach the witness

25    again, Your Honor?
```

```
 1              THE COURT:  Yes.

 2   Q.   (By Mr. Caldwell) Do you recognize the e-mail that's

 3   been handed to you?

 4   A.   Yes.

 5   Q.   All right.  And is -- just tell us who this e-mail is

 6   from.

 7   A.   So, it's from SK, the guy I named earlier, the

 8   delegate -- Korean delegate from Samsung.

 9              MR. CALDWELL:  Your Honor, I will move the

10   admission of a similar e-mail, this Plaintiff's Exhibit 297.

11              MR. LUMISH:  No objection, your Honor.

12              THE COURT:  It will be admitted.

13   Q.   (By Mr. Caldwell) And what did that delegate say back in

14   response to your proposal?

15   A.   So, SK seemed to be quite happy also with that

16   contribution.  He pointed out that, indeed, I made this

17   version while flying back to Japan, and they are very happy

18   and they are willing to co-sign.

19              MR. CALDWELL:  Once more, Your Honor, may I

20   approach?

21              THE COURT:  Yes.

22   Q.   (By Mr. Caldwell) Now, in this e-mail -- the first one

23   we looked at from Ericsson's representative, it looks like

24   you responded.  Do you see that?

25        Looks like J-A-N-N-E, Janne?
```

1    A.   Yes.

2    Q.   And then you responded to him and then someone named

3    Anil responded.  Do you recognize that?

4    A.   I do.

5    Q.   Is this in that same e-mail chain?

6    A.   Yes.

7             MR. CALDWELL:  Your Honor, Plaintiff moves for the

8    admission of Plaintiff's Exhibit 298.

9             MR. LUMISH:  No objection, Your Honor.

10            THE COURT:  It will be admitted.

11   Q.   (By Mr. Caldwell) What do we see in Plaintiff's

12   Exhibit 298, Mr. Sebire, picking up with the e-mail we looked

13   at a minute ago from Ericsson's representative and then

14   moving forward?

15   A.   So in response to Anil's e-mail, I thank him for

16   reviewing the document.  I attached an update to reflect the

17   desirable changes he had.  And I also correct one small

18   mistake that I made apparently.  I said 13 bytes instead of

19   3.

20   Q.   And then who responds?

21   A.   And then you have the delegate from DoCoMo who tells us

22   that DoCoMo is happy to co-sign the document.

23   Q.   Now, just to be clear, the document that you were

24   circulating at this point, is that the document that -- the

25   draft of the document that Apple's lawyers keep referring to

1  as an Ericsson proposal?

2  A.   That is the document, yes.

3  Q.   Who drafted it?

4  A.   I did.

5  Q.   Now, do you recall earlier being showed -- I think it

6  was Defendants' Exhibit 738.

7            MR. CALDWELL:  Can we pull up that?

8            And can we just zoom in on the top third just so it

9  will be a little bit bigger?

10 Q.   (By Mr. Caldwell) Do you recall discussing this earlier

11 contribution from October 8th to 12th that was presented by

12 Samsung?

13 A.   Yes.

14 Q.   And did you tell us that this document is cited,

15 actually, on your patent as a reference?

16 A.   Yes.

17 Q.   When you drafted the document that they called the

18 "Ericsson proposal," whose previous contributions were you

19 telling everybody that was based on?

20 A.   One of them was Samsung.

21 Q.   So, Mr. Sebire, when you sent the document that they

22 repeatedly called the "Ericsson proposal," did you type in

23 your e-mail:  Attached please find a contribution on the

24 buffer status report I quickly drafted based on Samsung and

25 Nokia-NSN previous contributions?

1  A.   Yes, I did.

2  Q.   Have you seen an e-mail where the Ericsson

3  representative writes back and says:  Wait a minute.  That's

4  based on Ericsson contributions?

5  A.   No.

6  Q.   What did he say instead?

7  A.   I believe he said, excellent work.  Yes.

8  Q.   Have you heard anything -- I'm sorry.  Remind me how to

9  pronounce his name.  I don't mean to be disrespectful.  I'm

10  just bad with them.

11  A.   Janne.

12  Q.   Janne?

13  A.   You can call him "Jane" but he would be pissed off.

14  Q.   Have you heard any indication, whatsoever, that we're

15  going to hear from Janne in this trial to come in here and

16  say you made a big mistake and that was Ericsson's

17  contribution?

18  A.   No.

19  Q.   Does Samsung file patents on contributions that they

20  make to the working groups you work on?

21  A.   Yes, of course.

22  Q.   So how many times do they come to you and say, you know,

23  Mr. Sebire we just filed a patent on this?

24  A.   Never.

25  Q.   Have you had many meetings with Ericsson folks?

1    A.    I guess about 200.

2    Q.    Do they file patents on ideas that they come up with and

3    contribute to the standard?

4    A.    Yes, of course.

5    Q.    And how many times can you recall that they have come up

6    to you and said:  Hey, we filed a patent on this?

7    A.    Never.

8    Q.    Now, as a delegate to the working group, do you feel

9    like they should come and tell you, we filed a patent

10   application on this, so you can decide if you want to take

11   that idea out of the standard?

12   A.    No, of course not.  It's quite the opposite.  So we

13   should select ideas only based on technical merits so that we

14   are sure that we always end up with the best solution.  No

15   other considerations, where it came from or whether there's a

16   patent, should be considered.

17          MR. CALDWELL:  All right.  This may be a touch

18   tricky.  But can you find Exhibit 567, which I think -- can

19   we -- and can we -- I've got to give you the computer.  I'm

20   sorry.

21          Can we get 567 on the top and 756 on the bottom?

22          All right.  Yeah, just kind of zoom in.

23          Thank you, sir.

24          On the bottom one let's scroll down, if you would,

25   to where we get closer to the text than in the PowerPoint,

1    which I think will start on several pages in.

2    Q.   (By Mr. Caldwell) Close to the end of your

3    cross-examination -- actually, I'll let you find those.

4        Did you find those?

5    A.   I can read them on the screen.

6    Q.   Well, I may need your help, truthfully.  So, if you

7    wouldn't mind, will you pull out 756?  I think we're -- we're

8    good on the top one but will you pull out 756?

9    A.   Yes.

10   Q.   Okay.  And let's just go ahead and pull it out of the

11   binder, if you would, just so that it's easier to review the

12   pages.

13       The lever on the bottom.

14   A.   Thank you.

15   Q.   Now --

16           MR. CALDWELL:  And on the top one, will you just

17   scroll up to where we're looking at the criteria portion,

18   Mr. Evans?

19           Thank you.

20   Q.   (By Mr. Caldwell) Near the end of your cross-examination

21   there were some questions that were trying to relate this

22   portion of 567 to portions of 756.  Do you recall that?

23   A.   I do.

24   Q.   And can you find the portion in 756 that you were being

25   directed to?  If you recall?  Or if Mr. Lumish has his notes

1    as to where it was, we're happy to.

2    A.   I will find it.  756-11.

3         MR. CALDWELL:  756-11.

4    Q.   (By Mr. Caldwell) Mr. Sebire, when you were being asked

5    about that document, do you recall being asked whether the

6    criteria in 567 was the same or comparable to what was in

7    756?

8    A.   I do.

9    Q.   And you said, I believe I'm quoting:  I'm happy to

10   explain, if you'd like.

11        Do you remember that?

12   A.   I do.

13   Q.   Were you given an opportunity to explain?

14   A.   No.

15   Q.   Mr. Sebire, what would you like to explain to the jury

16   about the difference in 567 and 756 that Mr. Lumish showed?

17   A.   Between 756.  So the slides from the workshop at the

18   bottom, you can see, introduces the problem.  It does not

19   give any solution.  The highlighting that was used in my

20   cross-examination was just to highlight that we have agreed

21   short and long.

22        And as repeated many times, this is not at all what I'm

23   claiming as an invention.  The selection criteria to know

24   when to send long and short is really what the invention is

25   about.  And this is where we were stuck at a workshop.

1   Q.   Did you get the idea for the selection criteria for

2   anyone else, sir?

3   A.   No.

4           MR. CALDWELL:   Now let's just make 567 the full

5   screen, if you would.

6   Q.   (By Mr. Caldwell) Starting where you were shown on 567,

7   just looking at the beginning of the criteria, what was it

8   that you were not able to explain in that questioning that is

9   further explained in your proposal as criteria for short and

10  long BSR?

11  A.   Sorry.  What was the number again?

12  Q.   567, the one that is on the screen as well, if that

13  helps.

14  A.   Oh, sorry.  Yes.

15       So, of course, in this document, there's not only one

16  proposal; there are actually three.

17       And Proposal 1 is to look at what we have preferred.  So

18  if we have data -- if we have data in more than -- I mean, if

19  we have data in zero, one, or more than one buffer, then we

20  decide which format we would choose.

21       So this was the left part of the -- right part, sorry --

22  of the flowchart, if you remember the other day.

23       Then on the left part, we have the case of padding that

24  in some cases we may not always have enough space.  And in

25  that case, we -- or I thought it would be best to select the

1   logical channel group or whatever group of highest priority.

2        And going back to the example, that would mean, for

3   instance, in -- because this is a data that has the most --

4   that is most important for the user.

5        And, finally, in Proposal 3 -- I don't think this was

6   agreed in a meeting -- or it was agreed but changed later on.

7   That was a way to signal the special case.  So a way to

8   signal the truncated BSR.  So this is really not only about

9   Proposal 1.

10       And in a nutshell, these three proposals reflect my

11   invention.

12                 MR. CALDWELL:  Could I have Defendants'

13   Exhibit 572?

14   Q.   (By Mr. Caldwell) For context, do you recall that 572 is

15   the copy of your provisional patent application where Apple's

16   lawyers have gone back and added a bunch of highlighting?

17   A.   Yes.

18   Q.   Do you feel that your provisional application unfairly

19   takes credit for ideas from other people?

20   A.   No, of course not.

21   Q.   And did you ever file patent claims seeking property

22   right protection on ideas that came from other people?

23   A.   No.  I wouldn't be able to attend meetings anymore if I

24   did that.

25   Q.   Does your patent application -- let me think of a better

 1   way to ask that.

 2       Is the only information in your patent application the

 3   information that came from the joint proposal that you typed?

 4   A.   No, no.  That really only sets the landscape for the

 5   invention.

 6             MR. CALDWELL:  Mr. Evans, will you do me a favor

 7   and just sort of scroll through this document, 572, just kind

 8   of page by page?

 9             Keep going.

10   Q.   (By Mr. Caldwell) Is there a large amount of information

11   that the jury was not shown that is your new material

12   supporting your patent claim?

13   A.   Yes.

14             MR. CALDWELL:  Go one more.  Let's start there --

15   actually, let's go one more.

16   Q.   (By Mr. Caldwell) What figure is this from your patent

17   application that is on the screen now?

18   A.   This is a figure describing the invention.

19   Q.   Did you describe it as some sort of a logical flow?

20   A.   Yes.  This is what we call a flowchart.

21   Q.   Was this logical flow in Samsung's contribution from

22   early October 2007?

23   A.   No, it wasn't.

24   Q.   Mr. Sebire, was this logical flow in the original draft

25   of the Ericsson PowerPoint for that late October meeting?

1    A.    No, it wasn't.

2    Q.    Now, after the group met -- I think until 9:00 p.m. that

3    day, according to the records, something like that, and then

4    the next day, were they editing that document during the

5    process of holding those meetings?

6    A.    Yes, to make sure that everybody agreed what was agreed

7    and what was not.

8    Q.    And I'm not asking you, sir, if this picture is drawn

9    identically in that document.  That's not what I'm asking,

10   okay?

11        But is the logic, the decision process, reflected in

12   that Ericsson document after all of those people, the people

13   you referred to as the most knowledgeable about this, got

14   together and met on it?

15   A.    No.

16   Q.    And then when you left and got on a plane, what did you

17   type up?

18   A.    The e-mail.  So -- and, of course, the draft

19   contribution.

20   Q.    The joint proposal?

21   A.    The joint proposal, yes.

22   Q.    The one where Ericsson says it looks great to them?

23   A.    Excellent, I think was the word.

24   Q.    Is this logical flow, whether in written form or drawn

25   form, however, is it in that joint proposal?

1   A.   No, it is not.

2   Q.   Was it discussed at that meeting?

3   A.   It wasn't.

4   Q.   Was it resolved at the meeting and understood what the

5   flow should be?

6   A.   No.

7   Q.   And who had the idea for that logical determination?

8   A.   I did.

9   Q.   Has anybody ever told you otherwise until you started

10  hearing it from Apple's lawyers?

11  A.   Never.

12  Q.   In opening yesterday, Mr. Homrig said he didn't want

13  this case to be about distractions.  And I think -- I don't

14  want to misquote him, but he said:  Hey, it shouldn't be

15  about distractions, quote, this case is about choosing

16  between short and long buffer status reports.

17       Do you recall that generally?

18  A.   I do.

19  Q.   Does your patent identify a particular method for doing

20  that?

21  A.   Yes.

22  Q.   Are you aware of anyone who had ever done that before?

23  A.   No.

24  Q.   I think maybe the ender question was something along the

25  lines of:  To this day, have you told them that you

1  invented -- that you filed a patent application on this

2  invention?

3  A.    No, I haven't.

4  Q.    Do you recall this question?

5  A.    I do.

6  Q.    To this day, has Ericsson told you about patents that

7  they -- all the patents they filed for in 36.321 or 36.300 or

8  any of the other sections of the LTE spec?

9  A.    No.

10  Q.    To this day, has Samsung?

11  A.    Samsung either.

12  Q.    Is that something that you guys do?  Do you write each

13  other and talk about:  Hey, guess what, I filed a patent?

14  A.    No, never.

15  Q.    Yesterday when your cross-exam began, Mr. Lumish was

16  asking you some questions along the lines of, well, Nokia's

17  not here fighting for its patent or saying the patent is

18  valid.

19        Do you recall those?

20  A.    I do.

21  Q.    All right.  Are you here standing up for your patent?

22  A.    Yes, I am.

23  Q.    Do you believe it is incorporated in LTE?

24  A.    I'm sure it is, yes.

25  Q.    Do you believe that it's valid, and you've never seen

```
 1   someone before with this idea?

 2   A.    Of course, yes.

 3   Q.    Mr. Sebire, do you believe it is a fair question about

 4   what you invented to go piece by piece and ask if you

 5   invented looking at what's in buffers?

 6   A.    I think it's very unfair.

 7            MR. LUMISH:  Your Honor, before he takes them down,

 8   may I just take a picture of it to have it as a

 9   demonstrative?

10            THE COURT:  Very quickly.

11            MR. LUMISH:  Very quickly.

12            (Pause in proceedings.)

13            MR. LUMISH:  Thank you, your Honor.

14   Q.    (By Mr. Caldwell) Mr. Sebire, do you believe it's fair

15   to ask in isolation whether people have looked at whether

16   there's data in at least one buffer?

17   A.    No, it is not.

18   Q.    Mr. Sebire, is it fair to look in isolation at whether

19   someone had thought about data in multiple buffers?

20   A.    No.

21   Q.    Are you claiming you invented the short format, sir?

22   A.    I'm not claiming that, no.

23   Q.    Is it fair to look at whether you invented the short

24   format as representative of whether you had an invention?

25   A.    No.
```

Q.    What about whether there's capacity for a long format?
Are you claiming that in isolation?

A.    No, I am not.

Q.    Mr. Sebire, are you claiming using or designating a long
format in isolation?

A.    No.

Q.    Are you claiming sending the buffer status report in
isolation?

A.    No, I am not.

Q.    Is it fair, if we want to evaluate your invention, to
look in isolation at which buffer has the highest priority?

A.    I don't think so.

Q.    And, again, are you claiming to have invented using
short format, sir?

A.    No.

Q.    What is it that you're claiming?

A.    I'm claiming that I was able to put all these pieces
together so that it makes sense.  You cannot just destroy
them one by one and say the whole thing is worthless.  You
have to remember all the arrows between the boxes.

Q.    Is that comparable to the example you gave us of someone
inventing swiveling headlights and then saying:  You can't
have an invention because you weren't the guy who invented
headlights a hundred years ago?

A.    Yes.

1  Q.   I'd like to ask you a little bit about pre-selected

2  conditions.  You were asked some questions about

3  infringement, and I just want to be clear about one thing in

4  case it's not.  Have you been given access to Apple's secret

5  code that's in their chips or the code that comes from their

6  vendor that supplies the chips?

7  A.   No, I haven't.

8  Q.   They don't let you see that?

9  A.   No.  I didn't ask to see it.

10 Q.   In the abstract, if software checks to see whether there

11 is data in any buffer, whether it's one -- data in one

12 buffer, or whether there's data in multiple buffers, is that

13 checking for pre-selected conditions?

14 A.   I believe it is, yes.

15 Q.   Yesterday at around 4:55, right before we stopped, we

16 had to seal the courtroom, and there was a general

17 question -- I won't make it where we have to seal the

18 courtroom, but there was a general question about whether,

19 when patents are filed, you know, for example, is there

20 compensation that goes along with that?

21 A.   Yes.

22 Q.   Do you recall?

23 A.   I do.

24 Q.   Is that common in your experience?

25 A.   It is common.  So my employer has legal obligations.  So

1    at least in Japan and Finland, the law is such that an

2    employer has to give -- I think it's reasonable compensation

3    for the patents that are being used -- currently in use.

4    Q.    In order to convey the property right to ownership of

5    the company?

6    A.    Yes.  So the law defines "reasonable."

7    Q.    (REDACTED BY ORDER OF THE COURT.)

8              MR. GLEASON:  Your Honor, can we approach?

9              MR. CALDWELL:  I'm sorry.  I'm sorry.  That's my

10   fault.

11             THE COURT:  Yeah, approach.

12             (Bench conference.)

13             MR. GLEASON:  Your Honor, I'm afraid the specific

14   amount is confidential.  I think he can rephrase the

15   question.

16             THE COURT:  Yeah.

17             MR. GLEASON:  I would ask that the amount be

18   stricken from the record --

19             THE COURT:  Yes.

20             MR. GLEASON:  -- if we can do that.

21             MR. CALDWELL:  I apologize.

22             MR. GLEASON:  Sure.  I understand.

23             MR. CALDWELL:  I'm sorry.

24             So, I guess, we can either seal the courtroom or --

25   I guess I probably would like to ask the question.

```
 1              THE COURT:  Okay.

 2              MR. CALDWELL:  So --

 3              THE COURT:  I'll seal the courtroom.

 4              MR. CALDWELL:  I'm sorry.

 5              THE COURT:  I'm going to strike the question --

 6    there's -- I'm going to strike the question in the unsealed

 7    portion of this transcript.  You can reask it once --

 8              MR. CALDWELL:  Can Your Honor state it in a way so

 9    it doesn't look like I'm reprimanded for asking the question?

10              THE COURT:  Yes.  Yes, I will.

11              MR. CALDWELL:  Thank you.

12              THE COURT:  Thank you.

13              (Bench conference concluded.)

14              THE COURT:  All right, everyone.  We're going to

15    seal the courtroom at this time.  I'm going to strike the

16    last question in the unsealed portion of the courtroom.

17              We're going to seal the courtroom at this time.

18    And so if you're not covered by the protective order, if you

19    had to leave yesterday, I need you to leave again today, and

20    we will let you know when the courtroom can be unsealed.

21              (Courtroom sealed.)

22              (This portion of the transcript is sealed and filed

23              under separate cover as Sealed Portion No. 2.)

24              (Courtroom unsealed.)

25              MR. LUMISH:  Can you bring up DTX-509, Page 39,
```

1    please.

2            And bring up all of Claim 1.

3                    RECROSS-EXAMINATION

4    BY MR. LUMISH:

5    Q.    This, sir, is the original claim that you told the

6    United States Government you invented, isn't it?

7    A.    Yes, I guess it is.

8    Q.    And it has monitoring buffers, right?

9    A.    Yes.

10   Q.    It has detecting one of a pre-selected condition, right?

11   A.    Yes.

12   Q.    Whether there's data in the buffer.

13          And it says:  Designating one of a plurality of buffer

14   status reporting formats depending on the pre-selected

15   condition, right?

16   A.    Yes.

17   Q.    Jumps way down to here (indicating), doesn't it?

18   A.    Sorry?

19   Q.    It jumps way down to here (indicating), the designation

20   step.

21   A.    I didn't hear that.  Can you say again?

22   Q.    It jumps way down to the designation step, doesn't it?

23   A.    Okay.  Yes.

24   Q.    And it says:  Communicate buffer status report, right?

25   A.    Yes.

1  Q.   We talked yesterday about how you didn't invent

2  monitoring; you didn't invent any of these steps in

3  isolation, right?

4  A.   Correct.

5  Q.   And you understand that the accusation in this case is

6  that my client, Apple, infringes when it chooses short

7  through Qualcomm's chip and Qualcomm's source code because

8  there's only a single buffer reporting data.

9      That's the only pre-selected condition that's been

10 identified.  You understand that?

11 A.   Okay.  Yes.

12 Q.   And we're not going to go back through all of those

13 documents, but we saw in the Ericsson documents, didn't we,

14 the PowerPoints, the same notion of choosing based on the

15 group?

16 A.   I need to get back to those slides.

17         MR. LUMISH:  Let's go to DTX-756 and particularly

18 Page 11.

19         And you can bring all that -- "2 formats" down to

20 the bottom, please.

21 Q.   (By Mr. Lumish) Now, I'm sure it was a mistake, but

22 CCE's lawyer said I didn't show you and didn't talk to you

23 about how to choose the format.

24     You remember we did talk about this, didn't you?

25 A.   Yes.

```
 1  Q.    And it says:  How to choose format.  That's selection

 2  criteria, isn't it?

 3  A.    I need to look at the flowchart again.  I'm sorry.

 4  Q.    I'm asking what the PowerPoint says, but look at what

 5  you need to.

 6  A.    Can you repeat the question?

 7  Q.    In this PowerPoint from Ericsson, it's identifying

 8  selection criteria for the short or long buffer status

 9  report.

10  A.    How to choose the format, yes.

11  Q.    And the criteria it identifies is based on how many

12  groups need to report, right?

13  A.    Based on how many groups need to report, yes.

14  Q.    And those are buffer groups, right?

15  A.    It doesn't say what "need to report" means.  You can

16  say -- it says "buffer" without the S.

17  Q.    You know when it says "groups," it means buffer groups,

18  don't you?

19  A.    Not necessarily.

20  Q.    Is your answer the same at the top where it says "2

21  formats" up here, and it says:  1 byte format with Group-ID

22  absolute size (if only one group to report), that's not

23  referring to buffers either?

24  A.    This means that if you only have one group, you use the

25  short format, and the short format will report the buffer of
```

1  the one group.

2  Q.   One buffer group, right?

3  A.   Yes.

4  Q.   So this tells you the formats on top, 2 formats, based

5  on buffer groups, right?

6  A.   No.  It only says:  If only one group to report.

7       It doesn't say that you have to look at the buffer

8  itself.

9  Q.   But it's a buffer group.  That's all I'm asking.

10  A.   We have logical channel groups, and we -- so we have

11  logical channel groups, and within each logical channel

12  group, we have radio bearers or logical channels, and each of

13  them has a buffer.

14  Q.   Radio bearer groups, logical channel groups, those are

15  the same, right?

16  A.   Yes?

17  Q.   And you understand that you were talking about radio

18  bearer groups and logical channel groups as the things they

19  needed to have buffer status reports about, right?

20  A.   Yes.

21  Q.   And these are formats for buffer status reports

22  specifically, aren't they?

23  A.   Say it again.

24  Q.   When it says "2 formats," these are for buffer status

25  reports.

A.   Yes.

Q.   Okay.  Short and long, 1 byte and 3 byte, correct?

A.   Correct.

Q.   Selection criteria.  Choose based on how many groups need to report.

     That's what that says?

A.   That's what it says.

          MR. LUMISH:  Take that down, please.

Q.   (By Mr. Lumish) You were shown some e-mails, 296, 297, and 298.  Let's look at those again and see what they say. So this is one of the e-mails you were shown.  It's Trial Exhibit 296 from Ericsson.  It says:  Dear Benoist, thanks a lot for the contribution, excellent work.

     That was the point you were making, right?

A.   One of the points, yes.

Q.   Does it say:  Thanks, Benoist.  They were all your ideas?

A.   I don't see why it should say that, but, no, it doesn't.

Q.   Does it say:  Thanks, Benoist, excellent work coming up with everything that is in the joint contribution?

A.   No.

Q.   Does it say:  Thanks, Benoist, we didn't contribute anything to the proposal, including the stuff that was in our PowerPoints?

A.   No.

```
 1   Q.    Does it say:   Thanks, Benoist, go ahead and file patent
 2   applications where you take all the text from that Ericsson
 3   and other joint proposal and copy it into the application?
 4   A.    No, it does not.
 5   Q.    Does it say:   Thanks, Benoist.  Go ahead and get a
 6   patent with only your name on it?
 7   A.    No.
 8   Q.    How about 297?  This is the e-mail from Samsung.
 9         Does it say any of those things?
10   A.    The same things?  No.
11   Q.    How about the e-mail from NTT DoCoMo?  Does it say any
12   of those things?
13   A.    Does not.
14             MR. LUMISH:   If you'll go back to DTX-509-39.
15   Q.    (By Mr. Lumish) I think you said, at some point, that
16   the three proposals in the January 2008 Nokia contribution to
17   the standard was your invention.
18             MR. LUMISH:   Oh, sorry.
19   Q.    (By Mr. Lumish) Do you remember that testimony on your
20   examination from CCE's lawyers, sir?
21   A.    Yes.
22   Q.    Those three proposals, they're not in this claim, are
23   they?
24   A.    I think the third one may not be there, yes.
25   Q.    And yet this is the claim that was in the application
```

1   when you signed under oath saying you were the sole and only

2   inventor, right?

3   A.   Yes.

4   Q.   Now, if the jury finds that pre-selected conditions

5   there are the same thing we just looked at in the Ericsson

6   proposal -- the Ericsson PowerPoints, I mean to say -- short

7   and the long format and choosing between them based on how

8   many buffers need to report data, will you agree that that is

9   not an idea you came up with all by yourself?

10          MR. CALDWELL:   Objection, your Honor.  I can argue

11   from here or we can take it to the bench.

12          THE COURT:   Come to the bench.

13          (Bench conference.)

14          MR. CALDWELL:   He's arguing from the original

15   drafted claim in a provisional.  It's not even a claim --

16   one, it's not a claim being tried; but more to the point,

17   it's not even in the issued set where the jury could even

18   vote on validity, which is a question that goes to them.

19          So this is extremely misleading, that he's -- he

20   needs to actually, I think, switch to a claim that's actually

21   before the jury, because, otherwise, at this point -- I mean,

22   maybe we shouldn't even be doing this at all.

23          If his point is that it is something to do with

24   disclosure of an initial filed claim or something, they could

25   have pled inequitable conduct or something along those lines,

```
 1    which they didn't.  Certainly a bench trial issue.  And I
 2    think he should be instructed to switch immediately to a
 3    claim that's in the patent.
 4            MR. LUMISH:  This is in -- this is the claim that
 5    was there when he signed his oath.  He showed him the same
 6    claim.  I just want to now carry that over into the final
 7    claim showing carried over the thing he signed an oath to
 8    saying he was the sole and original inventor is in Claim 1 of
 9    the '820 patent.
10            MR. CALDWELL:  I never showed him a single claim,
11    not once.
12            MR. LUMISH:  I misspoke then.
13            THE COURT:  Okay.  Let's stick to the claim.
14            (Bench conference concluded.)
15            MR. LUMISH:  Keeping the pre-selected conditions in
16    mind, let's go now to the Claim 1 of the actual patent,
17    Plaintiff's Exhibit 1, and let's see if that carried over.
18    Q.   (By Mr. Lumish) Three lines down, it refers to
19    "detecting one of a plurality of pre-selected conditions."
20         Do you see that?
21    A.   Yes, I do.
22    Q.   Same language we just looked at, isn't it?
23    A.   Yes.
24    Q.   And we go down five more lines, we see it again, don't
25    we, "pre-selected condition"?
```

1    A.    Yes.

2    Q.    I'll ask you the same question.  You understand CCE's

3    lawyers to be saying that these pre-selected conditions is

4    having a short format and a long format and choosing between

5    them based on whether you have one buffer or more than one

6    buffer.

7          Will you agree with me, sir, that wasn't an idea you

8    came up with all by yourself?

9    A.    So, if you have data in the buffer, you always have --

10   Q.    Is that a yes or a no?

11   A.    Sorry.  I was distracted.  Can you repeat the question?

12   Q.    If you understand that CCE's lawyer's argument in this

13   case is that these pre-selected conditions is the -- and the

14   detecting and designating is determining whether there is

15   data in one buffer or data in more than one buffer to choose

16   a long form buffer status report, will you agree with me that

17   it's not an idea you came up with all by yourself?

18   A.    The yellow part, yes, I will agree.

19   Q.    Have you ever been on a sports team?

20   A.    At school, yes.

21   Q.    And when you win, everybody wins, right?

22   A.    Usually, yes.

23   Q.    When you lose, it's the whole team that loses, right?

24   A.    Yes.

25   Q.    You don't take credit as an individual for the team

1   effort, right?

2   A.   Right.

3   Q.   Now, CCE's lawyer asked you about whether, after you

4   submitted the January 2008 proposal that you say is your

5   invention, nobody jumped up and said:  Wait a minute.  That's

6   mine.

7        Do you remember that question, generally?

8   A.   Yes, I do.

9   Q.   Will you agree with me, first of all, there's a big

10  difference between putting a proposal into the working group

11  and filing a patent on something?

12  A.   Not in 3GPP.

13  Q.   The proposal, that's saying:  Here's something I want

14  everybody to use, right?  Please, let's adopt this and get it

15  as widespread as we could.  Just like CCE's lawyer said:

16  Let's get it in every possible phone we can, every phone on

17  the planet.

18       That's what you want with a standard, right?

19  A.   I'm not sure what you're asking.

20  Q.   When you propose to put something in the standard, it's

21  because you're trying to get it adopted by as many phones and

22  systems as possible, aren't you?

23  A.   That's not the motivation.  The motivation is to have

24  efficiency.  Now, whether it ends up in many phones is

25  something out of control.

1    Q.    You took pride in the fact that it was in every phone on

2    your planet.  I think that was your testimony, right?

3    A.    As a result of the work, yes.

4    Q.    But on the other side of that is patents.  They're very

5    different from standards, patents, right?

6    A.    They are different.

7    Q.    A patent is a document that allows somebody to say:  I

8    own this all to myself, isn't it?

9    A.    I don't know if I can describe it that way.

10   Q.    When you put your proposal into the publication for the

11   Working Group, the January 2008 proposal, and nobody jumped

12   up and said, hey, that's mine, you didn't tell them you

13   patented it, right?

14   A.    I did not.

15   Q.    So that somebody didn't jump up and say, hey, I want

16   credit on this proposal for something that might go into the

17   standard, that's not the same as saying, oh, you can own it

18   all to yourself, is it?

19   A.    It's not the same, yes.

20   Q.    And when you put your January 2008 proposal into the

21   working group, you didn't tell them you had copied the

22   content of the joint proposal of Ericsson and Samsung and

23   DoCoMo and all those folks and put it into a patent

24   application with only your name on it, did you?

25   A.    To explain the context of my invention, no, I did not

1    tell them that I used content of the contribution I drafted.

2    Q.    If you are a part of a joint contribution with somebody

3    else in the working group, would it be okay with you if they

4    just filed a patent on the entire group's collaboration and

5    joint effort all to themselves?

6    A.    As long as it is only to describe the context of the

7    invention, I have no problem with that.

8    Q.    But if they claimed as an invention part of what was

9    contributed by the group as a whole, you're fine with that?

10   They can have it all to themselves; they can own it, file a

11   patent and sue people on it?

12   A.    No, of course not.

13   Q.    All right.

14          MR. LUMISH:   Thank you, sir.

15                      REDIRECT EXAMINATION

16   BY MR. CALDWELL:

17   Q.    Should we assume that every Ericsson patent they believe

18   is essential to the standard or related to the standard is

19   not valid or not enforceable or anything along these lines;

20   they can't be used; it's a bad patent; we should criticize

21   them if Ericsson didn't bring it up in a meeting?

22   A.    No.

23   Q.    Is your patent, in your mind, the result of misleading

24   other colleagues because you did not bring it up in a

25   meeting?

1    A.    No.

2    Q.    Does Samsung bring up patents in meetings?

3    A.    Not the issue, but they contribute patents.

4    Q.    They contribute ideas?

5    A.    Yes.

6    Q.    And do they come to the meeting and tell you:  We filed

7    a patent on it?

8    A.    No.  Nobody does that.

9          MR. CALDWELL:  Can we have Plaintiff's Exhibit 1

10   and move to Claim 1, please?

11   Q.    (By Mr. Caldwell) When Mr. Lumish was showing you your

12   Claim 1 after he switched actually to the patent claim, do

13   you remember he asked you about this word and I think this

14   word (indicating), "pre-selected conditions"?

15   A.    Yes.

16   Q.    Did he ask you anything about the additional requirement

17   of the designating involving when there is sufficient uplink

18   bandwidth?

19   A.    No, he did not.

20   Q.    Mr. Sebire, are you aware of anyone contributing the

21   full combination of elements that you claim to have invented?

22   A.    No.

23         MR. CALDWELL:  Thank you.  You can take that down.

24   Q.    (By Mr. Caldwell) I think I only have one more question

25   for you.

1          About those e-mails that you got back after you

2    circulated the draft, do you recall being asked whether they

3    kind of pushed back and how they might have pushed back after

4    you circulated the draft proposal to everyone?

5    A.    Yes.

6    Q.    Do you remember what the third bullet point was in your

7    e-mail when you sent it to the group?

8    A.    I think I was saying, like, format selection is left

9    out.

10   Q.    Did anyone from Ericsson, Samsung, NTT DoCoMo, any other

11   company respond to you and tell you that they came up with an

12   invention to solve that problem?

13   A.    No.

14   Q.    Who did it?

15   A.    I did.

16            MR. CALDWELL:  Thank you, sir.

17            THE COURT:  Anything further, Mr. Lumish?

18            MR. LUMISH:  Nothing further, Your Honor.

19            THE COURT:  All right, Mr. Sebire.  You may step

20   down.

21            Ladies and Gentlemen of the Jury, we're going to

22   take our lunch break now.  We're going to be in recess for

23   lunch until 1:00 o'clock.

24            COURT SECURITY OFFICER:  All rise.

25            (Jury out.)

1          THE COURT:  Have y'all given some thought to

2   whether we need to hear testimony outside the presence of the

3   jury with Mr. Sebire today?  And if not, I'm happy to take it

4   up at the end of lunch as well.

5          MR. LUMISH:  As I mentioned, Your Honor, I have

6   maybe 20 or so minutes of questions.  I thought Mr. Caldwell

7   was going to find out his schedule.  So we're happy to

8   proceed however works for everybody.

9          MR. CALDWELL:  My understanding is we need to go

10  forward today.  And I would request, I mean, given the fact

11  that he's just actually been on the stand and cross-examined

12  and -- that we shoot for that sort of -- I don't know -- in

13  the 4:00 p.m. time frame or --

14         THE COURT:  We're coming back at 1:00.  We'll go

15  with breaks until about 4:30 with the jury, and then I'll let

16  them go, and we'll take up the equitable stuff after that.

17         MR. CALDWELL:  Thank you, Your Honor.

18         THE COURT:  All right.  Thank you.  We'll be in

19  recess until 1:00 o'clock.

20         COURT SECURITY OFFICER:  All rise.

21         (Lunch recess.)

22

23

24

25

1                              CERTIFICATION

2

3              IT IS HEREBY CERTIFIED that the foregoing is a

4     true and correct transcript from the stenographic notes of

5     the proceedings in the above-entitled matter to the best of

6     our abilities.

7

8     /s/_____
9     CHRISTINE BICKHAM, CRR, RMR            September 7, 2016
      Official Court Reporter
10

11

12    /s/_____
      SHEA SLOAN, CSR, RPR
13    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25