```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                          TYLER DIVISION

 3
    CELLULAR COMMUNICATIONS        )
 4  EQUIPMENT, LLC
                                   )   DOCKET NO. 6:14cv251
 5
       -vs-                        )
 6                                     Tyler, Texas
                                   )   1:00 p.m.
 7  APPLE INC., ET AL                  September 7, 2016

 8

 9                        TRANSCRIPT OF TRIAL
                          AFTERNOON SESSION
                BEFORE THE HONORABLE K. NICOLE MITCHELL,
10                UNITED STATES MAGISTRATE JUDGE

11                    A P P E A R A N C E S

12  FOR THE PLAINTIFF:

13  MR. BRADLEY W. CALDWELL
    MR. JOHN AUSTIN CURRY
14  CALDWELL CASSADY & CURRY
    2101 Cedar Springs Rd., Suite 1000
15  Dallas, Texas 75201

16  MR. EDWARD R. NELSON III
    NELSON BUMGARDNER PC
17  3131 West 7th Street, Suite 300
    Fort Worth, Texas 76107
18
    MR. J. WESLEY HILL
19  WARD, SMITH & HILL PLLC
    1507 Bill Owens Parkway
20  Longview, Texas 75604

21
    COURT REPORTER:      MS. CHRISTINA L. BICKHAM, CRR, RMR
22                       FEDERAL OFFICIAL COURT REPORTER
                         300 Willow, Ste. 221
23                       Beaumont, Texas 77701

24
    Proceedings taken by Machine Stenotype; transcript was
25  produced by a Computer.
```

```
 1   FOR THE DEFENDANTS:

 2
     MR. DOUGLAS E. LUMISH
 3   MR. JEFFREY G. HOMRIG
     MS. LISA K. NGUYEN
 4   MR. BRETT M. SANDFORD
     LATHAM & WATKINS LLP
 5   140 Scott Dr.
     Menlo Park, California 94025-1008
 6

 7   MR. JOSEPH H. LEE
     LATHAM & WATKINS LLP
 8   650 Town Center Drive, 20th Floor
     Costa Mesa, California 92626-1925
 9

10   MR. ERIC H. FINDLAY
     FINDLAY CRAFT PC
11   102 N. College Avenue, Suite 900
     Tyler, Texas 75702
12

13

14                ******************************

15                     P R O C E E D I N G S

16            (Jury out.)

17            COURT SECURITY OFFICER:  All rise.

18            THE COURT:  Please be seated.

19            Before we bring in the jury, I want to -- I

20   conferred with our court reporting team to make sure I was

21   doing what I need to do to protect any information that

22   needed to be sealed.

23            And what I need to do is just put on the record

24   that I'm going to order that that last question, including

25   the amount that was mentioned, be redacted from the unsealed
```

1    portion of the transcript.  So it's not going to make a

2    substantive difference in what is and is not redacted, other

3    than we just need to get it off of the unsealed portion of

4    the transcript.

5            Is there anything we need to take up before we

6    bring the jury in?

7            MR. CALDWELL:  I thought there might be, but,

8    ultimately, I think not.  You know, given the corporate

9    character motions in limine I think this next one will be

10   actually really streamlined.

11           And then I thought when we were discussing issues

12   blocked on privilege and things like that, there was some

13   confusion in the correspondence; but it looks like Mr. Homrig

14   and I actually understand it the same way, that as long as we

15   are talking about the Plaintiff acquired the patents for X

16   amount of money, things that are just reflected on the face

17   of the document, we're.  Fine, and we're not going to go to

18   the, you know, motivations behind that or anything.  So I

19   think we are actually on the same page.  And if either of us

20   are going somewhere else, we're going to approach.

21           MR. HOMRIG:  That sounds right, Your Honor.  As

22   long as we don't get into why, I think we'll be all right.

23           THE COURT:  Very good.  All right.  Let's bring in

24   the jury.

25           COURT SECURITY OFFICER:  All rise for the jury.

1          (Jury in.)

2          THE COURT:  Please be seated.

3          Plaintiff, you may call your next witness.

4          MR. CALDWELL:  Thank you, your Honor.

5          Good afternoon, Your Honor.  The Plaintiff calls

6    Ms. Cristin Wagner.

7          THE COURT:  Ms. Wagner, if you'll please raise your

8    right hand to be sworn.

9          (Witness sworn.)

10          MR. CALDWELL:  Your Honor, I have a few minutes of

11   background and then, regrettably, we'll have to seal the

12   court, but hopefully it'll be just a real short -- real short

13   stint.

14          THE COURT:  Just let me know when you get there.

15          MR. CALDWELL:  Thank you, your Honor.

16          CRISTIN WAGNER, PLAINTIFF'S WITNESS, SWORN

17                    DIRECT EXAMINATION

18   BY MR. CALDWELL:

19   Q.   Good afternoon.

20   A.   Good afternoon.

21   Q.   Would you please introduce yourself to the jury?

22   A.   My name is Cristin Wagner.  I am a senior vice-president

23   at Acacia Research Group.

24   Q.   Why are you here today, Ms. Wagner?

25   A.   I'm here to provide some background on the Plaintiff CCE

1    and some background on Acacia.  I'm also going to talk a

2    little bit about the prior licensing of the '820 patent.

3    Q.    What is the relationship between Cellular Communications

4    Equipment, LLC, and Acacia Research?

5    A.    So Acacia is the parent company of CCE.  It's a

6    licensing technology company, and CCE is a subsidiary of

7    Acacia Research.  And it's the entity that owns the '820

8    patent, as well as some other patents in the cellular

9    communication space.

10   Q.    Where did you grow up, Ms. Wagner?

11   A.    I'm from Canada.  I grew up in a city called Regina,

12   Saskatchewan.

13            THE REPORTER:  What's the city called again?

14            THE WITNESS:  Regina, R-E-G-I-N-A.

15            THE REPORTER:  Okay.

16   Q.    (By Mr. Caldwell) When did you move to the United

17   States?

18   A.    I moved to the U.S. in March of 2013.

19   Q.    What did you do professionally in Canada?

20   A.    I'm a patent lawyer.

21   Q.    When you made the move to the United States, did you

22   become licensed to practice law in the U.S.?

23   A.    Yes, I did.  I took the California -- California Bar and

24   passed.  And also, since I knew I was going to be practicing

25   patent law, I also wrote the U.S. Patent Bar and became

1  registered before the USPTO.

2  Q.   Are you familiar with the term "intellectual property"?

3  A.   Yes, I am.

4  Q.   Generally, what is intellectual property?

5  A.   Well, ideas are property, or can be property.  And so if

6  you think of a Coca-Cola bottle, the bottle is the physical

7  property.  But the secret formula to make the Coke would be

8  considered intellectual property.

9  Q.   What was it about Acacia Research that intrigued you?

10  A.   Well, as I said before, Acacia is a technology licensing

11  company.  And what that means is it provides a service to

12  those who have intellectual property that may not be able to

13  protect it or get fair compensation for it.

14  Q.   What do you mean by "licensing"?

15  A.   Well, companies will work hard to develop technology.

16  And if they do that, then before another company uses it,

17  they should get permission and they should compensate that

18  other company.

19      And the U.S. Government thinks this is important, and so

20  what it does is it will grant patents for that technology to

21  protect that technology and invention.  And if a company

22  wants to use that technology, it gets a license which means

23  it gets permission and it compensates the -- the innovator.

24  Q.   Is intellectual property a property right that can be

25  bought, sold, or transferred?

1  A.    Yes.  It's like any other property, like mineral rights.

2  Q.    Do you remember in the preliminary instructions before

3  opening that Judge Mitchell instructed the jury on four basic

4  questions the jury will answer in this trial?

5  A.    Yes.

6  Q.    All right.  Now, just going back to those questions, are

7  you here to talk about infringement, willful infringement, or

8  validity?

9  A.    No.  I'm definitely not a technical expert in that area.

10  I wasn't allowed to see some of the documents that you would

11  need to answer those questions, so I'm not here to answer

12  those questions.

13  Q.    And will you be offering an opinion on what the amount

14  of damages are that should be awarded?

15  A.    No.  Same thing.  I'm not an expert in that field.  I

16  wasn't allowed to see the documents that you would need to

17  come to that conclusion.  I may provide some information with

18  the licenses, but I won't be talking about any opinion on

19  that.

20  Q.    Will you describe Acacia Research Corporation to us?

21  A.    Well, Acacia Research Corporation has been around for

22  about 20 years.  And it's been a publicly traded company for

23  about 15 years.  And Acacia Research Group, the company that

24  I work for, is the licensing arm of that operation.  And so

25  it's dedicated to licensing the technology or the

1  intellectual property that it has.

2  Q.    Who is Cellular Communications Equipment?

3  A.    So CCE is a sub of Acacia Research Group, and it's the

4  particular entity that holds the '820 patent.

5  Q.    Thank you.

6            MR. CALDWELL:  We're already at that point where I

7  need to seal the courtroom.

8            THE COURT:  All right.  We're going to seal the

9  courtroom at this time.  If you are not covered under the

10  protective order, please exit the courtroom.  We'll let you

11  know when you may come back.

12            (Courtroom sealed.)

13            (This portion of the transcript is sealed and filed

14            under separate cover as Sealed Portion No. 3.)

15            (Courtroom unsealed.)

16            THE COURT:  Who will be Plaintiff's next witness?

17            MR. CURRY:  Plaintiff calls Mr. Nigel Jones.

18            COURTROOM DEPUTY:  Mr. Jones, if you'll raise your

19  right hand to be sworn.

20            (Witness sworn.)

21            MR. CURRY:  May I proceed?

22            THE COURT:  Yes.

23             NIGEL JONES, PLAINTIFF'S WITNESS, SWORN

24                        DIRECT EXAMINATION

25  BY MR. CURRY:

1  Q.   Good afternoon.

2  A.   Good afternoon, sir.

3  Q.   Please introduce yourself to the jury.

4  A.   My name is Nigel Jones.

5  Q.   Why are you here at this trial, Mr. Jones?

6  A.   I am the source code expert, so I will be telling you

7  about how the source code in Apple's products work.

8  Q.   Are you what's called an expert witness?

9  A.   That's correct.

10 Q.   How is that different from a fact witness?

11 A.   So a fact witness talks about things they knew typically

12 before trial.  I will be talking about things that I had to

13 investigate and render an opinion on.

14 Q.   What do you do for a living, Mr. Jones?

15 A.   I'm an electrical engineering consultant.

16 Q.   Do you have an engineering degree?

17 A.   Yes.  I have a degree in electrical and mechanical

18 engineering.

19 Q.   Are you an employee of CCE?

20 A.   No.  I'm self-employed.

21 Q.   Nonetheless, have you been compensated for your work in

22 this case?

23 A.   Yes.  I'm being compensated at the rate of $540 an hour.

24 Q.   And is that compensation dependent on the outcome of

25 this case?

1   A.    Absolutely not.

2   Q.    Let's learn a little bit more about you.

3   How old are you?

4   A.    I'm 55.

5   Q.    And where do you live?

6   A.    I live in Frederick, Maryland.

7   Q.    Is that a Maryland accent I'm hearing?

8   A.    No.   This is a British accent.   I grew up in the UK and

9   Germany.

10   Q.    What had you growing up in the UK and Germany?

11   A.    My dad was in the British Army; and so like military

12   families, we moved around.   And I ended up in Germany and

13   England.

14   Q.    So what brought you to the United States?

15   A.    I always wanted to come to the United States; and when I

16   graduated from college, I started working for a British

17   multinational, and I worked on a product concept for them

18   that, in classic form, the British decided they didn't like

19   and the Americans loved.   And so I moved to the United States

20   to develop that product.

21   Q.    Do you have a family?

22   A.    Yes, I do.   I have a wife, Laurie; a 24-year-old

23   daughter; and a 27-year-old son.

24   Q.    How did you decide to get into engineering?

25   A.    Oh, I was one of those really fortunate people.   As

1    young as I can remember, I wanted to take things apart, put

2    them together.  It was only natural that I become an

3    engineer.

4    Q.    And where did you go to college for engineering?

5    A.    I went to Brunel University in London, UK.

6    Q.    Did you do well there?

7    A.    Yeah.  I graduated with what's called a first class

8    honors degree.  Here in the United States, that's roughly

9    equivalent to graduating with a 4.0 GPA.

10   Q.    How long have you been an engineering consultant?

11   A.    Over 20 years now.

12   Q.    Why did you start consulting instead of working as an

13   engineer at some company?

14   A.    Yes.  So, as an engineer, I love working on a wide

15   variety of things.  When you work for a company, you tend to

16   specialize.

17        The other problem I had was that companies wanted to

18   push me into management, and I wanted to stay as an engineer.

19   So consulting was the obvious route for me.

20   Q.    In your day-to-day job, what do you do as an engineering

21   consultant?

22   A.    Yes.  So I design electronic circuits; I write software;

23   I provide technical advice to clients, those sorts of things.

24   Q.    Who are some of your non-litigation clients?

25   A.    So my oldest client that I've had for, I think, 27 years

1   is a company called Babington Technology in Virginia.

2   Babington Technology makes, essentially, equipment for

3   feeding the U.S. Army and U.S. Marine Corps in the field, and

4   I design all of their electronic control systems.

5   Q.   Have you consulted for any telecommunications companies?

6   A.   Yes.  I've worked for Hughes Network Systems as a

7   consultant.

8   Q.   And you also in your job consult in litigation matters,

9   right?

10  A.   Yes, I do.

11  Q.   In your work, how much of your time is spent on

12  engineering consulting versus consulting on litigation

13  matters?

14  A.   So, on average, I spend about 20 percent of my time on

15  litigation.

16  Q.   Are you always retained by the plaintiff?

17  A.   No.

18  Q.   And in the litigation context, have you previously

19  served as an expert in a patent infringement case before?

20  A.   Yes, I have.

21  Q.   Mr. Jones, what makes you qualified to give testimony

22  about source code in this case?

23  A.   My education and experience.  I've been writing these

24  sorts of codes for years and years and years now.

25  Q.   Well, when was the last time you actually wrote some

1    source code?

2    A.    Actually, last week.

3    Q.    Mr. Jones, did you prepare some slides to assist in your

4    testimony today?

5    A.    Yes, I did.

6    Q.    Will you please give us an overview of the topics we're

7    going to cover today?

8    A.    Yes.  So if you'd like to direct your attention to the

9    slide, what I'm going to cover, first of all, is the products

10   at issue.  I'm going the tell you a bit about my

11   investigation.  I will provide you a summary of my findings.

12   Then we will delve into relevant technology.  We'll talk

13   about LTE in general and then buffer status reporting in

14   particular.  And then we will dive into the source code, and

15   I will show you the source code.

16   Q.    How long do you think it will take us to work through

17   all of this material?

18   A.    Probably up to about an hour and a half.

19   Q.    What sections will be the longest?

20   A.    The last two, the relevant technology and then the

21   source code.

22   Q.    Does it need to be that long?

23   A.    Yes, it does.  This is important stuff, and it's

24   important that I convey this information to you.

25   Q.    What is the first of your presentation?

```
 1   A.   So as you see, it is highlighted here, the products at
 2   issue.
 3   Q.   And what are the products at issue in this case?
 4   A.   So what we're talking about here are Apple's iPhones,
 5   iPhone 5 and 6 in particular, with LTE, and then the Apple
 6   iPads that contain -- support the LTE.
 7   Q.   Do all iPads support LTE?
 8   A.   No, they don't.  For instance, I have an iPad, and it
 9   doesn't support LTE.
10   Q.   In Apple's products, how is the LTE functionality
11   implemented in those devices?
12   A.   So the LTE functionality is pretty much restricted to
13   something called baseband processor.
14   Q.   Can you show the jury where that is in Apple's products?
15   A.   Yes.  I can try.
16        What I have here is an iPhone 6 Plus that we've gone
17   ahead and taken the lid off.  So if I hold it up for you, the
18   big black thing here is the battery.  What we're talking
19   about is the baseband processor, which is this chip right
20   here (indicating) in the middle.
21   Q.   And is that the part of the accused devices that do the
22   buffer status reporting?
23   A.   Yes, it is.
24   Q.   Do all of the iPhones and iPads in this case use the
25   same code for buffer status reporting?
```

1   A.    There are some differences between them, but for all

2   practical purposes, they're the same.

3   Q.    How do you know that?

4   A.    Oh, I've looked at the code for all of the accused

5   products, and I've compared them using what are called

6   differencing tools and have concluded that they're all ranked

7   materially the same way.

8   Q.    Will there be anything in your -- in your testimony

9   today that is true for one version of the code but not true

10  for another version?

11  A.    No.

12  Q.    Let's move on to the next topic.

13        You told us that you're here to discuss source code.  Is

14  source code the only thing you looked at in your

15  investigation in this case?

16  A.    No.  I looked at a lot more than source code.

17  Q.    What else did you review?

18  A.    So if you turn your attention to this slide here, I

19  reviewed the asserted patent.  That's the '820 patent.  I

20  looked at some of Apple's confidential documents.  I reviewed

21  my LTE textbooks in my LTE library.  I reviewed the relevant

22  LTE standards and specifications.  I also looked at some of

23  the deposition testimony from Apple's engineers.  And then

24  last, but certainly not least, I analyzed the source code of

25  the accused products.

1   Q.   Can you show the jury the LTE textbooks that were from

2   your personal library?

3   A.   Sure.

4        So this is my personal LTE library.   This first book

5   here by Dahlman, I've pretty much read cover to cover.   The

6   bottom book, Johnson, I've read well over half of.   And the

7   other two I delve into from time to time.

8   Q.   Now, we've been talking a lot about source code.   What's

9   that?

10  A.   So, "source code" is the term given to what people like

11  me do when we write down instructions that tell computers or

12  microprocessors what it is we want them to do.

13  Q.   Is source code the thing that's actually running on the

14  processor?

15  A.   No, not actually.   So microprocessors or computers, as

16  you probably heard, only understand 1's and 0's.   And so

17  there is a process called compilation that takes the source

18  code that someone like me writes and converts that into the

19  1's and 0's that the microprocessor understands.

20  Q.   Can you show uses a generic example of some source code?

21  A.   Yes, sure.

22       So what you can see here is an example of a very simple

23  program that I put together.   And let me take you through it.

24       On Line 3 you will see something there.   That is called

25  a comment.   So this isn't part of the program.   This is just

1    a note to myself or future programmers.  And it says:  Adds

2    the two numbers passed to it and prints the result.

3    Q.   What do you have at Lines 5 through 11?

4    A.   So what this is, this is what's called a function.  And

5    you will hear me use that term a lot today.  So this function

6    is called "add two numbers."  It's common to give functions

7    meaningful names.  And so what happens here is this function

8    is passed two numbers, and you can see on Line 8 it takes the

9    first number and the second number, adds them together, and

10   assigns it to a variable called "sum of numbers."  And then

11   on Line 10 the result is printed out.

12   Q.   All right.  Well, what's going on at Line 16?

13   A.   So Line 16 is an example of how we call a function.  So

14   here we are calling the function "add two numbers" and we are

15   passing two numbers, 89 and 42.  And so the function "add two

16   numbers" will take those two numbers, add them together, and

17   print the result for me.

18   Q.   All right.  Well, this was just generic code.  Can you

19   show the jury what real world code looks like?

20   A.   Yes.  So here's an example of some code that I wrote a

21   number of years ago for a real product.  You will see some

22   similar things.  You will see some comments.  You will see

23   stuff being added and compared and so on.  So this is what,

24   shall we say, real code looks more like.

25   Q.   And in this case how much LTE source code did you

1    review?

2    A.    So in this case it was a couple hundred pages.

3    Q.    How did Apple make the code available to you in this

4    case?

5    A.    So to review it, Apple put it on a computer in their

6    office -- their lawyer's offices in California.  So I

7    traveled to California to review it.

8    Q.    Were you able to print any of the code that you

9    reviewed?

10   A.    Yes, I was -- well, we were allowed to say which code we

11   wanted printed, and then it was printed for us.

12   Q.    Do you understand that some of the code that you

13   reviewed and printed has been made into a trial exhibit in

14   this case?

15   A.    That's my understanding, yes.

16            MR. CURRY:  For the record, that's PX-65.

17   Q.    (By Mr. Curry) Mr. Jones, is the jury going to have to

18   sift through the hundreds of pages of source code that you

19   reviewed in this case?

20   A.    No, absolutely not.  That's my job for you.

21   Q.    Mr. Jones, did you document your investigation in this

22   case?

23   A.    Yes, I wrote a report.

24   Q.    And did you provide that report to Apple?

25   A.    Apple has a copy, yes.

1   Q.   Moving on to the next topic, will you please summarize

2   what you found through your investigation in this case?

3   A.   Yes.  I'd be happy to.

4        So as this slide shows, for regular and periodic BSRs,

5   buffer status reports, the accused Apple devices build a BSR

6   based on the following:

7        No. 1.  Monitoring the uplink buffers.

8        No. 2.  Checking whether there are zero, one, or more

9   than one logical channel groups that have data in the

10  associated buffers.

11       And 3.  Checking whether there is sufficient available

12  space in the uplink -- uplink grant.

13  Q.   Do you have any more findings, Mr. Jones?

14  A.   Yes.  I had a separate set of findings for padding short

15  BSRs.

16  Q.   And what are those?

17  A.   So in that case the padding short BSRs, the accused

18  Apple devices build a BSR based upon the following:

19       No. 1.  Monitoring the uplink buffers.

20       No. 2.  Checking whether there is sufficient available

21  space in the uplink grant; and

22       3.  Whether there are zero, one, or more than one

23  logical channel groups that have data in the associated

24  buffers.

25  Q.   Will you be explaining what all of this means in your

1  testimony today?

2  A.   Yes.  Hopefully by the time I'm done some of these terms

3  will be more meaningful.

4  Q.   Now, we all know that this is a patent infringement

5  case.  Are you actually going to offer an opinion of

6  infringement in this case?

7  A.   No.  That's not my job.

8  Q.   Who will the jury be hearing from for infringement?

9  A.   You will be hearing from my colleague, Dr. Caloyannides.

10  Q.   But if Apple has any dispute with how you say the source

11  code works, they can ask you, right?

12  A.   Yep.  That's my job.

13  Q.   Thank you.

14       And what is the next section?

15  A.   So the next section we're going to talk a bit about LTE

16  in general.  So, hopefully, when we cover this section, a lot

17  of what we're talking about will make a lot more sense for

18  you.

19  Q.   What is the first technology concept you want to touch

20  on, Mr. Jones?

21  A.   So the first one -- hopefully we have a slide for it

22  here -- covers LTE cellular networks in general.

23  Q.   What are the network devices in LTE cellular networks

24  that we'll be focused on?

25  A.   So there are two things really of interest.  On the

1   left-hand side you can see an iPhone.  This is referred to

2   either as a user device or user equipment, usually

3   abbreviated UE.  So you will hear me use the term "UE" a lot

4   today.  When you hear UE, just think phone or iPad with LTE,

5   okay?

6   Q.   What do you have on the right there, Mr. Jones?

7   A.   On the right there is a base station.  I'm sure you've

8   seen these cell towers all over the place.  So, the term

9   "base station" refers principally to the electronics that sit

10  at the bottom of that tower and that control everything that

11  goes on within the cell.

12  Q.   What does a base station do?

13  A.   So the base station has multiple roles.  Its two most

14  important are -- go by the names of admission control -- so

15  this is where it decides whether you can connect to that cell

16  tower -- and also handles passing you from cell tower to cell

17  tower as, for example, you drive down the road.

18       The second really important thing it does is scheduling.

19  Q.   What's scheduling?

20  A.   So we used the term "scheduling" to describe the way in

21  which the cell phone decides which cell phones get to use

22  these over-the-air resources at any given time.

23  Q.   And as between admission control and scheduling, what

24  functionality of the base station is relevant to this case?

25  A.   So in this case we're principally focused on the

1    scheduling aspect.

2    Q.   Now, is there just one scheduler per base station?

3    A.   Actually, no.  There are two.  One for the uplink and

4    one for the downlink.

5    Q.   What's the downlink scheduler for?

6    A.   So the downlink scheduler is responsible for controlling

7    information that is downloaded from the base station to the

8    UE, hence downlink.  So it is responsible for controlling all

9    the traffic that is downloaded to phones.

10   Q.   Well, what's the uplink scheduler for, then?

11   A.   Well, the uplink scheduler goes the other way.  So, the

12   uplink -- this is the phone uploading information to the base

13   station, hence uplink.  And so the uplink scheduler is

14   responsible for controlling how that information is

15   transferred.

16   Q.   Do the downlink scheduler and the uplink scheduler work

17   the same way?

18   A.   They have a lot of similarities, yes.

19   Q.   Are there any differences between them?

20   A.   Yes.  There is one fundamental difference between

21   downlink and uplink scheduling.  So with downlink

22   scheduling -- so what's happening at the base station is

23   information is streaming in from the Internet from telephone

24   calls and so on, to the base station.

25        And so the base station knows all about the information

1   that is queued up at the base station waiting to be sent to

2   the phones.  It knows how much information, who it's for, and

3   how important it is.  So it's got all the information it

4   really needs to know in order to decide who gets to receive

5   information right now.

6   Q.   How is that different from the uplink scheduler?

7   A.   So with the uplink scheduler, if you think about it, if

8   you wish to send an e-mail and you hit send, there's no way

9   that the base station knows inherently that you are just

10  about to hit send and send an e-mail.  It has essentially no

11  information about what data is sitting on your phone waiting

12  to be uploaded to the base station.

13  Q.   Well, why doesn't the user device just do its own uplink

14  scheduling since it knows how much data it has to send and

15  what its priorities are, et cetera?

16  A.   Well, because there are typically anywhere, 50, 60,

17  maybe even more phones connected to the base station at any

18  one time.  And if they all just transmitted whenever they

19  felt like it, it would be complete chaos.  Everything would

20  interfere.  Nothing would get through.

21  Q.   Okay.  Then how can the base station determine how much

22  network resources to allocate to the user device if it

23  doesn't know anything about the data on that user device that

24  the user device has to send up?

25  A.   Right.  So the obvious answer is we have to have a

1  mechanism by which the UE can tell the base station about the

2  information on it ready to be transmitted.  And that's where

3  buffer status reports come in.

4  Q.   All right.  I think that takes us to our next topic.

5  A.   Yes.  So now we'll talk a little bit about buffer status

6  reports.

7  Q.   What are you showing on this slide, Mr. Jones?

8  A.   So I think you may have seen a variant of this slide

9  yesterday when Mr. Sebire was talking.  So I'm just going to

10  amplify or extend a bit more on what Mr. Sebire said.

11      So on the left-hand side we have the UE.  On the

12  right-hand side we have a base station.  Within the UE you

13  can see a number of blocks there, and these represent

14  buffers.

15  Q.   All right.  And what are the dotted lines between the

16  user device and the base station?

17  A.   So these are what we call radio bearers.

18  Q.   And what's a radio bearer?

19  A.   So you can think of a radio bearer as a logical link

20  between the UE and the base station.  So even though you

21  might think that my phone is communicating with a base

22  station, what's really happening is the phone has got

23  multiple communication links.  It might have one for voice,

24  another for e-mail, another for web browsing, another for

25  FaceTime, and so on.  Each of those would be called a radio

1    bearer.  Or sometimes a logical channel.  Two terms are used

2    interchangeably.

3    Q.   Is it only things like applications like FaceTime, web

4    browsing, et cetera, that need to use radio bearers?

5    A.   No.  There's actually also something called signaling

6    radio bearers, sometimes called SRBs.  So a signaling radio

7    bearer takes care of the command and control information that

8    goes back and forth between the phone and the base station.

9         So, for example, when you're handing off from one base

10   station to another, there's a certain amount of signaling

11   that has to go back and forth, and that has their own

12   dedicated radio bearers called signaling radio bearers.

13   Q.   And you mentioned the buffers.  What are those?

14   A.   So when you want to do something on your phone, you wish

15   to upload data, because you just can't start transmitting

16   whenever you feel like it, you can't transmit until you're

17   told to, it's very important that the UE buffer that data;

18   that is, it holds the data in a temporary holding area until

19   it has the right to physically transmit it across the air.

20   Q.   Now, I see you're showing that the radio bearers are

21   color-coordinated.  Are they actually organized in any way?

22   A.   Yes, they are.  So it is normal practice in LTE to

23   assign radio bearers, for logical channels, to logical

24   channel groups.  And so what we're showing here, we're

25   showing four logical channel groups, which is the number that

1   LTE supports.  And you can see that you can have different

2   numbers of radio bearers in each logical channel group.  So

3   you can have zero, one, two, three, four.  And that is

4   controlled by the base station.

5   Q.   How come logical channel groups aren't called radio

6   bearer groups?

7   A.   Sometimes we're just not very consistent in our

8   technology.  You could call them radio bearer groups, but in

9   standard they're called logical channel groups.

10  Q.   What's the point of organizing radio bearers into

11  logical channel groups?

12  A.   So the point is here is that when we send buffer status

13  reports, this is what we call overhead.  Because if you think

14  about it, the carriers really only get paid when you transmit

15  data, your data.  That's what counts, okay?  So what they

16  want to do is to minimize the overhead associated with

17  signaling in general and radio bearers in particular.

18       And so what we can do -- what they do is they group

19  radio bearers into groups that have similar characteristics.

20  And what I mean by similar characteristics, is how important

21  are these radio bearers, what data rates do they need, how

22  delay sensitive are they, and so on.

23  Q.   And can you give me an example of different types of

24  radio bearers that might have different sensitivities to

25  delay?

1   A.   Yes.  So a good example is e-mail is obviously -- at

2   least I assume it's obvious -- is very insensitive to delay.

3        Whereas, for example, if you were using FaceTime and

4   you're trying to stream video to someone this is very delay

5   sensitive.  If the video is delayed, then things get broken

6   up, the speech gets broken up.  And it's not a very nice

7   experience.

8   Q.   Now, how does all of this relate to buffer status

9   reports?

10  A.   So buffer status reports report how much information is

11  queued up in a logical channel group at the UE.  So this is

12  the information that the base station needs to make its

13  scheduling decisions.

14  Q.   And in this example, what is this short BSR showing?

15  A.   Right.  So there are a couple of different formats of

16  buffer status report.  And what is shown here -- on this

17  slide now we're showing both of them -- there is a short

18  buffer status report which consists of a 1 byte header and a

19  1 byte payload.  And then there is a long buffer status

20  report consisting of a 1 byte header and a 3 byte payload.

21  Q.   What are the 1's and 0's representing, Mr. Jones?

22  A.   So these 1's and 0's represent the size or the amount of

23  data that is queued up in the logical channel group.  This is

24  binary, 1's and 0's.  But it's the size of data that's --

25  that's queued up.

1    Q.    Do the long and short BSRs report on the same

2    information?

3    A.    Well, they're reporting on buffer status, but the short

4    buffer status report is reporting on just one logical channel

5    group; whereas, the long buffer status report is reporting on

6    all four logical channel groups.

7    Q.    In the short buffer status report, why are you showing

8    that vertical dotted line?

9    A.    Yes, that's an excellent question.

10         So with a short buffer status report we have to tell the

11   base station which logical channel we are reporting on.

12   Seems reasonable.  And so the two digits to the left of that

13   dotted line represent which logical channel group we're

14   reporting on.

15   Q.    How come the long buffer status report doesn't need to

16   indicate which buffers -- or which LCGs it's reporting on?

17   A.    So in this case because we're reporting on all four, we

18   just put them in order and the base station then inherently

19   knows what they belong to.

20   Q.    And you were in court when Mr. Sebire testified?

21   A.    Yes, I was.

22   Q.    He mentioned a truncated short buffer status report.

23   What's that?

24   A.    So a truncated short BSR is a special type of BSR which

25   occurs in the following condition:  You only have enough

space to send a short, but you actually have data in more

than one logical channel group.  When this situation arises,

you can only send a short.

     And so what you do is you send information on the

logical channel group, which is the highest priority; and you

indicate in the header that this is a truncated short, which

tells the base station, yes, the logical channel group that

is being reported on has this much data but, by the way,

there's another logical channel group that I'm not telling

you about that also has data.

Q.   Well, let's back up a little bit.

     What causes a user device to send a buffer status report

in the first place?

A.   So there are a number of different things that can

trigger a buffer status report.  Now, you might have heard

that term used a little bit so far today.  So what I can do

now is take you through all the different ways in which

buffer status reports are triggered.

Q.   Are they categorized in any sort of way, Mr. Jones?

A.   Yes.  We will be looking at three fundamental types of

buffer status report that go by the name of "regular,"

"periodic," and "padding."

Q.   All right.  Let's take those one at a time.  What

happens on the user device to trigger a regular buffer status

report?

1   A.   Yes.  So the first thing that happens -- or that can

2   trigger a regular BSR is the phone is sitting there with no

3   data and then suddenly one of the logical channel groups has

4   data to transmit, at which point that will trigger a regular

5   BSR.

6   Q.   Can you give me an example of a scenario in which that

7   might occur?

8   A.   Yes, absolutely.  You were just sitting there with your

9   phone.  You write an e-mail and then you hit send.  That is

10  an example of where suddenly data would become available in a

11  logical channel group and a regular BSR would be triggered.

12  Q.   Are there other things that can trigger a regular BSR?

13  A.   Yes.  So the next way it can happen is imagine that you

14  already have data in a logical channel group and then data

15  becomes available in another logical channel group which is

16  higher priority, in which case under those circumstance we

17  will also trigger a regular BSR.

18  Q.   Can you give me an example of when that might occur?

19  A.   Yes.  So, for example, let's say you've just hit send on

20  e-mail and the phone is waiting to get resources to send that

21  e-mail and then you start a FaceTime application.  If

22  FaceTime is in a different -- different logical channel

23  group, then that would also trigger a new buffer status

24  report.

25  Q.   Can a regular BSR be triggered in any other way?

```
 1   A.   Yes.   There is a third way it can be triggered, which is
 2   called a "retransmission regular BSR."  What happens here is
 3   after you have effectively triggered a BSR and sent -- sent
 4   the BSR out, if you don't get enough resources within a
 5   specified time, then it's indicative that something has gone
 6   wrong and so you will retrigger a periodic BSR.
 7   Q.   You also mentioned a periodic BSR.   What happens on a
 8   user device that would trigger a periodic BSR?
 9   A.   Yes.   So a periodic BSR, as the name suggests, is a BSR
10   that is generated periodically.   Under LTE this period can be
11   anywhere from 5 milliseconds to 2.56 seconds or completely
12   separate.
13        An example of where a periodic BSR would be triggered is
14   if, for example, again with FaceTime, you are having a
15   continuous FaceTime session, you are continually generating
16   video and voice data, then that would be picked up by the
17   periodic BSR.
18   Q.   The third type of trigger you mentioned was padding.
19        What's that?
20   A.   Right.   So padding BSRs are a little bit different.   So
21   in this situation padding BSRs come into play when the UE has
22   received -- the term we call is an "uplink grant."  So what
23   an uplink grant is, this is when the base station says to the
24   phone you have the right to transmit X number of bytes, 50,
25   500, or whatever.
```

1       And so if you are told you can transmit 500 bytes but

2    you only have, say, 480 bytes in your buffers, then you've

3    got space left over.  And that space would just typically be

4    filled with padding, just fill it with 0's and it's -- does

5    nothing useful.

6       So instead of filling it with padding, what we can do is

7    put a buffer status report in the space that would otherwise

8    be occupied just by padding bytes.  And we call that a

9    padding BSR.

10   Q.   Thank you.

11      How do the different triggers for sending BSRs compare

12   with what you're showing on the screen which are the

13   different formats of BSRs?

14   A.   So what I have here is a matrix.  And on the left you

15   can see the three different types:  Regular, periodic, and

16   padding.  And along the top, we have the long format, the

17   short, and the truncated short formats.  And you can see

18   basically that all combinations are possible.

19   Q.   Well, I don't want to go through all nine combinations,

20   but could you show us some examples that illustrate how some

21   of these different types and formats might work?

22   A.   Yes.  I have a few animations that hopefully will make

23   things a little clearer.

24   Q.   All right.  Let's start with a regular long BSR.  What

25   are we seeing on the screen, Mr. Jones?

1  A.    So on the left we have an iPhone.  On the far right we

2  have the base station.  And in the middle here you can see

3  this sort of blue grate.

4  Q.    What's that supposed to be?

5  A.    So this is supposed to represent the over-the-air

6  resources that are available for use.  And so in LTE the

7  over-the-air resources are divided up into what are called

8  resource blocks.

9       You can think of a resource block as a container that

10 contains information.  And what the base station does when it

11 schedules, is it says to you, you can use source blocks 6

12 through 12, for example.

13      And so you can think of that as being given the right to

14 use six containers to put your information in.  And so this

15 represents the containers into which you can put your

16 information.

17 Q.    Now, does the base station actually give containers to

18 the different devices on the network?

19 A.    No.  This is just illustrative.  Effectively, the UE

20 knows when it's told you can use 6 through 12, it knows the

21 part of the frequency spectrum in time when it can transmit.

22 Q.    All right.  Well, let's show the buffers on the phone.

23 And I see that you already have data in the fourth buffer.

24      Why is that, Mr. Jones?

25 A.    So this is representing the data that's buffered up, for

1   example, for an e-mail that's waiting to go out.

2   Q.   Well, what happens when FaceTime starts trying to send

3   data to the base station?

4   A.   So, if you crank up FaceTime, data immediately goes into

5   its buffers.  And because this is higher priority, what

6   happens then is the phone sends what is called a scheduling

7   request.

8        You see the flag that went across the screen?  What

9   basically has happened there is the phone is saying to the

10  base station:  Hi.  I need to schedule something.

11       And so what the base station will do in response is

12  allocate the UE a resource in order to send a buffer status

13  report.

14  Q.   In this resource block, is the user device going to

15  start filling that with its data?

16  A.   So what it will do first, the buffer status reports are

17  very high priority; and so what it will do first is it will

18  take the available space in the container and put a buffer

19  status report in.

20       And so what I'm showing here is we completely consumed

21  the resource with a long buffer status report, which, if you

22  remember, consumed 4 bytes.  And so we now have a long buffer

23  status report that we can now transmit to the base station.

24  Q.   Now, are resource blocks such that they could only, at

25  most, fit in one long buffer status report?

A.    No.   The size of a resource block -- or, rather, the

amount of information that a resource block can contain is

very available and depends upon radio conditions.

Q.    Well, when the base station receives the buffer status

report, what will it do?

A.    So, when it receives the buffer status report, it now

knows -- particularly a long buffer status report -- it now

knows everything it needs to know in order to provide

resources to the UE in order for the UE to transmit its

information to the base station.

Q.    And so what will it do?

A.    So here you can see, we've been given four resource

blocks.   And so what's happened here is we empty the FaceTime

buffers, we partially empty the buffers of the second logical

channel group, and the information is transmitted to the base

station.

Q.    Since there is data still in that fourth buffer, does

the user device have to send another scheduling request and

another buffer status report?

A.    No.   So, remember, the long buffer status report told

the base station everything it needed to know, so the base

station is well aware that the previous grant was not big

enough to empty all the buffers.

      And so a little bit later on, it will issue another

grant sufficient to allow that logical channel group to empty

1   out its buffers.

2   Q.    I want you to take us now through a similar situation

3   but for a truncated short buffer status report.

4        And I see that you've got the base station moving away.

5        Why is that?

6   A.    So what we're trying to demonstrate here is now the

7   phone is a lot further away from the base station.  You've

8   all experienced this.  You look at the phone.  You see that

9   the signal is very weak.

10       And so what happens now is, when the signal is very

11  weak, the amount of information that can be stored in these

12  resource blocks or containers is reduced.  And I've tried to

13  illustrate that by showing the large part of the container as

14  being grayed out.

15  Q.    I see you still have data in the fourth buffer, so we'll

16  show FaceTime adding data to the first buffer, and can you

17  take us through that, Mr. Jones?

18  A.    That's right.

19       So we just had a scheduling request, so just as before.

20  And so in response to a scheduling request, we receive a

21  grant from the base station in order to send a buffer status

22  report.

23       But in this case, the grant is too small to receive a

24  long buffer status report.  All we can do is fit a short BSR

25  in here.  And because we have data in more than one logical

1    channel group, it will be a truncated short that will be

2    sent.

3    Q.    And then what will the base station do upon receiving

4    the truncated short BSR?

5    A.    So with the truncated short BSR, now it knows about the

6    buffers for FaceTime but not about the buffers for the

7    e-mail.  And so it will get a grant.

8         And you'll notice that the grant wasn't big enough to

9    empty the buffers because radio conditions are very poor.

10   And so it's likely that we will need multiple grants over

11   successive time periods in order to empty those buffers.

12   Q.    Okay.  And now will you take us through a padding BSR

13   scenario?

14   A.    Certainly.

15   Q.    I want to start at the point where the user device has

16   already got data in its buffers, it's already sent the

17   scheduling request and buffer status reports, and it's now

18   been allocated resource blocks.

19        So from this point, will you take us through and show us

20   how padding short buffer status reports work.

21   A.    Yes.  So in this case, again, we have two logical

22   channel groups with data that are queued up.  We've received

23   the data here, and we will start filling up the grant.

24        You can see we've emptied the FaceTime buffers, but

25   we've also actually emptied buffers for the other radio

1    bearer as well.  In fact, now, as you can see, we have some

2    space left over.

3        And so in that space, we can stick a short buffer status

4    report.  And that's what's done here.  And then it gets sent

5    to the base station.

6    Q.    You've been showing us examples of one phone.  Will you

7    give us an example with multiple phones?

8    A.    Yes, certainly.

9    Q.    All right.  What are the phones going to be

10   transmitting, just as an example?

11   A.    So we have three phones here, each of them doing a

12   different application.

13        So I think the first one maybe is e-mail.  The second

14   one is maps.  You may not be aware of this; but when you use

15   the maps function, you're actually transmitting a lot of

16   information back and forth to the cell tower.  And then the

17   third one may be FaceTime.

18   Q.    All right.  What happens first?

19   A.    So you have these three phones all sitting here, and

20   they all issue scheduling requests to the base station.  The

21   base station gives them grants to send back buffer status

22   reports.

23        So you can see different types of buffer status reports

24   went back.  And at this point, the base station knows about

25   the buffers in all of the phones and can make sensible

1     scheduling decisions.

2         And so you can see that different amounts of resources

3     are being allocated to different phones, and that's the whole

4     point about scheduling, is to allocate these resources in a

5     fair, equitable, and efficient manner.

6     Q.   Let's move on to the last topic, which is detailed

7     analysis of the code operation.

8         How is this section different from what you just took us

9     through, Mr. Jones?

10    A.   So what I've been describing for you up until now is

11    I've just been describing to you in general how cell phones

12    and LTE and buffer status reporting works in general.

13        In this section, we're going to get into how the accused

14    products work in detail.

15    Q.   And based on your investigation, did you find that the

16    accused Apple devices in this case comply with the buffer

17    status reporting requirements of the LTE standard?

18    A.   Yes, I did.

19    Q.   And are you ready to testify about how the accused

20    products actually implement that functionality in the source

21    code?

22    A.   Yes, I am.

23            MR. CURRY:  Your Honor, I think we're at a point

24    where we need to seal, according to the Qualcomm protective

25    order in particular.

 1              THE COURT:  All right.  We're going to do that.

 2      We're also going to take our afternoon break right now.

 3      So we're going to take a break for 15 minutes; and when we

 4      come back from break, do not come back in if you're not under

 5      the Court's protective order.  We'll have the courtroom

 6      sealed at that time.

 7              We'll be in recess.

 8              COURT SECURITY OFFICER:  All rise.

 9              (Recess.)

10              (Courtroom sealed.)

11              (This portion of the transcript is sealed and filed

12              under separate cover as Sealed Portion No. 4.)

13              (Courtroom unsealed.)

14              THE COURT:  We're going to take just a short

15      ten-minute break, Ladies and Gentlemen of the Jury.  Stretch

16      your legs.  Then we'll come back for about 50 minutes and be

17      done for the day.

18              We'll be in recess for ten minutes.

19              COURT SECURITY OFFICER:  All rise.

20              (Recess.)

21              (Jury out.)

22              THE COURT:  All right.  Let's bring in the jury.

23              (Jury in.)

24              THE COURT:  Please be seated.

25              MR. CURRY:  The witness is on his way back.

 1          THE COURT:  All right.  We're on the homestretch,

 2   Ladies and Gentlemen of the Jury.  We'll keep you here until

 3   about -- well, until 4:30.  We'll let you go then.  We'll

 4   start again at 9:00 a.m. tomorrow, okay?

 5          I'll just take this moment, in case I forget later,

 6   to remind you, when we adjourn for the day -- I hate to sound

 7   like a broken record, but make sure that you don't discuss

 8   this case with anyone or talk about it with anyone at home.

 9   Don't talk about it with each other.

10          Remember, we're not going to talk about the case or

11   do any independent research.

12          THE WITNESS:  My apologies, Your Honor.

13          THE COURT:  No problem.

14          All right, Mr. Homrig.  Let's continue.

15          MR. HOMRIG:  Thank you, Your Honor.

16   Q.   (By Mr. Homrig) Sir, one thing I wanted to clarify is

17   about short and truncated BSRs, okay?  Both of those -- the

18   short and truncated, they use the same format.  That's right,

19   isn't it?

20   A.   The format of the body is the same, yes.  The header is

21   different.

22   Q.   Well, the content of the headers is different, right?

23   A.   So I'm not sure of the difference between what the

24   header and the content of the header is.

25   Q.   Fair enough.

1      But, generally speaking, the short and the truncated

2   BSRs use the same format?

3   A.    Yes.  The body -- the information that's reported in the

4   body is the same format.

5   Q.    Okay.  Now, I wanted to ask you a little bit about your

6   compensation in this matter.  It's right, isn't it, that your

7   rate for this case for the amount of work you do on this case

8   is $540 per hour; is that right?

9   A.    Yes, sir.

10  Q.    Now, I think at the time of your deposition, you had

11  billed about -- I think you gave a range of 100 to 300 hours.

12      Is that about right?

13  A.    That's right, yes.

14  Q.    Now, I would imagine you've done some work since then,

15  right?

16  A.    Oh, yes.

17  Q.    All right.  Can you estimate how much work you've done?

18      Do you know how much work you've done since the time of

19  your deposition?

20  A.    I would say I'm probably more in the 3- to 400-hour

21  range now.

22  Q.    Okay.  So that's the total, 3- to 400-hour range?

23  A.    That's an estimate, yes.

24  Q.    Okay.  One thing I wanted to ask you about, you gave

25  a -- I thought a very detailed presentation of, you know, the

```
 1    overall sort of background.  I want to -- and so I guess one
 2    starter question is that you have extensive knowledge of LTE,
 3    right?  That's fair to say?
 4    A.   I certainly have extensive knowledge of parts of LTE,
 5    yes.
 6    Q.   Okay.  But, generally, around this part, for example,
 7    BSRs, you've got extensive knowledge of that, right?
 8    A.   Well, but I also have extensive knowledge of scheduling,
 9    reporting, handover.  These are all areas that I work in.
10    Q.   Fair enough.
11         So the reason I ask, though, is I think you said in your
12    direct, you are not here to give an opinion about
13    infringement in this case, right?
14    A.   That's correct.
15    Q.   And you've prepared a report for this case where you
16    laid out all of the opinions you were going to testify about
17    at trial, right?
18    A.   Yes, I did.
19    Q.   Okay.  Now, in that report, you didn't include any
20    comparison between the claims of the '820 patent and the LTE
21    standard, right?
22    A.   That is correct.
23    Q.   And you did not offer an opinion about whether Apple's
24    products infringe the '820 patent, right?
25    A.   That's correct.
```

1    Q.    And in your expert report, you offered no opinion one

2    way or the other about what the claims cover or don't cover;

3    is that right?

4    A.    That's correct.

5    Q.    Okay.  So now I want to shift gears.  That was all about

6    infringement.  Let's talk a little bit about invalidity.

7         So, now, I think you agree that Mr. Sebire didn't come

8    up with the idea of buffer status reporting, right?

9    A.    Correct.  Yes.

10   Q.    All right.  But in preparing your expert report, you

11   didn't do any work to determine whether the '820 patent and

12   what specifically it covers is valid, did you?

13   A.    That is correct.

14   Q.    Related to that, in your report, you don't have any

15   opinions about whether Mr. Sebire conceived of the conditions

16   related to the number of buffers for selecting between long

17   and short BSRs on his own or as opposed to, say, together

18   with Ericsson and Samsung and others, did you?

19   A.    I didn't mention Mr. Sebire in my report.  I'm afraid

20   the question asked was a bit too complicated for me.

21   Q.    I'm sorry.  That's my fault.  I apologize.  So let's

22   back up.

23        So you spent a lot of time in your direct talking about

24   how the Qualcomm code checks the number of buffers to select

25   long or short BSRs.

1    Do you remember that?

2  A.   Among other things, yes.

3  Q.   Okay.  But in your report, you don't offer any opinions

4  directed to whether Mr. Sebire conceived of those conditions

5  on his own or whether he did it together with Ericsson and

6  Samsung and others or whether he did it at all; isn't that

7  right?

8  A.   I would agree with that.

9  Q.   Okay.  Now let's shift to damages.

10    In your report, you didn't provide an opinion about the

11  appropriate amount of damages in this case, right?

12  A.   That is correct.

13  Q.   Okay.

14    MR. HOMRIG:  With that, Your Honor, I pass the

15  witness.  Thank you.

16    THE COURT:  Redirect?

17    MR. CURRY:  Short redirect.

18    REDIRECT EXAMINATION

19  BY MR. CURRY:

20  Q.   Good afternoon.

21  A.   Good afternoon, sir.

22  Q.   You were questioned about the work you've done for

23  Acacia.  To be clear, is Acacia the only company that's

24  retained you for litigation matters?

25  A.   Absolutely not.  For example, I'm currently retained by

1   Fox and NBC in a matter.

2   Q.   And who else have you been retained by in the past in

3   other litigation matters?

4   A.   So I've been retained by such companies as DirecTV and

5   EchoStar, are names that you may have recognized.  EchoStar

6   is the holding company for Dish Network.

7   Q.   You're not here to testify about infringement.

8   A.   Right.

9   Q.   You're not here to testify about validity.

10  A.   Correct.

11  Q.   You're not here to testify about damages.

12  A.   That's right.

13  Q.   Please tell the jury what the scope of your testimony

14  is.

15  A.   The source code and what it does.

16  Q.   And on that, did Apple's lawyer get anything identified

17  in terms of anything you got wrong with how the source code

18  works?

19  A.   Not that I noticed, no.

20  Q.   Did Apple's lawyer identify any mistake you made in your

21  source code analysis in the report that the Apple lawyers

22  got?

23  A.   Not that I saw, no.

24  Q.   Did Apple's lawyer identify any mistake you made with

25  respect to your flowcharts?

```
 1   A.   He seemed to have an issue with one of them.  It's not

 2   clear to me he identified a mistake.

 3   Q.   In any event, are your flowcharts completely accurate in

 4   terms of how the source code operates?

 5   A.   Yes, they are.

 6   Q.   And who's going to testify to the jury about

 7   infringement?

 8   A.   Dr. Caloyannides.

 9   Q.   And who is going to testify to the jury about damages?

10   A.   That will be Mr. Phil Green.

11             MR. CURRY:  Pass the witness.

12             THE COURT:  Anything further?

13             MR. HOMRIG:  No further questions, Your Honor.

14             THE COURT:  All right.  Mr. Jones, you can step

15   down.

16             THE WITNESS:  Thank you.

17             THE COURT:  Who will be your next witness?

18             MR. NELSON:  Your Honor, before we call our next

19   live witness, which will be Dr. Michael Caloyannides, we are

20   going to play a 15-minute clip of the deposition testimony by

21   video of Mr. Madhu Chaudhary.

22             And he is a senior manager at Apple and leads a

23   team of protocol software engineers for cellular

24   technologies, and the responsibilities include LTE.

25             THE COURT:  Thank you.
```

1          (Video clip playing.)

2          QUESTION:  Can you please state your full name for

3     the record?

4          ANSWER:  Madhusudan Chaudhary.

5          QUESTION:  Do you understand that you've taken an

6     oath to tell the truth today?

7          ANSWER:  I do.

8          QUESTION:  Is there any reason you cannot give

9     complete and truthful testimony today?

10          ANSWER:  I can't think of any.

11          QUESTION:  Do you understand that you've been

12     designated to testify on behalf of Apple, Inc. today?

13          ANSWER:  Yes, I do.

14          QUESTION:  Are you prepared to testify on behalf of

15     Apple?

16          ANSWER:  Yes, I do.

17          QUESTION:  What is your experience with LTE?

18          ANSWER:  So I -- at Apple, I'm a senior manager,

19     and I lead a team of protocol software developers who

20     essentially handle protocol software for all wireless -- all

21     cellular technologies; namely, LTE, W-CDMA, GSM, CDMA2000,

22     and EVDO.

23          So I'm responsible as for these technologies from a

24     software perspective at Apple.

25          QUESTION:  What responsibilities do protocol

1    software developers have?

2         ANSWER:  So we are a product company, and we are

3    not a chip company.  So, essentially, we will buy a chip from

4    Qualcomm.  At the same time, we are responsible for the

5    end-user experience.

6         So, if people are experiencing call drop on the

7    iPhone or the data experience is not as good as it can be,

8    the management is going to come to my team to figure out why

9    that is the case, all right?

10        So, in terms of the role that we have, we have

11   multiple test organizations within Apple, and then for

12   certification, we use outside test houses, too.  An issue

13   that comes out of that, we are the first one to take a look

14   at it.

15        We'll figure out whether it's an issue because of

16   the hardware or software.  If it is hardware, we'll try to

17   narrow down to the root cause, and then we'll reach out to

18   Qualcomm, and we'll make sure that they fix the problem in

19   that -- in the right manner.

20        Besides that, there will be custom features that we

21   might implement.  They are outside the scope of 3GPP.

22   They're more product-level features.  And we would generate

23   IPR as well in the process of our work.

24        QUESTION:  Is it your understanding that iPhone

25   models beginning with the iPhone 5 have supported LTE?

1          ANSWER:  That is correct.

2          QUESTION:  Are you familiar with buffer status

3   reporting?

4          ANSWER:  Yes.

5          QUESTION:  Okay.  And how are you familiar with

6   buffer status reporting?

7          ANSWER:  So buffer status reporting is a mechanism

8   where the device can inform the network about its buffer

9   status so that network can inform about devices to transmit

10  data.

11         QUESTION:  Do LTE standards describe when devices

12  operating on an LTE network should send buffer status

13  reports?

14         ANSWER:  The 3GPP MAC specification does describe

15  in detail about when the device should send buffer status

16  report.

17         QUESTION:  Is that description provided in 3GPP

18  Technical Standard 36.321?

19         ANSWER:  The LTE MAC specification, I believe that

20  is 36.321.

21         QUESTION:  Do Apple iPhones that support LTE, send

22  buffer status reports as set forth in the 3GPP MAC

23  specification?

24         ANSWER:  I think any device which supports LTE will

25  have to comply with the 3GPP specification, and hence, it

1    will also have to send buffer status report in compliance

2    with the specification.

3           QUESTION:  Does the -- do you understand when the

4    3GPP standards require a LTE device to send a regular BSR?

5           ANSWER:  Yes, I do.

6           QUESTION:  Okay.  And when is that?

7           ANSWER:  So let's say, if you have no data in any

8    of your buffer and there is new data to send, at that point,

9    a regular BSR would get triggered.

10          It is also possible that you have existing data in

11   one of the queue, and there could be a higher priority

12   logical channel in which new data arrives.  So that could

13   trigger a BSR.

14          A periodic timer could also expire, and if that

15   happens, that would trigger a regular BSR, too.

16          QUESTION:  Do Apple iPhones that support LTE send

17   regular BSRs as you just described?

18          ANSWER:  Any phone that supports the LTE standard

19   will have to send the regular BSR.  If there is a trigger as

20   defined in the spec, an iPhone will do that, too.

21          QUESTION:  As would an iPad that supports LTE?

22          ANSWER:  That is correct.

23          QUESTION:  Before we took a break, I believe you

24   mentioned in your testimony that your team has responsibility

25   for tracking down issues that might arise during what you

1   referred to as certification; is that correct?

2          ANSWER:   That would be one validation activity that

3   happens, but there are many more as well.   So anything --

4   essentially, any issue with software, my team will be the

5   point of contact, as far as the protocol software goes.

6          QUESTION:   What -- when you refer to certification,

7   what does that mean?

8          ANSWER:   So certification is essentially a set of

9   test cases that are mandated by the regulatory authority.

10         So, if you need to ship a device in any country,

11  you need to make sure that you pass all the mandatory

12  certification test cases that are -- that are mandated by the

13  regulatory body.

14         QUESTION:   So, in the United States, for example,

15  that would be the FCC?

16         ANSWER:   Yes.   And I think they have another

17  organization called PTCRB.   So PTCRB would also have a list

18  of test cases that the device needs to pass.

19         ATTORNEY:   I'm sorry.   For the previous question,

20  you said FCC, right?

21         ATTORNEY:   Correct.

22         QUESTION:   I'm sorry.   You mentioned PTCRB.   What

23  is that?

24         ANSWER:   So I think there is PTCRB certification,

25  which essentially will tell you the list of test cases that

1    the device needs to pass.  The test cases by themself are

2    defined by the 3GPP body.  They are the ones who will choose

3    which are the ones that needs to be run.

4               QUESTION:  Does the PTCRB certification include any

5    test cases related to conformance with the 3GPP LTE MAC

6    protocols?

7               ANSWER:  The certification test cases cover pretty

8    much the entire 3GPP standard, and hence, they will also

9    cover MAC, which is part of the 3GPP standard.

10              QUESTION:  Do Apple devices that support LTE --

11   excuse me -- LTE undergo PTCRB certification to ensure that

12   they send buffer status reports in conformance with LTE

13   standards?

14              ANSWER:  I would rephrase it slightly differently.

15   The Apple device will have to pass all mandatory test cases

16   in order to ship, and we do pass all the mandatory test cases

17   for all the products that we have shipped in the past.

18              QUESTION:  What did you do to prepare to testify on

19   these topics today?

20              ANSWER:  So there are a couple of things that I

21   did.  We had a few meetings with the attorneys.  That's

22   number one.

23              Number two, I had my team look at the source code

24   to derive an understanding of how Qualcomm has implemented

25   LTE buffer status reporting.  I looked into the MAC

1   specification, studied it in detail, discussed it with my

2   team as well in detail.  And I also read the patent in

3   question.

4          QUESTION:  So it's your understanding that the

5   Qualcomm code that was studied, implements buffer status

6   reporting as described by the 3GPP standards; is that

7   correct?

8          ANSWER:  That is correct.  What we found is

9   Qualcomm software code implements the LTE MAC specification

10  when it comes to buffer status reporting as described in the

11  3GPP specification.

12         QUESTION:  Do you understand that there are

13  multiple devices that are accused of infringement in this

14  litigation?

15         ANSWER:  Uh-huh.

16         QUESTION:  Do you understand that there are

17  different Qualcomm baseband processors at issue?

18         ANSWER:  Uh-huh.

19         QUESTION:  And it's my understanding that there are

20  different software builds loaded into each of those Qualcomm

21  processors.  Is that consistent with your understanding?

22         ANSWER:  Yeah.  I think my understanding is

23  consistent with your understanding.  And even within the same

24  phone, there will be different software releases because, if

25  you go from, let's say, 6 to 6.1 software version, that will

1    also be a change.  So, even if for the same phone, there will

2    be multiple software releases as well.

3           I am not sure which particular software Venkat

4    took a look at to arrive at what question -- to arrive at our

5    conclusion.

6           Having said that, though, this part of the LTE

7    specification has been there since release 8.  And I would

8    imagine most of them will have pretty much the same software

9    unless they had fixed a bug or something like that.  But that

10   is pure speculation on my part, not a fact that I can --

11          QUESTION:  Okay.  But you have no reason to believe

12   that --

13          ANSWER:  I have no reason to -- I think that would

14   be a good way to rephrase.  I have no reason to believe that

15   this core functionality will be different across different

16   chipsets, even though I haven't verified that.

17          QUESTION:  You have been handed what was labeled as

18   Exhibit 4.  This is a document titled Exhibit A to Defendant

19   Apple, Inc.'s Second Supplemental Responses and Objections to

20   Plaintiff's First Set of Common Interrogatories (Nos. 1-3, 8,

21   and 11).  This document bears the Bates label

22   APL-CCE_00019296 through -19302.

23          Have you seen this particular document before?

24          ANSWER:  I have seen this particular document

25   before.

1          QUESTION:  I believe earlier you mentioned that you

2     believed we'd been given a list of products.  Is this the

3     list that you were referring to?

4          ANSWER:  This is the document that I was referring

5     to when you asked that question.

6          QUESTION:  So just to return to Exhibit 4 and the

7     list of products, is it your understanding that each of the

8     products identified in Exhibit 4 are capable of being

9     configured to support communications over an LTE network?

10          ANSWER:  Yes, that is correct.  This product can be

11     configured to support LTE.

12          QUESTION:  Do you agree that the products

13     identified in Exhibit 4 communicate buffer status reports

14     according to 3GPP technical standards when communicating over

15     an LTE network?

16          ANSWER:  That is correct.  The devices will -- if

17     there is a trigger to send BSR, the device will send BSR in

18     compliance with the 3GPP standard.

19          QUESTION:  And those triggers would be, for

20     example, what you identified earlier; example one was when

21     new data arrives in the uplink buffers, and it was previously

22     noted.  Is that one example?

23          ANSWER:  That was one example.

24          QUESTION:  And I believe the second example was

25     when higher priority data arrives in the uplink buffer; is

1    that correct?

2              ANSWER:  That is correct.

3              QUESTION:  I believe you mentioned a third trigger,

4    which was when a periodic timer expires; is that correct?

5              ANSWER:  So when the periodic timer expires, the

6    device will send BSR.

7              QUESTION:  Turning back to Exhibit 4, is it your

8    understanding that the information provided in Exhibit 4

9    accurately identifies the Qualcomm baseband chip that is

10   included with each product in Exhibit 4?

11             ANSWER:  Yeah.  To the best of my knowledge, yes.

12   The information about the Qualcomm chip with the

13   corresponding Apple product is correct.

14             QUESTION:  Is it your understanding that the

15   Qualcomm baseband processors included in the products listed

16   in Exhibit 4 execute software that implements LTE buffer

17   status reporting?

18             ANSWER:  That is correct.

19             QUESTION:  And then the software for -- is actually

20   executed by the baseband chip; is that correct?

21             ANSWER:  The software will be executed by the

22   baseband chip provided by Qualcomm.

23             QUESTION:  Just to make our lives easier, if you

24   would, just pop back to Exhibit 4.

25             And I may use the term "accused devices" or

 1   "accused products" as we move forward in the deposition.  And

 2   when I say that, I'm referring to the products listed in

 3   Exhibit 4.

 4           ANSWER:  Uh-huh.

 5           QUESTION:  Does that make sense to you?

 6           ANSWER:  Yeah, that makes sense to me.

 7           QUESTION:  Okay.  When was the LTE standard

 8   initially adopted?  Do you know?

 9           ANSWER:  I think it was -- again, I'm not a

10   standards guy, but I believe it was more around 2008 time

11   frame.

12           QUESTION:  Was Apple involved in the standard

13   setting process with respect to LTE at that point?

14           ANSWER:  I don't recall any efforts of Apple

15   playing a role in the standardization.  And if you look -- if

16   I think about the LTE standardization team itself, that came

17   into being in 2011.  So I don't even know how that is

18   possible.

19           QUESTION:  Now, you had mentioned a triggering type

20   of BSR, regular, periodic versus -- what's the third one --

21   padding.

22           ANSWER:  Uh-huh.

23           QUESTION:  Does that triggering event also

24   determine whether or not a long or short BSR is sent?

25           ANSWER:  No.  I think, to me, that triggering event

```
 1    and whether you send a long or a short BSR are two

 2    independent -- two independent events.

 3              QUESTION:  So let's talk about regular BSR.

 4              So for regular BSR, you had mentioned there's a

 5    triggering event that will cause the system to send a regular

 6    BSR.

 7              ANSWER:  Uh-huh.  Uh-huh.

 8              QUESTION:  The data that you look at or the

 9    information that the system looks at in order to determine

10    whether or not a regular BSR is triggered, is that the same

11    information that gets looked at when the system is deciding

12    whether or not to send a long or a short BSR?

13              ANSWER:  No.  Those are two entirely different

14    information.

15              QUESTION:  And for a periodic BSR, is the

16    information that's being looked at for the trigger event the

17    same information that's being used to determine whether or

18    not to send a long or a short BSR?

19              ANSWER:  I think in the case of periodic, the

20    trigger is a timer.  And whether you do long or short is

21    the -- how many logical channel group queues have data.  So

22    they are completely different.

23              QUESTION:  And I mean, maybe -- maybe this is an

24    easier way to ask the question.  Does the trigger event

25    itself necessarily determine whether a long or a short or --
```

1  BSR is sent?

2          ANSWER:  No.  I think the trigger event has no

3  bearing on whether or not a long or a short BSR is sent.

4          (End of video clip.)

5          MR. NELSON:  Your Honor, our next live witness will

6  be Dr. Michael Caloyannides.  May I have a few minutes to --

7          THE COURT:  Yes.

8          Dr. Caloyannides, if you will raise your right hand

9  to be sworn, please.

10          (Witness sworn.)

11          MR. NELSON:  Thank you, Your Honor.

12          I know we only have a little bit of time left to go

13  this afternoon, so we should be able to introduce

14  Dr. Caloyannides, get through essentially his background,

15  perhaps a little further.

16          There will come a point, just like with Mr. Jones,

17  that we would have to seal the courtroom, but we will not

18  have to do that the remainder of the day today.  I think

19  we're okay for the time being.

20          THE COURT:  All right.

21     MICHAEL CALOYANNIDES, Ph.D., PLAINTIFF'S WITNESS, SWORN

22                     DIRECT EXAMINATION

23  BY MR. NELSON:

24  Q.   Good afternoon.

25  A.   Good afternoon, sir.

1    Q.   Dr. Caloyannides, will you pull the mic up just a little

2    bit higher so it's closer to your...

3    A.   (Witness complies.)

4    Q.   Will you please introduce yourself to the jury?

5    A.   My name is Michael Caloyannides.

6    Q.   You're here to provide expert testimony on behalf of CCE

7    regarding the issue of infringement, are you not?

8    A.   That is correct.

9    Q.   I think the jurors have already noticed that you have a

10   bit of an accent.  Can you tell the jury where you are

11   originally from?

12   A.   I was born and raised as a kid in Athens, Greece.

13   Q.   So how did you find your way to the United States?

14   A.   By boat.

15   Q.   That's interesting, Dr. Caloyannides, but not really

16   what I meant.  But since you brought it up, why a boat rather

17   than a plane?

18   A.   Frankly, not by choice, but -- because the boat drive

19   was quite awful.  Not like the Romance of the Ocean crossing

20   trip.  It was a horrible ride, the ship bumping up and down

21   and me being sick to my stomach for the better part of a

22   week-and-a-half.

23       The boat was the least expensive means of transporting

24   myself to the U.S.  That's about all that my parents could

25   afford for me to come to the U.S.

1          MR. NELSON:  Your Honor, may I approach the

2   witness?

3          THE COURT:  Yes.

4   Q.   (By Mr. Nelson) So, Dr. Caloyannides, why did you move

5   to the United States?

6   A.   A number of reasons.  The educational environment that I

7   was raised in Greece was one that stressed learning by rote,

8   repeating what one learned regurgitating it, and that was

9   considered knowledge.  That was appalling to me.

10  I always had questions why not this, why that.  And

11  occasionally I was being sent to the principal's office for

12  questioning why things are not the way that everybody knows

13  they are.

14          From the American professors that I had growing up as a

15  kid, I felt that I would be much more at home in an

16  environment like the one that they appear to be coming from.

17          So to my parents' consternation, I applied on my own to

18  come to the United States to a university, the university

19  here, the Polytechnic University in New York.  I was granted

20  a full scholarship.  Tuition was eating, sleeping, the whole

21  works.

22          And as I mentioned, I packed my bags, got in a boat, and

23  at the other end, I was in New York and went to Institute of

24  Polytechnic.

25  Q.   Okay.  And did you receive a degree from Rensselaer?

1    A.    No.   After two years at Rensselaer, I found it was way

2    too cold for my taste, frankly.   Having been born in Greece

3    where it never snowed, to come to Troy, New York, it was

4    brutal.   Just snow to my knees for months on end.

5        So I thought I needed a different environment and

6    because I graduated first in the entire freshman and

7    sophomore class of well over a thousand students at

8    Rensselaer, I applied to Caltech, which had a much better

9    reputation and was in California.

10        I was given entrance exams for Caltech, the same exams

11    that they were giving to their sophomores finishing their

12    sophomore year, and I was told afterwards that I exceeded the

13    scores of all their own students graduating as sophomores, so

14    they offered me, again, a scholarship, all expenses paid, the

15    whole works, to continue studying at Caltech.

16    Q.    Did you receive a degree from Caltech?

17    A.    Yes, I did.   I got my bachelor's in science with honors.

18    Then I continued on and got my master's in electrical

19    engineering, and then I got my Ph.D. in electrical

20    engineering, applied mathematics, and philosophy, all --

21    Q.    When did you receive that Ph.D.?

22    A.    That was in 1971.

23    Q.    Okay.   So, if my math is right, you are now in your 70s,

24    are you not, Dr. Caloyannides?

25    A.    I am 72, unfortunately.

1    Q.   Are you a married man?

2    A.   Yes, I am.

3    Q.   Happily?

4    A.   Very much so, yes.

5    Q.   For how long?

6    A.   Oh, 20 years now.

7    Q.   Do you have children?

8    A.   I have two children.  One is an 18-year-old daughter,

9    who is in first year college at Virginia Tech, and the other

10   one is a graduating senior.  It's his last year of high

11   school.  That's my son.  My pride and joy, both of them.

12   Q.   What did you do after you received your Ph.D. degree in

13   electrical engineering?

14   A.   I was offered the position at Rockwell International in

15   California as a very senior member of a tech staff.  It was

16   mostly in telecommunications-related stuff, which is very

17   interesting for me, because that's where -- my primary

18   interest, lifework.  By the way, my Ph.D. in Caltech was in

19   telecommunications.

20        So I took that position and performed a number of

21   different tasks as a junior engineer, even though the senior

22   position, junior in terms of seniority.  One of them was

23   developed some -- then -- very high-speed modems, and I

24   applied for and was granted a patent on high-speed modem

25   design, a number of other telecommunication systems; some of

```
 1    them classified, some of them unclassified.

 2         But that's basically an overall summary of about seven

 3    years or so at Rockwell.

 4    Q.   And I see that you prepared some slides today, have you

 5    not?

 6    A.   That is correct.

 7    Q.   Okay.  And is that your patent listed there under

 8    Rockwell on the slide?

 9    A.   That is correct.

10    Q.   For how long were you at Rockwell?

11    A.   I was there from '71 until '84; 13 years.

12    Q.   And what did you do after leaving Rockwell?

13    A.   Well, I didn't just leave and then look for something.

14    While I was there, I was offered the position as senior

15    scientist for the research and development branch of the CIA.

16    Q.   That's the Central Intelligence Agency?

17    A.   That is correct.

18    Q.   So you were recruited to the CIA?

19    A.   Well, not recruited.  I was, again, offered a senior

20    position, no strings attached.  In fact, I accepted it with

21    some concern about leaving the climate of Southern

22    California, and I eventually left with a one-year

23    protectional, understanding that I would be there for a year,

24    and then I would go back to sunny California.  That one year

25    continues on.  I'm still in Washington.
```

1   Q.   What does a chief scientist in the Office of Research

2   and Development at the CIA do?

3   A.   Oh, it is not known -- CIA is not known for its

4   technical capabilities, which is just as well, perhaps,

5   because of the nature of the job.  It has -- it had and has

6   absolutely topnotch technological and scientific capability.

7   It has to have that.

8              THE COURT:  Dr. Caloyannides, would you lower the

9   mic just a hair?  I think it won't pop quite so much.

10             THE WITNESS:  I'm sorry about that.

11             THE COURT:  Thank you.

12  A.   It serves two primary functions, "it" being the research

13  and technology organization.

14       One is to provide its own people that work overseas with

15  the best in technical gadgetry that one can have for their

16  collection purposes.

17       And the second is to be able to assess the status of

18  technological developments by assorted adversaries, and

19  "assorted," I mean the whole world.

20  Q.   (By Mr. Nelson) Dr. Caloyannides, did you do work in

21  telecommunications for the CIA?

22  A.   Mostly, yes.  That was mostly what I did.

23  Q.   Please tell the jury about some of your experience with

24  telecommunications in the CIA.

25  A.   Well, I cannot go into any detail because, of course,

1    there are classification issues and the constraints applied

2    to me lifetime.  They don't expire.

3        But one thing I can mention is that I got a

4    highly-touted Scientist of the Year award at CIA for work

5    that led to a telecommunications system, which was ever to be

6    used and was used in an urban environment, which is pretty

7    much the same environment that cell phones work in.

8        Other efforts -- I mean, there were various efforts.  I

9    cannot go into great details.  Some of them involved means

10   for two parties in assorted environments -- urban, suburban,

11   whatever -- to be able to communicate with each other

12   dependably on a regular basis without anybody knowing that

13   there is any communication taking place.

14       This goes way beyond encryption.  With encryption, you

15   hide the content, but it's an affront to interceptors that

16   say:  Ha, ha, you cannot catch me.  That's totally untoward.

17       What you want is to give no indication at all there is

18   any communication whatsoever taking place.  That's a

19   challenge because you have to solve the communication

20   problem; and then on top of it, you have to impose the

21   problem of nobody else knowing that you're communicating.

22   Q.   Dr. Caloyannides, will you lower the mic just a little

23   bit?

24   A.   (Witness complies.)

25   Q.   Thank you.

1        So is it safe to say that during your time at the CIA,

2   you designed spy gadgets?

3   A.   Well, that's a misnomer here.   The CIA does not employ

4   spies.   I know this may come as a surprise, but the spying --

5   the actual -- CIA collects in two ways.   One is through

6   people, and the other is through machinery, basically.

7        The collection through machinery involves extremely

8   advanced technology, and I was involved in the design of

9   those systems.

10  Q.   Now, was your career at the CIA limited to research and

11  development?

12  A.   No, it was not, actually.

13       After about seven years of designing devices and

14  techniques, which I thought were superb -- and, frankly, they

15  were, I would say, a couple of decades ahead of the

16  commercial sector -- I had the impure thought of asking the

17  end users, of all the stuff that we build for you, which ones

18  do you like the most?

19       And the answer was none.   That was a humbling

20  experience.   When I asked why, they looked at me to see if I

21  was a complete idiot; and they were right, because what they

22  needed was not high technology.   What they needed was

23  basically two things that you have to have in the stuff that

24  they use.

25       Namely, it has to work dependably, no ifs and buts and

1    howevers, no excuses.  It has to work.  It has to work on the

2    date and time it is needed.  If it is ready the day after,

3    that is not good enough.  It has to work when it is needed.

4        And the next one is it has to be -- to look like

5    something else.  It cannot look like a metal box with U.S.

6    Army serial numbers.  It has to look like anything else.

7    Those things had not occurred to the techies, including

8    myself, as being important design constraints.

9        So, because of that, I moved on to the operations side

10   of the house, the one that's commonly known by the world at

11   large, where I supported the end users, the operators -- you

12   want to call them spies, you want to call them king's

13   officers, whatever -- with whatever they needed when they

14   need it, meeting their requirements and their form of logic.

15   Q.   And, Dr. Caloyannides, did you have top secret clearance

16   at the CIA?

17   A.   Top secret clearance, I was allowed to go to the

18   bathroom unescorted.  That's about it.  Quite a few levels

19   higher above that.

20   Q.   Okay.  So when did you leave the CIA and what did you do

21   after that?

22   A.   I left after the Cold War ended.  The primary motivation

23   for me going to CIA was the desire to ensure that this nation

24   was not vaporized, nothing, by incoming Soviet missiles.

25       When that threat more or less fizzled when the Soviet

1    Union imploded, the next threat, the one we're in today,

2    terrorism and this and that, did not come anywhere close to

3    the importance in terms of level of threat to the United

4    States.  So I felt it was time for me to move on.

5        So I went to work for a year at the Boeing Company that

6    makes the airplanes, among other things.  And the reason for

7    that is because Boeing had bought out Rockwell International,

8    and I needed one more year of trade service at Rockwell

9    International, or Boeing now, to be able to be vested for

10   retirement.  So I supported them for a year in

11   telecommunication stuff.

12   Q.   And what was your position at Boeing?

13   A.   Senior scientist.

14   Q.   And then I see on your slide that you went to work for a

15   company called Mitretek Systems.  Tell us about Mitretek.

16   A.   Yeah.  Mitretek is a spinoff from the Mita Corporation,

17   which stands for MIT Research and Engineering.  It is a

18   501(c)(3).  That's the IRS designation.  That means it's a

19   nonprofit organization.

20       So what it does is to be for the public good.  It is not

21   allowed to sell to the commercial sector or to support

22   individual companies.  Can only provide support to the U.S.

23   Government, which was just fine with me.

24       And I was there as a -- I think they call it a Tech

25   Fellow, which is the highest technical position they had,

overseeing all of their activities, not only including

telecommunications, which was always close to my heart.

     And I stayed there for -- I forget how many years -- a

number of years, and it was all well and good.  The problem

is that when you come from the CIA where they have an

emergency every hour, Mitretek Systems felt like a very

collegiate environment, which was okay; but it was not

exactly the sort of thing where you can say:  Fix the

problem.  It's urgent.

     So I moved to a small company in the northern Virginia

area called Ideal Innovations, which had boots on the ground

in Iraq.  And the U.S. had major problems at the time in

Iraq, deadly problems.

     One was improvised explosive devices, also known as

IEDs.  If you have not seen an IED explode, it is a sight to

behold.  It's something about the size of three of those

paper cups, which is placed by the roadside very vaguely

aimed at the car that's going to pass by.  It is detonated;

and when the thing detonates, it is a hellish situation.

     What happens is there's a cone in front of the IED,

inverted cone made out of copper, which melts, and all you

have is a stream of melted copper, which goes against the

U.S. truck.  It penetrates 12 inches of steel.  So it is one

hell of a weapon.

     And the question is:  Okay.  Now what do we do?  Then

1   someone says:  Well, put then 14 inches of metal on the

2   tanks.  But if you do that, then the tank cannot move.  It

3   just sinks of its own weight.

4        So we had to improvise solutions that would essentially

5   protect the U.S. tanks in Iraq in such an environment and

6   still allow them to move around.

7        Another problem was -- given to me at the time was the

8   problem of soldiers on top of tanks, your head popping up on

9   top of a tank, and they wore a helmet, and that helmet was

10  totally useless against sniper bullets.

11       The reason for that is that sniper bullets have a lot of

12  momentum, energy, if you will, not exactly the same, but

13  anyway.  And when a bullet from a sniper rifle hit one of

14  those helmets, it would snap the neck of the person wearing

15  it.

16       So we needed a solution that would essentially prevent

17  that from happening.  So I worked on that and developed a

18  capability, and I would sleep well at night knowing that it

19  saved some lives.

20  Q.   Okay.  Dr. Caloyannides, did you do consulting or

21  academic work since you left Ideal Innovations?

22  A.   Yeah.  I did a couple of things.

23       One is not even shown here.  I was chairman for the

24  Federal Communications Commission, FCC, panel in

25  telecommunications for about a year or so.

1    And for many years after that, in an independent

2 consultant matter, the National Aeronautics and Space

3 Administration.

4 Q.   And what did you do for NASA?

5 A.   Evaluating proposals that were being submitted to NASA

6 from around the whole world as to -- and advising NASA which

7 ones to fund and which ones were pure nonsense, because

8 people were submitting things that were violating the laws of

9 physics, and they knew it.  They were out-and-out lying.

10    But they were taught well, and they said:  It's the

11 N-A-S-A, and maybe NASA won't catch it, and they'll fund us

12 anyway.

13    And I was kind of the filter that said:  No, no, no.

14 This is nonsense.  Don't bother with it, trash can, or it is

15 good.  Even though it looks futuristic, do it, because it

16 will put us ahead -- quite a bit ahead of the competition,

17 other nations.

18 Q.   Dr. Caloyannides, what have you done for Johns Hopkins

19 University and George Washington University?

20 A.   I was teaching.  Actually, I enjoy teaching quite a bit.

21 It has its frustrating moments, but it has some very

22 rewarding moments.  The rewarding moments -- and there will

23 be many of those -- is when the students come to me

24 afterwards and say:  You have been my best professor I've had

25 at this place.

1          Even they gave me some signed plaques and so on that say

2    Best Professor.   I even got recognition from Johns Hopkins

3    that says best teacher there.

4          What I did is I taught classes both in

5    telecommunications and also in computer science.

6    Q.    Do you continue to teach today?

7    A.    Yes, I do.

8    Q.    In looking at your slide, it looks like you've supported

9    litigation as an expert witness; is that right?

10   A.    That is correct.

11   Q.    It sounds like you've had quite a bit of experience in

12   the telecommunications industry.

13   A.    Well, aside from my interest in the field, which goes

14   from when I was a little kid and was building things from

15   scratch in Greece from the flea markets, parts from there.

16   Being 72, that's one of the few benefits of that is that you

17   acquire a lot of, I guess, experience and knowledge.

18   Q.    Dr. Caloyannides, do you have specific experience

19   related to the subject matter of this case?

20   A.    Yes, I do.

21         One thing I want to clarify is that the subject matter

22   of this case is not a thing like -- you know, like a

23   doorknob, that I'm an expert on doorknobs.   That's not it.

24         A cell phone today is not a phone.   It is a computer

25   masquerading as a phone.   It does a ton of stuff.   Yes, it

allows you to talk, also, but it's also a computing device.
It has a camera.  It is a machine that plays.  It's a machine
that displays where you are.  It's a navigation system and on
and on and on and on.

     And to do all of that, it has a computing capability in
the one little phone today -- I mean, I'm looking at my own
little phone, which is off, by the way -- exceeds the
capability of the entire computing center that they had at
Caltech, which was taking the better part of this entire
building with big computers in air-conditioned rooms.  So
it's a very potent device.

     So to be an expert in cell phones, modern cell phones,
you have to know your computing science stuff and know it
well, and that pertains to buffer status reporting, which is
mostly a computing function really.

     You have to know your telecommunications, especially in
an urban environment, which is different than any other
environment because of multipath; meaning that your signal
travels from transmitting end to receiving end through a
bunch of different ways.

     You have to know your antennas quite well.  You may
recall the Antennagate issue with Apple a few years back when
things were not quite right, and Steve Jobs had to now --
dress down some of the employees involved with the antenna
design.

1    It is a whole bunch of different things, and I feel that

2    over the years, I've acquired expertise in practically all of

3    those fields.  I know telecommunications well.  I've been

4    building telecommunications things since I was 10 years old.

5    I know my computing science well.  I'm teaching at the

6    universities computer science.

7    And I know my antennas well.  I've been building them

8    for the U.S. Government, on and on.  Yes, I do.

9    Q.    Okay.  And, Dr. Caloyannides, we just have a few more

10    minutes left here today, so we'll try to wrap this portion

11    up.

12    But if you're looking at your slide, I know that you've

13    talked about a few of these things, the experience, the Ph.D.

14    from Caltech, the years of teaching graduate classes.

15    Briefly tell us about the textbooks and the remaining

16    items on this list.

17    A.    Oh.  You know, I authored two textbooks.  That was -- I

18    have not mentioned that to you before.  But around 2011, I

19    was diagnosed with cancer.  Pretty prevalent.  I had surgery,

20    chemotherapy, radiation, the whole works, and I did not know

21    if I was going to survive.

22    So I sat down, and I was writing books.  I didn't have

23    anything else to do because I was just too weak to move

24    around.  I wrote the textbooks, one in second edition, a

25    bunch of chapters in other people's books, tons of articles

1    in professional journals and so on.

2         That's what this is all about.

3    Q.    Okay.  And what about the remaining items there?

4    A.    Oh.  The next one is the following:  Before the cell

5    phones were deployed anywhere in the U.S., I still wanted to

6    have a cell phone, but there were no cell phones.

7         So I was in Los Angeles at the time, having finished

8    from Caltech.  So I sat down and built -- designed and built

9    my own -- I'm serious -- my own cellular system.

10        So whenever the phone rang in my house, my radio, which

11   I put in my car, would ring; and I would answer hello, and

12   nobody knew that I was not at home.

13        And from the house -- not from the house -- from the

14   car, I could also dial a number anywhere in the world, for

15   that matter, through my house computer that I built there.

16   And it was a learning experience.

17        As with most things, when you build things, just knowing

18   what the book says is not enough.  You always end up with,

19   oops, we didn't think of that.  Oops, we didn't think of

20   that.

21        That taught me a lot about all of the oopses that you

22   inevitably come across in building things, especially in the

23   telecommunications environment.  That was an enjoyable

24   experience.

25             MR. NELSON:  Your Honor, will this be a good time

1   to stop?

2               THE COURT:  Yes.

3               All right.  Ladies and Gentlemen of the Jury, I'm

4   going to excuse you for the day.  We'll see you in the

5   morning again.  We'll start at 9:00 a.m.  If you would like

6   to come a little early and have some breakfast, you may do

7   so.

8               We'll be in recess until 9:00 a.m.

9               COURT SECURITY OFFICER:  All rise.

10              (Jury out.)

11              THE COURT:  Please be seated.

12              Dr. Caloyannides, you may step down.

13              THE WITNESS:  Thank you.

14              THE COURT:  All right.  Before we get to our

15  equitable issues testimony, I just want to give you an update

16  on your trial times.  Plaintiff has used 4 hours and

17  1 minute.  Defendant has used 2 hours and 28 minutes.

18              Who will be -- will we be hearing from Mr. Sebire?

19              MR. LUMISH:  Yes, Your Honor.  Apple will call

20  Mr. Sebire.

21              MR. CALDWELL:  I was just going to ask, Your Honor,

22  I know you encourage opportunities for other folks to come in

23  your court and make presentations.  Is it okay if one of my

24  colleagues redirects Mr. Sebire after -- instead of me doing

25  it?

1                    THE COURT:  Yes.

2                    MR. CALDWELL:   Thank you.

3                    THE COURT:   Mr. Sebire, I remind you that you are

4    still under oath.  All right?

5                    Mr. Lumish, you may proceed.

6                    MR. LUMISH:   Thank you, Your Honor.

7              BENOIST SEBIRE, RE-CALLED, PREVIOUSLY SWORN

8                      FURTHER RECROSS-EXAMINATION

9    BY MR. LUMISH:

10   Q.   Mr. Sebire, I want to start off about where I started

11   before with your oath, when you signed your oath to the

12   Patent Office, if I may.

13        So I'll ask you -- you have a binder again in front of

14   you.  I'm going to refer to DTX-509-062 (sic), and we'll

15   bring that up on the screen for you.

16                    MR. LUMISH:  Can you blow that up?

17                    Actually, I need the text below that that says:   I

18   hereby declare...

19   Q.   (By Mr. Lumish) You signed this oath on the 6th of

20   November, 2008; is that right, sir?

21   A.   Yes.

22   Q.   And you said you declare that all statements made herein

23   of my own knowledge are true and that all statements made on

24   information and belief are believed to be true.

25        And when you cut to the end there, you say:  Willful

1    false statements may jeopardize the validity of the

2    application or any patents issued thereon.

3         That was the oath you signed, right?

4    A.   I understand, yes.

5    Q.   And you knew this was a serious oath when you took it?

6    A.   Yes.

7    Q.   I want to go to the page before.  So this is on

8    DTX-509-062.  I think I misspoke.  We were just looking at

9    063.

10        And look at the portion where you acknowledge the duty

11   to disclose information material to the Patent Office.

12             MR. LUMISH:  Do you have that, Mr. Schmoller?

13   A.   Sorry.  Was there a question?

14   Q.   (By Mr. Lumish) I'm waiting for it to come up on the

15   screen.

16        So three lines from the bottom on this screen, you see

17   part of the declaration was that you, quote, acknowledge the

18   duty to disclose information which is material to

19   patentability as defined in 37 CFR Section 1.56.

20        Do you see that?

21   A.   I do.

22   Q.   When you read this duty, your belief was that it meant

23   that you had a duty to provide information only if you were

24   asked to provide it; isn't that true, sir?

25   A.   So I did provide all the prior art -- I thought was

1   prior art when I submitted internally the invention report.

2   Q.   Can you look at Page 64 of your deposition for me,

3   please?

4       I'm sorry.  I have the wrong page number.

5           MR. MCCARTY:  Your Honor, I object to this

6   questioning.  It looks like they're getting into some PTO

7   procedure and policy with the 37 CFR rule.  They have not

8   pled under that rule for inequitable conduct in this case.

9   So I'm not sure what this goes to.

10          MR. LUMISH:  I don't think that's true.  It also

11  goes to unclean hands, which is undoubtedly at issue.

12          THE COURT:  Any response?

13          MR. MCCARTY:  They haven't pled inequitable conduct

14  in this case, and unclean hands isn't related to 37 CFR

15  before the USPTO.

16          THE COURT:  Okay.  I'll allow it.

17          MR. MCCARTY:  Thank you.

18  Q.   (By Mr. Lumish) Okay.  Mr. Sebire, I gave you the wrong

19  page number.  I'm sorry.  It's Page 129.  I'd like to look at

20  your deposition beginning at Line 23 actually, why don't we

21  start at Line 15, and it will carry over to Page 130, line 1.

22      Do you have that in front of you, sir?

23  A.   Can you repeat where it starts?

24  Q.   129, Line 15.

25      I'm going to read this for the record now.  I won't read

1    the whole question at Line 15.  I just read it to you a

2    moment ago.  I asked you whether you see the statement that

3    says -- well, I'll go ahead and read it.

4         Quote:  I acknowledge the duty to disclose information

5    which is material to the patentability as defined in 37 CFR,

6    Section 1.56.

7         Do you see that, sir?

8         Answer:  Yes, I do.

9         And then the question I just asked you:  And what did

10   that duty involve for you, as you understood it?

11        Your answer was:  I understood it as, if I'm asked to

12   provide something, I have to.

13        That was your testimony, right?

14   A.   Yes.

15   Q.   You didn't understand it to be an affirmative duty where

16   you had to provide information even if you weren't asked to,

17   sir?

18   A.   So what I understood, that after filing this

19   application, if I am asked to provide further prior art, I

20   should provide it.

21   Q.   Well, it's true that, in fact, you didn't do anything

22   without being asked to go out and find information that might

23   be material to the application of the '820 patent?

24   A.   That is true.

25   Q.   You don't recall anybody asking you to provide them with

1   information that was material to the patentability of the

2   claims in the '820 patent, do you?

3   A.   No, I don't.

4   Q.   And you mentioned the invention report.  You said you

5   had disclosed some information internally.  Is that what I

6   heard you say a few moments ago?

7   A.   Yes.

8   Q.   And you found in your work on this lawsuit something you

9   called an invention report; is that true?

10  A.   Correct.

11  Q.   Now, I know your lawyers have taken the position it's

12  privileged, so I'm not going to ask you all of the details

13  about it, but I want to ask you a little about what you told

14  me before and which your lawyers did not object to.

15       So this invention report, it was a form you filled out

16  that was something you used to describe the idea you had for

17  what became the '820 patent; is that right?

18  A.   Yes.

19  Q.   It included in it contributions -- I think you mean by

20  that LTE or 3GPP contributions that you identified as prior

21  art, right?

22  A.   Yes.

23  Q.   And these were contributions to the LTE standard by

24  people other than yourself, true?

25  A.   True.  Maybe some of myself.  I don't remember LTE, but

1    some documents that were provided to 3GPP RAN2 before the

2    invention.

3    Q.    Now, that report included some prior art.  It included

4    the Samsung contribution that we looked at in your testimony

5    in front of the jury before, the document Part 2-074265,

6    true?

7    A.    I don't exactly remember.  It could be.

8    Q.    Turn to Page 19 of your deposition, please.

9    A.    Page 19.

10   Q.    There's, I think, some text you need for context; but at

11   the beginning of Line 7 we discussed the invention report.

12        And you said that you had disclosed some prior art

13   beginning at Line 22, this is what I'd like to read into the

14   record.

15        I asked you:  So under other publications on the cover

16   of the patent, Exhibit 1, CCE 1235, it says, quote:  Samsung

17   buffer status reporting 3GPP TSG-RAN2 meeting...

18        And then I skipped ahead to the document number.  It was

19   R2-074265.  Do you see that?

20   A.    I do.

21   Q.    And your answer was -- and I asked you if that was the

22   document you were referring to and you said:  Yes, correct.

23        You -- you saw the Samsung proposal that we looked at

24   before with the document number we just read out and -- you

25   included that, I should say, in the invention report, didn't

1   you?

2   A.   No.  I did not remember.  It was two months ago, maybe I

3   checked the invention report.  I have a bit of memory.

4   I do know there was a Samsung contribution.  Now, which

5   number exactly -- I suspect it's the same one that is on the

6   cover page of the patent.

7   Q.   Well, another piece of prior art that you identified in

8   that report was the joint proposal with Ericsson, Samsung,

9   Qualcomm, DoCoMo, Exhibit 569 that we've looked at several

10  times today, right?

11  A.   Yes.

12  Q.   You know for sure that one was identified in the report?

13  A.   I know for sure, yes.

14  Q.   I'm sorry?

15  A.   Yes, I know for sure.

16  Q.   You know for sure.

17  A.   Sorry.  Yes.

18         MR. LUMISH:  Can we bring up the cover of

19  Plaintiff's Exhibit 1, please, the patent?

20  Q.   (By Mr. Lumish) There is a section called "information

21  considered."  Do you see that?

22  A.   I do.

23  Q.   That says "references cited," I apologize.

24  There's patents listed, and there's other publications

25  listed.  Do you see at the top is the Samsung R2-074265

1  proposal, right?

2  A.   Yes.

3  Q.   But what's not listed is the joint proposal with

4  Ericsson and Qualcomm, et cetera; is that true, sir?

5  A.   It is true, yes.

6  Q.   And when you and I spoke about this before, you had no

7  explanation for why the joint proposal with Ericsson wasn't

8  provided to or listed by the Patent Office on the cover of

9  the patent; isn't that right?

10 A.   That's right.

11          MR. LUMISH:  You can take that down, please.

12          Can we go to DTX-568?

13 Q.   (By Mr. Lumish) It should also be in your binder.

14          MR. LUMISH:   I believe this has been preadmitted,

15 Your Honor.

16 Q.   (By Mr. Lumish) The document in front of you, DTX-568,

17 it's entitled "3GPP working procedures."  Do you see that?

18 A.   I do.

19 Q.   And you understand this document governs how meetings

20 are supposed to be handled and other rules related to the

21 3GPP working groups?

22 A.   Yes.

23 Q.   But you actually had never read this document before

24 your deposition in June, had you?

25 A.   Not in -- not the whole document.

1    Q.    The document has the rules that tell you what to do and

2    what not to do as a member or delegate to the 3GPP; isn't

3    that right?

4    A.    Right.

5    Q.    It tells your employer Nokia what to do, right?

6    A.    I guess.  I don't know.

7    Q.    Well, you're the one who implements it, in any event.

8    You're the one who implements -- or one of the people for

9    Nokia who would implement the things that Nokia does at the

10   working group level, right?

11   A.    At the working group level, yes.

12   Q.    Let's look at Page 20 of Exhibit 568, please,

13   DTX-568-20.  You'll see something called Article 55.

14        Do you have that in front of you?

15   A.    I do.

16   Q.    That's the intellectual property rights policy, isn't

17   it?

18   A.    Seems so, yes.

19   Q.    And it says -- well, you know that intellectual

20   property, as it's used here when it talks about IPR,

21   intellectual property rights, that includes patents, right?

22   A.    I assume it refers to, yes, patents.

23   Q.    And you know it includes patent applications, don't you?

24   A.    That, I cannot tell.

25   Q.    All right.  Let's take a look at another document, then.

1    There's DTX-59 --

2              THE COURT:  Mr. Lumish, I'm sorry, before you move

3    on, in checking our exhibit list this document was not

4    preadmitted.

5              MR. LUMISH:  Oh.

6              THE COURT:  Would you like to offer it?

7              MR. LUMISH:  Thank you, Your Honor.  I apologize.

8    I thought it was.

9              Yes, I would ask to move DTX-567 into evidence.

10             THE COURT:  Mr. Gleason?

11             MR. GLEASON:  Your Honor, do we need to approach?

12             THE COURT:  Yes.  Please do.

13             MR. LUMISH:  Thank you.

14             (Bench conference.)

15             MR. GLEASON:  Your Honor, my concern is that I

16   don't know that this witness can lay a proper foundation for

17   this document.  He testified at his deposition that he had

18   never read the document before; that he was not familiar with

19   it.  At his deposition Mr. Lumish read the document to him

20   several times and asked him, do you see the words on the

21   page?

22             But I don't think that that's going to be a

23   sufficient foundation to allow the document to be admitted.

24             MR. LUMISH:  Which document do you mean?  The 3G --

25   3GPP working procedures?

1               MR. GLEASON:  Yeah.

2               MR. LUMISH:  Or do you mean the ETSI directives?

3               MR. GLEASON:  Both.

4               MR. LUMISH:  Okay.  He's testified about them.  He

5     has them in his possession.  He's the delegate for Nokia

6     who's --

7               MR. GLEASON:  I'm sorry, who's got them in his

8     possession?

9               THE REPORTER:  I'm sorry, you said he has them in

10     his possession?

11               MR. LUMISH:  Well, I mean, he has them in his

12     possession right now.  He's the delegate to the group that's

13     governed by these.  I think he can lay a foundation for it.

14               THE COURT:  Okay.  Have him lay the foundation.

15               MR. LUMISH:  Thank you.

16               THE COURT:  Any -- any additional objection from

17     you-all?

18               MR. CALDWELL:  I will let Mr. Gleason handle that

19     foundation objection.  I will say that we would object to any

20     inclusion of it in the record other than for bench trial

21     issues.

22               THE COURT:  Yes.

23               MR. CALDWELL:  Only.  And I think just for clarity

24     of the record, it was -- he said 567, but it was 568.

25               MR. LUMISH:  I'll fix that.

```
 1              THE COURT:  Okay.  Very good.
 2              (Bench concluded.)
 3  Q.   (By Mr. Lumish) Let's go back to DTX-568 for a moment.
 4       Have you read those 3GPP working procedures -- 568, do
 5  you have that in front of you?
 6  A.   Yes.  Sorry.
 7  Q.   3GPP is the standards body that you're a delegate to,
 8  correct?
 9  A.   Correct.
10  Q.   And your company, Nokia, is a member of the 3GPP?
11  A.   I don't exactly know --
12              THE REPORTER:  I'm sorry, can you repeat?
13  A.   I don't exactly know at which level Nokia is a member.
14  I think it goes to -- for instance, ETSI or ATIS or CCSA and
15  to that we go to 3GPP.
16  Q.   You see there are electronic links for this document
17  where you can find it online at www.3gpp.org?
18  A.   Yes.
19  Q.   Have you ever been to that site?
20  A.   Yes.
21  Q.   And have you seen this working procedures document since
22  you and I talked about it in June?
23  A.   No.
24  Q.   You understand that this is, in fact, a document that
25  the 3GPP publishes in order to tell people in your position
```

1    what the procedures are and the rules are for the working

2    groups?

3    A.    Yes.

4    Q.    Do you understand this to be a document that is produced

5    by the 3GPP in the ordinary course of its business

6    specifically to communicate to you, as a delegate, the rules

7    and procedures that you're supposed to follow?

8    A.    Yes.

9            MR. LUMISH:  Your Honor, I'll try again and ask to

10   move Defendants' Exhibit 568 into evidence.

11           THE COURT:  Any objection?

12           MR. GLEASON:  No, Your Honor.

13           THE COURT:  Okay.  It will be admitted in the

14   equitable portion of this case.  And I would just ask when

15   you-all are giving me your exhibit list tomorrow that you

16   keep any exhibits that are admitted for issues with the bench

17   only in a separate part of the list; that we do not

18   inadvertently send any of those exhibits back to the jury.

19   Okay?

20           MR. CALDWELL:  Yes, Your Honor.

21           THE COURT:  Thank you.

22           Mr. Lumish.

23           MR. LUMISH:  Thank you, your Honor.

24   Q.    (By Mr. Lumish) So what got me messed up on the numbers

25   before is 598.  Those are the ETSI directives.  Let's turn to

1    598, please.

2         Can you tell us what ETSI is?

3    A.    European Telecommunication Standards Institute.

4    Q.    And ETSI is the larger body that the 3GPP belongs to,

5    right?

6    A.    I'm not sure.

7    Q.    You don't know that ETSI is the body that has ultimately

8    the responsibility for publishing the LTE standard?

9    A.    Publishing, yes, maintaining.

10   Q.    Okay.  And have you seen the document, Exhibit 598,

11   before, sir?

12   A.    Yes, in June when we met for the deposition.

13   Q.    And do you understand that these directives are

14   directives that apply to the 3GPP?

15   A.    I don't exactly know what those directives are.

16   Q.    Let me ask you this:  We talked about the intellectual

17   property rights portion in Article 55 of DTX-568.  You

18   understand that that intellectual property rights section

19   also covers patent applications, don't you?

20   A.    I cannot tell.

21   Q.    I'll have you turn to Page 269 of your deposition,

22   beginning at Lines 11 and carrying on through Line 18.  I

23   asked you:  Reading two sentences together, you understood

24   that patent applications are included in IPR or has other --

25   other confidential information and trade secrets or the like

1     are excluded?

2         You said:  It does say including application, so I

3     assume, yes.

4         You understood we were talking about IPR in the context

5     of Article 55, didn't you?

6             MR. GLEASON:  Your Honor, may we approach?

7             THE COURT:  Yes.

8             (Bench conference.)

9             THE COURT:  Go ahead.

10            MR. GLEASON:  I don't think he's laid a foundation

11    for the second document, the ETSI IPR policy document.  And

12    he's trying to skip that part by going to a portion of the

13    deposition where he had asked the witness to read a portion

14    of the 3GPP document for which he did lay a proper

15    foundation.  And asking him to compare that to a portion of

16    the IPR policy for which he has not laid a proper foundation.

17            So I would ask that before Mr. Lumish be able to

18    ask this question, he needs to lay a foundation for the ETSI

19    IPR -- the ETSI IPR policy document.  And I think the witness

20    has testified several times already that he's not familiar

21    with that document.

22            MR. LUMISH:  My question wasn't about the document.

23    It was about the definition of IPR in the document that

24    Your Honor admitted, Exhibit 568.

25            Now, it is informed by the document Mr. Gleason

1    refers to.  There's no question about that.

2         I -- I don't know that I'll be able to establish a

3    foundation for the ETSI directives in light of what we heard,

4    but the definition has -- the -- the definition of IPR in

5    Article 5 [sic] of Exhibit 568 does testify he thinks then is

6    covered -- it covers applications.

7         MR. GLEASON:  The reason I objected to the question

8    in the deposition is because the witness had not -- there had

9    been no foundation laid that the witness understood the

10   documents; that it was just Mr. Lumish reading the document

11   to him drawing his own conclusion and asking if the witness

12   understood that conclusion.  That's why I think the question

13   is improper because it's founded on a question about a

14   document that the witness doesn't have a foundation to talk

15   about.

16        The witness, he's not a lawyer.  He doesn't

17   understand theses ETSI IPR documents.  And for Mr. Lumish to

18   try and get an engineer to expound on the implications of

19   ETSI IPR policy when he said several times he doesn't

20   understand the document he's never read it before, I think is

21   improper.

22        MR. CALDWELL:  Just so you think -- excuse me.

23   Just so you think it may not be all that abstract, there are

24   some portions in that section that refer to trade secrets and

25   confidential information as excluded and things like that.

1          So I don't know if that helps or not.  I just want

2    you to understand that I think that's why the legal

3    interpretation presented to an engineer who's being asked to

4    sort of interpret it and say, did you comply with this or

5    that -- that's why I think the foundation should go to -- you

6    know, it's significant.  It is not just an abstract concern

7    in this context.

8          MR. LUMISH:  All I'm trying to establish, Your

9    Honor, is how he reads Article 55.  I showed him a document

10   that tells you what IPR means in the larger standards

11   institution.  I asked him if he understood that and how it

12   applied to Article 55, which he has laid a foundation for.

13         THE COURT:  I'm not going to allow it.

14         MR. LUMISH:  All right.

15         THE COURT:  I'm going to exclude it.

16         (Bench conference concluded.)

17         MR. LUMISH:  Can we look at PTX-568, Page 20,

18   please?

19   Q.   (By Mr. Lumish) Back to the Article 55 that we had, sir.

20        It says:  Individual members shall be bound by the IPR

21   policy of their respective organizational partner.

22        Do you see that?

23   A.   Yes.

24   Q.   And you don't know who that organizational partner is,

25   at least as of the last time we talked about that; is that

1    correct?

2    A.    I'm obviously not sure what it means.

3    Q.    Now, it also says -- it also says in Article 55:

4    Individual members should declare at the earliest

5    opportunity, any IPRs which they believe to be essential, or

6    potentially essential, to any work ongoing within 3GPP.

7    Declarations should be made by individual members to their

8    respective organizational partners.

9        Do you see that?

10   A.    I do.

11   Q.    Now, I think you testified in this trial that you think

12   anybody using LTE must be infringing the '820 patent.  Wasn't

13   that your testimony, sir?

14   A.    Yes.

15   Q.    And that's an example of a patent being essential to the

16   standard, isn't it?

17   A.    When it's been granted, yes.

18   Q.    Did you say when it's been granted?

19   A.    Yes.

20   Q.    Now, let's turn to the meeting minutes that you have in

21   your working group meetings.  I'll use an example for the

22   purpose of this trial here, Defendants' Exhibit 674.  Do you

23   have that in front of you?

24   A.    674.

25   Q.    And we'll bring it up on the screen.  I don't know if

1   it's been admitted, so why don't we make sure you can

2   recognize it first.

3   A.   Yes.

4   Q.   If you can go to DTX-674.

5        Do you recognize these as meeting minutes from the -- a

6   meeting in January 2008, in Spain?

7   A.   Yes, I do.

8   Q.   And these are minutes you would have gotten as a

9   delegate for Nokia to the RAN2 Working Group?

10  A.   Uh-huh, yes.

11          MR. LUMISH:  Your Honor, we move DTX-674 into

12  evidence.

13          THE COURT:  Any objection?

14          MR. MCCARTY:  No objection, Your Honor.

15          THE COURT:  Thank you.  All right.  It will be

16  admitted.

17  Q.   (By Mr. Lumish) Now, if you go past the table of

18  contents, which takes two pages, and there's a blank page,

19  then you get to Page 5, DTX-674-5.  Do you see that, sir?

20  A.   I do.

21  Q.   And on that first page the Entry 1.1 says:  Call for

22  IPR.

23        Right?

24  A.   Yes.

25  Q.   And it says:  The chairman made the following IPR call.

1    And then there's a gray box underneath it.

2        The text says, quote:  The attention of the delegates of

3    this working group was drawn to the fact that 3GPP

4    individual -- individual members have the obligation under

5    the IPR policies of their respective organizational partners

6    to inform their respective organizational partners of

7    essential IPRs they become aware of.  The delegates were

8    asked to take note that they were hereby invited to

9    investigate whether their organization or any other

10   organization owns IPRs.

11       Did I read that correctly, sir?

12   A.   You do.

13   Q.   This call for IPR, that's the first thing that happens

14   at every meeting of the RAN2 Working Group, isn't it?

15   A.   Yes, together with the note we have --

16            THE REPORTER:  With a note?

17            THE WITNESS:  The note, yes.

18            THE REPORTER:  Together with the note.

19            THE WITNESS:  Together with the note we have this

20   call for IPR at every meeting.

21            THE REPORTER:  Thank you.

22   Q.   (By Mr. Lumish) And you are informed at the beginning of

23   every RAN2 Working Group meeting of the call for IPR and the

24   obligation, as it says, to inform the respective

25   organizational partner of essential IPRs; isn't that true?

1   A.   Yes.

2   Q.   And you know that Nokia has this obligation as a whole,

3   right?

4   A.   Yes.

5   Q.   Now, you filed the original application for the '820

6   patent in November of 2007, right?

7   A.   Correct.

8   Q.   That was three or four weeks before this call for IPR?

9   A.   I don't remember the date, no.

10  Q.   Well, we can go to the cover.  You can see at the very

11  top left corner it's 14 to 18, January 2008.

12  A.   Yes.

13  Q.   So three or four weeks before -- three or four weeks

14  after, I should say, you filed the application for the '820

15  patent?

16  A.   Yes.

17  Q.   And at that time the standard, the standard for the LTE

18  patent in particular for buffer status reporting, the section

19  that matters in this case, was still in the early stages of

20  the specification, wasn't it?

21  A.   It was.

22  Q.   Nothing was ready yet, as you put it?

23  A.   Yes.

24  Q.   You were still working on the details, weren't you?

25  A.   Correct.

1   Q.    Nobody had released an LTE network as of January, 2008,

2   true?

3   A.    True.

4   Q.    Nobody was selling phones or tablets for use on an LTE

5   network at that time?

6   A.    Correct.

7   Q.    And you'll agree with me it would have been relatively

8   easy in November or January -- November of 2007 or January of

9   2008 to make changes to the specification for the buffer

10  status reporting parts of the standard if you or anybody in

11  the working group had wanted to?

12  A.    Yes.

13  Q.    We talked about this before.  I won't belabor it.  But

14  you didn't disclose the pending patent application for the

15  '820 patent in the proposal, your January 2008 proposal, for

16  what you call BSR selection criteria, did you?

17  A.    I did not disclose in the meeting how the note detects.

18  Q.    Not just in the meeting.  I know your position is nobody

19  does this at the meeting, you don't have to do it at the

20  meeting.  My question is, you didn't do it at all, true?

21  A.    What other people do in my company is not within my

22  control.

23  Q.    And I can only ask you questions.  You're the only

24  person from your company here, sir.  I'm asking what you did.

25        You didn't put in the proposal, the January 2008

```
 1   proposal, right?

 2   A.   I don't know what my company did with that patent --

 3   patent application.

 4   Q.   Well, let's look at your proposal.  It's DTX-567.

 5        Do you recognize DTX-567 as the proposal that you told

 6   the jury today sets out your invention, right?

 7   A.   Yes.

 8   Q.   And nowhere in DTX-567 do you disclose the '820 patent,

 9   right?

10   A.   No.  Of course not.

11   Q.   I understand you say that's not normally done, but I

12   want to make sure we're in agreement on that.

13        And in no other way and at no other time did you

14   disclose to anybody in the working group, anybody at 3GPP,

15   anybody at ETSI that you had a patent application pending or

16   a patent issuing, concerning what you claimed to be your

17   invention here as described in DTX-567?  That's true, isn't

18   it?

19   A.   Myself, yes.

20   Q.   Let's turn to DTX-635.

21             MR. LUMISH:  I don't believe this has been admitted

22   yet so if you can start with it off the screen please,

23   Mr. Schmoller.

24   Q.   (By Mr. Lumish) Do you have that in front of you, sir?

25   A.   I do.
```

1    Q.    This is an e-mail from somebody named Anu Solo, on the

2    cover; do you see that?

3    A.    Yes.

4    Q.    And it's to the ETSI director general?

5    A.    Yes.

6    Q.    And it says anusolo@nsn.com.  Do you recognize that to

7    be an NSN e-mail address?

8    A.    Yes.

9    Q.    And it attaches an IPR information statement and

10   licensing declaration.  And it goes on for several pages

11   after that.  Do you see that?

12   A.    Yes.

13   Q.    Do you understand this to be a information statement and

14   licensing declaration from Nokia Siemens Networks, your

15   employer?

16   A.    I don't know.  It just seems to be a declaration.  I

17   don't know how you describe it.

18   Q.    Well, if you look at Page 2, DTX-635, Page 2, it says:

19   IPR holder, legal name:  Nokia Siemens Networks.

20         Do you see that, sir?

21   A.    No.  Sorry.

22   Q.    It's on Page 2 of the exhibit.  It's the first page of

23   the statement and declaration.

24   A.    Oh, yes.

25   Q.    Nokia Siemens Networks, that's your employer, right?  Or

```
 1   was at the time?

 2   A.   It was, yes.

 3   Q.   This is 2009 now we're talking about.  That was your

 4   employer then, right?

 5   A.   Correct.

 6   Q.   And you understand this to be an IPR information

 7   statement and licensing declaration that your company is

 8   submitting to ETSI, don't you?

 9   A.   That's what the record says, yes.

10        MR. LUMISH:  Your Honor, we would move DTX-635 into

11   evidence.

12        MR. MCCARTY:  No objection, Your Honor.

13        THE COURT:  It will be admitted.

14        MR. MCCARTY:  Your Honor, just to be clear, our

15   objection would be for the jury trial as evidence, but for

16   the bench trial we do not object.

17        THE COURT:  I understand.  I will note this is on

18   the preadmitted exhibit list so...

19        MR. MCCARTY:  Thank you, your Honor.

20        THE COURT:  The courtroom deputy, she's keeping us

21   all on task.

22        MR. LUMISH:  I went through all of that for

23   nothing, I guess.  You've got me nervous now on foundation.

24   Q.   (By Mr. Lumish) The date here, June 2009, that's 19 or

25   20 months or so after the '820 original application was filed
```

1    on November 5th, 2009, right?

2    A.    Seems so.

3    Q.    Was that a yes?  I'm sorry.

4    A.    Yes.

5    Q.    And if you look -- so if you turn to Page -- DTX-635,

6    Page 4, you'll see at the bottom of the table on that page

7    the application for your patent.  Do you see that?

8    A.    Yes, I do.

9    Q.    That's for the '820 patent, right?

10   A.    Yes.

11   Q.    And it's one row or one entry among -- I think my count

12   was 25.  If you can flip through the document and confirm for

13   me that it's one entry among a number of entries that -- or a

14   number of disclosures maybe that Nokia made with this

15   submission.

16   A.    Yes.

17   Q.    Now, you'll see it has a publication number.  If you

18   look at the top of the table on Page 4, I think it's the

19   seventh column over, you'll see publication number.

20   A.    Yes.

21   Q.    And, so there -- this document was published when this

22   was disclosed, right?

23   A.    Sorry.  I'm not...

24   Q.    Did you say you're not sure?

25   A.    I'm not following your submission when it was disclosed.

1  Q.   Well, you see it says publication number and then

2  there's a number given to it, correct?

3  A.   Yes.

4  Q.   You understand that CCE's position in this case is,

5  well, the reason they waited 19 or 20 months to disclose the

6  application for the '820 patent was because it had only just

7  published, right?

8  A.   I do not know.

9  Q.   Well, let's turn to the next page, DTX-635, Page 5.

10       Do you see the publication column there, and it's got

11  publication number for the first row, it starts with WO2008.

12       Do you see that?

13  A.   I do.

14  Q.   But there's three empty boxes below that, Row 3, Row 4,

15  Row 6 show no publication numbers; isn't that true?

16  A.   Apparently, yes.

17  Q.   And if we turn to the next page, DTX-635, Page 6, you'll

18  see three entries there which also have no publication

19  numbers, Row 1, 3, and 5.

20  A.   Yes.

21  Q.   Do you understand that Nokia does disclose pending

22  patent applications even though they haven't been published

23  yet, don't you?

24  A.   I don't understand.  I'm not sure how to read the table.

25  I don't know what publication means.

1   Q.    You don't know one way or the other.  Is that your

2   testimony?

3   A.    Yes.

4   Q.    You're not taking the position today in court that Nokia

5   is excused from disclosing pending patent applications if

6   they haven't yet published, are you?

7   A.    I say I don't understand how to read the table so I

8   don't know either way.

9   Q.    I'm not asking about the table now.  I'm asking about

10  your position generally.  You're not taking the position,

11  you're not testifying to the Court that Nokia is excused from

12  disclosing as IPR pending patent applications just because

13  they haven't been published, are you?

14  A.    I don't know.

15  Q.    You don't know one way or the other?

16  A.    I don't know one way or the other.

17  Q.    Now, in 2009 when this disclosure is made, it's June

18  11th of 2009 -- the standard, as it relates to buffer status

19  reporting, the LTE standard, was far more advanced than it

20  was in November of 2007; isn't that true?

21  A.    It was more advanced but was certainly not ready.

22  Q.    I'm sorry, I didn't hear the last thing you said.

23  A.    It was more advanced but certainly not ready.

24  Q.    It was far more advanced than it was in November of

25  2007, wasn't it?

1    A.    Yeah, of course.

2    Q.    There had been something on the order of ten meetings of

3    the RAN2 Working Group between November of 2007 and June of

4    2009; is that true?

5    A.    I'm not going to count.

6    Q.    Will you agree with me it was around ten meetings that

7    occurred between November of 2007 and June of 2009, sir?

8    A.    I can only repeat myself.

9    Q.    Let's turn to your deposition then, please, Page 180

10   beginning at Line 1.

11        And I asked you:  How many working group meetings were

12   there between November of 2007 and June of 2009?

13        There was an objection.

14        You said:  I cannot give you an exact number.

15        I asked you:  More than ten?

16        And you said:  Maybe around ten.

17        That was your testimony, wasn't it?

18   A.    Yes.  I believe you asked if it's around ten, so I don't

19   see any difference with saying maybe.  But if you want me to

20   say maybe, I can say maybe.

21   Q.    If we go to -- back to the rules here, DTX-568, Page 20.

22   And to the second paragraph there.  It says -- again, we saw

23   this before:  Individual members should declare at the

24   earliest opportunity, any IPRs.

25        Do you see that, sir?

1  A.    I do.

2  Q.    And you have no opinion -- or at least you had no

3  opinion in June of this year as to whether a 19- or 20-month

4  gap from the filing of your patent application was, in fact,

5  the earliest opportunity under that rule; isn't that true?

6  A.    True.

7  Q.    And you can't comment on why it took 19 or 20 months for

8  Nokia to make this declaration and disclosure of your pending

9  application for the '820 patent, can you?

10  A.    I cannot.

11           MR. LUMISH:  Your Honor, if I can just look for a

12  note.  I'm sorry.  It's fallen out of my book here.

13           MR. HILL:  Your Honor, while he does that, may I

14  ask to be excused?

15           THE COURT:  You may be excused.

16           MR. HILL:  Thank you, Your Honor.

17  Q.    (By Mr. Lumish) Just a few more questions, sir.  I know

18  you've had a long day.

19       The January 2008 NSN proposal that we looked at a few

20  moments ago, the Nokia proposal, that was the first time you

21  proposed to the working group to use the process in the '820

22  patent in your opinion; isn't that right?  That's your

23  testimony?

24  A.    Yes.

25  Q.    We may disagree about that, but that's your testimony to

1    the Court?

2    A.    It is.

3    Q.    And you said it earlier today, I believe, but it's your

4    testimony also that your invention, the things that are

5    claimed as inventions in the '820 patent, have been

6    incorporated into the LTE standard, right?

7    A.    Yes.

8    Q.    And so it's your belief that at some point your

9    proposal, the January 2008 proposal, was, in fact, adopted

10   into the standard, right?

11   A.    Yes.

12   Q.    And you didn't disclose the pending patent application

13   or the issuance or the allowance of the '820 patent at any

14   time during the development of the standard and before the

15   standard itself was actually adopted, did you?

16   A.    I would not phrase it as "adopted."

17   Q.    I'm sorry?

18   A.    I cannot phrase -- I cannot use the same word as you

19   did.  So the standard was "adopted."

20   Q.    Which word do you use to describe when the standard is

21   released to be used by people making phones in LTE networks?

22   A.    You have to look at the Annex of Change Request for

23   36.221.  And you can find for Release 8 that we've had many

24   changes for quite a lot of time.  And only when this amount

25   starts to stabilize or to be around just a few change

1  requests per meeting, you can say that the specification is

2  ready.

3  Q.   So you call it being ready?  Is that the normal --

4  A.   I would say --

5  Q.   -- word that you use in the working group?

6  A.   Yes.

7  Q.   And when was the standard ready as it relates to when

8  you believe to be the implementation of your invention in the

9  standard in Section 5.4.5?

10  A.   I cannot answer without looking at the specification.

11  Q.   The entire specification?

12  A.   Just the Annex.

13  Q.   Well, you never disclosed it at all, right?

14  A.   Excuse me?

15  Q.   Well, let me ask you something different, which is, the

16  proposal you made in January of 2008, again, you say that's

17  your invention, right?

18  A.   Yes.

19  Q.   And you didn't disclose that you had intellectual

20  property rights to that invention at any time before the

21  standard was ready as it relates to buffer status reports;

22  isn't that true?

23  A.   No, it is not.  I think the ready date is much later

24  than 2009, August.  Again, we need to look at the Annex on

25  change requests.

1   Q.    You can't give me the ready date, as you put it, now as

2   you sit here today?

3   A.    I cannot give you the ready date.

4   Q.    You personally have never disclosed your patent rights

5   or your pending patent rights to anybody in the working

6   group -- the RAN2 Working Group, 3GPP, or ETSI, true?

7   A.    Myself, no.

8   Q.    All right.  Thank you.

9           MR. LUMISH:  I pass the witness, Your Honor.

10          THE COURT:  Okay.

11                      CROSS-EXAMINATION

12  BY MR. MCCARTY:

13  Q.    Good afternoon, Mr. Sebire.

14  A.    Good afternoon.

15  Q.    Mr. Lumish, Apple's counsel, asked you a few questions

16  that related to patent prosecution.  Just to be clear, are

17  you a patent lawyer?

18  A.    No, I am not.

19  Q.    Do you, yourself, prosecute patents during patent

20  examination?

21  A.    I do not.

22  Q.    What is your role at Nokia Siemens?

23  A.    So I am a 3GPP delegate.  So I go to 3GPP meetings

24  representing my company.  And I also lead a team of engineers

25  to -- to attend this meeting.

1    Q.    Is there a role --

2              MR. MCCARTY:    Strike that.

3    Q.    (By Mr. McCarty) Is there a group or department at NSN

4    that specializes and handles things like patent prosecution?

5    A.    Since I'm not doing it myself, I will assume there is

6    such a group.

7    Q.    Mr. Sebire, what is the objective of 3GPP?

8    A.    I would say the objective is to come up with the best

9    possible standard.

10   Q.    And in your entire lifetime, how many 3GPP meetings have

11   you attended?

12   A.    About 200.

13   Q.    And have you been a delegate for NSN that entire time,

14   for each of those meetings?

15   A.    Nokia and NSN, yes.

16   Q.    As a delegate to 3GPP, are you tasked with developing

17   technical solutions leading up to the meetings that you

18   attend on behalf of NSN?

19   A.    Yes.

20   Q.    And do you circulate those proposals or contributions

21   leading up to the meetings that you attend on behalf of NSN?

22   A.    Yes, I do.

23   Q.    When you -- when you submit a technical proposal to 3GPP

24   leading up to a meeting, are you required to mark on that

25   proposal or that document some notice that -- whether or not

1    that idea has been filed for a patent?

2    A.    No.

3    Q.    How many contributions have you submitted on behalf of

4    NSN, Nokia, or jointly like in the case of the joint Ericsson

5    proposal that we've talked about in this case?

6    A.    I usually have between 10 and 30 contributions per

7    meeting, so times 200, I guess.  A few thousand.

8    Q.    In a few thousand contributions over the course of your

9    16-year tenure at 3GPP, have you ever submitted a

10   contribution and noted that that contribution was covered by

11   a pending patent application during that submission?

12   A.    Never.

13   Q.    How many patents have you filed for in your 16-year

14   tenure at 3GPP, about?

15   A.    Around 180.

16   Q.    And are some of those patents declared essential to the

17   LTE standard?

18   A.    I believe they are maybe 60, 70.  I'm not sure.

19   Q.    And did any of those patents that related to

20   contributions that you submitted to 3GPP -- how many times

21   did that contribution note that it was covered by a pending

22   patent application?

23   A.    Never.

24   Q.    Have you ever seen a contribution submitted to 3GPP that

25   said it was covered by a pending patent application?

1   A.   No, never.

2   Q.   Does that mean that you expect companies submitting 3GPP

3   contributions to have not filed for IPR coverage on their

4   inventions?

5   A.   No.

6   Q.   In your experience is it expected that contributing

7   companies will have filed for patent rights on the inventions

8   that they submit to 3GPP?

9   A.   Yes.

10  Q.   Now, turning to the actual 3GPP meetings, can you tell

11  me generally, Mr. Sebire, what the purpose of the 3GPP

12  meeting is?

13  A.   So the purpose is mostly to handle the contributions

14  that are submitted to the meeting.  So we typically go

15  through the contributions.  There are two types of

16  contributions, the change requests which bring changes to

17  existing specifications and the concept documents which

18  propose new ideas or new things to do.

19      And -- and for each of these contributions, usually

20  chairman will handle contributions one-by-one, and we will

21  review what is being proposed or suggested, and we would

22  discuss the proposal and either agree or reject.

23  Q.   So logistically the delegates march through the various

24  contributions that were submitted leading up to that meeting?

25  A.   Yes.

1  Q.   And are the contributions displayed on a screen or

2  handed out in paper form?

3  A.   On the screen.

4  Q.   In those 200 meetings that you have attended, have you

5  ever seen a delegate or company representative interrupt a

6  meeting to declare that they have patent coverage on a

7  contribution that is currently being discussed at the

8  meeting?

9  A.   Never.

10  Q.   Does that mean to you that those companies who offer

11  those proposals do not have patent coverage on their

12  inventions?

13  A.   No, of course not.

14  Q.   Mr. Lumish put on the screen something called a "call

15  for IPR."  Do you remember that?

16  A.   I do.

17  Q.   Can you tell me what a call for IPR is in the context of

18  a 3GPP meeting?

19  A.   So this is how the meeting usually starts.  The chairman

20  will read the call and remind everybody that these

21  declarations are not to be made to him or to the working

22  group.

23        MR. MCCARTY:   Could we have DTX-674 at 5 and 6.

24  Q.   (By Mr. McCarty) So this is the document -- these are

25  the meeting minutes for the meeting in Spain in 2008 in which

1    your contribution R2-080015 was submitted.

2              MR. MCCARTY:  Mr. Lumish [sic], if you could focus

3    in on the -- on the box here.

4    Q.   (By Mr. McCarty) This is what Mr. Lumish showed you, and

5    you would agree that this is the call for IPR that is said at

6    the beginning of every 3GPP meeting?

7    A.   Yes.

8              MR. MCCARTY:  If you could go to the very top of

9    the next page.

10   Q.   (By Mr. McCarty) And it bleeds over.  Did Mr. Lumish

11   show you the note below the call for IPR that's included in

12   every single 3GPP meeting?

13   A.   No.

14   Q.   And what does the note say, Mr. Sebire?

15   A.   It says that IPRs may be declared to the

16   director-general or chairman of the SDO, but not to the RAN2

17   chairman.

18   Q.   And what is your understanding of what that note means?

19   A.   That IPR issues are to be handled outside of the meeting

20   room.

21   Q.   Mr. Sebire, do you understand that Apple engaged an

22   expert witness in this case to offer an opinion related to

23   the 3GPP procedure and policy?

24   A.   I understand, yes.

25   Q.   And do you understand that expert to be Mr. Ben Levitan?

1   A.   Yes.

2   Q.   Have you read the expert report of Mr. Ben Levitan?

3   A.   I did.

4   Q.   Have you ever seen Mr. Levitan at a 3GPP meeting?

5   A.   Never.

6   Q.   Have you ever seen Mr. Levitan offer a technical

7   contribution to the LTE standard, or any other standard for

8   that matter?

9   A.   Not to my knowledge.

10   Q.   I'm going to read just a couple continuation from

11   Mr. Levitan's report.  And please tell me if you agree.

12            MR. LUMISH:  Objection, Your Honor.  He wants to

13   read from an expert report from a witness who's not here

14   testifying.

15            MR. MCCARTY:  Your Honor, they have chosen not to

16   bring Mr. Levitan to this trial.  And I'd like to ask the

17   witness a question about an opinion that he has offered that

18   is directly contradictory to the 3GPP working procedures and

19   the 3GPP standard that he has been to 200 meetings.  And he

20   will -- he will refute everything that the expert has offered

21   as an opinion.

22            THE COURT:  How is it relevant if the expert

23   opinion is not, in fact, going to be proper?

24            MR. MCCARTY:  Your Honor, they have submitted

25   findings of fact and conclusions of law that either cite to

1   or rely on the opinions of their expert.

2           MR. CALDWELL:  Your Honor, I was going to make one

3   proposal on this since we are in a bench trial.  I think

4   maybe it could be heard sort of like under advisement or

5   something.  It could probably be stricken from the record if

6   not -- if it's not applicable.  But we're in a little bit of

7   a bind, obviously, given Mr. Sebire's travel.  And we just

8   found out, you know, the day before the trial, I think, that

9   now they're saying they are not going to call Mr. Levitan who

10  is a --

11          THE COURT:  Is your concern that they may, in fact,

12  call him?

13          MR. CALDWELL:  Well, that, we don't know.  I mean,

14  as long as we are certain that they're not going to put in a

15  declaration from him, put in any evidence from him, maybe

16  that obviates it.  Although I think some of the factual

17  points are still obviously -- might be fair game.

18          THE COURT:  Mr. Lumish?

19          MR. LUMISH:  May I consult with my client, Your

20  Honor?

21          THE COURT:  Sure.  Of course.

22          (Counsel and client confer.)

23          MR. LUMISH:  Sorry, your Honor.  Thank you.

24          We're not going to call Mr. Levitan.  We're not

25  going to offer a declaration from him.  His report is

```
 1   hearsay.  And if they want to ask him questions about the

 2   substance or the -- without going into the report, they can

 3   do that, I think.  But reading the report and trying to get

 4   that into evidence is improper hearsay.

 5             THE COURT:  With that representation --

 6             MR. MCCARTY:  Your Honor, with that representation

 7   that they will not be calling Ben Levitan, I can move on.

 8             Thank you, your Honor.

 9             THE COURT:  Okay.

10   Q.   (By Mr. McCarty) Ultimately, Mr. Sebire, you mentioned

11   that you've never heard a discussion of IPR at a 3GPP

12   meeting.  Have you ever heard a 3GPP delegate interrupt the

13   meeting to declare IPR on a particular contribution?

14   A.   No.

15   Q.   Despite no discussion of IPR at 3GPP meetings, and

16   despite no notation of IPR coverage on the actual inventions

17   that are submitted for consideration at 3GPP meetings, is it

18   understood that companies proposing technical contributions

19   to 3GPP may very well have filed for patent coverage on those

20   inventions?

21   A.   It is understood that good and bad ideas are covered by

22   IPRs, yes.

23             THE REPORTER:  Good and bad ideas are?

24             THE WITNESS:  Covered.

25             THE REPORTER:  Oh, okay.
```

1    Q.   (By Mr. McCarty) As an experienced 3GPP delegate, what

2    are some of the problems associated with injecting IPR

3    considerations into the 3GPP technical meetings?

4    A.   So, as I explained earlier, our goal is to develop the

5    best technical solution.  Now, if we were to take into

6    account IPR issues, instead of having a room full of

7    engineers we would end up with a room full of lawyers.  And

8    we would not be able to disassociate the two.  We wouldn't be

9    able to judge the -- the proposal only based on the technical

10   merits.  We would have to take into account who owns what,

11   whether claims are valid.  So that wouldn't work at all.

12   Q.   Do you understand that's why, for the call for IPR, it's

13   explicitly outlined that you are not to discuss IPR or

14   declare an IPR at 3GPP meetings?

15   A.   Yes.

16   Q.   Now, do you understand that Apple's allegations in this

17   case are that from the time that you filed for a provisional

18   patent application on the '820 -- that ultimately issued as

19   the '820, and the time that NSN declared that patent

20   application as potentially essential to the LTE standard,

21   that was an untimely delay and was a breach of various duties

22   under the standards rule?  Do you understand that is the

23   allegation?

24   A.   Understood.

25   Q.   And do you understand that the patent application that

1   led to the '820 was ultimately published by the United States

2   Government in May of 2009?

3           MR. LUMISH:  Object to leading.

4           Sorry.  Object to leading.

5           THE COURT:  Rephrase the question.

6   Q.   (By Mr. McCarty) Do you know when the patent application

7   that led to the '820 was issued by the United States -- was

8   published by the United States Government?

9   A.   I do not.

10          MR. MCCARTY:  Can we have Defendants' trial

11  Exhibit 635, please?

12          THE REPORTER:  635?

13          MR. MCCARTY:  Yes, ma'am.

14  Q.   (By Mr. McCarty) Mr. Lumish asked you a few questions

15  about this document.  Do you understand that this document at

16  Defendants' Exhibit 635 is the declaration made to ETSI by

17  NSN on the patent application that ultimately issued as the

18  '820 patent?

19  A.   Yes, I understood that.

20  Q.   And what is the date listed on the front of Defendants'

21  Exhibit 635 as the transmittal date for the ETSI declaration?

22  A.   15th of June, 2009.

23  Q.   And so focusing on June 2009, NSN declared your patent

24  application as potentially essential to the LTE standard.  Is

25  that your understanding?

1    A.    It is.

2    Q.    After NSN declared the patent application that led to

3    the '820 as potentially essential, did any 3GPP members or

4    delegates question you about your failure or alleged failure

5    to timely disclose the patent application that led to the

6    '820?

7    A.    No.

8    Q.    Was there outrage at the next meeting following the ETSI

9    declaration by NSN in June 2009?

10   A.    There was not.

11   Q.    Did anyone from Ericsson or Samsung or Qualcomm contact

12   you at any point in time related to that ETSI declaration

13   after it was made by NSN?

14   A.    No.

15   Q.    Mr. Sebire, is it true that only three months after that

16   ETSI declaration was made by NSN, your colleagues actually

17   voted you in as the vice chairman of RAN2?

18   A.    Yes.

19   Q.    Now, Apple -- did Apple ever seek to hire you for a role

20   as a delegate for 3GPP?

21   A.    Yes.

22   Q.    And what specifically did Apple want to hire you for or

23   did they tell you they wanted to hire you for?

24   A.    They were impressed at my patent filing history.

25   Q.    And did you ultimately accept that position at Apple?

1  A.    No, I did not.

2  Q.    Do you understand that someone else did accept that

3  position at Apple?

4  A.    Yes.

5  Q.    And have you seen that individual attend 3GPP meetings

6  as an Apple delegate?

7  A.    Yes, every meeting.

8  Q.    And has that individual submitted technical contribution

9  to 3GPP on behalf of Apple?

10  A.    Yes.

11  Q.    And has that individual disclosed whether or not Apple

12  has filed for patents on that -- on that invention at the

13  3GPP meetings?

14         MR. LUMISH:  Lacks foundation, Your Honor.

15         MR. MCCARTY:  I'm just asking him about his

16  experience at 3GPP meetings and to recount specific instances

17  where Apple proposed technical contributions.

18         THE COURT:  Okay.  Are you just asking about what

19  he knows?

20         MR. MCCARTY:  Yes.  Yes, Your Honor.

21         THE COURT:  Could you rephrase the question?

22  Q.    (By Mr. McCarty) Do you know whether Apple's delegate to

23  3GPP ever confirmed or denied whether they had a patent

24  application filed during the time that they submitted a

25  technical contribution to 3GPP?

```
 1              MR. LUMISH:  I object to the lack of foundation.
 2   He's asking about every meeting, every disclosure.  I think
 3   if he asks him if he ever did that -- the delegate ever did
 4   that to Mr. Sebire, I wouldn't object.
 5              THE COURT:  Any response?
 6              MR. MCCARTY:  I'm not -- I guess I don't understand
 7   the objection if the delegate ever did what to Mr. Sebire,
 8   Your Honor?
 9              THE COURT:  Anything further, Mr. Lumish?
10              MR. LUMISH:  No, my point is he's asking whether
11   somebody from Apple has ever done anything to anybody at any
12   3GPP meeting.  There's no foundation for that.  Mr. Sebire
13   may have foundation for whether he personally observed that
14   or was the recipient of that communication.  That would be
15   unobjectionable.
16              THE COURT:  Okay.
17              MR. MCCARTY:  I'll rephrase the question, and I
18   will sit down, Your Honor.
19   Q.   (By Mr. McCarty) Are you aware of any instance in which
20   an Apple 3GPP delegate submitted a technical contribution to
21   3GPP and did not state that they had filed for a patent
22   application on that invention?
23   A.   So in RAN2, Apple has had contributions.  But I am not
24   aware of seeing them declaring that they have possible IPR
25   during the meeting or to me privately.
```

```
 1    Q.    Thank you.

 2              MR. MCCARTY:  No further questions.

 3              THE COURT:  All right.  Any redirect?

 4              MR. LUMISH:  Yes, Your Honor.  Briefly.

 5                     REDIRECT EXAMINATION

 6    BY MR. LUMISH:

 7    Q.    Counsel's questions all went to interrupting these

 8    meetings.  And you said you were at something like 200.

 9    There is a call for IPR at the beginning of every one of

10    those same 200 meetings, right?

11    A.    I think the call for IPR only started sometime -- I

12    don't remember when, but it was not always there.

13    Q.    Okay.  It certainly was before your application for the

14    '820 patent, and there's been a call for IPR at every RAN2

15    Working Group meeting since, true?

16    A.    That's true, yes.

17    Q.    Can we agree that they don't do that for no reason at

18    all?

19    A.    Sorry?

20    Q.    There's -- the call for IPR is not there for no reason,

21    right?  It's done for a purpose?

22    A.    Yeah, I think it's a result of a lawsuit against ETSI

23    but...

24    Q.    It's done to encourage people like you, delegates, to do

25    the right thing, to cause declarations of IPR to happen while
```

1   the standard is still being developed; isn't that right?

2   A.   Being developed, I don't know.  But yeah, it's a call to

3   declare the IPR art.

4   Q.   And that's because changes can be made or people can get

5   their FRAND declarations and all of those kinds of things in

6   order if the patents are made known; is that true?

7   A.   I cannot speculate on the --

8            THE REPORTER:  I cannot speak of?

9            THE WITNESS:  I cannot speculate.

10           THE REPORTER:  Okay.

11  A.   On the -- on the purpose of this call for IPR.

12  Q.   (By Mr. McCarty) You mentioned this job offer again that

13  you had from Apple?

14  A.   Yes.

15  Q.   It was in 2012, you said?

16  A.   Summer, yes.

17  Q.   What date?

18  A.   I don't remember.

19  Q.   What month?

20  A.   I flew to San Francisco at the end of July 2012 and I --

21           THE REPORTER:  I'm sorry, I'm sorry.  You flew to?

22  A.   I flew to San Francisco at the end of July 2012 to have

23  an interview.  And I got an offer shortly after.  The exact

24  date, I don't know.

25  Q.   You interviewed in San Francisco, not in Cupertino?

1   A.   I flew to San Francisco and then went to Cupertino.

2   Q.   Who did you meet with?

3   A.   I have a very bad memory for names, but I can find out.

4   Q.   Can you describe this person for me in any way?

5   A.   Yes.  He's the head of the delegation for Apple in RAN.

6   He is -- I think he moved.  His origin is Chinese, I think.

7   Q.   Did you say originally [sic] Chinese?

8   A.   Yes.

9   Q.   And you don't know the person's name?

10  A.   I do not remember.

11  Q.   Was that the only person you met with?

12  A.   No.  I met the whole team.

13  Q.   The whole -- what whole team?

14  A.   The standardization team, the --

15         THE REPORTER:   The?

16  A.   Standardization.  The team who wanted to hire me.  So I

17  think I had interviews for two days, meeting technical

18  people.

19  Q.   (By Mr. McCarty) I've got to tell you, sir, we've looked

20  in the HR database at Apple and your name doesn't appear.

21         Can you tell me the name of every person you met with?

22  A.   I do not remember any name.

23  Q.   Not one name?  You met the whole team and you don't

24  remember a single name?

25  A.   I have a very bad memory for names.

1   Q.   This offer that you say you got, was it written?

2   A.   I have some e-mails at home.  I -- I think Apple was

3   very careful at not giving me an amount in written form, so

4   most of it was by a phone call.  I do have the O-1 Visa

5   kickoff procedure.

6            THE REPORTER:  Say that again, I have the?

7   A.   O-1 Visa kickoff procedure.  So Apple asked me to feed

8   some form and to contact some colleagues to get

9   recommendation to get the O-1 Visa.

10   Q.   (By Mr. McCarty) How was that form transmitted to you?

11   A.   By e-mail.

12   Q.   And you say you have those e-mails?

13   A.   At home, yes.

14   Q.   And you told me when I deposed you in June that you

15   searched for all of the e-mails relevant to the case, and you

16   didn't find anything, right?  You didn't have anything in any

17   of your hard drives or any of your computers?

18   A.   I did not see how relevant that was to the case.

19   Q.   Well, your -- your lawyers brought it into the case,

20   right?  They must think it's relevant.

21   Do you have any other documents that would corroborate

22   the claim you've made that you got an offer from Apple from

23   the entire standardization team?

24   A.   I met an ex-colleague of mine on the campus.

25   Q.   Who is that?

1    A.   Giton -- I forgot his last name.  He works for Apple.

2    He moved from Finland to work at Cupertino.  He is now a

3    sound engineer.

4    Q.   Did he make you an offer to join the company?

5    A.   No.

6    Q.   So you don't have a written offer, correct?

7    A.   That, I don't know.  I need to check my e-mails.

8    Q.   This form that you mentioned, it doesn't contain an

9    offer for employment in it, does it?

10   A.   I don't know.  I guess not, but I need a sponsor to

11   get --

12   Q.   Did you bring those e-mails with you to court today?

13   A.   No.

14   Q.   Did you bring them here to Tyler?

15   A.   No.

16   Q.   Why not?

17   A.   I did not know it would be relevant.

18   Q.   You didn't know you were going to be asked questions

19   about those e-mails?

20   A.   No.  I didn't know it would pop up.

21   Q.   Do you have any written material at all that you could

22   provide that would show that, in fact, you were made an offer

23   for employment by Apple in 2012?

24   A.   I'm flying back tomorrow.  I can provide them on Friday.

25   Q.   Are you willing to do that?

1   A.   Yes.

2   Q.   Do you have a calendar that you carry?

3   A.   Sorry?

4   Q.   A calendar, an application, for example, on your

5   computer?

6   A.   Yes.  But I think every six months, it cleans up.

7   Q.   So your calendar won't show that you visited with Apple

8   in 2012?  Is that what you're saying?

9   A.   I do have a stamp on my passport showing I flew to San

10  Francisco.

11  Q.   That doesn't mean you got a job offer from Apple, does

12  it?

13  A.   No, it does not.  Of course not.

14  Q.   How much money did Apple offer you?

15  A.   They offered me $100,000 to move to California to

16  compensate me for the move.  I think the base salary was -- I

17  don't remember exactly.  Between 150 and 200, plus stocks,

18  plus signing bonus.

19  Q.   I'm sorry.  I didn't mean to interrupt you.

20       Who paid for your flight?

21  A.   Apple.

22  Q.   So Apple will have a record somewhere of paying for a

23  flight in your name.  Is that your testimony?

24  A.   Yes.

25  Q.   Okay.  And did they tell you what your title was going

1    to be?

2    A.   Excuse me?

3    Q.   Did they tell you what your title was going to be?

4    A.   We did not discuss a title, no.

5    Q.   And did they tell you who your boss would be?

6    A.   Yeah.  I met with the boss.  I can find the name, but I

7    just don't remember now.

8    Q.   That's the same gentleman you said you think is Chinese?

9    A.   Yes.

10   Q.   And you think he's left Apple.  Is that what I heard you

11   say before?

12   A.   Excuse me?

13   Q.   I thought you said you thought he'd left Apple.

14   A.   No, no.  I think he still works there.  I see him from

15   time to time.

16   Q.   Okay.  My misunderstanding.

17        Can you think of any other documents that we haven't

18   covered, sir, that you think would show that you were made a

19   job offer from Apple at all?

20   A.   No, sir.  I have to check my iMac at home.

21   Q.   Can you access your e-mail from here?

22   A.   Unfortunately not.

23   Q.   Can you reference your iMac or otherwise get to the

24   documents you mentioned from Tyler today?

25   A.   Not before flying.

```
 1    Q.    What type of e-mail do you use?

 2    A.    I have my own --

 3              MR. MCCARTY:  Objection, Your Honor.  Is this a

 4    deposition?  He's testifying under oath, and he's telling the

 5    truth.  They can test his veracity; but going into his

 6    personal details about his e-mail and everything else is, I

 7    think, not relevant.

 8              THE COURT:  Response?

 9              MR. LUMISH:  He testified -- they made it a

10    pinnacle of their case twice now, Your Honor, pillar of their

11    case twice that he got a job offer from Apple.  We have no

12    record of that.  And I'm trying to understand how we can find

13    one if it's actually out there.

14              The e-mail question relates to whether he can

15    actually access the e-mail remotely from here.  If it's Gmail

16    or Yahoo! or Apple or something like that, it should be

17    accessible over the Internet.

18              THE COURT:  Any final word?

19              MR. MCCARTY:  Yeah.  Your Honor, they deposed him

20    in June.  They did not ask him about any of these issues.

21              THE COURT:  Did you raise -- did they have notice

22    before this week's trial that he had gotten an offer from

23    Apple for a job?

24              MR. MCCARTY:  No, Your Honor.

25              THE COURT:  So how would they have asked him about
```

1    these issues?

2            MR. MCCARTY:  Well, they gave him the offer for

3    employment, Your Honor.

4            THE COURT:  Well, I'm hearing that might be in

5    dispute.

6            I will allow it.  Continue.

7            MR. LUMISH:  Thank you, Your Honor.

8    Q.   (By Mr. Lumish) Can you tell me what type of e-mail you

9    use, sir?

10   A.   Yeah.  I have my own server.

11   Q.   You don't use Gmail or Yahoo! mail or any of the popular

12   Internet-based e-mail services?

13   A.   No.  I am an engineer.

14   Q.   Let me switch gears.  I'm going to turn to PX-165.  And

15   I think this was -- I think this was already admitted into

16   evidence.

17           While we're getting that up on the screen, I'll ask you

18   one more question about your computer.  Can you remote into

19   your computer at home?

20   A.   No.

21   Q.   You asked, when I asked you questions before, for

22   something you called the Annex.  Do you recall that, sir?

23   A.   Yes, I do.

24           MR. LUMISH:  May I approach the witness, your

25   Honor?

1    A.    Yes.

2    Q.    (By Mr. Lumish) Sir, I just handed you a copy of PX-165.

3    It has the Annex in the back.

4          Do you see that?

5    A.    I do.

6    Q.    Can you use this to answer my question as to whether the

7    portion of the specification that relates to what you say

8    your invention is of the buffer status reports was ready, as

9    you put it, as of 2008?

10   A.    No, I cannot, because this is Version 840, dated from

11   2008 to '12.  But in my folder, I have PX-149, which is an

12   integration.

13   Q.    Okay.  Can you use PX-149 and answer the questions I

14   asked you before then as to when the portion of the LTE

15   standard that you claimed to have embodied your invention was

16   ready, as you put it?

17   A.    Yes.  So I would say early 2000, seeing that we have

18   almost no changes agreed.

19   Q.    As of what date?

20   A.    March 2000.  Before that, you can see there are still

21   many changes.

22   Q.    Buffer status reporting using your claimed invention

23   didn't begin until March of 2000?  Is that your testimony?

24   A.    My testimony is that before March 2000, many changes

25   were being discussed in 3GPP.  So had there been a will to

1  change something on BSR, that would have been a possibility.

2  Q.    Your proposal didn't even go in until January 2008, sir,

3  right?

4  A.    Excuse me?

5  Q.    Your proposal for what you claim to be your invention in

6  the standard doesn't even go in until 2008, right?

7  A.    Yes.

8  Q.    My question is, when that portion of the standard was

9  ready.

10  A.    I'm sorry.  This question doesn't make sense.

11  Q.    I'm trying to use the words you used before.  When it

12  was ready to be put into action in LTE networks and phones

13  that support LTE, do you know when that was, sir?

14  A.    I used the word "ready" for the whole specification.

15  You used it for a section, and I can't do that.

16  Q.    So you can't tell the Court, with any reasonable degree

17  of confidence, when the proposal you made in January 2008

18  began to be used in phones or cellular networks?

19  A.    No, I cannot.

20  Q.    We agree there were no further changes to the BSR

21  portion of the specification in the Annex after March of

22  2008?

23  A.    I cannot answer the question without scanning them all.

24  Q.    You would have to read all of them?  Is that your

25  testimony?

1    A.    It is.

2    Q.    You're not aware of any changes to the BSR portion of

3    the standard after March of 2008, are you?

4    A.    I can only repeat what I just said.  I would need to

5    read them.

6    Q.    Let me go back to your documents and this job offer.

7          Why can't you access your server from here?

8    A.    Because e-mails arrive on the server, they're downloaded

9    from my computer, and then removed from the server.  So if I

10   cannot access the home computer, I can't get the e-mail.

11   Q.    Do you have a Gmail account?  That's a Google email

12   account called Gmail that's benoist.sebire@gmail.com?

13   A.    I do.

14   Q.    And would you have been using that account to

15   communicate with anybody from Apple?

16   A.    No.  I use mail@benoa.net.

17   Q.    Can you say that again, please?

18   A.    M-A-I-L at B-E-N-O-A.N-E-T.

19   Q.    And so, if I go back to Apple and look for

20   communications with you, I should look for that address?  Is

21   that your testimony?

22   A.    I believe so, yes.

23   Q.    All right.  So, since you've been here at trial -- when

24   did you get here to Tyler?

25   A.    Saturday.

```
 1    Q.   Have you not checked your e-mail since then?

 2    A.   As I say, I cannot access.

 3    Q.   So you've been without e-mail since Saturday?

 4    A.   I can download e-mails, but once they are removed from

 5    the server, they only exist locally.

 6    Q.   You can download e-mails.  So you can go download the

 7    e-mails that were sent to you from Apple that you mentioned?

 8    A.   No.  That's not what I am saying.

 9    Q.   What's the difference?

10    A.   I don't know how to explain if you don't understand.

11    I'm sorry.

12         But the e-mail on the server -- when I'm at home if I

13    check the e-mails, they disappear from the server.  Remotely,

14    I can only access the server, which is free of old e-mails.

15    I can only see the new e-mails that have not been downloaded

16    yet.  That's how a server works.

17    Q.   Going back, if we can, to the document I handed you,

18    PX-165, the annex.  The changes are in date order, right?

19    A.   Sorry.  Which --

20    Q.   The annex that you asked to see before.

21    A.   Ah, yes.

22    Q.   The changes are in date order, aren't they?

23    A.   They are.

24    Q.   And is the last change you see from December 2008?

25    A.   Sorry.  Which document are you looking at?
```

1    Q.    I'm actually looking at a note that somebody handed me

2    so...

3         I'm going to need a little assistance on this one.

4         So if you look at PX-165, Page 42, you see the date

5    2008-12?  It's in the left column there.

6    A.    I do.

7              MR. LUMISH:  Up towards the top, Chris.  Right

8    there.  Thank you.

9    Q.    (By Mr. Lumish) So just the date I'm pointing at.  Do

10   you understand everything that follows that date -- so going

11   down -- is from December of 2008?

12   A.    Yes.

13   Q.    And there's no changes after December 2008 in the annex

14   that could relate to your BSR selection criteria; isn't that

15   true?

16   A.    So, again, I think you're checking the wrong one.  You

17   should be looking at PX-149.

18   Q.    149.  Is that what you said?

19   A.    Yes.

20   Q.    Can you look at that document and tell me the last date

21   there were changes to the BSR portion that you claim to be

22   your invention?

23   A.    I thought I already answered the question that I need to

24   check every single change request to see to what section they

25   are related to.

1    Q.   All right.

2            MR. LUMISH:   I pass the witness, your Honor.

3            THE COURT:   All right.   Any redirect?

4            MR. MCCARTY:   Yes, ma'am.

5                       REDIRECT EXAMINATION

6    BY MR. MCCARTY:

7    Q.   Very briefly.   Mr. Sebire, are you aware of a single

8    instance in which 3GPP made a decision to adopt or reject a

9    technical proposal based on whether that contribution was

10   covered by IPR?

11   A.   No.

12   Q.   Have you ever seen 3GPP change the text of a -- of a

13   particular standard after a relevant IPR was later disclosed

14   that was covered by the standard?

15   A.   Sorry.   Will you repeat that question?   I apologize.

16   Q.   Yeah.   In your experience, have you ever seen 3GPP

17   change the text of a particular section of a standard after a

18   relevant IPR was disclosed that covered that standard?

19   A.   No.

20   Q.   Just to clear up one thing, Mr. Sebire.   Plaintiff's

21   Exhibit 149 at Page 48, what is this document, Mr. Sebire?

22   A.   This is the 3GPP technical specification, No. 36.321.

23   Q.   And Apple's lawyer asked you a question about the last

24   change included in the annex here, the change annex.   Do you

25   recall that?

```
 1   A.    I do.

 2   Q.    And you mentioned March -- March 2000.  Did you mean

 3   March 2010?

 4   A.    I did, sorry.

 5            MR. MCCARTY:  No further questions, Your Honor.

 6            THE COURT:   All right.  Anything further?

 7            MR. LUMISH:  Nothing further, Your Honor.

 8            THE COURT:  Okay.  Mr. Sebire, may step down.

 9            MR. CALDWELL:  May he be released, Your Honor?

10            THE COURT:  Yeah, may he -- any objection for him

11   being excused?

12            If you have more to cover with him, let's do it

13   now.

14            MR. LUMISH:  We don't, Your Honor.  I mean, there's

15   nothing I can say -- we definitely want to ask him again.  We

16   have -- we're going to go back and look to see if there are

17   these e-mails, but he told the jury that he had a job offer,

18   but we cannot find them in the documents.  So that would be

19   the one issue that would gives me pause.

20            THE COURT:  I am assuming you-all will continue to

21   endeavor to find those e-mails, as well, as soon as you can.

22            MR. CALDWELL:  Sure.  Certainly.

23            THE COURT:  Okay.  All right.  Mr. Findlay?

24            MR. FINDLAY:  I thought we had -- we may be wrong,

25   so I thought we -- somebody had said that we thought he was
```

```
 1    going to be in town in Marshall next week for another trial.

 2             Is that -- are we just completely off-base?

 3             MR. CALDWELL:  I don't know.  I haven't said that.

 4             MR. FINDLAY:  That wasn't my question, though.  Do

 5    you know whether he's going to be back in Marshall next week?

 6             MR. CALDWELL:  I don't -- I actually don't know.

 7    That would be -- have nothing to do with us.  I mean, I've

 8    heard that he -- there's some other matter that they have.

 9    But I don't know what any of his schedule is.  I heard that

10    at some point before too long he's flying somewhere, maybe to

11    Houston, but I don't know.

12             MR. FINDLAY:  May we ask the witness about his

13    future Texas plans which sound like they might be soon?

14             THE COURT:  Do you think you might need him again?

15    Is that why you're asking?

16             MR. FINDLAY:  Well, it goes to Mr. Lumish's point,

17    Your Honor.  If -- if we were to find other evidence that is

18    relevant to this, either evidence at Apple, or lack thereof,

19    I think we might have a basis to want to call him again to

20    continue this inquiry.

21             And, frankly, no -- no aspirations at this point,

22    but to challenge this because if it turns out it didn't

23    happen, obviously, that's a major issue which we need to be

24    able to explore.  And the jury, obviously, would have to know

25    about it.
```

1          So if he's going to be back in the area, perhaps we

2  can at least have some understanding that -- depending on

3  what we find, he would make himself available at the Court's

4  request.  If that is something that comes up.

5          Admittedly, it's a little odd situation, but for

6  him to just fly back to Tokyo and he's gone, no chance of

7  talking to him again, doesn't seem completely fair given the

8  circumstances.

9          THE COURT:  Mr. Gleason, if you have a response

10  will you approach, please, to the mic?

11          MR. GLEASON:  Thank you, Your Honor.

12          I would just point out that this is what discovery

13  is for.  And when Apple did not discover this as -- I mean,

14  they had the opportunity to depose him.  They didn't ask him

15  any of these questions.  They didn't -- I mean, this is --

16  this is the point of discovery and discovery is closed.

17          I would also point out that they -- they didn't

18  challenge this when he was asked this question in front of

19  the jury.  And I don't think that there's any basis to move

20  testimony from this trial on equitable estoppel into the jury

21  trial.

22          THE COURT:  Okay.  Well, Mr. Findlay?

23          MR. FINDLAY:  One quick response to that.

24          I mean, we have mandatory disclosure obligations in

25  this district.  If they knew, which they obviously did, that

```
 1   they were going to parade this in front of the jury, they

 2   certainly had an obligation to provide evidence of it to us.

 3          So the fact that we didn't ask for something, which

 4   we never could have contemplated would be an issue in this

 5   case, is completely unfair.

 6          THE COURT:  You can ask him about his upcoming

 7   travel schedule.

 8          MR. FINDLAY:  Thank you, your Honor.

 9          THE COURT:  You're welcome.

10          MR. LUMISH:  Not done with me yet.  Sorry.

11                    RECROSS-EXAMINATION

12   BY MR. LUMISH:

13   Q.   Are you coming back to Tyler next week, sir?

14   A.   Not to Tyler, no.

15   Q.   Are you coming back to Texas next week?

16   A.   Yes.

17   Q.   Are you going to be testifying in Marshall?

18   A.   Correct.

19   Q.   In what case?

20   A.   Am I free to say?

21   Q.   I'm asking you.  I --

22   A.   It's Core Wireless versus LGE.

23   Q.   And are you actually going back to Japan between now and

24   then?

25   A.   Yes.
```

1    Q.    When are you flying out?

2    A.    Flying out?

3    Q.    When are you flying back to Japan?

4    A.    Tomorrow morning.

5    Q.    And when did you come back to Texas?

6    A.    Next Monday.

7    Q.    How long have you had those plans?

8    A.    The second week was only organized very recently, so

9    maybe two weeks ago.

10   Q.    When did you know you were going the tell our jury that

11   you had a job offer from Apple?

12   A.    I did not know.

13   Q.    You never knew.  It just came out today as a complete

14   surprise to you?

15   A.    I mean, I mentioned it in June but...

16   Q.    Did you provide any of the documents that showed any of

17   the things we've discussed today about this job offer in June

18   or at any other time to lawyers for CCE?

19   A.    No, I did not.

20   Q.    Did you provide it to lawyers for NSN?

21   A.    No.

22   Q.    Have you ever provided those documents for the purpose

23   of proving that you had a job offer from Apple, to anybody

24   related to this lawsuit?

25   A.    No.

```
 1              MR. LUMISH:  Your Honor, we would just reserve and

 2   ask Your Honor not to release him, but to leave us free to

 3   try to bring him back to testify in front of the jury on this

 4   issue?

 5              MR. GLEASON:  Your Honor?

 6              THE COURT:  Mr. Gleason.

 7              MR. GLEASON:  May I ask Mr. Sebire a couple

 8   questions about his travels next week?

 9              THE COURT:  Yes, you may.

10                          CROSS-EXAMINATION

11   BY MR. GLEASON:

12   Q.   Mr. Sebire, you're scheduled to fly to Houston on the

13   12th; is that correct?

14   A.   Correct.

15   Q.   And on the 12th you'll travel from Houston to Marshall,

16   is it?

17   A.   Yes.

18   Q.   And your understanding is that you're supposed to

19   testify in Marshall on the 13th, correct?

20   A.   Correct.

21   Q.   And when do you fly back to Tokyo?

22   A.   The day after.

23   Q.   On the 14th?

24   A.   Yes.

25   Q.   Okay.
```

1           MR. LUMISH:  Your Honor, they had mandatory

2    disclosure obligations.  They've known since June.  They've

3    been planning to do this.  I've heard the phrase "trial by

4    ambush" come out of Mr. Caldwell's mouth 12 times since we

5    started pretrial proceedings.

6           This is the archetypical example of that.  They

7    have known about this since June.  They planned this.  They

8    plotted it.  We saw it come out today.  It was terribly

9    prejudicial to Apple because we've never heard it before.

10          We've been scrambling since the moment we heard it

11   to see if there is evidence of it, if it's true.

12          This is a serious problem for us.  We should be

13   permitted to bring Mr. Sebire back if we're able to do

14   some -- now do investigation back, based on his testimony

15   this afternoon.

16          MR. CALDWELL:  Your Honor, I don't think there's

17   any trial by ambush.  I think what happened is they tried an

18   equitable case in front of the jury today.  And we weren't

19   actually intending to go into any of this.

20          And then what ended up happening is they tried a

21   complete equity case in front of the jury today, and we

22   weren't actually intending to go into any of this.  And then

23   what ended up happening is they tried a complete equity case

24   where they called him a liar and someone that's deplorable.

25   And then they attacked his conduct in front of the standard

1    setting body.

2           So what I would -- what I would actually suggest,

3    if it's okay, Your Honor, is it sounds like he might be

4    within the subpoena power of the Court at some point next

5    week, and he's offered -- my understanding is he has

6    childcare issues and things that are in Japan that he has to

7    deal with this weekend.

8           And so what my suggestion would be, if it's okay

9    with the Court, is that he be on his flight, because I think

10   he's set here to leave at 3:00 in the morning or something

11   and get back to DFW to be on his flight.

12          And I don't have any e-mails that are about it.

13   There was evidence that came out of his testimony.  If we get

14   e-mails and whatnot, we'll bring them back to the Court.

15          If we can't and it calls into question, you know,

16   the veracity of it, and we need to bring him back, we can

17   talk with the Court about that as soon as we can, because he

18   may be within -- it sounds like he's going to be within the

19   subpoena power of the Court next week, so...

20          MR. LUMISH:  It sounds like we're trying to get

21   evidence in by Tuesday.  So if we can have him here in time

22   to testify again, if need be, before the case goes to the

23   jury, I don't think that's unacceptable.

24          THE COURT:  Okay.  I don't have any problem with

25   him flying home this weekend to take care of obligations if

1    he's already coming back to Texas; and if it ends up that we

2    need to recall him, I need you to be available.

3             MR. CALDWELL:  I will.  I mean, certainly --

4             THE COURT:  I will certainly coordinate it with

5    Judge Gilstrap and not --

6             MR. CALDWELL:  And that's certainly fine with CCE.

7    The one thing I would like to observe is I don't -- I mean,

8    as I understand it, they're raising one issue, which is about

9    the indication of an Apple job offer.  What I don't think

10   would be fair is, if what they're trying to do is to re-call

11   him to revisit unrelated issues while he's in the middle of

12   dealing with some other case or something like that.

13            So my understanding is -- I mean, if it's just

14   proven that he came in here and told the truth, the issue is

15   probably put to bed.  I don't know if that's true or not, but

16   that's my understanding.

17            THE COURT:  You would be re-calling him for the

18   narrow issue that we're talking about, right?

19            MR. LUMISH:  Yes, Your Honor.

20            THE COURT:  Okay.  All right.  Then, Mr. Sebire,

21   you are excused to fly home this weekend, and we'll see you

22   next week if we need to.

23            THE WITNESS:  Thank you.

24            THE COURT:  You may step down.

25            Anything further?  I hesitate to ask.

1           MR. CALDWELL:  Not from the Plaintiff.

2           THE COURT:  Okay.  Anything from Apple?

3           MR. LUMISH:   No, Your Honor.

4           THE COURT:  All right.  I'll see you-all at 8:30,

5    if you need me.

6           We'll be in recess.

7           (Court adjourned.)

8                         CERTIFICATION

9

10          IT IS HEREBY CERTIFIED that the foregoing is a

11   true and correct transcript from the stenographic notes of

12   the proceedings in the above-entitled matter to the best of

13   our abilities.

14

15
     /s/_____
16   CHRISTINE BICKHAM, CRR, RMR           September 7, 2016
     Official Court Reporter
17

18

19   /s/_____
     SHEA SLOAN, CSR, RPR
20   Official Court Reporter

21

22

23

24

25