<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                          TYLER DIVISION

 3

    CELLULAR COMMUNICATIONS        )
 4  EQUIPMENT, LLC
                                   )   DOCKET NO. 6:14cv251
 5
        -vs-                       )
 6                                     Tyler, Texas
                                   )   8:31 a.m.
 7  APPLE INC., ET AL                  September 8, 2016

 8

 9                       TRANSCRIPT OF TRIAL
                           MORNING SESSION
                  BEFORE THE HONORABLE K. NICOLE MITCHELL,
10                  UNITED STATES MAGISTRATE JUDGE

11                      A P P E A R A N C E S

12  FOR THE PLAINTIFF:

13  MR. BRADLEY W. CALDWELL
    MR. JOHN AUSTIN CURRY
14  CALDWELL CASSADY & CURRY
    2101 Cedar Springs Rd., Suite 1000
15  Dallas, Texas 75201

16  MR. EDWARD R. NELSON III
    NELSON BUMGARDNER PC
17  3131 West 7th Street, Suite 300
    Fort Worth, Texas 76107
18
    MR. J. WESLEY HILL
19  WARD, SMITH & HILL PLLC
    1507 Bill Owens Parkway
20  Longview, Texas 75604

21
    COURT REPORTER:      MS. CHRISTINA L. BICKHAM, CRR, RMR
22                       FEDERAL OFFICIAL COURT REPORTER
                         300 Willow, Ste. 221
23                       Beaumont, Texas 77701

24
    Proceedings taken by Machine Stenotype; transcript was
25  produced by a Computer.
</pre>

1    FOR THE DEFENDANTS:

2
     MR. DOUGLAS E. LUMISH
3    MR. JEFFREY G. HOMRIG
     MS. LISA K. NGUYEN
4    MR. BRETT M. SANDFORD
     LATHAM & WATKINS LLP
5    140 Scott Dr.
     Menlo Park, California 94025-1008

6

7    MR. JOSEPH H. LEE
     LATHAM & WATKINS LLP
8    650 Town Center Drive, 20th Floor
     Costa Mesa, California 92626-1925

9

10   MR. ERIC H. FINDLAY
     FINDLAY CRAFT PC
11   102 N. College Avenue, Suite 900
     Tyler, Texas 75702

12

13

14              * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

15                        P R O C E E D I N G S

16              (Jury out.)

17              THE COURT:  All right.  What do we have this

18   morning?

19              MR. HILL:  Your Honor, we have a couple of issues

20   from the Plaintiff's point of view that I think the parties

21   would like to take up.  I know Mr. Caldwell has one in

22   particular that he would like to address concerning some of

23   the developments from yesterday.  Lucky for me he's just

24   wandering in.

25              THE COURT:  Great.

1          MR. CALDWELL:  I'm sorry, Judge.  There were some

2    traffic lights on Broadway.

3          MR. HILL:  They had a traffic light out there at

4    the mall, Judge.

5          MR. CALDWELL:  Just to address some of the --

6    Mr. Sebire's stuff at the end of the day.  He's going to go

7    check his e-mails, but there are some things -- and some of

8    these I don't have permission to necessarily publish to

9    everybody else, but we have a -- for example, the main

10   statement where Apple reimbursed him for the rental car.  We

11   have the passport stamp.  We have the flight numbers.  I

12   think we have a person that is a recruiter for Apple on

13   LinkedIn that reached out to him, which I am certainly happy

14   to tell you that name if that's helpful.

15         So, I mean, we have this information.  He's about

16   to get on a plane to fly to Japan.  So, anyway, to the extent

17   that he was fabricating the story, we've got some things that

18   he was able to find, but I don't want to publish his bank

19   statements or reimbursement so...

20         THE COURT:  I understand.

21         MR. CALDWELL:  And it says, you know, Apple Inc., 1

22   Infinite Loop, Cupertino; has the amount.

23         THE COURT:  Okay.  Any response?

24         MR. LUMISH:  Yes, Your Honor.  We should have

25   talked in advance.

1          So he doesn't need to publish those things.  We

2    have gone back.  We continued our investigation.  As I told

3    the Court yesterday, he's not in our database.  There's no

4    evidence of a formal written offer, but we have confirmed a

5    fair amount of what Mr. Sebire said.

6          We're not expecting to need to re-call him on

7    Tuesday -- or next week, I should say.

8          At this point, there's no basis for us to say he

9    testified untruthfully.  And so we're not saying that.  And

10   we're not asking to re-call him.

11         We are -- we remain concerned with the process, the

12   way things were handled.  It's our position that in light of

13   the fact that Mr. Sebire said he told the lawyers in June,

14   that should have been disclosed to Apple; that it was an

15   effort to spring this on us in trial for the courtroom

16   dramatics that we all saw.

17         We were either hindered or completely disabled in

18   our ability to cross-examine him under the circumstances, to

19   prepare rebuttal witnesses.  And I think, frankly, we would

20   have brought a motion in limine on something like this

21   because under 403 it's not relevant to the issues at hand.

22         And so on balance, Your Honor, we would ask that

23   the testimony related to the job offer be stricken from

24   yesterday; and that there be no further mention of it in the

25   trial.

1          THE COURT:  Your response?

2          MR. CALDWELL:  Of course, I -- I don't understand

3    that at all.  Mr. Lumish deposed him for seven hours so --

4    you know, we asked Mr. Sebire just conversational questions,

5    asking about if he's had interaction with Apple or if Apple

6    is participating in standards bodies, and it comes out in

7    this context.  They didn't ask any other question about it.

8          I mean, he has explained that the correspondence he

9    has is on a personal e-mail account, which, understandably,

10   he wasn't talking to Apple about a job offer through his NSN

11   work account.  There's no -- there was never any request for

12   any of that.

13         He wasn't personally -- there was no request for

14   any sort of personal e-mails.  I mean, Apple hasn't produced

15   e-mails in this case.  E-mail discovery was basically not

16   sought in this case at all.  There weren't any ESI requests.

17         So I don't actually understand it at all.  I mean,

18   I have a similar -- I had a similar sort of e-mail account

19   that's like that that I've had for 15 years.  It's my own

20   domain.  And it's also a POP3 mail server that just kind of

21   downloads onto a home computer and is not available on a

22   server.

23         So I don't think there's any reason -- and, I mean,

24   keep in mind it's a bit ironic that we're kind of hearing

25   this where they've been arranging for a while to bring an

1    Ericsson witness that we're going to hear from tonight or

2    tomorrow, and the night before trial we get a bunch of things

3    that, actually, were specifically subpoenaed a long time ago.

4         And then, you know, we didn't get to depose that

5    guy on those.  And it is what it is, and the Court told us

6    that, you know -- more politely -- put on our big boy pants

7    and deal with it at trial.  And so that's what we're going to

8    do.

9         MR. LUMISH:  So the documents weren't subpoenaed

10   from Ericsson.  The documents were subpoenaed from NSN.  And

11   if they were relevant from Mr. Sebire, they were relevant

12   enough to be used at trial, they should have been disclosed

13   under the Court's rules.  Otherwise, Your Honor, I would

14   defer to the Court.

15        THE COURT:  I'm going to deny the request to strike

16   that from the record.  Given what we know now, is there any

17   reason why I cannot excuse Mr. Sebire, say he doesn't have to

18   worry about coordinating -- potentially coordinating -- y'all

19   represented you're not going to re-call him.  I just want to

20   formally let him know he's excused.

21        MR. LUMISH:  No -- no objection to that, your

22   Honor.

23        THE COURT:  You-all formally let him know he's

24   excused.

25        MR. CALDWELL:  Will do.

```
 1                    THE COURT:  Thank you.

 2                    What's next?

 3                    MR. FINDLAY:  Yes, Your Honor, we have a couple

 4       quick objections.  And if I could approach?

 5                    THE COURT:  Sure.

 6                    MR. FINDLAY:  And, Your Honor, these are

 7       Plaintiff's Exhibits 56, 156, and 57.  And Slide 10 from

 8       Mr. Green's deck.  I've tabbed one of the exhibits.

 9                    This is basically -- I'll be very quick, Your

10       Honor.  It deals with our motion in limine ruling on

11       conflation between LTE and BSR.  We just think he's crossed

12       over that line.  They are pictures and Apple surveys where

13       they talk about LTE.  The pictures and the diagrams and the

14       description there talks all about the benefits of LTE.  There

15       is nothing limited towards buffer status reports.  And we

16       just think it does a conflation.

17                    I know their -- part of their response will

18       undoubtedly be, well, we've told the jury that we didn't --

19       that we didn't invent LTE.  Mr. Sebire has been clear upon

20       that.  I would agree with that narrow statement, but

21       conflation, I think, is more than that.  And that's what I

22       think this is.  And we would ask that it be limited.

23                    THE COURT:  Response.

24                    MR. STEWART:  Your Honor, Chris Stewart for the

25       Plaintiff.
```

1            Basically, what we've presented in the slides we

2    sent over last night, is exactly what we said we would do in

3    both arguments on this issue.  In a 65-slide deck, I think,

4    that we sent them last night, three of the slides at the very

5    beginning address these issues related to the technological

6    context for the invention.

7            They are not going to conflate LTE with the

8    patent-in-suit, just like Your Honor instructed us to do.

9    They're simply going to say, as we've always said, this is

10   the technological context.  This is why the patent

11   contributes to that context.

12           And there is those two exhibits -- I think 56 and

13   57 -- that just mention, hey, by the way, this LTE concept is

14   somewhat important to Apple and Apple's customers so it's not

15   just a complete, you know, abstract notion.  And that's it.

16           Then we move on to talking about the actual

17   evaluation that Mr. Green did in view of the licenses the

18   same way that Mr. Bakewell does.

19           THE COURT:  Anything else, Mr. Findlay?

20           MR. FINDLAY:  Nothing more, Your Honor.  We just

21   think it is the same concern we had before.  And I hear

22   Mr. Stewart, but we are concerned about the prejudice that

23   will be made to the jury.

24           THE COURT:  Okay.  That objection is overruled.

25           What's next?

 1          MR. FINDLAY:  Just one more, Your Honor, and this

 2    is --

 3          MR. STEWART:  Counsel, may I --

 4          MR. FINDLAY:  Oh, yes.

 5          MR. STEWART:  So one issue we had with respect to

 6    some deposition clips that are going to be played by

 7    Defendants.  It's almost, I think, impossible that they'll

 8    actually -- actually come up today, but according to

 9    procedures, today would be the day we were supposed to raise

10    them.

11          So if Your Honor would like to hear that, we can

12    discuss them now or save them for later.

13          THE COURT:  I can hear them now.

14          MR. STEWART:  Okay.  So the objections relate to

15    deposition testimony of Marvin Key, who is the CEO -- CEO of

16    Acacia Research Corp.  They designated roughly ten minutes of

17    testimony from Mr. Key, including about four minutes of

18    somewhat irrelevant testimony about the extent of his

19    knowledge of the CCE patents or the CCE portfolio.  There are

20    some questions that get into other litigation between Acacia

21    and other portfolio companies and other Defendants.

22          And so this is just, basically, a series of

23    testimony that goes directly to the corporate character that

24    has been excluded.  And we had a similar issue come up in the

25    Smartflash case where, even though Apple agreed to not

1    mention these pejorative terms explicitly and had a lot of

2    agreed MILs, just like we have in this case, they still tried

3    to designate testimony from representatives of the Plaintiff

4    that insinuated as much, without having any probative value

5    towards any issue in the case.

6         And so we have proposed a compromised set of clips

7    that we are okay with.  It's about six minutes of testimony

8    that at least gets tangentially into the issues for the jury.

9    But four minutes of it is just irrelevant to anything other

10   than to show that, oh, this guy doesn't know anything about

11   this portfolio, and this is a fake company.  To that, we have

12   objected.

13        THE COURT:  Response?

14        MR. SIMS:  Good morning, Your Honor.

15        This is the Plaintiff's CEO, and they have stated,

16   and we expect them to state that this '820 patent is one of

17   their -- one of the most important patents in this portfolio.

18        We believe this testimony discusses the nature of

19   their thoughts on the '820 patent and the potential

20   negotiations that would -- the negotiations that would come

21   out.

22        With respect to this patent, we are not intending

23   to impair the character of CCE through these designations.

24   They are simply to provide context for the importance of the

25   patent and the negotiation positions of the parties in this

1   case.

2               THE COURT:  It's a little difficult for me to make

3   a decision -- without actually seeing the testimony, to make

4   a decision about whether it crosses the line into a MIL.  Why

5   don't y'all hand that up, I'll take a look at it this

6   morning, and I'll let you know, all right?

7               MR. STEWART:  Yes, Your Honor.

8               May I approach?

9               THE COURT:  Yes.

10              MR. LUMISH:  We understand this is the objected-to

11  portions only.

12              THE COURT:  Okay.

13              MR. STEWART:  And, Your Honor, if I could just make

14  one more point as you review this in response to what

15  Mr. Sims said.  We actually did not, in our presentation, for

16  example, with Ms. Wagner, go into the subject matter that was

17  objected to as potentially getting into stuff blocked by

18  privilege in Defendants' MIL.  We expressly avoided getting

19  into that territory in respect to Your Honor's ruling.

20              And so what this does is, while we were blocked

21  from presenting the testimony on the actual value or the

22  importance of the '820 patent in that context, this asks a

23  different witness:  Well, you don't have any opinions on the

24  value, or you don't have any opinions about how

25  technologically important this patent is.

1          And so that's why we think this is prejudicial, in

2   addition to the fact that getting into this sort of territory

3   about the CEO of the company could potentially open the door

4   to lots of issues with respect to Rockstar and other shell

5   companies and similar relationships that Apple has had.

6          THE COURT:  Okay.  What's next?

7          MR. FINDLAY:  Last, Your Honor, I believe from our

8   side is Slide 65 from Mr. Green's report.  It's obvious he's

9   going to talk about FRAND.

10          Our position, Your Honor, this has not been

11   adequately disclosed.  The only mention of FRAND in his three

12   reports -- I believe this is correct; if not, Mr. Stewart

13   will correct me -- is a footnote at the end of the second

14   supplemental report, which was served on August 18th where

15   he, for the first time, I think, claims that the 15 cents is

16   FRAND analysis.  There's nothing in his previous reports on

17   it.

18          He did indicate, I think, in an answer in a

19   deposition, that he claimed it was FRAND, but there's none of

20   the typical analysis you expect to see, and we think to have

21   it come in at this late date is improper, and we ask that it

22   be stricken.

23          MR. STEWART:  Your Honor, in Mr. Green's initial

24   report, he did address standard-essential patents and FRAND

25   concepts at a high level.  He also discussed the different

1    Georgia-Pacific Factors in detail, including ones that are

2    not as relevant to a FRAND analysis as others.

3           After Mr. Bakewell's report in rebuttal came out,

4    he discussed FRAND at length.  In Mr. Green's deposition, he

5    repeatedly, more than one time, multiple times described his

6    opinion that his rate would not change if it was done under a

7    FRAND analysis because the factors that he did consider in

8    his first report are consistent with a FRAND analysis.

9           And then as Mr. Findlay said, on August 18th, in

10   his second supplemental report, he included a reference to

11   the fact that, as he stated in his deposition, his opinion is

12   a FRAND analysis.

13          That's all this slide is going into.  It's just

14   confirming that because of the factors that he did and did

15   not consider and the weight he gave them, his opinion is

16   consistent with FRAND, which is in response to Mr. Bakewell's

17   rebuttal.

18          THE COURT:  I mean, is that what he's going to say,

19   that his opinion would not change if he did a FRAND analysis

20   or that he did a FRAND analysis?  Those seem to be two

21   different things.

22          MR. STEWART:  I mean, I think FRAND is a

23   characterization, right?  It's fair, reasonable, and

24   non-discriminatory.  It's not necessarily an analysis you

25   have to come at from that exact direction.

1            He's saying that the analysis I did is, either in

2     retrospect or from the front end, fair, reasonable, and

3     non-discriminatory because of the way I analyze the

4     Georgia-Pacific Factors.

5            THE COURT:  Okay.  Response?

6            MR. FINDLAY:  I think Your Honor's question is the

7     right one.  There's no analysis done of FRAND.  I realize --

8     I suppose, if all he's going to say is, well, it would have

9     been the same either -- he did say that in deposition.

10            So if he's going to go no further than that, that

11     might be all right.  That might not cross the line.  But if

12     he talks about, no, I really did this detailed FRAND analysis

13     and let me tell you about it, that's nowhere in his reports,

14     and we would object.

15            THE COURT:  Any argument?

16            MR. STEWART:  So Mr. Curry can hop up if I say

17     anything wrong, but I think the way the slide is described,

18     it's simply saying:  Here is my understanding of FRAND, here

19     are the factors and the analysis I already did, and it's

20     consistent with FRAND.

21            THE COURT:  Is that right, Mr. Curry?

22            MR. CURRY:  That's right, Your Honor.

23            THE COURT:  I'll let him say that.

24            MR. FINDLAY:  Thank you, Your Honor.

25            THE COURT:  Anything further?

1    MR. FINDLAY:  Not from the Defendants.

2    THE COURT:  Thank you, Mr. Findlay.

3    MR. MCMANIS:  Your Honor, Jason McManis for CCE.

4 We would just offer our trial exhibit list through September

5 7th of 2016.

6    MR. HILL:  Your Honor, can I -- can we wait and do

7 that in front of the jury?

8    THE COURT:  You bet.

9    If there's nothing further we'll be in recess until

10 9:00 a.m.

11    COURT SECURITY OFFICER:  All rise.

12    (Recess.)

13    (Jury in.)

14    THE COURT:  Please be seated.

15    Good morning, Ladies and Gentlemen of the Jury.

16    Let's take up any housekeeping matters before we

17 continue with our testimony this morning.

18    Mr. McManis.

19    MR. MCMANIS:  Good morning, Your Honor.  Jason

20 McManis for Plaintiff CCE.  We offer our trial exhibit list

21 through September 7th, 2016.

22    THE COURT:  Any objection?

23    MR. SANDFORD:  No objection, Your Honor.

24    MR. MCMANIS:  May I approach?

25    THE COURT:  Yes.  Hand it up, please.  Thank you.

 1              MR. SANDFORD:  Good morning, Your Honor.  Brett

 2     Sandford for Apple.  Apple offers its exhibit list through

 3     September 8th.

 4              THE COURT:  Any objection?

 5              MR. MCMANIS:  No objection.

 6              THE COURT:  Okay.  Hand it up.

 7              All right.  Let's continue with our testimony this

 8     morning.

 9              Mr. Caloyannides, if you'll come back up here.

10              I'll remind you that you're still under oath and

11     you may be seated.

12       MICHAEL CALOYANNIDES, PH.D., PLAINTIFF'S WITNESS, SWORN

13                   DIRECT EXAMINATION (CONTINUED)

14     BY MR. NELSON:

15     Q.   Good morning, Dr. Caloyannides.

16     A.   Good morning, sir.

17     Q.   How many times, sir, have you served as an expert in

18     patent infringement matters generally?

19     A.   Oh, quite a few.  I would say just a little short of a

20     hundred.

21     Q.   And what kinds of companies have hired you to be an

22     expert witness?

23     A.   Quite a spectrum.  All the way from large companies such

24     as Verizon, Samsung, L3, and so on, all the way down to

25     individual investors -- inventors, I'm sorry, that wanted

1    some technical help with their invention.  And I supported

2    them gratis, no charge.

3    Q.    In the past have you been retained by both plaintiffs

4    and defendants?

5    A.    That is correct, equal amounts, more or less.

6    Q.    Dr. Caloyannides, who hired you in this matter?

7    A.    In this case I was hired by the attorneys for CCE.

8    Q.    And how are you being compensated?

9    A.    I'm paid $200 an hour.

10   Q.    Do you have an economic interest in the outcome of this

11   case?

12   A.    No, not at all.

13   Q.    Dr. Caloyannides, please tell the jury what you were

14   hired to do in this case.

15   A.    I was hired to read and understand the '820 patent and

16   determine, to the best of my ability, to what extent is it or

17   is it not infringed by the accused products.  And also to

18   review the reports about alleged invalidity of the patent

19   submitted by the opposite side and to comment on that.

20   Q.    And how do you go about determining whether a device

21   infringes a particular patent?

22   A.    Well, the first and most important task is for me to

23   study the patent very carefully and especially the claims

24   part of the patent.  Then I look at any term construction,

25   the definitions of the terms that have been created by the

1   Court.

2       And once this is done, then I compare the claims to the

3   accused products to see whether there is infringement or not.

4   Q.   Please describe the types of information that you used

5   to investigate the accused Apple devices in this case?

6   A.   It was an extensive collection of things.  There was a

7   massive amount of technical documents.  I mean massive

8   (indicating) generated by Apple and by others.

9       I also reviewed, with Mr. Jones, the source code that

10  was produced by Apple.

11      I also looked at public information, such as items on

12  the Internet, Web pages by Apple that advertise features of

13  its cell phones.

14      I also reviewed information that was provided by

15  Qualcomm company about the chips that are inserted into the

16  accused products.

17      I also reviewed deposition testimony by a number of

18  witnesses, as well as written discovery responses of some

19  witnesses.

20  Q.   How long did you spend --

21  A.   I'm sorry.

22  Q.   Excuse me?

23  A.   I'm sorry.  I was not finished.

24  Q.   Oh, excuse me.  Please continue.

25  A.   And lastly, I relied on about half a century of

1    experience in telecommunications of my own.

2    Q.    My apologies, Dr. Caloyannides.

3    A.    No problem.

4    Q.    How long did you spend in connection with this case

5    reviewing all those materials, including the source code?

6    A.    Oh, I haven't tallied it up.  But including the

7    effort -- current effort here, I would say around 4- or 500

8    hours at most.

9    Q.    Was that all on the infringement part of the case?

10   A.    No.  No.  That was roughly half on the infringement part

11   of the case and half on assessing the assertions by the

12   opposite side that the patent is allegedly invalid.

13   Q.    Did you prepare a report in this case?

14   A.    Yes, I did.

15   Q.    Is that a copy of your report on infringement in front

16   of you?

17   A.    Yes, that is correct.

18   Q.    Is making a report something you typically do as an

19   expert witness in a patent case?

20   A.    Every time.  That is correct.

21   Q.    Does your infringement report identify and reference all

22   of the evidence that you reviewed and considered in this

23   case?

24   A.    Yes, it does.

25   Q.    And have you formed opinions regarding infringement?

1    A.    Yes, I have.

2    Q.    And what are those opinions?

3    A.    The opinions, in a nutshell, are the accused devices,

4    namely, iPhone 5, iPhone 5C, iPhone 5S, iPhone 6, iPhone

5    6 Plus, and iPads 3, 4, mini, and mini with Retinal Display,

6    plus iPad Air.  They all infringe Claims 4, 10, 12, 20, and

7    24.

8    Q.    Are your opinions and your basis for them set forth in

9    your report?

10   A.    Yes, they are.

11   Q.    And one last thing relative to the slide on the screen,

12   the devices that you read under the -- under the column

13   heading "accused devices," do you see that?

14   A.    I do.

15   Q.    If I refer to them as accused devices or you refer to

16   them as accused devices in the course of your testimony, can

17   we have the agreement that that means these products that are

18   set forth on the screen?

19   A.    Yes.  That would be very helpful.

20   Q.    Okay.  Let's turn to the patent itself.

21        Now, Dr. Caloyannides, we've heard a great deal of

22   testimony already about the '820 patent from persons like

23   Mr. Sebire and Mr. Jones.  Were you present for their

24   testimony and presentations?

25   A.    Yes, I was.

1    Q.   So in the interest of time, let's focus on an animation

2    that -- that you prepared.  And please describe for the jury

3    what we're seeing.

4    A.   In the light of what was discussed yesterday, which I

5    won't waste your time by repeating, a buffer status report is

6    sent by the Apple device, the cell phone, iPad if it has such

7    capability, informing the base station of the type and extent

8    of information on that Apple device that the device wants to

9    upload to the base station.  Could be voice, could be

10   whatever else.

11        In response to that, the control -- the tower sends back

12   a grant to the device saying you are hereby granted the

13   following resources to upload the information you wanted to

14   upload.

15        And at that point the Apple device, or any other device

16   that complies with the spec, does exactly that, namely,

17   upload the data that it wanted to upload in the first place.

18   Q.   Okay.  Let's briefly focus on the data transfer back to

19   the base station, which is the pink or red arrow on the

20   screen; is that right?

21   A.   That is correct.

22   Q.   Okay.  What types of information are in that data

23   transfer?

24   A.   It's a vast amount nowadays.  It can include, of course,

25   digitized voice; and all voice on cell phones these days is

1    digitized, Facebook, back-and-forth chats, Facebook games,

2    e-mails, web browsing, FaceTime, Pokemon Go, the latest fad,

3    assorted games and on and on, photographs, videos, you name

4    it.

5    Q.    Now turning back to the '820 patent, Dr. Caloyannides,

6    what technological problem does the '820 patent address?

7    A.    Well, the short version is that cell phones, when they

8    send buffer status reports to the tower, the base station, do

9    that on a very, very regular basis, as in thousands of times

10   per second per device.  And with a number of phones doing the

11   same thing, there would be mass confusion as to who is

12   requesting what and when and why.

13       The '820 patent tried to put some order to this mess

14   that was -- without this order, the system would just clog.

15   It would not be able to function.  And it did so in a number

16   of ways, which I will be happy to discuss, if you want.

17   Q.    Yes.  Why don't you elaborate on what Mr. Sebire's

18   solution was to this problem.

19   A.    Solution, basically, at the risk of oversimplifying a

20   fairly complex patent, had two parts.

21       One was to appreciate the fact that not all requests for

22   service to the base station by the mobile are of equal

23   length.  Some can be shorter and can be accommodated with

24   less size request.

25       So you don't send a long request if a short one will do.

1   That cuts down on the traffic quite a bit.  And, of course,

2   the criteria is when to send a short, when to send a long.

3       In addition -- that has not been mentioned too much in

4   the last day or two -- Mr. Sebire realized that just because

5   you want to send a long does not mean that there is the

6   resources to send a long.

7       So you check to see are there resources to send the long

8   based on the selected conditions or not.  And that's the

9   short bandwidth check or availability check.

10      And in combination, those two bits of information are

11  the ones that enable the recipe, if you will, offered by the

12  '820 patent to put order and cut quite a bit on the

13  back-and-forth chitchat between the cell phone and the base

14  station.

15  Q.  Okay.  Let's dive into the patent just a bit.  And I see

16  you have a slide of what appears to be two versions of

17  Figure 4 from the '820 patent.  And if you could, please

18  explain first what we're looking at on the left-hand side and

19  then what we're looking at on the right-hand side.

20  A.  Yes.  On the left-hand side, we're looking at a flow

21  diagram, which essentially is a logical description of what

22  is the phone doing and why and when, as shown in Figure 4 of

23  the patent itself.

24      And it shows, for example, what is highlighted in

25  yellow -- I'm not sure why.  That is not correct -- has been

1   a connection from the decision point where it says:  Is data

2   in multiple buffers?  Yes or no?  That's in Box 430, pointing

3   to the box labeled 470, which determines buffer priority.

4        Now, on the right-hand side, there is the corrected

5   version of the patent.  When I say corrected, I'm not

6   implying that somebody fudged anything here.  It's simply a

7   drafting error.  The one on the left is plain old simple

8   human drafting error, and the one on the right is the correct

9   one.

10  Q.   Okay.  Dr. Caloyannides, how do you know that the one on

11  the right is the correct Figure 4?

12  A.   Two main reasons, frankly.

13       The first one, the preliminary patent application --

14  "provisional" is the proper term -- by the same inventor has

15  the exact same diagram in his provisional patent, and it's

16  the handed one shown on the right, and in that diagram, it

17  shows the correct version of the flow diagram.

18       So it's evident that the inventor intended that to be

19  the flow diagram in the patent.

20  Q.   And this is the same hand drawing from Mr. Sebire that

21  he testified to in this matter?

22  A.   That is correct.

23  Q.   Okay.  And then turning to the patent itself, does that

24  also help us understand that there was just a minor drafting

25  error in Figure 4?

1   A.   Yes, definitely do, because, if one looks at the patent

2   itself, the way it describes what the Figure 4 does, what the

3   patent describes is the corrected Figure 4, which is not in

4   the patent because of the drafting error, but the erroneous

5   Figure 4.

6        And that's the wording.  Says, if there's not enough

7   uplink capacity to use the long format, then the method 400

8   continues by determining 470, the buffers and so on, and

9   that's exactly what the corrected figure depicts.

10  Q.   So, in your view, Dr. Caloyannides, is it appropriate to

11  refer to the corrected drawing?

12  A.   I think that's the only drawing one should refer to.

13  Q.   So, on the screen, it appears that we have the corrected

14  Figure 4 from your slides.  And if you could, briefly walk us

15  through how the corrected Figure 4 flows.

16  A.   Sure.

17       Again, this represents the pictorial logical flow

18  depiction of what is actually happening in the software in

19  the phone.

20       And the first step is to peek into the buffers and see,

21  is there data in them.  And that is the Step 410.

22       The next step, in Box 420, is to determine, is data in

23  at least one of the buffers; and if so, there's Box 430, how

24  many of them, is it in multiple buffers, or in just one

25  buffer, and different courses of action are pursued in the

1    remaining flow diagram depending on the outcome of the

2    decision.

3         In particular, if there is data not in multiple buffers,

4    that means it's only in one buffer.  Then that means

5    designate -- select in plain English -- the short format.

6    That is what is shown by Box 450.

7         If there's data in multiple buffers, the yellow -- the

8    green arrows in the circles is yes, then a check is made to

9    see, is there capacity for a long format.

10        Obviously, if I'm coming out of 430, we want a long

11   format and can we do it.

12        And then after that, if it said, yes, there is capacity,

13   well, then designate the long format.  If there isn't, well,

14   then decide what to do.  And what to do next is you're stuck

15   now with a short format.

16        And the question is:  Well, given that you have to send

17   a lot of stuff there, what do you put in the short format and

18   what do you leave out?

19        And the wise decision was made what to put in there is

20   what has the highest priority, and what you don't put in the

21   there, which, of course, does not have the highest priority.

22        So we designate the short format with the highest

23   priority data and off you go.

24   Q.   Thank you, Dr. Caloyannides.

25             MR. NELSON:  Your Honor, at this point, we're going

1    to need to seal the courtroom.

2              THE COURT:  All right.  Ladies and Gentlemen, if

3    you are not covered by the protective order, I'm going to

4    need you to leave the courtroom at this time.  We will let

5    you know when you may reenter.

6              (Courtroom sealed.)

7              (This portion of the transcript is sealed and filed

8              under separate cover as Sealed Portion No. 5.)

9              (Courtroom unsealed.)

10             MR. NELSON:  And, Your Honor, briefly, there were a

11   series of eight exhibits that the parties agreed would be

12   preadmitted that Dr. Caloyannides testified to on his direct.

13             They are Plaintiff's Exhibits 133, 151, 141, 20,

14   116, 95, and 103.  And I would move those into evidence.

15             THE COURT:  Any objection?

16             MR. LUMISH:  No objections, your Honor.

17             THE COURT:  They will be admitted.

18             All right.  Cross-examination?

19             MR. LUMISH:  Thank you, your Honor.

20                          CROSS-EXAMINATION

21   BY MR. LUMISH:

22   Q.   Good morning, Dr. Caloyannides.

23   A.   Good morning, sir.

24   Q.   We've met before, sir, right?

25   A.   We have indeed.

1   Q.   It's good to see you again.

2        I want to just start by talking about what infringement

3   means to you.  And I can't remember who said it.  One of the

4   lawyers from CCE, at some point in the trial, described

5   patents and claims as a recipe.

6        Were you here for that?  They talked about the secret

7   recipe for Coca-Cola?

8   A.   Yes.  I remember that, yes.

9   Q.   Okay.  I thought that was a pretty apt description.  And

10  so, if you think of a recipe or claims as infringement, do

11  you agree that to infringe a claim, Apple, in this instance,

12  would have to practice every single limitation in the claim?

13  Right?

14  A.   That is correct.

15  Q.   Every claim element would have to be practiced exactly;

16  isn't that true, sir?

17  A.   For a method claim, that is correct.

18  Q.   And so, if you think of the recipe for Coca-Cola, if you

19  changed an ingredient -- so, for example, you changed sugar

20  to brown sugar -- might still be brown; might still be

21  bubbly; might still be sweet; but it wouldn't be Coca-Cola

22  anymore, would it?

23  A.   Well, again, I'm not familiar with the Coca-Cola recipe.

24  I agree with your first premise, that you have to meet all of

25  the limitations of the claims.

1  Q.   It's the claims that matter, right?

2  A.   As far as infringement is concerned, I'm not an

3  attorney, but that is my understanding.

4  Q.   If you change sugar to molasses, that would be a

5  different recipe, wouldn't it?

6  A.   Well, again, I'm not a chemist or a Coke expert, but I

7  would imagine so.

8  Q.   And in this case, in light of your opinions, it's not

9  good enough to just get close, right?  You can't say it's an

10 equivalent but different.  You have to establish, and it's

11 CCE's burden of proving, that every requirement of the

12 claims, every part of that recipe is met literally.  Isn't

13 that true?

14 A.   Well, again, I'm not an attorney, but that's my

15 understanding.

16 Q.   Okay.  Now, you spent a lot of time in your presentation

17 this morning talking about the standard and showing that

18 Apple complies with the standard.

19      Do you recall that generally?

20 A.   I do.

21 Q.   But as you noted, that's not really in dispute, right?

22 Apple agrees that for that one part of the LTE standard,

23 Section 5.4.5, that it complies with the standard.

24 A.   I don't remember the exact number for the standard, but

25 I remember that Apple agreed that it complies with some

1    portions of the standard, yes.

2    Q.    You can't establish infringement based on comparing the

3    claims to the standard, though, right?  You have to compare

4    the claims to the accused products here.

5    A.    Well, yes.  I'm complaining -- comparing -- I'm sorry --

6    the claims to the accused products, and I only referenced the

7    standard in showing that the claims are infringed upon.

8    Q.    The patent claims here -- were you here when Mr. Sebire

9    testified yesterday?

10   A.    I was.

11   Q.    And he testified that the claims were written by

12   lawyers, right?

13   A.    I believe he said something to that effect.

14   Q.    And he wasn't sure if those lawyers were LTE experts,

15   right?

16   A.    I believe he said so.

17   Q.    And so it could be, right, that the claims don't

18   actually cover the LTE standard.

19   A.    Again, I was not asked to opine on whether the claims do

20   or do not cover the standard, only whether the claims are

21   infringed upon by the accused products.

22   Q.    Right.  So you haven't told our jury and haven't opined

23   in this case that the claims of the '820 patent cover the

24   words of the standard, true?

25   A.    Again, I have not compared the claims to the standard.

1   Neither was I was asked to.

2   Q.   Now, you understand that the arguments between the

3   parties, the disagreements between us, really relate to the

4   source code and what the source code does and whether the

5   source code that Qualcomm provides on the Qualcomm chip

6   practices every one of those claims -- I'm sorry -- every one

7   of those requirements of the claims that you've said are

8   infringed, right?

9   A.   Well, I wouldn't limit it to that.   I mean, the claims

10  cover a wide assortment of aspects, and source code comes

11  into play with some of them.

12  Q.   I'm asking you about the disagreements between the

13  parties.   You understand that where Apple disagrees with

14  CCE's accusation in this case are really down in what the

15  source code does and what it doesn't do, right?

16  A.   Well, again, I have not narrowed it down to that level,

17  but there are some differences, which are as to what the

18  source code does or does not do.   I'm not sure that that's

19  all the differences that we have.

20  Q.   Okay.   You agree at least with me, I hope, that Apple

21  thinks that the source code shows that it doesn't infringe

22  the '820 patent.   I know you're not going to agree that we're

23  right, but you agree that that's the position that we've

24  advanced and the reason we're here defending ourselves?

25  A.   That is correct.

1       Again, I remind you I'm not a source coding expert.

2  They had the source coding expert yesterday and plenty of

3  opportunities to question him on source code matters.

4  Q.   And the source code -- well, that's kind of like the

5  recipe for what the Qualcomm chip does, isn't it?

6  A.   Source code is the recipe for what the chip does, yes.

7  Q.   We're comparing recipes.  We're comparing the recipe in

8  the claims of the '820 patent to the recipe of the source

9  code of the Qualcomm chip, fair?

10  A.   Yeah, to some extent.  That's an oversimplification, but

11  I think that's somewhat correct, yes.

12  Q.   And the only way to know what the Qualcomm chip is

13  programmed to do is to look at that code, isn't it?

14  A.   Well, that is one way of looking at what the Qualcomm

15  chip does.  However, we didn't show that the -- show that the

16  code itself is identical to the flowchart and showed why it's

17  identical to the flowchart.

18      So whether I apply something to the code or the

19  flowchart, to me, that's equivalent.

20          MR. LUMISH:  Your Honor, it probably makes sense

21  and I'd ask the Court to seal the court at this point to

22  comply with the Qualcomm protective order issues.

23          THE COURT:  Okay.  We're going to seal the

24  courtroom at this time.  Please exit if you're not under the

25  protective order.

```
 1                    (Courtroom sealed.)

 2                    (This portion of the transcript is sealed and filed

 3                    under separate cover as Sealed Portion No. 6.)

 4                    (Courtroom unsealed.)

 5                    MR. LUMISH:   Okay.   Starting again, Your Honor.

 6    Q.   (By Mr. Lumish) So going back to your expertise in

 7    standards, you're not a member and you're not affiliated with

 8    the 3GPP, right?

 9    A.   That is correct.

10    Q.   You didn't participate in any way with the 3GPP?

11    A.   That is correct.

12    Q.   You're not a member or affiliated with ETSI, the

13    European Standards Institute, that is the one that publishes

14    the LTE standard, right?

15    A.   Correct.

16    Q.   You're not a member or in any way affiliated with any

17    cellular standards organization?

18    A.   That is correct.

19    Q.   Even in your technical work, you've never designed any

20    buffer status report triggers or selection criteria, have

21    you?

22    A.   Well, that is not correct actually.   Even though the

23    name "buffer status reports" is usually understood to be in

24    connection with 4G and, perhaps, with much lesser extent to

25    some 3G, the notion of handshaking between the sending end
```

```
 1   and the receiving end or the sending and the request
 2   resources to be provided for sending data, I've been
 3   affiliated with and designed systems that do that for many
 4   decades.  If it were a lined word -- world and also in the
 5   wireless world, it was not called BSR but it was functionally
 6   the same.
 7   Q.   So your testimony today is you have designed buffer
 8   status report triggers?
 9   A.   I believe I answered.  I have not designed what is --
10   you call BSR triggers, but I have designed things which are
11   functionally performing a comparable function.
12   Q.   Okay.  So my question is simple.  You've never designed
13   any buffer status report triggers; is that true or false?
14   A.   Well, if you would leave the term "buffer status
15   triggers" to what is done in 4G cellular, that is correct.
16   Q.   Okay.  And you haven't developed any buffer status
17   report triggers, right?
18   A.   Again, in the context of 4G cellular, it is correct.
19   Q.   When you say 4G cellular, that's LTE, right?
20   A.   That is LTE.
21   Q.   Okay.  And you haven't programmed any code to implement
22   buffer status report triggers, have you?
23   A.   No.  I do not program.
24   Q.   You didn't talk to Mr. Sebire in preparing your reports
25   about the LTE standard or buffer status report triggers or
```

1    selection criteria, right?

2    A.    No.   I have not talked to Mr. Sebire until I saw him a

3    couple of days ago here.

4    Q.    You never spoke with Mr. Sebire in learning about the

5    case and trying to prepare yourself to form the opinions that

6    you've testified about today?

7    A.    No.   I have not talked to Mr. Sebire before yesterday.

8    Q.    You never emailed or communicated with him either,

9    before your deposition at least, right?

10   A.    That is correct.

11   Q.    Let's turn to Qualcomm.

12         You understand that Qualcomm here provides the chips and

13   the functionality that's been accused of infringement?

14   A.    That is correct.

15   Q.    All of the functionality, in fact, that you testified

16   today and said infringes the '820 patent comes from or is

17   performed by what's called a baseband chip that Apple buys

18   from Qualcomm, right?

19   A.    That's correct.

20   Q.    But you didn't -- well, you don't know exactly what the

21   baseband chip for Qualcomm does or does not do in any depth,

22   do you?

23   A.    Well, it depends what you mean in any depth.   Not in

24   sufficient depth for the purposes of my opinions that were

25   formed and presented in my report and in my testimony.   And

```
 1    at that level of depth I know as to what it does, and that's

 2    further attested to not only by my own -- by my own review of

 3    Qualcomm chips but also by the testimony of Qualcomm and

 4    Apple employees.

 5    Q.    Well, you don't know if the Qualcomm baseband chip

 6    incorporates LTE downlink technology, do you?

 7    A.    No.   I only concentrate on the portions that pertain to

 8    the infringement of this case.

 9    Q.    I'm sorry.  Was that a no?  I didn't hear the beginning.

10    You -- let me ask it again because I'm not sure what the

11    testimony is.  I apologize.

12         You don't know if the Qualcomm baseband chip performs

13    LTE downlink technology.  Is that true or false?

14    A.    I was only concerned about the uplink portion of the

15    technology that the LT -- that the Qualcomm chip performs.

16    Q.    And you don't know if it's possible for the Qualcomm

17    chip to send buffer status reports in a non-infringing

18    manner, right?

19    A.    Well, like I said, I only concentrated on the portions

20    of the Qualcomm chip that appeared to be confirming

21    infringement.

22    Q.    I'm sorry, sir.  Again, I have to repeat myself again.

23    I would appreciate it if you'll answer my questions.  You'll

24    have a chance, you understand, to come back and testify on

25    redirect examination and -- and say whatever you think you
```

| | |
|---|---|
| 1 | would like to say.  Do you understand that? |
| 2 | A.    Yeah.   I'm trying to be helpful by giving you precise |
| 3 | answers as opposed to yeses or noes. |
| 4 | Q.    I appreciate that.  So, if you -- if you could answer |
| 5 | the questions I'm asking, I'd very much appreciate it. |
| 6 | You don't know if the Qualcomm -- withdraw, I'll start |
| 7 | again. |
| 8 | You don't know if it's possible for the Qualcomm chip to |
| 9 | send buffer status reports in a non-infringing way; isn't |
| 10 | that right? |
| 11 | A.    I don't know what the Qualcomm chip can do other than |
| 12 | what I discussed. |
| 13 | Q.    Right.  You have no way of knowing any capabilities of |
| 14 | the Qualcomm chip if they're not written down in your report, |
| 15 | right? |
| 16 | A.    That is correct. |
| 17 | Q.    You do know that the Qualcomm chip performs a lot of |
| 18 | other functions, though, right? |
| 19 | A.    That's my understanding. |
| 20 | Q.    But you don't know what else the Qualcomm chip is |
| 21 | capable of doing other than specifically LTE buffer status |
| 22 | report reporting, right? |
| 23 | A.    That is correct. |
| 24 | Q.    When we talked before, you couldn't name any other |
| 25 | functionality of the Qualcomm chip? |

1   A.   Yeah, I'm not surprised.   Yes.

2   Q.   You don't know if the chip provides GPS functionality,

3   for example?

4   A.   I don't know.   I would imagine it does, but I do not --

5   I have not looked into that.

6   Q.   And you don't know if the Qualcomm chip can provide 3G

7   cellular communications, right?

8   A.   Well, I don't know formally.   I know from using my own

9   cell phone, which has a Qualcomm chip, in a 3G environment

10   and it worked.   So from that I infer that the Qualcomm chip

11   does support 3G functionality as well.

12   Q.   And you'll agree with me that the 3G cellular

13   functionality doesn't infringe the claims of the '820 patent,

14   right?

15   A.   That's my understanding.

16   Q.   You didn't speak with any Qualcomm employees or

17   engineers about the Qualcomm chip that's accused of

18   infringing in this case, did you?

19   A.   No, I did not.

20   Q.   You didn't speak with any Qualcomm engineers in any way

21   related to the lawsuit; is that true, sir?

22   A.   That's also true.

23   Q.   Now, you talked about testing earlier.   And I'll put up

24   another slide, if I may.

25        This was a slide that you presented to the jury this

1   morning; is that right, sir?

2   A.   Yes, that is correct.

3   Q.   And to form your opinions of infringement in this case,

4   you relied on the testing that these results are reflecting;

5   is that right?

6   A.   Yes.  I relied partially on that, yes.

7   Q.   But you received this chart -- the one that's on the

8   screen, you got that from CCE's lawyer, right?  It was a

9   single sheet of paper provided to you?

10  A.   That is correct.  I don't remember CCE's lawyers or

11  whether it was provided through them.  I really don't

12  remember how I got, but it was either through CCE or from the

13  gentleman that did the tests.  I forget now which one.

14  Q.   And which gentleman who did the tests do you mean?

15  A.   I believe Mr. Claude Royer is his name.

16  Q.   Now, you'll agree with me the chart that you showed the

17  jury, on the right-hand side here -- maybe I can zoom in a

18  little better -- refers to long and short buffer status

19  report count, right?

20  A.   That is correct.

21  Q.   It doesn't mention truncated at all, does it?

22  A.   No, it does not.  My understanding is that truncated is

23  a variant of short BSRs.

24  Q.   I'll come back to that one in a moment.

25       You -- for this testing that you talked about, you

1   personally didn't conduct any tests to reach your conclusions

2   that the Qualcomm chip and Apple somehow infringed the '820

3   patent, did you?

4   A.   I did not conduct any tests personally.  That's correct.

5   Q.   All of the testing that you relied on, that was all done

6   by somebody else, right?

7   A.   That is correct.

8   Q.   And before you issued your reports in this case, you

9   spoke to those people who did the testing once or twice for

10  about half an hour, right?

11  A.   Approximately, yes.

12  Q.   You don't know who the testers were.  At least you

13  didn't when we met before after you submitted your reports in

14  this case, right?

15  A.   Well, I could not recall their names, if that's what you

16  mean.

17  Q.   You didn't know where they worked, right?

18  A.   I still don't.

19  Q.   You still don't.  Is that what you said?

20  A.   Not exactly where they work.

21  Q.   You didn't know what procedures or equipment these

22  testers used for the tests that created this chart that you

23  presented to the jury today, right?

24  A.   No, that's not true.  During the telephone conversation

25  that I had with them, I recall that they described to me

1   exactly what test equipment they used and what procedures

2   they used.  I did not feel that this was important in the

3   context of the chart here to spell out in the report.  I may

4   have done it, though.  I don't remember.

5   Q.   Can you turn in your deposition, please, to Page 400?

6   Beginning at Line 25 and going through 401, Page [sic] 10 is

7   what I'm going to refer to.  I'll ask my question again after

8   you've had a chance to read it, though, sir.

9   A.   Yes.

10  Q.   Do you agree with me now that when you and I met -- I

11  think it was in June -- or when you were deposed, I should

12  say.  I don't think this was me -- in June of this year you

13  didn't recall what the procedures or equipment were that were

14  used for the testing that led to the chart that you presented

15  to the jury today?

16  A.   Oh, yeah.  I've not memorized it by heart.  That's

17  correct.

18  Q.   You didn't know what model of networking equipment the

19  testers used for the testing, did you?

20  A.   No.  I did not retain that to memory, no.

21  Q.   You didn't know what applications were running on the

22  cell phones that were tested, did you?

23  A.   No.  Again, they told me what they were doing, and I did

24  not feel that that was something I should commit to memory.

25  Q.   So this is another slide that you presented this

1   morning.  Do I have that right, sir?

2   A.   Yes.

3   Q.   And this was a slide you put up to explain to the jury

4   that you thought the monitoring step of the claims was

5   practiced by the Qualcomm chip and software, right?

6   A.   That's correct.

7   Q.   This is the -- the monitoring, that's the first element

8   of the claims, isn't it?

9   A.   It is.

10  Q.   Now, I noticed that you didn't actually put the claim

11  language up; you put a figure up, right?

12  A.   In this case, that is correct.

13  Q.   And you know you can't say somebody infringes because

14  they do what's in a figure, right?

15  A.   Well, that is not the only claim.  That slide is titled

16  "Corrected Figure 4," and it's only meant to show corrected

17  Figure 4.  The analysis about infringement -- because later

18  on is where it shows a functional equivalent between the

19  flowchart and the source code.

20  Q.   So if you could answer my question, though, please.  You

21  know that you can't reach a conclusion that somebody

22  infringes because you believe they practice a figure, right?

23  A.   I believe so, yes.

24  Q.   They have to practice the claim.

25  A.   Yes.

1   Q.   Okay.  And, in fact, for the monitoring step, you have

2   no idea about how the Qualcomm chip allegedly monitors

3   buffers, do you?

4   A.   No, that is not true, actually.  I showed the actual

5   portion of the Qualcomm chip software both in the prep build

6   BSR and the build BSR where this monitoring step is

7   performed.

8   Q.   So if you would turn to your deposition, please, and

9   starting at Page 819, and let me know when you have that,

10  please.

11      Do you have 819 in front of you?

12  A.   Yes, I do.

13  Q.   I'd like to read from Lines 3 through 16.

14  A.   Yes.

15  Q.   I asked you the question:  When you talk about the

16  devices monitor the uplink data buffers, they're monitoring

17  individual buffers, not LCGs or radio bearer groups, right?

18      You answered:  They monitor individual buffers, that is

19  correct.

20      And I asked you:  And how?  Tell me precisely how

21  they're monitoring those individual buffers.

22      And you answered:  They just check to see if they have

23  transitioned from non-zero data to -- I'm sorry -- from zero

24  data to non-zero data, for example.

25      And I asked you:  How?  How are they detecting that?

1        You answered:  You're asking about the innards of the

2   chip.  I have no idea.

3        Right?

4   A.   Yes.  And I continue on to say, I'm not a chip

5   manufacturer.  Yes, that's correct.

6   Q.   You don't know the specific details about how the

7   Qualcomm chip monitors the buffers, according to your

8   opinion, right?

9   A.   Well, in terms of the innards of the hardware, the

10  electronics, the transistors, the resistors, or whatever

11  else, that is correct.

12  Q.   So, my question is:  You don't know the specific details

13  of how the Qualcomm chips monitor those buffers, do you?

14  A.   No, that's not correct.  I know how the software code

15  performs that function.  But you asked me exactly how they do

16  it; and that, to me, implied hardware.

17       So I don't know -- don't have a microphotograph of the

18  hardware to see just exactly what transistors and resistors

19  and whatnot they used to do that.

20  Q.   Let's look at your deposition again, please, on Page

21  822.

22       Do you have that page in front of you?

23  A.   I do.

24  Q.   So beginning at Line 5, I asked you:  You're telling me

25  they do that.

1      Do you understand that here we're talking about the

2   monitoring buffers?

3   A.    Right.

4   Q.    And I said:  You're telling me they do that.  I'm asking

5   you, how they do that.

6      And your answer was:  I don't know the specific details

7   of how they do it.  The patent here does not say doing it

8   this way or that way, just doing it any way.  As long as you

9   monitor the use of a buffer, and the Qualcomm chips do that,

10  then it is infringing the element of the claim no matter how

11  they do it.

12     That was your testimony, wasn't it, sir, under oath?

13  A.    It is.  Again, I think we have it -- what you're

14  pointing out here is a communications gap.  When you say how,

15  I interpret that to mean how in terms of transistors,

16  resistors, hardware, because you're talking about a chip.

17     I do know how they do it in terms of the software, but

18  in terms of the hardware, again, I have no idea.

19          MR. LUMISH:  May I please have Slide 59 from

20  Dr. Caloyannides' presentation?

21          Our numbering is not matching up.  Looks like this

22  is actually 58 in what was presented.

23  Q.    (By Mr. Lumish) Do you recognize this slide as one you

24  showed to the jury, sir?

25  A.    I do.

1   Q.   And you showed this as part of your evidence for

2   monitoring, didn't you?

3   A.   That was part of the evidence, indeed.

4   Q.   Now, the monitoring of the claims of the '820 patent,

5   that's supposed to be done to -- as part of the process for

6   designating long or short buffer status reports, isn't it?

7   A.   Well, the standards I pointed out in my testimony is

8   done in two places; but it's, indeed, part of the process of

9   determining whether you designate a short or a long BSR, yes.

10  Q.   I'm not sure we're connecting.  I'm asking you about the

11  claims now.  So about what the patent requires in the recipe

12  in those claims.

13       The claims require the monitoring to be part of that

14  process for designating long and short form buffer status

15  reports, or do you disagree with that?

16  A.   I agree with that.

17  Q.   Okay.  But yet the chart that you showed here on

18  Slide 58, this actually all occurs after the designation has

19  already happened; isn't that right?

20  A.   No, no, no, no, no.  You know, the uplink task in the

21  case of the padding BSR is distinct from the regular and

22  periodic BSR.  The monitoring is happening when one counts

23  the number of zero LCGs.  Unfortunately, they don't count

24  something unless you want to do it first.

25       So you peek in the buffers to see is there data, buffer

```
 1   groups in this case; and if there is, then you count them.

 2   That's where the monitoring in this case is done.

 3   Q.   It's hard to see it, but you have two diamonds that you

 4   didn't color in.  You colored in the things around them.  One

 5   says:  BSR size equals long.  The other says:  BSR size

 6   equals short, question mark.

 7        You understand that those diamonds are actually checking

 8   whether the BSRs, the buffer status reports, have already

 9   been designated as long or short?

10   A.   You're asking a different question.  You asked me before

11   the question, where is the monitoring done, and I pointed to

12   the standard in maroon-colored rectangle.

13        Now you asked a different question.  What is the

14   different question?

15   Q.   Can you answer my question, please?

16        The diamonds --

17             MR. LUMISH:  Can you bring this back up in larger

18   form, please?

19             Thank you.

20   Q.   (By Mr. Lumish) It says:  BSR size equals long, question

21   mark, right?

22   A.   Yes.

23   Q.   And the other says:  BSR size equals short, question

24   mark, right?

25   A.   Yes.
```

1    Q.    These diamonds aren't designating short or long; they're

2    checking whether the buffer status report has previously been

3    designated as long or short, aren't they?

4    A.    I can't see the figure.   It's obscured by what you just

5    magnified here.

6    Q.    Sure.   I had to make it bigger.   It's hard to see, at

7    least for me.   What part would you like --

8    A.    No, no.   That's fine.

9        As I pointed out in my testimony, what's happened is,

10   before we get to the -- in the case of the patent, BSR, the

11   first one looks at the available space; and if there's enough

12   space to accommodate a long BSR, then a long BSR is

13   generated.   And that is what is shown in the first rectangle

14   here.

15       If the space is not enough for a long BSR, then we go

16   through this ratio of trying to see what kind of a short BSR

17   do we send.

18   Q.    Okay.   So do you disagree, then, that the maroon

19   monitoring step that you highlighted comes after there's

20   already been a designation of the buffer status report as

21   long or short?

22   A.    Well, I'll agree that in the case of the padding BSR,

23   the number of LCGs and the designation of short -- truncated

24   short is done after the long BSR option has been eliminated

25   from consideration, yes.

1   Q.   Okay.  You're talking about padding BSRs.  You wrote

2   that on your slide, didn't you?

3   A.   I am.

4   Q.   And I'm asking you about the maroon box at the top that

5   you say performs the monitoring step of the claims.

6   A.   Yes.

7   Q.   Are you with me there?

8   A.   Yes.

9   Q.   You agree with me, don't you, that that monitoring step

10  comes after the check has been done to determine whether the

11  buffer status report should be long or short?

12  A.   Well, that would appear from the chart.  However, as I

13  indicated, the determination for long BSR is done even before

14  all of that if there is sufficient uplink bandwidth for a

15  long BSR.  One does not even get into this flowchart here if

16  there's enough room for a long BSR.

17  Q.   Let's go to another one of your slides here, please.

18       This was -- at least according to the numbered copy I

19  have -- Slide 52.

20       It says:  Apple source code regular/periodic BSR.

21  A.   Yes.

22  Q.   And you -- you show -- and this is your effort to show

23  multiple pre-selected conditions.  Do I have that right?

24  A.   Well, that's showing the uplink task in the build BSR

25  and the designation function, yes.

1  Q.    And you break out truncated BSRs and short BSRs.  Do you

2  see that?

3  A.    I do.

4  Q.    Are you trying to suggest to the jury that those are

5  different buffer status report formats?

6  A.    No.  The difference is what is shown in the title.  And

7  this one is for regular and periodic BSR.  And the other one

8  is what happens in the case of a padding BSR, which is a

9  different logic.

10  Q.    Okay.  So you'll agree with me, then, I hope, that short

11  and truncated BSRs, that -- that's the same format.  It's

12  just a name for what the contents and header are, not the

13  format, right?

14  A.    The formats for short and truncated short are, indeed,

15  the same.

16  Q.    They're the same.  You can lump them together, can't

17  you?

18  A.    Well, it depends what you mean by "lumping" them

19  together.  But you can lump them as far as the shortness of

20  their BSRs, yes.

21  Q.    The formats between what you call truncated and short

22  are indistinguishable, aren't they?

23  A.    They are indistinguishable, yes, the formats, not the

24  contents.

25  Q.    Now, to decide whether to send a long format buffer

1    status report -- I'm on padding buffer status reports,

2    though, you understand that, sir?

3    A.    Okay.  But you're showing me now the chart for

4    regular/periodic.

5    Q.    You're right.  So I'll take the chart down so there's no

6    confusion.

7        Let me ask you about padding BSRs again.  To decide

8    whether to send a long format padding buffer status report or

9    a short format, the only thing the source code checks is

10   whether there is sufficient space, right?

11   A.    That is correct.

12   Q.    It doesn't say how many buffers have data.  Does it look

13   for that in order to designate short or long?

14   A.    No.  But then once it -- I'm sorry.  It has to figure

15   out what kind of a short and that's where that code gets into

16   the picture.

17   Q.    Right.  What kind of a short, meaning do I use a

18   truncated short or a non-truncated short?

19   A.    Exactly.

20   Q.    But the same format, right?  It's not changing format

21   with that question.

22   A.    Well, it's the same format as far as outside appearance

23   is concerned.  As far as the contents, they're different.

24   Q.    Of course.  But the format is indistinguishable?

25   A.    To an outside observer, yes.

1          MR. LUMISH:  Can we have Claim 1, please, from the

2    patent, Plaintiff's Exhibit 1?

3    Q.    (By Mr. Lumish) I want to ask you about pre-selected

4    conditions, if I can, sir.

5          So there's a few requirements in this claim as they

6    relate to pre-selected conditions.  Do you agree with me

7    there?

8    A.    I'm sorry.  I missed a word.  Is a what requirement?

9    Q.    I'll walk you through them.  Why don't we start -- if

10   you see the second limitation, it says:  Detecting one of a

11   plurality of pre-selected conditions.

12   A.    I see that.

13   Q.    One of the things that you have to show to find

14   infringement by the Qualcomm chip is that there is a

15   plurality of pre-selected conditions, right?

16   A.    That is correct.

17   Q.    And plurality means two or more, right?

18   A.    Well, it means more than one.

19   Q.    More than one.

20   A.    That can be 17.

21   Q.    And these pre-selected conditions, they're used, you can

22   see, in the next limitation to designate a buffer status

23   reporting format, right?

24   A.    That is correct.

25          MR. LUMISH:  If you can highlight "designating" for

 1   me, please, the word "designating" and then "buffer status

 2   reporting format" down -- actually -- that works.

 3           Thank you.

 4   Q.   (By Mr. Lumish) And these pre-selected conditions, they

 5   have to correspond to the plurality of buffers.  Do you see

 6   that in the requirement above, the detecting limitation?

 7   A.   That is correct.

 8   Q.   So there's three requirements.  Can we agree on that?

 9   There's got to be two or more pre-selected conditions.  They

10   have to be used to designate long or short formats.  And they

11   have to correspond to the buffers?

12   A.   They have to correspond to the number of buffers with

13   non-zero data in them.  That's correct.

14   Q.   They have to correspond to the plurality of buffers is

15   what the claim says.

16   A.   Well, they have to correspond to the conditions that

17   correspond to the plurality of the buffers.  Yes.

18   Q.   I'm asking you about the claim language.

19           MR. LUMISH:  So, Chris, if you could highlight,

20   please -- or maybe pull down the highlighting and just help

21   me with corresponding to the plurality of buffers in the

22   detecting requirement.

23           Thank you.

24   Q.   (By Mr. Lumish) So, I'm asking you about this language,

25   Dr. Caloyannides.  The pre-selected conditions have to

1  correspond to the buffers, don't they?

2  A.    That is correct.

3  Q.    You talked on direct -- I'll try to do this in a way

4  where we don't need to seal the courtroom.  But you talked in

5  your direct examination about some source code that checks to

6  see whether there are zero buffers that have data.  Do you

7  remember that?

8  A.    I do.

9  Q.    But that zero check to see if there is none, that's just

10  to decide whether you send any buffer status report of any

11  kind, isn't it?

12  A.    You cannot disassociate the check to see if there is

13  zero, one, or two.  It's a single check.  It consists of a

14  number of "if" statements.  Is it more than zero, is it more

15  than one.  So it's all part of the same package.

16  Q.    Were you here when Dr. Jones -- or Mr. Jones testified

17  yesterday?

18  A.    I was.

19  Q.    Did you hear him testify that if there are no buffers

20  with data, you skip everything after that and you go to the

21  end in the source code?

22  A.    I believe he said so, yes.

23  Q.    Right.  And that's -- that shows you, doesn't it, that

24  if there are no buffers with data, you don't choose long or

25  short.  You don't send a buffer status report at all.

```
 1   A.   Well, of course.  If there's nothing to send, you don't
 2   send anything.  Yes.
 3   Q.   If there are zero buffers with data, you don't send a
 4   buffer status report because there's nothing to send, right?
 5   It's pretty straightforward.
 6   A.   Most of the time, yes.
 7             MR. LUMISH:  May I please have, from the '820
 8   patent specification, Column 60 -- Column 7, Line 60.  Sorry.
 9             And then if you could just bring it to the end of
10   that column, please.
11             Thank you.
12   Q.   (By Mr. Lumish) You've read this part of the '820 patent
13   before, haven't you, Doctor?
14   A.   I did.  Let me refresh my memory, if I may.
15   Q.   While you're doing that, I want to ask you about the
16   second sentence that says "in some embodiments" -- really,
17   all of that sentence.
18   A.   Okay.
19   Q.   Have you read this part of the patent before?
20   A.   Yes, I have.
21   Q.   And this is describing a pre-selected condition, right?
22   A.   It is describing the detection of the pre-selected
23   condition as to what it may look, yes.
24   Q.   And it's "pre-selected condition" in the singular.  This
25   is one of the plurality.  This would be one example of the
```

1    more than one that you would need to find in the -- to find

2    practicing of the claims, right?

3    A.    No.  Even though -- again, I'm not a semanticist or a

4    linguist, but it says the condition may include detecting one

5    or more communication buffers.  These are two conditions.

6    One is one condition.  More communication buffers is another

7    condition.

8    Q.    Well, the patent says "condition" in the singular.

9    You'll at least agree with me there, won't you?

10   A.    It says -- yes, I pointed out I'm not a linguist or a

11   semanticist, but it is clear they're talking about two

12   conditions.  And, in fact, the entire patent makes a big

13   tadoo about the fact we're -- we're doing one -- one thing if

14   there's one buffer of data or different thing if there's more

15   than one buffers of data.

16   Q.    Can you answer my question, please?  The language of the

17   patent -- I understand how you would like to interpret it.

18   But the language of the patent, the words that it uses, says

19   "pre-selected condition" in the singular.  There is no "S" on

20   the end of "condition" is there?

21   A.    In this case there is no "S."

22   Q.    You would put an "S" on the end, though.  You think it

23   should mean "conditions," plural.  Is that what I just heard

24   you testify to?

25   A.    Well, it's evident from the fact it's talking about two

conditions.  It says one or more communication buffers.

That's two conditions.

Q.    Okay.  Now --

            MR. LUMISH:  We can take that down.

            Thank you.

Q.    (By Mr. Lumish) I'm sorry, Doctor.

A.    That's fine.

Q.    Let me -- let me talk to you about the specification,

again, if I might, sir.

      You agree with me the LTE specification is really big,

right?  If you were to try to print it, it would go up to the

ceiling.

A.    It is voluminous, yes.

Q.    You -- you have no reason to disagree that it's maybe as

many as 20,000 pages or more, do you?

A.    I would not be surprised, no.

Q.    This was a slide you showed the jury, wasn't it?

A.    Yes, it was.

Q.    And this is part of the LTE specification, isn't it?

A.    Yes, it is.

Q.    Section 5.4.5, the one I mentioned earlier in our

discussion this morning?

A.    Well, it's the 3GPP spec for the 36.321, yes.

Q.    You can see in the upper left corner, though, Section

5.4.5?

1    A.    Yes.

2    Q.    This is the part of the standard you were telling our

3    jury that sets forth the selection of long and short that CCE

4    claims is covered by their patent, right?

5    A.    I believe so, yes.

6    Q.    It's the sum total of it, isn't it?

7    A.    Well, that's part of it.

8    Q.    Is it --

9    A.    I mean, that's the part of the spec.  I have not

10   committed to memory the entire 36.321, which, as you pointed

11   out, goes for hundreds of thousands of pages; but this one

12   seems to refer to regular/periodic and padded BSRs, yes.

13   Q.    My point is that the hundreds of thousands of pages, as

14   you just said, this is the sum total of the part that matters

15   for this case; isn't that right?

16   A.    Oh, my God.  I cannot recall from memory whether there's

17   any reference of the same subject in some of the other

18   hundreds of thousands of pages.

19   Q.    You agree that the LTE standard has vast numbers of

20   technical specifications in it?

21   A.    The LTE standard does have, indeed, a vast number of

22   technical specifications in it, that's correct.

23   Q.    And when you and I spoke before, you compared the LTE

24   system to a space shuttle, didn't you?

25   A.    Well, but in a different context.  I was trying to show

1    that LTE, as I said, is not a doorknob.  It's a complex

2    conglomeration of a bunch of different disciplines and things

3    like that.  Because of that, one has expertise in those

4    various different disciplines to address it competently.

5    Q.   And compared to that, buffer status reporting, and in

6    particular, what we see on the screen here in the small

7    section that relates to selecting long or short, you would

8    refer to that as a very small slice of the overall pie,

9    wouldn't you?

10   A.   Well, I mean, the importance of things does not

11   correspond to their physical size.  This talks about

12   regular/periodic BSRs and padded BSRs.  Is that thing

13   mentioned in the other hundreds of thousands of pages?  May

14   well be.  I have no idea.

15   Q.   Can you answer my question, please?

16   A.   Well, as I pointed out, this is a small -- what you're

17   showing me is a small piece.  Now to tell you it is the only

18   piece?  I don't know.

19   Q.   It's a very small slice of the overall pie in your

20   words, isn't it?

21   A.   This page is a small pie -- a small piece of the overall

22   pie.  If there are other pages like it, I don't know.

23   Q.   You own iPhones, don't you?  You're an Apple customer?

24   A.   That is correct.

25   Q.   We appreciate that.

1   A.    Thank you.

2   Q.    I will thank you on behalf of my client.

3         You started buying iPhones within the last seven or

4   eight years, right?

5   A.    Approximately, yes.

6   Q.    And you'll agree with me that customers do not care and

7   do not know about choosing long and short form buffer status

8   reports, right?

9   A.    Well, they don't care in terms of the terms you put it,

10  but they do care about the performance, which is very much

11  affected by the buffer status reports without the end

12  customers knowing about it.

13  Q.    So you say that, but, in fact, you haven't done any

14  tests, and you haven't done any measurements to show that the

15  selection between long and short would have any major impact

16  on the efficiency of an LTE network; isn't that right?

17  A.    Well, I have not done any tests myself.  However, based

18  on my 50-plus years of experience in the field, I can, I

19  think, competently defend the proposition that using short

20  and long buffer status reports as opposed to

21  one-size-fits-all, does result in an improvement in the usage

22  of the spectrum, and hence, improvement in the performance of

23  the phones that use that.

24        MR. LUMISH:  Your Honor, I object and move to

25  strike as nonresponsive.

```
 1              THE COURT:  I'll sustain the objection.
 2   Q.   (By Mr. Lumish) Can you answer my question, please,
 3   Dr. Caloyannides?
 4        You yourself have not done any tests or taken any
 5   measurements to prove that using the selection between long
 6   and short form buffer status reports instead of, for example,
 7   just using long all of the time would have any major impact
 8   on the efficiency of an LTE network?
 9   A.   I have not personally done any tests, if that's what
10   you're asking.
11   Q.   Or taken any measurements?
12   A.   Or I have not personally taken any measurements, yes.
13   Q.   In fact, you wouldn't know how to measure how much more
14   efficient or cost effective any network or phone is or would
15   be because of the ability to choose long versus short buffer
16   status reporting, according to the LTE standard?
17   A.   No, that's not right at all.
18   Q.   Can you turn to Page 752 in your deposition, please,
19   sir?
20        Do you have that in front of you?
21   A.   I do.
22   Q.   I'd like to read from Lines 12 through 20, which I think
23   go directly to what I just asked you.
24   A.   Give me just a minute.
25   Q.   Please.
```

1   A.   Yes.

2   Q.   In your deposition in June, I asked you, quote:

3        Question:  And you don't quantify in Paragraph 59 in any

4   way how much more efficient or cost effective any network or

5   phone is because of the long versus short BSR triggers

6   claimed in the '820 patent, do you?

7        There was an objection.

8        And you answered:  If by quantify, you -- if you mean --

9   I don't know how you measure the performance.

10       That was your testimony, wasn't it, sir?

11  A.   Yes, it was.  And it's the short version of what would

12  have been a much longer explanatory answer, yes.

13  Q.   Well, I'll show it to you on the screen, sir.

14  That's the -- I didn't drop anything from the question,

15  right?

16  A.   No.  I said I condensed my answer to a short answer for

17  you.

18  Q.   Okay.  But you agree I read the question and the answer

19  exactly as I asked it and exactly as you answered it?

20  A.   That is what I said.  If you let me explain, I will be

21  happy to.

22  Q.   Well, I think I'll let you use CCE's lawyer's time for

23  that, if you don't mind.

24       Will you agree with me, sir, that the industry never

25  reacted to the '820 patent and said:  Wow, this is a really

1  great and important invention?

2  A.   Oh, that, I don't know.

3  Q.   Will you agree with me that no awards were given to

4  Mr. Sebire or to Nokia for the achievements purportedly

5  provided by the '820 patent?

6  A.   Again, I am not privy to any of that information.

7  Q.   You agree with me that nobody's said in the industry or

8  otherwise that -- well, maybe outside of this lawsuit and

9  CCE -- that the claims or the inventions claimed in the '820

10  patent are important, revolutionary, ground-breaking, words

11  like that?

12  A.   Again, I am not privy to any of that information.

13  Q.   Will you agree with me that no one has ever said that

14  the reason LTE has been a successful network is because of

15  the things Mr. Sebire said to the jury this week that he

16  claimed as an invention in the '820 patent?

17  A.   Again, I do not know that information.

18  Q.   And will you agree with me that nobody has ever said

19  that the reason LTE has been successful is because of the

20  triggers or selection criteria for choosing between long and

21  short buffer status reports?

22  A.   Same answer.

23         MR. LUMISH:  Your Honor, I'll pass the witness.

24         THE COURT:  All right.  Redirect?

25         MR. NELSON:  Just briefly, Your Honor.

1                         REDIRECT EXAMINATION

2    BY MR. NELSON:

3    Q.    Dr. Caloyannides, do you understand the '820 patent?

4    A.    Yes, I do.

5    Q.    Is it within your area of expertise?

6    A.    Oh, yeah, definitely.

7    Q.    Did you determine that before accepting the job?

8    A.    I did.

9    Q.    Who reviewed the code in this matter?

10   A.    Mr. Jones.

11   Q.    Did you hear Mr. Jones testify about the code yesterday?

12   A.    I did.

13   Q.    Does that also inform your opinions about infringement

14   today?

15   A.    Very much so.

16   Q.    Did you see anything yesterday during Mr. Jones'

17   testimony to make you question his conclusions?

18   A.    No.

19              MR. NELSON:  No further questions, Your Honor.

20              THE COURT:  All right.

21              MR. LUMISH:  Nothing further, Your Honor.

22              THE COURT:  Okay.  Dr. Caloyannides, you may step

23   down.

24              THE WITNESS:  Thank you.

25              THE COURT:  Who will be your next witness?

1          MR. CURRY:  Your Honor, Plaintiff's next witness is

2    Mr. Green, Mr. Phil Green.

3          THE COURT:  Mr. Curry, we'll go until about noon.

4          So, as we get closer, if you find a good stopping

5    point, just let me know.

6          Mr. Green, if you'll come forward and raise your

7    right hand to be sworn.

8          (Witness sworn.)

9          MR. HILL:  Your Honor, can we get the binders?

10          PHILIP GREEN, PLAINTIFF'S WITNESS, SWORN

11                    DIRECT EXAMINATION

12   BY MR. CURRY:

13   Q.   Good morning.

14   A.   Good morning.

15   Q.   Please introduce yourself to the jury.

16   A.   My name is Philip Green.  I am 54 years old.  I live in

17   Boston, Massachusetts; but I grew up in New Jersey.  I have

18   two kids, a son 24 and a daughter who's 20.

19   Q.   Mr. Green, did you prepare some slides to assist you

20   with your testimony today?

21   A.   Yes, I did.

22   Q.   All right.  Let's take a look at one of your slides.

23          Where do you currently work?

24   A.   I currently work for a firm called Hoffman Alvary &

25   Company, which is located in Newton, Massachusetts, which is

1  a suburb of Boston.

2  Q.   And what does Hoffman Alvary do?

3  A.   Hoffman Alvary is a consulting firm, but I specialize in

4  helping my clients and their counsel in understanding the

5  financial, accounting, valuation, and licensing-related

6  issues that have to do with intangibles such as intellectual

7  properties, patents, copyrights, trademarks, those sorts of

8  things.

9  Q.   How long have you been at Hoffman Alvary?

10  A.   I'm one of the founders of the firm.  And I've been

11  there for the last 20 years.

12  Q.   And what are you here to testify about today?

13  A.   I'm here to testify about the damages that would be due

14  CCE in the event that the jury determines that the '820

15  patent is valid and infringed.

16  Q.   Is this your first time serving as a damages expert in a

17  patent infringement case?

18  A.   No, sir, it's not.

19  Q.   About how many times have you done this?

20  A.   I've testified at trial on patent damages at least 20

21  times.  And I've written literally hundreds of other reports

22  on patent infringement damages throughout my career.

23  Q.   How did you get into valuing intellectual property?

24  A.   Well, the way I got into it, actually, sort of is at the

25  beginning of my resume in 1987 when I started working at

1    Ernst & Whinney.  Ernst & Whinney was a big accounting firm,

2    and a lot of their clients at the time were clothing

3    manufacturers, so people who were making shirts and jeans and

4    whatever.

5        And we all know that when we buy a piece of clothing

6    often enough, it has a label on it and, you know, a alligator

7    or something like that.  And it turns out that when you have

8    those labels, the clothing manufacturer actually has to pay a

9    royalty or something to somebody who owns that right.  And so

10   that was part of my auditing.

11       And over the course of the last course of my career,

12   I've since then always been involved in things that have to

13   do with understanding payments for the use of intellectual

14   properties, their value, licensing them and so forth.

15   Q.   Let's back up a little bit.

16       What sort of education did you receive that led you into

17   this field?

18   A.   Well, I graduated from college with a degree in history.

19   I got that degree from Rutgers College -- or Rutgers

20   University.  I then went on to get an MBA in accounting from

21   Rutgers Col -- from Rutgers University from the graduate

22   school of management.

23   Q.   Why did you choose to go to Rutgers?

24   A.   Well, I was actually very lucky.  My father was a

25   professor there so I could go for free.  And if you can get a

1    free education, you take it.

2    Q.    Do you hold any professional certifications?

3    A.    I do.   I'm a licensed certified public accountant.   I

4    have a license from the State of New York.

5         I'm also a certified management accountant, which means

6    I've taken a sequence of tests and some studies that have to

7    do with how companies report financial information

8    internally, so what the management looks at.

9         I also have two designations that relate to business and

10   intangible valuation.   One from the AICPA.   And the other

11   from a group called the American Society of Appraisers, which

12   is the ASA designation.

13   Q.    What exactly is the ASA designation you just mentioned?

14   A.    Well, the ASA designation is basically a designation

15   that connotes a specialty, at least in my case, in doing

16   business valuation.   And it takes 10,000 hours of work that

17   you have to demonstrate to the American Society of Appraisers

18   that you've done in business valuation.   And 10,000 hours

19   amounts to about five years of professional career.   And then

20   you also have to submit to them -- at least when I did it --

21   two reports that they then peer review.

22   Q.    What are some of the companies you've worked for either

23   as valuing intellectual property just generally or acting as

24   a damages expert?

25   A.    Well, over the course of my career, it's been a wide

1    variety of companies and entities.  Some are consumer

2    products companies like Johnson & Johnson.  That does

3    Band-Aids and stuff -- I've worked on some of their products

4    over the years.

5         Keurig which makes those little cups that we say that

6    make coffee.

7         New Balance makes sneakers.

8         I've worked for a company over the years called Cooper

9    Cameron.  Cooper Cameron makes things like undersea Christmas

10   trees that are used in making -- in drilling for oil.  I've

11   worked on behalf of semiconductor manufacturers like Micron

12   and Motorola.  And I've also worked for Harvard University

13   out of Boston.

14   Q.   Harvard kind of seems odd-man out.  What are they doing

15   up there?

16   A.   So Harvard actually asked me to help them with licensing

17   some of the technology that had been developed by one of

18   their professors.  The technology, actually, was a way to

19   make a semiconductor chip really cleanly and had very, very

20   small wires in it.  And so they asked us to help out with

21   that.

22   Q.   Now, have you actually negotiated a patent license

23   before?

24   A.   Yes, sir, I have.

25   Q.   Can you describe the patent license negotiation process?

1   A.   Sure.

2        The patent license negotiation process sort of starts

3   off with the caution that all negotiations are different.  I

4   mean, when it comes down to it patent license negotiations

5   are typically over different patents.  And because a patent

6   is a unique thing when you get it out of the Patent Office,

7   it -- it generally is going to very much drive -- drive,

8   excuse me, what a license negotiation will do.

9        The parties are very important.  The product in and of

10  itself is very important.  And then ultimately in the end, a

11  patent license negotiation often results in a payment or some

12  other kinds of terms.

13  Q.   I see there at the bottom you have royalty in

14  parentheses.  What's a royalty?

15  A.   A royalty is the payment that somebody gets to actually

16  use intellectual property.  It's like rent.

17  Q.   Well then, what's the difference between a license and a

18  royalty?

19  A.   So license is an agreement that comes from a license

20  negotiation.  It's the terms of what people agree to.  If I

21  have a patent and others want to use it -- use it, I wind up

22  giving them a license, just like we have driver's licenses

23  that let us drive around on the streets.  If we don't have a

24  license, we shouldn't be driving.

25       Same thing here.  A patent gives the holder a particular

1    right.  And when you have a patent license, you can use that

2    right.  That's what usually happens.  A royalty is typically

3    the payment for the use of that right.

4    Q.   Now, in this case you have been retained by the

5    Plaintiff CCE, right?

6    A.   Yes, sir.

7    Q.   Have you ever been retained on behalf of a defendant?

8    A.   Yes.

9    Q.   And about how often are you retained by plaintiffs

10   versus defendants?

11   A.   It's about 50/50 usually in -- in the way that my

12   practice works.

13   Q.   And are you being compensated?

14   A.   Yes.  My firm Hoffman Alvary & Company is.

15   Q.   At what rate?

16   A.   My rate is $550 an hour.

17   Q.   How many hours have you put into this case?

18   A.   Well, I probably have now, between preparing for the

19   trial and doing all of the work, close to 300 hours.

20   Q.   And is your compensation dependent in any way on the

21   outcome of this case?

22   A.   No, sir.

23   Q.   Mr. Green, what were you asked to do when you were

24   retained?

25   A.   I was asked to take a look at the documents, get an

1    understanding of the patented technology, do some of my own

2    research, and determine what a reasonable royalty would be

3    assuming that the '820 patent is found by you folks to be

4    valid and infringed.

5    Q.    And can you give the jury a preview of what your

6    conclusion is in this case?

7    A.    Sure.

8        I believe it was mentioned in the openings but my

9    conclusion is that a reasonable royalty for the use of the

10   '820 patent would be 15 cents per accused device.   And

11   through March of 2016, that would result in total damages due

12   to CCE of $27,647,770.

13   Q.    And what evidence did you consider when evaluating

14   damages owed to CCE?

15   A.    I considered a whole variety of evidence.   I first off

16   looked at the patent, but I'm not a technical expert, so I

17   needed to -- but I needed to get an understanding of it from

18   my point of view of how licensing would normally work.

19       And then I also looked at documents that were part of

20   this case.   There have been depositions.   There have been

21   discovery.   In other words, the documents that the parties

22   provided to one another.

23       I did some of my own research.   I looked at financial

24   information.   I looked at patent licenses of all sorts.

25   Q.    All right.   Can you give us an overview of the topics

1   that you're going to be discussing today?

2   A.   Yes, sir.  So I prepared this roadmap because there's a

3   whole bunch of different pieces that go into talking about

4   damages in a patent infringement case.

5        The first thing I'm going to do is talk a little bit

6   about the patented technology and the background.  Not to

7   retread what Mr. Sebire, Dr. Caloyannides, or Mr. Jones has

8   done, but to put it in the context of what I would need to

9   do, the kind of analysis that I've done.

10       We're then going to talk a little bit about the rules

11  that are associated with actually determining a royalty in

12  this kind of a case.  There's a lot of rules.

13       We're going to talk about the licenses, like I said, for

14  the '820 patent.  Those are very important.

15       Some additional points that are important in

16  understanding the damages.

17       And then we're going to talk about the conclusion, how I

18  got there, and what the calculation of the damages is.

19  Q.   About how long do you think it will take us to work

20  through all of this material?

21  A.   I think it's going to take about an hour.

22  Q.   So you mentioned the background of this case and

23  technology.  For that, where did you start?

24  A.   Well, I did what I normally do, which is I took a look

25  at the patent.  Now, like I said, I'm not a technical expert

1    so I had conversations with Dr. Caloyannides, Mr. Jones, and

2    got an understanding basically of what the patent does and

3    what part of the business world it really fits into.

4        And what you can see from this slide is, basically, I've

5    got an understanding, I think, what everybody else has, is

6    that the patent relates to improving buffer status reporting.

7        And as a practical matter, what it does in the handset,

8    I think both Mr. Jones and Dr. Caloyannides have said, is

9    that it improves the performance in the uplink.  In other

10   words, it makes the overall wireless system run a little more

11   efficiently.

12   Q.   Why does improved uplink performance matter?

13   A.   Well, it matters just in a very general sense to the

14   wireless carriers, as well as to us because what we really

15   want to be able to do is have our data go into and out of the

16   phone relatively quickly.

17   Q.   And this document you've shown to the jury is PX-156,

18   right?

19   A.   That's right.

20   Q.   Who created this document?

21   A.   This document comes from a company called Ericsson.

22   Ericsson makes base station equipment or infrastructure

23   equipment that is used in a wireless network.

24   Q.   And who is the intended audience of a document like

25   this?

1  A.   This -- the intended audience, really, are the wireless

2  carriers themselves, so AT&T and Sprint.   And what they're

3  really trying to show here is that, at least from their

4  study, Ericsson's study, what's important to -- to -- to

5  consumers is having fast uploads and fast downloads, which is

6  really what's on this chart.

7  Q.   Okay.   But does this document say anything about buffer

8  status reporting?

9  A.   No, sir, it doesn't.

10  Q.   And are you telling this jury that the '820 patent is

11  the only thing that improves up -- uplink capacity or

12  performance in LTE?

13  A.   No, sir.   There's lots of things that help to improve

14  performance, but this is -- in an LTE network.   But this is

15  just to point out that this is part of what this technology

16  does.   So I know that it's not something else that has to do

17  with another part of the operation of a network or a phone.

18       This is just solely to discuss that we need to narrow in

19  on what exactly the technology does in order to be able to

20  understand what damages would be.

21  Q.   All right.   You're showing us a document from Ericsson

22  to the carriers.   How does Apple fit in?

23  A.   Well, Apple actually kind of fits into the middle of

24  what is a pretty complicated set of wireless industry

25  relationships.   You can see Apple is sort of down there in

1   the third box from the bottom there.

2        But what's really going on here is that Apple winds up

3   having to provide us, the consumers who are on the bottom,

4   all of those people, with phones and handsets that we all

5   like to have that meet our needs.

6        At the same time Apple has to work with Verizon and

7   Sprint and the other wireless carriers to make sure that

8   they're putting equipment onto the networks that actually

9   meet their specifications; in other words, that Verizon and

10   Sprint have specs on how to -- what needs to -- what needs to

11   go into their networks.

12        And then NSN and Ericsson, people who are making the

13   base station equipment, are working with Verizon and Sprint

14   in order to be able to build networks that are efficient and

15   keep on being able to provide the type of data transfers that

16   we all are getting used to on our phones.

17   Q.   Have you seen anything measuring or quantifying the

18   benefits that are specifically enabled by the '820 patent?

19   A.   No, I haven't.

20   Q.   All right.  Well then, how are you able to go about

21   determining what a royalty should be in this case?

22   A.   Well, in the circumstance where you don't have any

23   detail about the benefit of the specific -- the use of a

24   patent, then what you would wind up doing is taking a look at

25   prior licensing history, what the industry might have paid

```
 1   for using the technology, and so forth.
 2        So sometimes quantifying it for the benefit of a
 3   particular technology is just not possible.  It's not part of
 4   the daily accounting records that one can see or the
 5   measurements that might be done technically.  So that leaves
 6   us with trying to understand it based on other measures, in
 7   this case I've looked at licenses.
 8   Q.   All right.  Well, before we jump into the licenses
 9   themselves, are there any rules or frameworks that you
10   followed in order to determine the royalty owed to CCE in
11   this case?
12   A.   Yes, there are.
13        So Judge Mitchell is going to instruct you-all on the
14   law, but the very first place I start with -- and I believe
15   this showed up also in one of the openings -- is the patent
16   damages statute.  And what the -- what the statute says is
17   that if you, the jury, should find that the '820 patent were
18   valid and infringed, then CCE would be entitled to damages
19   that would be adequate to compensate for the infringement but
20   in no event less than a reasonable royalty for the use made
21   of the invention.  And that's the important part, that we're
22   talking about a reasonable royalty for the use made of the
23   invention.
24   Q.   Now, you already told us that it's your opinion that
25   15 cents per device is appropriate.  Why did you conclude
```

1    that a per-device or a per-unit format was appropriate in

2    this case?

3    A.    There are a number of reasons but one of them is simply

4    because of this term, that we're trying to measure the use

5    made of the invention.  And we know that the invention is

6    actually included in every one of the phones that is accused

7    of infringement.  And, so, therefore, by using a royalty that

8    measures each individual unit, we're accounting for the use

9    made of the invention.

10   Q.    All right.  Let's go to Slide 14.

11            THE COURT:  Mr. Curry, is this a good stopping

12   point?

13            MR. CURRY:  This is.

14            THE COURT:  Okay.  Good.  We're going to take our

15   lunch break now, Ladies and Gentlemen of the Jury.  The jury

16   will be in recess until 1:30.

17            COURT SECURITY OFFICER:  All rise.

18            (Jury out.)

19            THE COURT:  Please be seated.

20            I just wanted to let you all know that I have

21   several criminal matters I need to take up over the lunch

22   break.  So I don't need you to clear everything off of

23   counsel table, but I need you to make it where a couple of

24   lawyers and their clients can stand at counsel table, okay?

25            And those begin a little before 1:00, and I think

 1    we'll be through easily by 1:30.  But if you come in and see

 2    me, I'll be in the middle of something.  You're welcome to

 3    come in but just stay behind the bar, okay?

 4              We'll be in recess until 1:30.

 5              COURT SECURITY OFFICER:  All rise.

 6              (Recess.)

 7

 8                              CERTIFICATION

 9

10              IT IS HEREBY CERTIFIED that the foregoing is a

11    true and correct transcript from the stenographic notes of

12    the proceedings in the above-entitled matter to the best of

13    our abilities.

14

15    /s/_____

16    CHRISTINE BICKHAM, CRR, RMR            September 8, 2016
      Official Court Reporter

17

18

19    /s/_____

      SHEA SLOAN, CSR, RPR

20    Official Court Reporter

21

22

23

24

25