```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                        TYLER DIVISION

 3
     CELLULAR COMMUNICATIONS        )
 4   EQUIPMENT, LLC
                                    )    DOCKET NO. 6:14cv251
 5
          -vs-                      )
 6                                       Tyler, Texas
                                    )    1:30 p.m.
 7   APPLE INC., ET AL                    September 8, 2016

 8
                         TRANSCRIPT OF TRIAL
 9                       AFTERNOON SESSION
               BEFORE THE HONORABLE K. NICOLE MITCHELL,
10                 UNITED STATES MAGISTRATE JUDGE

11                    A P P E A R A N C E S

12   FOR THE PLAINTIFF:

13   MR. BRADLEY W. CALDWELL
     MR. JOHN AUSTIN CURRY
14   CALDWELL CASSADY & CURRY
     2101 Cedar Springs Rd., Suite 1000
15   Dallas, Texas 75201

16   MR. EDWARD R. NELSON III
     NELSON BUMGARDNER PC
17   3131 West 7th Street, Suite 300
     Fort Worth, Texas 76107
18
     MR. J. WESLEY HILL
19   WARD, SMITH & HILL PLLC
     1507 Bill Owens Parkway
20   Longview, Texas 75604

21
     COURT REPORTER:     MS. CHRISTINA L. BICKHAM, CRR, RMR
22                       FEDERAL OFFICIAL COURT REPORTER
                         300 Willow, Ste. 221
23                       Beaumont, Texas 77701

24
     Proceedings taken by Machine Stenotype; transcript was
25   produced by a Computer.
```

1    FOR THE DEFENDANTS:

2
     MR. DOUGLAS E. LUMISH
3    MR. JEFFREY G. HOMRIG
     MS. LISA K. NGUYEN
4    MR. BRETT M. SANDFORD
     LATHAM & WATKINS LLP
5    140 Scott Dr.
     Menlo Park, California 94025-1008

6

7    MR. JOSEPH H. LEE
     LATHAM & WATKINS LLP
8    650 Town Center Drive, 20th Floor
     Costa Mesa, California 92626-1925

9

10   MR. ERIC H. FINDLAY
     FINDLAY CRAFT PC
11   102 N. College Avenue, Suite 900
     Tyler, Texas 75702

12

13

14                  *******************************

15                       P R O C E E D I N G S

16           (Jury out.)

17           THE COURT:  I understand we've got something to

18   take up before we bring the jury in.

19           MR. LUMISH:  Just briefly, Your Honor.  We were

20   hoping to get some guidance from the Court.

21           We anticipate that CCE is likely to rest either

22   today or early in the morning tomorrow.  I wanted to get

23   guidance from Your Honor on how you would like us to proceed

24   on 50(a) motions, whether we would just file them in paper at

25   some point before the jury gets the case, or if you'd like to

1    hear an oral recitation today.  Just looking for some

2    guidance on that, if I may.

3            THE COURT:  I'm fine with written submissions.  I'm

4    also fine to hear oral argument on them.  I just would like

5    to do it at 5:00.  And I will say on the record, you won't

6    waive anything by not doing it at the instant they rest.  But

7    we'll carry those.  If you would like to make oral argument

8    on the motions, we'll do it at 5:00.

9            MR. LUMISH:  Thank you, Your Honor.

10            THE COURT:  Anything else?

11            MR. HOMRIG:  Yes, Your Honor.

12            There's one issue with that designation as to

13    Mr. Matthias Sauer.  That's unresolved.  Specifically, there

14    were designations back and forth according to the protocol.

15            In the final one that we got back, some of our

16    counters had been removed.  And it's on us, Your Honor.  We

17    didn't catch it right away.  So we sent them back and said:

18    Well, we drop our objections.

19            But there's one that we wanted to raise.  The

20    argument is that it violates MIL 9, which is Your Honor's

21    ruling that witnesses cannot give an opinion about

22    infringement and the reasons for infringement or

23    non-infringement.

24            So what the question and answer is, is Mr. Sauer

25    was asked:  Does Apple infringe CCE's patents?

```
 1              He responded:  I don't believe we do.

 2              So we don't think that violates MIL 9, but here's

 3   why it's important:  Because what they want to play are

 4   questions of Mr. Sauer about why he didn't instruct people

 5   not to infringe the patents to set up the issue of, well,

 6   Apple says -- and they have some testimony from him -- that,

 7   you know, Apple has patents and treats patents with respect.

 8              But then they want to play this thing of why didn't

 9   he instruct people not to infringe, but then cut out his

10   belief that we don't infringe.

11              And so we're fine if it all comes out.  We're fine

12   if he puts it in.  We've prepared a clip that we can play at

13   the end so that we can use their clips, if they want to play

14   it today, but we don't think it should be that one-sided

15   situation.

16              THE COURT:  Response?

17              MR. MCMANIS:  Good afternoon, Your Honor.

18              This is actually the first I've heard explanation

19   of this objection.  We thought we had a deal last night.

20              So I think, if the request is just to strike Page

21   16, Lines 9 through 12, "Have you instructed anyone at Apple

22   to do anything to try not to infringe," we would be okay with

23   that.

24              The next Q and A, 16, 13 through 19 about whether

25   or not Apple has changed the way its products operates since
```

1    the suit was filed, we still think that's improper, and that

2    should be pled.

3            MR. HOMRIG:  We appreciate that offer.  I think

4    that resolves most of it.  I do think that with the remaining

5    question, the suggestion in the question is that there should

6    have been something to change.  So we think it should stay

7    in.

8            But if Your Honor finds that that's all right and

9    would resolve the issue, we're okay with that, I think.

10           THE COURT:  Okay.  So the 13 through 19, Plaintiffs

11   you want that out as well?  Is that what you're saying?

12           MR. MCMANIS:  Your Honor, we would leave 13 through

13   19 in --

14           THE COURT:  Okay.

15           MR. MCMANIS:  -- and take out 9 through 12.

16           THE COURT:  Okay.  And, Mr. Homrig, you want --

17           MR. HOMRIG:  That's right, Your Honor.

18           So, as Mr. Findlay points out, the suggestion in 13

19   to 19 is that there was some reason we should have changed.

20           So, although taking out 9 to 12 helps, we still

21   believe that the answer as to whether Mr. Matthias Sauer

22   believes that there's infringement, should stay in because

23   that's not an opinion that violates MIL 9.  It's his personal

24   belief.  And so that should stay in.

25           THE COURT:  Okay.  I'm going to take out 9 through

```
 1    12 and take out the ultimate question on "we don't believe we

 2    infringe," and you can keep in, Plaintiff, 13 through 19; is

 3    that correct?

 4              MR. MCMANIS:  Yes, Your Honor.

 5              THE COURT:  All right.

 6              MR. HOMRIG:  Thank you, Your Honor.

 7              THE COURT:  You're welcome.

 8              Is that it?

 9              Let's bring in the jury.

10              COURT SECURITY OFFICER:  All rise for the jury.

11              (Jury in.)

12              THE COURT:  Mr. Curry, you may continue.

13              MR. CURRY:  Thank you, Your Honor.

14         PHILIP GREEN, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

15                    DIRECT EXAMINATION CONTINUED

16    BY MR. CURRY:

17    Q.   Good afternoon.

18    A.   Good afternoon.

19    Q.   Still under oath.

20    A.   Yes, sir.

21    Q.   Okay.  So, before we broke for lunch, you were taking us

22    through the rules for calculating damages in patent

23    infringement cases.  And you showed us the statute.

24         Can you now turn to Slide 14 and explain what you're

25    showing here?
```

1    A.    Sure.

2          So, in order to be able to figure out what the

3    reasonable royalty is, the amount of it and the terms,

4    when -- the second rule that I have to deal with is something

5    called a hypothetical negotiation.

6          And what this is -- all about is imagining what would

7    have happened, what this slide shows, if NSN, on the one

8    side, got together with Apple to negotiate a license to use

9    the '820 patent.

10   Q.    Is the hypothetical negotiation something you just made

11   up?

12   A.    No, sir.  It's part of the case law and the other parts

13   of the rules that I have to follow.

14   Q.    And could you, please, describe a little bit more what

15   you mean by a hypothetical negotiation?

16   A.    Well, a hypothetical negotiation is essentially, like I

17   said, trying to imagine that NSN, on the one side, and Apple

18   got together to negotiate a patent license.

19         Because we're all here in this courtroom, we know that

20   it hasn't happened; and that's why it's called hypothetical.

21   Q.    Why is NSN and not CCE at the hypothetical negotiation

22   table?

23   A.    Well, NSN is at the hypothetical negotiation table

24   because, at the time of the hypothetical negotiation, the

25   rule is it's supposed to happen when the infringement first

1   began.

2       The infringement really first began with one of the

3   Apple iPads, which is accused of infringement in this case.

4   And that was first sold in March of 2012.  At that time, NSN

5   was still the owner of the '820 patent.

6       In other words, the transaction with CCE and Acacia had

7   not yet occurred.

8   Q.   Well, how is it, then, that the damages are up to CCE in

9   this case and not to NSN?

10  A.   As I understand it, there's a lot of lawyers involved in

11  that part of the process.  CCE is the successor, essentially,

12  to NSN for purposes of collecting damages on the '820 patent.

13  Q.   Are there differences between real-world negotiations

14  and the hypothetical negotiation?

15  A.   Yes, there are.

16  Q.   What are those?

17  A.   Those are really on my next slide.

18      This is really, again, part of the rules of thinking

19  about this negotiation between NSN or CCE, on the one side,

20  and Apple, on the other side, and sort of the differences

21  between the way the world really works and what we have to

22  think about here.

23  Q.   Okay.  So could you explain some of the differences that

24  you're showing on this slide, sir?

25  A.   Sure.

1        The first difference, which is really the subject of the

2   first bullet point on either side, is that in a real-world

3   negotiation, one of the things that typically drives the

4   discussion in my experience is a discussion of whether the

5   patents that are being licensed are valid and infringed.

6        In other words, when you're sitting at a negotiation

7   table with -- in a normal license negotiation, nobody knows

8   that, and in point of fact, the parties typically really talk

9   about that issue over and over again.  One party says they do

10  infringe.  The other one says no.  It's just a big fight.

11       In the hypothetical negotiation, that's not what

12  happens.  The assumption is that the patent is already found

13  to be valid and infringed.  Essentially, you-all have made

14  that decision.

15  Q.   And I also see that in a real-world negotiation, you're

16  showing that the parties don't need to strike a deal, and

17  they can walk away.  How does that compare to the

18  hypothetical negotiation?

19  A.   Well, again, in a real-world negotiation -- and all of

20  us have experienced this, whether we've ever bought a car or

21  negotiated for renting a house or something, if we don't like

22  the terms, we can walk away.  We don't have to do the deal.

23       In the hypothetical negotiation, the parties actually

24  have to come to agreement.  There's no walkaway provision.

25  They have to come up with some kind of compensation for the

1    use of the patented technology.

2    Q.    And I see that in the hypothetical negotiation, you're

3    showing that the cards are face up.  What do you mean by

4    that?

5    A.    Well, what I mean by that is -- and this kind of goes

6    back to negotiating with a car dealer or, you know, renting a

7    place -- you don't know what the landlord or the car dealer

8    is thinking.  That discussion with the manager or whatever,

9    we don't know what's going on.

10        But in a hypothetical negotiation, both parties know

11   each other's business.  You've got the financials.  You have

12   the information from both sides.

13   Q.    And, finally, can you explain the difference in the

14   real-world negotiation where the future is unknown versus

15   what you're showing in the hypothetical negotiation?

16   A.    Sure.

17        In most negotiations that any of us have been in, we

18   don't know what's going to happen in the future.  The car may

19   run; the apartment may not be what we wanted it to be,

20   whatever the negotiation was about.

21        However, with this hypothetical negotiation, here we are

22   in 2016 talking about a negotiation that happened in 2012.

23   We know about other facts that happened in the ensuing four

24   years, and we're allowed to use those in the hypothetical

25   negotiation.

1   Q.   Okay.   So you've set up the hypothetical negotiation.

2   Are there any rules as to what the parties in a hypothetical

3   negotiation can discuss as they negotiate a royalty?

4   A.   Yes, there are.   And we're not going to go through this

5   list in any detail, but this is a set of rules called

6   Georgia-Pacific.

7        And Georgia-Pacific, as many of us know, they make paper

8   and plywood and all kinds of things.   This set of rules comes

9   from a very old case, and what it's talking about are facts

10  or factors that people could talk about at the hypothetical

11  negotiation.

12       They can talk about licenses.   They talk about

13  competition.   They talk about profits.   They talk about what

14  the patents do.   They talk about a variety of different

15  things.   And that's what these factors are.

16       Now, there's other things they can talk about.   This is

17  not what they say exclusively, but it is a list of what often

18  is focused on.

19  Q.   And do patent damages experts like yourself and even

20  those retained by Defendants, consider the Georgia-Pacific

21  Factors?

22  A.   Yes, they do.

23  Q.   Well, let's look at Factor 9:   Advantages of the

24  substitutes.

25       Have you been in court the entirety of the trial?

1    A.    Yes, sir, I have.

2    Q.    Did you hear Mr. Sebire testify that his invention is in

3    LTE?

4    A.    Yes, I did.

5    Q.    Okay.  Well, if you use LTE, thereby using Mr. Sebire's

6    invention, would it not be the case that you couldn't use LTE

7    without using his invention?

8    A.    Well, yeah.  If you were thinking that the '820 patent

9    is actually a standard that somebody -- everybody has to

10   practice it in an LTE phone, that's how the parties to these

11   standard setting organizations work.  Everybody wants to make

12   sure that one -- everybody uses the same particular way of

13   doing buffer status reporting, then everybody has to use that

14   technology; and you don't really think about Georgia-Pacific

15   Factor 9, the advantages.

16   Q.    Okay.  Well, my question is more like, if the substitute

17   is not using LTE, then does Apple have to pay the entirety of

18   the value of LTE in this case?

19   A.    No, it doesn't.  It only has to pay for the value of

20   what it's using.

21   Q.    And is there another type of rules that apply in that

22   situation involving standards?

23   A.    Yes, sir, there are.

24   Q.    What are you showing on Slide 17?

25   A.    Well, the rules that relate to what you do with a

1   license relating to a standard is called FRAND, F-R-A-N-D.

2        And FRAND stands for fair, reasonable, and

3   non-discriminatory.  And, basically, what it means is that

4   you're trying to find a royalty rate that would apply to

5   everybody regardless of whether or not they're your

6   competitor.

7        In other words, often enough, a competitor won't try and

8   license another competitor.  You can't do that here.  FRAND

9   is fair, reasonable, and nondiscriminatory to everybody.

10  Q.   Going back to the Georgia-Pacific Factors, are there

11  certain factors that have more weight or are more helpful in

12  this case?

13  A.   Yes, there are.

14  Q.   And what are those?

15  A.   Well, those would be the licensing, CCE's licenses and

16  some that are considered with respect to Apple, some things

17  that relate to the nature and scope of the license, some

18  customary industry royalty rates that I need to talk about or

19  terms, and then some other things that are just part of the

20  overall Georgia-Pacific process.

21  Q.   Can you put these factors into a special formula to

22  calculate a royalty?

23  A.   No, sir, you can't.

24  Q.   Why not?

25  A.   Well, a royalty in a patent infringement case typically

```
 1    comes from this hypothetical negotiation.

 2         And all of us who have ever been part of a negotiation

 3    know that it doesn't -- you don't walk into a car dealer and

 4    think, well, I'm going to pay exactly this amount of money.

 5         Usually there's some up and down on it, or, you know,

 6    sometimes you can negotiate with a landlord on it.  There's

 7    going to be some up and down on it.

 8         You know a little bit about -- you know what you want to

 9    pay, and you may have a starting point, but you don't

10    necessarily know how it's going to work out.  That's what a

11    negotiation is.

12    Q.   So, in your Georgia-Pacific Factor analysis, where did

13    you start?

14    A.   Well, I started with considering the other licenses for

15    the '820 patent.

16    Q.   Okay.

17              MR. CURRY:  And I think, at this point, we need to

18    seal the courtroom, Your Honor.

19              THE COURT:  All right.  The courtroom is going to

20    be sealed now.  If you're not covered by the protective

21    order, please exit the courtroom.

22              (Courtroom sealed.)

23              (This portion of the transcript is sealed and filed

24              under separate cover as Sealed Portion No. 7.)

25              (Courtroom unsealed.)
```

1          Ms. Mayes, if you'll let everyone back in, please.

2          Thank you, Mr. Curry.

3    Q.   (By Mr. Curry) Mr. Green, would you move to the next

4    slide, please?

5    A.   Sure.

6    Q.   After you determined comparability in Step 1, remind us

7    what you did in Step 2.

8    A.   So in Step 2, what I did is I figured out how much of

9    the lump sum that was paid -- we saw that NEC had paid about

10   $417,000 and Amazon had paid $350,000 -- how much of those

11   payments were related to rights in the U.S. versus those in

12   other places, like Amazon had rights in Europe and NEC had

13   rights in Japan.

14        And so when I did that analysis, I came then to figure

15   out that, for NEC, the value of the rights to the U.S.

16   portfolio were a dollar three per unit.

17        In other words, all of the patents that they got rights

18   to amounted to a dollar three -- $1.03 per Amazon unit --

19   excuse me -- NEC units sold in the United States.

20        And for Amazon, the rate ranged to between 37 and 49

21   cents per unit for the portfolio, for all of the patents that

22   CCE had in the U.S. that were relevant to the negotiation.

23   Q.   And then can you explain your calculations in Step 3,

24   please.

25   A.   Yes, sir.

1    Then what I had to do was figure out what was paid for

2    the '820 patent.  So Step 2 was the portfolio.  There's more

3    than just the '820 patent that was negotiated as part of

4    these U.S. portfolios.  And so what I did is I had to find

5    out from the $1.03, for example, what portion of that related

6    to the '820 patent.

7    And so there's a number of indicators that are in the

8    documents.  One of them, for example, is which of the patents

9    had been asserted against -- by CCE as against NEC, because

10   as I told you, they had originally sued them.  And so that

11   would be one way of being able to figure out what portion of

12   the portfolio relates just to the '820 patent.  So I looked

13   at that.

14   Another way of looking at it was to look at what patents

15   CCE had actually asserted just in the United States.  Those

16   are the important ones in the portfolio.

17   And so that's why you have these ranges.  One is, you

18   know, 10 to 15 cents for NEC, and Amazon, it's 9 cents to 24

19   cents, depending on how you look at things.

20   Q.   After you calculated the per-unit rates in Step 3, what

21   did you do next in your analysis?

22   A.   Well, what I did is I started looking around at what

23   happened in the hypothetical negotiation.  So I realized that

24   two values -- these values that I got for the NEC -- from the

25   NEC and the Amazon licenses were basically starting points.

1          So, like I say, when we go into negotiations, we usually

2     think about, well, I only want to be able to pay about this

3     much.  We have some ideas about what those should be.

4          These are starting points for the negotiation, based on

5     the licenses that CCE had actually already done; and these

6     really are the prices that they had been getting for the use

7     of the '820 patent.

8          And so from here, what I need to figure out is, well,

9     what would the parties really negotiate to?  Let's go back to

10    putting our hypothetical negotiation hats on and figure out

11    what else is going to affect that negotiation.

12    Q.   In your opinion, does the evidence support a jury award

13    for 9 cents a device?

14    A.   Well, that would be one piece that -- one way that the

15    jury could interpret this.  They could say that the parties

16    would have started at 9 cents.  Sure.

17    Q.   And in your opinion, would the evidence support a jury

18    award of 24 cents per device?

19    A.   Sure.  You can see that part of the analysis gets you to

20    24 cents.

21    Q.   And do you actually have an opinion as to where you

22    believe that Apple and CCE would arrive or converge in this

23    range?

24    A.   Yes, I do.

25    Q.   And what is that?

1    A.    That's the 15 cents that I talked about when we

2    started -- started talking about the damages.

3    Q.    And you mentioned also that the parties in the

4    hypothetical negotiation are going to be considering other

5    negotiating points.  What are those?

6    A.    Well, these are other things that would basically help

7    us to understand how to close this range between 10 cents and

8    24 cents effectively, or 9 cents and 24 cents, how do we

9    figure out what the parties would come to.  And so there's

10   other facts that we would need to consider.

11        One is basically that CCE is going to wind up getting

12   a -- giving Apple a nonexclusive license.  So, basically, all

13   of these other licenses are also nonexclusive.  But that's an

14   important factor.  They're not getting exclusive rights to

15   use the '820 patent.  Exclusive rights are very valuable,

16   usually.

17        Also, there's another factor.  When I talk about

18   factors, this is referring to the Georgia-Pacific factors

19   that we -- that I showed you earlier.

20        Factor No. 2 is Apple's patent license agreements.  I

21   looked at them.  Apple didn't really have any comparable

22   license agreements of its own for comparable technologies

23   that at least I was provided with.

24        I could see that Apple has taken running royalty

25   licenses in certain circumstances, but they didn't have any

1   licenses that I could then analyze just like I did the CCE

2   ones and give you some alternative rates for them.

3   Q.   I want to talk a little bit about Factor 12.

4        You're showing industry volume discounts.  What do you

5   mean by that?

6   A.   Well, what I mean by that is that in the electronics

7   industry, especially in this industry that's related to

8   phones and electronics and so forth, there is often licensing

9   that has got a price for a certain number of units; and then,

10  often enough, there's a lower price if you have a larger

11  number of units when you're talking about licensing a patent.

12       So it may be, you know, 20 cents a unit if you have a

13  hundred thousand units; and then if you've got 200,000 units,

14  it goes down to 15 cents a unit.

15       Rarely, though, does it take the license -- the --

16  actually, I've never seen one where the discount is for

17  higher volumes that's greater than about 40 percent or

18  50 percent.  You never see a cut below that for a running

19  royalty on a per-unit basis.

20  Q.   How does it make sense that a company that infringes

21  more, gets a better deal?

22  A.   Well, I'm not sure that those companies are actually

23  infringing more.  They have actually gone and taken licenses;

24  and they have agreed that since they have higher volumes,

25  they are going to pay less.  That's part of the advantage of

1    actually having taken a license.

2    Q.   And earlier you described the differences between the

3    real-world negotiation and a hypothetical negotiation.   Would

4    those differences also affect the negotiations?

5    A.   Yes, they would.

6    Q.   All right.  Please tell us how.

7    A.   Well, one of the reasons -- we talked about how the

8    volume discounts on the one hand would affect a hypothetical

9    negotiation.  But then in the hypothetical negotiation we

10   know that there's validity and infringement that are going to

11   be assumed.  And so what that means is that even though there

12   may be some indicators in these licenses that -- of the

13   royalty rates, none of these licenses actually had anybody

14   admit to validity and infringement.

15       So all of these prices don't assume this very big

16   difference between the hypothetical negotiation and the real

17   world, which is that the '820 patent is valid and infringed.

18       Generally, if a patent is valid and infringed, the

19   royalty rate is higher.  The entity has to take a license.

20   It's using the technology.

21   Q.   In the real world can a company use its defenses of

22   noninfringement and invalidity as leverage to drive down the

23   rate?

24   A.   Yes, sir, they can.

25   Q.   Can they do that in the hypothetical negotiation?

1    A.    No, they can't.  That's part of the construct, actually.

2    That's one of the key differences here.

3    Q.    And is that why you're showing the green arrow moving

4    toward -- more towards the 24-cent side?

5    A.    Yes, sir.

6    Q.    And what did you conclude that the parties would arrive

7    at in this range?

8    A.    I concluded that the parties would arrive at a royalty

9    rate of 15 cents a unit.  It's in the middle of, effectively,

10   the Amazon rate.  It's a very -- at the very high end of the

11   NEC rates, but it's consistent with what the actual licensing

12   has been.  And when you start to look at the fact that none

13   of these licenses assumed validity and infringement and

14   assume some volume discounts, this would be a fair and

15   reasonable royalty.

16   Q.    And after you identify that Apple 15 cents per

17   infringing unit, where you then able to calculate the total

18   amount of unpaid royalties that Apple owed CCE in this case?

19   A.    Yes, I was.

20   Q.    Can you take us through that, please?

21   A.    Sure.

22        So to be able to calculate the damages in this case, one

23   would take a royalty rate and multiply it by the number of

24   accused units.  And so what I did is I calculated up the

25   total number of devices that have been accused, the iPad 3's

and 4's, the iPhone 5 -- 5's and 6's.  And it turns out that

through March of this year there is 184,318,469 units that

were sold.

And multiplying those by 15 cents per unit, the royalty

rate gets you damages of 27,647,770.

Q.   And is 15 cents per unit also a FRAND rate?

A.   Yes.  I think it is.

Q.   And can you please explain why?

A.   Well, sure.

This FRAND notion and this FRAND discussion is really

something that is trying to make sure that a license -- the

royalty rate that's being paid for something that's

standard-essential is fair.  And there's a lot of different

ways to look at it, but one of the ways is to basically

separate out the influences of competition in other things

and what the royalty rate would be.

And so one thing that we were taking a look at is

whether or not the royalty is something they call ex-ante.

That's the first part of this slide.

And it's basically to say, well, is this a rate that

they would have paid if they knew nothing else about the

market and the technology hadn't yet been adopted.  It's

ex-ante.

And, in my view, because Amazon and NSN were exiting the

market, that's kind of what ex-ante is.  They don't -- they

1    don't have to pay it in the future.  They know that there's

2    no competition anymore.  In point of fact, CCE is not -- and

3    NSN weren't in competition with Apple for the use of this

4    technology.  CCE and NSN don't sell smartphones or tablets.

5    Q.    Could you move your mic closer, please?

6    A.    Sure.

7    Q.    And I see on bullet point 3 you're saying that the

8    benefit of the LTE standard did not drive the royalty rate.

9          What do you mean by that?

10   A.    Well, what I mean by that is if you look at what I was

11   showing you from the license negotiation, those were all

12   about, as we heard Ms. Wagner say, about the geographies, the

13   unit volumes, some of the other terms.  Whether or not the

14   benefit of LTE was present or not, wasn't part of those

15   discussions.

16   Q.    And did your analysis push the royalty rate outside of

17   the range that others had paid?

18   A.    No, it doesn't.  As you can see, it's consistent with

19   the rates that were paid in the NEC and the Amazon

20   agreements.

21   Q.    And how does volume discounts factor into your FRAND

22   analysis?

23   A.    What it goes to show you is that, for example, in the

24   Amazon deal there's a -- there's a royalty.  It could be as

25   much as 24 cents per unit as a royalty.  The royalty that

```
 1    I've included on the 15 cents is, it's about 40 percent of
 2    that -- or excuse me -- 60 percent of that.  It's consistent
 3    with the discount.
 4    Q.   All right.  Could you please tell the jury what you
 5    found in terms of the amount of unpaid royalties that Apple
 6    owed CCE in this case?
 7    A.   Again, the total amount of CCE's damages are
 8    $27,647,770.
 9    Q.   Thank you.
10          MR. CURRY:  Pass the witness.
11    A.   Through March of this year.
12          THE COURT:  All right.  Cross-examination.
13          MR. FINDLAY:  Thank you, your Honor.
14                    CROSS-EXAMINATION
15    BY MR. FINDLAY:
16    Q.   Good afternoon, Mr. Green.
17    A.   Good afternoon.
18    Q.   My name is Eric Findlay, and I represent Apple in this
19    case.
20          Do you understand that?
21    A.   Yes, I do.
22    Q.   I don't think you and I have ever met before, so it's
23    nice to meet you.
24    A.   It's nice to meet you, too.
25    Q.   Welcome to Tyler.
```

1   A.   Thank you.

2   Q.   Excuse me for that.

3        Let me -- if I could, I want to start off someplace

4   different than what I had planned on.  Is that all right?

5   A.   Sure.

6   Q.   I was here this morning before we broke for lunch.  And

7   you were here for Dr. Caloyannides' testimony?

8   A.   Yes, sir, I was.

9   Q.   And then you gave a little bit of testimony before we

10  broke for the lunch break; isn't that right?

11  A.   Yes, sir.

12  Q.   And you said something there that I wanted to talk to

13  you about just to start, and then I'll get back with my

14  normal roadmap that I have.

15       Let me see if I can find a highlighter.

16       Do you remember when -- I think it was under

17  cross-examination -- Mr. Lumish asked Dr. Caloyannides

18  something along the lines of you don't have any testing, or

19  you don't have any measurement which can prove to the jury

20  the amount of the alleged improvement that choosing between a

21  long or short buffer status report might give to the LTE

22  network and uplink latency.

23       Do you recall that questioning?

24  A.   I remember that line of questioning, yeah.

25  Q.   And you would agree with me, wouldn't you, that

```
 1   Dr. Caloyannides basically said:  I don't have any testing
 2   that can prove that improvement, and I don't have any
 3   measurements that can prove that improvement, that alleged
 4   improvement.
 5   A.    That's my recollection of the testimony, too.
 6   Q.    And then I think you -- and I think you said the exact
 7   same thing in your opening remarks before we broke for lunch.
 8        And this was questioning by your own counsel:  Have you
 9   seen anything measuring or quantifying the benefits that are
10   specifically enabled by the '820 patent?
11        And you said, no, you hadn't, correct?
12   A.    That's correct.
13   Q.    And I think you kind of admitted that as much in your
14   report in this case and also in the deposition that you gave
15   earlier.
16        Would you agree with that?
17   A.    I would agree with that, yes.
18   Q.    So then you said -- or I'm sorry -- your counsel asked:
19        Well, how -- well, then how are you able to go about
20   determining what a royalty should be in this case?
21        And then you talked about:  In the circumstances where
22   you don't have any detail about the benefit of the specific
23   use of a patent, then what you wind up doing is taking a look
24   at prior licensing history, what the industry might have paid
25   for using the technology and so forth.
```

1      Correct?

2  A.    Yes, sir.

3  Q.    Okay.  So just so we're on the same page, CCE apparently

4  is not going to present, to your knowledge -- and I -- if you

5  don't know, tell me you don't know -- CCE is not going to

6  present to this jury a shred of evidence that can quantify in

7  some tangible way any alleged benefit that choosing between

8  short and long buffer status reports as opposed to sending

9  just long buffer status reports has on uplink performance of

10  a network.

11      Would you agree with that?

12  A.    Well, I can tell you I don't know what CCE may present

13  throughout the rest of the trial.  I haven't seen any

14  documents or anything that specifically measures or

15  quantifies the benefits, that's for sure.

16  Q.    And that's fair, and I appreciate that.

17      And you have been here since opening statements,

18  correct?

19  A.    Correct.

20  Q.    I appreciate that, Mr. Green.  Thank you.

21      So, if we have to -- and it's your testimony, then, that

22  we have to look at the licenses.  You would agree with me,

23  though, that there isn't -- and we'll talk about this more in

24  detail later on, but just to make sure we're all on the same

25  page when we start, you would agree with me there isn't one

1  license that CCE ever gave to just the '820 patent alone,

2  correct?

3  A.    That's right.  CCE gave portfolio licenses; and in many

4  instances, you can see from the licenses, specifically Amazon

5  and NEC, that the '820 patent was part of the key drivers.

6  Q.    Okay.  So we don't have -- there is not a single license

7  you can show this jury where it says here, somebody is paying

8  just for the '820 patent, fair?

9  A.    That's fair.

10 Q.    All right.  And would you agree with me that you have no

11 evidence to present to this jury that any company or any

12 individual or any group has ever come to CCE and said:  Hey,

13 we read that '820 patent; we would like to take a license

14 just to that patent because we think it improves uplink

15 latency in the LTE network?

16 A.    I don't think I've seen a document that talks

17 specifically about the scenario that you're talking about

18 where somebody just walks in and licenses a single patent.

19 That's pretty unusual.  But I haven't -- I agree.  I haven't

20 seen a document like that.

21 Q.    So the answer to my question is yes; you haven't seen

22 any evidence like that?

23 A.    No.  I would be shocked to find it, though.

24 Q.    And, likewise, you haven't seen any evidence that anyone

25 came to Acacia when it owned the '820 patent and said the

1   same sort of thing:  Hey, we want to take a license to just

2   that patent?

3   A.   Right.  Again, I would be shocked to find it.  Usually

4   these portfolios are licensed as portfolios.

5   Q.   Fair enough.  And we'll talk about that.

6        And then as to the original owner of the '820 patent,

7   NSN, again, you don't have any evidence that anyone ever came

8   to NSN and said:  That '820 buffer status report patent is

9   really good; I want to take a license just to that patent?

10  A.   I haven't seen any evidence from NSN about its licensing

11  really at all, so...

12  Q.   Okay.  Fair enough.  Thank you for indulging me with

13  those kind of introductory questions.  I'll get back into my

14  prepared notes.

15       You've done this lots of times before, I think you said?

16  A.   Yes, sir.

17  Q.   Testified in trial, how many times do you think?

18  A.   At trial, probably over 40 times in my career.

19  Q.   Okay.  And you were up front enough -- and I appreciate

20  that -- to share with the jury that the rate you're getting

21  paid in this case, I think, is $550 an hour; is that right?

22  A.   My firm is getting paid, yes.

23  Q.   Your firm.  I'm sorry.  That's right.

24       And you would agree that's a pretty -- that's a pretty

25  healthy rate?

1  A.    I agree, sure.

2  Q.    Okay.  And you would agree -- and I don't mean anything

3  other than just that that's a -- you're well paid for what

4  you do.  Let me put it that way.

5  A.    I don't know about that.  I mean, I'm able to charge a

6  rate because of the kinds of services and the detail I

7  provide.  So I'm not sure I can say one way or another.

8  Q.    Okay.  Well, my point is -- and I'm not trying to trick

9  you or anything -- that in what you do as an expert witness,

10 you're well paid, as is Mr. Bakewell.  He'll be up here

11 testifying later on.  He's our damages expert.  He's well

12 paid.

13      We can probably agree on both of those facts; wouldn't

14 you say?

15 A.    I would say that's true, yeah.

16 Q.    Okay.  And you're correct in pointing out that it's not

17 you that's sending the bill for $550 an hour; that comes from

18 your company, right?

19 A.    That's right.

20 Q.    And you understand that's the same way it works with

21 Mr. Bakewell.  Whatever he's charging per hour, that comes

22 from his company, not from him individually, right?

23 A.    That's right.

24 Q.    And you know Mr. Bakewell professionally?

25 A.    Yes, I do.

1   Q.   Respect him?

2   A.   Yes, I do.

3   Q.   Okay.  Your company has worked a lot for Acacia.   I

4   think the numbers we were given was, since 2008, your company

5   had billed Acacia a little over $3.5 million.

6        Does that sound right?

7   A.   Out over the course of four separate matters, yeah.

8   Q.   Okay.  Fair enough.

9        And the billings on just CCE matters, I think through

10  July of this year, was just shy over $800,000.  Would you

11  agree?  Does that sound close to right?

12  A.   Sounds probably close to right.  That's right.

13  Q.   And there's probably more added since then since you've

14  been working hard getting ready for trial?

15  A.   Yeah.  Not as much as you might think, but yeah.

16  Q.   Okay.  Can we agree that one of the reasons the figures

17  are that big for your company and the figures are that big

18  for Mr. Bakewell's company, I imagine, is because taking a

19  case all the way to a patent trial, like we are here, in

20  front of a jury, is an expensive endeavor?

21  A.   It's an expensive endeavor, but it's also that there

22  were other parts of the case which we're not talking about

23  here, so...

24  Q.   And that's fair, and I appreciate that.

25       But you would agree with me that -- I think -- I think

1    you talked about this in your deposition.  The average cost

2    of litigation to take a patent case all the way to trial is

3    averaged between 3 and $5 million.  Is that a fair value?

4    A.    Between all the lawyers and all the experts and all

5    that, that's about what these cases do cost on average, yes.

6    Q.    Okay.  Good.

7          Can you and I agree on -- I hope we can agree on this

8    next statement.  Can we agree that as between you and

9    Mr. Bakewell, the things that we should be focusing on is the

10   substance of your testimony, the substance of your opinions,

11   not about the finances as to who was paid what?

12   A.    I think that's fair, sure.

13   Q.    Okay.  Good.  I thought we could agree on that, but I

14   appreciate that.  Thank you.

15        I think your counsel confirmed this, but I just want to

16   go through it with you briefly.  You are not here to give

17   this jury any opinion in terms of infringement?

18   A.    That's right.

19   Q.    And you're not here to give this jury any opinion in

20   terms of validity?

21   A.    That's right.

22   Q.    And you would agree with me that if the jury finds that

23   there is no infringement, if the jury believes that Apple is

24   not using the '820 patent, then there are no damages and that

25   number is zero?

1    A.    Right.  My whole analysis assumes that you-all find that

2    the patent -- the '820 patent is valid and infringed.  Sure.

3    Q.    Okay.  Fair enough.

4          You know that Apple is a company that makes, among other

5    things, the iPad and the iPhone, makes consumer electronic

6    devices, correct?

7    A.    That's right.

8    Q.    And you would agree with me that Apple is an innovative

9    company?

10   A.    With respect to many of its consumer products, sure.

11   Q.    Yeah.  It's an innovator.  I think we can all agree on

12   that?

13   A.    Yes, sir.

14   Q.    All right.  Thank you.

15         This might be stating the obvious, but you would agree

16   that Apple is not a cellular network operator, correct?

17   A.    That's true.

18   Q.    So I looked at your report and you submitted three

19   reports in this case, I think; is that right?

20   A.    That's right.

21   Q.    And at least in your initial report, I think I saw the

22   word "network operator" over a hundred times.  Does that

23   sound -- any reason you would need to quibble with that

24   number?

25   A.    No.  I -- I'd like to answer your question completely.

```
 1    Q.   Please.
 2    A.   I understand that there's all kinds of rules with --
 3              MR. CURRY:  May we approach?
 4              THE COURT:  Yes, approach.
 5    A.   I just don't want to violate them.
 6              MR. CURRY:  Appreciate that.
 7              (Bench conference.)
 8              MR. CURRY:  Mr. Findlay is taking advantage of the
 9    fact that the carriers were severed and stayed.  Back when
10    Mr. Green wrote his original report they hadn't been severed
11    and stayed.  And so now he's trying to take a victory lap
12    over him on this because naturally in his original report
13    he's talking about the network operators a lot and the
14    carriers.
15              MR. FINDLAY:  I'm not at all, Your Honor.  He's
16    talking -- his slides talk about network operators, equipment
17    manufacturers.  And this is obviously about the network.  I
18    just want to make it clear.  And that's the only question I'm
19    going to ask, that when you talk about network operators in
20    your report, you're not talking about Apple.  That's as far
21    as I'm going with it, just one question.
22              MR. CURRY:  My witness should not be penalized for
23    talking about the carriers when the carriers -- and talking
24    about them a lot in his original report, at a time when he
25    wrote his report the carriers were still in this case.  And
```

```
 1   that's what Mr. Findlay's talking about.

 2            THE COURT:  Let's move on.

 3            MR. FINDLAY:  Okay.

 4            MR. CURRY:  Thank you.

 5            (Bench conference concluded.)

 6   Q.  (By Mr. Findlay) You would agree with me that no one

 7   from CCE was involved in the '820 patent, correct -- in the

 8   development or getting, if you will, of the '820 patent?

 9   A.   That's correct.  CCE acquired a portfolio that included

10   the '820 patent.

11   Q.   And -- I'm sorry.  And that includes also no one from

12   Acacia was involved in the '820 patent?

13   A.   Not in its development.  Acacia acquired the patent from

14   NSN which developed it.

15   Q.   And as I think the jury has heard, Acacia bought the

16   patent from NSN.  Nokia Siemens Network gave it to CCE.  And

17   eventually we wound up here.  Fair?

18   A.   That's fair.

19   Q.   You would agree with me, also, that the '820 patent did

20   not invent the idea of buffers?

21   A.   That's right.

22   Q.   It did not invent the idea of buffer status reports?

23   A.   To my knowledge, that's true.  Again, I'm not a

24   technical expert.  We've all agreed upon that, so to my

25   knowledge, you're right.
```

1    Q.    But you've spoken to the technical experts?

2    A.    Correct.

3    Q.    And you would agree with me it also didn't invent the

4    idea of a long or short buffer status report?

5    A.    Not to my knowledge.  That's correct.

6    Q.    And you would agree with me that there are other buffer

7    status reporting patents out there, correct?

8    A.    I believe there are.  That's true.

9    Q.    Okay.  Now, as the jury has heard, the '820 patent has

10   to do with uplink capacity, correct?

11   A.    Yes, sir.

12   Q.    And that's when data is going from my phone up to the

13   network?

14   A.    That's right.

15   Q.    When something is coming down into my phone, we can call

16   that downlink or download.  Do you agree with me?

17   A.    Yeah.  I think downlink is usually how I would refer to

18   it.

19   Q.    So if I'm sending a picture to my son at college from my

20   phone, when I -- when it leaves my phone that's an uplink

21   transmission, for us lay folks?

22   A.    That's right.

23   Q.    And then if I'm -- if I'm watching Netflix, I'm watching

24   a show on my phone, I'm streaming it or on my iPad, that's

25   all downlink, correct?

```
 1    A.    That's correct.
 2    Q.    And would you agree with me that there's more -- a lot
 3    more downlink traffic out there than there is uplink traffic?
 4    A.    There has historically been that.   That's true.
 5    Q.    And historically that's been the -- that's been the main
 6    focus, if you will, on people working on the network is to
 7    increase the speed of downlink so you can stream Netflix, you
 8    can watch movies, download songs, that sort of thing?
 9    A.    Right.   That's historically true.   It's changing lately,
10    to my understanding.
11    Q.    Okay.   And the '820 patent doesn't have anything at all
12    to do with downlink activity, right?
13    A.    That's right.   It has to do with uplink.   Although as I
14    understand it, there is some technical relationships between
15    downlink and uplink which are beyond the scope of what I
16    truly understand.
17    Q.    And they're far beyond mine, too.   But the '820 is --
18    it's limited simply to uplink.   That's your understanding?
19    A.    That's correct.
20    Q.    And you also agree with me, obviously, that the '820 is
21    limited solely to the LTE network?
22    A.    That's right.
23    Q.    So in Boston I'm going to bet you've got better LTE
24    coverage than we do out here in East Texas; but I can tell
25    you there are lots of times if I drive to court in Texarkana,
```

```
 1   I'll go through lots of areas where I don't have LTE.  There
 2   are some areas where I don't have any cell phone coverage.
 3        And if -- and if that happens and I'm off LTE, that,
 4   obviously, means my phone is not using the '820 patent even
 5   if we were to -- even if the jury were to believe CCE's
 6   infringement allegations, correct?
 7   A.   If I understand your question, I -- all you're asking
 8   is, well, there are parts of the country where LTE isn't
 9   available.  I agree with you.  And you would be surprised how
10   bad the cell service is in Boston.
11   Q.   Fair enough.
12        And -- and any time that happens, if I look down at my
13   phone and I'm on 3G, or I'm on something other than LTE, that
14   doesn't concern the '820 patent at all.  Can we agree on
15   that?
16   A.   To my knowledge, that's correct.
17   Q.   Okay.  And would you agree with me that a lot of times
18   when somebody doesn't have LTE -- for instance, in their
19   home -- they might put their phone on a wireless, on a WiFi
20   network.
21   A.   Yes.  I think that's true.
22   Q.   Do you have WiFi at your house?
23   A.   Yes, I do.
24   Q.   And when you get to the house, does your phone either
25   automatically connect to it, or do you sometimes just take a
```

 1   moment and put your phone on WiFi?

 2   A.   It tends to want to automatically connect, yes.

 3   Q.   Mine does, too.

 4        And are you aware that the iPhone actually will do that?

 5   If it senses an area where it's in a known WiFi network, it

 6   will automatically connect to that -- connect to the WiFi?

 7        Is that your understanding?

 8   A.   That is my understanding.

 9   Q.   Okay.  And you would agree with me that when your

10   phone's on WiFi, that's got nothing to do with LTE?  And

11   then, of course, that's got nothing to do with the '820

12   patent?

13   A.   Right.  Yeah.  WiFi is another feature that's in your

14   phone that is part of the overall operation of the phone.

15   Yes.

16   Q.   So and -- that's a good point.  But a better way to ask

17   my question probably would be, if I'm doing uplink work and

18   I'm sending photos uplink or I'm posting something to

19   Facebook and I'm on WiFi, because I'm in my house, that's got

20   nothing to do with the LTE network and nothing to do with the

21   '820 patent.  Can we agree on that?

22   A.   Usually, that's true.  It depends on what's going on in

23   your house.  But, yeah, if you're on WiFi you're typically

24   not, to my knowledge, dealing with an LTE network.

25   Q.   And is your experience the same as mine in that every

1    year it seems to me that there are more and more areas where

2    there is readily WiFi available, free WiFi available?

3    A.   It depends.   Yes.   I mean, we're seeing more and more

4    WiFi networks when we go into stores and so forth, hotels,

5    what have you.   But the quality of those networks and what

6    your phone can hook into is still kind of a -- it's still not

7    completely reliable, specifically.

8    Q.   No.   I would agree with you.   Sometimes you might just

9    have two bars instead of the -- you see, I've got -- you see

10   the little WiFi signal there in the corner?

11   A.   Yeah.

12   Q.   Yeah, I've got four bars in here.   I'm on the Court's

13   WiFi, but sometimes you might not have the full bars and so

14   the connection may not really be fast.

15   A.   Right.   And then sometimes the connection isn't

16   sufficient to download your e-mail.   There's a lot of

17   different things that go on.

18   Q.   And I don't disagree with that at all.   But in general,

19   would you agree with me it seems every year we find there are

20   more and more places that have free WiFi available to folks?

21   A.   I agree with you.

22   Q.   Okay.   Thank you.

23        And the reason I asked that is because there was one

24   part in your report -- and if you want to see it, let me know

25   and I'll show it to you -- where you talked about that

| | |
|---|---|
| 1 | sometimes at -- there could be a bottleneck effect with a |
| 2 | cellular network and major events with large crowds.  Do you |
| 3 | remember that in your report? |
| 4 | A.   Yes. |
| 5 | Q.   And I assume there you were talking about things like |
| 6 | sporting events or concerts where you've got 80,000 people |
| 7 | somewhere, that there could be a lot of traffic on the |
| 8 | network -- on the cellular network, and that it could slow |
| 9 | things down? |
| 10 | A.   It can be at major sporting events.  It could be there |
| 11 | are -- there are places where there's lots of, say, tourists |
| 12 | who are taking photos and then they're uploading them into |
| 13 | their Facebook and stuff, so it's a -- it's a variety of |
| 14 | different circumstances that I understand the carriers are |
| 15 | having to plan for and work with these things. |
| 16 | Q.   Sure. |
| 17 | Would you agree with me, though, that -- well, let me |
| 18 | put it this way:  Are you a sports fan? |
| 19 | A.   Sure. |
| 20 | Q.   Cowboys fan by any chance? |
| 21 | A.   Well, I'm living in Boston so... |
| 22 | Q.   Okay.  Well, you know, you need to go see Jerry's World. |
| 23 | A.   So I hear. |
| 24 | Q.   Okay.  And I've been there, and probably wouldn't |
| 25 | surprise you that they've got free WiFi throughout AT&T |

1   Stadium.

2   A.    Yes, they do.

3   Q.    And if you were to be lucky enough to go see a Mavericks

4   game at the American Airlines Center in Dallas, same sort of

5   thing.

6   A.    Correct.

7   Q.    And I even looked up -- since I knew you were from

8   Boston, I found an article on Boston.com that said:   At least

9   Fenway Park has baseball's speediest WiFi.

10   A.    Considering their sponsorship, yes.

11   Q.    Okay.  So you would agree with me, in more and more of

12   those places where you find lots of people, like a concert,

13   like a sporting event, there are tons of folks on WiFi.

14   Isn't that just fair?

15   A.    There are tons of folks on WiFi.  There are tons of

16   folks that are on -- just using their cellular data as well.

17   So it's a whole mixed bag, as I understand it.

18   Q.    But if they're on WiFi, then they're not bottlenecking

19   the LTE network as you were talking about in your report,

20   fair?

21   A.    Technically fair, but what's -- at least as I understand

22   it; and based on my analysis of going through the industry,

23   there's a tremendous number of instances where even around

24   Gillette Stadium or even Fenway, they have put in these

25   little small cell base stations to be able to cover this.

1        And so there's an awful lot of both WiFi and LTE

2    connectivity inside of sporting events and so forth.

3    Q.    Thank you.

4        Let me turn a little bit more to the '820, and let me

5    turn to -- do you recall -- let me read you a portion of your

6    report.  And if you want to see it, I'll be happy to provide

7    it to you.

8        You talked about alternatives to infringing, in your

9    report.  And you said, quote:  According to Mr. Jones and

10   Dr. Caloyannides, a non-infringing alternative would be a

11   reversion to prior methods of buffer status reporting.  In

12   this instance, there would be increased latency and no

13   scheduling gain.

14       Do you recall that?

15   A.    Yes.

16   Q.    Okay.  Would you agree with me, though, that just in the

17   way we started this examination, where you admitted that

18   there is no evidence or no testing or measuring which can go

19   to prove the amount of the alleged improvement that '820

20   gives to LTE, similarly, you don't have any testing or any

21   measurement to show that the old way, the reversion way, was

22   slower.  Fair?

23   A.    Well, I don't have -- I haven't seen any testing.  I'll

24   give you that.  But, logically, it would make sense that if

25   you weren't using these technologies, that they hadn't

1    actually been implemented in standards, then you wouldn't be

2    getting these benefits, just logically.

3    Q.    Let me break that down a little bit.

4          So you agree on the first part of my question, that

5    there's no evidence or testing or measurement you can point

6    to to suggest that there's a specific improvement in uplink

7    reduced latency.

8          Similarly, there's no testifying -- I mean, there's no

9    testing or measuring which establishes that the old way is X

10   slower.

11   A.    Correct.  I haven't seen it yet, but, logically, just

12   understanding the differences in the technologies, it would

13   make sense that it would be slower or would be more use -- it

14   would use more resources in the system.

15   Q.    But that opinion comes just from your conversations with

16   Dr. Caloyannides and Mr. Jones; is that fair?

17   A.    Sure, CCE's technical experts.

18              THE COURT:  Mr. Findlay?

19              MR. FINDLAY:  Yes, ma'am.

20              THE COURT:  Whenever we get to a good stopping

21   point, it's about time for our afternoon break.

22              MR. FINDLAY:  This will be fine, Your Honor.  Thank

23   you.

24              THE COURT:  Very good.

25              Ladies and Gentlemen, we'll be in recess for 15

1    minutes.

2              COURT SECURITY OFFICER:  All rise.

3              (Jury out.)

4              (Recess.)

5              (Jury out.)

6              COURT SECURITY OFFICER:  All rise.

7              THE COURT:  Let's bring in the jury, please.

8              (Jury in.)

9              THE COURT:  Please be seated.

10             Continue.

11             MR. FINDLAY:  Thank you, Your Honor.

12   Q.   (By Mr. Findlay) Welcome back, Mr. Green.

13   A.   Thank you.  Welcome back.

14   Q.   I wanted to start off where I started off before real

15   quickly.  There was a line of questioning that I meant to

16   raise with you.

17        We've agreed that you are looking at the licenses since

18   there's no testing or measurable evidence to -- to point to

19   as to the benefit of the '820, et cetera.  We talked about

20   that.

21        But in connection with that, it's true, is it not, that

22   you haven't set forth any opinion which compares -- which

23   compares the value of the '820 patent specifically relative

24   to all of the other patents in the CCE portfolio?

25   A.   I wouldn't say that.  I'd like to answer that question

```
 1    more fully, but I think I might be stumbling over something

 2    the Judge doesn't want me to talk about.

 3            THE COURT:  Counsel, approach.

 4            (Bench conference.)

 5            THE COURT:  I would like this witness to stop

 6    saying he doesn't want to walk into things the Judge doesn't

 7    want him to talk about.

 8            MR. CURRY:  Okay.  I think he's just trying to

 9    respect your -- your motion in limine.

10            THE COURT:  Okay.

11            MR. CURRY:  And I think that the questions are

12    getting into it and so...

13            MR. FINDLAY:  This is --

14            MR. CURRY:  I mean, my witness is in a bad

15    position.  He can either not testify truthfully or violate a

16    ruling in limine.  And so we, actually, told him in this

17    scenario to say that, so that we can approach and work it out

18    with the Judge rather than plowing into --

19            MR. FINDLAY:  The motion in limine.

20            THE COURT:  Yeah.

21            MR. CURRY:  Okay.

22            THE REPORTER:  I'm sorry.

23            MR. CURRY:  So I think that the witness is -- said

24    what he said about Your Honor's rulings because the analysis

25    that he did that identifies the '820 patent, particularly as
```

1  a valuable patent, is contingent upon the -- Apple's IPRs not

2  getting instituted.

3          And so in this scenario I think, you know,

4  Mr. Findlay has opened the door.  The witness should be

5  allowed to answer fully and honestly as to what his analysis

6  should be -- or actually is.

7          MR. FINDLAY:  Frankly, I don't know what he's --

8  what they're talking about.  I was asking -- trying to get

9  him to confirm, as he's testified in deposition, in his

10  report that he didn't value the '820 separately from the

11  entire CCE portfolio.  That's a classic --

12          MR. CURRY:  I don't think classic.

13          MR. FINDLAY:  -- question.

14          THE COURT:  Okay.

15          MR. FINDLAY:  I think I know what my question is,

16  Mr. Caldwell.  That's my question.

17          THE COURT:  Okay.  He can answer that question

18  presumably, right?  Wait.

19          MR. CURRY:  Which -- which question?  It -- it gets

20  to --

21          MR. FINDLAY:  You didn't value the '820 patent

22  relative to all of the other patents in the CCE portfolio.

23          MR. CURRY:  He did, though.  And he used the denial

24  of the IPR institution as part of that.

25          MR. FINDLAY:  Where is that?  If you show me where

1    he did that -- well, he didn't -- that's not what he said in

2    his deposition.  He just said, no, he didn't do it because he

3    was talking about a damages analysis, not a valuing.

4         So I don't understand how this is conflating with

5    the IPR issue.  I don't see the connection at all.

6         MR. CURRY:  And it is part of his analysis.  And,

7    you know, at this point I think --

8         THE COURT:  No.  We're not getting into it.

9         MR. FINDLAY:  All right.

10        THE COURT:  So let's figure out how to frame the

11   question in a way that doesn't get into it and that is

12   consistent with his prior testimony.

13        MR. FINDLAY:  That's my question.  You haven't

14   valued the '820 relative to all of the other patents in the

15   CCE portfolio.  That's the only question I'm asking.  Then

16   I'm moving on.

17        THE COURT:  Okay.  Well, and so what is his prior

18   testimony on that?

19        MR. CURRY:  He has disclosed that his analysis

20   depends on, in part, how Apple tried to institute the '820

21   and failed and so that --

22        THE COURT:  So he has a place in his report where

23   he values only the '820 patent?

24        MR. CURRY:  Let -- let me answer very precisely

25   because it's not that he assigns like a certain weight.  It's

1   when he's figuring out which of the patents in that portfolio

2   are the most important.  He talks about how there is

3   significant importance for the '820.  He doesn't quantify it.

4   Maybe that's the question that Mr. Findlay can ask.

5           MR. FINDLAY:  That's the question I'm asking.

6           MR. CURRY:  So the question -- the question was had

7   he compared the value of the '820 patent, specifically,

8   relative to the other patents.  And so his --

9           MR. FINDLAY:  With the CCE portfolio, correct.

10          MR. CURRY:  I'm going to finish my point.

11          So I think what he's saying, and the reason that it

12  tripped up the witness, is he said this -- because there's

13  all of the threats of PTAB proceedings and so forth.  And

14  this one has been twice denied.  And so that's why -- I mean,

15  actually we're just trying to make sure that he doesn't step

16  on your orders.

17          THE COURT:  Right.

18          MR. CURRY:  But the question specifically says, why

19  does this one stand out?  Why is it relative to the others?

20  That's what it said.

21          MR. FINDLAY:  Respectfully, that's -- that's not

22  what I'm trying to ask him.  I'm simply trying to get the

23  point that I think it was clear in his report and his

24  deposition, that he didn't do an analysis of the '820 value

25  in comparison to all of the couple hundred patents in the CCE

```
 1    portfolio.  That's the only point I'm trying to get at,
 2    Judge.
 3              MR. CURRY:  Well --
 4              MR. FINDLAY:  I don't understand or agree that this
 5    conflates with the IPR MIL.
 6              MR. CURRY:  You can see why our witness got tripped
 7    up.  I mean, we -- we read the question.
 8              If Mr. Findlay is going to go into this, he needs
 9    to be extremely narrow in how he asks the question because,
10    otherwise, our -- our witness does have an answer to this,
11    but it's covered by our ruling.
12              MR. FINDLAY:  Where is his answer in the report
13    that says that?  You're saying that.  Show us where that is.
14    I think that's relevant to this discussion, guys.
15              MR. CURRY:  You don't think he talked about the IPR
16    denial of institution in his report?
17              MR. FINDLAY:  No, I'm sure he did.  My point is I
18    don't remember anything in his report where he said somehow
19    that he couldn't value the '820, relative to the other
20    patents because of that issue.  That's what I think you're
21    trying to tell the Judge.  And I'm saying, show us in the
22    report where that is.  Otherwise, you've got nothing to back
23    up your complaints about my question.
24              MR. CURRY:  I'm actually staying focused on the
25    question you asked him and --
```

```
 1              THE COURT:  I'm trying to figure out a question he
 2    can ask the witness at this point and not get into this
 3    objection.
 4              MR. CURRY:  I think mathematically calculate or
 5    something like that.  I mean, you know, I think then he can
 6    say no, and we can move on.
 7              MR. FINDLAY:  I'll ask:  Did you calculate the
 8    value of the '820 patent, relative to the value of the other
 9    patents in the portfolio?
10              MR. CURRY:  But I think that's still in the box
11    where this one is not relative to others.  So that's why I
12    think Mr. Curry's proposal is if it's sort of a
13    quantification thing, that might get you there.  But if his
14    point is always this one is higher --
15              THE COURT:  Can you just ask him:  Did you
16    mathematically calculate the value of the '820 patent
17    relative to the other --
18              MR. FINDLAY:  Sure.  I'll ask that question.
19    Is that fine?  We're not going to argue that's violating
20    something?
21              THE COURT:  And then no more, because we're
22    treading closely on the door here.
23              MR. CURRY:  And -- and do you want me to advise my
24    witness to stop -- or to proceed in a different way or --
25              THE COURT:  I don't think he's acting
```

 1   inappropriately.

 2           MR. CURRY:  Okay.

 3           THE COURT:  I just -- I just would like us to stop

 4   getting so close to MILs --

 5           MR. CURRY:  Yeah, I agree.

 6           THE COURT:  -- that trigger him.  Okay.

 7           MR. CURRY:  Thank you.

 8           (Bench conference concluded.)

 9           MR. FINDLAY:  May I proceed, Your Honor?

10           THE COURT:  You may.

11           MR. FINDLAY:  Thank you.

12   Q.   (By Mr. Findlay) Mr. Green, let me rephrase the question

13   I had.

14       Did you do any sort of mathematical calculation to

15   determine the value of the '820 patent, relative to all of

16   the other patents within the CCE portfolio?

17   A.   So you're asking about whether I did a fair market

18   valuation of the '820 patent versus other patents.  This was

19   discussed at my deposition.  And the answer is, I didn't do a

20   fair market valuation.  There are indicators, however, that

21   the '820 patent is more valuable than others in the patent

22   portfolio, which I discussed in my deposition as well.

23   Q.   Fair enough.  Thank you.

24       Let's talk about lump sum versus running royalties.

25       Your opinion that you presented to the jury in this case

1   is that Apple should pay a running royalty, correct?

2   A.   Correct.

3   Q.   A lump sum refers to a payment which is one time in

4   nature, fully pulled up -- fully paid up.  And once that is

5   paid, the alleged infringer gets a license to the patent,

6   goes on its way, and the parties can part company and never

7   have to worry about each other again.  Fair?

8   A.   That is one of the ways that a lump sum can be set up.

9   Some lump sums are for a period of time, so...

10  Q.   Okay.

11  A.   With that exception.

12  Q.   And I don't know if you said this in your direct

13  testimony or not, but the Sharp agreement, was that

14  running -- running royalty or a lump-sum agreement?

15  A.   That was a lump-sum agreement.  All of the -- I think I

16  testified that all of the agreements, all seven licenses,

17  were lump sums or had been calculated to lump sums.

18  Q.   So every license that CCE has entered for its portfolio,

19  including the '820, patent has been done on a lump-sum basis,

20  correct?

21  A.   The agreements came down to lump sums.  There's

22  indications, as I testified, that the lump sums were based on

23  counting up units or the -- and then calculating what a lump

24  sum would be based on those units.

25  Q.   But that's -- and I'm not trying to fuss at you, but

1    that's a long way of saying we agree all of the other license

2    agreements to the CCE portfolio, which included the '820

3    patent, are lump-sum agreements.  Fair?

4    A.    They came down to lump sums.  A lump sum can have a lot

5    of different meanings when you're looking at how license

6    agreements go together and what the parties are talking

7    about.

8    Q.    So I think we agree.  Do we agree?  Lump sum?

9    A.    With a caveat, yes.

10   Q.    Fair enough.  I'll take the caveat.  Fair enough.

11         And you're aware, are you not, that CCE's policy is that

12   it is fine with a lump sum or a running royalty and really

13   doesn't have a preference.  Fair?

14   A.    I think that's fair with respect to its licensing

15   practices, yes.

16   Q.    And you were here in the courtroom when Ms. Wagner

17   testified, were you not?

18   A.    Yes, I was.

19   Q.    And you heard her say something to that effect in

20   response to questions, that they were fine with a lump-sum

21   agreement, correct?

22   A.    I don't recall her necessarily saying that, but I know

23   that to be true.

24   Q.    Okay.  Did you read Ms. Wagner's deposition in this case

25   that was taken?

1   A.   Yes, sir.

2   Q.   And do you remember in her deposition where she talked

3   about and admitted that lump-sum agreements have certain

4   advantages, like the fact that you're paid all up front, you

5   don't have to worry about the other party going out of

6   business or not paying you, and that a lump sum can save on

7   things like reporting obligations and expenses?  Do you

8   remember that testimony?

9   A.   I do remember that testimony.

10  Q.   Now, I don't want you to tell me what the number is

11  until we close the courtroom, which we will be in a few

12  minutes, but you did provide a lump-sum opinion for Apple in

13  your expert report, correct?

14  A.   Yes, I did.

15  Q.   And that is -- and, again, we'll tell the jury what it

16  is when we seal the courtroom.  But that lump sum is an

17  amount that would be a one-time payment which Apple would

18  then have to make no other payments, free to go about its

19  way, correct?

20  A.   That's correct.

21  Q.   And it's your opinion that that is a reasonable amount

22  that you set forth as an alternative opinion in your report,

23  correct?

24  A.   That's true.

25  Q.   Okay.  Would you agree with me -- with this general

1  statement, that although you and I may disagree on the facts

2  of the case and how they play out or what side they support

3  or don't support, would you agree with me that it's important

4  for us to give the jury all the facts we can, so that they

5  can come to their decision?

6  A.   Oh, absolutely.  I would agree with that.

7  Q.   Would you agree with me that neither you nor I would

8  want to hide relevant facts from the jury?

9  A.   I think that's true, too, yes.

10  Q.   And would you agree with me that you certainly would not

11  want the jury to think that you were hiding relevant facts

12  from them?

13  A.   That's true, too.

14  Q.   Okay.

15       MR. FINDLAY:  Your Honor, at this time, I do think

16  we'll need to seal the courtroom.

17       THE COURT:  All right.  Let's seal the courtroom.

18  If you're not covered by the protective order, please exit.

19       (Courtroom sealed.)

20       (This portion of the transcript is sealed and filed

21       under separate cover as Sealed Portion No. 8.)

22       (Courtroom unsealed.)

23       MR. NELSON:  And, Your Honor, we have three short

24  video clips before our last live witness.

25       And the first one is Ms. Supriya Gujral.  And she

 1   is the director of partner marketing at Apple.

 2            (Video clip playing.)

 3            QUESTION:  Please state your name.

 4            ANSWER:  Supriya Gujral.

 5            QUESTION:  And, Ms. Gujral, who do you work for?

 6            ANSWER:  I work for Apple.

 7            QUESTION:  And what is your title at Apple?

 8            ANSWER:  My title is director of partner marketing.

 9            QUESTION:  Ms. Gujral, do you understand that

10   you've been sworn to testify truthfully and to the best of

11   your ability just as if you were in court in front of a jury

12   today?

13            ANSWER:  Yes.

14            QUESTION:  Is battery life important to Apple's

15   customers -- Apple's iPhone customers?

16            ANSWER:  Yes.

17            QUESTION:  Why do you say battery life is important

18   to Apple's iPhone customers?

19            ANSWER:  Only because you would want to keep your

20   phone running all day long.

21            (Video clip ended.)

22            MR. NELSON:  Your Honor, the next short video clip

23   will be Mr. Matthias Sauer, and he's the director of cellular

24   hardware and architecture at Apple.

25            (Video clip playing.)

1        QUESTION:  Sir, please state your name.

2        ANSWER:  My name is Matthias Sauer.

3        QUESTION:  You're an inventor on two patents; is

4   that correct?

5        ANSWER:  I'm, I think, currently on two and a

6   number of pending.

7        QUESTION:  Do you think it's worse to infringe a

8   large company's patent or a small company's patent?

9        ANSWER:  I don't think it depends on the size.

10        QUESTION:  Does Apple respect intellectual

11   property?

12        ANSWER:  Yes.

13        QUESTION:  Has Apple changed the way it does things

14   or any of its technology in response to filing this lawsuit?

15        ANSWER:  I'm -- I'm not aware of that.  I don't

16   know.  I do not know that.

17        QUESTION:  What's your educational background?

18        ANSWER:  I received training as electrical engineer

19   in Germany and finished that with a diploma degree, which is

20   somewhat equivalent to master's degree, and continued on with

21   a -- with a Ph.D. in electrical engineering.

22        QUESTION:  And where did you attain your Ph.D. in

23   electrical engineering?

24        ANSWER:  Technical University of Munich, Germany.

25        QUESTION:  And when were you awarded the Ph.D.?

1              ANSWER:  It was in 1994.

2              QUESTION:  Did you start working in industry after

3    that?

4              ANSWER:  No.  I did a few more years of research,

5    academic research, as a post-doc first in Gothenburg, Sweden,

6    and afterwards at the University -- excuse me -- University

7    of Oxford.

8              QUESTION:  And what was your post-doctoral research

9    in?

10             ANSWER:  It was in formal methods for hardware

11   design.

12             QUESTION:  You said formal methods --

13             ANSWER:  Yes.

14             QUESTION:  -- for hardware design?

15             ANSWER:  Hardware design, yes.

16             QUESTION:  What does that mean?

17             ANSWER:  It means how to use high-level languages

18   and logic reasoning to design circuit architectures or

19   computer architectures in a specific, correct manner and have

20   proof techniques to show that the design you made is correct.

21             QUESTION:  Have you ever heard of flow control

22   buffer status reporting?

23             ANSWER:  Actually, I've heard of that.

24             QUESTION:  What is flow control buffer status

25   reporting?

1        ANSWER:  So that's -- yeah.  So that rings a bell

2    now.  So there's a way of controlling the thermal dissipation

3    of the -- of the modem that the Qualcomm chipset provides,

4    and it's used in our devices to avoid overheating.

5        And one way -- or one of the ways to accomplish

6    that is to throttle the throughput in the uplink or the

7    downlink.  And that -- in that regard, you control the uplink

8    or downlink flow.  And you could accomplish that through

9    using buffer status reports.

10        QUESTION:  So how does -- how does flow control BSR

11   affect thermal dissipation?

12        ANSWER:  So, if you control the uplink flow to send

13   fewer data, fewer payload data, then there's less computation

14   to be done in the uplink; and, therefore, there's also less

15   uplink activity on the power amplifier, which in turn leads

16   to a lower dissipated heat in the electric device, electronic

17   devices.

18        QUESTION:  Well, why is it important to seek a

19   lower dissipated heat?

20        ANSWER:  Well, from a user's perspective, if you

21   want to -- well, or -- well, just in general, you don't want

22   the device to exceed a certain temperature at the outside

23   skin of the device.

24        And that's one -- one reason.  So you want to

25   control that.  And the baseband is one contributor of many

1    that's taken into consideration.

2           Another reason is that the circuitry might exceed

3    their operating temperature range, and you want to control

4    that to avoid an uncontrolled shutdown of the device.

5           (End of video clip.)

6           MR. NELSON:  And, lastly, Your Honor, there's

7    Mr. Vijay Ramamurthi.  He's a software engineer at Apple who

8    works on LTE.

9           (Video clip playing.)

10          QUESTION:  Good morning.

11          ANSWER:  Good morning.

12          QUESTION:  Will you please state your name for the

13   record?

14          ANSWER:  My name is Vijay Kumar Ramamurthi.

15          QUESTION:  Question, what documents did you review

16   in preparation for today?

17          ANSWER:  I did -- apart from the context of the

18   litigation, I did go through the specification, MAC

19   specification.

20          QUESTION:  What specification?

21          ANSWER:  The MAC specification.

22          QUESTION:  What's the MAC specification?

23          ANSWER:  LTE 36.321.

24          QUESTION:  Okay.  We'll get to that later.  But I

25   assume you're referring to the LTE standard specification?

1                ANSWER:  That is correct.

2                QUESTION:  It sounds like you looked at documents

3    other than the MAC specification.  I want to know what those

4    documents are.

5                ANSWER:  Okay.  I looked at the patent application.

6                QUESTION:  The patent application?

7                ANSWER:  Yeah.

8                QUESTION:  Based on what you read, what do you know

9    about the patent?

10                ANSWER:  Again -- again, the -- the -- the patent

11   document is -- is a legal document, first of all.  So I do

12   not really understand much of it.  You know, it's a lot of

13   legal jargon in there.

14                And I was just going through -- you know, just

15   glancing through what the patent was so that -- that -- you

16   know, so I have some understanding of the patent.

17                QUESTION:  So you didn't really read the patent in

18   detail; you just glanced at it?

19                ANSWER:  That would be a correct statement, yes.

20                QUESTION:  You just glanced at it.

21                ANSWER:  Yeah.

22                QUESTION:  For a minute?  Two minutes?

23                ANSWER:  Maybe five to ten minutes.

24                QUESTION:  Five -- just -- okay.  Just glanced at

25   it for five to ten minutes?

1              ANSWER:  Yes.

2              QUESTION:  Did you look at any other documents in

3      preparation for today?

4              ANSWER:  Yes.  I did mention that I did look at the

5      LTE specification document.

6              QUESTION:  You work for Apple.

7              ANSWER:  Yes.

8              QUESTION:  How long have you worked for Apple?

9              ANSWER:  I started working there in August 2014.

10             QUESTION:  2014?

11             ANSWER:  Yes.

12             QUESTION:  What's your current job title?

13             ANSWER:  Senior software engineer.

14             QUESTION:  Do you have any people that report to

15     you?

16             ANSWER:  No.

17             QUESTION:  When you started in 2014, what was your

18     job title?

19             ANSWER:  It was the same job title.

20             QUESTION:  What would you say are your main

21     responsibilities at Apple?

22             ANSWER:  My job is to -- I work on the LTE system,

23     and I troubleshoot and, you know, fix bugs, if any, in the

24     LTE system.

25             QUESTION:  Do you know anything about CCE, or

1    Cellular Communications Equipment, also the Plaintiff in this

2    case?

3              ANSWER:  No, I do not.

4              QUESTION:  I'm just asking you, like, what day or

5    year or whatever did you first learn about this patent?

6              ANSWER:  The first time was regarding this

7    litigation sometime, and I don't remember the exact date.

8              QUESTION:  So ballpark, within the last week?

9              ANSWER:  Maybe -- maybe a few weeks.

10             QUESTION:  Do you wish you would have known about

11   the '820 patent earlier than just a few weeks ago?

12             ANSWER:  No.

13             (End of video clip.)

14             MR. HILL:  Your Honor, before we call our next

15   witness, there's one matter we'll need to take up with the

16   Court.

17             THE COURT:  All right.

18             (Bench conference.)

19             MR. HILL:  Your Honor, I wanted to approach

20   regarding a potential limine issue that's going to come up

21   with Ms. Mewes, who will be our next witness.  She's an Apple

22   in-house lawyer.

23             The issue, Your Honor, is Apple has made a

24   concerted effort to put Ericsson as a central figure in this

25   case by pursuing a defense that depends largely on

1    discrediting the inventor and suggesting to the jury that an

2    Ericsson witness would come in this courtroom and explain

3    that Mr. Sebire was not the sole inventor on the '820 or that

4    others made contributions -- their derivation defense, if you

5    will.

6         By doing so, Your Honor, they have put plainly at

7    issue the relationship between Apple and Ericsson because it

8    goes to the credibility of the Ericsson witness and the bias

9    that that witness may have because of the relationship

10   between Apple and Ericsson.

11        So as part of my questioning of Ms. Mewes, who has

12   testified in her deposition and has personal knowledge of

13   that relationship, I would like to ask about the

14   relationship, about the fact that there is a license

15   agreement between the two, that it was entered in December of

16   2015, and the terms of that license agreement generally.

17        I don't plan to try to admit the document.  I don't

18   plan to put the document in front of the jury.  I plan to

19   simply expose the extent of Apple's relationship with

20   Ericsson because it is directly relevant to the bias and to

21   the credibility of both Apple's story and of the testimony

22   we're going to hear from an Ericsson witness soon, Magnus

23   Stattin.

24        Ms. Mewes will be the only Apple representative who

25   will have personal knowledge of the license agreement through

```
 1    whom I can make these points.  And so I would ask leave of

 2    the Court to do that and make sure I'm clear of any limine

 3    issues before I do so.

 4              THE COURT:  Response.

 5              MR. LUMISH:  Do you need to do it in the next

 6    15 minutes, or could we take this up in the morning after I

 7    have a chance to look at the deposition testimony?  Because

 8    this is catching me a little bit by surprise.

 9              MR. HILL:  Your Honor, I would prefer to put my

10    witness on and keep our trial moving.

11              MR. LUMISH:  No, no.  I mean, do you need to ask

12    those questions, though, in the first 15 minutes?

13              MR. HILL:  It's the first part of my -- of my

14    issues, Your Honor.  I may not get fully through them today.

15              THE COURT:  Then -- then we'll let the jury go for

16    the day.  I've got a few issues I need to take up with y'all

17    anyway.  And we'll start with her first thing in the morning,

18    and we'll take up this issue.

19              MR. LUMISH:  Thank you, Your Honor.

20              THE COURT:  All right.

21              MR. LUMISH:  Appreciate that very much.

22              MR. HILL:  Thank you.

23              (Bench conference concluded.)

24              THE COURT:  Ladies and Gentlemen of the Jury, you

25    have put in a long, hard day.  I've been watching you pay
```

1   attention.  I appreciate it.  And the parties do, too.  Your

2   reward, we're going to stop 15 minutes early today.  You've

3   earned it.

4          So I'll see you in the morning at 9:00 a.m.  Do not

5   discuss the case with anyone.  Talk about whatever else is

6   going on in your day but not this case, all right?  We'll see

7   you tomorrow.

8          COURT SECURITY OFFICER:  All rise.

9          (Jury out.)

10          THE COURT:  Please be seated.

11          All right.  We'll take up the next witness in the

12   morning.  I'll encourage y'all to continue to meet and confer

13   on that issue.

14          MR. HILL:  Your Honor, I'm -- I'm happy to meet and

15   confer and deal with it in the morning.  The reason I raise

16   it today, too -- or would like to raise it today, is just to

17   have some certainty so when I come in in the morning I know

18   which direction I have to go, so to speak.

19          So to the extent the Court can give me guidance

20   about whether that topic will be allowed to be explored, I

21   would appreciate it.  But if you can't, and I need to do it

22   in the morning, I certainly respect that, too.

23          THE COURT:  I would like to hear a response before

24   I make a ruling.  So I'm going to -- I'm going to give

25   Mr. Lumish the time he needs to look back over the testimony

```
 1    and give me an adequate response.
 2              MR. HILL:  And we'll certainly -- I'm certainly
 3    willing to discuss it with him as well so that they
 4    understand the extent of what I'm planning so that if we can
 5    do it by agreement we can do it.
 6              THE COURT:  Very good.
 7              MR. LUMISH:  That's all I ask for.  Thank you, Your
 8    Honor.
 9              THE COURT:  Okay.  All right.  Before I let you all
10    go -- we're early so I didn't develop your trial times.
11    I'll -- sorry, you're going to have to wait until in the
12    morning for those.
13              But the Court has received your joint proposed jury
14    instructions.  Thank you for submitting those in in joint
15    form.  In the e-mail it said we're going to continue and meet
16    and confer and see if we can narrow down some of these
17    disputes.
18              As you know, the Court takes the charge very
19    seriously, and it is a heavy work burden -- workload for the
20    Court to get it done and in final form.
21              What I don't want to do is spend our late night
22    tonight and through the weekend getting this thing whittled
23    down to find out on Monday you-all have worked out a bunch of
24    these disputes.
25              Have you had a meaningful meet-and-confer about the
```

1    charge?  Would more time be beneficial?  Can you look at it

2    tonight and give me an updated version in the morning?  I'm

3    just trying to --

4              MR. HILL:  Yes, Your Honor, we can look at it

5    tonight.  And we will give you an updated version in the

6    morning.

7              MR. LUMISH:  Agreed.  Absolutely.

8              THE COURT:  Okay.  All right.  Then just to give

9    you an idea of tomorrow, we will go until noon and we will

10   recess until Monday morning, okay?

11             Is there anything further the Court can help you

12   with?

13             MR. LUMISH:  Not from Defendants, Your Honor.

14             THE COURT:  All right.  We'll be in recess until

15   tomorrow morning.

16             COURT SECURITY OFFICER:  All rise.

17             (Court adjourned.)

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3              IT IS HEREBY CERTIFIED that the foregoing is a

4    true and correct transcript from the stenographic notes of

5    the proceedings in the above-entitled matter to the best of

6    our abilities.

7

8    /s/_____
9    CHRISTINE BICKHAM, CRR, RMR          September 8, 2016
     Official Court Reporter
10

11

12   /s/_____
     SHEA SLOAN, CSR, RPR
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25