1           IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF TEXAS
2                     TYLER DIVISION

3
CELLULAR COMMUNICATIONS          )
4  EQUIPMENT, LLC
                                 )   DOCKET NO. 6:14cv251
5
      -vs-                       )
6                                    Tyler, Texas
                                 )   8:33 a.m.
7  APPLE INC., ET AL                 September 9, 2016

8
                      TRANSCRIPT OF TRIAL
9         BEFORE THE HONORABLE K. NICOLE MITCHELL,
               UNITED STATES MAGISTRATE JUDGE
10
                    A P P E A R A N C E S
11
FOR THE PLAINTIFF:
12
MR. BRADLEY W. CALDWELL
13  MR. JOHN AUSTIN CURRY
CALDWELL CASSADY & CURRY
14  2101 Cedar Springs Rd., Suite 1000
Dallas, Texas 75201
15
MR. EDWARD R. NELSON III
16  NELSON BUMGARDNER PC
3131 West 7th Street, Suite 300
17  Fort Worth, Texas 76107

18  MR. J. WESLEY HILL
WARD, SMITH & HILL PLLC
19  1507 Bill Owens Parkway
Longview, Texas 75604
20

21  COURT REPORTER:      MS. CHRISTINA L. BICKHAM, CRR, RMR
                     FEDERAL OFFICIAL COURT REPORTER
22                   300 Willow, Ste. 221
                     Beaumont, Texas 77701
23

24  Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.
25

```
 1  FOR THE DEFENDANTS:

 2
    MR. DOUGLAS E. LUMISH
 3  MR. JEFFREY G. HOMRIG
    MS. LISA K. NGUYEN
 4  MR. BRETT M. SANDFORD
    LATHAM & WATKINS LLP
 5  140 Scott Dr.
    Menlo Park, California 94025-1008
 6

 7  MR. JOSEPH H. LEE
    LATHAM & WATKINS LLP
 8  650 Town Center Drive, 20th Floor
    Costa Mesa, California 92626-1925
 9

10  MR. ERIC H. FINDLAY
    FINDLAY CRAFT PC
11  102 N. College Avenue, Suite 900
    Tyler, Texas 75702
12

13

14              ******************************

15                    P R O C E E D I N G S

16          (Jury out.)

17          THE COURT:  I know we've got a few issues to take

18  up this morning before we bring in the jury.  I also want to

19  give you your trial times as of the end of the day yesterday.

20          Plaintiff has used 6 hours and 51 minutes.

21  Defendant has used 5 hours and 1 minute.  And that's just on

22  the jury issues.

23          So what's the first thing we need to take up?

24          MR. LUMISH:  The first issue for me, Your Honor --

25  and this is Doug Lumish for Apple -- is Mr. Stattin's lawyer
```

1  told me yesterday that he needs to fly home to Sweden

2  tomorrow.  I have discussed it with Mr. Hill.

3        I think we have a solution that works for both of

4  us, which we hope will work for the Court, which is they will

5  start with Ms. Mewes today.  I understand their examination

6  sounds like it will be about a half an hour.

7        We'll do some redirect with Ms. Mewes, but if it

8  looks like it's going to go longer than would allow

9  Mr. Stattin to go up and down today, we'd like to state to

10 the Court that we're going to reserve the rest of our

11 questions, we have more questions for her, but that we're

12 going to reserve them in order to let Mr. Stattin go and get

13 home to Sweden, give them a chance to rest, call Mr. Stattin

14 and then go back to our witnesses and our case-in-chief.

15        THE COURT:  Any objection?

16        MR. HILL:  No, Your Honor.

17        THE COURT:  Okay.  That's great.

18        MR. LUMISH:  There's -- we were waiting for a

19 ruling from you on the key deposition designations which

20 we'll need to play the video at some point, but I don't think

21 you need to do that at this moment, Your Honor.

22        THE COURT:  Let me hear argument on that again.

23 I've reviewed the deposition.  I've the gotten notice from

24 you-all in light of the testimony yesterday.

25        MR. LUMISH:  It's fairly straightforward.  He's the

1    CEO of CCE.  He's the only CCE witness that would be

2    appearing in this case.  We think the jury should hear from

3    him.

4            There's been an effort -- and I think we'll see

5    more of an effort when our witnesses appear -- to paint them

6    as having been cavalier or negligent about the way they went

7    about this case; that they didn't review source code

8    sufficiently; that they didn't do the things that CCE thinks

9    they should have done in response to this case.  And I think

10   it's only fair to have some balance in that.

11           Mr. Key is the person who was sending letters back

12   and forth to Apple.  He's the one who's at the top of the

13   letterhead, as it were, on this case and this company.  And

14   this testimony goes to some of that.

15           In addition, it just is relevant to damages issues

16   as much as anything else.  They have presented the '820

17   patent as if it were the crown jewel and the most important

18   thing in the CCE portfolio.  And we think it's very clear

19   from Mr. Key's testimony that he didn't, at least, observe

20   that or -- or believe that.

21           THE COURT:  Okay.  Response.

22           MR. HILL:  Thank you, Your Honor.  Wesley Hill for

23   the Plaintiff.

24           Your Honor, we oppose the playing of Mr. Key's

25   deposition, for a couple reasons.

1          No. 1, this issue that suggesting there needs to be

2     parity between the facts that we showed about Apple's either

3     diligence or lack of diligence in terms of reviewing the

4     allegations in this case actually go to the issue that the

5     jury has to decide.  It goes to the willfulness case.  It

6     also goes to the intent elements that accompany an inducement

7     claim.  And so those are things that are material to a fact

8     our jury will have to decide.

9          And when you turn that around and you try and use

10     it as a justification to then play testimony to simply try to

11     disparage Mr. Key by suggesting that he is some way out of

12     touch or not as tuned in to this litigation as Apple would

13     prefer, we're not pursuing an issue that's actually before

14     the Court.

15          And so I think there's a fundamental disconnect in

16     terms of that argument.  One goes to a material fact; one

17     goes to an irrelevant fact for which the prejudicial value

18     clearly outweighs any probative value because there is no

19     probative value.  So that's the first point, Your Honor.

20          With regard to the -- and frankly, Your Honor,

21     that's the majority of the Key deposition.  I mean, I know

22     the Court has seen it, and the Court has reviewed it.  You

23     know, to the extent that they want to select portions of it

24     to go to some relevant element of the case, something other

25     than just trying to suggest that they're attacking Acacia's

1    business model, which the Court has dealt with in the motion

2    in limine context and said it's improper, or whether they are

3    disparaging corporate character, which the Court has said in

4    the limine rulings is improper, or they are just simply

5    trying to, you know, make Mr. Key look bad, which is what we

6    think the majority of the depo goes toward, we maintain our

7    objections.

8            We would ask that the Court, frankly, exclude most,

9    if not all, of the deposition because of those issues.  And

10   at minimum, Your Honor, we would ask the Court review our

11   actual objections to the page and line and give us specific

12   rulings on the issue because this is a point of preservation

13   for us on which we need to make a clear record.

14           THE COURT:  Response.

15           MR. LUMISH:  Yes, your Honor.

16           First of all, they -- they've only objected to

17   about four minutes of the proposed video, so I don't think

18   they're entitled to raise the objection to the larger video.

19   The rest should come in.  They've waived objections, we've

20   negotiated those in meet and confer according to the normal

21   process.

22           There's four minutes of time that they want

23   excised, which I believe was handed up to Your Honor.  So we

24   would ask that you only rule on that four minutes as opposed

25   to the larger video which has been negotiated.

1          Otherwise, I think I've -- I've made my point, Your

2     Honor.  We think it's relevant to damages, we think it's

3     relevant to the -- to the overall balance of the case.

4          THE COURT:  Okay.  I'm going to exclude this --

5     this four minutes that you-all handed up yesterday.  Everyone

6     represented to me that this was the disputed portion of the

7     testimony.  So everything else is coming in.

8          MR. HILL:  Your Honor, may I raise one issue?  And

9     I will confess a lack of familiarity with the extent of all

10    the designations.  But to the extent the designations deal

11    with going after Acacia's business model from a licensing

12    standpoint, we think that opens the doors to a number of

13    things, including things like the Rockstar Consortium and

14    other matters that could be pertinent to other witnesses in

15    this case.

16         THE COURT:  Are we even going to get to this depo

17    clip today before lunch?

18         MR. LUMISH:  I doubt it, your Honor.

19         THE COURT:  Okay.  Well, I would encourage y'all to

20    keep -- to -- to have more discussion about that because I

21    understood that this was the only portion that was objected

22    to.  So if now that's different, I -- I need to know about

23    it.

24         MR. HILL:  Thank you, Your Honor.

25         THE COURT:  All right.  What's next?

1          MR. LUMISH:  Lastly, I think Mr. Hill and I reached

2    another agreement.  I think we ought to talk to each other

3    every night.  It was a nice change of pace.

4          So we addressed the Ericsson issue that Mr. Hill

5    raised with you in sidebar yesterday, Your Honor, and have

6    reached what I believe is an agreement.  I'd like to read it

7    out to you, if I may?

8          THE COURT:  Please, yes.

9          MR. LUMISH:  So -- and for the purpose of trying to

10   establish bias with Ms. Mewes this morning we have agreed

11   that CCE --

12         MR. HILL:  Mr. Lumish, that may be the question you

13   were just asking.  Do we need to do anything for the

14   protective order --

15         MR. LUMISH:  Well, that was the question he was

16   just asking me, whether we should seal the courtroom for the

17   purpose of -- may we do it on sidebar?

18         THE COURT:  Yeah, if y'all want to.

19         MR. LUMISH:  Would that be acceptable, Your Honor?

20         (Courtroom sealed.)

21         (This portion of the transcript is sealed and filed

22         under separate cover as Sealed Portion No. 9.)

23         (Courtroom unsealed.)

24         THE COURT:  All right.  Mr. Hill, let's take up the

25   next matter.

1          MR. HILL:  Thank you, Your Honor.

2          Your Honor, we have one other issue we were going

3   to put on the record.  The parties have agreed that neither

4   will mention anything to do with the alleged job offer Mr.

5   Sebire got from Apple for the remainder of the jury trial.

6          This means we can both be assured here that there

7   will be no further testimony, evidence, or argument mentioned

8   in closing arguments, anything of the sort on the subject for

9   the remainder of the jury trial.  To the extent it's relevant

10  to bench issues, we'll raise those with the Court.  And the

11  parties have made that agreement.

12          MR. LUMISH:  We agree, Your Honor.

13          THE COURT:  Very good.

14          Anything else?

15          MR. LUMISH:  Not from us.

16          THE COURT:  Thank you-all for your hard work last

17  night.  It's evidence and I appreciate the agreements.

18          MR. HILL:  Your Honor, I'm going to spoil your

19  praise.  We spoke too soon.

20          We -- we do -- and I don't know that it's a

21  dispute, but it's an issue I want to raise.

22          With regard to prior art references that the

23  Defendants actually intend to pursue in their case, we don't

24  know what those are still.  We have -- we know it could be

25  among a universe of, I don't know, six or eight -- nine I'm

1    told -- but we don't know which of the nine.  We know it

2    won't be all nine.  They know it won't be all nine.

3         We don't want to be put in the position that the

4    first time we learn what they're actually going to use for

5    their invalidity case is when their last witness presumably,

6    or close to last witness, Mr. Acampora, hits the stand and

7    testifies.  And then we have that quick turnaround putting on

8    a rebuttal case knowing for the first time what they're

9    actually pursuing.

10        So we would ask that the Court require there be

11   some identification by the weekend period so that we can

12   start work with our folks who, you know, aren't all staying

13   in town over the weekend -- there's a travel issue here in

14   terms of working with experts -- so that we're on fair

15   notice, we can prepare adequately for what's going to be

16   launched at us.  I'm not asking for a preview of their case,

17   just asking which records will actually be pursued.

18        MR. LUMISH:  I think we're happy to let them know

19   over the weekend, Your Honor.  Another thing we probably

20   should have talked about last evening.

21        So I think we'll be able to work that out.  I don't

22   have a list in my head right now, so I'll need to go back and

23   figure it out; and we'll let them know over the weekend.

24        MR. HILL:  Okay.  We would ask by midday Saturday

25   if at all possible, Your Honor.

1       MR. LUMISH:  How about by Sunday morning?

2       MR. HILL:  We can -- we can live with that.

3       MR. LUMISH:  All right.

4       THE COURT:  Thank you.

5       MR. LUMISH:  See how that works?  Thank you, Your

6   Honor.

7       THE COURT:  My praise continues.  Good job.

8   All right.  We'll be in recess until 9:00 a.m.

9       (Recess.)

10      (Jury in.)

11      THE COURT:  Good morning, Ladies and Gentlemen of

12  the Jury, we're going to fit in a half day this morning, and

13  we'll recess at lunchtime.

14      Plaintiffs, who will be your next witness?

15      MR. HILL:  Thank you, Your Honor.  At this time the

16  Plaintiffs call Ms. Heather Mewes.

17      THE COURT:  Oh, Mr. Hill, may we take up a -- looks

18  like a housekeeping matter?

19      MR. HILL:  You sure can.  I jumped the gun, Your

20  Honor.  I apologize.

21      MR. MCMANIS:  Good morning, Your Honor.

22      First, Plaintiff would move into evidence PX-56,

23  which was used yesterday in the redirect of Mr. Green.

24      THE COURT:  Any objection?

25      MR. SANDFORD:  No objection, your Honor.

1          THE COURT:  All right.

2          MR. MCMANIS:  And with that, Plaintiff offers its

3     list of trial exhibits admitted through September 8th.

4          THE COURT:  Any objection to the exhibits on that

5     list?

6          MR. SANDFORD:  No objection, Your Honor.

7          THE COURT:  Okay.  That will be admitted.

8          MR. MCMANIS:  May I approach?

9          THE COURT:  You may bring that up here.

10          Thank you.

11          MR. SANDFORD:  Good morning, Your Honor.  Brett

12     Sandford for Apple.

13          Apple would like to offer the evidence of their

14     preadmitted list for September the 9th.

15          THE COURT:  Any objection?

16          MR. MCMANIS:  No objection, Your Honor.

17          MR. SANDFORD:  May I approach?

18          THE COURT:  You may.

19          Those exhibits will also be admitted.

20          MR. FINDLAY:  One --

21          THE COURT:  Mr. Findlay.

22          MR. FINDLAY:  Thank you, Your Honor.

23          Your Honor, I wanted to take just a second and to

24     sincerely apologize to the Court, to the jury, and to

25     opposing counsel for the mistake I made yesterday with the

1   document at the end of Mr. Green's cross-examination.  I was

2   taught to measure twice and cut once, and I didn't do that.

3   And for that I apologize.

4          This had nothing to do with my client or the team.

5   It's all on me, and I just wanted to make that representation

6   to the Court in open court and on the record.

7          Thank you, Judge.

8          THE COURT:  Thank you, Mr. Findlay.

9          All right.  Mr. Hill, who will be your next

10  witness?

11         MR. HILL:  Your Honor, at this time we call

12  Ms. Heather Mewes.

13         THE COURT:  Good morning, Ms. Mewes.  If you'll

14  just please come right over here and raise your right hand to

15  be sworn.

16         (Witness sworn.)

17         THE COURT:  Thank you.

18         HEATHER MEWES, PLAINTIFF'S WITNESS, SWORN

19                        DIRECT EXAMINATION

20  BY MR. HILL:

21  Q.   Good morning, Ms. Mewes.  How are you?

22  A.   Good morning.  Good, thank you.

23  Q.   My name's Wesley Hill.  I represent CCE, the Plaintiff

24  in this case.

25         I don't believe we've met before.

1   A.   No, sir.

2   Q.   Well, let me ask you this:  Is it your first time in

3   East Texas?

4   A.   It is not.

5   Q.   Okay.  Well, I was going to welcome you if it was, but

6   welcome back.

7   A.   Thank you.

8   Q.   Now, I understand that, Ms. Mewes, you're an attorney

9   with Apple's legal department; is that right?

10  A.   That's correct.

11  Q.   Okay.  What's your title?

12  A.   Principal counsel.

13  Q.   And what are your responsibilities as principal counsel

14  for Apple?

15  A.   So I have a number of responsibilities; but one of them

16  relates to patent licensing, particularly with respect to

17  cellular essential patents.

18  Q.   Okay.  And are you responsible for Apple's cellular

19  standard essential licensing?

20  A.   Yes.

21  Q.   All right.  Now, before this case, I understand that you

22  were a patent attorney with a national law firm just like the

23  lawyers representing Apple here today; is that right?

24  A.   So, yeah, I was a -- I was a litigator at a law firm.

25  That's correct.

1    Q.    How long did you do that?

2    A.    It was about 13 years, I think.

3    Q.    Okay.  So fair to note, you know more than most people

4    about patent lawsuits?

5    A.    I know some.  I don't know about most people.

6    Q.    All right.  Well, you spent 13 years as a litigation

7    attorney and, ultimately, a litigation partner practicing

8    intellectual property law, right?

9    A.    Yes, that's right.

10   Q.    Okay.  Now, you were here for opening statements?

11   A.    Yes, sir.

12   Q.    Have you heard any summaries or descriptions in the

13   testimony this week?

14   A.    No, sir.

15   Q.    All right.  And that's because you've been out of the

16   room all week, right?

17   A.    That's correct.

18   Q.    And that's because we have a Rule in court that fact

19   witnesses don't sit in during other fact witnesses'

20   testimony, correct?

21   A.    That's right.

22   Q.    So I want to talk to you a little bit about something

23   we've heard from Apple's lawyers in opening statements when

24   you were present in the courtroom, okay?

25   A.    Okay.

1    Q.   Now, you'll remember that Mr. Homrig showed some

2    slides -- counsel for Apple -- he showed some slides, and he

3    said that Apple would show that Mr. Sebire didn't invent

4    what's in the '820 patent, that other people at 3GPP made

5    part of those inventions.

6         Do you recall those suggestions?

7    A.   Yes, I do recall that.

8    Q.   And would you agree that it's important when you're in a

9    courtroom, when you have a jury assessing whether a party is

10   telling them the truth or not -- would you agree that it's

11   important to consider people's motivations when they testify?

12   A.   Yeah.  Sure.

13   Q.   And those can be things like money, like business

14   relationships, like common interests.

15        Do you agree all of those things can be matters that

16   affect potential bias and the credibility of the witness?

17   A.   Yeah.  I think you want to look at the full picture.

18   Q.   And those are all important considerations when you're

19   assessing credibility and trying to decide whether or not the

20   party's story is worthy of belief; isn't that right?

21   A.   Yeah, I think so.

22   Q.   And so we heard in opening statement a lot about a

23   company called Ericsson.

24        Do you recall that?

25   A.   Yes, I do.

```
 1    Q.    And we also heard from Mr. Homrig that there would be

 2    this gentleman from Ericsson that would come into this

 3    courtroom and that would tell this jury -- convince them --

 4    not just tell them, convince them, because there's a clear

 5    and convincing evidence burden -- convince them that

 6    Mr. Sebire didn't invent the very thing for which the Patent

 7    Office, after a full examination, granted Mr. Sebire the '820

 8    patent.

 9         Recall that?

10    A.    I do recall that, yes.

11    Q.    In fact, we had a series of slides that were used.

12              MR. HILL:  Can we take a look at those?

13    Q.    (By Mr. Hill) There was a series of slides.  There was

14    this slide where the reference was made about these other

15    people that were around the table at the 3GPP meetings.

16         Do you recall that?

17    A.    Yes, I do.

18    Q.    And then we saw this slide here where we saw a picture

19    of a fellow who presumably is going to be this witness from

20    Ericsson that's going to come tell us all about how

21    Mr. Sebire didn't invent what the Patent Office granted him

22    the '820 patent on, correct?

23    A.    That's what I heard in openings, yes.

24    Q.    Full disclosure to the jury important, Ms. Mewes?

25    A.    Sure.
```

```
1    Q.   Well, in full disclosure, Ericsson is no stranger to

2    Apple, is it?

3    A.   No.  That's right.

4         MR. HILL:  Your Honor, at this time, I think we

5    need to seal the courtroom because of some protective order

6    issues that may come up.

7         THE COURT:  All right.  Ladies and Gentlemen, we're

8    going to seal the courtroom.

9         Now, the protective order in this case covers

10   counsel of record for a party.  Because of the nature of the

11   testimony we're going over today, I'm going to ask that only

12   counsel for Apple, CCE, and Ericsson remain in the courtroom,

13   as well as any testifying experts.

14        If you don't fall into one of those categories,

15   then I need you to exit now, please.

16             (Courtroom sealed.)

17             (This portion of the transcript is sealed and filed

18             under separate cover as Sealed Portion No. 10.

19             Due to the nature of this testimony, Sealed Portion

20             No. 10 will be filed double locked.)

21             (Courtroom unsealed.)

22        THE COURT:  Good morning.  If you'll please raise

23   your right hand and be sworn.

24             (Witness sworn.)

25        MAGNUS STATTIN, PH.D., DEFENDANTS' WITNESS, SWORN
```

```
 1                         DIRECT EXAMINATION

 2    BY MR. LUMISH:

 3    Q.    Good morning, Dr. Stattin.

 4    A.    Good morning.

 5    Q.    We talked by video conference.  I'll introduce myself

 6    again since we've not met in person.  My name is Doug Lumish.

 7    I'm a lawyer for Apple.  Thank you very much for being here

 8    today.

 9          Would you mind introducing yourself to our jury?

10    A.    I'm Dr. Magnus Stattin from Sweden.  I work at Ericsson,

11    and I'm here to testify today.

12    Q.    Did you pronounce it Stattin?

13    A.    Stattin, yes.

14    Q.    Okay.  My apologies for mispronouncing it.

15          Are you a married man, sir?

16    A.    I'm a married man.

17    Q.    And do you have any kids?

18    A.    I have three children; a 7-year-old daughter, and two

19    boys soon to be 6 and 3 years old.

20    Q.    And where do you live?

21    A.    I live in a suburb to Stockholm on the north side.  It's

22    called Upplands Vasby.

23               THE REPORTER:  What was -- can you repeat the name

24    again?

25               THE WITNESS:  Upplands Vasby.
```

1          THE REPORTER:  Okay.

2    Q.   (By Mr. Lumish) And you said near Stockholm.  That's in

3    Sweden, then?  Pardon me.  I hadn't heard of your hometown so

4    I assume that's still in Sweden?

5    A.   It is in Sweden.

6    Q.   Okay.  Then where did you grow up?

7    A.   I grew up in Upplands Vasby.

8    Q.   Can you tell us a little bit about your education,

9    please?

10   A.   I started electrical engineering at the Royal Institute

11   of Technology in Stockholm and received my master's degree in

12   1998, I believe it was.  And then I continued my studies for

13   licentiate degree and Ph.D. degree in -- and Ph.D. degree I

14   received in 2005.

15   Q.   And you work at Ericsson; is that right?

16   A.   That's correct.

17   Q.   What's your role at Ericsson?

18   A.   I'm involved in our technical work internally.  I'm a

19   expert in one of our major -- major projects on the research

20   side.

21   Q.   And is that project confidential, or can you tell us

22   what that is?

23   A.   It provides concepts -- develops concepts for

24   standardization and then mobile communicate systems.  And

25   also provides some support to the product organization when

1    it comes to providing solutions and evaluations.

2    Q.    And before the work you just described, have you been

3    involved with Ericsson's standardization efforts?

4    A.    Yes, I have.

5    Q.    And can you tell us a little bit about what you've done

6    in that regard?

7    A.    I joined the Ericsson standards team in January 2006 and

8    attended working group meetings in the RAN2 Working Group

9    developing certain protocols -- certain protocols for mobile

10   communication.  And I was involved in that work from 2006 in

11   January until, I believe, early 2013.  And my role was in the

12   beginning I was delegate for Ericsson, and then I went on to

13   be the head of our Ericsson delegation in RAN2.

14   Q.    Have you received patents for your work?

15   A.    I have.

16   Q.    How many have you received?

17   A.    I -- it's quite a few.  I don't recall exact number, but

18   it would be more than 80 patent applications that I can

19   recall of.

20   Q.    When did you get to Tyler here, sir?

21   A.    I got here on, I believe, Monday afternoon.

22   Q.    And have you and I met while you've been here?

23   A.    No, we have not.

24   Q.    Have we sat down to script out what we're going to talk

25   to the jury about today?

1  A.   No, we have not.

2  Q.   What have you been doing with your free time here in

3  Tyler?

4  A.   I've been doing some regular work from remote, talking

5  to people back at home by e-mail.  I have been out walking.

6  I went from the hotel to -- to JC Penney to buy some -- a few

7  pair of jeans.  And I also got my kids a few presents, some

8  clothes.

9  Q.   Why jeans at JC Penney?  Is that a --

10  A.   I -- it's very expensive, blue jeans in Sweden.  So

11  while I'm here, I tend to take care, the opportunity to go to

12  places I know and stock up on -- on jeans.

13  Q.   Got it.  Thank you.

14       Have I told you what to tell our jury today?

15  A.   No, you have not.

16  Q.   Has any of my team -- any Apple lawyers done that, sir?

17  A.   No.

18  Q.   Do you work for Apple in any way?

19  A.   No, I don't.

20  Q.   Do you owe any obligation to Apple of any kind?

21  A.   No.

22  Q.   Are we paying you to be here today, sir?

23  A.   No, you're not.

24  Q.   Did Apple give you an iPhone, an iWatch, any kind of

25  incentive to come here today?

1    A.    No.

2    Q.    In the standardization work you did -- let's go to the

3    substance so we can use your time efficiently today.  You

4    worked on the 3GPP RAN2 Working Group; is that right?

5    A.    That's correct.

6    Q.    And maybe just can you tell us from your point of view

7    what the purpose is of the 3GPP standards body?

8    A.    The 3GPP -- the purpose of 3GPP is to try to specify a

9    global standard for mobile communication systems.  In the

10   past we've had many different standards used in different

11   parts of the world.  By totality it is a bit inconvenient for

12   people using one cell phone in U.S., one cell phone in

13   Europe, and another cell phone in Japan.  So 3GPP was created

14   to try to develop a global standard.

15   Q.    Do -- is part of the effort at 3GPP, to have different

16   companies come together and collaborate with each other?

17   A.    Yes.  Many companies come together to -- to define the

18   specifications, a standard.

19   Q.    And why is it important or helpful to have different

20   companies come together and collaborate in that way?

21   A.    It's -- these systems, there are huge investments

22   involved, and it's developing your own system and your own

23   sort of specifications.  Then, yes, maybe you will be able to

24   sell that.

25         But if you do it together, a lot of companies, there's a

risk that you will not get the market share that you would

like to have, but at least you're having compatible products,

and you will still have a possibility to sell something and

get a return on investment.

Q.   What has your role been in the RAN2 Working Group?   I

think you know this case relates to buffer status reporting

and RAN2 and some of your work had overlapped with

Mr. Benoist Sebire.   So I just want to ask what your role was

related to that working group, if I may?

A.   My role was -- I mean, I was a delegate for Ericsson

selling Ericsson views and had discussions with other

companies, I represented Ericsson.

     I was also the rapporteur of technical specification

with the No. 36.321.

Q.   And the 36.321 specification, you said you were the

rapporteur for that?

A.   Yes.

Q.   We've -- we've heard what a rapporteur is.   What is that

part of the specification and how does it relate, if it does,

to buffer status reports?

A.   The 36.321 specification describes a communication and

control -- how the network can communicate and control the --

the mobile phone.   And it relates to what we call the user

plane.   That is the part which takes care of transporting

user data.   And buffer status reporting is an essential part

1    of that specification.

2    Q.    So are you the rapporteur for the entire -- that entire

3    area of the standard?

4    A.    Yes.

5    Q.    And are you still now?

6    A.    No.   As of last August I passed this responsibility on

7    to a colleague of mine.

8    Q.    So then what was the time frame over which you were the

9    rapporteur for that part of it, for 36.321, that part of the

10   standard?

11   A.    I was the rapporteur from the day it was -- it was

12   created.   That was in some first half of 2007, if I recall

13   correctly, until now basically.

14   Q.    Within the RAN2 Working Group we talked about

15   collaboration of companies.   Do companies that are in the

16   RAN2 Working Group together, also sometimes collaborate with

17   each other?

18   A.    Yes, they do.

19   Q.    Do you sometimes submit joint proposals among different

20   companies?

21   A.    Yes.

22   Q.    And have you yourself been part of joint proposals and

23   joint submissions with people from other companies?

24   A.    Yes, I have.

25   Q.    How do those come about?   What -- what causes companies

1    to work to work together and do a joint proposal instead of

2    just one for themselves?

3    A.    There are many companies in 3GPP, and sometimes when all

4    of the companies come with slightly different proposals, it's

5    not clear to the group in which direction we are working, and

6    it may result in very long discussions trying to agree on the

7    details.

8         And to show some common understanding among a great

9    number of companies, we sometimes produce joint contributions

10   to enhance or speed up our process.

11   Q.    Thank you.

12        Do you sometimes and does Ericsson sometimes, though,

13   also submit proposals to the RAN2 Working Group?

14   A.    Yes.

15   Q.    And how do you decide which one to do as an individual

16   and which ones you'll do as a -- as a joint team?

17   A.    It depends on the context and the state of discussions.

18   If there have been very prolonged discussions and it seems

19   that progress is very difficult to make, then it's-- if you

20   can find other companies having similar thinking, then that's

21   a good -- good opportunity for joint contributions.  And if

22   you're in the early stages of discussions, then it is

23   unlikely that companies have considered all of the options

24   available, so then typically you have individual

25   contributions.

1          MR. LUMISH:  Your Honor, may I approach the witness

2     and hand up some binders?

3          THE COURT:  Yes.

4          MR. LUMISH:  Thank you.

5     Q.   (By Mr. Lumish) I wanted to ask you about a particular

6     collaboration in the RAN2 Working Group, which our jury has

7     heard a fair amount about.

8          You have a binder that you've been given, and the way

9     this works is it's labeled by what we call exhibit numbers.

10          And so if you open it up, you'll see there's a tab.  I'm

11     going to call out the numbers for them and ask you to take a

12     look at some of these documents.  But we're also going to put

13     them up on the computer monitor in front of you.  So

14     whichever is easier for you, on paper or monitor, however is

15     best for you.

16          I want to start with DTX-754, and the first page of

17     that.

18          MR. LUMISH:  Bring up the e-mail, if we could,

19     please.

20     Q.   (By Mr. Lumish) Do you recognize this, sir, this

21     document?

22     A.   It's an e-mail from -- it's an e-mail from myself to a

23     colleague of mine and several delegates at other companies,

24     which were -- which were -- which we had an ad hoc workshop

25     with.

1    Q.    You looked a little perplexed at the e-mail address.

2    Let me ask you a question.   Has Ericsson had lawyers to

3    represent the company related to Apple asking you to appear

4    in trial today?

5    A.    I've been asked by Ericsson Legal to appear here today,

6    and I was asked by Ericsson Legal to provide certain

7    documents.

8    Q.    And do you know if the law firm, though, that's been

9    helping you is a firm called Holland & Knight?

10   A.    I believe so.

11   Q.    Do you see the reference to "hklaw" there?

12         Are you aware that sometimes when documents are

13   forwarded or produced, it might change the e-mail address?

14   Have you seen that happen before?

15   A.    I haven't seen it before.

16   Q.    Okay.   So I'll represent to you that I think -- I think,

17   anyway, that's what happened here.   It's from your lawyer

18   forwarding these e-mails to me and to CCE's lawyers.

19         So you say here:   Dear all -- well, let me actually ask

20   about the subject first.

21         It says:   SR and BSR triggering slides.

22         Do you know what that refers to?

23   A.    That refers to a slide-set on scheduling requests and

24   buffer status reporting triggering that we produced during

25   our workshop in Helsinki.

1    Q.    And is this an e-mail you actually sent on or around

2    October 22nd, 2007, sir?

3    A.    I believe that's correct.

4    Q.    The attachments referenced something called:  MAC LTE

5    workshop v3.

6          What is the MAC LTE workshop?

7    A.    The MAC LTE workshop was an ad hoc that Ericsson

8    arranged in Helsinki in October 2007 to try to progress some

9    matters related to the 36.321 specification.

10   Q.    And why were you forwarding slides -- well, let me ask

11   you this:  There's a number of people listed in the "to" line

12   of the e-mail in the address.  So were those the people

13   involved in the workshop?

14   A.    Those were some of the people involved in the workshop,

15   those that I had the e-mail addresses of readily available.

16   Q.    Are there other people that participated in the workshop

17   that you know of or can remember now, that aren't listed

18   there in the e-mail addresses?  Mr. Sebire listed out who all

19   these people are.

20   A.    Yes.  There are more people that were present at that

21   workshop.  There were a number of more delegates or

22   representatives from Nokia and NSN.

23   Q.    Do you remember any particular names that aren't listed

24   here?

25   A.    From the top of my head, I recognize -- or I can't --

1    yes -- Malkamaki and Lars Dalsgaard.

2    Q.    Just like it sounds?

3    A.    I believe so.

4    Q.    Would you mind spelling it, please, sir?

5    A.    Sorry.  I cannot spell it.

6    Q.    Okay.

7    A.    Lars is spelled L-A-R-S.  The last name, I regret I

8    don't recall how to spell it.

9    Q.    Okay.  We're in the same boat.

10             MR. LUMISH:  So let's turn to the slides, if we

11   could.  If we can go to Page 2 of this exhibit, 754, Page 2.

12   Q.    (By Mr. Lumish) You see again a reference to the MAC LTE

13   workshop, and there's dates there, 22nd through 23rd, October

14   2007.  What do those dates mean to you?

15   A.    Those dates are the dates where we had our discussions

16   on our LTE workshop.

17   Q.    And there's an Ericsson logo on these slides in the

18   bottom right corner.  Do you know why that's there?

19   A.    It's there because I produced this summary of our

20   discussions.

21   Q.    So are these slides that you yourself created then, sir?

22   A.    I created these slides, and possibly there's maybe input

23   from both Ericsson and other companies on them.  But I

24   created the slides.

25             MR. LUMISH:  Can we turn to DTX-754, Page 3?

1    Q.   (By Mr. Lumish) So it will be the next page of your

2    exhibit if you're looking on the paper, sir.

3         And Mr. Schmoller is highlighting exactly what I wanted

4    to show you here, which is down towards the bottom, a

5    reference to when -- it says:  BSR is triggered when UL-SCH

6    resources are allocated and number of padding bits is larger

7    than the BSR size.

8         Do you see that statement, sir?

9    A.   I see that.

10   Q.   Can you tell me, first of all, what padding bits means

11   to you?

12   A.   Padding bits is -- they are bits, which are not filled

13   with data.  So they are leftovers, and they aren't used for

14   any particular purpose.  They just -- we need to fill the

15   protocol data unit up to the size that is expected by lower

16   layers in the mobile device.

17        And to do that, we add some bits, put them 0's or 1's or

18   a mix of 0's or 1's.  It depends on how it is specified.

19   Q.   You mentioned a protocol data unit.  What is that?

20   A.   That is the -- the units are blocks that are produced by

21   the protocol layer and sent further down in the protocol

22   stack to the lower layers to transmit them over the air.

23   Q.   Is a protocol unit a type of packet, data packet?

24   A.   Yes.  We actually -- we have these service data units

25   and protocol data units.

1      Service data units is where data from higher layers,

2  from above, potentially user data, is coming in.

3      And protocol data units are where, after you have

4  processed them and put them together in a certain format or

5  arranged many different SDUs and some internal control

6  information, and then you output them as PDUs, protocol data

7  units.  That's on the sending side.

8      On the receiving side, it's the opposite.  Then you're

9  receiving the protocol data units, and then you demultiplex

10  and disassemble them and out comes service data units that

11  you are sending further up.

12  Q.   Does the number of padding -- let me ask you a different

13  question.  I'll withdraw that.

14      Are you familiar with something called the uplink grant

15  that would be provided to a phone or a tablet?

16  A.   Yes.

17  Q.   And can you tell us just briefly what your understanding

18  of an uplink grant is?

19  A.   An uplink grant is an indication that the mobile device,

20  the mobile phone or the tablet, has a right or permission to

21  send something from the mobile device to the network.  It

22  describes how much data and in which -- how it should be

23  encoded.

24  Q.   So, if the uplink grant says how much data can be sent,

25  does that relate in any way to the number of padding bits

1   that may be found in a PDU or those protocol data unit

2   packets?

3   A.   Yes.  If, for instance, the grant says that the UE, or

4   the mobile device, should send 800 bits worth of data, and

5   there's only data maybe in some 700 bits in the terminal that

6   needs to be sent, then you'll have to add a hundred bits of

7   padding.

8   Q.   So the jury has heard a fair bit about something called

9   a padding BSR or a padding buffer status report.  Are you

10  familiar with that concept?

11  A.   I -- strictly speaking, there is no padding buffer

12  status report.

13  Q.   Are you familiar with the concept in the standard of

14  putting a buffer status report in a protocol data unit packet

15  to replace padding bits?

16  A.   Yes, I am.

17  Q.   Do you call that by any particular name?

18  A.   We call it buffer status report triggered by padding or

19  for padding --

20  Q.   Okay.

21  A.   -- for padding purposes.

22  Q.   In the case we've been referring to that as a padding

23  buffer status report.  So if I do that again, you'll know at

24  least what I'm talking about.

25       The sentence that we have up on the screen:  BSR is

1    triggered when the UL-SCH resources are allocated and number

2    of padding bits is larger than the BSR size.

3         Is there a check here to determine the space available

4    in the protocol data unit or the uplink grant to determine

5    whether the buffer status report should be triggered and

6    sent?

7    A.   Sorry.  Could you repeat the first part of the question?

8    Q.   Sure.  It was long.  I apologize.

9         Does the sentence I read relate to checking the space

10   that's available in the uplink grant as it's reflected in the

11   PDU?

12   A.   Yes.

13   Q.   In what way?

14   A.   To know whether a buffer status report would fit in the

15   PDU, but in the place of padding you would need to check how

16   many bits are not used yet.

17   Q.   If you tried to fit a buffer status report into the

18   protocol data unit packet, that PDU packet, and there were

19   not enough padding bits, what would happen?

20   A.   You couldn't fit the entire report.

21   Q.   Can you say that again?  I'm sorry?

22   A.   You couldn't fit the entire report.

23   Q.   What would the logical thing -- well, let me ask you a

24   different question.

25        If you tried to first send -- let me start over.

```
 1        You're familiar with long and short form buffer status
 2   reports, I assume?
 3   A.   Yes, I am.
 4   Q.   If you tried to send a long form buffer status report to
 5   replace padding bits and it didn't fit, what would be the
 6   logical thing to do, in your mind?
 7   A.   I would think that --
 8             MR. CALDWELL:  Objection, Your Honor.
 9   A.   -- the short --
10             MR. CALDWELL:  Objection, Your Honor.
11             THE COURT:  Mr. Stattin, hold on just a second --
12   Dr. Stattin.
13             MR. CALDWELL:  He's offering expert testimony that
14   hasn't been disclosed.  We can approach if you would like.
15             THE COURT:  Yeah, do.
16             (Bench conference.)
17             THE COURT:  Okay.
18             MR. CALDWELL:  Mr. Lumish asked him a question that
19   was -- this isn't disclosed here, so what would be the
20   logical next step in your mind?
21             So he's asking him to make sort of an obviousness
22   type extension of what's in the document, and that hasn't
23   been disclosed.
24             Just so you know, this man is literally not on
25   their Rule 26 disclosures at all.  The only reason he's even
```

```
 1  here period is because we're not going to raise tick-tack

 2  stuff.  They incorporated by reference -- they incorporated

 3  by reference AT&T's -- or T-Mobile's, and I think one of them

 4  just says, you know, he was around for the 3GPP.  That's

 5  fine.

 6          But, I mean, the extension to try to draw

 7  inferences that should have been disclosed.  And we,

 8  obviously, have a motion in limine on the expert testimony

 9  extensions.

10          MR. LUMISH:  I'm not offering it as expert

11  testimony.  I'm not asking him to give an opinion.  I'm

12  asking as a percipient fact witness of ordinary skill in the

13  art how he reads the document.

14          THE COURT:  I'm not going to let him go into what's

15  the logical next step --

16          MR. LUMISH:  Okay.  Thank you.

17          (Bench conference concluded.)

18          MR. CALDWELL:  Your Honor, I know that he began

19  answering that, and I don't know if we were talking over what

20  the transcript looks like; but obviously, we -- I would like

21  to clarify that the question and answer are stricken from the

22  record.  Because I was paying attention to you.  I wasn't

23  aware of how much he was starting to answer to the --

24          THE COURT:  Okay.  The jury will disregard the last

25  question and answer.
```

```
 1              Let's continue, Mr. Lumish.
 2              MR. LUMISH:   Thank you, your Honor.
 3   Q.   (By Mr. Lumish) Can we turn to Defendants' Exhibit
 4   DTX-756 in your binder, sir?  We'll bring up the cover of
 5   that on the screen for you as well.
 6         We have the same e-mail address issue here, but do you
 7   recognize this e-mail, sir?
 8   A.   Yes, I do.
 9   Q.   It says in the subject -- or in the body there it says:
10   Dear all, please find the raw slides from today.
11         How do you pronounce that name that I see there?
12   A.   Janne.
13   Q.   Janne?
14   A.   Janne.
15   Q.   Janne, okay.  I'll do my best.  I apologize.
16         And who is that person?
17   A.   Janne was the head of our RAN2 delegation.
18   Q.   And was Janne part of -- what's the last name?  Let me
19   ask that first.
20   A.   Peisa.
21   Q.   Peisa.  And it's Mr. Peisa?
22   A.   It's Dr. Peisa.
23   Q.   Dr. Peisa.
24         Was Dr. Peisa involved in the MAC LTE workshop?
25   A.   He was.
```

```
 1   Q.   And what was his role?

 2   A.   He was arranging it.

 3   Q.   What do you mean by that?

 4   A.   On behalf of Ericsson he contacted the participants and

 5   invited them to the workshop.  And he arranged the meeting

 6   venue so that we could be where we were.  And he also -- I

 7   believe he chaired the meeting and provided notes and minutes

 8   from the meeting.

 9   Q.   So was -- who had the original idea, then, for the MAC

10   LTE workshop?

11   A.   It was an Ericsson idea.

12   Q.   Now, there are attachments to this document as well.  It

13   says:  MAC LTE workshop v3.zip.

14       Are these the same slides that we saw before, or are

15   they different somewhat?

16   A.   These, I believe, are different.  These are the output

17   from the entire workshop.

18   Q.   And what do you mean by that?  What's the -- what do you

19   mean by the output from the entire workshop?

20   A.   They -- they captured the agreements made during the

21   workshop.  On some topics we were able to draw some

22   conclusions and companies could -- could agree on a common

23   solution.

24       On certain other topics or details, there was no

25   consensus.
```

1      But these slides, I believe, capture those things which

2   were agreed.

3   Q.   What was the process you went through in trying to reach

4   consensus among the workshop members?  Can you describe for

5   us, and maybe put us in the moment, of what you guys were

6   doing and how -- how you were doing it, please?

7   A.   It was a long time ago; but as usual, at these kind of

8   meetings, we presented the views.  I presented part of the

9   views from Ericsson.

10      I -- if I recall correctly, Janne presented some other

11  views from Ericsson on another topic.

12      Other companies presented their views and their

13  preferred solutions.  And then we had long discussions on the

14  pros and cons of different solutions and whether we could

15  sort of align on particular solutions so that we could show

16  that we had a common understanding of where to go with the

17  standard.

18  Q.   Did -- did everybody in the workshop contribute to the

19  ideas that were being provided or was it a smaller subset?

20  A.   I believe all companies at the workshop contributed to

21  the discussions.

22  Q.   And did you personally contribute to the discussions?

23  A.   I did.

24  Q.   And did you observe Dr. Peisa contributing to the

25  discussions and -- and trying to reach consensus?

1    A.    I did.

2    Q.    Can I ask you to look at DTX-756, Page 9, please?  And

3    we'll bring it up on the screen.

4          There is a reference down towards the bottom.  It says:

5          Would prefer two formats:  Single byte format when only

6    one radio bearer has data to transmit; multi-byte format when

7    only several radio bearers have data.

8          Now, the jury has heard, I think, quite a bit about long

9    and short form buffer status reports.  Does this -- these

10   statements here about formats relate to the notion of long

11   and short form buffer status reports?

12   A.    In my opinion, yes, they do.

13   Q.    In what way?

14   A.    A single byte format is a shorter format than the

15   multi-byte format.

16   Q.    And can you tell from the description here when one

17   would use a single byte format versus a multiple byte format

18   in the context of the workshop discussions?

19   A.    Yes.  This would indicate that in case there is data on

20   only radio bearer or radio bearer group, then you would use

21   the single byte format to avoid the overhead of reporting

22   that there is no data on the other bearers.

23         And in case -- the second sub-bullet.  In case you would

24   have data on multiple radio bearers or radio bearer groups,

25   then the multi-byte format would be used to convey

1    information about the data available on more than one group.

2    Q.   At the very top of the slide, it says:  Buffer Status

3    Reporting.  The buffers aren't mentioned in the sentences

4    we've highlighted on the center of the screen there.

5         When you talk about radio bearers and radio bearer

6    groups, does that relate to buffers and the status reports

7    for those buffers?

8    A.   Yes, it does.

9         And, generally, it was understood that there could be

10   radio bearers and logical channels and queues and buffers.

11        And each queue or radio bearer or logical channel would

12   have a buffer.  And consequently, also, if you group the

13   radio bearers and logical channels, there would be a buffer

14   for the group of bytes.

15   Q.   Let me ask you, please, to turn to Page 11.  So DTX-756,

16   Page 11.  We'll bring that up on the screen for you.

17        This slide starts with High-Level Format Summary.  And

18   in the middle of the slide, it says:  2 formats.  Can you

19   tell from the slide, sir, what is -- what things or formats

20   are being referred to here?  Is it buffer status reports or

21   something else?

22   A.   It's buffer status report formats.

23   Q.   So in the first part, it says:  2 formats, 1 byte format

24   with Group-ID + Absolute size.  And then it's -- the thing in

25   parentheses is what I want to ask you about.

```
 1        Is that the same short form buffer status report that we
 2   looked at a couple of slides earlier?
 3   A.    That would be my understanding.
 4   Q.    And what do you read "(if only one group to report)" to
 5   mean?
 6   A.    That you would use this format if there's data in only
 7   one group, a radio bearer group or logical channel group.
 8   Q.    And then it says:  3 byte fixed size format.
 9        Is that the same long form buffer status report we
10   talked about earlier?
11   A.    I believe so.
12   Q.    And if we jump down just a little bit on the page --
13             MR. LUMISH:  Mr. Schmoller, could you bring up the
14   last two bullets for me, please?
15             I want the -- yeah, that one as well.  Thank you.
16   Q.    (By Mr. Lumish) So one says:  Only one set of triggers
17   for both formats.
18        Do you see that?
19   A.    Yes, I see that.
20   Q.    What does the word "triggers" mean to you here?
21   A.    The trigger here, to me, means the events that triggers
22   the need or the transmission of a buffer status report.  And
23   it's not -- this trigger does not describe whether it's going
24   to be a long or short.  That's described based on the buffer
25   status.
```

1    Q.    That was my question.  I wasn't sure if it related to

2    the format selection or not.

3         Now, the next sentence says -- or the next bullet says:

4    How to choose the format.

5         Is this then describing the selection criteria for

6    choosing long versus short?

7    A.    Yes.

8    Q.    And it says:  How to choose the format.  Based on how

9    many groups need to report, based on amount of data in the

10   buffer.

11        When it says:  Based on how many groups need to report,

12   how do you read this slide in the selection criteria for long

13   versus short buffer status reports?

14   A.    I would read this as -- it would depend on how many

15   groups were expected to be reported.  And then the criteria

16   for what is needed to be reported that -- it's a little bit

17   vague here, and it -- my understanding is that may be so that

18   companies didn't fully agree on the exact criteria at the

19   meeting.

20        However, there was input to the meeting, as we saw on

21   the previous page, on Page 9, I believe it was, where one

22   solution was described.  And I believe that was the Ericsson

23   idea provided to the workshop.

24   Q.    Tell us again, then, what you believe the Ericsson idea

25   provided to the workshop was, as far as the selection

1  criteria for choosing short versus long buffer status

2  reports.

3  A.   My understanding is that the Ericsson idea was to report

4  data for non-empty radio bearers.  And that would be that you

5  use a short report if there is data on one group or radio

6  bearer, and you use a long format if there is data available

7  for transmission on multiple radio bearers or radio bearer

8  groups.

9  Q.   And who put that idea, both on Page 9 and Page 11 of the

10  slides, into this PowerPoint that we're looking at as

11  Exhibit 756?

12  A.   I believe Janne Peisa provided these slides, and he may

13  have put them there.

14  Q.   Do you believe it came from Ericsson or from companies

15  other than Ericsson?

16  A.   I believe that the first part on Slide 9, what we

17  referred was coming from Ericsson, and the other part on

18  Slide 11, that was the output or the contribution at the

19  workshop.  So that would be the joint.

20  Q.   And I showed you the dates on the cover before.  It was

21  October 22nd through 23rd of 2007.  Was it the first time --

22  was the LTE -- MAC LTE workshop the first time that Ericsson

23  had the idea of choosing a long or short buffer status report

24  based on the number of radio bearer group buffers that needed

25  to report data?

1    A.    No, it was not.

2    Q.    Do you know when the first time was?

3    A.    To my understanding, we filed a patent application in

4    the summer of 2006 suggesting the use of multiple different

5    formats to improve efficiency and precision of buffer status

6    reporting.

7              THE COURT:  Mr. Lumish, in the next few minutes,

8    whenever you get to a good stopping point, we need to take

9    our morning break.

10             MR. LUMISH:  Perfect time right now, Your Honor.  I

11   was about to switch documents.

12             Thank you.

13             THE COURT:  Very good.

14             All right.  Ladies and Gentlemen of the Jury, we'll

15   be in recess until 10:45.

16             COURT SECURITY OFFICER:  All rise.

17             (Jury out.)

18             THE COURT:  I have to take care of a quick criminal

19   matter on our break, so I just need you to make room for our

20   incoming attorneys.

21             Thank you.

22             (Recess.)

23             (Jury in.)

24             THE COURT:  Please be seated.

25             Mr. Lumish.

1            MR. LUMISH:   Thank you, your Honor.

2   Q.   (By Mr. Lumish) Dr. Stattin, I'd like to turn you now to

3   DTX-569.  And it's a document we've seen several times in

4   this case, and it's been referred to, at least by me, as a

5   joint proposal with Ericsson and others.

6        Do you recognize Exhibit 569?

7   A.   I do.

8   Q.   Did you have a role in the creation of Exhibit 569 --

9   well, let me ask this, I can tell you're puzzled.  Let me

10  start with, is there a relationship between this document --

11  let me start again.

12       Tell me what you understand this document to be.

13  A.   My understanding is that this document is the output

14  from -- or it's capturing the output from the -- this

15  workshop and we made a joint contribution to the RAN2 Working

16  Group.

17  Q.   When you say "capturing the output from the workshop,"

18  do you mean the MAC LTE workshop we talked about before?

19  A.   Yes, I do.

20  Q.   And when you said "we," do you include the people who

21  are listed -- or the companies that are listed as sources on

22  the top of Exhibit 569?

23  A.   Yes, I do.

24  Q.   Did the -- did you at least, and any other people at

25  Ericsson by your observation, read and participate in the --

1   the -- the ideas that are provided in Exhibit 569?

2   A.   Yes.   We -- at Ericsson, we reviewed this document that

3   was drafted by Mr. Sebire and checked that it was in line

4   with the contributions at the workshop.

5   Q.   And do you feel that you and Ericsson contributed ideas

6   to this proposal, this joint proposal to the RAN2 Working

7   Group?

8   A.   Yes, I do.

9   Q.   What ideas do you believe you helped contribute?

10  A.   For instance, I believe we contributed the idea to use

11  multiple different buffer status reporting formats.

12  Q.   The --

13          MR. LUMISH:   If we could turn to Page 2 of the

14  exhibit, if you'll look at DTX-569, Page 2, and I'd like the

15  text above and below.

16      Thank you.

17  Q.   (By Mr. Lumish) So we've spent a fair amount of time in

18  this case on these -- this part of the joint proposal as

19  well.   And I'll just look at some of the text at the top

20  there.   It says:   Since it is not necessary to report the

21  four RBGs always...

22      What does that mean to you?

23  A.   It means that when there is no information about --

24  nothing to report on all of these radio bearer groups, it

25  could be that they're not -- some of them are not configured

1   or some of -- of that some of them have no data.

2   Q.    So you have a statement in parentheses there, and I want

3   to jump ahead to the end of that line.  It says:  It is

4   proposed to introduce two formats of BSR:  One where only one

5   RBG is reported and one where all four RBGs are.

6        And then it describes the number of bits and refers to

7   the figures below it.  Do you see that?

8   A.    I see that.

9   Q.    And did Ericsson have any role in the text I just read

10  and the figures that we see below of the short and long form

11  buffer status report?

12  A.    It looks consistent with ideas we've had at Ericsson.

13  Q.    And then you have Proposal 6 at the bottom.  It says:

14  There are two types of BSR, a short BSR reporting the status

15  of one RBG only, 1 byte long; and a long BSR reporting the

16  status of the four RBGs, 3 bytes long.

17       Do you see that?

18  A.    I see that.

19  Q.    And does this text and looking at the figures tell you

20  when you would choose a long and when you would choose a

21  short as a reader of the joint proposal?

22  A.    If you only read the Proposal 6 and the figures -- and

23  the figures, then it doesn't necessarily tell you-all about

24  when to use which.

25  Q.    Would you know at least, though, you would use the short

1   form buffer status report if there was only one radio bearer

2   group that had data in the buffers to report?

3   A.    Could you repeat that question, please?

4   Q.    Sure.

5         The -- we start with the figure.  It says:  Buffer size,

6   6 bits.

7         Do you see that?

8   A.    I see that.

9   Q.    And is that a size that's intended to hold data from one

10  buffer or more than one buffer?

11  A.    It's there to show our -- disclose the amount of data

12  available on one radio bearer group.

13  Q.    One radio bearer group.  Is that different from buffer,

14  though?  I want to make sure we're on the same page with

15  that.

16  A.    Depends on how you read it.  It's a buffer size of --

17  pertaining to an aggregate of a number of radio bearers.

18  Q.    And then -- but these are buffer status reports, so

19  they're reporting on buffer data for radio bearer groups; or

20  do I have that wrong?

21  A.    It's -- what is meant here is that it's the sum of the

22  buffers of the individual radio bearers in the one group.  So

23  it's the amount of data available for transmission on all

24  other radio bearers within a group collectively.

25  Q.    And then it's -- the text that's highlighted in green

1    below says that:  The short BSR reporting the status of one

2    RBG only.

3         Does that tell you when you would use the short buffer

4    status report as far as how many radio bearer groups were

5    reporting data?

6    A.   In the view of some it would.  And I think different

7    readers may have different understandings of that.

8    Q.   Okay.  What does it tell you?

9    A.   To me, it was in line with the Ericsson proposal to have

10   a short buffer status report if you would have data only on

11   one radio bearer group.

12   Q.   And is it in line with your view of when you would

13   have -- when you would use the long buffer status report?

14   A.   It's in line with that.

15   Q.   And when would you use the long buffer status report

16   again?

17   A.   When you have data on more than one radio bearer group.

18            MR. LUMISH:  If we could go to DTX-757, please.

19   Q.   (By Mr. Lumish) I don't know if you've seen this one

20   before.  It's an e-mail from Mr. Sebire, and it's to a number

21   of people.

22        By the way, I don't think this e-mail does it, but I

23   wanted to ask you one question, which is there's some e-mails

24   where your name is referenced as magnus.lindstrom instead of

25   magnus.stattin; is that right?

1    A.    Yes.

2    Q.    And can you tell us why that is?

3    A.    Yes.   When I married, my wife had a name, which was not

4    very common.   Her maiden name was not very common.   And my

5    name was -- last name was Lindstrom.   It was a very common

6    name, and she didn't really feel like changing to a more

7    common name than she already had.

8         So we looked into our families' history, and we found

9    out the maiden name of my grandmother on my father's side, it

10   was a rather uncommon name, which was disappearing from our

11   branch of the family, so we decided to change names, both of

12   us, to Stattin instead of taking either Lindstrom or my

13   wife's maiden name.

14              MR. LUMISH:   So, if I now can go back to

15   Defendants' Exhibit 757, please.

16   Q.    (By Mr. Lumish) It's an e-mail from Mr. Sebire to the

17   working group.   We've seen this before here in the trial.

18        But I wanted to direct your attention to a sentence at

19   the top that CCE's counsel has focused on.

20        The e-mail says:   Attached please find a contribution on

21   the BSR I quickly drafted based on Samsung & Nokia-NSN

22   previous contributions.

23        Do you see that?

24   A.    I see that.

25   Q.    So, Dr. Stattin, you'll see that there is, I think, an

early draft of the joint Ericsson contribution that begins on

the next page, DTX-757, Page 2.

Did you read what Mr. Sebire was saying here to mean

that all the ideas in the joint contribution came only from

Samsung and NSN?

A.   No, I did not.

Q.   How did you read it, if you recall, when he said:  Based

on Samsung and Nokia-NSN proposal?

A.   I understood it to mean that he had used parts or pieces

of text coming from those previous contributions to describe

certain aspects.

And then in addition to that, the proposals, they were

describing the conclusions from our MAC workshop.

Q.   And then counsel -- we've both actually looked at with

the jury the third bullet down in the e-mail body.

It says:  The selection of which BSR (long/short) is not

discussed (running out of steam now.)

Do you see that?

A.   Yes.

Q.   Do you recall reading that when you got it from

Mr. Sebire?

A.   Yes.

Q.   And what did you take "(running out of steam now)" to

mean?

A.   He was on a flight back from Helsinki.  I believe it was

1   a long-haul flight, so I took it to mean that he was tired

2   and didn't have the energy to complete all aspects of what we

3   had contributed at the meeting.

4   Q.   Did you take it to mean that Mr. Sebire hadn't yet

5   conceived of all of the ideas for selecting long versus short

6   buffer status reports on his own and separate from the

7   workshop?

8   A.   Now, that, I don't know.  I know that we discussed this,

9   how to select long and short at the workshop, but he did not

10  include that in the contribution for some reason.

11       My take on it was, from reading this, that he was too

12  tired to do it and that he didn't feel it was urgent to

13  propose that in 3GPP at that moment.  We had made substantial

14  progress or consensus in this group of companies to drive

15  progress in 3GPP, and then we could add this aspect later.

16  Q.   So you mentioned that you had the ideas before the

17  workshop and during the workshop of selecting a short buffer

18  status report when there's only one buffer to report data and

19  a long when there was more than one.  Did you share those

20  ideas with the workshop members?

21  A.   We did.

22  Q.   Now -- and did that include Mr. Sebire?

23  A.   Yes.

24  Q.   I want to turn your attention, please, to Plaintiff's

25  Exhibit 296.

1      And this is an e-mail.  It says it's from, as I read it,

2  Dr. Peisa to Mr. Sebire, and I believe it cc's the Workshop

3  Group.  And it's really the first sentence there that I want

4  to focus your attention on.

5      It says:  Thanks a lot for the contribution, excellent

6  work.

7      Do you see that?

8  A.    I do.

9  Q.    Did you take that to mean that Ericsson or Dr. Peisa was

10  acknowledging in some way that Mr. Sebire had conceived of

11  all of the ideas in the Ericsson joint proposal all on his

12  own?

13  A.    No.

14  Q.    What did you take it to mean?

15  A.    I understood it to mean that we were very grateful that

16  someone -- in this case, Mr. Sebire -- had taken the time to

17  put down in a joint contribution form the conclusions and

18  suggestions from the -- our joint workshop.

19  Q.    Can you turn to Defendants' Exhibit 570 for me, please?

20      And I would like you to look at it on the binder so you

21  may want to compare them.

22      We've done this for the jury before.  I won't do it

23  again in any detail, but what you see on the screen now and

24  in your binder is the cover of the Ericsson proposal -- the

25  joint Ericsson proposal, I should say, Defendants'

1    Exhibit 570.  That's color-coded.

2        Do you see that?

3    A.    Yes.

4    Q.    And I won't ask you to do this, in the interest of time,

5    because I want to make sure CCE's lawyers have a chance to

6    ask you their questions so we can get you home to Sweden

7    tomorrow.

8        But if you look at 572 [sic] and you flip through it,

9    you'll see color-coding in what is the original application

10   filed for the patent application in Mr. Sebire's name.

11   Have you seen Exhibit 572 [sic] before?

12   A.    Not in this moment.

13   Q.    And you'll see the color-coding there.  I'll just

14   represent to you, sir, so you don't have to do the work, that

15   the colors match up -- and we've shown this to the jury

16   already -- they match up to the joint Ericsson proposal.

17       Before you got pulled into this lawsuit, did you know

18   that the text from the joint Ericsson proposal had been

19   copied into a patent application for Nokia?

20   A.    No, I did not.

21   Q.    What was your reaction when you found out?

22   A.    Surprised.

23   Q.    I've got a lot more questions for you, but I'm very much

24   interested in making sure you get home, so I'm going to just

25   jump to the end here.

1      When CCE's lawyer comes up in a couple of moments, I

2  think he's going to ask you eight ways to Sunday and maybe in

3  a dozen different ways whether the people in the Working

4  Group and the 3GPP sit around and talk with each other about

5  all of their patents.

6      You don't do that, do you?

7  A.   We don't do that.

8  Q.   But that's not really what I want to know.  What I'd

9  really like to understand is:  Would you put your name, and

10  only your name, on a patent application that covered the

11  combined efforts and contributions of a team of people?

12  A.   No, I would not do that.

13  Q.   Why not?

14  A.   Because it's not my -- only my work.  It's not only my

15  ideas.

16  Q.   If you had worked with a team of people to come up with

17  ideas and you thought you should be able to patent some of

18  those just to yourself, do you think you would talk to them

19  about it before you did that?

20  A.   I would.  I would check whether they felt that they had

21  contributed.

22  Q.   And did Mr. Sebire or anybody from Nokia ever ask you

23  whether you thought you should be named as an inventor on the

24  '820 patent?

25  A.   No.

```
 1   Q.   Sir, I want to -- on behalf of my client, Apple, I want

 2   to extend our sincere thank you to you.  I know this has been

 3   a terrible imposition for you.  I hope you enjoyed your time

 4   here in Texas.  Thank you very much for your testimony.

 5               MR. LUMISH:  Pass the witness, your Honor.

 6               THE COURT:  All right.

 7                         CROSS-EXAMINATION

 8   BY MR. CALDWELL:

 9   Q.   Good morning, Mr. Stattin.

10   A.   Good morning.

11   Q.   How are you?

12   A.   Fine.  Thank you.  How are you?

13   Q.   Fine.

14        Were you suggesting to the jury that you had never

15   talked with Apple's lawyers?

16   A.   No.

17   Q.   You have talked with Apple's lawyers prior to your

18   testimony, correct?

19   A.   I talked to Apple's lawyer on a video call.

20   Q.   On a video call, what, was it about a week ago, ten days

21   ago, something of that nature?

22   A.   Probably two weeks ago.

23   Q.   You didn't mean to suggest that you had not talked with

24   Apple's lawyers to prepare at all for this trial, correct?

25   A.   No.
```

1   Q.   And we've actually not met, correct?

2   A.   Excuse me?

3   Q.   You and I have actually not met.

4   A.   We have not met.  I met Mr. Cecil.

5   Q.   Right.  Well, my name is Brad Caldwell, and I represent

6   CCE.  It's nice to meet you.

7       Do you feel it's important for you to be here on behalf

8   of Ericsson today?

9   A.   I was asked to but not to be here today by Ericsson

10  Legal.

11  Q.   Just -- do you feel it's important for you to be here

12  today?

13  A.   It was -- my employer asked me to, so I feel that it is

14  important that I do what I'm asked to do.

15  Q.   Now, just to get one thing real clear, in your testimony

16  you did not tell the jury that you or Ericsson or anyone else

17  at any of those meetings contributed to something that

18  Mr. Sebire claimed in his patent claims, correct?

19  A.   I don't know because I haven't read his patent

20  application.  And I haven't studied it in detail.

21  Q.   So is it correct that you did not tell the jury that you

22  or Janne or anyone else at the meeting contributed anything

23  to Mr. Sebire's patent claims?

24  A.   I don't know.

25  Q.   You don't know if you told the jury?

1  A.   I didn't tell the jury that we did not, and I didn't

2  tell the jury that we did, because I haven't studied the

3  application.

4  Q.   Are Apple and Ericsson adversaries?

5  A.   Not that I know of.

6  Q.   I mean, you're familiar with Apple, correct?

7  A.   I am.

8  Q.   Are they competitors?  Do they compete, for example, in

9  the base station market?

10  A.   No.

11  Q.   Are you aware of any markets where Apple and Ericsson

12  compete?

13  A.   Not immediately.

14  Q.   Are Ericsson and Nokia-NSN competitors?

15  A.   They are two vendors in the same market.

16  Q.   Is that yes?  They are competitors?

17  A.   In some sense -- in some sense we are competitors, yes.

18  Q.   Before LTE was released, did Mr. Sebire's company notify

19  the other participants in the standard setting community that

20  a patent application had been filed on his idea?

21  A.   I don't know.

22  Q.   So am I correct that you are not here contending that

23  Mr. Sebire has patent claims on something that is not his

24  idea?  Am I correct about that?

25  A.   I don't think that's my responsibility.

1   Q.   Am I correct that you are not here making that claim,

2   sir?

3   A.   I'm not making any claims.  I am here to provide the

4   facts I know.

5   Q.   You've seen a joint proposal that counsel for Apple

6   usually refers to as the Ericsson proposal and sometimes

7   refers to as a joint Ericsson proposal.  Do you remember

8   that?

9   A.   I do.

10  Q.   Do you think it's fair to call that proposal an Ericsson

11  proposal?

12  A.   I think it is a joint proposal.  It's a joint

13  contribution by the companies listed on the source.

14  Q.   So for purposes of presenting the facts to the jury, is

15  it more accurate to call it a joint proposal or an Ericsson

16  proposal?

17  A.   I'm not a lawyer, so I wouldn't know.

18  Q.   Would you call it an Ericsson proposal, sir?

19  A.   I would call it a joint proposal or an Ericsson proposal

20  or something proposal.

21  Q.   So you would call it an Ericsson proposal?

22  A.   That's a possibility.

23  Q.   Did Ericsson draft it?

24  A.   Ericsson did not draft the document.

25  Q.   Now, when a proposal is joint -- and let's say

1    Ericsson's name is on it -- does that mean that Ericsson

2    conceived of the ideas in the proposal, or does it mean that

3    Ericsson is willing to co-sponsor or co-sign the proposal?

4    A.    That varies.

5    Q.    You can't tell from Ericsson's name being listed on the

6    cover as one of the sponsors whether or not that means

7    Ericsson contributed to the ideas, correct?

8    A.    No, you cannot.

9    Q.    I think this may have been dealt with just -- aptly at

10   the end of your direct.  But just to be clear, when you go to

11   these meetings, do you tell Mr. Sebire and other folks at the

12   meeting that you filed a patent application?

13   A.    No, I don't.

14   Q.    And is that because the goal of the meetings is to work

15   towards the best technical standard?

16   A.    It's because the meetings are focused on the technical

17   aspects.

18   Q.    Would you agree that the companies in the working group

19   make decisions based on the contributions, not patent

20   applications?

21   A.    The group doesn't see patent applications so decisions

22   and product specifications are made based on contributions.

23   Q.    And, Mr. Stattin, some ideas are rejected, right?

24   A.    Yes.

25   Q.    As the rapporteur, did you get to just force ideas in to

1    the standard without discussion and approval?

2    A.    No.  No, I did not.

3    Q.    And so sometimes someone proposes an idea, and they

4    explain why they like it, and does the group say, no, we

5    don't agree?  Does that happen?

6    A.    It happens.

7    Q.    Do sometimes companies present competing proposals of

8    how to solve the problem?

9    A.    Yes, they do.

10   Q.    And do you just put the two competing results in the

11   standard, or do you figure out which one is best?

12   A.    That is what I devised this long -- at times very long

13   discussions would go on for many meeting cycles.  Some

14   disagree, but one tries to find a common way for trying to

15   form a consensus for which to deduce.

16   Q.    Now, are -- in that situation when people are having

17   that debate, are the participants in the working group

18   prevented from speaking their mind about what they think is

19   the best proposal?

20         Do you ever tell someone they have to stay quiet?

21   A.    No, never.

22   Q.    Do they get a chance to say, I like this proposal or I

23   like that proposal?

24   A.    Yes.

25   Q.    Do they get to say, you're proposing something that

1   we've already rejected before?

2   A.   They can say that, but it depends on -- on the group

3   whether that is still considered again or not.

4   Q.   Do you file patent applications on ideas that you

5   contribute to a working group?

6   A.   Yes.

7   Q.   And I won't ask you any specifics.  This is just a

8   yes/no question.  Do you get compensated by your company when

9   you file patent applications?

10  A.   Yes.

11  Q.   When you file the patent application, as a delegate, is

12  it part of your duty that you need to stand up and interrupt

13  the meeting -- or sit and interrupt the meeting -- and tell

14  the other members that you've got relevant intellectual

15  property rights you're pursuing?

16  A.   No.

17          MR. CALDWELL:  Can I see Plaintiff's Exhibit 149 at

18  Page 25?

19          Actually, if we could just go to the first page.

20  I'm sorry there, Mr. Evans.

21  Q.   (By Mr. Caldwell) Do you recognize the document that's

22  shown on the screen, sir?

23  A.   I do.

24  Q.   36.321, that was the portion of the standard where you

25  were rapporteur, correct?

1   A.    That's correct.

2   Q.    When was that portion of the standard finalized?

3   A.    It's still being developed and -- and evolved.  But the

4   first version was, to my recollection, completed -- I believe

5   it was in December, 2008.

6   Q.    Now, are you familiar with the contents of this

7   document?

8   A.    Yes, I am.

9            MR. CALDWELL:   Could I see Page 25.

10  Q.    (By Mr. Caldwell) Are you familiar with the Section

11  5.4.5, buffer status reporting?

12  A.    Yes.

13  Q.    And then starting partway down, do you see that there's

14  a description of buffer status report shall be triggered?  Do

15  you see that?

16  A.    I see that, yes.

17  Q.    Is there a difference between triggering a buffer status

18  report and having criteria to determine whether it is long or

19  short?

20  A.    Yes.

21  Q.    What is that difference, sir?

22  A.    The triggering is related to whether the buffer status

23  report shall be transmitted at all, whereas the selection

24  about which format to use is based on other criteria.

25  Q.    Has Mr. Sebire ever said, I claim to have invented

1  triggering buffer status reports?

2  A.   I don't know.  Not to me.

3  Q.   Are you aware -- do you have any reason to think that in

4  this court case he has taken the position that he invented

5  triggering of buffer status reports?

6  A.   I don't know.  I haven't -- haven't been here in

7  listening to Mr. Sebire.

8            MR. CALDWELL:  Can we flip to the next page, sir?

9            Just kind of grab maybe the top 40 percent of the

10  page, something like that.

11  Q.   (By Mr. Caldwell) Now, do you see these portions of

12  5.4.5?

13  A.   Yes.

14  Q.   And it's -- I don't want to read it all, but:  For

15  regular -- I'll read a portion of it.  Is that okay?

16      For regular and periodic buffer status reports:  If more

17  than one LCG has data available for transmission in the TTI

18  where the BSR is transmitted, report long BSR; else report

19  short.

20      Correct?

21  A.   Yes.

22  Q.   And then the next one is:  The number of padding bits is

23  equal to or larger than the size -- and it goes on.

24      Were you the rapporteur who put this in the standard?

25  A.   I don't recall when this was put into the standard and

```
 1    whether I drafted the document doing that.  Up to the point
 2    where the document -- the specification was put under change
 3    control, I was providing the text and the input.
 4         And after it was put under change control, then also
 5    other companies could propose change requests to the
 6    specification.
 7    Q.   Just to be real clear, when you say you drafted the
 8    document putting this into the standard, are you saying,
 9    after someone proposed it, you typed it into 36.321, or are
10    you saying you're the person who proposed that text for
11    inclusion in 36.321?
12    A.   I didn't quite follow.  Did I say that I drafted the
13    text?
14    Q.   I thought you did.
15    A.   I believe I said that up to the point that the
16    specification was put under the change control, I drafted
17    document, the text which went into the specification.
18         After that point, it was also possible for other
19    companies to propose changes and change requests.
20    Q.   And I'm not talking about, like, the possibility of
21    change requests at the end.  I just want to be real clear.
22         When this text that's in the area -- when this text
23    that's in that area (indicating) was added into 5.4.5, are
24    you the person who came up with the text that would be
25    included in 5.4.5 or not?
```

1    A.    I don't recall.

2    Q.    Is that a contribution from Benoist Sebire?

3    A.    Which part?

4    Q.    The same portion, sir.  (Indicating.)  Is that a

5    contribution from Benoist Sebire?

6    A.    I believe this is a contribution that is containing the

7    parts that was agreed in this workshop, plus some parts which

8    may have been added later.

9    Q.    By whom?

10   A.    I don't recall.

11         May I ask for clarification of the question?

12   Q.    Certainly.

13   A.    Do you mean by whom -- who wrote the text that went into

14   this specification or the --

15   Q.    Yes, sir.

16   A.    -- who contributed the proposal to 3GPP or who disclosed

17   the idea the first time?

18   Q.    Who wrote the text that's in the specification?

19   A.    If this was prior to releasing and the closure of the

20   release, then it might have been myself.

21   Q.    It might have been you?

22   A.    (Nods head affirmatively.)

23   Q.    You're not telling the jury that it was you; you're just

24   saying that's a possibility?

25   A.    Depends on when it was done.  I didn't go back and

1   check.

2   Q.   All right.   Now, the next option -- who put that in a

3   proposal -- that information, that criteria in a proposal to

4   3GPP?

5   A.   The -- some of the text was put in a proposal to 3GPP by

6   these joint companies, these companies in the joint

7   contribution.

8   Q.   Anyone else separate from that joint contribution?

9   A.   As I said, I don't recall all of the details on what

10  happened as to that.

11  Q.   Do you recall showing us these -- do you recall showing

12  us these PowerPoint-type presentations that had some Ericsson

13  logos on them?   They were, I think, Defendants' Exhibits 754

14  and 756.

15       And the question is just whether you recall showing

16  these to us.

17  A.   Sorry.   What was the question?

18  Q.   Do you recall showing the jury Defendants' Exhibits 754

19  and 756 that had the Ericsson PowerPoints?

20  A.   I recall they were shown to the jury, yes.

21  Q.   What is the significance of text that is in bold versus

22  text that is not in bold in those presentations?

23  A.   My understanding is that the text in bold is the

24  conclusion -- is the conclusion from the workshop; whereas,

25  the text not in bold are parts which were discussed but may

1    not have been accepted by all companies.

2    Q.   Or maybe it's unanswered questions that need to be

3    addressed, correct?

4    A.   Oh, I understand that a lot of the text was input to the

5    workshop.

6    Q.   My question is this, though:  If there are things that

7    are not in bold, it may represent unanswered questions that

8    still need to be resolved, correct?

9    A.   If there is a question mark, yes.

10   Q.   And we've seen a question mark in an unbolded sentence

11   in this case, haven't we?

12   A.   Where?

13          MR. CALDWELL:  Can you flip to 756-011, sir?

14   Q.   (By Mr. Caldwell) Do you remember this page,

15   Mr. Stattin?

16   A.   I do.

17   Q.   The group specifically left unresolved "what to do when

18   short format fits but long one does not," correct?

19   A.   That was -- there was no conclusion on that.

20   Q.   And there's no place we can flip to in this document to

21   find an answer to that question, is there?

22   A.   I don't believe that there is in this document, no.

23   Q.   Are you aware of any other documents that answer that

24   question before Mr. Sebire did?

25   A.   I don't -- I'm not aware of a document presenting that,

1    and I'm not aware whether Mr. Sebire did or not.

2    Q.   Do you have any reason to believe --

3             MR. CALDWELL:   I'm sorry.   Thank you.

4    Q.   (By Mr. Caldwell) Do you have any reason to believe that

5    Mr. Sebire has ever taken credit for inventing the concept of

6    having short buffer status reports and long buffer status

7    reports?

8    A.   No.

9             MR. CALDWELL:   Could we see Defendants' Exhibit

10   569, please?

11            All right.   Let's just kind of zoom in the top

12   third, if you don't mind, Mr. Evans.

13   Q.   (By Mr. Caldwell) Are you familiar with this document,

14   sir?

15   A.   I am.

16   Q.   This is the document that Apple's lawyers sometimes call

17   the Ericsson proposal, correct?

18   A.   Yes.

19   Q.   Who prepared this document?

20   A.   It was drafted by Mr. Sebire and capturing the

21   conclusions and the proposals that the -- the conclusions of

22   the group at this MAC workshop.

23   Q.   And are you here on behalf of Ericsson taking credit for

24   the conclusions that are repeated in this document?

25   A.   That's not why I'm here.

1   Q.   After the meeting that we discussed that was around

2   October 22nd and 23rd, was Ericsson tasked with focusing on

3   the triggering aspects of buffer status reporting?

4   A.   If I recall correctly, yes.

5   Q.   And that's different from the determination criteria,

6   correct?

7   A.   Yes.

8            MR. CALDWELL:  Can we flip to the second page and

9   grab the middle of the page?

10           Perfect.

11  Q.   (By Mr. Caldwell) Now, I'm sorry that the imagery is a

12  little spotty.  Can you -- can you make it out okay?  It's

13  got -- the lines are a little faint, but can you make it out?

14  A.   Yes.

15  Q.   I apologize for that.  I think it was used maybe in a

16  deposition and copied and scanned.  So sorry about that.

17           Who drew the figures, Figure 1 and Figure 2, that are in

18  this document?

19  A.   I don't know.

20  Q.   Now, if Mr. Sebire drew those figures, would you

21  challenge that?  Would you dispute it?

22  A.   No.  I -- I would only note that these figures do

23  describe what we saw on some other slides captured in text.

24  And this is a figure capturing the same thing.

25  Q.   I'm asking about the figures.  I'm not arguing with you

1    about that point.  I'm asking who drew the figures.

2    A.    I don't know.

3    Q.    If Mr. Sebire drew these figures, would you reuse them

4    in an Ericsson-only document and pass them off as Ericsson

5    figures?

6    A.    If a figure in a joint contributions, yes, I would use

7    them because these figures are -- these are joint

8    contributions, so it's the -- the work and the output from

9    our joint efforts.

10   Q.    But would you be sure to say, hey, a guy from NSN drew

11   these pictures?

12   A.    In 3GPP, we typically reuse figures because that's part

13   of our normal work.

14   Q.    What about if you reused them in a patent application?

15   Would you be sure to say, you know, some guy from NSN drew

16   these figures?

17   A.    If I would reuse something then -- if I'm reusing

18   something from prior art, then it is described as prior art.

19   And if I have used some figure -- it depends on the context.

20   Q.    So you don't know?

21   A.    I don't know.

22   Q.    Would it surprise you if this figure were almost

23   identically reused in an application that names you as an

24   inventor and --

25   A.    No.

1   Q.    -- does not mention Mr. Sebire?

2   A.    Not -- no, I wouldn't be too surprised.

3   Q.    You can see at the top of the screen -- if I can work

4   this thing -- there's a reference to Proposal 5.  Do you see

5   that?

6   A.    Yes.

7   Q.    Okay.  And I think -- I'll admit that I have trouble

8   reading these documents when they first come out.  But am I

9   correct, just for context, that Proposal 5, where it says

10  Proposal 5, is actually referring to what's above the bold

11  word "Proposal 5"?

12  A.    Could you say that again?

13  Q.    Sure.  I'm -- it was probably a dense question.  Let me

14  ask you slightly differently.

15        This says "Proposal 6" down here (indicating), do you

16  see that?

17  A.    Yes.

18  Q.    And you'll agree with me that this (indicating) is what

19  it's talking about is Proposal 6, not what's further down on

20  the page below?

21  A.    I have to look at the contribution --

22  Q.    No problem.

23  A.    -- completely.

24  Q.    Yes, sir.  It's No. 569.

25             MR. CALDWELL:  In fact, would you zoom out?  That

1   might help out, actually.

2   A.    It's a new section of Proposal 6, so I think it's fair

3   to say what is below Proposal 6 is a part of something else,

4   but it could be related.

5   Q.    (By Mr. Caldwell) Fair enough.  I'm not disputing that

6   point.

7           MR. CALDWELL:  Can you just slide it up just a tiny

8   bit?

9           That's fine.  Thank you.

10  Q.    (By Mr. Caldwell) So all I'm getting at is the simple

11  point that where Proposal 6 is presented in this paper is in

12  the area I've just marked in red.

13  A.    Yes.  The text leading up -- the text after Proposal 5

14  seems to be leading up to Proposal 6.

15  Q.    Would you agree with me that this merely had proposed

16  that there are two types and two formats, and it does not say

17  under which conditions we use them?

18  A.    This text does not include the aspects of which to use

19  that was discussed in this joint workshop, no.

20  Q.    This text merely had proposed that there are two types

21  and two formats and does not say under which conditions we

22  use them, correct?

23  A.    Yes.  This text does not disclose that.

24  Q.    You mentioned that you've got a lot of patents, sir.

25  A.    Yes.

1  Q.    You said something earlier about providing background

2  information in a patent.  Or context information.  Do you

3  recall describing that generally?

4  A.    No.

5  Q.    Let me ask you a different question, then.

6        Are you familiar with what a claim of a patent is?

7  A.    I'm familiar that there are claims, but I'm not a patent

8  lawyer.

9  Q.    Do you know what the significance of the claims of a

10  patent is?

11  A.    I'm not a patent lawyer.

12  Q.    Was a separate contribution to 3GPP made to present

13  criteria for choosing between short and long buffer status

14  reports?

15  A.    I don't recall.

16  Q.    Have you looked for that in preparing to testify to the

17  jury today?

18  A.    No, I have not.

19  Q.    Now, if a separate proposal was made to show criteria

20  for choosing between long and short buffer status reports, is

21  that something that we could find publicly available on the

22  Internet?

23  A.    If there were documents contributed to 3GPP, you should

24  be able to find that.

25  Q.    When you had your video conference with Apple's lawyers,

1    were you shown any subsequent contribution where criteria for

2    choosing short or long buffer status reports was contributed?

3    A.    No.

4              MR. CALDWELL:   Could we see Defendants' Exhibit

5    DTX-567.

6              Just kind of grab the top third of it, sir.

7    Q.    (By Mr. Caldwell) Have you ever seen this contribution,

8    R2-080015, sir?

9    A.    I may have, long time ago.

10   Q.    You don't remember it as you sit here today, correct?

11   A.    Correct.

12   Q.    Do you have any doubt that the contributions of this

13   document came from Nokia or Nokia Siemens Networks?

14   A.    I believe this document was produced and that --

15   submitted to 3GPP by Nokia Siemens Networks.

16   Q.    But you're not here taking the position that the

17   contents did not come from Mr. Sebire, are you?

18   A.    I haven't read the contribution now, so I don't know

19   what is the content.  I would only speculate based on the

20   title.  And I'm not here to speculate.

21   Q.    Fair enough.

22        But you're also not here under oath telling the jury

23   that you or your colleagues at Ericsson came up with the

24   ideas in this contribution, are you?

25   A.    I don't know.  I haven't studied this contribution in a

1    very long time.

2    Q.    Did it cross your mind before you testified to go look

3    at the 3GPP website and see if there were other related

4    contributions to the issues that we're talking about in this

5    trial?

6    A.    I was looking at contributions prior to those -- that we

7    had been discussed before, not after.

8    Q.    Would you agree that this proposal introduces criteria

9    for short and long BSR, DTX-567?

10   A.    I don't know.  I haven't studied it.  And I have

11   difficulty reading it on the screen.  And it's not in my

12   binder.

13   Q.    And will you --

14             MR. CALDWELL:  Do we have 567?

15   A.    And it would probably take me some time to study it.

16   Q.    (By Mr. Caldwell) Well, about how long do you think it

17   would take you to study it?

18   A.    I don't know.

19   Q.    Okay.  I mean, I'm happy to give you a copy of it.  I

20   don't have a problem with that, so...

21             MR. CALDWELL:  Mr. Lumish, do you have 567

22   somewhere?

23             May I approach the witness and hand him this

24   binder, Your Honor?

25             THE COURT:  Yes.

1    Q.   (By Mr. Caldwell) Now, I know we have a limited amount

2    of time because I know we're ending at noon today, and you're

3    taking off in the morning, correct?

4    A.   Correct.

5    Q.   Just suffice it to say, you haven't studied Defendants'

6    Exhibit 567, correct?

7    A.   Correct.

8    Q.   And you're not here taking a position claiming any

9    portion of Defendants' Exhibit 567, correct?

10   A.   What does that mean?

11   Q.   You're not here claiming to have invented or conceived

12   of the content of Defendants' Exhibit 567, correct?

13   A.   I'm not -- I was not asked to come here to do that.  But

14   if I look at this, the first paragraph in Section 2, it looks

15   very much like what Ericsson suggested in the joint MAC

16   workshop.

17   Q.   Was this proposal ever discussed in the Working Group?

18   A.   I don't recall if it was discussed prior to this

19   document was submitted in the Working Group.  I know it was

20   discussed at this joint workshop among those companies.

21   Q.   And that's not reflected in the presentation, is it?

22   A.   In which presentation?

23   Q.   That this proposal was discussed.  That is not reflected

24   in the Ericsson PowerPoints we've seen, is it?

25   A.   It is -- I believe there were a couple of bullets

1   listing the criteria for selecting long or short, and it

2   was -- I believe it was mentioned that there was a preference

3   to do it in a certain way, and I believe that was the

4   Ericsson input.

5   Q.   And we also discussed, didn't we, that the decision of

6   what to do when certain things don't fit was left as an

7   unresolved, unanswered question, correct?

8   A.   There was no consensus from that workshop.

9   Q.   It was left as an unanswered question, correct?

10  A.   From the collective -- from the group point of view, it

11  was left as an unanswered question.  There may have been

12  suggestions and ideas on how to handle it from different,

13  individual companies.

14  Q.   So, Mr. Stattin, who presented this proposal, the

15  DTX-567, to the Working Group?

16  A.   I don't recall.  It was a very long time ago.  It was in

17  2008, it appears here; and now it is 2016, eight years ago.

18       And we present typically up to a thousand contributions

19  per meeting.

20  Q.   Now, is there any way to check and see if it was

21  presented at a meeting?

22  A.   Possibly.

23  Q.   And how might we do that?

24  A.   You could look in meeting minutes, if that is captured,

25  but it has not always been.

```
 1   Q.    What would you expect the meeting minutes to reflect if

 2   this proposal were discussed at a meeting?

 3   A.    I don't know.  The style of meeting has varied and

 4   changed over the years.  So this was something eight years

 5   ago.  I don't recall.

 6              MR. CALDWELL:  Your Honor, may I approach the

 7   witness and Mr. Lumish as well?

 8              THE COURT:  Yes.

 9   Q.    (By Mr. Lumish) I've handed you a document that has not

10   been pre-admitted in this case.  But are you familiar with

11   Working Group meeting minutes that are reflected and recorded

12   and stored online?

13   A.    Yes, I am.

14   Q.    Can you take a look at what you were just handed that is

15   marked at the top R2-080549?

16              MR. LUMISH:  Can we approach, Your Honor?

17              THE COURT:  You may.

18              (Bench conference.)

19              MR. LUMISH:  This looks like a 20-page document.

20   There's no trial exhibit number.  It wasn't disclosed.  I'm

21   not aware of what it is.  This is unfair.

22              MR. CALDWELL:  It's the meeting minutes off the

23   public 3GPP website.

24              THE COURT:  Okay.  And what is the relevance to

25   them?
```

1            MR. CALDWELL:  They're the meeting minutes where

2    Mr. Sebire's proposal was discussed by the Working Group

3    where he was at the meeting.

4            MR. LUMISH:  The issue is it's not on the list.

5            THE COURT:  Why wasn't it disclosed?

6            MR. CALDWELL:  Well, it's an impeachment exhibit.

7            THE COURT:  Okay.

8            MR. CALDWELL:  It's certainly at least --

9            THE COURT:  I'm just asking you to assert your

10   objection and your response.

11           MR. CALDWELL:  Absolutely.  Absolutely.

12           I'm also thinking about -- the reason I smile is

13   I'm thinking about the cross-examination on an order from a

14   Georgia court yesterday.  It's a public record.

15           And this document had -- this witness has personal

16   knowledge of these meetings and the minutes that come out of

17   them, so I think he has more than adequate foundation for it.

18           THE COURT:  If he lays the foundation, what's your

19   objection to the document?

20           MR. LUMISH:  Just that it wasn't disclosed.  That's

21   all.

22           THE COURT:  Okay.  That objection is overruled.

23           Lay the foundation and then offer it.

24           MR. CALDWELL:  Yes, Your Honor.  Yes, Your Honor.

25   I was just going to also remind the Court, remember that we

1   got a huge production from him and Ericsson the night before

2   trial, so...

3           THE COURT:  I've got it.

4           MR. LUMISH:  Can I make one more point, if I may,

5   please, while we're here?

6           THE COURT:  Yes.

7           MR. LUMISH:  I'm going to need three or five

8   minutes of redirect, so I just wanted to check in on timing.

9           MR. CALDWELL:  I think you'll be fine.

10          MR. LUMISH:  Okay.  Thank you.

11          THE COURT:  All right.  Thank you.

12          MR. LUMISH:  Thank you very much.

13          (Bench conference concluded.)

14  Q.   (By Mr. Caldwell) So, Mr. Stattin, what is the document

15  that I've handed you?

16  A.   It appears to be a 3GPP RAN2 Working Group document.

17  Q.   Are you familiar with documents like this?

18  A.   Yes.

19  Q.   Have you flipped through it a little bit to see that it

20  reflects minutes from a meeting known as No. 60b?

21  A.   No, I have not.

22  Q.   Can you tell that, by looking at the header and flipping

23  through it for a second?

24  A.   Based on the header and the object, it appears to be

25  minutes from an LTE user session.

1   Q.   Do you have any reason to believe that these are not the

2   authentic meeting minutes from those meetings that are

3   reflected on the public 3GPP website?

4   A.   No immediate reason to say that.

5           MR. CALDWELL:  Your Honor, we'd move for the

6   admission of this exhibit, which I will get a new sticker

7   for.

8           MR. LUMISH:  No objection, Your Honor.

9           THE COURT:  Okay.  It will be admitted.

10          Let me know what the number will be.

11          MR. CALDWELL:  Your Honor, it is Plaintiff's

12  Exhibit 299.

13          THE COURT:  Thank you.

14  Q.   (By Mr. Caldwell) Mr. Stattin, will you do me a favor

15  and flip to the eighth page, which we'll also pull up on the

16  screen?

17          MR. CALDWELL:  Would you pull up that section,

18  Mr. Evans?

19  Q.   (By Mr Caldwell) Mr. Stattin, do you see that Nokia's

20  contribution of criteria for short and long BSR was discussed

21  at this meeting?

22  A.   Excuse me.  Could you repeat that question?

23  Q.   Yes, sir.

24      Do you see that the Nokia contribution, R2-080015, was

25  specifically discussed at the 60b meeting?

1    A.    From this document, it appears that this Nokia

2    contribution was discussed at that meeting, yes.

3    Q.    Now, is there any indication whatsoever that anybody at

4    that meeting disputed that this contribution came from

5    Mr. Sebire?

6    A.    Whether the content of the ideas are coming from a

7    certain company or not is not reflected by the company or who

8    is creating the contribution to the meeting.

9          It may be based on early ideas and early discussion, and

10   then it has been put in a contribution at some point by a

11   company because maybe they're being formed more -- more of a

12   consensus in that direction or it's -- the standard has

13   more -- matured a bit, and it's a better moment, better time

14   to discuss and decide certain aspects.

15         So from just seeing this document and the title and its

16   minutes, I cannot tell from whom the ideas are coming.

17   Q.    Have you seen any document from which you can say

18   someone other than Mr. Sebire conceived of the ideas in his

19   patent claims?

20   A.    I'm not aware of the patent claims.

21   Q.    And just so we're clear, that question was about --

22   about documents.  Are you contending, or is it your belief

23   that someone other than Mr. Sebire contributed and conceived

24   of the ideas that are inventive in his patent claims?

25   A.    I've not seen the claims.  What I have seen is that I've

1    told already that in the beginning of this contribution

2    080015, there were some bullets and criteria which were

3    contributed by Ericsson in the joint workshop.

4    Q.    How well do you know Mr. Sebire?

5    A.    I've been meeting him at RAN2 Working Group meetings for

6    a number of years.

7    Q.    Do you trust him?

8    A.    I believe I do.

9    Q.    You guys actually knew each other fairly well.  It's not

10   just that you happen to see each other at meetings; is that

11   fair?

12   A.    Can you define "know someone well"?

13   Q.    Let me ask a different question.

14         Did you and Mr. Sebire actually get pitted against each

15   other in an election at one point?

16   A.    We were -- Mr. Sebire, myself, and a delegate of -- was

17   it LG Electronics -- were at one point all candidates for a

18   vice chairman position in RAN2.

19   Q.    What happened in the election?

20   A.    In the election there was a round of elimination and

21   then there was a final round.  In the first round the

22   candidate from LG Electronics was eliminated, and in the next

23   round it was concluded that Mr. Sebire won the election.

24   Q.    Did that election take place before or after Mr. Sebire

25   made contribution 080015 to the standard?

1   A.   My recollection is that the election was in 2009, so

2   that would have been after 2008.

3   Q.   The election was after the contribution?

4   A.   The election was after the meeting that we are looking

5   at in this exhibit.

6   Q.   Was the election before or after Nokia-NSN told the

7   other 3GPP participants that it had a patent application on

8   Mr. Sebire's idea?

9   A.   I don't know.

10  Q.   Does Ericsson sometimes have ideas that it keeps secret

11  until it can file a patent application before they propose it

12  to the standards group?

13  A.   What do you mean by "keep secret"?

14  Q.   Does Ericsson sometimes have ideas that it keeps

15  confidential internally at Ericsson to make sure they file a

16  patent application before they disclose it to the working

17  group?

18  A.   If we're going to file a patent application, that, to my

19  understanding, needs to be done before disclosing the

20  invention or publishing the invention.

21  Q.   So does that mean that, yes, Ericsson will keep it

22  confidential from the working group until they get the

23  application on file?

24  A.   Ericsson would keep it confidential from the public.

25  I mean, if we would share it with other companies, then I

1   think it would be very difficult for us to file it

2   afterwards.

3   Q.   Will you find DTX-576?

4           MR. CALDWELL:  No.  I think I gave you the wrong --

5   I was looking for 080015 -- I'm sorry.

6   Q.   (By Mr. Caldwell) I'm sorry -- I'm sorry, 567.  Do you

7   have Defendants' Exhibit 567 handy, sir?  It's the

8   contribution from Mr. Sebire.

9   A.   Yes.

10  Q.   Would you have preferred to show this contribution to

11  the jury during your direct testimony?

12  A.   I don't think I understand the question.

13  Q.   Would your testimony have been more complete if you had

14  showed Defendants' Exhibit 567 to the jury, sir?

15  A.   I don't know.

16  Q.   I understand that you have -- we have a limited amount

17  of time, and you have to leave tomorrow.

18          MR. CALDWELL:  So I will pass the witness now so

19  that Mr. Lumish can have some follow-ups.  Thank you.

20          THE WITNESS:  Thank you.

21                    REDIRECT EXAMINATION

22  BY MR. LUMISH:

23  Q.   Let's look at 567.

24      The suggestion you were hearing, sir, if you were

25  confused by it, was that we somehow were hiding this document

1    either from you or from somebody else.  Let's start at the

2    top of it.

3        First of all, look at the date.  It says January -- why

4    don't --

5              MR. LUMISH:  Actually, Mr. Schmoller will you bring

6    up through Proposal 1 for me, please?

7              Right there.  So I want to have the date at the top

8    and -- thank you.

9    Q.   (By Mr. Lumish) Do you see the date at the top, sir?

10   A.   I do.

11   Q.   It says 14-18 January 2008.

12   A.   Yes.

13   Q.   Is that before or after the workshop?

14   A.   That's after the workshop.

15   Q.   Is that before or after the joint Ericsson contribution

16   that we talked about before?

17   A.   It's after.

18   Q.   And there is a source listed there.  Do you see the

19   source?

20   A.   Yes.

21   Q.   Does it include Ericsson on it?

22   A.   No.

23   Q.   Now, he didn't show you the actual criteria and call

24   those up.  Let's take a look at those in Section 2 here.  Do

25   you see it says --

```
 1              MR. LUMISH:  Can you maybe blow that up for me
 2    please, Mr. Schmoller?
 3    Q.   (By Mr. Lumish) It says:  In its simplest form the
 4    criteria can simply depend on the amount of data that is
 5    buffered in the different logical channel groups.
 6          Do you see that?
 7    A.   I see that.
 8    Q.   And you've talked about radio bearer groups.  Is there a
 9    difference, in your mind, between logical channel groups and
10    radio bearer groups?
11    A.   They are commonly used -- they use these terminologies
12    interchangeably in the RAN2 Working Group.
13    Q.   And the criteria that Mr. Sebire lists here only in
14    Nokia's name are, first:  If only one LCG has buffered data,
15    report the short BSR format.  And as soon as more than one
16    LCG has buffered data, report the long BSR format.
17          Do you see that?
18    A.   I see that.
19    Q.   Do you believe that Mr. Sebire conceived of those
20    selection criteria for choosing between short and long buffer
21    status reports all by himself, separate from the workshop?
22    A.   No.
23              MR. LUMISH:  Let's look at the proposal, please,
24    Mr. Schmoller.
25              That was right underneath there, Proposal 1.
```

1          Thank you.

2    Q.   (By Mr. Lumish) It says Proposal 1:  If only one LCG has

3    buffered data, report short BSR.  As soon as more than one

4    LCG has buffered data, report long BSR.

5          Is that an idea that Ericsson had before January 2008?

6    A.   Yes.

7    Q.   And is that an idea that Ericsson presented to the

8    workshop?

9    A.   Yes.

10   Q.   Is that an idea that Ericsson presented to the workshop

11   when Mr. Sebire was there?

12   A.   Yes.

13          MR. LUMISH:  Can you -- Mr. Schmoller, will you

14   bring up the criteria again, please?  I'm going to ask you to

15   split screen.

16          And if you could split it with Page 11 of

17   Defendants' Exhibit 756.  So DT-756, Page 11.

18   Q.   (By Mr. Lumish) So we have on the left the January 2008,

19   Nokia submission; and on the right, we have the PowerPoint

20   slide from Ericsson from the workshop.

21          MR. LUMISH:  Can you make them bigger or maybe put

22   one on top of the other?

23          Thank you.

24          So I -- yeah, I need the -- exactly.  Actually,

25   above that.  So the four or five bullets above it, too.  From

1    "2 formats" down, please.

2              Thank you.

3    Q.    (By Mr. Lumish) We're going to try to make this a little

4    easier to read.

5          So on the top now we have the proposal that Mr. Sebire

6    submitted in Nokia's name only.  It says:  If only one LCG

7    has buffered data, report the short; and if more than one,

8    report the long.

9          Now, on the bottom we have the PowerPoint from Ericsson.

10   It's in bold text, isn't it?

11   A.    Yes.

12   Q.    So that's the same bold texting that Mr. Caldwell asked

13   you about and with the same significance he asked you about

14   in the -- in the PowerPoint?

15   A.    Yes.

16   Q.    And do you see any similarities here, sir, between what

17   Ericsson wrote in the PowerPoint and what's in Mr. Sebire's

18   name in the first document at the top there?

19   A.    Yes, I do.

20   Q.    And what's the similarity?

21   A.    The similarity is that if you have data to report on one

22   group, then you use the short format.  If you have data on

23   more radio bearer groups, then you use the long format.

24   Q.    Forgive me.  I wrote on this.  I got excited when I saw

25   it.

1    Mr. Caldwell didn't show you this part of Plaintiff's

2 Exhibit 299.  These are the meeting minutes.

3    Let me make sure I've got the number correct.  Sorry.

4 Plaintiff's Exhibit 299.

5    He showed you these meeting minutes from the RAN2

6 Working Group.  He didn't ask you about that bullet, I don't

7 think, unless I misheard, where it says:  Ericsson is quite

8 happy with the Proposals 1 and 2.

9    Do you see that?

10 A.    I do.

11 Q.    Do you remember what Proposals 1 and 2 are?

12 A.    Not from the top of my head.  Proposal 1, I have read

13 now during my testimony.  And you showed it to me so that I

14 recall.  And that is in line with what Ericsson has been

15 proposing before.

16 Q.    So Proposal 1 is the one that we looked at here in the

17 Nokia submission of using one -- of using a short form buffer

18 status reports when there's only one buffer to report.  And a

19 long form buffer status report, when there's more than one

20 buffer to report.  Are you surprised that Ericsson was happy

21 with that proposal?

22 A.    Not at all.

23 Q.    Why would you think Ericsson would be happy with it?

24 A.    Because it was consistent with our ideas and what we

25 were thinking.

1   Q.   Now, a couple of times Mr. Caldwell referred to a video

2   conference you and I had.  Do you remember this?

3   A.   Yes.

4   Q.   And I think he also was suggesting to the jury there

5   that I -- I hid that from him.  Do you remember me asking you

6   about that in your first minute or two of your testimony

7   today?

8   A.   Yes, you did.

9   Q.   Okay.  And tell the jury more about that call, please,

10  the video conference you and I had.

11  A.   In that video call we discussed -- I was asked about my

12  educational background, my work at Ericsson, my work in 3GPP.

13       We discussed a little bit about buffer status reporting.

14  We discussed the joint contribution and a patent by Johan

15  Torsner.

16            THE REPORTER:  By who?  I'm sorry, repeat that.

17            THE WITNESS:  The name?

18            THE REPORTER:  Yes.

19            THE WITNESS:  Johan Torsner.

20            THE REPORTER:  Thank you.

21  Q.   (By Mr. Lumish) Now, earlier in your testimony on direct

22  you mentioned something about a patent application that you

23  thought showed to you that Ericsson had conceived of the

24  ideas of using a short form with a single buffer that needs

25  to report data and a long form when there's more than one.

1      What -- what was the application or patent you had in

2   mind when you testified?

3   A.    That was the same patent by Johan Torsner.

4   Q.    And do you know if that patent ends -- excuse me -- do

5   you know if that patent ends in the number '666?

6   A.    I think it does.

7   Q.    Okay.  Now, he also asked you about whether you knew --

8   whether you thought of Apple as an adversary.  You're not in

9   the legal department of Ericsson, are you?

10  A.    I'm not.

11  Q.    And are you aware of any lawsuits between Apple and

12  Ericsson?

13  A.    No.

14  Q.    So you -- you don't know if Apple and Ericsson have been

15  embroiled in lawsuits in any time in the past?

16  A.    In the past I am aware, yeah, we have been in lawsuits.

17  But not any -- I'm not aware of any present.

18  Q.    Okay.  He -- Mr. Caldwell asked you if it crossed your

19  mind to look at any later dated proposals to the working

20  group or to the 3GPP, later dated than the joint Ericsson

21  proposal.

22      By the way, the reason I call it that, is Ericsson is

23  the first name.  I've been calling it that for two years.  I

24  don't think I'm going to be able to change now.

25      So he said:  Did it cross your mind to look later -- at

1    later proposals after the joint Ericsson proposal?

2         You said you looked for prior.  Why did you look for

3    prior instead of later?

4    A.   I was looking trying to understand what led up to the

5    joint proposal.  And I had no reason to believe I would look

6    at things after that.

7    Q.   All right.  I think my last question for you, sir, is,

8    Mr. Caldwell referred to an election.  Do you remember that?

9    A.   Yes.

10   Q.   And in the election you were running to become vice

11   chair of some part of the standards body; is that right?

12   A.   That's right.

13   Q.   You lost that election to Mr. Sebire; is that fair?

14   A.   I did.

15   Q.   And how did you feel about that?

16   A.   At the time it was my not preferred outcome, of course,

17   because if you're running, then you prefer to come out

18   winning.

19        But it's also -- it would be an honor to be chairman,

20   but it would also be a lot of work.  And, frankly speaking, I

21   think I made a better job for Ericsson being a delegate.

22   Q.   Do you hold a grudge against Mr. Sebire because he won

23   the election and you didn't?

24   A.   No, I don't.

25   Q.   Did you shade any of your testimony to our jury today

1    because you lost that election?

2    A.    No.

3    Q.    Did you say anything today that you think is untruthful

4    because you lost some election at the working group level?

5    A.    No.

6    Q.    That's all I have for you, sir.  Thank you very much.

7              MR. CALDWELL:  Can I try and fit it in, in a minute

8    here?

9              THE COURT:  All right.

10                       RECROSS-EXAMINATION

11   BY MR. CALDWELL:

12   Q.    Mr. Stattin, I'll try to be real quick, given the time.

13        You said that Apple and Ericsson used to be adversaries

14   in lawsuits, right?

15   A.    I said that I am aware that Ericsson and Apple was in a

16   lawsuit.

17   Q.    And they resolved those difference in December of 2015,

18   correct?

19   A.    I don't have a clear picture of the entire timeline on

20   that.

21   Q.    Prior to the resolution of that lawsuit, had you ever

22   contended that Mr. Sebire claimed inventions that weren't

23   his?

24   A.    No.

25   Q.    Did you ever offer to have a video conference with us?

1   A.   I didn't have a video call with CCE.  I met a CCE

2   representative at the -- at my deposition, though.

3   Q.   And then when you had a discussion with Apple and talked

4   about this Torsner patent, just to be clear, you didn't

5   present any indication to the jury that that Torsner patent

6   has any relationship to what we're talking about today, did

7   you?

8   A.   I don't recall if I -- if I did or not.

9   Q.   Sir, you've not identified a single person who conceived

10  of inventive concepts in Mr. Sebire's claims, correct?

11  A.   I still haven't seen the claims, so, sorry, I cannot

12  answer that question.

13  Q.   So -- I may -- I may already know the answer to this,

14  then.  Do his claims address the unanswered question of what

15  to do if a short format fits and a long one does not?

16  A.   I don't know.

17  Q.   And when his proposal was presented to the working

18  group, Ericsson said it was happy, right?

19       It was quite happy with this proposal, correct?

20  A.   Ericsson seemed so.

21  Q.   Do you remember the suggestion that I hid that -- that

22  bullet point from the jury?  Do you remember that suggestion

23  just now?

24  A.   Can you repeat that question?

25  Q.   Yes, sir.

1        Do you remember Mr. Lumish's suggestion that I did not

2   show the jury that bullet point?

3   A.   No.  I must have missed his saying that.

4   Q.   You don't remember him saying:  Now, Mr. Caldwell didn't

5   direct you to this part right here where it says Ericsson is

6   quite happy with Proposals 1 and 2?

7        You don't remember that?

8   A.   Now that you say it, yes, I remember it.

9   Q.   Who brought that document to court?

10  A.   You did.

11  Q.   Who directed the jury to that page?

12  A.   You did.

13  Q.   And in those minutes does it say that Ericsson stood up

14  and said:  Hey, this is our proposal.  We talked about it a

15  long time ago?

16  A.   That's not usually the way things are done in 3GPP.

17  Q.   It does not say that, does it?

18  A.   Doesn't say that, and that's not how we work in 3GPP.

19             MR. CALDWELL:  No further questions, Your Honor.

20             Thank you.

21             THE COURT:  All right.  Anything further?

22             MR. LUMISH:  No, Your Honor.

23             THE COURT:  Okay.

24             MR. LUMISH:  Nothing further.  Thank you.

25             THE COURT:  All right.  Dr. Stattin, you may step

1   down.

2           All right.  Ladies and Gentlemen of the Jury,

3   you've put in a long half day, and we're going to recess

4   until Monday morning at 9:00 a.m.

5           Again, if you'll be here a few minutes early so we

6   can start on time.  I will, again, caution you not to talk

7   about this case over the weekend with family or friends or

8   anyone.  Just put it out of your mind.  Enjoy your weekend,

9   and we'll pick it back up an Monday.  We'll be in recess.

10          COURT SECURITY OFFICER:  All rise.

11          (Jury out.)

12          THE COURT:  Please be seated.

13          I just wanted to give you all your trial times

14   before we adjourn.

15          So the Plaintiff has used 8 hours and 18 minutes.

16   Defendant has used 6 hours and 5 minutes.

17          Is there anything that you need from the Court

18   before I let you go for the weekend?

19          MR. CALDWELL:  No, Your Honor.

20          MR. LUMISH:  Nothing at all.

21          THE COURT:  All right.  Thank you very much.  We'll

22   be in recess until Monday at 9:00 a.m.

23          COURT SECURITY OFFICER:  All rise.

24          (Court adjourned until 9:00 a.m.,

25          September 12, 2016.)

1

2                          CERTIFICATION

3                  IT IS HEREBY CERTIFIED that the foregoing is a

4      true and correct transcript from the stenographic notes of

5      the proceedings in the above-entitled matter to the best of

6      our abilities.

7
       /s/_____
8      CHRISTINA BICKHAM, CRR, RMR          September 9, 2016
       Official Court Reporter
9

10

11     /s/_____
       SHEA SLOAN, CSR, RPR
12     Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25