IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

CELLULAR COMMUNICATIONS        )
EQUIPMENT, LLC
                               )    DOCKET NO. 6:14cv251

    -vs-                       )
                                    Tyler, Texas
                               )    8:30 a.m.
APPLE INC., ET AL                   September 13, 2016


TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE K. NICOLE MITCHELL,
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S**

FOR THE PLAINTIFF:

MR. BRADLEY W. CALDWELL
MR. JOHN AUSTIN CURRY
CALDWELL CASSADY & CURRY
2101 Cedar Springs Rd., Suite 1000
Dallas, Texas 75201

MR. EDWARD R. NELSON III
NELSON BUMGARDNER PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107

MR. J. WESLEY HILL
WARD, SMITH & HILL PLLC
1507 Bill Owens Parkway
Longview, Texas 75604


COURT REPORTER:      MS. CHRISTINA L. BICKHAM, CRR, RMR
                     FEDERAL OFFICIAL COURT REPORTER
                     300 Willow, Ste. 221
                     Beaumont, Texas 77701


Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

```
 1 | FOR THE DEFENDANTS:
   |
 2 |
   | MR. DOUGLAS E. LUMISH
 3 | MR. JEFFREY G. HOMRIG
   | MS. LISA K. NGUYEN
 4 | MR. BRETT M. SANDFORD
   | LATHAM & WATKINS LLP
 5 | 140 Scott Dr.
   | Menlo Park, California 94025-1008
 6 |
   |
 7 | MR. JOSEPH H. LEE
   | LATHAM & WATKINS LLP
 8 | 650 Town Center Drive, 20th Floor
   | Costa Mesa, California 92626-1925
 9 |
   |
10 | MR. ERIC H. FINDLAY
   | FINDLAY CRAFT PC
11 | 102 N. College Avenue, Suite 900
   | Tyler, Texas 75702
12 |
   |
13 |
   |
14 |            ******************************
   |
15 |                P R O C E E D I N G S
   |
16 |         (Jury out.)
   |
17 |         THE COURT:  Good morning, everyone.  Please be
   |
18 | seated.
   |
19 |         I understand there are some matters we need to take
   |
20 | up before we bring in the jury this morning.
   |
21 |         MR. HOMRIG:  Thank you, your Honor.  Yes.
   |
22 |         The first issue are some objections to
   |
23 | Dr. Acampora's slides.  The first thing I'd like to know,
   |
24 | there was a point of agreement on those slides, just to put
   |
25 | on the record, that in light of Plaintiff's representation
```

that it is withdrawing contributory infringement, we are

dropping three slides related to substantial non-infringing

uses.

There are some slides, however, about -- some

slides and documents related to the provisional application

and related to the Ericsson proposal.  I can hand up to

Your Honor the specific slides.

The basic issue here, as I understand it, is

whether or not these fall within the scope of his prior

disclosures.  Dr. Acampora addressed the substance of the

Ericsson proposal in his original report on invalidity.

Then after expert discovery closed, Mr. Sebire was

deposed.  And during that time period he testified about the

Ericsson proposal, and there was some matching of the -- of

the proposal to the provisional application.

After that time, the transcript was sealed.

Dr. Acampora did not have access to it until NSN allowed him

to do so.  Once he had access to it, he then, within two

weeks, served a supplemental report addressing the substance

of that deposition.  And so that's sort of the procedural

history on this.

Now, if we look at the slides, the first two slides

in that deck are DDX-4.114 and 115.  These are simply

reproductions of the marked-up copies of the -- oh, I --

actually, I misspoke.

1          So DDX-114 is the marked-up copy of the Ericsson

2    proposal that was used during Mr. Sebire's deposition.   So

3    that was marked then, and that's what that is.

4    DDX-115 is a copy of the '820 patent where Dr. Acampora

5    matches up some of the disclosures of the Ericsson proposal

6    into the '820 patent.

7          And -- and the basis for that is that during his --

8    his -- or in his original report he was comparing the

9    Ericsson proposal to the '820 patent generally, and this

10   falls within the substance of his -- his original disclosure

11   even though he didn't make a figure that actually matched

12   them up directly.   So that's the background on that as well.

13         The three slides -- well, the Slide DDX-4.121, that

14   is similarly showing the comparison between the Ericsson

15   proposal figures and the '820 patent, and that is something

16   that -- that was addressed in Paragraph 10 of his

17   supplemental report in terms of the Ericsson proposal and the

18   highlighting that was done during the deposition.

19         And then there is basis, for example, back in

20   Paragraph 272 of his original report discussing the Ericsson

21   in comparison with the '820 patent generally and how its

22   disclosure matches up with -- with what's claimed in that

23   patent.

24         The next two slides, Your Honor, are DDX-4.117.

25   That is a comparison of the Ericsson proposal with the '820

1   patent.  And in his original report, Dr. Acampora, at

2   Paragraph 145 and 173, discusses the substance of the

3   Ericsson proposal in relation to the '820 patent.

4          And then DDX-4.119 is a similar kind of slide.

5   That -- that discloses the Ericsson proposal and the

6   substance of that in Paragraph 388 of the original invalidity

7   report.  And there, he addresses, again, the substance in

8   comparison with the '820 patent.

9          So all of these slides fall within the scope of

10   what he has already opined on in this case, and we submit

11   that -- that we should be permitted to use them.

12          THE COURT:  Response.

13          MR. CALDWELL:  Good morning, Your Honor.

14          The argument that these were submitted to us timely

15   I think is fairly misleading.  I think Mr. Homrig tried to

16   basically correlate it to the timing of the deposition of

17   Mr. Sebire and then some confidentiality issues, but they had

18   the provisional for months and months and months, years.

19          They had what they referred to as the Ericsson

20   proposal for a long time.  And as I say, he addressed the

21   Ericsson proposal, as they call it, in his first report.  He

22   did none of this in his first report.

23          So he had all of those materials, and the point is

24   to show that there's overlap in the two of them.  The

25   timeliness argument that he came back and submitted this, I

think basically a month and a half after Mr. Sebire's depo,

but perhaps more importantly, almost two months after his own

deposition, is -- is, I think, a big timeliness -- timeliness

problem.

The other thing is more fundamentally in terms of

the prejudicial issue in front of the jury, is Mr. Acampora

does not offer an opinion on derivation, nonjoinder.  He

doesn't, you know, plug any of the gaps on derivation or

nonjoinder.  He doesn't identify someone who's a missing

inventor.  He doesn't identify anyone from whom material was

derived that ended up in a claim.

And so what I think is happening is this is an

attempt through -- I mean, I will acknowledge that in his

late report, well after his deposition, he attached these

sort of color things that Apple's lawyers made.  I know that

he did that.

What it sounds like is he's going to come in here

and essentially give testimony on these derivation and

nonjoinder-type issues.  There's a high-level issue, I think,

that we need to discuss in the case, and maybe now is not the

time.  But there's the evidentiary issues for him.

And a preview on the high-level issue is they can't

prove derivation and nonjoinder.  They can't -- you know, I

understand everybody makes 50(a) motions to preserve our

error going down the road, but the reason we filed our brief

1    with you last night is because this is a preview.

2         At some point today we really want to talk about

3    the derivation and nonjoinder, not merely as a preservation

4    of error sort of thing, but because they literally can't

5    prove it.

6         And I think we must have done a bad job persuading

7    you at the motion in limine hearing; but a point that may or

8    may not have been clear, the Local Rules require that you

9    identify a person from whom something was derived or someone

10   that should be a co-inventor.

11        And that's something they've never done, much less

12   corroborated it.  And, okay, so it isn't kept out as a motion

13   in limine, but it has pervaded this trial, and it started

14   with attacks on Mr. Sebire, and it started then -- followed

15   with Magnus Stattin who, on cross-examination, of course,

16   admits there is no person he can attribute this to.

17        And, you know, I'm not trying to argue that point

18   now, but my point is this:  This expert can't fill those

19   gaps.  He is not a percipient witness on any of the

20   inventorship or derivation issues.  He has not offered an

21   opinion as to who the people are that should be plugged in.

22        And it looks like -- because the way that this

23   document has been used throughout, it looks like they are

24   trying to present those defenses with this witness who

25   doesn't have an opinion on them and can't fill those gaps.

1          And I think that's our big concern, particularly

2    with an untimely report.  And, you know, just these things

3    coming in later -- consistency with how these have been used.

4          Because what you'll note with these slides is he's

5    not doing the anticipation or obviousness thing, which is

6    where his opinions are.  He's not saying -- in these anyway.

7          Maybe he does somewhere else in his 120 slides.

8    He's not saying, okay, these are places where this content is

9    in the claim and it results in an obviousness-type issue.

10          This -- this is more the argument that yeah, okay,

11    I know your guy typed the Ericsson proposal and then he

12    reused those words and -- in the application.  It's more on

13    this kind of theft of the invention derivation theme, which

14    is not an issue for Mr. Acampora.  And that's why we object.

15          MR. HOMRIG:  Your Honor, there's a whole lot in

16    there to address.

17          Let me briefly on the -- on the larger issue of the

18    50(a) motion, let me just say that there is evidence in the

19    record, both from Mr. Sebire and from Dr. Stattin, about who

20    was involved and -- and that can be addressed separately.

21          But Dr. Acampora's role is not to address those

22    issues.  Those already have come into evidence.

23          Dr. Acampora's role on this issue is to do,

24    frankly, a very similar exercise to what he's doing on

25    obviousness; and an exercise that has been disclosed to them

1    since he filed his opinions.  And that is -- one of the

2    things we need to show is that this subject matter that is

3    relevant to inventorship made its way into the claims and

4    into the patent.

5            He is being asked, or would be asked, not on the

6    broader question of inventorship, but on being able to tie

7    the subject matter into the claims and into the patent.

8            We disclosed that to them.  That's consistent with

9    his earlier opinions.  There's no broader purpose here other

10   than to meet our burden.  And -- and to do it with an expert

11   who is opining on those specific issues.

12           So if the concern is that we're going to somehow

13   try to sneak in a bigger opinion about inventorship or have

14   him opine on that, that's -- that's not the intent.  The

15   intent here is to have him tie that subject matter to the

16   claims and to the patent, all of which has been disclosed.

17   They knew about it, and there should be no issue here, Your

18   Honor.

19           THE COURT:  Response.

20           MR. CALDWELL:  But that's not what these slides do.

21   These slides -- nowhere in anything he showed you -- I mean,

22   understand that, there were 120 some-odd slides, and they had

23   to disclose based on our agreements, I don't know, 60 or 80

24   or some very large number.

25           We're bringing a very few disputes to you because

1    that is -- he just verified my concern.  What they want to do

2    is try inventorship with this -- this person who has not

3    offered an opinion that the patent is invalid for failure to

4    name a proper inventor.  Or has not said, you know, this

5    claim was derived from somebody.

6            And what this is, is it's -- you know, and I kind

7    of wish we could all go back to the motion in limine stage

8    because this is sort of a classic skunk in the box in that

9    they're saying, oh, text was reused, therefore -- they're --

10   they're painting it as though it's an inventorship argument.

11           And he's saying, ah, it's similar enough to our

12   obviousness argument.

13           This is the problem.  That we're not -- the jury

14   isn't being asked to decide whether there's overlap in the

15   specifications.  They need to be making their obviousness and

16   anticipation arguments, not something that's similar.

17           We're just asking that the testimony is limited to,

18   you know, what was in his reports and what they have verbally

19   contended.  And it seems like they're trying to -- to stretch

20   that because he's not giving us inventorship or derivation

21   invalidity opinion.

22           MR. HOMRIG:  And, Your Honor, the ultimate issue

23   of -- of inventorship and derivation is for the jury.  What

24   he's being offered on is the technical analysis of how the

25   subject matter is in the claims, all of which has been

1    disclosed.

2            THE COURT:  Well, it does sound like he's -- it

3    appears from these slides he's making kind of an inventorship

4    argument, but he hasn't offered any opinions on that.

5            MR. HOMRIG:  Well -- well, Your Honor, he is

6    offering technical analysis that is relevant to that

7    decision, and that has been disclosed.  It was addressed in

8    his supplemental report where he -- he looks at the Ericsson

9    proposal, the version that was highlighted.  He talks about

10   it.  That was disclosed to them.  He did that shortly after

11   he was allowed to see the deposition transcript himself by

12   NSN.

13           So, yes, it is relevant to the issue of

14   inventorship, but he is not offering opinions on

15   inventorship.  He is just doing a technical analysis related

16   to that issue that has been disclosed to them.

17           MR. CALDWELL:  Timeliness argument makes no sense.

18   In the deposition of Mr. Sebire testified --

19           THE COURT:  Okay.  Timeliness aside, tell me

20   about -- respond to that point, that he's doing this

21   technical analysis and it's relevant.

22           MR. CALDWELL:  Well, then that's, I think, quite

23   simply -- if what he's saying is that the witness's opinion

24   is on obviousness or anticipation, what he should be doing is

25   taking what they referred to as the Ericsson proposal and

1   then he should be looking at the claims and saying this part

2   of this proposal makes this part of the claim obvious.

3         What he's doing instead is to sort of fill the

4   persuasive gap, he's throwing up these kind of color things

5   to say, oh, he reused it, which I think maybe plays on some

6   sort of confusion or it's an implicit allegation of

7   plagiarism or something, even though he wrote it.

8         That doesn't go to the issue of whether the claimed

9   subject matter is obvious or anticipated, and they should

10  stick to that.  That's why we're just objecting to, you know,

11  this series of demonstratives that you don't need if you're

12  not trying to bleed over into this "stole the invention"

13  theme.

14        THE COURT:  Are you -- are you taking the position

15  that he's giving, you know, opinions and testimony about

16  anticipation and obviousness and some part of inventorship

17  through this technical comparison?  I mean, what -- what is

18  this piece?  What is this for?

19        MR. HOMRIG:  This portion that they're objecting to

20  goes to inventorship.  But it does not go to the ultimate

21  question.  It simply goes to show that the technical material

22  that is derived from or comes from those discussions goes to

23  the claims, and that's what he was disclosing.

24        It's -- I think the issue that somehow it takes on

25  a new -- you know, it's all different kind of testimony

1    simply because it's relevant to multiple issues, what the --

2    the question he's addressing is do these parts of the

3    Ericsson proposal find their way into the --

4    subject-matter-wise into the '820 patent.  That's it.  He's

5    not going to opine on intent.  He's not going to opine on who

6    else was involved.

7           He's simply going to look from a technical

8    perspective at the issue of does this subject matter, does

9    that go into -- into the claims and into the patent.

10          THE COURT:  Don't you already have that testimony

11   through other witnesses?

12          MR. HOMRIG:  We do, but --

13          THE COURT:  Why do you need it from this witness?

14          MR. HOMRIG:  Well, we need it from this witness for

15   the simple reason that I would expect during closing

16   arguments if we do not have an expert tie the subject matter,

17   we're going to hear from -- from the other side that, well,

18   you know, in the same way they have that -- that either he

19   wasn't willing to do it or we tried to hide it from them or

20   one of these kind of arguments that we've heard so much

21   through trial.

22          And our ability should not be hampered to be able

23   to offer the technical analysis that is relevant to the

24   various defenses that we're presenting.  And that's all this

25   is.

1            THE COURT:  Final word, Mr. Caldwell.

2            MR. CALDWELL:  He just never concludes that there's

3    an inventorship or derivation problem.  He just doesn't, and

4    they're trying to wedge that in right now.

5            As I say, I think if they were looking at those

6    references and making an obviousness argument, just here's

7    what's in the claims, are these elements obvious, that's one

8    thing.  They're obviously not.  They're trying to patch up

9    the inventorship.

10           And from our perspective, I mean, we came into

11   trial with no contention, no expert report identifying anyone

12   who is the alleged co-inventor or anyone from whom a claim

13   was allegedly derived; no one.  It wasn't kept out on limine,

14   but the percipient witnesses were up and down.  We had --

15   Mr. Sebire come over from Japan, and we had Mr. Stattin came

16   over from Stockholm.

17           At that point the percipient witnesses are gone.

18   They have not plugged that hole.  And to have this person go

19   back and repeat something that's already in there, is just

20   unduly prejudicial.  It's not disclosed.

21           THE COURT:  Okay.  I'm going to exclude these

22   slides.

23           What's next?

24           MR. MCMANIS:  Good morning, Your Honor.

25           With respect to Defense Exhibits 655 and 656, we

1    discussed these a little bit yesterday at the end of the day

2    with Mr. Bakewell.  Apple is now seeking to admit these

3    documents without any witness.

4            They haven't laid the foundation for these

5    documents, and we don't see any reason now that they should

6    be allowed to sort of take the preadmitted exhibit process

7    which involves negotiation between the parties and -- about

8    the evidence that each side expects to come in through

9    witnesses over the course of trial and turn that into a

10   post-admission process where Apple is now, at the end of the

11   trial -- they haven't had a witness to discuss these

12   documents, and now they're trying to slip these in the back

13   door.

14           You know, we think it's inappropriate, and we don't

15   think that there's any basis for these exhibits to come in.

16           THE COURT:  What are the exhibits?

17           MR. MCMANIS:  The exhibits are agreements between

18   Qualcomm and NSN.  They go to the alleged issue of patent

19   exhaustion, which I -- we've discussed a number of times.  We

20   don't think it's been properly pled or disclosed in

21   discovery.  But I don't think that that necessarily has to

22   govern the issue because at this point there's -- there's no

23   witness here who can testify to these documents.

24           THE COURT:  Are these being offered for the bench

25   issues?

1           MR. MCMANIS:  I'm sorry?

2           THE COURT:  Are these being offered for bench

3    issues?

4           MR. MCMANIS:  Yes, Your Honor.

5           THE COURT:  Okay.  Response.

6           MR. LUMISH:  Thank you, Your Honor.  Doug Lumish

7    for Apple.

8           The argument you heard yesterday, and I think a

9    shade of it today, was that there's no authentication for

10   these documents.  And, in fact, that's not true.  There's a

11   declaration that both parties received on September 2nd that

12   authenticates the Qualcomm agreement.

13          We ask to offer it only in the bench trial.  That's

14   already been resolved.  It's a very important agreement.

15   They know it, in that it -- we believe it will establish an

16   exhaustion problem for them, which is an issue for Your Honor

17   to decide.

18          But we have an agreement -- pardon me --

19   declaration.  It was signed on September 2nd by Matthew

20   Dobbins of Qualcomm.  It authenticates the agreement.  It was

21   provided to both CCE and to Apple on the same day, on

22   September 2nd.

23          We've been subpoenaed, Apple had subpoenaed this

24   document on December 15th.  So, you know, we did what we

25   could; but as soon as we got it, they got it.

 1          This isn't really that tricky of a question.  It's

 2   an agreement that's important to an equitable defense.  It's

 3   authentic.  It's authenticated.  Their objections aren't

 4   well-taken.

 5          MR. MCMANIS:  Your Honor, they have admitted that

 6   their own report on these issues is hearsay and is not going

 7   to be admitted in this case.  This declaration here is

 8   hearsay.  There's -- there's no basis to bring these

 9   agreements in.  They don't have a witness who can cure this

10   hearsay problem, frankly, as --

11          THE COURT:  Are you saying the declaration is

12   hearsay or the agreement is hearsay?

13          MR. MCMANIS:  Frankly, they're both hearsay, I

14   think.

15          THE COURT:  Well, a declaration lays out the

16   business records predicate, from what I could very quickly

17   read through it just now.  So you can respond to the

18   substance of that if you would like or take up the issue of

19   the declaration.

20          MR. MCMANIS:  Well, Your Honor, I think the issue

21   is -- is less the authentication of the document versus

22   whether there's anyone to explain what this document is

23   about.

24          We have nobody -- we have no witness that they're

25   going to put on the stand to discuss these documents that

1    will give us the opportunity to cross-examine that witness

2    about the contract interpretation or -- or any of the other,

3    you know, factors that went into the negotiation of the

4    agreements or what the agreements actually mean.

5              So, really, this is a prejudicial situation that

6    they have precluded us from being able to cross-examine one

7    on these documents by not calling any witnesses and then

8    trying to admit them at the last minute.

9              MR. LUMISH:  So I think he's raising a parol

10   evidence question which has never been raised before.  The

11   question here that I thought was at issue is whether the

12   document can come in.  Whether it's efficient for Your Honor

13   to construe it, is a next-layer question.

14             And so we have an agreement which is

15   self-authenticating that it's a business record from

16   Qualcomm, and we have a declaration which authenticates it,

17   just because of the complaints that we've heard.

18             Let's recall that they were allowed by the Court to

19   use a declaration from a gentleman named Bao Nguyen to bring

20   in source code in this case.  Mr. Nguyen didn't come.  Nobody

21   from -- from Qualcomm came to talk about the source code,

22   either; yet, it's in evidence.  So their argument is

23   inconsistent with their positions.

24             And long story short, Your Honor, is you can decide

25   whether you think you have enough in the four corners of the

1    agreement to construe it.  And if parol evidence were

2    required, that's something they could raise separately or

3    they could say is a defense to the exhaustion question.  But

4    on admissibility, none of that really matters.

5              THE COURT:  Final word.

6              MR. MCMANIS:  Your Honor, documents don't just jump

7    into the record.  There has to be a witness from whom this

8    testimony can be admitted.  And these documents in

9    particular, which have large swaths of redacted

10   information -- we need -- we need a witness to be able to

11   cross-examine this issue.

12             THE COURT:  Okay.  Seeing that this is a bench

13   issue and we have a jury coming in in eight minutes, I'd --

14   I'd like to see the exhibit.  I'd like to see the

15   declaration.  I'll take it up, and I'll give you a ruling on

16   its admissibility.

17             MR. LUMISH:  Thank you, Your Honor.

18             THE COURT:  What's next?

19             MR. LUMISH:  May I hand it up?

20             THE COURT:  Yes, please.

21             MR. FINDLAY:  Your Honor, the remaining issue, I

22   believe, is that of the Plaintiff's proposed rebuttal case.

23             And in light of the time, if you would like, can I

24   just hand up some cases to you real quickly?

25             THE COURT:  Yes.

1          MR. FINDLAY:  I think we are in sort of an

2    agreement that these cases are on point.  Plaintiffs want to

3    put on not only a validity rebuttal case, which in the

4    general scope of things is appropriate -- we would reserve

5    the right to object to certain issues depending on how they

6    come in or piece of evidence.

7          They also want to present the rebuttal case on

8    infringement and damages, which we think is inappropriate.

9    Those three cases, and particularly the Rodriguez case, I

10   think, if the Court would care to read it, make clear that

11   there has got to be something new that hasn't -- that

12   somehow, if not a surprise, didn't come up adequately in the

13   Plaintiff's case.

14         Rodriguez in particular, on Page 4 of the printout

15   there, basically says:  Rebuttal is a term of art and

16   evidence introduced by a Plaintiff to meet new facts brought

17   out in its opponent's case-in-chief.

18         And that -- he turns later in the case on Page 6,

19   goes farther and talks about:  The evidence is new if, under

20   the all the facts and circumstances the Court concludes that

21   the evidence was not fairly and adequately presented to the

22   trier of fact before Defendants' case.

23         We have asked them last night in the

24   meet-and-confer, I understand, you know, what is it that's

25   new in the damages case, the infringement case that you don't

think you were able to anticipate or respond to.  They were
silent on that issue.

With respect to Mr. Jones, which we believe they
want to call up in his infringement case, Mr. Jones isn't
even an expert.  He just was opining the source code.  We
don't think there's anything new for him to raise.

And I think it's particularly egregious if they're
able to call up Mr. Green on damages when you look at the
situation where they didn't even really do a substantive
cross-examination of Mr. Bakewell, focused on the finance
issues, and to now to be able to do that through Mr. Green in
rebuttal is, I think, the classic example of sandbagging.

And without pointing new evidence that somehow
surprised them, or something to that effect, we think to be
able to go into this on infringement and damages is very
inappropriate.

THE COURT:  Response.

MR. HILL:  Thank you, Your Honor.

Your Honor, what you're going to find in those
cases that were just handed up to you is the unremarkable
proposition that under Rule 611 the Court has discretion in
controlling the mode and order of presentation of witnesses.
That's what you're going to find.  There's no hard-and-fast
rules.

What we all know, Your Honor, from not patent

1   cases, from all cases, you try a personal injury case, you

2   try a civil -- a prisoner civil rights case, the plaintiff

3   gets a rebuttal case if they wish to put it on.  There's no

4   hard-and-fast rule that there has to be an affirmative

5   defense and that you can only address an affirmative defense

6   in the context of a rebuttal case.  It is a chance to respond

7   to evidence that has come up.

8          And what we saw in this case, Your Honor,

9   particularly with regard -- what makes Mr. Jones relevant, he

10  was an expert witness, by the way, an expert witness on

11  source code -- is we saw Defendants' source code expert

12  disavow his own flowcharts from his report in ways that, you

13  know, demonstrate fundamental flaws in his analysis.  We're

14  entitled to put a witness up and to address that, to address

15  validity if we choose, or to address any other issue that's

16  come up in the course of the evidence.

17         It's the normal presentation order of cases.  We're

18  not asking to do anything extra.  And, frankly, Your Honor,

19  as the Court knows from checking the times, the clock's going

20  to take care of most of this.  It's not as if we're going to

21  be able to reopen and put on a whole new rebuttal case -- or

22  a whole new lawsuit.

23         So we would ask that the Court allow us -- frankly,

24  I think it's done in the ordinary course in most cases, being

25  patent or not, the Plaintiff an opportunity to put on a

1   rebuttal case.

2              THE COURT:  All right.  I'm going to allow

3   Plaintiff to put on its rebuttal case within the given time

4   of the Court.

5              What else can I help you-all with?

6              MR. LUMISH:  May I just approach to hand you --

7              THE COURT:  Yes.

8              MR. LUMISH:  -- the agreement and the declaration,

9   Your Honor?

10             THE COURT:  Hand them to Ms. Hardwick.

11             MR. LUMISH:  Thank you.

12             I highlighted the reference to the particular

13  document on the declaration for both of you.

14             THE COURT:  Thank you.

15             I'll just make one announcement before we get

16  started today, before we recess until 9:00.  I've got a

17  Baylor law student observing court today watching you-all at

18  your finest.  I know that there are needs to seal the

19  courtroom at times.

20             I would like you to really make a conscious effort

21  to balance that with our need for open court, so that she can

22  watch you as much as possible today.  All right?

23             We'll be in recess until 9:00 a.m.

24             COURT SECURITY OFFICER:  All rise.

25             (Recess.)

```
 1              (Jury out.)

 2              COURT SECURITY OFFICER:  All rise.

 3              THE COURT:  Let's bring in the jury.

 4              (Jury in.)

 5              THE COURT:  Good morning, Ladies and Gentlemen of

 6    the Jury.

 7              Mr. McManis, let's take up that housekeeping matter

 8    before we continue.

 9              MR. MCMANIS:  Good morning, Your Honor.

10    Plaintiff offers its list of previously-admitted trial

11    exhibits for September 13th.

12              THE COURT:  Any objection?

13              MR. SANDFORD:  No objection, Your Honor.

14              THE COURT:  Okay.  Hand that up, please.

15              MR. SANDFORD:  Good morning, Your Honor.  Brett

16    Sandford for Apple.  Apple offers its list of admitted

17    exhibits through September 13th.

18              THE COURT:  Okay.  Any objection?

19              MR. MCMANIS:  No objection, Your Honor.

20              THE COURT:  All right.  Please hand those up.

21              MR. CURRY:  Your Honor, I have had a housekeeping

22    matter as well.

23              Plaintiff marks the Frappier flowchart as PDX-4,

24    and we would offer that into evidence.

25              THE COURT:  Any objection to that?  Where -- where
```

1   is that chart?

2           MR. CURRY:  I can get you that.

3           It's this chart, Your Honor.

4           THE COURT:  Are you offering it for demonstrative

5   purposes?

6           MR. CURRY:  Yes.

7           THE COURT:  Okay.  Any objection?

8           MR. HOMRIG:  Your Honor, there is no objection as a

9   demonstrative, but -- but it's certainly not evidence as it

10  certainly stands right now.

11          THE COURT:  Okay.  It will be admitted for

12  demonstrative purposes only.

13          MR. CURRY:  Thank you.

14          THE COURT:  What's next?

15          Mr. Homrig, you may continue.

16          MR. HOMRIG:  Thank you, your Honor.

17     ANTHONY ACAMPORA, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

18                 DIRECT EXAMINATION (CONTINUED)

19  BY MR. HOMRIG:

20  Q.   Good morning, Dr. Acampora.

21  A.   Good morning, Mr. Homrig.

22  Q.   All right.  I'd like to kind of pick up where we left

23  off, and then we're going to dive into your analysis, all

24  right?

25  A.   Sure.

1   Q.   Okay.  So the first question I have for you is, focusing

2   on this case, can you estimate about how many hours you've

3   worked on this case?

4   A.   Altogether, including time spent here in Tyler over the

5   past couple of weeks, I would estimate between 4- and

6   500 hours.

7   Q.   All right.  And what is your rate for working -- working

8   on the case?

9   A.   $725 an hour, which is the rate I -- I bill for all

10  matters of this type over the past several years.

11  Q.   Okay.

12        MR. HOMRIG:  Now, Your Honor, Apple proffers

13  Dr. Acampora as an expert in electrical engineering and

14  cellular technology.

15        THE COURT:  Any objection?

16        MR. CALDWELL:  No, Your Honor.

17        THE COURT:  Thank you.

18        Continue, Mr. Homrig.

19        MR. HOMRIG:  Thank you, your Honor.

20  Q.   (By Mr. Homrig) All right.  So, sir, would you walk us

21  through the roadmap that we're going to go through this

22  morning?

23  A.   Sure.  I'm going to start with a very brief technical

24  tutorial.  I'll talk a little bit more about the '820 patent,

25  which you've already heard a great deal about; a little

1    something about the products that are being accused; and then

2    I'll provide my opinions on noninfringement and my opinions

3    on invalidity.

4    Q.   All right.  Thank you.  Let's dive right in.

5         So, sir, here on the first slide of the tech tutorial,

6    what do you want to illustrate?

7    A.   Okay.  So what I've laid out here is a basic structure

8    of the radio resources in LTE showing with the uplink.  The

9    downlink would look identical.

10        And we've heard much about radio resources and grants.

11   In LTE, the radio resources consist of a so-called time

12   frequency grid.  Time is running along the -- the axis, the

13   horizontal axis from left to right.  And different radio

14   channels appear in a vertical direction from top to bottom.

15        LTE uses a relatively new technology called orthogonal

16   frequency division multiplex, which is just a word, but it

17   means a bunch of real narrow radio channels are stacked one

18   on top of each other.  And resources are allocated both in

19   time and frequency, and I think we have an illustration

20   showing that.

21        So we see here that this one cell phone, based upon

22   grants that's received from the base station, has been told

23   you can send using the uppermost -- the rightmost time slot

24   in the upper two radio channels.

25        Jumping to the left, you can send in this particular

1    time slot; and you can use one, two, three, four, five -- six

2    radio channels.

3        So the grant is sort of being sized to the need.  And

4    this is definitely motivated by packet access to the

5    Internet.  So you could upload -- you can do more than just

6    place telephone calls.  You can upload e-mail.  You can

7    request web pages.  You can upload photos, things like that.

8    And the downlink looks very similarly.

9    Q.    All right.  Now, if we move on to the next slide, what

10   are you illustrating here?

11   A.    Okay.  So this is a representation of what might happen

12   with regard to a single grant.  So the user has been given a

13   grant to send in the time slot shown, the first time slot,

14   and five frequency channels from the top.  What's inside of

15   that grant.

16   Q.    Let's take a look.

17   A.    What's inside the grant is a packet.  Now, these packets

18   in different standards and different textbooks go by

19   different names.  In LTE it's known at a protocol data unit.

20   It's a bunch of bits.

21       And starting from the left, the packet contains a

22   so-called header.  Every packet has a header basically

23   describing to the receiver what the receiver might expect as

24   far as the rest of the contents.

25       Next, there are some control elements.  And, by the way,

```
 1    these -- all of these fields, the yellow field, the red

 2    fields, the blue fields, these are going to be filled by

 3    bits, 0's and 1's.

 4         And the control elements are an additional type of

 5    overhead, again necessary for the network to operate

 6    correctly.

 7         Finally, we get to the payload.  That's the user's data.

 8    So the whole idea here is not to send overhead information

 9    like headers and control elements but to send user data.  The

10    control elements and the header are necessary to accomplish

11    that, but the user doesn't pay for that.  The user is paying

12    for the payload to be delivered.  So you want these payloads

13    to be big compared to the headers.

14         Finally, at the very tail-end, we've heard about padding

15    bits.  That's the padding field shown at the end.  As it

16    turns out, this particular grant was larger than the

17    permissible size of payload that the user can place into the

18    grant, leaving some space at the end which the UE would then

19    fill -- would then fill with some dummy bits, so-called

20    padding bits.

21         Now, one of these control elements we've heard a great

22    deal about in this trial, one of these elements is the BSR.

23    Q.   All right.  Thank you, sir.

24         Now, with that background, let's dive into the '820

25    patent.
```

1          Sir, on this slide you've listed the priority date.  Did

2     you consider the priority date in reaching your conclusions

3     in this case?

4     A.   I did.  That's the date that we -- the original

5     application was filed.  That's the date that I considered

6     when reviewing prior art, what was already public before that

7     date.

8     Q.   And then down below, the asserted claims, you see those

9     listed there.  Did you -- did you analyze the asserted claims

10    for invalidity and noninfringement purposes?

11    A.   I did.

12    Q.   All right.  And are you going to be offering opinions on

13    those claims today?

14    A.   I am.

15    Q.   Now, on the next slide you show Claim 1 with some

16    highlighting and underlining.  Would you explain to us what

17    you highlighted and underlined and why?

18    A.   Okay.  So the patent is -- it's focused on determining

19    the size of the BSR that should be sent.  So I've highlighted

20    the claim elements and sort of focused on the head aspect of

21    the -- of the patent.

22         So just walking through these real quickly, the first

23    step, the -- the method of this claim, the steps consist of

24    detecting one of a plurality of pre-selected conditions

25    corresponding to the plurality of buffers.

1          So the UE has a bunch of buffers.  It has four.  There

2     are conditions that can be defined in advance with regard to

3     the status of these four buffers.  These are what we call

4     pre-selected conditions.  There must be a plurality of them;

5     two or more.  And then one of them must be detected.

6          So something happens, sort of like watching the buffers

7     as they fill up.  Something happened.  Aha.  I just detected

8     one of these pre-selected conditions.

9          What happens then?  Based upon whichever one was

10    detected, designating takes place.  Designating consists of

11    designating one of a plurality of buffer status reporting

12    formats.  Among those formats must be a long format and a

13    short format, and the designating must be based upon

14    pre-selected condition detected.

15         And then, finally -- we're not there yet, almost -- the

16    last limitation that I highlighted says:  Wherein designating

17    designates the long -- let me pause there for a second.

18         This last limitation would appear to come into play only

19    if the first designating step said:  Based upon the

20    preselected condition detected, choose a long.

21         Now we have to check to make sure there's enough space

22    in the PDU to fit in the long.  And if there is, if there's

23    sufficient uplink bandwidth and sufficient space in the PDU,

24    send the long.  That's it.  That's what the claim is

25    basically about.

1    Q.    Thank you, sir.

2          Now, in considering the claims that are asserted in this

3    case, are you aware the Court construed some of the terms?

4    A.    I am.

5    Q.    All right.  And here we see the Court's construction of

6    "usage" has plain meaning.  Did you apply that meaning?

7    A.    I did, yeah.

8    Q.    All right.  Now, here we see the Court's construction of

9    "uplink bandwidth" as the space available in an uplink grant.

10         Did you apply that analysis?

11   A.    I did.

12   Q.    And, finally, we see the Court's construction for "the

13   designating unit" where the Court listed the function and the

14   structure.  Did you apply that construction, sir?

15   A.    I did.

16   Q.    All right.

17   A.    And we'll talk a little bit more about that later.  I --

18   I dislike flashing up slides and not explaining them.  We'll

19   come back to that.

20   Q.    Yes, we will.  Thank you, sir.

21         Now, what -- what conclusions did you reach about the

22   asserted claims?

23   A.    Well, two conclusions.  The first conclusion, it's my

24   opinion that none of the asserted -- none of the asserted

25   claims are infringed.  And it's my opinion that all of the

1    asserted claims are, in fact, invalid.

2    Q.   All right, sir.  So we're going to cover today the

3    infringement/non-infringement issue first.  Before we do

4    that, let's take a quick look at the accused products.

5        Sir, here on DDX-4.28 you're showing an iPad and an

6    iPhone.  What -- what are you trying to illustrate here?

7    A.   Simply the fact that there are several versions of

8    iPhone that have been accused, several versions of iPad that

9    are accused.  And I show the face of two represented devices

10   only to show that there's a lot of functionality inside these

11   phones that have nothing to do with BSRs.

12   Q.   All right.  Now, on the next slide you've identified

13   some -- some different kind of -- well, you've got some

14   arrows with some names on it.  I'll -- I'll let you explain

15   it.  What -- what are you trying to show here?

16   A.   Okay.  So this is attempting to show just the

17   communications capability of the phone.  A phone can do a lot

18   of things.  It's a computer.  It doesn't even need to be

19   connected to a network to do a lot of what you might want to

20   do on a phone.  If you want to take photos and never upload,

21   as an example, you don't get to communicate.

22       Showing here only the communication capability, a small

23   portion of the capability, this phone -- all of the accused

24   products can, in fact, communicate using a bunch of different

25   standards.

1       The standards shown on the right pointing toward the

2   cell tower are the cellular standards.  It can certainly

3   communicate using LTE.  That's a the fourth generation

4   standard setting.

5       The other standards are second generation -- or one

6   version of second generation -- and two versions of third

7   generation.

8       All of this is in the phone.  So if the phone should

9   roam into an area where LTE coverage is not available, it

10  will communicate using the different cellular standard.

11      But it doesn't have to use only cellular.  The phone

12  also has three versions of WiFi built in.  IEEE 802.11 is the

13  standard for WiFi, like home routers, things like -- the type

14  of -- of router that might exist in Starbucks.  If you walk

15  in and you want to use the Internet, you can connect to

16  Starbucks' access point.

17      These are the standards that could be used.  They're all

18  on the phone.  And the phone could also communicate

19  externally by means of Bluetooth.

20      The only thing that's accused here is the LTE uplink.

21  Let me mention, also, there was also the downlink of all of

22  these different standards.  None of that has been accused.

23  Q.   All right.  Thank you for clarifying that.

24      And then on the next slide, we've seen this one before,

25  what -- what are you trying to illustrate here?

1  A.    This is the Qualcomm chip.  We've heard about that.

2  That Qualcomm chip is what we call the baseband processor or

3  the baseband modem.  It's the responsibility of that chip to

4  develop all of the signals that are used for radio

5  communications.  And to receive all of the signals -- I say

6  radio -- cellular communications.  Let me be clear.  The

7  Qualcomm chip implements all of these signals that would be

8  needed to communicate and to receive from the cellular

9  network.  There's a lot of functionality on that chip.

10 Q.    Now, let's take a look at your opinions on

11 noninfringement.  Let's start with regular and periodic BSRs,

12 okay?

13 A.    Sure.

14 Q.    Now, first I want to ask is, how is it that you

15 developed an understanding of the source code and the

16 functionality of the chip in Apple's products for purposes of

17 evaluating infringement/noninfringement?

18 A.    Okay.  So I do not personally read source code.  I just

19 don't know the language.  I don't know C.  I never learned

20 that.

21     But I did ask for somebody to be engaged in this matter.

22 That somebody is Mr. Frappier.  You heard from him yesterday.

23 I interviewed him.  I was convinced that he knew what he was

24 doing.  I asked him to read the code relevant to the BSR, the

25 hundred lines of code that we -- that we heard about,

1    relative to the millions of lines that are actually in the

2    Qualcomm chip.

3        I asked him to read the code and provide a written

4    report explaining in English, which I can understand, what's

5    in that code, just provide a translation from C to English.

6    And I based my opinions on that translation.

7        I also spoke to Mr. Frappier along the way so I had some

8    understanding of what he was finding before he actually

9    submitted his report.  And then I reviewed his report before

10   I submitted my own report.

11   Q.   Now, sir, in addition to Mr. Frappier's analysis, did

12   you consider other materials related to the case?

13   A.   I did.

14   Q.   All right.  Can you just give us a general overview of

15   what you considered?

16   A.   Well, I looked at -- well, a couple of things, what

17   Mr. Jones had written.  I looked at what Mr. Caloyannides had

18   written.  I looked at some Qualcomm documentation.  I -- I

19   looked at some deposition testimony.  I looked at quite a

20   bit.

21   Q.   Okay.  Thank you.

22       Now, sir, let's take a look at the claims.  And here

23   you've listed the asserted claims.  And you've highlighted a

24   couple of the -- the limitations.  Would you let us know why

25   you did that?

1   A.   Yeah.   So for purposes of noninfringement, it's my

2   understanding that to infringe a claim the accused thing must

3   meet every claim limitation, must practice every claim

4   limitation.   And I'm going to define -- confine my analysis

5   to two limitations, the detecting and designating

6   limitations, because it's my opinion that those two

7   limitations are not found in the accused products.

8        And those two limitations are reflected in each one of

9   the claims.   Claim 1 is not asserted, but Claim 4 is.   Claim

10   4 depends from Claim 1.   So to infringe Claim 4, all of the

11   limitations of Claim 1 must be found, including the two

12   highlighted ones, and the additional step of Claim 4.

13   Same for Claim 10.

14        So I'm going to show that the detecting and designating

15   steps are not present.   Those two steps reflect over into

16   Claims 12, 20, and 24.

17   Q.   Now, sir, in general, how is it that you found that

18   those steps are not present for regular and periodic BSRs?

19   A.   I went through a fairly rigorous analysis -- and I think

20   we have -- can I have the next slide?   I think that might

21   help out.

22   Q.   Actually, if I'm not mistaken, I think you told me you

23   wanted to draw a diagram, is that right, of how the -- the

24   steps --

25   A.   If I'm allowed to step down, I would love to do that,

```
 1    yeah.
 2              MR. HOMRIG:  Your Honor, may he step down?
 3              THE COURT:  That's fine.
 4              Dr. Acampora, we're going to put a microphone on
 5    you, though.
 6              THE WITNESS:  Thank you.
 7    A.   I even brought a pointer.  I'm in teaching mode.
 8    Q.   (By Mr. Homrig) Thank you, sir.
 9    A.   Okay.  Thank you.
10    Q.   Here is a pen for you.
11         Now, as I understand it, you wanted to draw a diagram of
12    how the claims operate --
13    A.   Yeah.
14    Q.   -- relative to the detecting of the -- one of a
15    plurality of pre-selected conditions corresponding to the
16    plurality of buffers and then the next designating step?
17    A.   Yeah.  So this is going to be as one example.  I'm not
18    saying it's the only way the claims can operate.
19         But one -- one way that the claim limitations could be
20    met -- that might be the easiest way for me to explain what's
21    in the claim, what does the claim require.
22         First, the claim requires that there be a plurality of
23    pre-selected conditions associated with the buffers.  Let me
24    give an example of plural conditions.
25         Condition one, and we've seen this iPhone used before.
```

1 The diamond is a condition.

2     And suppose this condition is -- is the following:

3 Count the number of buffers containing data.  If that number

4 is equal to 4 -- that's a condition -- if the number is equal

5 to 4, choose a very long format.

6     So here I have the detection of this condition and the

7 designating of a very long BSR based upon having detected

8 that condition.

9     Second condition.  Suppose this is not detected, but

10 let's suppose that what is detected is that three of the

11 buffers have data.  In that case I'll designate a long BSR.

12     And if this is not designated -- if this is not

13 detected, I should say -- pardon my drawing -- then I'll

14 check the third condition associated with buffers, is the

15 number of buffers with data equal to 2?

16     And if the answer is yes, I'll designate a medium size

17 BSR.

18     And if the answer is no, then I'll check a fourth

19 condition, is the number of BSRs equal to 1?

20     And if the answer is yes, I'll designate a short; and if

21 not, do nothing.

22     So here is an example of four conditions.  The claim

23 requires at least two.  Here's an example of four.  These

24 conditions are associated with the buffers.  The claim

25 requires a plurality of buffer status reporting formats.

1    That means more than two.

2         In this example there would be four.  The claims require

3    at least a long and a short.  Here they are.

4         So as far as these limitations are concerned, this is an

5    example of how the claim limitations would be met, the

6    detecting, one of a set of -- one of a plurality of

7    pre-selected conditions, designating a format based upon what

8    you actually observed.

9    Q.   Okay.  Now, sir, just for clarity, would you label the

10   drawing that you've done as the '820 patent so we can keep

11   track?

12   A.   (Witness complies.)

13   Q.   All right.  Now, based on your analysis, how does the

14   source code for the accused products work with respect to

15   buffer conditions related to choosing short and long?

16   A.   Okay.  Well, we heard Mr. Frappier testify yesterday.

17   And as far as designating a BSR format based upon -- I don't

18   have the claim language in front of me -- based upon some

19   observation made on the buffers -- and I'm paraphrasing

20   what's in the claim -- the accused products check only one

21   condition.

22        The condition is the following:  Is the number of BSRs

23   greater than one?  One condition.  If the answer is yes,

24   designate a long; and if not, designate a short.

25        So this is very different than this example of the type

1    of process that would actually infringe these limitations of

2    the '820 patent.

3         And anticipating you're going to ask me to label here --

4    Q.   I was.

5    A.   This is what is accused.

6    Q.   Okay.  Now, you said that your drawing of the '820

7    patent claims was -- was an example, but let me ask you this:

8    Understanding the claims, is one required to have multiple

9    buffer-related conditions, one of which could be detected?

10   A.   Yes.

11   Q.   For the '820 patent?

12   A.   That's what the claim says.  That the first highlighted

13   limitation says -- and I can't quite read it, but detecting

14   one of a plurality of pre-selected conditions corresponding

15   to the buffers.  Plurality means two or more.  There have to

16   be at least two conditions.

17   Q.   Okay.  So, sir, could a product that only checks one,

18   like you've drawn right here, could that ever infringe any of

19   the asserted claims?

20   A.   That would not -- that be an example of how -- of a

21   product -- or a process that would not infringe the claim.

22   The claim is very specific.  They have to be at least two.

23   The inventor claimed what the inventor claimed.  The inventor

24   claims at least two.

25        The accused product only has one.  So for this reason

1    alone, this cannot infringe any of the asserted claims.

2    Q.    All right.  Thank you, sir.  You may take your seat back

3    at the witness stand.

4    A.    Sure.

5    Q.    All right, sir.  Now, I know you said you relied on

6    Frappier's analysis.  Is this testimony from the trial, from

7    Mr. Frappier, consistent with your analysis?

8    A.    Yes.  He's reasoned -- he reached the same conclusion

9    that -- that I did.

10   Q.    Okay.  Well, how about Mr. Chaudhary?  Is this portion

11   of his testimony from Lines 27:2 through 27:7, for September

12   12th, is that consistent with your analysis?

13   A.    It is.

14   Q.    How about Mr. Jones, his testimony from the sealed

15   portions Nos. 3 and 4 at Lines 54:13 to 54:22, is that

16   consistent with your analysis?

17   A.    Yes, it is.  He was asked specifically the number of

18   non-zero LCGs -- well, there was a series of questions.  And

19   at the end of which he concluded:  That's correct.  It's one

20   channel, the number of non-zero LCG buffers is greater than

21   one.  That's like a test, yes.

22   Q.    All right.  Thank you.

23         And now, did you also consider the LTE standard?

24   A.    I did.

25   Q.    And how does that relate to your analysis?

```
 1   A.   The standard basically says as far as this aspect of BSR
 2   size selection, if more than one logical channel group has
 3   data available for transmission, report the long BSR, or else
 4   report the short -- short BSR.  It's -- it's what I drew with
 5   regard to the accused product.
 6   Q.   All right.  Now, you've included in your slides this --
 7   this photo.  Why did you include it here?
 8   A.   Yeah.  I wish I had a better photo.  I'm not sure
 9   this -- it's sort of like slanted.
10        This is sort of a slice of everyday life.  And I use
11   this here to illustrate what's actually in the accused
12   product.
13        Let's suppose you take a child to an amusement park.
14   You approach a ride.  It's a dangerous ride.  There's a sign
15   up and the sign up is saying -- the sign says:  You must be
16   this tall to ride.
17        This is a condition necessary to ride.  So if a child
18   fits -- does not fit under the bar, the child could sort of
19   bend down, go under the bar.  You're in.  You're tall enough
20   to ride.  If not, come back next year after you've grown a
21   couple of inches and try again.
22        So it's a simple -- it's a simple test.  It's one
23   condition.  There's one condition associated with whether you
24   can or cannot enter the ride, are you this tall (indicating),
25   just like in the accused product.  It's a single condition.
```

1   Q.    All right, sir.   Now, have you ever been to an amusement

2   park with a sign kind of like this?

3   A.    Sure.

4   Q.    Have you ever seen somebody step up to the line and

5   measure to see if they're taller than it, then back away and

6   step up again to see if they're shorter than it?

7   A.    No.   I've seen people step up to the line thinking maybe

8   it was wrong the first time and try again, but I never saw

9   somebody go back and say:  Am I tall enough?   Am I short

10  enough?   I've never seen that.

11  Q.    All right.   So just summarizing your opinions, can the

12  regular and periodic BSRs in the accused products, can they

13  infringe any asserted claim?

14  A.    No.

15  Q.    All right.   Let's turn to padding BSRs.

16        Sir, I see you've highlighted the same steps of the

17  claims related to padding BSRs.   What, ultimately, did you

18  find?

19  A.    The padding BSRs cannot meet these two claim

20  limitations.

21  Q.    All right.   And we're going to -- we're going to dive

22  into -- into why.

23        MR. HOMRIG:   Your Honor, may we seal the courtroom

24  briefly, please?

25        THE COURT:   Yes.

1          Ladies and Gentlemen, we're going to seal the

2   courtroom at this time.  If you are not covered under the

3   protective order, I'll need you to leave.  We'll let you know

4   when you can come back into court.

5          MR. HOMRIG:  Thank you, your Honor.

6          (Courtroom sealed.)

7          (This portion of the transcript is sealed and filed

8          under separate cover as Sealed Portion No. 16.)

9          (Courtroom unsealed.)

10  Q.   (By Mr. Homrig) All right, sir.  So would you remind us,

11  please, what your conclusion is about the asserted claims

12  relative to validity/invalidity?

13  A.   It's my opinion that the asserted claims -- all of the

14  asserted claims are, in fact, invalid.

15  Q.   Okay.  So, sir, did you consider obviousness in your

16  analysis?

17  A.   I did.

18  Q.   And what was your conclusion?

19  A.   My conclusion is that the asserted claims are invalid

20  because they were obvious.

21  Q.   All right.  I didn't mean to cut you off.  Please go

22  ahead.

23  A.   Okay.  A person of skill in the art, knowing what's in

24  the prior art, would have known that comparing the teachings

25  of the prior art against the claims of the patent would have

```
 1   recognized this is obvious.  Based upon this body of

 2   knowledge that's out there, we would have known how to do

 3   this here.

 4   Q.   All right.  Now, I'm going to walk through that analysis

 5   with the jury today.

 6       Let me ask you first, did you consider the level of

 7   skill that one having ordinary skill in the art would have

 8   had at the relevant time period?

 9   A.   Yeah.  So as far as obviousness is concerned, it's not

10   just obvious to anybody but obvious to this so-called person

11   of ordinary skill in the art at the time of the invention.

12       So based upon my reading of the patent and my

13   understanding of what's taught there, I believe that such a

14   person would have had a bachelor's degree in either computer

15   science or electrical or computer engineering and two years

16   of technical experience in -- in the design or implementation

17   of communication networks, not even wireless networks, just

18   communication networks.

19       This notion of BSRs -- this is -- this is the notifying

20   the central controller if you get an allocation also occurs

21   in wire online networks.  This is not unique to cellular or

22   wireless.

23   Q.   Okay.  Now, is that the understanding that you applied

24   in conducting your obviousness analysis?

25   A.   It is.
```

```
1    Q.   Now, did you consider what Dr. Caloyannides said about

2    level of skill in the art?

3    A.   His "person of ordinary skill" was defined a little bit

4    differently, but nonetheless, even if I adopted his

5    definition of "a person of ordinary skill," I would have come

6    to the same conclusion.

7    Q.   All right.  Now, sir, did you consider what the prior

8    art teaches generally?

9    A.   Yes.

10   Q.   Okay.  What -- what did you find?

11   A.   Well, what I found were -- I actually found a lot of

12   things, but I'm going to describe my analysis of only one set

13   of things in the interest of time.

14        I also need to apologize in advance.  My understanding

15   is that to show invalidity, I need to show that each and

16   every element of the asserted claims is found in the prior

17   art.  So this is going -- this is going to be somewhat

18   tedious, and I apologize in advance.

19   Q.   All right, sir.  I -- and actually, I'm going to ask

20   Mr. Schmoller to start setting up some demonstratives that

21   we're going to use during that analysis.  But while he does

22   that --

23             MR. HOMRIG:  And thank you, sir.

24   Q.   (By Mr. Homrig) While he does that, let's move to this

25   picture here.
```

1       Why did you include this in your presentation?

2  A.   Okay.  Another slice-of-life example of what this patent

3  is about.  And, again, it's really very simple.  Let's

4  suppose you're going on a trip and you're going -- the first

5  thing you ask yourself is, am I going on a short trip?  You

6  have to choose the size of luggage you want to take.  So am I

7  going on a one -- on an overnight trip?  If the answer is

8  yes, maybe I'll take a short -- a small bag.

9       On the other hand, let me -- let me see -- maybe I'm

10  going on a two-week trip.  If I'm going on a two-week trip,

11  then I'd want to take a larger bag.  So I look at my calendar

12  and I see, okay, I'm going on the long trip.  Let me take the

13  large bag.  I have a lot of -- a lot of clothing to take with

14  me.

15       Then I realize when -- when I go outside, oh, I'm going

16  with my friend.  He's driving.  So he pulls up in his car,

17  opens the trunk, and there's stuff in it.

18       And I think, hmm, can I fit in my big bag?  In this case

19  this fellow -- I think -- I think he's breathing a sigh of

20  relief.  It looks like it's going to fit.

21       So based upon the fact he's taking a long trip, he

22  decided to take a big bag.  Then he checked to see if there's

23  enough space to put the big bag in the trunk.  And there was.

24       That's -- that's Claim 1.

25  Q.   All right, sir.  Now -- thanks for that explanation.

1    Let me ask you, do you remember this demonstrative from

2  trial during Mr. Sebire's testimony?

3  A.    I do.

4  Q.    Why did you include it in this -- in this testimony?

5  A.    Well, I thought it was kind of interesting.  Mr. Sebire

6  admitted that with regard to the flowchart -- now, the

7  flowchart is not the claim.  It's just the flowchart.  But

8  with regard to the parts of this flowchart, Mr. Sebire's

9  testimony was that none of this was his idea.  None of these

10  boxes and diamonds, none of these were his.

11    There was some ambiguity as far as what's heading off to

12  the -- to the left where the X is, but that -- that is not

13  reflected in any of the accused claims.  The rest of it is.

14    And he admitted he didn't come up with any of it.

15  Q.    All right.  Now let's turn to the next slide.

16    What are you showing here?

17  A.    These are the three pieces of prior art that I'm going

18  to analyze.

19  Q.    All right.  Let's -- let's take a look at them.  So

20  let's start with the Ericsson joint proposal.

21    What are you illustrating here on this slide about the

22  source of this proposal?

23  A.    These are the contributors to the proposal:  Ericsson,

24  Nokia, NSN, NTT DoCoMo, Qualcomm Europe, Samsung.  A pretty

25  broad cross-section of -- of the players in the telecom

1   industry in terms of what they represent.

2       Ericsson and NSN being equipment makers, not the only

3   equipment makers.  Nokia and Samsung being cell phone makers,

4   not the only.  NTT DoCoMo.  NTT is a large cellular -- NTT

5   DoCoMo is a large cellular operator in Japan.

6       So all of the major players -- all of the major piece

7   pods, I should say, not players -- major piece pods of

8   cellular systems contributed to this proposal.

9   Q.   Now, the next slide you called out from DTX-525, Page 1,

10  this date and some other information.  Why did you do that?

11  A.   We've heard this before.  This is the date that

12  Mr. Sebire uploaded the Ericsson proposal, Ericsson joint

13  proposal, onto the RAN website, the 3GPP website.

14      So he posted this so that all of the others -- all of

15  the other participants would see this here.  But when he did

16  that, so could the public.  This is not a private server.

17  Anyone could look at this.  So on October 30th this was made

18  public, the Ericsson proposal was made public.

19  Q.   Now, the next slide, you call out from the Ericsson

20  proposal some dates.  What are you showing here?

21  A.   These are the dates where the proposal -- well, on at

22  least one of these dates this proposal was discussed at a

23  particular meeting of -- a particular 3GPP meeting.

24  Q.   All right.  Now, if we go dive into the substance of the

25  Ericsson proposal, we see this bit about scheduling

1    information, also from Page 1.  What are you showing here?

2    A.    Yeah.  This is basically saying this -- this in general

3    is what the proposal is about.  So just looking at the

4    highlighting, it's speaking about scheduling information,

5    buffer status reporting, and relative to HSUPA -- I'm sorry,

6    it's in the fourth line not highlighted -- right -- right

7    beneath that line, we see the HSUPA, that's a 3G standard.

8         And, apparently, the objective here was to do something

9    that was sort of generally similar to what's done in 3G, but

10   maybe provide a little bit more flexibility.  That's what

11   this proposal was trying to do, extend 3G with a little bit

12   more flexibility.

13   Q.    Okay.  Now, if we go to the next slide, we see another

14   call-out from Page 1 of the Ericsson proposal.  And you've

15   highlighted a couple of things.

16        Let me ask you about that first one where it says:  A

17   priority class is defined by grouping radio bearers.

18        Why did you include that?

19   A.    Okay.  So each radio bearer group has a different

20   priority associated with it.  A group of -- remember, a radio

21   bearer is a channel.  What's being proposed here is that

22   channels with similar needs be grouped together and be

23   identified by one priority.

24        And second highlighting, what's being proposed is that

25   there be four such groups.

1    Q.    And then on the next slide you call out some information

2    also from Page 1 about the buffer size.  Do you see that?

3    A.    I do.

4    Q.    Can you illustrate for us why you think that's

5    significant?

6    A.    Yeah.  So what's being considered here is how many bits

7    should be included in the buffer status field to indicate how

8    much data is in the corresponding buffer.  And consideration

9    is being given to using 6 bits or 14 bits.

10         So I'll short-circuit some of this.  If we look at the

11   fourth line not highlighted, but the first sentence:  6 bit

12   buffer size gives 64 code points.

13         And it gives a certain percentage.

14         And it goes on to read:  This is comparable to 32 points

15   and approximately 24 percent step size of HSUPA.

16         That granularity is basically saying 6 bits would be a

17   little bit better than what we had in HSUPA.  14 bits would

18   have been a whole lot better, and I guess it was deemed to be

19   overkill.  So the proposal was, let's use a 6 bit buffer size

20   field.

21   Q.    Then on the next slide you call out some figures, 1 and

22   2 from the Ericsson proposal, Page 2.  What are you showing

23   here?

24   A.    These are the formats proposed for the two buffer sizes,

25   one short, one long.

1    Q.   All right.  So now that we've discussed the Ericsson

2    proposal, let's look at the Lee application.

3    A.   Uh-huh.

4    Q.   So on the next slide you call out the inventors.   Why

5    did you do that?

6    A.   Just to identify who the inventors are of this -- this

7    was a foreign patent application, but these are the

8    inventors.

9    Q.   All right.  And the next page you've got -- or the next

10   slide you show us the date May 18, 2006?

11   A.   Yeah.

12   Q.   Why is that?

13   A.   May 18, 2006 is the date this application was made

14   public.

15   Q.   Okay.  Now, the next slide you've got some call-outs

16   from Page 22 of the Lee application.  Why did you include

17   these?

18   A.   Just to indicate that this is also about reporting

19   buffer status information.  And this -- the Lee patent is

20   proposing two kinds of mechanisms, a so-called absolute

21   buffer status report and a relative buffer status report.

22        And as their names would suggest, absolute buffer status

23   report, tell me the entire contents of the buffer.  Relative

24   buffer status report, tell me how much new data has arrived

25   since the last report.  So one would be long; one would be

1    short.

2    Q.    All right.  Now, this next call-out from Page 23 of the

3    application, does that relate to the relative buffer status

4    reports that you were just discussing?

5    A.    Yeah.  That's based -- this is basically from the patent

6    itself saying different words, what I just said, the number

7    of bits associated to relative buffer status report is small.

8    Q.    All right.  So now let's turn to the Alcatel proposal.

9          So, sir, here on this slide you called out the date

10   1 November, 2006.  And this is from DTX-522, Pages 1 and 2?

11   A.    Yes.

12   Q.    Why is that significant?

13   A.    This is the date that this proposal was uploaded to the

14   3GPP website.  This proposal was being made to the same

15   working group that the Ericsson proposal was made to but

16   approximately a year earlier.

17   Q.    All right.  Now, on the next slide you show a date here,

18   6 through 10 November, 2006.  Why did you include that?

19   A.    That's -- somewhere in that time frame is when the

20   proposal was actually made to the working group.

21   Q.    All right.  And here on the next slide from the Alcatel

22   proposal you have a call-out about buffer reporting schemes.

23         Do you see that?

24   A.    I do.

25   Q.    Why did you include this?

1    A.    This also was in exactly the same -- dealing with the

2    same subject matter, reporting buffer status, and in the

3    uplink, and declaring that it should be flexible.

4    Q.    Now, if we go to the next slide we see a pretty good

5    amount of highlighting, so let's step through it.  Let's

6    start with the -- with the top highlighting reporting to --

7    referring to buffer reporting criteria.  Do you see that?

8    A.    Yeah.

9    Q.    What -- what were you trying to show here with this

10   call-out from --

11   A.    Okay.

12   Q.    -- from DTX-605, Page 1?

13   A.    Okay.  So this is -- again, I'll try to short-circuit

14   this.  The buffer status reporting criteria is based on

15   either per radio bearer -- so before doing any groupings

16   we're going to report on each and every channel -- or on

17   groups of radio bearers.  So let's do the grouping.  We don't

18   have to report every channel, report just on groups of

19   channels.

20   Q.    All right.  And then if you move down to the -- to the

21   next call-out, what's significant there?

22   A.    Okay.  So this is basically describing the formats that

23   would be used.  And it uses so-called bitmap format.  I can

24   try to explain this very simply.  Bitmap is well -- is

25   well-known in the field.

1    When you go to present a list of items -- in this case

2    the amount of data in various buffers -- a bitmap can be used

3    to indicate in this case which buffer groups are being

4    reported.

5    So there are four buffer groups.  The bitmap reads as

6    follows:  If I find a 1 in bit position No. 1 -- can I write

7    with this -- if I find a 1 in bit position No. 1, that tells

8    me I'm going to report on the first buffer group.  And sure

9    enough, that's where it is.

10   A 0 means no report on buffer Group 2.  Position 2,

11   don't expect to find a report in buffer Group 2.

12   But, on the other hand, in -- in Position 3, bit

13   position 3, I find another 1; and sure enough, there's a

14   report in the third group.

15   And you see with this heading, there's no report on the

16   fourth group.

17   So if there was one buffer and only one buffer that was

18   being reported, a 1 would be in one of these 4-bit positions,

19   and it would be one report.

20   If any two were being reported, there would be two 1's

21   somewhere within these first 4 bits and two buffers reported.

22   Similarly for three.  Similarly for four.  So this is

23   basically describing four different formats.

24   Q.   All right.  Thank you.

25   Now, when we get to the next slide --

1          MR. HOMRIG:  And, Mr. Lee, would you kindly help

2     set up the charts we would like to walk through?

3          Thank you.

4     Q.   (By Mr. Homrig) All right.  So while they're doing that,

5     let's turn to your analysis.

6          So here you've grouped a number of limitations from the

7     claims, the monitoring, detecting, and designating depending

8     on pre-selected condition.  And then you've called out some

9     material from Ericsson.  Would you share with us why you've

10    grouped that all together?

11    A.   Yes.  So what I'm going to do from this one chart is

12    illustrate where in the Ericsson proposal these three

13    limitations can be found.  So this is just shorthand.  You

14    could read from the claims themselves, which are up on these

15    boards, what the full limitations -- I'm shorthanding this.

16         I'm going to call these the monitoring, detecting, and

17    designating limitations.  The first three limitations --

18    well, yeah, the first three limitations of the claim.

19    Q.   All right.  Now, below that you've got the figures for

20    the short BSR type and the long BSR type in the Ericsson

21    proposal.  What -- what's the significance of that and the

22    other disclosures you've included here for these limitations?

23    A.   Yeah.  So the second pullout is telling us that it's not

24    necessary to report -- to always report four radio bearer

25    groups.  I tried to clean up the English a little bit.  It's

not necessary to always report four radio bearer groups.

And the example that was given is if there's only a limited number of bearers configured.  But that would suggest to a person of skill -- in fact, this was actually testified to by Mr. Stattin.  This also means report the number of radio bearer groups that actually have data.

So this is literally saying as an example, if only two radio bearer groups are even configured, you never have to report on Groups 3 and 4.  But this could also mean simply report on the number that actually have data.

And the proposal is to use two formats, one with only radio bearer group to be reported and one with all four to be reported.  And, once again, we see the formats of the long and short.

Q.   All right, sir.  So -- so let me -- let me ask you now about the next slide you have here.  You've got some call-outs from Lee for the same limitations.  Why did you include these?

A.    Okay.  So Lee is telling us here there are -- just like the Ericsson proposal told us that there were different pre-selected conditions that would be used to select the long or a short, Lee is doing the same thing.  The one on the left is saying that the UE sends a relative buffer status report -- or would send a relative buffer status report each time a predetermined reference is made.

1    The right one is saying almost the same thing except for

2 an absolute buffer status report.  The absolute buffer status

3 report is transmitted each time a prescribed reference is

4 met.  Prescribed, predetermined, same thing.

5    Now, these have to be different references.  If they

6 were the same, there would be no way to distinguish between a

7 relative and an absolute.  So this is a clear disclosure of

8 two criteria, each of which corresponds to one report format,

9 a long or a short.

10 Q.   All right, sir.  Now, is it your understanding that the

11 monitoring, detecting, or designating, that those limitations

12 are parts of all of the asserted claims in this case?

13 A.   They are.  We can see the same language used in every

14 asserted claim.

15 Q.   All right.  So for the Lee application, is it your

16 opinion that material from the Lee application discloses

17 elements of each and every asserted claim?

18 A.   Yes.

19 Q.   Now, let me back up and ask you about Ericsson.

20    Is that the same, sir?  Is it your opinion that the

21 Ericsson proposal discloses elements of each and every

22 asserted claim?

23 A.   Yes.  The first three elements for both cases.

24 Q.   Okay.  Let's go ahead and move on.

25    Let me ask you, though, sir, while we do that, am I in a

1  position to -- to check off the monitoring, detecting, and

2  designating elements of all of the claims?

3  A.    Yes.

4  Q.    Okay.  So let me ask you about the communicating and

5  designating when there is sufficient uplink bandwidth

6  limitations.  Here you've called out some material from the

7  Ericsson proposal.

8  A.    Yes.

9  Q.    And my question to you, sir, is:  Does the Ericsson

10  proposal relate to these limitations?

11  A.    Yes.  So let's look at the communicating limitation

12  first.

13       Again, there are two limitations on this slide.

14       Communicate.  In Proposal 5 you see the BSR reports

15  something.  Who is the report made to?  The report is made to

16  the eNodeB.  We see that in the third -- the second line of

17  the third pullout.  ENodeB is the base station.  So clearly,

18  the BSR is being reported as being communicated.

19       Communication limitation is present.

20       Now, when there's sufficient uplink bandwidth.  Look at

21  the last highlighted sentence and the underlined portion of

22  that, which is almost the whole thing:  The number of radio

23  bearer groups to report should not be too small to provide

24  enough information to the scheduler but cannot be too large

25  either to limit the overhead.

1    It's like a Goldilocks, not too hot, not to cold.  So

2    this is telling us you don't want to send something that's

3    too small because you may not send enough information.

4    Conclusion.  If you have space available to designate

5    the long, use the long.  Why waste the space?  So this is

6    suggesting, to a person of skill in the art, that the

7    designating the sufficient uplink bandwidth limitation is

8    disclosed.

9    Q.   All right, sir.  So, is it your opinion that the

10   Ericsson proposal discloses material in the communicating and

11   designating when there is a sufficient uplink bandwidth of

12   each and every limitation of each and every claim?

13   A.   Yes, sir.

14   Q.   Okay.  Let's move on to the Alcatel proposal for the

15   same steps.  And why did you include this here?

16   A.   Okay.  So, once again, what these two pullouts are

17   disclosing are the two limitations that we just considered,

18   the communicating step and the designating step.

19   Designating there is sufficient uplink bandwidth.

20   Remember, there were two designating steps, one based upon

21   pre-selected conditions associated with the buffers, a second

22   associated with there being sufficient uplink bandwidth.

23   We're talking about the second here.

24   So the report method can reduce overhead and improve

25   uplink throughput.  So it is clear that the BSR is going to

be communicated if it is going to reduce the overhead and improve uplink throughput.  The base station is the one that is controlling the uplink throughput.  The base station has to be made aware of the BSR.  That BSR has to be communicated from the UE back to the base station.

But the proposal goes on.  If possible, whenever there is padding space in the MAC PDU, part of the buffer status can be inserted in this MAC PDU.  And it goes on in the second pullout, leveraging the MAC PDU padding bits to report buffer status, which reduces overhead.

So once again this is suggesting use the padding field to send the BSR.  If you haven't got enough space, send only part.  If you have got enough space, it would be understood, don't waste it.  Send a long BSR.  So that limitation -- the second designating limitation is disclosed as well.

Q.   In the Alcatel proposal?

A.   Yes.

Q.   All right, sir.  Now, so is it your opinion that one of skill in the art at the relevant time would have thought the communicating and designating when there is sufficient uplink bandwidth limitations, would have been obvious?

A.   Yes, sir.

Q.   Okay.  So, am I free to check off those boxes?

A.   Yes.

Q.   Are we finished?

1   A.   No.   I'm sorry.   We're not finished.   I have to talk

2   about every one of the limitations.

3   Q.   All right, sir.   Let's do just that.   So on -- excuse

4   me.   I clicked the wrong button.   All right.   So there we

5   are.

6        So this is Claim 4, and here you've called out -- again,

7   we see the figures and some other material from the Ericsson

8   proposal.

9        Would you describe for us why you included that on this

10  slide?

11  A.   Yeah.   This one is fairly straightforward.   The claim

12  limitation requires that there be a short format

13  corresponding to a single radio bearer group, long

14  corresponding to multiple radio bearer groups.

15       This proposal that is shown on Figure 1, reporting on

16  one bearer group, that is a short.   Reporting on both, that's

17  a multiple for the long BSR.   So this limitation is present.

18  Q.   All right.   And, so, is it your opinion, sir, that the

19  Ericsson proposal discloses the material set forth in Claim

20  4?

21  A.   It does, sir.

22  Q.   Okay.   Am I free to check off that box now, sir?

23  A.   Please do.

24  Q.   All right.   So let me ask you this, though:  Does -- on

25  this slide from the Ericsson proposal, you've also identified

1  some callouts from priority class and four radio bearer

2  groups.  Does this disclosure in the Ericsson proposal, is

3  this also relevant to Claim 4?

4  A.   This is relevant to Claim 4 and also relevant to Claim

5  10.

6  Q.   All right.  We're going to get to Claim 10 in -- right

7  now.

8  A.   Okay.

9  Q.   All right.  So here is another report -- or another

10  portion of the Ericsson proposal that you've called out for

11  Claim 10.

12      Would you describe for us why you've included it here?

13  A.   Okay.  So Claim 10 says selecting a buffer status report

14  of a radio bearer group of highest priority.  So to get to

15  Claim 10, somehow the highest priority has to be reported.

16      Now, we've already seen that a long BSR can be reported.

17  There were four priority classes -- one, two, three, four.

18      If a long is reported, by definition the highest

19  priority has been reported.  It was one of those four.

20      Now, suppose only one radio bearer group is being

21  reported.  Well, that would mean there was only one with

22  data.  That would then also, by definition, be the one of

23  highest priority.  It is the only one with data.  The others

24  have no data.  So the limitation -- claim limitation 10 is

25  present as well.

1   Q.   All right.  Now, let's go to the next slide, which

2   groups a number of limitations like apparatus and processor

3   and some others and then calls out some information from

4   Page 2 of the Ericsson proposal.

5        Would you describe to us why you included this

6   information on this slide?

7   A.   Okay.  So Claim 12 is an apparatus claim.  The apparatus

8   comprised a processor and memory with computer program code,

9   basically programmed to perform a bunch of steps.  We already

10  spoke about the steps, so the good news is we're not going to

11  talk about those again.

12       What about the processor and memory?  At the time that

13  this proposal was made, every UE had a processor -- had a

14  computer in it.  A computer is a processor, memory, and a

15  program running in the memory providing instructions to the

16  processor.

17       We see here data is buffered in the UE.  That tells me

18  that the memory, including computer program -- programmed to

19  perform the following steps is disclosed in this patent -- is

20  disclosed in this proposal.  It's in the UE.  The UE is

21  the -- includes the claimed apparatus.

22  Q.   All right.  Now, how about the nontransitory computer

23  readable medium for Claim 24?  Would you address that, sir?

24  A.   Yeah.  So it's a lot of words.  Nontransitory computer

25  readable medium.  There are two types of memory, so-called

1    volatile memory -- if you pull the plug, the contents are

2    gone.   Nonvolatile memory like a hard drive, if you pull the

3    plug, the memory remains.

4         So this is saying put the instructions to do these

5    steps, which we've already spoken about, on nontransitory

6    medium.   Put it in nonvolatile memory.   And the UE in the

7    Ericsson proposal would be understood to have the nonvolatile

8    memory because if it didn't, every time it lost power -- the

9    battery ran out, if you didn't keep it fully charged -- you

10   would have to run back to the store and have it reprogrammed.

11        So almost every computer operates that way.   There is a

12   hard drive storing the software when a computer is turned

13   off.   When you power up the computer, portions of that memory

14   are put into volatile memory which runs must faster, and that

15   is the memory that actually feeds the instructions to the

16   CPU, to the processor.   So all computers operate that way.

17   Q.   All right.   And is it your view that the Ericsson

18   proposal discloses that limitation?

19   A.   Yes.

20   Q.   Now let's talk about designating unit.   We're going to

21   look at the Court's construction in just a moment.   But let

22   me ask you first, sir, did you find that the Ericsson

23   proposal disclosed the designating unit as part of the

24   claims?

25   A.   I did.

1    Q.    All right.  So, here, sir, if you would, would you

2    explain sort of your application of the function and

3    structure identified by the Court?

4    A.    So this is a type of claim limitation.  It is known as a

5    means-plus-function limitation.  And the Court has told us

6    that the claimed designating unit, (a) must perform the

7    function that is shown on your screen; and (b) the structure

8    that performs that function must be what's -- must be as

9    defined.

10        And the Court was very specific.  It's got to be shown

11   from the patent, units 240 and 260, implemented in hardware

12   or software performing one or more of a bunch of algorithms.

13        So we know the function; we know the structure.

14   Q.    All right.  And then on the next slide we see some of

15   the figures referred to by that construction.

16   A.    Yes.  So Figure 2 contains the units 240 and 260, that I

17   just mentioned.  They are simply boxes.  They, basically,

18   describe what they do.  There is no detail about what's

19   inside the box.

20        They are inside the UE.  And what the UE does -- one of

21   the things that the Court identified was the uplink capacity

22   designating unit cooperating with the designating unit 260 to

23   determine the appropriate buffer status report.  We walked

24   through this here already.

25        The format designating unit and the uplink capacity

1  detecting unit is basically saying check how much space is

2  available; and working with the format designating unit, use

3  the appropriate size BSR.  So this is all in the UE.  That

4  limitation is present.

5  Q.   All right.  Now, sir, let me last turn to Claim 20.

6       Here you've called out some -- again, some information

7  from the Ericsson proposal.  Is it your view that the

8  Ericsson proposal discloses the elements in Claim 20?

9  A.   Yes, it does.  The claim requires a long buffer status

10  reporting format.  Here's the long buffer status reporting

11  format exactly from the Ericsson proposal.

12  Q.   Okay.  Now, sir, considering all of the evidence that

13  you've walked through with this jury just now, is it your

14  view that each and every element of each and every claim

15  that's asserted against Apple in this case is obvious?

16  A.   Yes.

17  Q.   Now, one of the things I wanted to ask you about is

18  whether you considered whether those claims incorporate sort

19  of general or generic concepts known to those skilled in the

20  art back at the relevant time.

21  A.   Okay.  All of them are.  As I explained to you, these --

22  these are well-known concepts.  They're relatively simple

23  concepts.  I even gave the example of the guy trying to shove

24  the luggage into the car.  This is -- there's not too much

25  involved here.

```
 1   Q.   Okay.  Now, here I see you've called out some more from
 2   the Ericsson proposal, Page 1.  Why did you include this?
 3   A.   Yeah.  So it's saying that the Ericsson proposal is --
 4             MR. CALDWELL:  Your Honor, I object --
 5   A.   -- all on the same --
 6             THE COURT:  Hold on a second.
 7             MR. CALDWELL:  I'm sorry.  I object to the X that
 8   Mr. Homrig just ran up and threw on.  Can we approach the
 9   bench?
10             THE COURT:  Yes.
11             (Bench conference.)
12             MR. CALDWELL:  There was no question about -- about
13   which he just ran up and threw an X on the board on
14   designating unit.  And, in fact, when they were just in
15   designating unit they were pointing to the Court's
16   means-plus-function structure in our patent.  And this is a
17   point of contention.  There was the Daubert on it before.
18             He didn't identify that structure in the
19   references, much less just show it.  And so they've kind of
20   moved on to a different topic, and Mr. Homrig ran up and
21   checked the board.  And we object to that.
22             MR. HOMRIG:  So I actually asked him about it
23   before I went to the Court's construction.  He said it was
24   there.  He identified the UE.  He said it twice.  I'm happy
25   to go back and ask him again; but, Your Honor, he's already
```

1    given that opinion in this court now twice.

2         MR. CALDWELL:  Well, then what he's trying to do is

3    go outside the scope of his report.  It's not in his report

4    where he -- he identifies structure meeting the Court's

5    construction.  I don't -- I don't agree that that's what's

6    happened.

7         I mean, if -- if he asked a leading question that

8    says, oh, did you find this stuff, and then they went to

9    start proving it, and they said the Court's construction

10   requires this structure, they never did the next step, which

11   is give me -- give me the opinion where -- where that

12   structure is identified.  Because it's always been our point

13   that's the part he never put in his report.

14        MR. NELSON:  And, Your Honor, if I may just add to

15   that.  They're trying to equate uplink bandwidth detecting

16   unit in the form of designating unit as the UE.  In his

17   report he didn't even identify the UE as that.

18        They're just basically trying to say, oh, this is

19   in there somewhere.  And that's not what he did in his

20   report.  He never identified the structure in any prior art

21   reference.  They just walked right past it and put an X on

22   the box.

23        MR. HOMRIG:  Your Honor, that's -- that's not what

24   happened.  I'm happy to ask him again if he --

25        THE COURT:  Ask him again.  You can handle it on

1    cross.

2            MR. CALDWELL:  Okay.  But what if it's not in his

3    report?  I mean, that's why -- I mean, I don't want to

4    obviously run up here a lot, but I'm wondering what do we do

5    because that's our contention that it's not in his report.

6            So the question that he's about to go ask -- I

7    mean, I don't want to just stand up and make an

8    outside-the-scope objection.  And so I'm wondering how it's

9    best to handle that with Your Honor.

10           THE COURT:  Is it in his report?

11           MR. HOMRIG:  I believe it is, Your Honor.  And what

12   I'm asking him is whether this -- this combination -- I can

13   ask very clearly whether he believes that all of the elements

14   in light of all the evidence that he has discussed discloses

15   each and element of that claim.

16           You know, and if that's the question, I don't see

17   how there could be an objection.  He addresses that in his

18   report.  He goes to the combination.  All of that is covered,

19   Your Honor.

20           MR. CALDWELL:  But I'm still connecting this dot on

21   the unit which is a construed term.

22           THE COURT:  Ask a follow-up question.

23           And you can stand up and make your objection.

24   And we'll take our morning break and handle it outside the

25   presence of the jury.

1          MR. CALDWELL:  Okay.

2          (Bench conference concluded.)

3   Q.   (By Mr. Homrig) Let me -- let me return for a moment,

4   sir, to -- to Claim No. 12, okay?

5   A.   Okay.

6   Q.   In light of the prior art that you've discussed here

7   today, is it your opinion that one skilled in the art would

8   have thought that each and every element of that claim was

9   obvious at the time that we're looking at, the relevant time

10  period?

11  A.   Yes.

12         MR. CALDWELL:  Objection.

13  A.   Would have been the testimony.

14         THE COURT:  Go ahead, Mr. Caldwell.

15         MR. CALDWELL:  Objection, Your Honor.  That's the

16  reference we believe is outside the scope of the report.

17         THE COURT:  All right.  Ladies and Gentlemen of the

18  Jury, we're going to take our morning break at this time.

19         We'll be in recess probably for 20 minutes.

20         COURT SECURITY OFFICER:  All rise.

21         (Jury out.)

22         THE WITNESS:  Can I step down, Your Honor?

23         THE COURT:  No.  You stay there, please.  Thank

24  you.

25         All right.  Let's take up your objection,

1    Mr. Caldwell.

2              MR. CALDWELL:  I'm sorry, Your Honor.  I just --

3              THE COURT:  Let's take up your objection.

4              MR. CALDWELL:  Mr. Nelson is grabbing the report,

5    but our objection is that what they have done is circumvented

6    a hole in his report -- or they're attempting to circumvent a

7    hole in his report where there is no structure consistent

8    with the Court's claim construction that has been identified

9    for the designating unit.  Therefore, the opinion is outside

10   the scope because he hasn't connected those dots.

11             THE COURT:  Response.

12             MR. HOMRIG:  Yes, Your Honor.

13             This is -- this is addressed.  The overall opinions

14   are addressed in Paragraphs 322 of the invalidity report

15   where he discusses the Ericsson proposal and the apparatus

16   containing a processor.  And goes on to describe it and its

17   functionality.

18             He discusses it in Paragraph 335 of his invalidity

19   expert report where he speaks about disclosing how the

20   processor and how the UE disclosed in the Ericsson proposal

21   performs the various steps that are incorporated, including

22   the monitoring and things in the flowcharts that were

23   incorporating the construction.

24             And in Paragraph 412, for example, he also

25   discusses the non -- you know, in the course of discussing

1    the non-transitory computable -- computer readable medium, he

2    talks about how it's -- it's a computer program configured to

3    control a processor to perform operations, how that user

4    equipment that's disclosed performs those steps, how one

5    skilled in the art would understand that this information was

6    disclosed.  And he walks through sort of the functionality.

7            So he covers both the structure and in his opinions

8    the steps that are incorporated into the Court's

9    construction.  All of that material is there in -- in those

10   particular paragraphs and then elsewhere.

11           MR. CURRY:  Your Honor, not one of those paragraphs

12   does that.  It describes the art at issue.  It never links,

13   in the paragraphs that Mr. Homrig just referenced, the art,

14   the fact that it has a processor or whatever, to the Court's

15   claim construction in any, way, shape, or form.

16           The only paragraph where this is addressed relative

17   to the Ericsson proposal is Paragraph 354.  And he says the

18   Ericsson proposal also discloses a designating unit as

19   construed by the Court.  Conclusory statement, okay?  And

20   then proceeds to say -- deal with this only about the

21   functional language.

22           There's never any reference in here to the uplink

23   capacity detecting unit or the format designating unit in

24   this paragraph relative to this.  He talks about the

25   designating unit generally, which is the term he used in the

1    claim.  Does not refer to the Court's claim construction,

2    does no structural analysis, whatsoever.

3         This was part of the Daubert motion that we -- that

4    we brought on this particular point because it's a complete

5    utter hole in his report.  It is a defect.  It does not link

6    any prior art to the structure identified by the Court in

7    that means-plus-function term.

8         MR. HOMRIG:  Your Honor, in Paragraph 354, which

9    Mr. Nelson refers to, it does start out by saying that it

10   discloses the designating unit as construed by the Court; and

11   then it walks through how as previously discussed with

12   respect to various claim limitations, like claim limitation

13   No. 1(e), it walks through how Ericsson discloses the --

14   designating the long buffer status reporting format.

15        And it talks about the algorithm identified by the

16   Court in the '820 patent for performing the designating unit

17   function.  It walks through how the same algorithm, you know,

18   is met there.  And then it goes on and on and on to walk

19   through all of these parts.

20        So I think what -- what their criticism is, is it

21   seems like even though Dr. Acampora addressed the entire

22   scope, he called it out as applying the Court's construction,

23   he references back to his discussion because, of course, the

24   Court's construction incorporates those flowcharts that walk

25   through all of the limitations of the claims.

1          So, for example, one of those flowcharts covers

2  basically the steps in Claim 1.  And so what he's doing by

3  referring back to his prior discussion is referencing that he

4  has already walked through the functions that that processor

5  performs and that UE performs.

6          And he's addressing it right here in 354, how that

7  applies, that overall analysis applies to the Court's

8  construction.  It's right there.  The Court, you know, denied

9  the Daubert.  It did so for good reason.  He has covered this

10  issue.

11          THE COURT:  I don't -- I don't -- I think -- I

12  don't think they dispute that he does talk about the function

13  but that he doesn't point to any structure.

14          MR. HOMRIG:  But he -- he does.  I mean, he says:

15  The Ericsson proposal also requires user equipment on which

16  the method disclosed in the Ericsson proposal is implemented.

17          One of skill in the art would understand that the

18  Ericsson proposal at least inherently discloses software and

19  hardware for implementing the algorithm as the user equipment

20  necessarily must contain software and hardware to implement

21  the functionality disclosed in the Ericsson proposal.

22          So he says that and the Court's construction

23  requires software or hardware for performing these steps.  He

24  has addressed that specifically, and he's told where to find

25  it and where he got there.  It's all there.

1          THE COURT:  Final word, Mr. Nelson.

2          MR. NELSON:  He said it right there.  He just said

3    that he's saying -- making some sort of inherency argument

4    here.  There are two pieces of structure that are identified

5    by the Court explicitly.  There is no analysis of those two

6    pieces of structure in any way, shape, or form.  But for some

7    loose inherency argument, that -- that just doesn't hold

8    water.  That's what the cases are that we cited in the

9    Daubert motion in the first place.

10         MR. HOMRIG:  And he -- he explained on the stand

11   why one skilled in the art would understand the disclosure of

12   UE, which is user equipment, and how it would operate, what

13   they would have known at the time.

14         And the -- you know, that is -- that's all there.

15   So this isn't -- this isn't anything new, and it's not

16   anything that's an overreach, Your Honor.  It's right there

17   in his report.

18         THE COURT:  Okay.  I'm going to overrule the

19   objection.  Take it up on cross-examination.  We'll be in

20   recess for ten more minutes.

21         MR. HOMRIG:  Thank you.

22         COURT SECURITY OFFICER:  All rise.

23         (Recess.)

24         (Jury out.)

25         THE COURT:  Please be seated.

```
 1              I just wanted to let you all know, Mr. Homrig, you

 2   have used 11 hours and 24 minutes of your time so -- all

 3   right?

 4              MR. HOMRIG:  Thank you, Your Honor.

 5              THE COURT:  Uh-huh.  Let's bring -- get the rest of

 6   the people, and we'll bring in the jury.

 7              All right.  Let's bring in the jury.

 8              COURT SECURITY OFFICER:  All rise for the jury.

 9              (Jury in.)

10              THE COURT:  Be seated.

11              You may continue, Mr. Homrig.

12              MR. HOMRIG:  Thank you, Your Honor.

13   Q.   (By Mr. Homrig) Dr. Acampora, before the break I was

14   asking you about Claim 12.  And just in case the jury didn't

15   catch your answer, let me ask you again.

16         In your view in light of the evidence that you walked

17   through during your testimony today, do you have an opinion

18   on whether each and every element set forth in Claim 12 would

19   have been obvious to one skilled in the art?

20   A.   I believe that it would have been, yes.  That's my

21   opinion.

22   Q.   And is it your opinion that as to each and every claim

23   that we've discussed today, all of these boxes are

24   appropriately checked off?

25   A.   Yes.
```

1   Q.    And is it your opinion that one skilled in the art would

2   have come not just in the individual elements but to the

3   combination of elements that is set forth in each of the

4   asserted claims?

5   A.    Yes.

6   Q.    All right, sir.  So let's -- in the interest of time,

7   let me ask you this:  In reaching your conclusions here, did

8   you consider commercial success related to the invention?

9   A.    I did.

10  Q.    Okay.  Did you consider whether the accused products in

11  this case might be evidence of commercial success for the

12  alleged inventions set forth in any of these claims?

13  A.    Okay.  So it is my understanding that commercial success

14  would be an indication of non-obviousness, but it has to be

15  tied to the invention.

16        The iPhones have been commercially successful, but I see

17  no evidence -- I don't know of anyone that ever ran down to a

18  store and said, give me one of those new iPhones because of

19  its BSR format.  So I don't think the commercial success has

20  anything to do with BSR.

21  Q.    And then when you get to the BSR format, does the BSR

22  format, according to your analysis, used in the accused

23  products even perform any of the steps of any of the claims?

24  A.    No.

25  Q.    So could it be commercial success?

1   A.   No.

2   Q.   Okay.  Now, let's turn to the LTE standard.

3        Sir, did you consider whether the LTE standard or LTE

4   generally could be commercial success for the alleged

5   inventions in any of the claims?

6   A.   LTE is successful.  There were many reasons it was

7   successful.  I don't think the success has anything to do

8   with its use of its choice of BSR formats.  In fact, we saw

9   this earlier.  The actual selection of BSR format is one page

10  out of a page -- I think Dr. Caloyannides described it as

11  being hundreds of thousands of pages.  I don't know if it was

12  that long, but there's lots of pages in the LTE.  BSR --

13  selecting BSR formats is one.

14  Q.   And then even if we look at selecting formats in LTE, in

15  your opinion, do -- do those steps practice each and every

16  element of any of the asserted claims?

17  A.   No.  No.  That's been my testimony.

18  Q.   So could it ever -- so could LTE ever be commercial

19  success for the asserted claims?

20  A.   No.

21  Q.   All right.  So, sir, we are almost finished, but I have

22  just a few more questions for you, okay?

23  A.   Sure.

24  Q.   All right.  Now, in the 2007-2008 time period, were

25  there other ways than the way set forth in the claims of the

1    asserted patent to select a BSR format besides -- actually,

2    let me -- let me withdraw that question and ask it slightly

3    differently so it will be -- so it will be clear.

4         In the 2007-2008 time period, were there other ways to

5    select a BSR format besides the alternative adopted by the

6    standard?

7    A.    Sure.

8    Q.    Can you give me an example of one such alternative?

9    A.    Let me give you two.  First of all, buffer status

10   reports were used in UFTS, have nothing to do with these

11   types of BSRs.

12        But another simple thing that could have been done is

13   always report a long BSR.  The base station will certainly

14   have all of the information it needs to do its scheduling,

15   which is the purpose of a BSR.  And it -- it wouldn't have

16   been any big deal.

17   Q.    Now, sir, would using that kind of approach with the

18   standard, would that have made a material difference, in your

19   opinion, in how well cell phones worked?

20   A.    I think cell phones would have worked -- it would be

21   indistinguishably different.

22   Q.    All right.  So let's -- let's just wind up here and

23   remind folks of your conclusions.

24        Now, as to the asserted claims in this case, what is

25   your opinion about infringement?

1    A.   I believe that all of the asserted claims are infringed,

2    as I explained.

3    Q.   Excuse me, sir.  I think my question wasn't clear.  I

4    was -- let me ask you about infringement.

5         In your opinion, are any of the asserted claims in this

6    case infringed by the accused products?

7    A.   If I said something differently, none of the asserted

8    claims are infringed.  That was my testimony.

9    Q.   Okay.

10   A.   I -- I showed two limitations weren't present.  Every

11   limitation must be present.  No asserted claim is infringed.

12        Thank you.

13   Q.   You're welcome.

14        Now, let me ask you about obviousness.  In your opinion,

15   is each and every asserted claim obvious in light of the

16   prior art you discussed?

17   A.   Yes.

18   Q.   All right.  Thank you, sir.

19             MR. HOMRIG:  I pass the witness.

20             THE COURT:  Cross-examination?

21             MR. CALDWELL:  Your Honor, may I have just one

22   moment to get organized?

23             THE COURT:  Yes.

24                        CROSS-EXAMINATION

25   BY MR. CALDWELL:

1   Q.    Good morning.

2   A.    Good morning, Mr. Caldwell.

3   Q.    We have not met, have we, Mr. Acampora?

4   A.    Not formally, no.

5   Q.    All right.  Well, pleasure to meet your -- make your

6   acquaintance.

7   A.    Same here.

8   Q.    Just because it's fresh on my mind, let me start with

9   something.  Did you just say that an alternative solution to

10  the -- to the invention would be to just send long BSRs?

11  A.    Yeah.  When there's a need to send a BSR, send the BS --

12  the long BSR only.  Yes.

13  Q.    Isn't that what they did in 3G?

14  A.    Not quite but essentially, yes.

15  Q.    And did you do any testing or anything, whatsoever --

16  A.    Let me correct that.  3G reported like a total amount of

17  the buffer, total amount of data stored.  When I say "long

18  BSR," I mean the long BSR based upon four reports, how much

19  data is in each of the four buffers.  That's different

20  than -- than 3G.

21  Q.    Did you do any testing, whatsoever, to support what

22  you've just stated about how that would be indistinguishable

23  or something along those lines, from using the patented

24  invention?

25  A.    Testing, no.  But a mental analysis, yes.

1   Q.   Okay.  Did you quantify that mental analysis anywhere in

2   your report -- in your report?

3   A.   It's not in my report, but I would be happy to do it now

4   if you would like me to.

5   Q.   Okay.  I'm just making sure.  That's an opinion we've

6   heard for the first time today, right?

7   A.   That's probably true.  But you asked and -- did I do

8   anything and, yeah, I actually did.

9   Q.   All right.  And Apple's counsel asked you if it would

10   make a difference, right?

11   A.   I'm sorry?

12   Q.   Apple's counsel asked if it would make a difference to

13   just not send shorts and longs and instead only send longs?

14   A.   That was the question that was asked.  And it's my

15   opinion it would make insignificant difference.

16   Q.   Do you remember in your deposition you were asked about

17   what is the problem being solved by the invention?

18   A.   I was asked a lot.  Maybe.

19   Q.   You started that answer by going to the background of

20   the patent and referring to how the problem being solved was

21   addressing the inflexibility and inefficiency in not being

22   able to choose between different formats.  Do you remember

23   that?

24   A.   Well, I think I was using -- I was using that document,

25   and that's how it was characterized in the document.  But I

don't disagree that we found that right on the face of

Googling the Ericsson proposal for that matter.

     Standards bodies do a lot of things for a lot of

reasons.  Sometimes it's very important.  Sometime it's not

quite so important.  I'm giving you my opinion.  I don't

think this is a biggie.

Q.   Mr. Acampora, you understand that we are on tight time

frames, right?

A.   I suppose so, yeah.

Q.   And do you realize my question was do you remember that,

discussing it in your deposition?

A.   I remember some discussion about that, yeah.

Q.   And I mean you no disrespect, but just for efficiency so

that we can get through our information with the jury in a

timely fashion, and then so that Apple's lawyer has a chance

to come back up here, will you do me a favor and try to stick

to the question that I ask you?

A.   Yeah, as long as it -- as long as the answer that I give

is -- is adequate, if it's a truthful answer, sure.

Q.   Do you remember referring to a problem being solved by

this invention as addressing the inflexibility and

inefficiency of prior systems where you couldn't change

between formats?

A.   There was some discussion of that, yes.

Q.   And is it your solution that the way to solve the

1  problem of inflexibly and inefficiently sending just one long

2  size is to just send one long size?

3  A.   That's how it can be characterized in some of the prior

4  art, yes.

5  Q.   Did you prepare your slides?

6  A.   Pardon me?

7  Q.   Did you prepare your slides?

8  A.   What do you mean by "prepare"?

9  Q.   Well, I mean, did you put the Apple logos on them and

10 all that?

11 A.   Well, the content was all mine.  I did not type them.

12 Q.   Okay.  And I won't belabor this point, but just so

13 everyone is clear, you are being compensated, correct?

14 A.   Sure.

15 Q.   And your rate is, I think, 725?

16 A.   That's correct.

17 Q.   Does that make you, I guess, the highest paid expert

18 that's here testifying?

19 A.   I don't know.

20 Q.   Okay, sir.  You pretty much work for defendants, right?

21 A.   I've -- pretty much so.  Do you mean more often than

22 not?  Yeah, I wouldn't disagree with that.

23 Q.   And you don't ever put out a report acknowledging that

24 the patent asserted against them is valid or that the patent

25 asserted against them is infringed, right?

1    A.    I don't recall having written such a report.  That's

2    correct.

3    Q.    We'll go back to this here for a minute; but just for

4    starters, do you -- were you here when Mr. Stattin testified?

5    I think it was last Friday morning?

6    A.    I was.

7    Q.    Now, do you agree that the joint proposal, which you

8    call the Ericsson proposal, does not tell you how to decide

9    between short and long formats?

10   A.    I think it would be obvious, but it doesn't necessarily

11   tell you explicitly, yeah.  But I don't think, based upon --

12   I think it would be pretty obvious.

13   Q.    It doesn't say anything about a bandwidth check, does

14   it?

15   A.    Well, I -- it doesn't say "bandwidth check" but I

16   gave -- it may not use the exact words but the concept was

17   there.  It was my Goldilocks thing, not too hot, not to cold.

18   I explained that.

19   Q.    The Alcatel proposal does not say make a bandwidth

20   check, does it?

21   A.    The Alcatel proposal speaks about padding BSRs.  So it's

22   quite clear what a -- what a padding BSR -- there is also a

23   concept called "piggybacking" well-known.  That's what it's

24   talking about.  You sort of piggyback something that you have

25   some space to do.  That's what's -- that's what's being

1    disclosed.

2    Q.    Okay.  But I didn't ask you about piggybacking, and I

3    didn't ask you about padding.  I asked you about bandwidth

4    checks, correct?

5    A.    I'm applying the Court's claim construction, if you

6    will.

7    Q.    My question to you is:  The Alcatel proposal does not

8    tell you to do a bandwidth check, does it?

9    A.    It does not explicitly use the word "bandwidth," but it

10   does speak about padding bits.

11   Q.    I understand it speaks about padding bits.  You keep

12   changing the question to padding bits, and I keep asking you

13   about bandwidth.

14        It doesn't tell you -- the Alcatel proposal does not

15   tell you to do a bandwidth check, does it, sir?

16   A.    It does not use the word "bandwidth."  I agree.

17   Q.    And nor does Lee, correct?

18   A.    That's also true.

19   Q.    Do you remember what company the Lee reference was from?

20   A.    I believe it was LG.

21   Q.    It's the same LG that took a license to the patent

22   portfolio for, I think, (REDACTED BY COURT ORDER), something

23   like that.  I can't --

24            MR. CALDWELL:  I'm sorry.  I probably should seal

25   the courtroom.  I'm sorry, your Honor.  Can I strike that

1    from the record?

2              THE COURT:   You may --

3    Q.   (By Mr. Caldwell) Is that the same company that took a

4    license to the patent portfolio for a substantial sum, sir?

5    A.   Well, I do remember that LG took a proposal.  I don't

6    remember anything about the sum.

7    Q.   And you were in here, correct, when that -- when the

8    evidence was presented?

9    A.   I was.

10   Q.   I guess I'll try and walk through things sort of in the

11   order that you presented them.

12        One of the things you mentioned early on is you referred

13   to a Qualcomm baseband processor.  Do you remember that?

14   A.   I did.

15   Q.   Is a baseband processor something -- a concept you're

16   familiar with?

17   A.   Yes.

18   Q.   Quite?

19   A.   Quite.

20   Q.   And that's a concept or terminology you've been familiar

21   with for a while in your career, would you say?

22   A.   Yes.

23   Q.   Now, were you mentioning baseband processor to suggest

24   that if there is any infringement, it's just in the Qualcomm

25   chip, it's not the Apple product?  Is that the gist?

```
1   A.    Well, I was mentioning baseband processor just to

2   illustrate the functionality that's on the baseband

3   processor.  A very small part of that functionality is BSR

4   reporting.  That's the reason I described it.

5   Q.    Okay.  Mr. Acampora, so you're not trying to suggest

6   that any infringement is Qualcomm's and not Apple's, are you?

7   A.    I don't have any opinions on that.  I'm sorry.  But I

8   will say that it's -- the BSR -- everything we're talking

9   about is on that baseband -- is performed in the phone on

10  that baseband chip.  That, I can -- that's a technical

11  opinion.  That, I can testify to.

12  Q.    And according to the law, which I believe you addressed

13  in your report, an act of infringement includes importing; am

14  I right?

15  A.    That's my understanding, yes.

16  Q.    And we know that it is Apple who imports the accused

17  devices from China, correct?

18  A.    Well, let's say probably, but I -- again, I have no idea

19  who put it on the boat or the plane, who took -- I just don't

20  know.  Who took it off when it arrived in Los Angeles, that's

21  not my expertise.

22  Q.    All right.  And I started this by asking if a baseband

23  processor is something that's known to you, right?

24  A.    Yes.

25  Q.    Does Apple manufacture baseband processors?
```

1   A.    Not that I'm aware of.

2   Q.    But you, at least, understand the question, correct?

3   It's just that you may not -- you're not aware of whether

4   they manufacture them, right?

5   A.    I understand the question, yes.

6   Q.    Do you remember what you said when we asked that

7   question in your deposition?

8   A.    No.

9   Q.    You were asked:  To your knowledge, does Apple

10   manufacture any baseband processors?

11        And your answer was:  Does Apple manufacture any

12   baseband processors?  Tell me what you mean by "baseband

13   processor."

14        Do you recall that?

15   A.    I do.

16   Q.    And you've been here for the whole trial, except maybe

17   bathroom breaks and things like that, correct?

18   A.    I know -- I was here for the entire trial.  I missed a

19   brief portion of -- of Apple's -- of the damages expert -- of

20   Apple's damages expert.

21   Q.    Well, you were here for Dr. Caloyannides's testimony,

22   right?

23   A.    I was.

24   Q.    You were here when he was cross-examined, and I believe

25   that was by Mr. Lumish?

1    A.    I was.

2    Q.    You also heard both Mr. Frappier from Apple and

3    Mr. Jones from CCE, correct?

4    A.    I did.

5    Q.    So that makes the four technical experts, right?

6    A.    Yes.

7    Q.    And would you say, at least conceptually, you have sort

8    of Frappier and Jones are the source code guys, and then you

9    have Acampora and Caloyannides that look to the source code

10   guys?

11   A.    That -- that's certainly a good characterization, yeah.

12   Q.    So your closest counterpart on the CCE side is

13   Dr. Caloyannides, correct?

14   A.    That's -- that's my understanding, yes.

15         Dr. Caloyannides is offering opinions --

16   Q.    And do you remember -- I'm sorry, I didn't mean to cut

17   you off.

18   A.    Dr. -- I heard Dr. Caloyannides offer opinions on

19   infringement.  I offered opinions on invalidity -- on

20   invalidity and noninfringement.

21   Q.    Do you recall Mr. Lumish trying to establish with

22   Dr. Caloyannides that the main thing that mattered in this

23   case was the source code, at least for infringement?

24   A.    Yes.

25   Q.    Now, did you hear Mr. Lumish go after Dr. Caloyannides

```
 1    repeatedly about, you can't tell me what this line of code
 2    does, and you aren't able to answer questions about this
 3    section of code?
 4         Do you remember that?
 5    A.   I do.
 6    Q.   Did it seem a little unfair for Mr. Lumish to make that
 7    attack on Dr. Caloyannides?
 8    A.   I'm sorry.  Say it again.
 9    Q.   Did that seem a little unfair to you that Mr. Lumish was
10    making that attack on Dr. Caloyannides?
11    A.   I don't -- I don't have an opinion on whether that is
12    fair or not fair.  I saw a lot of things in this courtroom
13    that I -- that just from a personal point of view, not a
14    technical point of view, I thought was pretty unfair.
15    Q.   Did it at least make you uncomfortable to watch a
16    cross-examination of Dr. Caloyannides questioning whether he
17    had a sufficient understanding of the code?
18    A.   Did it make me uncomfortable?
19    Q.   Yes, sir.
20    A.   No.
21    Q.   You didn't personally review any source code at all, did
22    you?
23    A.   I don't read source code.
24    Q.   So I'm --
25    A.   That's not to say -- I looked at it, but it's not a
```

1  language I understand.  I asked for that to be translated

2  into English.

3  Q.   Would you agree with me, then, you relied on the code

4  review from Mr. Frappier?

5  A.   Well, I relied on the code review from Mr. Frappier, but

6  also I had the -- at that point in time I also had the code

7  reviewed by Mr. Jones.  I also had Dr. Caloyannides' opening

8  report on noninfringement.  So I had more to go on.

9  Q.   And which one of those two code experts gave a more

10 accurate recitation of how the code works?

11 A.   I think that they were pretty much the same, except I

12 think that -- that Mr. Frappier provided a little bit more

13 context and a little better explanation of what's actually in

14 the code, not using flow diagrams but what is actually in the

15 code.

16      By the way, having sat through this here, I don't read

17 code.  As far as a few lines of code regarding BSR reporting

18 in LTE, now I do.  I saw a lot of that.

19 Q.   And you understand that an "if" statement is a condition

20 in the code, correct?

21 A.   That -- that, I do.  Yes.

22 Q.   And you understand that -- that the claims require a

23 plurality of pre-selected conditions, right?

24 A.   Associated with the buffers.  You're paraphrasing the

25 language of the claim.

1   Q.   You didn't identify a single "if" statement for a single

2   piece of prior art, did you?

3   A.   Well, no, but that's a different question.

4   Q.   That is a different question.  I'm asking, you didn't

5   identify a single "if" statement from a single piece of prior

6   art, did you?

7   A.   That -- that is true.

8   Q.   Do you dispute that the accused devices in this case

9   send long and short buffer status reports when operating in

10  an LTE environment?

11  A.   Can you say that again?  I'm not sure I even heard it.

12  Q.   Is there any dispute -- do you disagree --

13          MR. CALDWELL:  Let me strike that.

14  Q.   (By Mr. Caldwell) Do you contend that the accused

15  products do not send long and short BSRs when operating in

16  LTE?

17  A.   I do not dispute that.

18  Q.   I mean, you've been working on this case for Apple for a

19  while, a couple of years maybe.

20  A.   Couple of years, yes.

21  Q.   When did you first realize that the accused products

22  send buffer status reports?

23  A.   You mean pin it down with absolute certainty?

24  Q.   Sure.

25  A.   Probably when I saw Dr. Caloyannides' report and

1  Mr. Jones.  I mean, with absolute certainty.  Did I strongly

2  believe they did prior to then?  Sure.

3  Q.   You strongly believed that the devices sent BSRs prior

4  to that, correct?

5  A.   Yes.

6  Q.   In fact, you know that the LTE standard requires them

7  to, don't you?

8  A.   Well, the only -- the standard simply describes what

9  must be done in the case of BSRs when certain conditions

10  arise.  Now, if those conditions never arise, then they

11  wouldn't be sent.  But, again, I would strongly believe that

12  the BSRs are being sent.

13  Q.   What about when you power on your phone and it connects

14  with a cell station?  Are there BSRs sent then?

15  A.   As part of the initial -- the initialization?

16  Q.   Well, as part of getting permission to actually use your

17  phone.

18  A.   Actually, I'm not sure the first thing that happens has

19  anything to do with BSRs.

20  Q.   I didn't ask if the first thing is sending BSR; what I'm

21  asking is part of getting associated with a cell, do you send

22  a BSR?

23  A.   I don't know.

24  Q.   Just cut to the chase.  Was it your idea in April to

25  deny that Apple's accused products send buffer status

1   reports, in that request for admission we've seen a few

2   times?

3   A.   Can you repeat that question, please?

4   Q.   Yes, sir.

5       Was it your idea to deny that the Apple devices sent

6   buffer status reports, in that answer to the request for

7   admission that we've seen a couple of times?

8   A.   Was it my idea?  I don't think so.

9   Q.   If you had been asked under oath in April whether the

10   Apple devices sent buffer status reports, would you have said

11   no?

12   A.   Well, if I can give a very short two-part answer.  As

13   claimed, no.  At large, something that's called a BSR is

14   sent, probably.

15   Q.   I'm actually working to make sure that we go through

16   things more efficiently, so I appreciate your patience.

17       Do you mind if I take down your boards here?

18   A.   Be my guest.

19   Q.   Actually, I'm going to come back to something, but I

20   just want to point out one thing real quick.  Do you see this

21   tiny little line right here (indicating)?

22   A.   Yes.

23   Q.   Is that the way that appears in the claim, just sort of

24   as its own element:  Wherein the designating unit is

25   configured to?

```
 1   A.    I'd have to look at the claim.  I don't -- I just don't
 2   recall.  You asked me if it -- if the "designate," which
 3   follows, appears on the same line as the "to"?
 4   Q.    Yes.
 5   A.    I'd have to look.  I don't remember.  I -- it very well
 6   may.
 7   Q.    Do you think it very well may be an isolated element:
 8   Wherein the designating unit is configured to?
 9   A.    The opposite.
10   Q.    You think they very well may be combined?
11   A.    Again, I'd have to look at the claim.
12   Q.    Let me just ask it this way:  Do you think there's any
13   chance, whatsoever, that in the claim "wherein the
14   designating unit is configured to" is a stand-alone element?
15   A.    Is there any chance that it is?  I -- again, if you just
16   show me the claim, how -- how it reads, I can -- we can cut
17   to the chase, and I'll let -- I'll let you know.  I don't
18   know.
19   Q.    I do not want to be accused of not showing you the
20   claim, so here is the claim.  Hopefully slightly more
21   focused:  Wherein the designating unit is configured to.
22         Does the element stop there, sir?
23   A.    No.  No.  That's a run-on.  I agree.  So that's -- it's
24   the same as if the line hadn't ended with "to" and the
25   "designate" continued on that line.
```

1  Q.   Sir, so when you look at the Court's construction, and

2  you look for the corresponding structure, the structure that

3  corresponds to the function for that term addresses:

4  Designating the long buffer status reporting format when

5  there is sufficient uplink bandwidth to communicate using the

6  long buffer status reporting format.

7       Correct?

8  A.   That is correct.   That's the function -- that's part of

9  the Court's claim construction, as I recall.

10 Q.   And presenting that function and the structure that

11 performs it, is a more accurate way to represent the claim

12 than breaking them out separately, correct?

13 A.   I'm sorry.   I'm not sure I even understand the question.

14 Q.   Mr. Acampora, do you remember drawing this?

15 A.   I do.

16 Q.   All right.   And did you label it '820 patent up there?

17 A.   I did.

18 Q.   Was that your idea, to label that the '820 patent?

19 A.   I was -- I believe I was asked does that represent -- I

20 don't recall exactly what I was asked.   It might have been,

21 could you label that the '820 patent as a question, would

22 that be accurate to do so.

23      That, I -- I just don't remember the exact context, if I

24 was instructed to write it, if I was asked would that be

25 representative of and then wrote it.   I -- I -- but I

1    certainly wrote it.

2    Q.    Okay.  Mr. Acampora, is there any part of the '820

3    patent that talks about having four diamonds and has short,

4    medium, long, and very long?

5    A.    This is an illustration of what -- of steps that would

6    meet the claim limitations, not the only way to meet the

7    claim limitations.  So is that specific way disclosed?  No.

8    But did that meet limitations?  Yes.

9    Q.    Mr. Acampora, did you have trouble finding a graphic

10   that showed you the way to do a flowchart for the '820

11   patent?

12   A.    I'm not sure I understand that question, either.  There

13   were flow diagrams in -- in the patent itself; but I went

14   right to the claim, just like the proof of the pudding is in

15   the code, the proof of the pudding is in the claim.

16   Q.    And when we look at that claim, that's where we're going

17   to find the four diamonds and the very long and the medium,

18   right?

19   A.    I -- I never said that.  I said -- but that is -- that's

20   just an example of what would be the claim limitations.  The

21   claim requires two preset conditions corresponding to the

22   buffers, detecting a pre-selected condition and designating

23   long or short based upon the one you selected.  That would

24   meet the limitation.

25        Now, I'm not saying that's the only way.

```
 1    Q.    Okay.  Let's just focus on a simple question.

 2          Can I look in the claim and find diamond No. 4 for the

 3    very long BSR?

 4    A.    Probably not.

 5    Q.    In fact, when we look through the intrinsic record,

 6    there's already been a handy-dandy diagram drawn for us,

 7    correct?

 8    A.    I remember this -- this drawing.

 9    Q.    Mr. Sebire presented this drawing to the jury, didn't

10    he?

11    A.    He did.  But I believe that was in one of the -- that

12    was in an early application.

13    Q.    So you made this argument to the jury or presented this

14    position to the jury that the accused products don't have the

15    plurality of pre-selected conditions, right?

16    A.    That's my opinion, yes.

17    Q.    And now am I correct that there is no dispute that an

18    "if" statement reflects the condition?

19    A.    In general, an "if" statement -- an "if" statement is

20    posing a question.  Look -- it's condition nexus.  Look for

21    this condition.  And if you find it, do something.

22    Otherwise, do something different.

23    Q.    Well, perhaps, something we can agree on -- you, me, and

24    Mr. Frappier -- he was asked and also referred to an "if"

25    statement:  What's that?
```

1          And his answer -- at trial -- was:  It's a -- it's a

2     particular kind of statement that is used for testing

3     conditions.

4          Do you recall that?

5     A.    I -- I do.

6     Q.    And do you agree with it?

7     A.    I would agree with that.

8     Q.    Am I correct -- let's just talk about regular and

9     periodic BSRs, okay?

10    A.    Okay.

11    Q.    And it's your position that you do not check two

12    pre-selected conditions before you determine -- before you

13    send your regular or periodic BSR; is that correct?

14    A.    Well, you don't select -- you don't test two conditions

15    upon the detection of one of which would cause you to

16    designate a buffer status reporting format.  That's my

17    opinion.

18    Q.    What the code does -- and I guess I don't know what's

19    going to rise to the level of causing someone sensitivity.

20    I'm trying to talk at an abstract level, but I'm afraid

21    someone's going to be mad at me about the code, so...

22          MR. CALDWELL:  Regretfully, may we seal the court,

23    Your Honor?

24          THE COURT:  Let's leave the courtroom if you're not

25    covered under the Court's protective order at this time.

1    Mr. Caldwell, as soon as you think we can unseal

2    it, let me know.

3        (Courtroom sealed.)

4        (This portion of the transcript is sealed and filed

5        under separate cover as Sealed Portion No. 17.)

6        (Courtroom unsealed.)

7    Q.   (By Mr. Caldwell) So the point I think we agree on is

8    the mere fact that someone is -- sorry -- the mere fact that

9    something is prior art does not mean it invalidates the

10   claims.  Fair?

11   A.   It only means that it appeared and was available to the

12   public earlier.  That's my understanding.

13   Q.   And, in fact, there are lots of things that are prior

14   art, just generally speaking, correct?

15   A.   I suppose so.

16   Q.   Like the 2G cellular networks, those are prior art,

17   right?

18   A.   I suppose so.  The only thing I'm hesitant about is are

19   we talking about prior art in a relevant field, any

20   publication like Einstein's theory of relativity?  I mean,

21   that's all prior art.  Or are we focusing on this particular

22   topic?

23   Q.   I'm not -- does it actually matter for the answer to my

24   question of whether 2G is prior art?

25   A.   That's what I -- that's -- that's my -- when you speak

1    of prior art, the first thing that comes to my mind is it was

2    published earlier.  In the relevant topic, not in the

3    relevant topic, doesn't matter.  It just happened earlier.  I

4    agree with that, if that's what you were asking.

5    Q.    Yeah.  So things like 2G and 3G, they happened earlier,

6    right?

7    A.    Sure.

8    Q.    And then people work hard to develop the next standard,

9    correct?

10   A.    I won't comment on that in terms of how hard people work

11   to develop a standard.

12   Q.    You don't partnership in 3GPP, do you, sir?

13   A.    Not directly.

14   Q.    Now, you are not contending in this trial that any one

15   of those references discloses all elements of any claim,

16   right?

17   A.    The references being Ericsson, Lee, and Alcatel?

18   Q.    Yes, sir.

19        You have not contended that any one of those references

20   discloses all elements of the claims.  That was not part of

21   your presentation, correct?

22   A.    My -- my opinion is based upon a combination of the

23   three.

24   Q.    If -- if the opinion were that one reference disclosed

25   all elements of the claim, that's a separate analysis called

1    "anticipation," right?

2    A.   Well, or single reference obviousness.

3    Q.   And in this case you're not making -- you're not making

4    the anticipation presentation.  You're saying that when you

5    look at the combination of these things, it renders the

6    claims obvious, in your view, right?

7    A.   The opinion that I presented on invalidity is based upon

8    the combination of the three references.  That's true.

9    Q.   Did you take into account that LG, the folks who

10   submitted Lee, Alcatel, the folks who submitted the Alcatel

11   proposal, and all the companies listed on the joint proposal,

12   were all working in the working group?

13   A.   As one indication -- well, putting Lee aside because I

14   don't know if Lee was in the working group, but certainly the

15   contributors to the Ericsson proposal and Alcatel, I believe

16   they were all working on -- in the same working group,

17   addressing the same issue of selecting buffer status report

18   format.  And to me, that's one of the reasons that it would

19   be apparent to do a combination of what's being -- of what's

20   being taught here.  This is -- this is all known, people all

21   working on the same issue.

22   Q.   Despite LG, Alcatel, Ericsson, Nokia, Nokia Siemens, NTT

23   DoCoMo, Samsung, despite all of them being in this RAN2

24   Working Group, they did not jointly come up with and publish

25   and include into the standard all of the elements of the

1   claim, right?

2   A.   Well, I don't think anyone put all of the elements of

3   the claim into the standard, if that was part of your

4   question.   In terms of whether anyone -- any one or a number

5   of participants came up with the idea of the patent, or

6   the -- the steps of the patent, that I would have a different

7   opinion on.

8   Q.   Did you address the fact -- in your obviousness

9   analysis, did you address the fact of how the group responded

10  when Mr. Sebire presented his proposal R2-080015?

11  A.   Which proposal are you talking about?  I don't -- that

12  number was just a bunch of numbers.

13  Q.   Do you remember that after the joint proposal, the one

14  that you've shown us, Mr. Sebire presented to the same group

15  a separate proposal about criteria for selecting long versus

16  short BSRs, and that's the one that was numbered 080015?

17  A.   I remember that Mr. Sebire testified as to another

18  submission, but I couldn't tell you it was that number or

19  that the contents were as you represented them to be.

20  Q.   And all those companies -- Alcatel, LG, Ericsson, Nokia,

21  NTT DoCoMo -- they were all represented at the meeting where

22  Mr. Sebire presented R2-080015, correct?

23  A.   I'd have to look at the list of attendees, but let me

24  accept that, that they -- that they were there.  They had

25  been involved in the meetings, and a lot of these ideas had

1    been discussed over quite some period of time.

2    Q.   Prior to this lawsuit, are you aware of any of those

3    companies contending that Mr. Sebire's idea was obvious to

4    them?

5    A.   I'm not aware of that having happened.  That's correct.

6    Q.   And, in fact, the evidence in this case has shown that

7    it was an unanswered question how to decide between different

8    formats of BSRs, correct?

9    A.   No.

10   Q.   You disagree with that?

11   A.   I disagree with that.

12   Q.   We saw a presentation that was shown by -- well, you

13   heard the testimony of Mr. Stattin, correct?

14   A.   I was here, yes.

15   Q.   And he even says that in the joint proposal -- which is

16   the latest of the three references that you've shown,

17   correct?

18   A.   Yes.

19   Q.   The joint proposal does not tell you how to decide when

20   to send one format versus the other, correct?

21   A.   I don't know about that.

22   Q.   Did you review his deposition transcript that was taken

23   a long time ago?

24   A.   How long ago?

25   Q.   Well, I mean, it was taken in June, I think.

1   A.   I'd have to look at my list of material that I

2   considered.  But I believe that I did look at it at some

3   point in time.  I'm just not sure when that was, relative to

4   when I prepared the reports and -- yeah.  I'm just not sure.

5   Q.   And do you remember that when you look in the joint

6   proposal, it's -- when you get to Proposal 6, that's the one

7   that has a drawing for the -- a short BSR and a long BSR?

8   A.   Yes.

9   Q.   Who drew those drawings?

10  A.   Okay.  So my recollection -- by the way, more recently a

11  bunch of slides were produced, which I did look at.  These --

12  those slides were actually used -- I've seen some of the

13  slides used here in court.

14       So you're asking me who drew the long and short BSR

15  format?

16  Q.   That are in the documents --

17  A.   That are in the Ericsson proposal?

18  Q.   Who drew the long and short format that are in the

19  document you call the Ericsson proposal?

20  A.   In terms of actually drawing it or recapturing a group

21  discussion?

22       The second -- the first, who drew it, I -- that might

23  have been Mr. Sebire, since he sort of described everything

24  on his way home after the meeting when a whole bunch of

25  things were discussed.

1    Q.    Do you remember -- I've asked you about Proposal 6.

2    That's where the long and short are, correct?

3    A.    Yes.

4    Q.    Do you remember Mr. Stattin testifying under oath that

5    that Proposal 6 does not say -- does not say under which

6    conditions we use them?  It merely had proposed that there

7    are two types and two formats?

8    A.    I do remember his testimony to that effect.  But I think

9    that was in the context of whether it was decided how that

10   would be done, not in the context of whether there had been

11   some discussion of what conditions might apply and when.  But

12   no decision was made.  That's -- that's what I do recall.

13   Q.    My question is specifically, do you agree that

14   Mr. Stattin testified Proposal 6 does not say under which

15   conditions we use them; it merely had proposed that there are

16   two types and two formats?  Do -- so you agree -- do you

17   realize he said that?

18   A.    I think that is what he said, and I don't -- I wouldn't

19   disagree with that.  That's -- that's all Proposal 6 says.

20       That does not mean there wasn't some discussion on the

21   subject.

22   Q.    And, sir, you are absolutely positively not a fact

23   witness to any alleged discussions you're alluding to right

24   now, right?

25   A.    That's for sure.

1    Q.   You can't tell us what anyone said, and you're not

2    trying to, are you?

3    A.   I was not present.  What I -- what I can do is rely on

4    testimony that I heard and I did hear -- I heard what was

5    said.  So did the jury.

6    Q.   Sir, I'm not trying to fuss at you, but I don't -- I'm

7    not interested in getting some off-the-cuff opinion that you

8    haven't issued before.  Correct?  You -- so when I'm

9    asking --

10   A.   It depends what question you ask.  I'm sorry.

11   Q.   No.  My question was, you're not a fact witness.  I was

12   trying to focus directly on that and you went around --

13   A.   I said for sure.  I'm an expert witness.  I'm not a fact

14   witness.  I wasn't present.  That's true.

15   Q.   We established earlier, I believe, that you've not

16   identified two "if" statements in any of the references you

17   present for obviousness, correct?

18   A.   Not written as "if" statements.  That's true.

19   Q.   And you've also not identified anywhere in your

20   presentation a place where after a plurality of pre-selected

21   conditions are checked, that there is then a check for

22   sufficient space in the uplink grant, correct?

23   A.   Ask that question again, please.

24   Q.   Yes, sir.

25   A.   I -- I don't know if that's correct.

1    Q.   You did not identify in your presentation a place where

2    a plurality of conditions are checked, and then subsequently

3    a check for the sufficiency of space in the uplink grant is

4    performed, correct?

5    A.   The words or the concept?  The concept, yes; the words,

6    no.

7    Q.   So there was not a place you identified in any of those

8    references where after two checks, you check your space in an

9    uplink grant.  It -- whether it says exactly check the space

10   in your uplink grant or not, you didn't point to that in

11   those references, correct?

12   A.   Again, I -- I don't think that's correct.  I believe I

13   pointed to two -- two places, one in the Ericsson document

14   and one in the Alcatel document.

15       Now, again, the words might not have been the same, but

16   to this person of ordinary skill looking at what was

17   disclosed, comparing it to the language that you just gave

18   me, one would recognize it's the same thing.  You could say

19   the same thing different ways, but it means the same thing.

20   Q.   In the claims you first try to determine, for example,

21   whether you want to send a long or short, based on

22   conditions.  Fair?

23   A.   You detect one of a plurality of conditions and use that

24   to designate a format.  A format could be -- could be a long

25   and short -- a long or a short.  It would depend on what

1  condition you checked.

2  Q.    And then after that, you check the bandwidth or you

3  check the -- whether there's sufficient space in the uplink

4  grant, right?

5  A.    Sufficient space in the uplink grant to send a long.

6  Q.    After you've made a preference for long versus short,

7  you check whether there's sufficient space for the long,

8  correct?

9  A.    That's correct.

10  Q.    And you didn't point to a place where the references

11  make a decision of short or long and afterwards make a check

12  whether there's sufficient space for a long, correct?

13  A.    Not correct.  Is it -- again, are you asking do I see

14  the concept there or do I see the words "check sufficiency of

15  grant"?  The words were not there.  The concept, that I would

16  disagree.

17  Q.    Do you remember talking about Claim 10?

18  A.    I do.

19  Q.    You've rendered an opinion to this jury that you believe

20  Claim 10 is invalid, and you think there's clear and

21  convincing evidence supporting that, right?

22  A.    I do.

23  Q.    Do you remember what you said about the meaning of

24  Claim 10 in your deposition?

25  A.    The exact language?  No.

1    Q.    Would it surprise you if you said:  I'm not actually

2    sure what that claim means?

3    A.    That's a strange claim.  I could provide interpretation

4    to what it means, which I just did in my testimony here

5    today.  That is a strange claim deriving from Claim 1.

6          Is that referring to what you would do if you failed the

7    second designating step?  Does it refer to what you would do

8    if you passed the second designating step -- the designating

9    being checking -- the second step being is there enough

10   space?

11         Claim 1 ends with a check -- with -- with an

12   instruction:  Send the long if there's sufficient space.

13   It says nothing about what to do if there's insufficient

14   space.

15         So because of that, it's not quite clear what Claim 10

16   is referring to.  But in either event, I think that what I

17   found in the prior art disclosed Claim -- Claim 10 no matter

18   how you interpret it.

19   Q.    Mr. Acampora, respectfully, will you please try to limit

20   your answers to my questions?  I have no problems with the

21   redirect if they want to use their time.  But you understand

22   we're pressed for time?  Do you understand that?

23   A.    You've -- you've told me that, yes.

24   Q.    In your deposition you said you're not sure what that

25   claim means.  Do you dispute that?  Do you dispute that you

1   said that in your deposition?

2   A.   I would not dispute that.

3   Q.   The one thing you're clear about, you don't know what it

4   means --

5   A.   I don't know the context, but I wouldn't dispute that.

6   Q.   Okay.  You don't know what the claim means, but you're

7   darn sure that it's not infringed and it's invalid under

8   clear and convincing evidence; is that fair?

9   A.   For the reason that I just explained, under either

10  interpretation, I think that it's found in prior art.

11  Q.   Now, the best and brightest minds sat around in these

12  3GPP meetings and were talking about -- I'm sorry.  You're

13  smiling.  Let me just stop my question.  You don't agree that

14  these were smart folks that --

15  A.   Oh, you said the best and the brightest.  I -- a bunch

16  of knowledgeable people sat around and -- and pondered what

17  direction the standard should take.  That, I don't disagree

18  with.

19  Q.   Well, would you agree with me that the folks working on

20  the 36.321 spec are pretty darn experienced at buffer status

21  reports?

22  A.   Sure.

23  Q.   I mean, more than you would have been coming into the

24  case, right?

25  A.   That's probably true.

1    Q.    Probably by leaps and bounds, right?

2    A.    I don't know about that.  The reason -- the reason I say

3    that, there's not much there.  There's just not much to

4    understand.

5    Q.    You understand that Claim 10 further limits the claim

6    from which it depends, which is Claim 1, right?

7    A.    Yes.

8    Q.    And LG was participating in these meetings, right?

9    A.    I think so.  I think so.

10   Q.    But you didn't check into that?

11   A.    I didn't specifically check to see whether LG was

12   participating.

13   Q.    Alcatel was participating in these meetings for sure,

14   right?

15   A.    Alcatel was participating.  They submitted a proposal.

16   I relied on that proposal.

17   Q.    I mean, Ericsson was participating?

18   A.    Yes.

19   Q.    Nokia?

20   A.    Yes.

21   Q.    NSN?

22   A.    Yes.

23   Q.    But that's not all of the people that were there, right?

24   A.    More people were there.

25   Q.    A lot more people there, right?

1    A.    I don't know how many, but I would assume there were

2    more people present, yes.

3    Q.    I mean, other big companies --

4    A.    And there might have been multiple people from each of

5    those companies.

6    Q.    And your -- your suggestion today to the -- to the jury

7    is that you've stepped back into that time frame, looked at

8    the claims, looked at what was known to LG and Alcatel and

9    the joint proposal folks, and you've decided that the claims

10   which have been issued by the U.S. Patent Office are obvious

11   and, therefore, invalid, right?

12   A.    There's not much there.  Yes.

13   Q.    Do you think that from what folks in the working group

14   knew and from reading the joint proposal, that Claim 10 would

15   be obvious?

16   A.    I think they would, for the reasons that I do.

17   Q.    You have an advantage over those folks back then, don't

18   you?

19   A.    What's that?

20   Q.    Well, you get to look at Mr. Sebire's patent claims,

21   right?

22   A.    Well, I looked at his claims.  I'm not sure that would

23   be my advantage.

24   Q.    Well, you got to look at his claims and go back and look

25   for those parts in the prior art, didn't you?

1    A.    Okay.  I think I understand your question.

2         So I was aware of what was in the claim, and I looked at

3    a bunch of prior art to see if prior art has what's in the

4    claim.  And some of the art I looked at did not; and some

5    that I looked at did.  Is that what you mean by "advantage"?

6    Q.    You get to actually look at the claim and use that as

7    sort of a plan or a roadmap for what to find in the prior

8    art, correct?

9    A.    The only -- only, sir, as you put it, prior art could be

10   all over the map.  I used the claims as a guide to what I

11   should be looking at.

12   Q.    You used the claim as a guide to the art you should look

13   at, right?

14        That's what you just said?

15   A.    Well, I wouldn't look at Einstein's theory of relativity

16   for this claim.  True.

17   Q.    Well, I'm not trying to make a joke about it.  I

18   understand --

19   A.    I'm -- I'm not sure I understand your question.  I -- I

20   looked at the claim.  I looked at the prior art.  I -- I had

21   an idea of what I was assessing, does the art disclose the

22   limitations.  So, yeah, sure.

23   Q.    Mr. Acampora, I actually repeated back your answer to

24   me, and that's the thing you're telling me you don't

25   understand.  Are you with me?

1    A.    No.

2    Q.    Okay.

3    A.    I'm sorry.  I'm not.

4    Q.    You said you looked at the patent claim as a guide for

5    the prior art, and I'm -- I'm just making sure that I didn't

6    misunderstand what you said.  I may have missed a word, but I

7    think that's what you said.

8    A.    Yeah.  So I wasn't looking at the wrong art.

9    Q.    Do you understand that in your position when you're

10   hired, compensated to go back and grab prior art and piece it

11   together, that you're not allowed to use hindsight to make

12   out an obviousness case?  Do you understand that?

13   A.    Sure.

14   Q.    Did you look to see what the companies in the

15   meetings -- this would be after Lee, after Alcatel, and when

16   the joint proposal, the last one -- when that proposal was

17   discussed, did you look to see in the public records what the

18   companies said about it?

19   A.    What the company said about what?  The --

20   Q.    The contents of the joint proposal.

21   A.    I -- I didn't search the public records to see what they

22   said, if that's what you're asking.  No.

23   Q.    Well, right now we have -- in 2016, we have Dr. Acampora

24   looking back to 2007-2008.  But there are actually minutes of

25   meetings that these companies had in 2007 and 2008 about the

```
 1   proposal, right?

 2   A.   I believe there were minutes.

 3   Q.   And did you go look to see what the companies were

 4   actually saying?

 5   A.   I did not go to look to see what the companies said, no.

 6   Q.   Is it your view that it's clear by the time the third

 7   reference was being presented, the joint proposal, what you

 8   used to select which radio bearer group you would send

 9   pursuant to Claim 10?

10   A.   You mentioned the third something, and you referred to

11   it as being the joint proposal.  Can you be specific?  I want

12   to make sure I understand exactly what document you're

13   referring to.

14   Q.   I'm just looking at your timeline.  And there was LG,

15   Alcatel, and the last one was the joint -- the last one in

16   time --

17   A.   Last one in time, okay.

18   Q.   -- was --

19   A.   The one that was closest to the actual application of

20   the '820?

21   Q.   Yes.

22   A.   The Ericsson proposal, okay.

23   Q.   Well --

24   A.   The joint proposal.

25   Q.   "Joint proposal" is more accurate, right?
```

1   A.   Okay.  Sure.

2   Q.   Did you look to see what the participants in the meeting

3   said when the joint proposal was discussed?

4   A.   Did I overtly go to look for that?  No.  I was basically

5   given a set of prior art, which I pored over some that was

6   rejected and not.  What you're referring to was actually made

7   available, as I understand it, very recently, as recently as

8   maybe a week and a half ago.

9   Q.   Sir, the 3GPP website was available long before you

10  prepared your report, right?

11  A.   I did not go search the 3G website.  That, I -- I

12  concede.  I did not go search the 3GPP website.

13  Q.   Now, would it surprise you -- I'll start over.

14       Have you ever heard of Panasonic?  Have you ever heard

15  of Panasonic?

16  A.   I've heard of Panasonic, yes.

17  Q.   Part -- right -- a gigantic electronics company?

18  A.   I believe it's adequately -- it -- it made the brand

19  name, yes.

20  Q.   And they partnership in 3GPP meetings, right?

21  A.   I don't know that for sure, but I wouldn't be surprised

22  if they did.

23  Q.   Would it surprise you that even after, well after the

24  Lee application, well after an Alcatel proposal, and even

25  after the joint proposal was submitted, that Panasonic was

1    still asking, well, how -- if we can only fit one buffer in a

2    BSR, how are we going to decide which one?  Would that

3    surprise you?

4    A.    I don't know if I would be surprised by that or not.  I

5    also don't know if it happened or not.  I -- but I would not

6    be surprised one way or the other.

7    Q.    And do you have any idea who would have answered that

8    question in that meeting?

9    A.    I don't know if the question was asked or answered

10   but -- no.  I -- I don't know what transpired in the meeting.

11   I was not there.

12   Q.    It's Apple's burden to prove invalidity in this case and

13   take away the patent, right?

14   A.    Well, leave out that second part.  My understanding is

15   it's Apple's burden to prove that the patent is invalid.

16   What happens beyond that, I have no idea.

17   Q.    And you didn't even go look at what the industry said in

18   response to these proposals that you cited as your prior art

19   references?

20   A.    I did not.

21            MR. CALDWELL:  I'll pass the witness.

22   A.    Nor would I need to.  I formed my opinions based on what

23   I saw, and this is inclusive of the claims.

24            MR. CALDWELL:  I'll pass the witness.

25            THE COURT:  All right.  Ladies and Gentlemen, we're

1  going to take our lunch break.  I'm sorry, we went a little

2  long today.  We're going to be in recess until 1:45.

3          COURT SECURITY OFFICER:  All rise.

4          (Jury out.)

5          THE COURT:  A few announcements.  I have criminal

6  court at 1:00 o'clock, so I don't need you to totally vacate

7  the place, just make room for my criminal attorneys to sit

8  here at counsel table.

9          Your trial times, Plaintiff has used 11 hours and

10  37 minutes.  Defendant has used 11 hours and 28 minutes.

11          And we're going to get you the charge at the end of

12  the lunch break, okay?

13          We'll be in recess until 1:45.

14          COURT SECURITY OFFICER:  All rise.

15          (Recess.)

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3              IT IS HEREBY CERTIFIED that the foregoing is a

4    true and correct transcript from the stenographic notes of

5    the proceedings in the above-entitled matter to the best of

6    our abilities.

7

8    /s/_____
9    CHRISTINA BICKHAM, CRR, RMR         September 13, 2016
     Official Court Reporter
10

11

12   /s/_____
     SHEA SLOAN, CSR, RPR
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25