```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF TEXAS
 2                            TYLER DIVISION

 3
       CELLULAR COMMUNICATIONS          )
 4     EQUIPMENT, LLC
                                        )    DOCKET NO. 6:14cv251
 5
            -vs-                        )
 6                                           Tyler, Texas
                                        )    8:31 a.m.
 7     APPLE INC., ET AL                      September 14, 2016

 8
                            TRANSCRIPT OF TRIAL
 9             BEFORE THE HONORABLE K. NICOLE MITCHELL,
                    UNITED STATES MAGISTRATE JUDGE
10
                          A P P E A R A N C E S
11
       FOR THE PLAINTIFF:
12
       MR. BRADLEY W. CALDWELL
13     MR. JOHN AUSTIN CURRY
       CALDWELL CASSADY & CURRY
14     2101 Cedar Springs Rd., Suite 1000
       Dallas, Texas 75201
15
       MR. EDWARD R. NELSON III
16     NELSON BUMGARDNER PC
       3131 West 7th Street, Suite 300
17     Fort Worth, Texas 76107

18     MR. J. WESLEY HILL
       WARD, SMITH & HILL PLLC
19     1507 Bill Owens Parkway
       Longview, Texas 75604
20

21     COURT REPORTER:      MS. CHRISTINA L. BICKHAM, CRR, RMR
                            FEDERAL OFFICIAL COURT REPORTER
22                          300 Willow, Ste. 221
                            Beaumont, Texas 77701
23

24     Proceedings taken by Machine Stenotype; transcript was
       produced by a Computer.
25
```

```
 1   FOR THE DEFENDANTS:

 2
     MR. DOUGLAS E. LUMISH
 3   MR. JEFFREY G. HOMRIG
     MS. LISA K. NGUYEN
 4   MR. BRETT M. SANDFORD
     LATHAM & WATKINS LLP
 5   140 Scott Dr.
     Menlo Park, California 94025-1008
 6

 7   MR. JOSEPH H. LEE
     LATHAM & WATKINS LLP
 8   650 Town Center Drive, 20th Floor
     Costa Mesa, California 92626-1925
 9

10   MR. ERIC H. FINDLAY
     FINDLAY CRAFT PC
11   102 N. College Avenue, Suite 900
     Tyler, Texas 75702
12


13

14              ******************************

15                  P R O C E E D I N G S

16          (Jury out.)

17          COURT SECURITY OFFICER:  All rise.

18          THE COURT:  Good morning, everyone.  Please be

19   seated.

20          I understand there's some matters that we need to

21   take up before we begin this morning.  What's first?

22          MR. MCMANIS:  Good morning, Your Honor.

23          Just one issue for CCE.  We passed up a slide to

24   you.  We object to this slide in Apple's closing as

25   prejudicial and not supported by the facts in evidence.
```

1          There was no one who took CCE's proposed royalty

2     rate for the '820 patent and demonstrated that that would be

3     an appropriate royalty rate for all of the 155,000 worldwide

4     patents that have been declared to the standard.  Apple's own

5     witnesses couldn't testify as to the number of those patents

6     they actually practiced.

7          And so we think multiplying those two numbers

8     together is -- is highly prejudicial, misleading to the jury,

9     and is not supported by any of the facts that have been

10    presented so far.

11          THE COURT:  Response.

12          MR. LUMISH:  Thank you, Your Honor.

13          It does come from facts in evidence.  The 15-cent

14    rate comes from their expert.  155,000-plus worldwide

15    declared patents essential comes from Ms. Mewes.  The notion

16    of royalty stacking and the problems that it creates comes

17    from both Ms. Mewes and Mr. Bakewell.  The only thing

18    somebody didn't do is the basic, I think it's third grade

19    math to multiply the two things together, which is the only

20    thing you can --

21          THE COURT:  Is there any evidence that each of the

22    155,000 patents should be licensed at a 15-cent royalty?

23          MR. LUMISH:  No, but that's the point.  That's the

24    point we're going to make, is if you apply that 15 cents,

25    they're going to say it's not very much money, it's just

1    15 cents per phone.  If you apply that and just extrapolate

2    it out over all of the people who could say that, you end up

3    with a number that's stack rate.

4           THE COURT:  Any final word, Mr. McManis?

5           MR. MCMANIS:  Yes, Your Honor.

6           I think you hit the nail on the head.  There's --

7    there's no evidence that these other patents -- even that the

8    patent owners would suggest that they are worth 15 cents per

9    unit.  Defendants have argued that each patent must be taken

10   specifically, even within the standard.  And we think they

11   should be held to the same standard that they argued for

12   throughout this case.

13          THE COURT:  I'm going to exclude it.

14          What's next?

15          MR. MCMANIS:  Nothing from CCE, Your Honor.

16          THE COURT:  Anything from Apple?

17          Did you-all get Ms. Mehta's e-mail with regard to

18   the updated verdict form?  We just removed one of the

19   qualifying sentences to make the verdict form consistent.  Is

20   there any objection to that?

21          MR. MCMANIS:  No objection, Your Honor.

22          THE COURT:  Okay.

23          MR. LUMISH:  None from Apple, Your Honor.

24          THE COURT:  Thank you.

25          MR. LUMISH:  The only other thing was we handed to

1    Ms. Mehta some testimony.  We had suggested that, perhaps,

2    Your Honor would like to take that last bit of testimony for

3    the bench trial on paper, but just wanted to get guidance as

4    far as whether you wanted it played for the Court or just

5    have it handed up to you.

6              THE COURT:  Handed up to me is fine.

7              Is there any objection?

8              MR. MCMANIS:  No, Your Honor.

9              THE COURT:  Thank you.

10             MR. LUMISH:  I think that's all Apple had, Your

11   Honor.

12             THE COURT:  All right.  Well, we'll be in recess --

13   my plan is to charge the jury.  That will take a little while

14   to read it to them.  Take a short break so that you-all can

15   get set up, and then we'll go through both closings.  And

16   then I'll do the final -- the part of the charge -- the

17   instructions for deliberations I'll save until you are done

18   with your closings, give it to them, and let them go

19   deliberate.  All right?

20             MR. FINDLAY:  One question, Your Honor, looking

21   forward.  What is the Court's practice with respect to

22   discussions or contact with the jurors after?  I assume

23   it's -- we are allowed?  We're not allowed?  They can

24   approach us?  If you can enlighten us on that.

25             THE COURT:  They can approach you.

1           MR. FINDLAY:  Okay.

2           THE COURT:  And I'll tell them that, that if they'd

3    like to talk to you, they can approach you.

4           MR. FINDLAY:  Would -- would Your Honor consider

5    asking the jurors individually if they would mind being

6    contacted by the lawyers?

7           THE COURT:  I -- I don't mind asking them that.  I

8    can -- but I will ask them that when I go back to talk with

9    them afterwards, not on the record.  I don't want to single

10   them out.

11          MR. FINDLAY:  Okay.

12          THE COURT:  Yeah.

13          MR. FINDLAY:  Okay.  Thank you, Your Honor.

14          THE COURT:  All right.  And I'll let you know.

15   I'll let all of you know.

16          MR. FINDLAY:  Thank you.

17          THE COURT:  All right.  We'll be in recess until

18   9:00 a.m.

19          COURT SECURITY OFFICER:  All rise.

20          (Recess.)

21          (Jury in.)

22          THE COURT:  Good morning, Ladies and Gentlemen of

23   the Jury.  We are beginning our last day of the trial.  What

24   I'm going to do now is read to you the Court's charge.  It is

25   rather lengthy, and I'm going to read it to you.  You will

1    not need to take notes unless you want to.  You will get a

2    copy of the Court's charge when you -- each of you will --

3    when you retire to the room to deliberate.

4         So I'm going to read the charge, then we're going

5    to take a short break to allow the parties to prepare the

6    room for closing argument.  You will come back, you will hear

7    closing argument of the parties, and then you will retire to

8    the jury room to deliberate.

9         MR. MCMANIS:  Your Honor, if I might take up one

10    housekeeping matter first.

11         THE COURT:  Thank you, Mr. McManis, for keeping me

12    on task.

13         MR. MCMANIS:  Good morning, Your Honor.

14         Plaintiff CCE offers its final list of admitted

15    trial exhibits.

16         THE COURT:  Any objection?

17         MR. SANDFORD:  No -- no objections, Your Honor.

18         THE COURT:  Okay.  Hand that up, please.

19         MR. SANDFORD:  Good morning, Your Honor.  Brett

20    Sandford for Defendant Apple.

21    Apple offers their final list of admitted exhibits.

22         THE COURT:  Any objection?

23         MR. MCMANIS:  No objection, Your Honor.

24         MR. SANDFORD:  May I approach?

25         THE COURT:  Yes.  Thank you.

1          Now we will begin.

2          Members of the Jury, you have heard the evidence in

3  this case.  I will now instruct you on the law that you must

4  apply.  It is your duty to follow the law as I give it to

5  you.

6          On the other hand, you, the jury, are the judges of

7  the facts.  Do not consider any statement that I have made

8  during the trial or make in these instructions as an

9  indication that I have any opinion about the facts of this

10  case.

11          After I instruct you on the law, the attorneys will

12  have an opportunity to make their closing arguments.

13  Statements and arguments of the attorneys are not evidence

14  and are not instructions on the law.  They are intended only

15  to assist you in understanding the evidence and the parties'

16  contentions.

17          A verdict form has been prepared for you.  You will

18  take the form to the jury room and when you've reached a

19  unanimous agreement as to your verdict, you will have your

20  foreperson fill in, date, and sign the form.

21          Answer each question on the verdict form from the

22  facts as you find them.  Do not decide who you think should

23  win and then answer the questions accordingly.  A corporation

24  and all other persons are equal before the law and must be

25  treated as equals in a court of justice.  With respect to

1    each question asked, your answers and your verdict must be

2    unanimous.

3         In determining whether any fact has been proved in

4    this case, you may, unless otherwise instructed, consider the

5    testimony of all witnesses, regardless of who may have called

6    them, and all exhibits received in evidence, regardless of

7    who may have produced them.

8         You, the jurors, are the sole judges of the

9    credibility of all witnesses and the weight and effect of all

10   evidence.  By the Court allowing testimony or other evidence

11   to be introduced over the objection of an attorney, the Court

12   did not indicate any opinion as to the weight or effect of

13   such evidence.

14        When the Court sustained an objection to a question

15   addressed to a witness, you must disregard the question

16   entirely and may draw no inference from the wording of it or

17   speculate as to what the witness would have testified to if

18   he or she had been permitted to answer the question.

19        At times during the trial, it was necessary for the

20   Court to talk with the lawyers here at the bench out of your

21   hearing or by calling a recess.  We met because often during

22   a trial something comes up that does not involve the jury.

23        You should not speculate on what was discussed

24   during such times.

25        In deciding whether to accept or rely upon the

1    testimony of any witness, you may also consider the bias of

2    any witness -- any bias of the witness; the opportunity and

3    ability of the witness to see or hear or know the things

4    testified to; the witness's memory; the witness's manner

5    while testifying; whether other evidence contradicted or

6    corroborated the witness's testimony; the reasonableness of

7    the witness's testimony in light of all the evidence; and any

8    other factors that bear on believability.

9         Certain testimony in this case has been presented

10   to you through a deposition.  A deposition is the sworn,

11   recorded answers to questions asked a witness in advance of

12   the trial.  This deposition testimony is entitled to the same

13   consideration and is to be judged by you as to the

14   credibility and weight as if the witness had been present and

15   had testified from the witness stand in court.  Neither party

16   is required to call every possible witness.

17        While you should consider only the evidence in this

18   case, you are permitted to draw such reasonable inferences

19   from the testimony and exhibits as you feel are justified in

20   the light of common experience.

21        In other words, you can make deductions and reach

22   conclusions that reason and common sense lead you to draw

23   from the facts that have been established by the testimony

24   and evidence in this case.

25        The testimony of a single witness may be sufficient

to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding the truth as to the facts in the case.

One is direct evidence, such as testimony of an eyewitness.

The other is indirect or circumstantial evidence, the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts.

As a general rule, the law makes no distinction between direct and circumstantial evidence but simply requires that you find the facts from all the evidence, both direct and circumstantial.

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field (he or she is called an expert witness) is permitted to state his or her opinion on those technical matters.

However, you are not required to accept that opinion.  As with any other witness, it is up to you to decide whether the witness's testimony is believable or not, whether it is supported by the evidence, and whether to rely upon it.

1          In deciding whether to accept or rely upon the

2     opinion of an expert witness, you may consider any bias of

3     the witness.

4          During this trial, the attorneys have presented

5     confidential information belonging to a person, party, or

6     witness as evidence.  You are not to discuss or communicate

7     any confidential evidence presented during this trial to

8     anyone aside from the other jurors during deliberations,

9     either during the trial or after the trial.

10          I will first give you a summary of each side's

11     contentions in the case.  I will then tell you what each side

12     must prove to win on these issues.

13          Plaintiff Cellular Communications Equipment LLC

14     (CCE) contends that Apple, Inc. makes, uses, sells, offers to

15     sell, or imports products into the United States -- the

16     accused devices (specifically Apple's iPhone 5, iPhone 5c,

17     iPhone 5s, iPhone 6, iPhone 6 Plus, iPad 3, iPad 4, iPad

18     Mini, iPad Mini with Retina Display, and iPad Air), that

19     fringe Claims 4, 10, 12, 20, and 24 of United States Patent

20     No. 8,055,820 (the 820 patent).  These claims have been

21     referred to as the "asserted claims" and the patent has been

22     referred to as the "patent-in-suit."

23          CCE also contends that Apple is inducing the direct

24     infringement of the asserted claims.  CCE is seeking damages

25     for the alleged infringement by Apple.  CCE also contends

1    that Apple's infringement of the '820 patent has been

2    willful.

3           In response to CCE's contentions, Apple contends

4    that it does not infringe the asserted claims, either

5    directly or indirectly.  Apple further contends that it does

6    not willfully infringe the asserted claims of the '820

7    patent.  Apple further contends that the asserted claims are

8    invalid as rendered obvious by the prior art, or because the

9    patent applicant omitted other inventors from the patent.

10          Finally, Apple contends that CCE is not entitled to

11   any damages.  In response to Apple's invalidity contentions,

12   CCE contends that Apple has not met its burden to show by

13   clear and convincing evidence that any of the asserted claims

14   of the patent-in-suit are invalid.

15          In any legal action, facts must be proved by a

16   required amount of evidence, known as the "burden of proof."

17   The burden of proof in this case is on CCE for some issues

18   and on Apple for other issues.  There are two burdens of

19   proof in the case you'll be asked to consider:  Preponderance

20   of the evidence and clear and convincing evidence.

21   CCE has the burden of proving infringement, damages and

22   willfulness by a preponderance of the evidence.

23          "Preponderance of the evidence" means the evidence

24   that persuades you that a claim is more likely true than not

25   true.  If the proof establishes that all parts of CCE's

infringement claims are more likely true than not true, then you should find for CCE as to that claim.

Apple has the burden of proving invalidity by clear and convincing evidence.  "Clear and convincing evidence" means evidence that produces in your mind a firm belief or conviction as to the matter at issue.

Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard.

If the proof establishes in your mind a firm belief or conviction, then the clear and convincing evidence standard has been met.

In determining whether any fact has been proved by a preponderance of the evidence or by clear and convincing evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

The claims of a patent are the numbered sentences at the end of the patent.  The claims describe the invention made by the inventor and describe what the patent owner owns and what the patent owner may prevent others from doing.  The figures and text in the rest of the patent provides a description and/or examples of the invention and provide a

context for the claims, but it is the claims that define the breadth of the patent's coverage.

In this case, Claims 4, 10, 12, 20, and 24 are at issue.  Claims may describe apparatuses, devices, or products such as machines.  Such claims are called "apparatus claims." Claims may also describe processes or methods for making or using a product.  Those claims are called "method claims."

In this case, CCE has asserted apparatus and method claims.  Specifically, asserted Claims 12, 20, and 24 are apparatus claims; and asserted Claims 4 and 10 are method claims.

Claims are usually divided into parts or steps called "limitations" or "elements."  Each of these limitations or elements is a requirement of the claim.  For example, a claim that covers the invention of a table may recite the tabletop, four legs, and the glue that secures the legs on the tabletop.  The tabletop, legs, and glue are each separate limitations of the claim, and these limitations can also be referred to as the "elements" or "requirements" of the claim.

When a thing (such as a product or process) meets all of the requirements of the claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim.

In other words, a claim covers when -- a claim

covers a product or process where each of the claim elements

or limitations is present in that product or process.

Conversely, if a product, process, or system meets

only some, but not all, of the claim elements or limitations,

then that product or process is not covered by the claim.

In deciding whether or not the accused products and

methods infringe the asserted claim and whether or not the

claim is invalid, the first step is to understand the meaning

of the words used in the patent claims.

It's my job as the Judge to determine what the

patent claims mean and to instruct you about that meaning.

You must accept the meanings I give you and use

those meanings when you decide whether or not the patent

claims are infringed, and whether or not they are invalid.  I

have interpreted the meaning of some of the language in the

patent claims involved in this case.

My interpretation of those claims appears in your

notebook.  The claim language I have not interpreted for you

in your notebook is to be given its ordinary and accustomed

meaning as understood by one of ordinary skill in the art.

The case involves two types of patent claims:  Independent

claims and dependent claims.

An "independent claim" sets forth all of the

requirements that must be met in order to be covered by that

claim.  Thus, it is not necessary to look at any other claim

to determine what an independent claim covers.  In this case,
for example, Claims 12 and 24 of the '820 patent are each
independent claims.

The rest of the claims being asserted, 4, 10, and
20, in this case are "dependent claims."  A dependent claim
refers to another claim and includes all of the requirements
or parts of the claims to which it refers.  In this way the
claim "depends" on another claim.  The dependent claim then
adds its own, additional requirements.

To determine what a dependent claim covers, it is
necessary to look at both the dependent claim and any other
claim to which it refers.  A product or method that meets all
of the requirements of both the dependent claim and the
claims to which it refers is covered by that dependent claim.

The beginning portion, or preamble, to some of the
asserted claims uses the word "comprising."  "Comprising" and
"comprises" mean "including but not limited to" or
"containing but not limited to."

Thus, if you decide that an accused product
includes all the requirements in that claim, the claim is
infringed.  This is true even if the accused instrumentality
includes components in addition to those requirements.

For example, a claim to a table comprising a
tabletop, legs, and glue would be infringed by a table that
includes a tabletop, legs, and glue, even if the table also

includes wheels on the table's legs.

Claim 12 of the '820 patent uses the phrase "the designating unit."  The "designating unit" is a special type of claim element in patent law known as a "means-plus-function" element.

A means-plus-function claim element covers a structure or a set of structures that performs the recited function and that is either identical or "equivalent" to at least one of the structures described in the patent specification for performing that function.  The issue of whether two structures are identical or equivalent is for you to decide.

I have identified the structures described in the patent that perform the function identified in the means-plus-function element of Claim 12.  They are in your notebook.  You should apply my definition of the function and the structures described in the patent for performing it just as you would apply my definition of any other claim term.

Several times in my instructions, I refer to a person of ordinary skill -- skill in the field of the invention.  In this case, a person of ordinary skill in the art of the '820 patent would be a person with a bachelor's degree in electrical or computer engineering or in computer science, and two years of direct technical experience in the design or implementation of communication networks, or

equivalent experience and/or education.

A person or business entity infringes a patent if that person or business entity makes, uses, sells, or offers to sell within the United States or imports into the United States what is covered by a patent claim without the patent owner's permission.

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed.  To determine if there is infringement, you must compare the asserted patent claims (using the definitions for certain claim terms that I have given you), to the accused products and determine whether or not there is infringement.

You should not compare the accused products or methods with any specific example set out in the patent, because it is the language of the claims that defines the invention covered by the patent.

You must reach your decision as to each asserted -- assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by all of the parties.

The issue of infringement is assessed on a claim-by-claim basis.  Therefore, there may be infringement as to one claim but no infringement as to another claim in the patent.

1          In this case, there are two possible ways that a

2     claim may be infringed.   I will explain the requirements for

3     each of these two types of infringement to you.   The two

4     types of infringement are called "direct infringement" and

5     "indirect infringement."   Indirect infringement can occur in

6     the form of active inducement.   I will discuss active

7     inducement more fully in a moment.

8          In order to prove infringement for any particular

9     claim, CCE must prove that the requirements for either of

10    these types of infringement are met by a preponderance of the

11    evidence.

12         Direct infringement occurs when the party accused

13    of infringement itself makes, uses, or offers to sell, sells

14    in the United States or imports into the United States what

15    is covered by one or more claims of a patent without the

16    patent owner's permission.

17         To determine direct infringement for each asserted

18    patent claim, you must compare Apple's accused products with

19    each and every one of the requirements of that claim, using

20    my instructions as to the meaning of the patent claims.   A

21    person may directly infringe a patent even though in good

22    faith it believes what it is doing is not an infringement of

23    any patent and even if the person did not know of the patent.

24         Direct infringement does not require proof that the

25    person copied a product or the patent.

1          Asserted Claims 12, 20, and 24 are apparatus

2    claims.  If the accused product does not contain one or more

3    of the limitations recited in a claim, then the product does

4    not directly infringe that claim.

5          If you find that the accused product includes each

6    element or limitation of the claim, then that product

7    infringes the claim even if such product contains additional

8    elements that are not recited in the claim.

9          Asserted Claims 4 and 10 cover methods.  To

10   determine infringement of a method claim, you must determine

11   whether the accused product performs each of the steps

12   recited by the method claim.

13         Where more than one actor is involved in practicing

14   the steps of a method claim, direct infringement can also be

15   found when an alleged -- when an alleged infringer controls

16   each of the steps and/or conditions participation in an

17   activity or receipt of a benefit upon performance of a step

18   or steps of a patented method and establishes the manner or

19   timing of that performance.

20         In deciding whether the actions of others (such as

21   the end users of Apple's products) are attributable to Apple,

22   you should consider the totality of the circumstances,

23   including whether Apple controls the method or manner in

24   which the method steps are carried out, or whether Apple

25   conditions the receipt of any benefit on the end user's

1    performance of the method steps.

2         Offering a product, system, or service does not

3    itself infringe a method claim.  In order for a method claim

4    to be directly infringed, CCE must prove that each step of

5    the method is actually performed.  The fact that a product or

6    service is capable of an infringing use is insufficient to

7    show infringement of a method claim.

8         Infringement requires performance of each step of

9    the claim.  If a recited step is not performed, then the

10   claim is not infringed.

11        As I have previously explained, Claim 12 of the

12   '820 patent includes a claim element that has been defined as

13   a means-plus-function element or requirement.  In your

14   notebook, I have instructed you about the meaning of this

15   claim element, explaining, first, the function that the

16   means-plus-function claim element performs and second, the

17   structure or set of structures disclosed in the patent

18   specification that corresponds to the means-plus-function

19   element.

20        To establish direct infringement of a

21   means-plus-function requirement of a claim, CCE must prove

22   two things:  That the accused device employs a structure or

23   set of structures identical or equivalent to the structure

24   described in the patent; and that the relevant structure or

25   set of structures in the accused device performs the

1    identical function specified in the claim.

2            Where the structure in the accused device and the

3    structure disclosed in the patent specification are not

4    identical, CCE has the burden of proving that it is more

5    probable than not that the relevant structure in the accused

6    device is equivalent to the disclosed structure in the

7    patent, as I have defined it for you.

8            Two structures are equivalent if a person of

9    ordinary skill in the art would consider the differences

10   between them to be insubstantial at the time the patent was

11   issued.

12           One way to determine this is to look at whether or

13   not the accused structure performs the identical function in

14   substantially the same way to achieve substantially the same

15   result.

16           Another way is to consider whether people of

17   ordinary skill in the art would have known that the structure

18   of the accused product and the structure in the patent were

19   interchangeable at the time the patent issued.

20           If the product does not perform the specific

21   function recited in the means-plus-function claim element,

22   the element is not met, and the product does not literally

23   infringe the claim.

24           In addition, if the accused product's structures

25   perform the function recited in the claim element but those

structures of the accused product are neither identical nor "equivalent" to the structures I identified for you in the jury notebook, then the product does not literally infringe the claim.

CCE also alleges that Apple is liable for infringement by actively inducing others to directly infringe the asserted claims.  As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis.

To show active induce -- to show induced infringement, CCE must prove by a preponderance of the evidence that customers or end users of Apple have directly infringed the asserted patent claims and that Apple had actively, and knowingly aided and abetted that direct infringement.  Apple is liable for active inducement of a claim only if:

Apple took action during the time the patent is in force which encourages acts by someone else;
The encouraged acts constitute direct infringement of that claim;

Apple was -- (a) was aware of the patent and knew that the encouraged acts constitute infringement of the patent; or (b) was willfully blind to the infringement of the patent.

Willful blindness requires that Apple subjectively

1   believed that there was a high probability that the

2   encouraged acts constituted infringement of the patent and

3   Apple took deliberate actions to avoid learning of the

4   infringement;

5        Apple had the specific intent to encourage

6   infringement by someone else; and

7        The encouraged acts are actually carried out by

8   someone else.

9        In order to prove active inducement, CCE must prove

10   that each of the above requirements is met by a preponderance

11   of the evidence, that it is more likely true than not that

12   each of the above requirements has been met.

13        In considering whether Apple has induced

14   infringement by others, you may consider all the

15   circumstances, including whether or not Apple knew of the

16   patent or was willfully blind to the patent when designing

17   and manufacturing its products and whether or not it removed

18   or diminished the alleged -- allegedly infringing features.

19   Apple cannot be liable for inducing infringement if it

20   reasonably believed that its actions or any -- that its

21   actions or any alleged direct infringer's actions did not

22   infringe the asserted claims.

23        Evidence of active steps taken to encourage direct

24   infringement, such as advertising an infringing use or

25   instructing how to engage in an infringing use, may be

considered in light of all the circumstances in determining whether Apple had specific intent to cause others to infringe.

In order to establish active inducement of infringement, it is not sufficient that Apple was aware of the acts that allegedly constitute the direct infringement; rather, you must find that Apple specifically intended to cause the acts that constitute the direct infringement and must have known or was willfully blind to the action -- that the action would cause the direct infringement.

If you do not find that the accused infringer meets these specific intent requirements by a preponderance of the evidence, then you must find that the accused infringer has not actively induced the alleged infringement.

In this case, CCE contends that Apple willfully infringed the '820 patent.  To prove willful infringement, CCE must first prove by a preponderance of the evidence that Apple infringed a valid claim of the '820 patent.  The requirements for proving such infringement were discussed in my prior instructions.

If you decide that Apple has infringed one or more of the asserted claims, you must next address the additional issue of whether or not that infringement was willful.

To prove willful infringement, CCE must prove by a preponderance of the evidence that Apple had knowledge of the

'820 patent and that its conduct was willful, wanton, malicious, bad faith, deliberate, consciously wrongful, or flagrant.

You must base your verdict on the knowledge and actions of Apple at the time the infringement occurred. Infringement alone is not enough to prove willfulness and mere knowledge of the '820 patent at the time of infringement is not enough to prove willfulness.

You should consider all of the circumstances including the motive or intent of Apple in developing and/or selling the accused products.  If you decide that any infringement was willful, that decision should not affect any damage award you give for infringement.

I will now instruct you on the specific rules you must follow to determine whether Apple has proven that the asserted claims of the '820 patent are invalid.

Patent invalidity is a defense to patent infringement.  Apple has challenged the validity of the asserted patent claims.  For a patent to be valid, the invention claimed in the patent must be new, useful, and not obvious.

A patent cannot take away from people their right to use what was known or what would have been obvious when the invention was made based on the prior art.  In addition, the patent must comply with certain statutory requirements

1    for patentability.  Apple has challenged the validity of the

2    claims of the '820 patent on a number of grounds.

3          Apple must prove that a patent claim is invalid by

4    clear and convincing evidence.  An issued patent is accorded

5    a presumption of validity based on the presumption that the

6    United States Patent and Trademark Office acted correctly in

7    issuing a patent.

8          Even though the Patent Office examiner has allowed

9    the claims of a patent, you have the ultimate responsibility

10   for deciding whether the claims of the patent are valid.

11         In deciding the issue of invalidity based on a

12   prior art reference or other information, you may take into

13   account whether the prior art or other information was, or

14   was not, previously considered by the Patent Office when it

15   examined the '820 patent but only if Apple showed that the

16   art or other information not considered by the Patent Office

17   was more relevant than the art or other information that was

18   considered by the Patent Office.  You may decide how much

19   weight to assign to this fact based on the totality of the

20   evidence and circumstances.

21         I will now explain to you Apple's grounds for

22   invalidity in detail.  In making your determination as to

23   invalidity, you should consider each claim separately.

24   In this case, Apple contends that the asserted claims of the

25   '820 patent are invalid as obvious.

1          A patent claim is invalid if the claimed invention

2    would have been obvious to a person of ordinary skill in the

3    field of the invention at the time the application was filed,

4    even if all of the requirements of the claim cannot be found

5    in a single prior art reference.

6          Even though an invention may not have been

7    identically disclosed or described before it was made by an

8    inventor, in order to be patentable, the invention must also

9    not have been obvious to a person of ordinary skill in the

10   field of the technology of the patent at the time the

11   invention was made.

12         Apple may establish that a patent claim is invalid

13   by showing, by clear and convincing evidence, that the

14   claimed invention would have been obvious to a person having

15   ordinary skill in the art at the time the invention was made

16   in the field of communication networks.

17         In determining whether a claimed invention is

18   obvious, you must consider the level of ordinary skill in the

19   field of the invention that someone would have had at the

20   time the invention was made, the scope and content of the

21   prior art, and any differences between the prior art and the

22   claimed invention, along with any objective evidence or

23   secondary considerations that shed light on the obviousness

24   or not of the claimed invention.

25         Keep in mind that the existence of each and every

element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on building blocks of prior art.

In considering whether a claimed invention is obvious, you may, but are not required to find obvious if you find that at the time of the claimed invention there was a reason that would have prompted a person having ordinary skill in the field of cellular communication networks to combine the known elements in a way the claimed invention does, taking into account such factors as:

Whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s);

Whether the claimed invention provides an obvious solution to a known problem in a relevant field;

Whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; Whether the prior art teaches away from combining elements in the claimed invention;

Whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions; and

Whether the change resulted from more design incentives or other market forces.

1        To find it rendered the invention obvious, you must

2   find that the prior art provided a reasonable expectation of

3   success.   Obvious to try is not sufficient in unpredictable

4   technologies.

5        In determining whether the claimed invention was

6   obvious, consider each claim separately.

7        In determining whether a person of ordinary skill

8   would combine the prior art references in the combinations

9   that Apple has suggested, it is important to avoid hindsight

10  bias.

11       Whether a patent claim is invalid as obvious must

12  be determined by considering whether a person of ordinary

13  skill in the art would have been motivated to combine the

14  references at the time of the priority date of the invention.

15       In making these assessments, you should take into

16  account any objective evidence (sometimes called "secondary

17  considerations") that may shed light on the obviousness or

18  not of the claimed invention, such as:

19       Whether the invention was commercially successful

20  as a result of the merits of the claimed invention (rather

21  than the result of design needs or market-pressure

22  advertising or similar activities);

23       Whether the invention satisfied a long-felt need;

24       Whether others had tried and failed to make the

25  invention;

1          Whether others invented the invention at roughly

2    the same time;

3          Whether others copied the invention;

4          Whether there were changes or related technologies

5    or market needs contemporaneous with the invention;

6          Whether the invention achieved unexpected results;

7          Whether others in the field praised the invention;

8          Whether persons having ordinary skill in the art of

9    the  invention expressed surprise or disbelief regarding the

10   invention;

11         Whether others sought or obtained rights to the

12   patent from the patent holder; and

13         Whether the inventor proceeded contrary to accepted

14   wisdom in the field.

15         In this case, Apple contends that the '820 patent

16   is invalid because of improper inventorship.  A patent is

17   invalid if it fails to meet the requirements that all of the

18   actual inventors, and only the actual inventors, be named as

19   inventors in the patent.  This is known as the "inventorship"

20   requirement.

21         To be an inventor, one must make a significant

22   contribution to the conception of at least one or more of the

23   claims of the patent even if that claim has not been alleged

24   to be infringed.

25         Whether the contribution is significant is measured

against the scope of the full invention.

The test for conception is whether the alleged inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention.

In other words, conception exists when the idea is so clearly defined in the alleged inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.

If someone only explains to the actual inventors well-known concepts or the current state-of-the-art, he or she is not an inventor.

Merely helping with experimentation by carrying out the inventor's instructions also does not make someone an inventor.

If a person does not contribute to the conception of the invention but merely assists with implementing the invention or reducing it to practice, that person does not qualify as an inventor for the patent.

What is required is some significant contribution to the invention claimed.

A joint invention is simply the product of a collaboration between two or more persons working together to solve the problem addressed.  Persons may be joint or co-inventors even if they do not alone conceive of the entire invention, even if they do not make the same type or amount

of contribution, and even if they do not contribute to the
subject matter of each claim of the patent.

Persons may be joint or co-inventors even though
they do not physically work together, but they must have some
open line of communication during or at approximately the
time of their inventive effort.

Oral testimony regarding inventorship, whether from
the inventor named in the patent or from any person claiming
to be an inventor of the patent, requires corroboration,
which can take many forms, including, for example,
contemporaneous documents, circumstantial evidence about the
inventive process, and oral testimony of someone other than
the alleged inventor.

After a patent is examined and allowed by the
Patent Office, it is presumed that the inventors have been
correctly named on the patent.  To prevail on its
inventorship defense, Apple must prove by clear and
convincing evidence that one or more natural persons, other
than Benoist Sebire, made a significant contribution to the
conception of the invention that led to one or more of the
claims of the '820 patent.

Oral testimony alone is insufficient to prove
Apple's inventorship defense by clear and convincing
evidence.  Instead, corroboration of such oral testimony is
required.  A higher degree of corroboration is required where

the oral testimony is provided by the alleged inventor
himself or herself, or if the oral testimony is provided by
an interested party.

Documentary or physical evidence that is made
contemporaneously with the alleged inventive conception
provides the most reliable corroboration for the oral
testimony on these issues, but corroborating evidence may
only consist of testimony of a witness, other than an alleged
inventor interested party.

If you find that Apple has not corroborated the
oral testimony with other evidence, you are not permitted to
find for Apple on its inventorship defense.

If you find that Apple has infringed any valid
claim of the '820 patent, then you must consider what amount
of damages to award CCE.

I will now instruct you on the measure of damages.

You must determine the amount of money damages to
which CCE is entitled only if you find that Apple has fringed
at least one valid claim of the '820 patent.

By instructing you on damages, I do not suggest
that one or the other party should prevail.  These
instructions are provided to guide you on the calculation of
damages in the event you find the asserted claims of the '820
patent are valid and infringed.

If you have found infringement, then the damages

must be adequate to compensate CCE for Apple's infringement, and it may not be less than a "reasonable royalty."

At the same time, your damages determination must not include additional sums to punish Apple or to set an example.  You may award compensatory damages only for the loss that CCE proved was more likely than not caused by Apple's infringement.

CCE has the burden to establish the amount of its damages by a preponderance of the evidence.  CCE must prove the amount of damages with reasonable certainty by a preponderance of the evidence but need not prove the amount of damages with mathematical precision.  CCE is not entitled to damages that are remote or speculative.  You should award only the amount of damages that CCE establishes by a preponderance of the evidence.

If you find that any asserted claim of the '820 patent is both valid and infringed, then CCE is entitled to damages adequate to compensate for the infringement but not less than a reasonable royalty for any use made of the invention.

A royalty is the money a licensee pays to a patent owner to make, use, or sell the patented invention.  A reasonable royalty is the amount of money a willing patent owner and a willing prospective licensee would have agreed upon at or just before the infringement began.  The parties

1    agree that the earliest date of the hypothetical negotiation

2    between Apple and CCE would have been in 2012.

3         A reasonable royalty is the royalty that would have

4    resulted from an arm's-length negotiation between a willing

5    licensor and a willing licensee.  Unlike a real-world

6    negotiation, in a hypothetical negotiation all parties are

7    presumed to know that the patent is infringed and valid.

8    The reasonable royalty you determine must be a royalty that

9    would have resulted from the hypothetical negotiation and not

10   simply a royalty either party would have preferred.

11        A reasonable royalty can take the form of a running

12   royalty or a fully paid-up, lump-sum royalty.  A running

13   royalty is a fee that is paid for the right to use the patent

14   that is paid for each unit of the infringing product sold.

15        In other words, the licensee pays based on the

16   volume of licensed products it sells.  By contract, a fully

17   paid-up, lump-sum royalty is paid by the accused infringer at

18   the time of the hypothetical negotiation and covers all

19   future infringement.

20        As part of your damages determination, you may

21   consider whether the parties to the hypothetical negotiation

22   would have agreed to a running royalty or a lump-sum royalty.

23        This determination must be made based on the

24   evidence presented at trial.

25        In deciding what is a reasonable royalty that would

have resulted from the hypothetical negotiation, you may consider the factors that the patent owner and the alleged infringer would consider in determining the reasonable royalty at the hypothetical negotiation.

A reasonable royalty award must be based on the incremental value attributable to the claimed invention, and no more.  In determining a reasonable royalty, you should consider all the facts known and available to the parties at the time of the infringement.  You may also consider facts arising after the date of the hypothetical negotiation, to the extent they are of assistance in determining the amount of a reasonable royalty.

Some of the kinds of factors that you should consider in making your determination are:
The royalties received by the patentee for licensing of the patents-in-suit, proving or tending to prove an established royalty;

Royalties paid for other patents comparable to the asserted patents;

The nature and scope of the license, as exclusive or nonexclusive; or as restricted or nonrestricted in terms of territory; or with respect to the parties to whom the product may be sold;

Whether or not the licensor had an established policy and marketing program to maintain its patent

exclusivity by not licensing others to use the inventions or by granting licenses under special conditions designed to preserve that exclusivity;

The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory and the same line of business, or whether they are inventor and promoter;

Whether being able to use the patented invention helps in making sales of other products or services;

The duration of the patent and the term of the license;

The profitability of the patented invention and whether or not it is commercially successful or popular;

The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention;

The extent of the licensee's use of the patented invention and any evidence probative of value of that use; The portion of the profit or the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions;

The portion of the profits that is due to the patented invention as compared to the portion of the profit due to other factors, such as unpatented elements or unpatented manufacturing processes or features or improvements developed by the licensee;

Expert opinions as to what would be a reasonable royalty;

The amount that a licensor and a licensee would have agreed upon if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which an accused infringer would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a patent owner if it would have been willing to create a license.

No one factor is dispositive and you can and should consider any evidence that has been presented to you in this case on each of the factors.  The framework which you should use in determining a reasonable royalty is a hypothetical negotiation between normally prudent businesspeople.

You have heard evidence in this case that the asserted patent is a standard essential patent; that is, the LTE standard cannot be practiced without the infringing patent.

If you agree that the patent is essential to the LTE standard, you must ensure that your damages award

reflects only the value of the patented invention and not the additional value that resulted from the patent's inclusion in the LTE standard.

In other words, you may not consider the success of the LTE standard itself in determining a reasonable royalty for the patent-in-suit.

In considering a reasonable royalty, you may also consider whether or not Apple had a commercially acceptable non-infringing alternative to taking a license from the patent holder and whether that would have affected the reasonable royalty the parties would have agreed upon.

When determining a royalty, you should consider whether the patent is essential to the standard and required to be licensed on fair, reasonable, and non-discriminatory terms (also called FRAND terms).  The parties dispute whether or not the '820 patent is essential to the standard.

By referring to standard essential patents, the Court is not instructing you that the '820 patent is actually essential to any standard.  Again, it is up to you, the jury, to decide whether or not the patent is standard essential.

When dealing with standard essential patents, there are two special apportionment issues that arise.

First, the patented feature must be apportioned from all of the unpatented features reflected in the standard.

1          Second, the patentee's royalty must be premised on

2     the value of the patented feature, not any value added by the

3     standard's adoption of the patented technology.

4          These steps are necessary to ensure that the

5     royalty award is based upon the incremental value that the

6     patented invention adds to the product, not any value added

7     by the standardization of that technology.

8          In other words, the patent holder should only be

9     compensated for the approximate incremental benefit derived

10    from his invention.

11         This is particularly true for standard essential

12    patents.  When a technology is incorporated into a standard,

13    it is typically chosen from among different options.  Once

14    incorporated and widely adopted, that technology is not

15    always -- is not always used because it is the best or the

16    only option; it is used because it is necessary to comply

17    with the standard.

18         In other words, widespread adoption of a standard

19    essential technology is not entirely indicative of the added

20    usefulness of an innovation over the prior art.

21         To ensure that a royalty reflects the incremental

22    value of the patented technology, you must consider the

23    following two factors in setting a royalty:

24         Any royalty for the patented technology must be

25    apportioned from the value of the standard as a whole; and

1    The royalty must be based on the value of the invention, not

2    any value added by the standardization of that invention.

3    In determining the royalty amount, you may consider any

4    evidence of royalty stacking.

5              I have a few remaining instructions for you all but

6    I'm going to leave them after closing -- until after the

7    closing because they pertain to your deliberations.  So what

8    we're going to do at this time, we're going to take a

9    15-minute break.  When you come back, we'll hear the closing

10   argument of the parties.  We'll be in recess.

11             COURT SECURITY OFFICER:  All rise.

12             (Recess.)

13             (Jury out.)

14             THE COURT:  Please be seated.

15             MR. HILL:  Your Honor, I had a couple of issues I

16   wanted to raise right quick with the Court before we get

17   started with the final closing here.

18             THE COURT:  All right.

19             MR. HILL:  Number one is our time division in terms

20   of on the front end.  We're going to use 25 minutes on the

21   front end of our presentation and 20 minutes in the rebuttal.

22             I'll be doing the first half; Mr. Caldwell will be

23   doing the second half.

24             And if I could get a warning when I've used

25   20 minutes, I would appreciate it.  And then Mr. Caldwell

1    would like a warning 5 minutes before the end of time.

2              THE COURT:  That's the same for both of y'all,

3    right?  You both want a 5-minute warning?  Okay.

4              MR. HILL:  That's correct, your Honor.  Yeah.

5    Essentially, we both want a 5-minute warning.

6              THE COURT:  All right.

7              MR. HILL:  The second issue -- or I guess -- let me

8    think what else we had to raise with the Court.  There was

9    one other issue, Your Honor, and this a -- this will be an

10   ambush on you.  I apologize.  I forgot this issue right after

11   I spoke with your law clerk, and it has to do with the

12   sealing of the courtroom for the closing arguments.

13             There are portions of the infringement case and the

14   damages case, which I will have to discuss with the jury,

15   which will involve information covered by the protective

16   order.

17             I'm fine to seal the courtroom before we start.  My

18   concern is fits and starts in the middle of a closing

19   argument, trying to seal and unseal the courtroom.  And, so,

20   to avoid that, Your Honor, I would propose, I think we're

21   just going to have to seal it from the get-go, at least for

22   our presentation.

23             I maybe can get into it to some extent and then

24   stop and seal it, but it wouldn't be much.  And so, again, my

25   fear is the fits and starts that would be involved, so I

1   would ask that we seal it.

2          And the other thing I would ask, though, Your

3   Honor, and I would ask for an order from the Court to this

4   effect, is an order that would exempt Ms. Wagner, our

5   corporate representative, from having to leave the courtroom

6   for the closing arguments.

7          There is nothing that is going to be, frankly,

8   useful to anyone -- though I recognize and respect the terms

9   of the protective order -- that's going to be shown.  You

10  know, there's going to be snippets of code that have been

11  addressed with the jury throughout the case, there are going

12  to be things of that matter, nothing that's going to change

13  the world for anybody or in this way advantage her in any

14  kind of sense.

15         And so I would ask that, despite the terms of the

16  protective order, that the Court order that she be allowed to

17  stay present in the courtroom for the closing arguments.

18         THE COURT:  Response.

19         MR. LUMISH:  Yes, Your Honor.  Doug Lumish for

20  Apple.

21         My first concern is that my client should be able

22  to hear as much of the closing arguments as they can.  And

23  what we just heard was they should be shut out of all of it.

24  I don't think that's appropriate or fair.

25         I don't want to interrupt Mr. Hill's closing any

1    more than I'd like mine interrupted; but, perhaps, there's

2    another way to handle it.

3         What we did with our slides is obscure the things

4    that we thought were highly confidential and subject to the

5    protective order.  We sent them to them last night so they

6    could see that and tell us if they felt otherwise.

7         But if they could take an approach more like that

8    so that my client could stay in the court and watch closing

9    arguments, I think that's more appropriate.  Otherwise, I

10   think we ought to have to do it piecemeal, as much as I hate

11   to say it.

12        MR. HILL:  Your Honor, I can, I think solve his

13   problem about his client's participation.  I've asked that my

14   client, the Court enter an order excusing my client from the

15   protective order for purposes of being present for the

16   closing argument.  I would ask that you extend that same

17   courtesy to Apple.  That would take care of it.

18        If they want to be present, that's fine.  As long

19   as the Court orders it, no third party can complain about it

20   either in a meaningful way.  And so we would ask that the

21   Court enter that order that the parties, their

22   representatives be present throughout the closing argument.

23        They can hear whatever's discussed in the closing

24   argument; and that that is an exception to the protective

25   orders entered in the case.

1     MR. LUMISH:  That works from Apple's perspective,

2  Your Honor.  Of course, there's source code in this case that

3  comes from Qualcomm.  We can't speak for them.  So -- but as

4  far as Apple's confidential information goes, we're fine with

5  that, as long as our client can stay as much as theirs.

6     MR. HILL:  Great news about being the Judge, Your

7  Honor, is you can speak for them.  And so we'd ask that you

8  enter an order that takes precedence over the other orders

9  you've entered in this case with regard to the production of

10  information that allows the closing arguments to go on

11  without interruption.

12     THE COURT:  What are the parameters that the

13  protective order require people can view it to do, with

14  regard what they know about the confidential information?

15     MR. HILL:  Are you speaking in terms of prosecution

16  bars or things of that sort?

17     THE COURT:  Yeah.  Well, what I'm speaking of is

18  there some additional language I can put in the order that

19  would give Qualcomm some comfort about what maybe one sees

20  today and what they could do down the road with what they

21  see.

22     MR. HILL:  Well, the Court, I think, could

23  certainly order that the parties can stay in the courtroom;

24  however, they cannot use or repeat or make any use of any of

25  the information that they may see or hear other than for the

1   purpose of observing these cross -- or these closing

2   arguments.

3           That would at least give them some modicum of

4   protection; that if they believe someone is out there in the

5   world using that information in some way, which again,

6   considering the small pinhole of information they're going to

7   see in this closing, I think it's unlikely.  But it would

8   give that party the ability to come back to the Court and ask

9   to enforce the order.

10          MR. LUMISH:  That's acceptable to me, Your Honor.

11          THE COURT:  All right.  All right.  Then --

12          MR. HILL:  And, Your Honor, I had one other issue,

13  and I, for the life me, can't think of it.  I'm hoping that

14  maybe the Court can help me with that if you were told in

15  advance.

16          THE COURT:  I was only told about the time

17  warnings.

18          MR. HILL:  Time split, warnings, I think that is

19  it, Your Honor.  I think we've covered it.

20          THE COURT:  Okay.  So I'm going to order this so

21  that we don't have to unseal and seal the courtroom:  We

22  will -- we will seal it, and I will exempt both clients from

23  that requirement and order those clients not to make any use

24  of, repeat anything that they see, or in any way otherwise

25  use the information beyond viewing it today as part of the

1    closing argument.

2           I don't really like sealing the courtroom during

3    closing arguments, but I'm -- I'm believing the

4    representation that it will be a good chunk of what you're

5    going to deal with in closing.

6           MR. HILL:  Well, Your Honor, the problem is, is

7    because of the way the information invades the liability side

8    of the case and then also the damages side of the case.  You

9    would have multiple -- you would have two or three fits and

10   starts in between.

11          I recognize what Mr. Lumish suggests about

12   obscuring things from the jury.  I won't tell him how to, you

13   know, practice his trial techniques, but I have a strong

14   reservation about suggesting to a jury that I'm holding

15   information from their view during closing argument.  So

16   that's why I have a problem with the obscuring suggestion.

17          MR. LUMISH:  Well, in fact, Your Honor, if I may,

18   I'm asking to have all of the things that obscure my slides

19   removed now because if the courtroom is going to be clear --

20   going to be sealed, then I'd like to be able to show the jury

21   the evidence directly.

22          MR. HILL:  And, Your Honor, if those are slides or

23   materials that have been used previously in the case and the

24   jury has already seen, we have no objection.

25          THE COURT:  Okay.  All right.  Then we're going to

1    seal the courtroom with the exceptions and as ordered by the

2    Court, noting you-all may stay, the clients.

3            Let's seal the courtroom at this time.  If you're

4    not covered by the protective order, I'm going to ask you to

5    leave, and then we'll bring in the jury.

6            (Courtroom sealed.)

7            (This portion of the transcript is sealed and filed

8            under separate cover as Sealed Portion No. 19.)

9            (Courtroom unsealed.)

10           THE COURT:  All right.  Ladies and Gentlemen of the

11   Jury, I've got just a few more instructions regarding

12   deliberations, and then you will recess to the jury room.

13           You must perform your duties as jurors without bias

14   or prejudice as to any party.  The law does not permit you to

15   be controlled by sympathy, prejudice, or public opinion.  All

16   parties expect that you will carefully and impartially

17   consider all the evidence, follow the law as it is now being

18   given to you, and reach a just verdict, regardless of the

19   consequences.

20           You should consider and decide this case as a

21   dispute between persons of equal standing in the community,

22   of equal worth, and holding the same or similar stations in

23   life.  A corporation is entitled to the same fair trial as a

24   private individual.  All persons, including corporations, and

25   other organizations stand equal before the law, regardless of

size or who owns them, and are to be treated as equals.

When you retire to the jury room to deliberate on your verdict, you may take these instructions with you, as well as exhibits which the Court has admitted into evidence.

Select your foreperson and conduct your deliberations.

If you recess during your deliberations, follow all of the instructions that I have given you about your conduct during the trial.

After you have reached your verdict, your foreperson is to fill in your answers to the questions on the verdict form.  Do not reveal your answers until such time as you are discharged, unless otherwise directed by me.  You must never disclose to anyone, not even to me, your numerical division on any question.

Any notes that you have taken during this trial are only aids to your memory.  If your memory should differ from your notes, then you should rely on your memory and not on your notes.  The notes are not evidence.

A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

If you want to communicate with me at any time,

1    please give a written message or question to the court

2    security officer, who will bring it to me.  I will then

3    respond as promptly as possible, either in writing or by

4    having you brought into the courtroom so that I can address

5    you orally.

6         I will always first disclose to the attorneys your

7    question and my response before I answer your question.

8         After you have reached your verdict, you are not

9    required to talk with anyone about the case unless the Court

10   orders otherwise.  You may now retire to the jury room to

11   deliberate.

12        COURT SECURITY OFFICER:  All rise for the jury.

13        (Jury out.)

14        THE COURT:  Please be seated.

15        I wanted to let you know I have some criminal

16   matters that begin at 1:00 o'clock this afternoon, so I'll

17   need to you make room for my criminal attorneys.

18        I also wanted to let you know that it has been a

19   real pleasure to preside over the case.  So thank you for the

20   opportunity.

21        We'll be in recess awaiting the jury's verdict.

22        (Recess taken.)

23        (Jury out.)

24        THE COURT:  I just wanted to let you-all know we

25   had Juror Note No. 1 for the jury; and it is just a request

1    for Exhibit PX-65, which we have verified that they do, in

2    fact, have there.  So we don't need to take any further

3    action, but I wanted to let you know we had an official note,

4    and that was their request.

5             Any questions about that?

6             MR. LUMISH:  Not from Apple, your Honor.

7             MR. HILL:  No, your Honor.

8             THE COURT:  All right.  Thank you.  We'll be in

9    recess awaiting the jury's verdict.

10            (Recess, 1:44 p.m. to 2:32 p.m.)

11            (Jury out.)

12            THE COURT:  We have received Juror Note No. 2,

13   which just says, "Need a dry-erase board!"  So I think they

14   would like a dry-erase board, I suspect also and some

15   dry-erase markers to do some work.

16            Does anybody have one handy?  The Court can

17   probably locate one.  Okay.  If so, I will ask y'all to get

18   it to Ms. Hardwick and Ms. Mayes; and they will get it back

19   to the jury.

20            MR. CALDWELL:  Is it clean?

21            THE COURT:  Yeah.  Let's make sure it doesn't have

22   anything on it or behind it.

23            Any questions?

24            MR. LUMISH:  No, your Honor.

25            MR. HILL:  Thank you, Judge.

1          THE COURT:   Thank you.   We will be in recess

2   awaiting the jury's verdict.

3               (Recess, 2:35 p.m. to 3:43 p.m.)

4               (Jury out.)

5          THE COURT:   The Court has just received Juror Note

6   No. 3, which says:   "We have a verdict."

7          So, we're going to bring in the jury in just a

8   minute.   I would like to remind everyone in the whole room,

9   not just counsel but everyone, that once the verdict is read,

10  I expect there will be no facial expressions, no reactions

11  from behind the gallery, anywhere.   Save that for when we

12  leave the courtroom.

13         I will instruct the jury that they are free to talk

14  to you if you want to, but you should not approach them.

15     But when I go back and talk to them in the room and

16  release them, I'll ask them individually if anyone would like

17  to be contacted or would like to not be contacted.   I will

18  let you know what they say.   All right?

19         Are there any questions before we bring in the

20  jury?

21         MR. LUMISH:   No, your Honor.

22         MR. HILL:   No, your Honor.

23         THE COURT:   All right.   Let's bring in the jury.

24         (Jury in - 3:44 p.m.)

25         THE COURT:   Mr. Foreperson, I understand the jury

1    has reached a verdict.  Is that correct?

2              THE FOREPERSON:  That's correct, your Honor.

3              THE COURT:  If you will please hand that to the

4    court security officer for me.

5              All right.  Ms. Hardwick, if you will read the

6    verdict for me.

7              COURTROOM DEPUTY:  Yes, your Honor.

8              Did CCE prove by a preponderance of the evidence

9    that Apple infringes the following claims of U.S. Patent

10   No. 8,055,820:

11             As to Claim 4, 10, 12, 20, and 24 the answer is

12   "yes" for all.

13             Did Apple prove by clear and convincing evidence

14   that any of the asserted claims of the '820 patent are

15   invalid as obvious?  As to Claim 4, 10, 12, 20, and 24, the

16   answer is "no" as to all.

17             Did Apple prove by clear and convincing evidence

18   that the '820 patent is invalid based on improper

19   inventorship?  The answer is "no."

20             What sum of money, if any, if paid now in cash, do

21   you find that CCE proved by a preponderance of the evidence

22   would fairly and reasonably compensate CCE for any

23   infringement of the '820 patent by Apple?  The answer in

24   dollars and cents is:  "$22,118,216.20."

25             Was this monetary award a running royalty for

1    Apple's infringement through March, 2016, or a lump sum for

2    the life of the patent?  The answer checked is "running

3    royalty through March, 2016."

4         Did CCE prove by a preponderance of the evidence

5    that Apple's infringement was willful?  The answer is "yes."

6         Signed by the Jury Foreperson.

7         THE COURT:  Is there a request to poll the jury?

8         MR. HILL:  Not from the Plaintiff, your Honor.

9         MR. LUMISH:  No, your Honor.

10        THE COURT:  All right.  The verdict will be filed

11   by the clerk of the court.

12        Ladies and Gentlemen of the Jury, thank you again

13   for your service.  Your work is done.  I am about to dismiss

14   you; but before I do, if you will just retire to the jury

15   room for a brief minute, someone will come around and let you

16   go.  But I and the parties thank you for your service.  You

17   are dismissed.

18        (Jury dismissed from the courtroom - 3:47 p.m.)

19        THE COURT:  If you all want to wait until I'm done

20   visiting with the jury and dismiss them to get a list of who

21   would like to be contacted and who would not, feel free to

22   either remain here or close by, and Ms. Mehta will get it to

23   you.

24        All right?  Is there anything further?

25        MR. CALDWELL:  Not from the Plaintiff.

1          MR. HILL:  No, Your Honor.

2          MR. LUMISH:  No, Your Honor.

3          THE COURT:  All right.  Thank you.  We'll be

4     dismissed.

5          (Court adjourned.)

6

7                         CERTIFICATION

8

9          IT IS HEREBY CERTIFIED that the foregoing is a

10    true and correct transcript from the stenographic notes of

11    the proceedings in the above-entitled matter to the best of

12    our abilities.

13

14
      /s/_____
15    CHRISTINA BICKHAM, CRR, RMR          September 14, 2016
      Official Court Reporter
16

17

18    /s/_____
      SHEA SLOAN, CSR, RPR
19    Official Court Reporter

20

21

22

23

24

25